1       IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF LOUISIANA
2
JOHNNY TAYLOR,          C.A. NO.
3                        3:18-cv-01110-SDD-EWD
4           Plaintiff,
5   v.
6   UNION PACIFIC RAILROAD
    COMPANY, INC.,
7
            Defendant.
8
9   *********************************************
10      The deposition of JOHNNY TAYLOR was
11  taken in the offices of J. ARTHUR SMITH, III,
12  ESQ., located at 830 North Street, Baton
13  Rouge, Louisiana  70802, on the 7th day of
14  August, 2019, commencing at 9:56 A.M. and
15  ending at 4:45 P.M.
16
17
18  REPORTED BY:
19      DENISE M. CENTANNI
        CERTIFIED COURT REPORTER
20      REGISTERED PROFESSIONAL REPORTER
21
22
23
24
25

```
 1              A P P E A R A N C E S

 2

 3       SMITH LAW FIRM
         (BY:  J. ARTHUR SMITH, III, ESQ.)
 4       830 North Street
         Baton Rouge, Louisiana  70802
         jasmith@jarthursmith.com
 5

 6            ATTORNEYS FOR THE PLAINTIFF,
              JOHNNY TAYLOR

 7

 8       SEYFARTH SHAW, LLP
         (BY:  LINDA C. SCHOONMAKER, ESQ.)
 9       700 Milam Street, Suite 1400
         Houston, Texas  77002-2812
         lschoonmaker@seyfarth.com
10

11            ATTORNEYS FOR THE DEFENDANT,
              UNION PACIFIC RAILROAD COMPANY

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                I N D E X
 2                                          PAGE
 3   CAPTION . . . . . . . . . . . .          1
 4   APPEARANCES . . . . . . . . . .          2
 5   INDEX . . . . . . . . . . . .            3
 6   STIPULATION . . . . . . . . . .          5
 7
     EXAMINATION BY:
 8
     MS. LINDA C. SCHOONMAKER. . . . . .       6,
 9                                            244
10   MR. J. ARTHUR SMITH . . . . . . .       223,
                                             263
11
     REPORTER'S CERTIFICATE. . . . . .       265
12
     WITNESS'S CERTIFICATE . . . . . . .     266
13
                  E X H I B I T S
14
     NO. 1     Two-page document, cell phone  29
15             records, PLF01004-005
16   NO. 2     Complaint for Damages,         32
               PLF000704-711
17
     NO. 3     Charge of Discrimination       34
18
     NO. 4     Dismissal and Notice of        50
19             Rights, Recommendation for
               Closure
20
     NO. 5     Plaintiff's Response to        64
21             Defendant's First Set of
22             Requests for Production of
               Documents
23   NO. 6     Series of documents produced,  67
               OSHA 1-14
24
     NO. 7     Series of pages; document,    120
25             UP-TAYLOR 1-47
```

EXHIBITS, CONTINUED:                          PAGE

NO. 8      Documents, PLF757, 756, 758,   156
           UP-TAYLOR 174, UP-TAYLOR 175,
           UP-TAYLOR 169, UP-TAYLOR 170,
           UP-TAYLOR 171, UP-TAYLOR 172,
           173, PLF792, UP-TAYLOR 176,
           177, 178, 179, PLF816, PLF807,
           PLF808

NO. 9      1099 for 2018                   201

NO. 10     2018 Form 1099-R                202

NO. 11     PLF00715, performance           205
           commendation

NO. 12     Complaint                       207

```
1              S T I P U L A T I O N

2

3       IT IS STIPULATED AND AGREED by and among

4   counsel for the parties hereto that the

5   deposition of the aforementioned witness is

6   hereby being taken for all purposes allowed

7   pursuant to the Federal Rules of Civil

8   Procedure, in accordance with law, pursuant

9   to notice;

10      That the formalities of reading and

11  signing are specifically not waived;

12      That the formalities of filing, sealing,

13  and certification are specifically waived;

14      That all objections, save those as to

15  the form of the question and the

16  responsiveness of the answer, are hereby

17  reserved until such time as this deposition

18  or any part thereof may be used or sought to

19  be used in evidence.

20      * * * *

21      DENISE M. CENTANNI, Certified Court

22  Reporter, in and for the State of Louisiana,

23  officiated in administering the oath to the

24  witness.

25
```

1      JOHNNY TAYLOR, 14047 West Creek Drive,
2  Gonzales, Louisiana  70737, having first been
3  duly sworn, was examined and testified as
4  follows:
5  EXAMINATION BY MS. SCHOONMAKER:
6      Q.   Good morning, Mr. Taylor.  My name
7  is Linda Schoonmaker.  We've introduced
8  ourselves.
9      A.   Okay.
10     Q.   But I'm going to introduce myself
11 for the record.  I represent your former
12 employer, the Union Pacific Railroad Company.
13 And we've not met before; right?
14     A.   No.
15     Q.   Okay.  Have you ever given a
16 deposition before?
17     A.   No.
18     Q.   Have you ever sued anybody before?
19     A.   No, not that I can recall.  No.  I
20 made a complaint with the EEOC.
21     Q.   Right.
22     A.   Yeah.
23     Q.   Against the Union Pacific?
24     A.   Railroad.
25     Q.   Right.

```
 1        A.   I complained to the EEOC.  And I
 2   made the complaint with OSHA against --
 3        Q.   Right.  Against Union Pacific.
 4        A.   -- Union Pacific Railroad.  But
 5   that's all I can recall.
 6        Q.   Okay.  I know you've had the
 7   opportunity to meet with your lawyers about
 8   this deposition, particularly since this is
 9   your first one; right?
10        A.   Uh-huh.
11        Q.   I'm not going to ask you to tell me
12   anything that they told you in discussions.
13   And if you go to answer a question and it
14   necessarily would involve you telling me
15   something your lawyers said to you or you
16   said to your lawyers, don't do it.  I don't
17   want you to reveal anything you said to them
18   or they said to you.  Okay?
19        A.   Okay.
20        Q.   You need to give verbal answers
21   because the court reporter, while excellent,
22   can only take down verbal answers.  Can't
23   take down "uh-huh" or "uh-uh."  So I need you
24   to give a verbal answer.
25        A.   Okay.
```

```
 1        Q.    And the court reporter, although
 2   excellent, can only take down one of us
 3   talking at a time.  So if you would let me
 4   finish my question before answering -- and
 5   I'll try to do the same -- that will be very
 6   helpful.
 7        A.    Okay.
 8        Q.    Is there any reason you cannot give
 9   truthful and accurate testimony today?
10        A.    There's no reason that I cannot
11   give truthful and accurate testimony today.
12        Q.    Are you taking any medication
13   today?
14        A.    Yes, I am.
15        Q.    What medications are you taking?
16        A.    I'm taking Clonazepam, Trazadone,
17   and also Effexor.
18        Q.    Now, I got the Trazodone and
19   Effexor.  But I didn't get the first one.
20        A.    Clonazepam.  I think it's
21   C-L-O-Z-E-P-A-M (sic).  I might not be
22   pronouncing it right.
23        Q.    Do you know what that medicine is
24   for?
25        A.    Anxiety.
```

```
 1        Q.   And how long have you been taking
 2   Clonazepam?
 3        A.   I've been taking Clonazepam for
 4   approximately -- three months approximately,
 5   estimate.
 6        Q.   And do you know why you take
 7   Trazodone?
 8        A.   I take Trazodone to help me sleep
 9   at night.
10        Q.   How long have you been taking
11   Trazodone?
12        A.   I've been taking Trazodone for a
13   few years now.
14        Q.   Do you know why you take Effexor?
15        A.   I'm taking Effexor for depression,
16   anxiety.
17        Q.   How long have you been taking
18   Effexor?
19        A.   Approximately three months.
20        Q.   It sounds like you started some new
21   meds, Clonazepam and Effexor, just a few
22   months ago.  Did they replace other
23   medication you were taking?
24        A.   No, they did not.
25        Q.   So before that time, you were only
```

1   taking Trazodone?

2       A.   That is correct.

3       Q.   Who prescribed these medications

4   for you?

5       A.   Trazodone was prescribed for -- by

6   Dr. Bodin.  And also, Trazodone was

7   prescribed by Dr. Burl Forgey, the

8   psychiatrist.

9       Q.   Tell me that name.

10      A.   Burl, B-U-R-L, Forgey, F-O-R-G-E-Y.

11      Q.   And who prescribed the Clonazepam

12  and Effexor?

13      A.   Burl Forgey.

14      Q.   Dr. Forgey is a psychiatrist;

15  correct?

16      A.   That is correct.

17      Q.   What kind of doctor is Dr. Bodin?

18      A.   He's my general physician that I

19  see.

20      Q.   When were you born, Mr. Taylor?

21      A.   I was born May 29th, 1970.

22      Q.   Where were you born?

23      A.   I was born in Jackson, Mississippi.

24      Q.   Where did you graduate high school?

25      A.   I graduated high school from

1  Provine High School in Jackson, Mississippi.

2  　　　Q.　　Did you go to college?

3  　　　A.　　Yes, I did.

4  　　　Q.　　Where did you go?

5  　　　A.　　I went to Jackson State University.

6  　　　Q.　　Did you graduate?

7  　　　A.　　Yes.

8  　　　Q.　　What year did you get your degree?

9  　　　A.　　I got my degree in 2002, and a BS

10  in mathematics.  And I got my second BS

11  degree in 2007, which is civil engineering.

12  　　　Q.　　Also from Jackson State?

13  　　　A.　　That is correct.

14  　　　Q.　　After you graduated with your

15  Bachelor of Science degree in 2002, did you

16  go to work?

17  　　　A.　　I went to work for the Mississippi

18  Department of Transportation.

19  　　　Q.　　What did you do there?

20  　　　A.　　I was in charge of rail safety,

21  railroad grade crossings, upgrading railroad

22  grade crossings for the State of Mississippi.

23  　　　Q.　　How long did you stay with

24  Mississippi Department of Transportation?

25  　　　A.　　Five years.

```
 1        Q.   And were you getting your second
 2   bachelor's degree at Jackson State while you
 3   were working for the Mississippi Department
 4   of Transportation?
 5        A.   That is correct.
 6        Q.   When did you leave the Mississippi
 7   Department of Transportation?
 8        A.   It was in July 2007, approximately
 9   around that time.
10        Q.   Why did you leave?
11        A.   To work for the Union Pacific
12   Railroad.
13        Q.   Where did you hire on with the
14   Union Pacific?
15        A.   Well, they hired me.  I was still
16   in Jackson.  So I was traveling back and
17   forth to Omaha.  So I was still staying in
18   Jackson at the time when I worked for the
19   Union Pacific Railroad in their management
20   training program.
21        Q.   Now, I know that the Union Pacific
22   doesn't have track in Jackson.
23        A.   Right.
24        Q.   So where were you working for the
25   Union Pacific in the management training
```

1    program?

2         A.   I was in Omaha.  I worked in Texas.

3    I worked in Louisiana.  And I did some work

4    in Arkansas.

5         Q.   When did you complete the

6    management training program?

7         A.   2008.

8         Q.   Why did you choose to join the

9    Union Pacific?

10        A.   I liked working with trains.  I

11   mean, I like doing railroad work.  I mean,

12   it's fulfilling for me.

13        Q.   Any negative reason why you had to

14   leave Mississippi Department of

15   Transportation?

16        A.   No.

17        Q.   So once you completed the

18   management training program, where was your

19   first job with Union Pacific?  Where were you

20   located?

21        A.   I was located in Livonia.

22        Q.   At the Livonia Service Unit?

23        A.   The service unit, yeah.

24        Q.   When did you start working at the

25   Livonia Service Unit?

```
 1        A.   It was in 2008.
 2        Q.   What was your job title when you
 3   started working --
 4        A.   I still --
 5        Q.   Wait.  Wait.  You have to let me
 6   finish.  Okay?  That's really -- I know
 7   you're a little anxious to get out the
 8   answers, but let me finish the question
 9   first.
10             What was your first job at the
11   Livonia Service Unit?
12        A.   I still was an engineer associate.
13        Q.   How long did you stay in Livonia?
14        A.   Approximately six to seven months,
15   approximately.
16        Q.   Where did you go next?
17        A.   I went to Lufkin, Texas.
18        Q.   What was your job there?
19        A.   Then they made me Assistant Manager
20   of Track.
21        Q.   The assistant MTM?
22        A.   Yeah.  Assistant MTM, yes.
23        Q.   Who did you report up to in Lufkin?
24        A.   Jerry Hammerson (presumed
25   spelling).
```

1      Q.   And how long did you stay in
2  Lufkin?
3      A.   Approximately six months, five to
4  six months.
5      Q.   Did you get promoted while you were
6  in Lufkin?
7      A.   In Lufkin, I got a call from a
8  Butch Miller at the time to go to Odessa,
9  Texas.
10     Q.   Did you get a promotion to go to
11 Odessa?
12     A.   Not at first.  I was in Odessa six
13 months before they actually made me the MTM
14 for the Toyah sub in Odessa, Texas.
15     Q.   So you went from Lufkin to Odessa
16 as an assistant MTM?
17     A.   Right.
18     Q.   Then about six months into your
19 tour in Odessa, you got promoted to MTM?
20     A.   That is correct.
21     Q.   Where did you go next?
22     A.   After Odessa, Texas, they sent me
23 to the Livonia sub in Louisiana as an MTM.
24     Q.   How long did you stay there?
25     A.   I was there for five years.

1    Q.    Where did you go next?

2    A.    I was terminated.

3    Q.    So you finished your career at the

4    Livonia Service Unit; right?

5    A.    That is correct.

6    Q.    And you finished your career as an

7    MTM?

8    A.    That is correct.

9    Q.    When were you terminated?

10   A.    February 27, 2018.

11   Q.    Are you currently working?

12   A.    No, I'm not.

13   Q.    Any reason why?

14   A.    I'm putting in applications for

15   jobs.  I've got acceptance for hire with

16   Walmart, but they haven't called me in yet.

17        I'm taking my certification to

18   become a teacher.  I'm working on trying to

19   be a substitute teacher in the East Baton

20   Rouge Parish.  They haven't finalized my

21   process yet.

22        And I got an interview with Lowe's

23   Friday.  No.  Thursday.  Correction.  It's

24   Thursday.

25   Q.    Have you applied to any of the

```
1    other Class 1 railroads?
2         A.   I applied to KCS.  They did not
3    hire me.
4         Q.   Anybody else?
5         A.   No.
6         Q.   Have you applied to any short
7    lines?
8         A.   No.  I haven't applied to any short
9    lines.
10        Q.   Why not?
11        A.   I don't really know any short lines
12   in the Louisiana area.
13        Q.   So you're not willing to relocate?
14        A.   No.
15        Q.   Not willing?
16        A.   Not willing to relocate, no.
17        Q.   Even though you moved a number of
18   times with Union Pacific?
19        A.   Not at this time I'm not willing to
20   relocate.
21        Q.   Why is that?
22        A.   I'm not willing to relocate at this
23   time because my wife had brain surgery two
24   years ago and she has a doctor that she
25   seeing.
```

```
 1        Q.   In addition to the mental health
 2   issues you are taking medication for, do you
 3   have any other health issues?
 4        A.   The only other medication I'm
 5   taking is for high blood pressure.
 6        Q.   What is that medicine?
 7        A.   Oh, it begin with an "L."  I'm
 8   not -- I can't recall the name.
 9        Q.   Lisinopril?
10        A.   It sounds familiar, yes.
11        Q.   Okay.  Whatever it is, it's for
12   high blood --
13        A.   It's for high blood pressure.
14        Q.   How long have you had blood
15   pressure problems?
16        A.   Approximately five to six years.
17        Q.   So you had blood pressure problems
18   before you lost your job at Union Pacific?
19        A.   Yes.
20        Q.   Okay.  And you were taking
21   Trazodone before you lost your job at Union
22   Pacific; is that right?
23        A.   That is correct.
24        Q.   You told me that one of your
25   treating physicians was a Dr. Bodin; is that
```

1  correct?

2       A.   That is correct.

3       Q.   And he is your general

4  practitioner?

5       A.   Yes.

6       Q.   How long have you been seeing

7  Dr. Bodin?

8       A.   This is a rough estimate.

9       Q.   That's all I need.

10       A.   2014 or '15.  Just a rough

11  estimate.

12       Q.   And he is in Gonzales; is that

13  right?

14       A.   That is correct, yes.

15       Q.   Then you came back to the Livonia

16  sub as an MTM.  Where did you relocate to

17  live?

18       A.   I was staying in Midland, Texas.

19  And I relocated from Midland, Texas, to

20  Gonzales.  I moved to Gonzales.

21       Q.   And have you lived in Gonzales ever

22  since?

23       A.   Yes.

24       Q.   So other than high blood pressure

25  and prescribing Trazodone for sleep, what

1  other kind of medical care has Dr. Bodin

2  given you?

3      A.   Medical care?  You know, he check

4  my prostate, just general --

5      Q.   Routine?

6      A.   Routine.

7      Q.   Any kind of sicknesses or

8  conditions that he's treated you for?

9      A.   No.  Just --

10      Q.   Go ahead.

11      A.   No.  Just routine.

12      Q.   Okay.  Now, you said that Dr. Burl,

13  B-U-R-L, Forgey, F-O-R-G-E-Y, is your

14  psychiatrist; is that right?

15      A.   Yes.  That's his title, yes.

16      Q.   Okay.  Is there something that he

17  is in addition to the psychiatrist?

18      A.   No.

19      Q.   How long have you been seeing

20  Dr. Forgey?

21      A.   So rough estimate, probably three

22  months.

23      Q.   And what led you to go see

24  Dr. Forgey three months ago?

25      A.   I was having problems sleeping.  I

1   was in a deep depression.  I was irritable.
2   I had suicidal thoughts.
3       Q.   Is Dr. Forgey the first
4   psychiatrist you had ever treated with?
5       A.   No.
6       Q.   Who did you treat with with a
7   psychiatrist before Dr. Forgey?
8       A.   Dr. Cary Mack.
9       Q.   Karen Mack?
10      A.   Cary, C-A-R-Y, M-A-C-K.
11      Q.   Is that Ms. Mack or Mr. Mack?
12      A.   Mr. Mack.
13      Q.   Okay.  And he was also -- he also
14  is a psychiatrist?
15      A.   That is correct.
16      Q.   When did you treat with Dr. Cary
17  Mack?
18      A.   2016.
19      Q.   And he's also in Baton Rouge?
20      A.   Yes.
21      Q.   And when did you stop seeing
22  Dr. Cary Mack?
23      A.   I stopped seeing Dr. -- 2000 --
24  well, November, between November and December
25  of 2016.

1      Q.   When did you start seeing him?

2      A.   Oh, start seeing him?

3      Q.   Yeah.  Let's figure that out.  You

4  said --

5      A.   October.  October 2016.

6      Q.   And then you stopped seeing him a

7  month or two later?

8      A.   Yes.

9      Q.   So why did you see Dr. Mack?

10     A.   Union Pacific Railroad instructed

11  me to go see a psychiatrist.

12     Q.   Were you working through the

13  Employee Assistance Program?

14     A.   Yes.

15     Q.   Did Dr. Mack prescribe any

16  medication?

17     A.   No.

18     Q.   Why did you stop seeing Dr. Mack?

19     A.   I stopped seeing Dr. Mack because

20  he said I didn't have a problem at that time.

21     Q.   Other than Dr. Forgey and Dr. Mack,

22  have you seen any other psychiatrists during

23  your adult life?

24     A.   No.

25     Q.   Did you also treat with a David

1  Sepulveda, physician assistant in Gonzales?

2      A.   Yes.   I treated with him.   I never

3  talked to him.   My physician is Dr. Bodin,

4  And he just do my lab work.   So that's why he

5  appeared up on my medical records because he

6  does my lab work.   But my physician is

7  Dr. Bodin.   I can't recall ever talking to

8  Dr. --

9      Q.   So physician assistant David

10  Sepulveda works in Dr. Bodin's office?

11      A.   Correct.

12      Q.   So other than Dr. Bodin,

13  Dr. Forgey, and Dr. Mack, have you treated

14  with any other physicians during the time you

15  were a Union Pacific employee and afterwards?

16      A.   I can't recall any other physicians

17  that I treated with.   I can't recall.   No.   I

18  met with counselors before, but I can't

19  recall any physicians or psychiatrists.

20      Q.   Tell me the names of counselors you

21  met with.

22      A.   I can't recall the name.

23      Q.   What kind of counselors?

24      A.   It was through Union Pacific

25  Railroad, EAP Program.   So you can research

1    it through there.  I used the EAP Program
2    when I used the counselors.
3         Q.   And these would be therapists
4    dealing with mental health issues?
5         A.   They'd be dealing with my crisis in
6    life.  I had issues because my daughter was
7    raped, so I was seeing them.
8         Q.   And I certainly don't want to
9    offend you in any way today or cause you any
10   pain.  But I have to ask these questions
11   because they go to some of the claims you've
12   made in this lawsuit.
13        A.   Okay.
14        Q.   So you've had some life issues?
15        A.   Right.
16        Q.   Your wife has had brain surgery?
17        A.   Yes.
18        Q.   When did she have the brain
19   surgery?
20        A.   It was approximately -- that was
21   about two, two and a half years ago she had
22   brain surgery.
23        Q.   Does she have brain cancer?
24        A.   She has a -- it wasn't cancer when
25   they took the tumor out, her pituitary gland.

1  It wasn't cancer.  But she still had to get

2  regular treatment.

3      Q.  And how is she doing now?

4      A.  She's doing okay now.

5      Q.  How long have y'all been married?

6      A.  Thirty years.

7      Q.  And how many kids do y'all have

8  together?

9      A.  Together, we have two.

10      Q.  How old are those kids?

11      A.  My son is 28 and my daughter is 26.

12      Q.  And do you have other children not

13  with this wife?

14      A.  Yes.

15      Q.  How many?

16      A.  One.

17      Q.  And how old?

18      A.  He's 30.

19      Q.  And does your wife have other kids,

20  other than the ones you have together?

21      A.  No.

22      Q.  And I don't need to hear about your

23  daughter's situation.  But there was a sexual

24  assault; right?

25      A.  Right.

```
 1        Q.    Other issues that were going on in
 2   your life aside from that; your wife's brain
 3   surgery; and, of course, later your
 4   termination?
 5        A.    Other issues that was going on
 6   with -- in my life was harassment I was
 7   getting from my managers.
 8        Q.    Okay.  What I mean is outside of
 9   the scope of this lawsuit, did you have any
10   other big life tragedies, challenges?  Your
11   wife had the brain surgery.  Your daughter
12   was sexually assaulted.  Anything else?
13        A.    My grandson.
14        Q.    What happened with your grandson?
15        A.    My grandson mother is on drugs, so
16   she was in and out of drug rehab.
17        Q.    And his mother is not your child;
18   right?
19        A.    Huh?
20        Q.    Is his mother your child?
21        A.    No.
22        Q.    Okay.
23        A.    He's -- my son.
24        Q.    Okay.
25        A.    And I was taking my grandson in for
```

1    periods of a time keeping him.  So I had --
2    well, between five and seven, he was staying
3    with me for like months at a time.  So I had
4    another responsibility of taking care of my
5    grandson.
6        Q.   And what years were those?
7        A.   2015, '16, and some of 2017.
8        Q.   Any other major life issues
9    unrelated to your employment with Union
10   Pacific?
11       A.   I can't recall.  No.  I can't
12   recall any more at this time.
13       Q.   It's been almost a year and a half
14   since you lost your job at Union Pacific;
15   right?
16       A.   Yes, uh-huh.  That is correct.
17       Q.   And you said you started seeing
18   Dr. Forgey three months ago because, in
19   addition to other things, you were having
20   suicidal thoughts; right?
21       A.   That is correct.
22       Q.   Did something happen three months
23   ago that caused you to have suicidal
24   thoughts?
25       A.   No.  Just being a typical male, I

```
1    should have went earlier, but I didn't.  I
2    should have went early because I was
3    suffering from suicidal thoughts from the
4    time I got fired from Union Pacific Railroad.
5            But I didn't go.  I should have,
6    but I did not.  I tried to handle it myself.
7    And it got overbearing and I couldn't take it
8    anymore.
9       Q.   Has Dr. Forgey suggested
10   hospitalization to you?
11      A.   No.
12      Q.   So what is he doing to deal with
13   your suicidal thoughts?
14      A.   He's got me on medications.
15      Q.   Is that helping?
16      A.   Yes.
17      Q.   Are you still having suicidal
18   thoughts?
19      A.   No.
20      Q.   Does your wife work outside the
21   home?
22      A.   Yes.
23      Q.   What is her job?
24      A.   She work at JCPenney's.
25      Q.   What does she do for JCP?
```

1      A.   She's a supervisor for JCPenney.

2      MS. SCHOONMAKER:

3           Mark that as 1, please.

4  BY MS. SCHOONMAKER:

5      Q.   Mr. Taylor, I'd like you to look at

6  what the court reporter has marked as Exhibit

7  1 to your deposition, which is a two-page

8  document produced to us by your lawyer,

9  marked PLF01004 and 005.  Do you see that?

10     A.   Yes, I do.

11     Q.   Can you tell me the significance of

12 this document which appears to be cell phone

13 records?

14     A.   Yes.  This is -- I filed a

15 complaint with the EEO.  And on the 31st is

16 when the EEO contacted me.

17     Q.   When you say the EEO, are you

18 talking about the Equal Employment

19 Opportunity Commission or internal Union

20 Pacific EEO?

21     A.   The internal Union Pacific Railroad

22 EEO.

23     Q.   Okay.  So this is January 31, 12:47

24 P.M.  You called an Omaha number; is that

25 right?

1    A.    Yes.

2    Q.    And was that -- oh, that was an

3    incoming call.  Sorry.  I'm trying to

4    understand this because I wasn't clear.

5         Was this a call from Union Pacific

6    EEO?

7    A.    That is correct.

8    Q.    And then on the second page, March

9    6th at the bottom, it appears to be an

10   incoming call from an Omaha number.  Is that

11   also a call from EEO?

12   A.    That is correct.

13   Q.    And I see a number of other entries

14   for that number.  Is there some dispute about

15   your calling EEO?  Is that why this was

16   produced?  I'm trying to understand the

17   significance of that.

18   A.    Oh, the significance of this?  I

19   filed an EEO complaint on January 22, 2018.

20   On January 31st, Scott McMillan called me and

21   informed me that he was starting the EEO

22   process.

23        Well, as the EEO process was going

24   on, I didn't hear from Scott McMillan.  On

25   February 27, 2018, I was terminated from the

1  company by -- it was by Mark Wheeland and

2  also Kenny Stuart.  They had me -- meet me at

3  the Starbuck in Gonzales.  And he terminated

4  me.

5         So I sent Emails trying to get in

6  contact with Scott McMillan to explain -- ask

7  him was the EEO process over with because I

8  hadn't heard from him at that particular

9  time.

10        And I finally got in contact with

11  Scott McMillan, you see here on the 6th.  And

12  we had an 18-minute phone conversation.  And

13  I was asking him, you know, had the EEO made

14  their decisions about my complaint.

15        And he told me that they was not --

16  he was not finished.  He did not finish an

17  investigation at that time.

18        And he followed up with me on

19  March 23rd, 2018, sent me a letter from the

20  EEO saying that Union Pacific Railroad didn't

21  find any wrongdoing with what they did.

22     Q.   Thank you.  That clears up that

23  mystery for me.

24        Another mystery I had in looking at

25  the documents you produced, I'd like you to

1    look at what the court reporter has marked as

2    Exhibit 2 to your deposition, a lawsuit

3    complaint for damages filed in the Eastern

4    District of Louisiana by Adam Scott against

5    Union Pacific Railroad Company produced by

6    you as PLF00074 (sic) through 711.

7         A.    Okay.

8         Q.    What is the significance of this

9    lawsuit which appears to be a personal injury

10   lawsuit filed against the Union Pacific under

11   the FELA?

12        A.    Yes.  In Ama yard, I inspected that

13   yard and found defects.  And I took the track

14   out of service.  They had a washout on their

15   Ama yard track.  It was a collapsed culvert.

16   And I had my backhoe operator to go fill the

17   hole back in.

18            And I explained to the people that

19   worked for Ama yard that it's their

20   responsibility and they need to maintain

21   their track.  And what happened, the hole

22   came back again.  And the employee fell off

23   in the hole and hurt his leg.

24        Q.    And when you say "the yard," you're

25   saying the Ama?

1      A.    Ama yard.

2      Q.    A-M-A?

3      A.    A-M -- yes.

4      Q.    A-M-A yard.  Okay.

5            Have you had communications with

6    Mr. Scott's lawyer?

7      A.    Yes.

8      Q.    Has the case been tried?

9      A.    I do not know.

10     Q.    Okay.  Have you given deposition

11   testimony in it?

12     A.    I gave an affidavit.

13     Q.    I think this is your first

14   deposition; right?

15     A.    Right.

16     Q.    Okay.

17     A.    Yes.  I did an affidavit, just...

18     Q.    Did you keep a copy?

19     A.    We have a copy.  I have a copy of

20   it.  And we have a copy of them on file.

21     Q.    Okay.  Who's "we"?

22     A.    I gave a copy to my lawyers and

23   everything, so we have a copy on file.

24     Q.    Are you claiming that the Union

25   Pacific in some way retaliated against you

1    for giving that affidavit?

2         A.   No.

3         MR. SMITH:

4              Linda, if you'd like for me to get

5    that for you, I'd be happy to do it.

6         MS. SCHOONMAKER:

7              We can do it at a break.

8         MR. SMITH:

9              Sure.

10        MS. SCHOONMAKER:

11             Thank you.

12        MR. SMITH:

13             I haven't seen it.  But I assume

14   that we have it based on what Mr. Taylor is

15   saying.

16        MS. SCHOONMAKER:

17             Not a concern.  It just cleared up

18   the mystery for me.

19             Let's take a ten-minute break.

20             (OFF RECORD)

21             (RECESS)

22   BY MS. SCHOONMAKER:

23        Q.   Mr. Taylor, I'd like you to look at

24   what the court reporter has marked as Exhibit

25   3 to your deposition, which is a two-page

1 document which is your Charge of

2 Discrimination to the Equal Employment

3 Opportunity Commission, No. 461-2107-00121.

4         Are you familiar with this

5 document?

6     A.   Yes, I am.

7     Q.   And is that your signature at the

8 bottom left corner?

9     A.   That is correct.

10     Q.   And did you sign this document on

11 or about December 19, 2016?

12     A.   That is correct.

13     Q.   This says that you are accusing the

14 Union Pacific of race, retaliation, and age

15 discrimination; is that correct?

16     A.   That is correct.

17     Q.   What is your date of birth?

18     A.   May 29, 1970.  Yeah.  May 29, 1970.

19     Q.   Sorry.  I already asked you that

20 question, didn't I?

21     A.   Okay.  Yeah.

22     Q.   I just wanted to make sure I have

23 that down.

24         Some of the document is

25 handwritten.  Is that your handwriting?

1      A.   That is correct.

2      Q.   The rest, in terms of the

3  particulars, is typed.  Is that based on what

4  you told the Equal Employment Opportunity

5  Commission investigator?

6      A.   Yes.

7      Q.   So this says, "I began my

8  employment with Union Pacific Railroad on

9  September 12, 2007."

10          That's correct; right?

11     A.   Yes.

12     Q.   And it goes on to say, "In April of

13  2016, I was denied a promotion to Director of

14  Track Maintenance"; correct?

15     A.   Yes.

16     Q.   Between September 12th of 2007

17  until April of 2016, is it accurate to say

18  that you felt you were fairly treated at the

19  Union Pacific?

20     A.   Can you repeat the dates again?

21  MS. SCHOONMAKER:

22          Do you want to read that back?

23          (READ-BACK OF REQUESTED MATERIAL)

24  THE WITNESS:

25          Incorrect.

1    BY MS. SCHOONMAKER:

2        Q.    Okay.  So when were you first

3    unfairly treated by the Union Pacific?

4        A.    I was first unfairly treated by the

5    Union Pacific Railroad, 2014.

6        Q.    What happened in 2014?

7        A.    Marcus Begley threatened to fire me

8    for following Robert Faaborg, the FRA

9    inspector, commands for writing up tie

10   defects on Livonia sub.

11       Q.    Was that because of your race?

12       A.    No.  That's not because of my race.

13       Q.    Okay.  And who is Marcus Begley?

14       A.    He was my Director of Track

15   Maintenance at the time.

16       Q.    Anything else happen that you

17   thought was unfair treatment before April of

18   2016?

19       A.    Yes.

20       Q.    What was that?

21       A.    In November of 2016 --

22       Q.    I said before April of 2016.

23       A.    Before April 2016?

24       Q.    (Nods head.)

25       A.    In January of 2016, I reported to

1    the FRA that Union Pacific Railroad had

2    put -- labeled a derailment of track calls

3    instead of human factor calls.  I reported to

4    FRA, Nicholas Roppolo.

5         Q.   Anything else that happened to you

6    as a result of you doing that?

7         A.   Yes.  I was passed up for promotion

8    in January of 2016 by Mark Wheeland for the

9    Director of Manager of Track Project and

10   Director of Track Maintenance.

11        Q.   And you were saying you were passed

12   up by him or he got the job?

13        A.   No.  He did not selected me.  I

14   mean, he -- I put in for the job, but he

15   didn't select me.

16        Q.   Okay.  And who was that?

17        A.   Mark Wheeland.

18        Q.   Anything else that happened before

19   April of 2016 that you believed was unfair

20   treatment by Union Pacific?

21        A.   That's all I can recall at this

22   time.

23        Q.   Okay.  Is it fair to say, though,

24   based on Exhibit 3, that the first time you

25   felt you experienced race discrimination or

1  age discrimination or retaliation

2  discrimination was in April of 2016 when you

3  were denied a promotion?

4      A.   That's correct.

5      Q.   Okay.  Because Exhibit 3 says, "In

6  April 2016, I was denied a promotion to the

7  director of Track Maintenance.  Bryan Shields

8  was selected for the position even though I

9  had more education and/or experience than him

10 because Mr. Shields does not have a college

11 degree."

12       That denial of promotion was the

13 first time that Union Pacific, you thought

14 you received discrimination because of your

15 race, your age, or in retaliation for

16 something?  If you know.

17     MR. SMITH:

18       Well, subject to the prior

19 testimony, he's already testified as to

20 certain facts in that.  So we would object

21 that it's been asked and answered.

22       But including the word

23 "retaliation" at the end, it's kind of

24 overbroad.  Are you talking about race

25 discrimination, or race retaliation, or

1  retaliation for reporting to the FRA?  But I
2  just make my objection for the record.
3          Mr. Taylor, you go ahead and answer
4  the question as best you can.
5  BY MS. SCHOONMAKER:
6      Q.   If you can remember the question at
7  this point.
8          Let me try it again.  I'm trying to
9  understand your EEOC Charge of Discrimination
10 in which you claimed race and age
11 discrimination and retaliation
12 discrimination, not under the Federal Rail
13 Safety Act but under the discrimination laws.
14     A.   Right.
15     Q.   Let's do it this way.  Why do you
16 believe your denial of promotion in April of
17 2016 was based on your race, or your age, or
18 in retaliation for complaining of
19 discrimination?
20     MR. SMITH:
21          Race discrimination?
22     MS. SCHOONMAKER:
23          Well, or age discrimination.
24 BY MS. SCHOONMAKER:
25     Q.   Retaliation discrimination is not

1    retaliation under the first step.  Okay?

2    We'll say retaliation discrimination.

3            Let's work at it this way, because

4    your lawyer is having a struggle with this, I

5    think.  And I just want to get an answer to

6    the question.

7        A.   Okay.

8        Q.   Why do you think the decision was

9    discriminatory?  I mean, other than the fact

10   that you're obviously of a certain age and

11   you're obviously of a certain race, why do

12   you think it was discriminatory?  You thought

13   it was wrong.  You thought it was the wrong

14   choice.

15       A.   The reason I thought it was

16   discriminatory is because everybody that was

17   being promoted was white, white males.

18       Q.   Okay.  Well, is that the only

19   reason, everybody being promoted was white

20   males?

21       A.   Yeah.  They were white males that

22   was -- I felt that I had more qualification

23   than him.

24       Q.   Okay.  But what does your race have

25   to do with that, or your age?

1      A.   Because they was younger than me.

2      Q.   So who got the promotion?  If you

3  want to look at the exhibit, I think it has

4  the answer in it.

5      A.   Mr. Shields got it.

6      Q.   Okay.  How old were you back then?

7      A.   2016?  Forty-nine, 47.

8      Q.   How old was Mr. Shields?

9      A.   I don't know exactly his exact age.

10     Q.   Do you know his about age?

11     A.   No.  I can't recall.

12     Q.   Would it surprise you to know that

13 Mr. Shields was around the same age as you?

14     A.   If he was -- okay.

15     Q.   Would that surprise you?  You were

16 born in 1970; right?

17     A.   Right.

18     Q.   Would it surprise you to know that

19 Mr. Shields was born in 1971?

20     A.   Okay.

21     Q.   So why do you think your age had

22 anything to do with his being chosen for the

23 promotion?

24     A.   Well, let me explain.  Because the

25 EEO document that you got in front of me

1    don't have all the details that I wrote out.

2    It's not detailed where I named several

3    people that I felt that I should have got the

4    position over.  But it's not on here, so I

5    can't recall it.

6              So this is just a general document.

7    I do not have my full EEO document where I

8    wrote out and spelled out everyone that got

9    promoted that I felt like I should have been

10   promoted over them.  Without looking at those

11   documents, I can't fully discuss or talk

12   about it.

13       Q.   But you agree you're complaining

14   that Mr. Shields got selected for the

15   promotion instead of you?

16       A.   Yes.

17       Q.   Okay.  Do you know how many years

18   of experience Mr. Shields had as a

19   railroader?

20       A.   I can't recall at this time.

21       Q.   When did you hire on?

22       A.   2007.

23       Q.   Would it surprise you to know that

24   Mr. Shields got hired on in 2004?

25       A.   Okay.

1          Q.    Would it surprise you?  So you'd

2     agree he had more experience than you did;

3     right?

4          A.    No.

5          Q.    Why is that?

6          A.    Because I worked for the

7     Mississippi Department of Transportation Rail

8     Division.  I had experience working with the

9     railroad.

10          Q.    Right.

11          A.    And working with the -- dealing

12     with tracks and everything.  Because I was

13     going out with the inspector with the

14     Mississippi Department of Transportation Rail

15     Division inspecting tracks in Mississippi,

16     with either North Central, Norfolk Southern.

17               So I felt like that I have 15

18     years' experience because I was still doing

19     it.  That was the reason why Union Pacific

20     Railroad hired me, because I had prior

21     experience inspecting tracks and dealing with

22     tracks.

23               So I'm counting my experience from

24     the Mississippi Department of Transportation,

25     which was five years, plus my experience at

1  that time working with the railroad.  It

2  should put me approximately about the same

3  amount of years of Bryan Shields.

4      Q.   So if you have so much experience

5  in the railroad industry, why can't you get

6  hired on by another railroad now?

7      A.   Well, you'll have to ask the other

8  railroad why I'm not getting hired.  I can

9  only do -- put in applications.  And one of

10  the reasons is I'm telling the railroads that

11  I was terminated from Union Pacific Railroad.

12         And I do not have any reference.  I

13  can't go to Kenny Stuart and get a reference.

14  I can't go to Mark Wheeland and get a

15  reference.  I can't go to Jacob Gilsdorf to

16  get a reference.  All my managers fired me,

17  so I have no reference from Union Pacific

18  Railroad.

19         So if you going from a $95,000 job

20  to another $95,000 job, they want references.

21  And I explained to them that I was terminated

22  because I refused to allow a train to go on

23  an unsafe track.  They asked me what my

24  reason for termination.  That was my reason

25  for termination, and I put it down.

1      I'm not going to lie on my

2   application.  If they asked me was I

3   terminated from a company, I put yes.  And I

4   explain the reason why I was terminated.

5      Q.    But you only applied to the KCS,

6   just one railroad; right?

7      A.    Right.  One railroad.  But all the

8   other jobs I applied for, they asked me if

9   I'm terminated.  I'm putting it down that I

10  was terminated.

11     Q.    Do you understand that the policy

12  of Union Pacific is that they do not give

13  references, good or bad?  Do you understand

14  that?

15     A.    No.

16     Q.    Okay.  You go on to say in your

17  charge of discrimination with the EEOC that

18  Mr. Shields left the Livonia service and the

19  position became opened.  And in September of

20  2016, Mark Oldham was selected for the

21  position.

22          "On September 13, 2016, I filed an

23  EEO complaint with the company on not being

24  promoted."

25          Now, are you saying that you should

1   have been selected instead of Mark Oldham for

2   that position?

3          A.   Yes.

4          Q.   And what is the basis for your

5   belief that you were more qualified than

6   Mr. Oldham?

7          A.   More qualified?  Because I have a

8   civil engineering degree, a degree in

9   mathematics, my education background.  And,

10   plus, I have 15 years' experience, you know,

11   dealing with railroad tracks.

12          Q.   And what do you know about

13   Mr. Oldham's experience?

14          A.   I can't recall without looking at

15   the document.

16          Q.   So what led you to conclude, if you

17   did conclude this, that you didn't get that

18   promotion again because of your race or your

19   age?

20          A.   Let me explain myself.

21          Q.   Please.

22          A.   When I turned this document in to

23   the EEO, I had several names on there.  And

24   without me looking at the other names that I

25   have on there that was promoted, I cannot

1  accurately give you that information because

2  this is just part of my EEO document.  I

3  can't recall all the names that I put down on

4  my full report to the EEOC.

5      Q.   Well, I'm just asking about why you

6  think your race played any factor in the

7  decision to give that job to Mr. Oldham

8  instead of promoting you to it.

9      A.   Because, as I said before, that it

10  was white males getting the job.

11      Q.   Okay.

12      A.   So I'm an African-American male.

13  So that's why I said race.  But if I explain

14  myself again, that, you know, I have to look

15  at the full report because there was several

16  names on here.

17          So that had me basing my whole

18  decision not off the names that you just

19  giving me right now, but it was based off of

20  all the names that I gave to the EEOC at the

21  time.

22      Q.   But I'm just asking you why you say

23  that your race or your age played any role in

24  the decision to give Mark Oldham the job that

25  you wanted.

1     A.   Because he's a white male and I'm

2  an African-American male.  And Union Pacific

3  Railroad was selecting white males.

4     Q.   Do you have any knowledge of how

5  old Mr. Oldham was at that time?

6     A.   Not without looking at the

7  document.

8     Q.   What document would you need to

9  see?

10     A.   I would need to see the document

11  that we got back from the EEOC from Union

12  Pacific Railroad with their response to the

13  EEOC.  I would look at my full EEOC complaint

14  that I turned in to it.  That's what document

15  I would need to see.  Without looking at

16  those documents, I'm kind of handicapped.

17     Q.   Would you agree with me that

18  Mr. Oldham is significantly older than you

19  are?

20     A.   I do not know Mr. Oldham's age.

21     Q.   Would you be surprised to know that

22  at that time he was 59 years old?

23     A.   No.  I mean, I don't know his age.

24     Q.   You went on with a number of other

25  complaints in your Charge of Discrimination

1     to the Equal Employment Opportunity

2     Commission; is that correct?

3          A.   Yes.

4          Q.   Feel free to read it all if you

5     need to.

6          A.   (Reading.)

7          Q.   Is that accurate that you

8     complained about a number of other things in

9     your charge as well?

10         A.   That is correct.

11         Q.   I'd like you to look at what the

12    court reporter has marked as Exhibit 4 to

13    your deposition, which is a two-page

14    document.  It's a little unclear.  Oh, there

15    it goes, PLF00717 through 718.  Do you see

16    that?

17         A.   Yes.

18         Q.   This is a document from the EEOC

19    issuing a determination on the Charge of

20    Discrimination we've just been talking about,

21    Exhibit 3; correct?

22         A.   Yes.

23         Q.   And this says, "The EEOC issues the

24    following determination.  Based on its

25    investigation, the EEOC is unable to conclude

 1    that the information obtained establishes

 2    violations of the statutes.

 3              "This does not certify that the

 4    respondent is in compliance with the

 5    statutes.  No finding is made as to any other

 6    issues that might be construed as having been

 7    raised by this charge."

 8              And that is dated September 21,

 9    2017.  Is that accurate?

10        A.    Yes.

11        Q.    Do you remember receiving this?

12        A.    Yes.

13        Q.    It says that you have to file a

14    lawsuit regarding the issues you raised in

15    the charge within 90 days of your receipt of

16    this notice.  You never filed that lawsuit,

17    did you?

18        A.    No, I did not.

19        Q.    Why not?  If it was upon advice of

20    counsel, don't tell me.

21        MR. SMITH:

22              Yeah.

23    BY MS. SCHOONMAKER:

24        Q.    I just want to know -- okay.  You

25    can't tell me because it was upon advice of

1   counsel.  Fair to say?

2        A.   Uh-huh.

3        Q.   Is that a yes?

4        A.   Yes.  Yes.

5        Q.   Okay.  That's fine.

6             Let's go to the second page.  Right

7   above the signature of investigator, do you

8   see that paragraph that starts out,

9   "Respondent contends that CP," charging

10  party, "applied for promotional positions in

11  July of '16 and September 2016.  Respondent

12  contains (sic) that CP," charging party, "was

13  not more qualified than the person selected.

14            "In both cases, the person selected

15  for the position had more years of experience

16  and more supervisory experience than charging

17  party, and were in the PAG," which is EEOC

18  talk for protected age group.

19            Do you disagree with that

20  statement?

21       A.   Yes.

22       Q.   And what part do you disagree with?

23       A.   I disagree with that because it was

24  more than one person, two people that I said

25  I was discriminated against when I turned it

1  into the EEO.  So I disagree with that

2  statement.

3          It was other positions that they

4  gave positions to, to other people, that I

5  felt I was qualified for.

6      Q.   What about the positions, the two

7  positions that were the subject of the charge

8  in 2016?  Do you agree that the people

9  selected had more years of experience and

10  more supervisory experience than you?

11     A.   No.

12     Q.   Okay.  Do you agree that they were

13  both in the protected age group, meaning of

14  40?

15     A.   Without looking at the age...

16     Q.   Is the answer you don't know?

17     A.   I don't know the answer.

18     Q.   You don't know that Mr. Oldham is

19  much older than you?

20     A.   I don't know his -- I mean, you

21  told me his age, I mean, reading off of it.

22  But, I mean, I have no...

23     Q.   Okay.  Do you think he's younger

24  than you?

25     A.   No.  I don't think he's younger

1    than me.

2        Q.    Okay.  Going back to Exhibit 3,

3    sort of in the middle of the particulars, you

4    say, "On October 4, 2016, I filed an EEO

5    complaint for retaliation with the company

6    and was placed on administrative leave after

7    telling my supervisor, Mark Oldham, I could

8    not finish work that day because earlier that

9    morning I went to the doctor for treatment.

10            "Mr. Oldham told me that if I

11   couldn't by rail with him that day, I wasn't

12   fit to do my job.

13            "On October 5, 2016, I was

14   discharged but the company brought me back on

15   October 21, 2016, because of what happened on

16   October 4, 2016, when I went to the doctor."

17            Can you describe what happened

18   between Mr. Oldham and yourself that involved

19   your being placed on administrative leave?

20       A.    Yes.  I was supposed to go

21   hi-railing with Mr. Oldham.  And he counseled

22   me several times.  And on October the 4th

23   when I went to the office, I went to -- I

24   texted him that morning and told him I was at

25   the doctor.  And then when I went to Livonia

1   on October the 4th --

2         Q.   Hold on.  You need to speak a

3   little more slowly --

4         A.   Okay.

5         Q.   -- because the court reporter --

6         A.   I'm sorry.

7         Q.   -- is going to be --

8         A.   Okay.

9         Q.   -- exhausted by lunchtime.

10        A.   I'm sorry.

11             On October 4th, I texted Mark

12   Oldham in the morning and said that I had a

13   doctor appointment.  I went to my doctor

14   appointment.  And I kept informing Mark

15   Oldham by text message on October the 4th.

16             And when I went into his office, it

17   was later on that afternoon.  I told

18   Mr. Oldham that I'm sick.  I don't feel well,

19   could we plan this hi-rail trip another day.

20             And Mr. Oldham told me when I told

21   him that I was sick, he said that if I cannot

22   perform my job as an MTM, you know, "You need

23   to find another place of employment."

24             So Mr. Oldham sat down and he

25   called -- made a phone call to Mark Wheeland

1    and --

2         Q.   Wheeland?  Mark Wheeland?

3         A.   Mark Wheeland.  Yeah, Mark

4    Wheeland.

5              He came back in the office.  And he

6    told me, you know, to get my laptop computer,

7    you know, and he drove me home.

8              And I asked him what my status with

9    Union Pacific Railroad.  And he told me, you

10   know, "As far as it's concerned, you

11   terminated.  And you can talk to HR."

12             At the particular time, you know,

13   when I was sick, he denied me medical

14   treatment.  He wouldn't let me talk to

15   anybody with the EAP, the nurse or anybody.

16   He drove me home and dropped me off at my

17   house and told me that I was terminated.

18             So on October 5th, I have a phone

19   call from -- it was -- I'm trying to think of

20   the name.  Cameron Thrall.  And he asked me

21   about it.  She was asking me about what was

22   going on.

23             And I told her that, you know, I

24   told him that I wasn't feeling well.  And I

25   told her about the EEO complaint that I made

1  in September to the Union Pacific Railroad

2  EEO and told her I made the complaint to

3  them.

4          And I explained to them what was

5  going on.  And she told me that Chad Wilburn

6  instructed her to put me on EAP.  And she

7  told me Chad Wilburn, you know, wanted me to

8  go see a psychiatrist.

9          So they set up with EAP for me to

10 go see a psychiatrist.  I went and seen the

11 psychiatrist.  It took a week and something

12 to get all the information in.  And that's

13 when I first saw Dr. Cary Mack.

14         I also called the EEO that morning

15 and sent the Email to them explaining to --

16 you know, that they terminated me.  I sent

17 the information in to the EEO, the Email.

18 And I went through the whole process for like

19 a week or so.  And then they finally turned

20 around and brought me back.

21     Q.   Tell me whether or not this is a

22 true statement.  "On or about October 5,

23 2016, charging party" -- that's you --

24 "walked into Mark Oldham's, his supervisor's

25 office, and stated he was too stressed to go

1    out on the track and work."

2            Is that a true statement?

3    A.    No.

4    Q.    Okay.

5            "Mr. Oldman -- Oldham took charging

6    party's concerns seriously.  He immediately

7    contacted his supervisor.  Based upon their

8    conversation and concern, they recommended

9    charging party be evaluated by the Employee

10   Assistance Program.

11           "Charging party was removed from

12   service and placed in administrative leave.

13   He received all pay during this time.  And

14   this does not appear on his personnel

15   record."

16           Now, is that true?  While you were

17   on administrative leave, you received your

18   pay?

19   A.    Right.

20   Q.    Okay.  Did you ever look at your

21   personal record?  Do you know if it's on

22   there that you were off on leave?

23   A.    No.  It's not on my record.

24   Q.    Okay.

25   A.    I didn't see it on my record.

1      Q.   Okay.  Is this when you claim you
2   were terminated?
3      A.   If I came at first on October the
4   4th, he told me it was terminated.  It went
5   to October the 5th when Cameron Thrall called
6   me.  And he said that, you know, I'll be
7   placed on administrative leave.
8            So October the 4th when he took me
9   home, he said I was terminated.  So I'm --
10  that's what he told me on October the 4th.
11  And then October the 5th is when he said that
12  I was on administrative leave.
13     Q.   Right.  So were you?  Have you
14  looked at your personal record?  Does it show
15  you were terminated?
16     A.   No, it does not.  So...
17     Q.   And you got all your pay during
18  this time?
19     A.   I got -- I received all of my pay.
20     Q.   All right.
21          "After he was evaluated, he
22  returned to work."
23          Is that true?
24     A.   Yes.
25     Q.   Did you ever tell Mr. Oldham that

1    you were too stressed to work?

2         A.    No.

3         Q.    When did your wife first have her

4    medical issue?

5         A.    Her first medical issue was around

6    2015, 2016.  Around that area, yes.

7         Q.    Okay.  Was there anything

8    significant going on in your personal life in

9    October 2016 that would be causing you

10   immense stress?

11        A.    No.  I mean, nothing -- I had the

12   regular routine life issues.

13        Q.    And were you taking Trazodone back

14   then?

15        A.    No.  I wasn't taking Trazodone.

16        Q.    So it started afterwards --

17        A.    Yes.

18        Q.    -- taking Trazodone?

19              Were you taking any psychiatric

20   medication --

21        A.    No.  I was not taking any

22   psychiatric medication.

23        Q.    You've got to let me stop talking

24   before you talk.

25        A.    Oh, I'm sorry.  Yes.

```
 1        Q.    The person can only take -- the
 2   person --
 3        A.    Okay.
 4        Q.    Stop talking.  The person can only
 5   take us down one at a time.
 6        A.    Okay.
 7        Q.    Your attorney sent me an audio
 8   recording that you made of a meeting with
 9   Mark Oldham on October 21st, 2016.  Is that
10   when you returned to work from your
11   administrative leave?
12        A.    That is correct.
13        Q.    Did you tell Mr. Oldham that you
14   were tape recording -- or I'm sorry.  That is
15   dating me -- that you were recording the
16   conversation?
17        A.    No, I did not.
18        Q.    Okay.  Did you do it with your
19   phone?
20        A.    Yes.
21        Q.    Why did you choose to record him
22   surreptitiously like that without telling
23   him?
24        MR. SMITH:
25             Objection due to the argumentive
```

```
 1   characterization --
 2   BY MS. SCHOONMAKER:
 3        Q.   Go ahead.
 4        MR. SMITH:
 5             -- of the incident.
 6   BY MS. SCHOONMAKER:
 7        Q.   You can answer.
 8        A.   Why I recorded him?
 9        Q.   Yeah.  You told me you didn't tell
10   him; right?
11        A.   Uh-huh.
12        Q.   That's why I said surreptitiously.
13   Why would you record someone?
14        A.   Because Mark Oldham was giving
15   false information about what I said.  So I
16   recorded him so we'd have a record of
17   actually what I said.  I'd have a record of
18   actually what I said.
19        Q.   Was there anything, to your
20   recollection, significant on that recording
21   that supported your claims here?
22        A.   Yes.  He was talking about my
23   performance.  And what my performance have to
24   do with me being sick?
25             He kept saying that he wanted me to
```

1  do my job.  I was doing my job.  I mean, I

2  have no disciplinary actions on me.  So I

3  couldn't understand why he was talking about

4  my performance because I was sick one day.

5          I attended -- well, the year

6  working with the railroad, that was the first

7  day that I ever took out sick.  So I don't

8  understand what that had to do with my

9  performance.

10     Q.   And I believe that's the only audio

11 recording I received from your lawyer in this

12 lawsuit.  Did you make recordings of other

13 people?

14     A.   Yes.

15     Q.   Did you turn them over to your

16 lawyer?

17     A.   Yes.

18     Q.   How many other recordings are

19 there?

20     A.   I have one recording on the 31st of

21 January with Cliff Bowman and --

22     Q.   What year?

23     A.   2018.

24     Q.   With Cliff?

25     A.   Bowman and Jacob Gilsdorf.

1       Q.   G-I-L-S-D-O-R-F, Jacob.  I didn't
2   get the Cliff part though.
3       A.   Cliff Bowman, the superintendent at
4   the time.
5       Q.   Bowman, B-O-W-M-A-N.  All right.
6       A.   And I --
7       Q.   And that was an audio recording?
8       A.   Yes.
9       Q.   Any other recordings?
10      A.   I have a recording on the 25th of
11  January.
12      Q.   Of what year?
13      A.   Of 2018.
14      Q.   This is another audio recording?
15      A.   Yes.
16      Q.   And what did you record then?
17      A.   Kenny Stuart, Jacob Gilsdorf, and
18  Phillip Hawkins.
19      Q.   Phillip Hawkins?
20      A.   Yes.
21      Q.   Any other recording?
22      A.   No.  That's it.
23      Q.   I'd like you to look at what the
24  court reporter has marked as Exhibit 5 to
25  your deposition, which is your Response to

1    Request for Production of Documents Union

2    Pacific sent to you.

3         A.    Okay.

4         Q.    Have you seen this document before?

5         A.    Yes, I have.

6         Q.    If you look on the second page,

7    Request 3, page 2.  The numbers are at the

8    bottom.

9         A.    Uh-huh.

10        Q.    Request 3, "Any and all tape

11   recordings, voice mails, audio recordings, or

12   transcripts thereof of any individual

13   concerning or recording the facts and

14   circumstances underlying your lawsuit."

15             And the answer was:  "The video

16   recording dated January 23, 2018, and the

17   audio recording dated October 21, 2016, are

18   responsive to this request."

19             What was on the video recording

20   dated January 23, 2018?

21        A.    That would be a train going across

22   the track.

23        Q.    Okay.  That was not a recording --

24        A.    No.

25        Q.    Wait.  Let me finish the question.

1      A.    Uh-huh.

2      Q.    That was not a recording of a

3  conversation; correct?

4      A.    No.

5      Q.    No, that's not correct?  Yes,

6  that's correct?

7      A.    Yes, that's correct.

8      Q.    And what was the point of the video

9  of the train crossing the track?

10      A.    It showed the defect that it had on

11  the track.

12      Q.    Okay.  Do you have any knowledge as

13  to why these other two audio recordings you

14  mentioned, the July 31st and the -- I'm

15  sorry -- January 31 and January 25th, 2018,

16  recordings are not listed on this answer?

17      A.    Do I have any knowledge?  No.

18      Q.    Okay.  But you reviewed these

19  before they were submitted to Union Pacific?

20      A.    I looked at them, yes.

21      Q.    Okay.  Other than the two tape

22  recording -- the two audio recordings that

23  you mentioned to me and the audio recording

24  for October 21, 2016, is it correct you have

25  no other audio recordings of Union Pacific

1    employees?

2        A.   No.  I have no others.

3        Q.   I'd like you to look at what the

4    court reporter has marked as Exhibit 6 to

5    your deposition.

6        A.   Okay.

7        Q.   Have you seen Exhibit 6 before,

8    Mr. Taylor?

9        A.   Yes.

10       Q.   Exhibit 6 is a series of documents

11   produced by your attorneys labeled OSHA 1

12   through 14.  Is it fair to say this is your

13   complaint to OSHA regarding a violation or

14   violations by the Union Pacific of the

15   Federal Rail Safety Act whistleblower

16   provisions?

17       A.   Yes.

18       Q.   And for purposes of this

19   deposition, is it okay with you if we just

20   call it the FRSA, the F-R-S-A, all caps, the

21   FRSA, instead of saying Federal Rail Safety

22   Act?  Can I just refer to it as FRSA

23   whistleblower?

24       A.   Yes.

25       Q.   And I was spelling it out for the

1    court reporter so she'd know how to

2    transcribe it.  Okay?

3         A.   All right.

4         Q.   All right.  This is dated May 30th,

5    2018; is that correct?

6         A.   Yes.

7         Q.   Is this your first and only

8    complaint to the OSHA accusing Union Pacific

9    of violating the FRSA whistleblower

10   provisions?

11        A.   No.

12        Q.   What was your prior complaint to

13   OSHA?

14        A.   My prior complaint to OSHA was what

15   happened on October 4th with Mark Wheeland.

16        Q.   Okay.

17        A.   Excuse me.  Let me correct myself.

18   That's Mark Oldham.

19        Q.   And that's back in 2016?

20        A.   '16.  That is correct.

21        Q.   And did you make a FRSA

22   whistleblower complaint against the Union

23   Pacific back in October of 2016?

24        A.   Yes.

25        Q.   And did you make it with OSHA?

1      A.    Yes.

2      Q.    Do you have a copy of that

3  complaint?

4      A.    They included it in the discovery,

5  yes.

6      Q.    And what was the outcome of that

7  complaint?

8      A.    When I talked to OSHA, he asked me

9  did I want to proceed further with it.  And I

10  told them no because they brought me back to

11  work.

12      Q.    Did you withdraw your complaint?

13      A.    I withdrew my complaint.

14      Q.    Had you ever, before October of

15  '16, made a complaint with OSHA accusing

16  Union Pacific of violating the FRSA

17  whistleblower provisions?

18      A.    No.

19      Q.    Between October of 2016 and

20  May 30th of 2018, did you make any other

21  complaints to the OSHA accusing Union Pacific

22  of violating the FRSA whistleblower

23  provisions?

24      A.    Can you repeat the dates again?

25      Q.    Between -- after the complaint you

1    made and withdrew back in October of 2016 --

2        A.    Right.

3        Q.    -- and before May 30th of 2018,

4    which is the date of Exhibit 6, did you file

5    any other OSHA whistleblower complaints

6    against the Union Pacific with the OSHA?

7        A.    No.

8        Q.    And it's fair to say you filed your

9    OSHA whistleblower complaint that is captured

10   in Exhibit 6 after you were terminated by the

11   Union Pacific; right?

12       A.    That is correct.

13       Q.    And you were terminated on

14   February 27, 2018?  Do I have that right?

15       A.    Yes.

16       Q.    Let's turn to page 2 --

17       A.    Okay.

18       Q.    -- of Exhibit 6.

19       A.    Uh-huh.

20       Q.    Under "Factual Background," second

21   paragraph:  "On January 8, 2014, FRA

22   Inspector Robert Faaborg," F-A-A-B-O-R-G,

23   "inspected the tracks at the Union Pacific

24   subdivision in Livonia, Louisiana.

25            "Mr. Faaborg found numerous

1    defects, including areas under a 'slow order'

2    of 40 miles per hour but which could not

3    support a train traveling over ten miles per

4    hour, numerous defective track ties, and

5    areas that did not meet FRA standards.

6              "Mr. Faaborg instructed Mr. Taylor

7    to write up defects for all of the tie

8    clusters, which he did."

9              Now, could you explain just briefly

10   your job duties at that time?  You were the

11   MTM; right?

12        A.   That is correct.

13        Q.   And that stands for Manager of

14   Track Maintenance; right?

15        A.   Yes.

16        Q.   So what were your duties as an MTM?

17        A.   My duties of the MTM is to make

18   sure that Union Pacific Railroad is under

19   compliance with the FRA track standards.

20        Q.   Okay.  Anything else in your

21   duties?

22        A.   My duties as the MTM is to protect

23   the public and the environment.  My duties as

24   the MTM is to ensure that my workers are

25   working safe and abiding by Union Pacific

1   Railroad rules and regulations.

2       Q.    Do you also give direction to the

3   employees who work for you about how to

4   maintain the track?

5       A.    Yes.

6       Q.    Because you are also responsible

7   for the track maintenance issues themselves;

8   right?

9       A.    Right.

10      Q.    So going on to page 3, "On March 6,

11  2014, Mr. Taylor met with his supervisor,

12  John Begley, and Raymond Davis, Director of

13  Track Maintenance, in Donaldsonville,

14  Louisiana."

15          What was Mr. Begley's title at that

16  time?

17      A.    His title was Director of Track

18  Maintenance.

19      Q.    And Mr. Davis was also a DTM; is

20  that correct?

21      A.    No.  He was the Manager of Track

22  Projects.

23      Q.    Okay.  Because this says that you

24  met with your supervisor, Mr. Begley, and

25  Raymond Davis, the DTM.  That's wrong; right?

1      A.   Marcus Begley is a DTM.

2      Q.   Okay.  But this says Raymond Davis

3 is the DTM.  Is that incorrect?

4      A.   No.  Raymond Davis not the DTM.

5 Marcus Begley is the DTM.

6      Q.   Right.  So this is wrong; right?

7 That's what I'm trying to get you to confirm.

8      A.   Yes.  It should be Marcus Begley,

9 DTM.

10     Q.   Okay.  And what is Raymond Davis's

11 title?

12     A.   Manager of Track Projects.

13     Q.   That's what we call an MTP; right?

14     A.   Right.

15     Q.   And that's one of the jobs you

16 wanted to get; right?

17     A.   Right.

18     Q.   What is Mr. Begley's race?

19     A.   He is white.

20     Q.   And what is Mr. Davis's race?

21     A.   He's black.

22     Q.   "Mr. Begley threatened to terminate

23 Mr. Taylor's employment if he reported any

24 additional safety issues regarding tie

25 clusters in tracks under his management."

1      Other than Mr. Davis and Mr. Begley

2  and you, was anyone else present when Mr.

3  Begley allegedly made that threat?

4      A.   No.

5      Q.   "That same day, Mr. Taylor called

6  Mr. Faaborg and informed him of Mr. Begley's

7  threat."

8      Did you record the discussion with

9  Mr. Begley and Mr. Davis that time?

10     A.   No, I did not.

11     Q.   "On November 20, 2015" --

12     A.   Can I explain?

13     Q.   Sure.

14     A.   On March 7, 2014, I received an

15  Email from Robert Faaborg addressing Marcus

16  Begley, re-instructing me about writing no

17  tie defects on the Livonia sub.  And he said,

18  "Per my phone conversation with Johnny."

19  That's what he said in his Email.

20     So he sent the Email.  And Marcus

21  Begley was copied in on it from the FRA.

22  It's dated March 7, 2014.

23     Q.   Okay.  What is the significance of

24  that?

25     A.   The significance of that is because

1  when I made the phone call on March 6, he

2  sent an Email to Marcus Begley and myself

3  telling me that I need to write the defects

4  up --

5       Q.   Okay.

6       A.   -- based off the phone conversation

7  that I called him on March 6.  He said, "Per

8  our phone conversation."

9            And he sent the Email.  And he

10 copied in Marcus Begley so Marcus Begley

11 would know that hey, I am instructing Johnny

12 Taylor to do this, because I told him on the

13 6th that Marcus Begley told me not to do it.

14      Q.   Okay.  And could you go back to

15 talking a little more slowly again?

16      A.   Okay.

17      Q.   The court reporter is going to have

18 a very hard day if you keep it that speed.

19      A.   Okay.

20      Q.   "On November 20, 2015, Mr. Taylor

21 met with several Union Pacific staff."

22           Who were those people?

23      A.   Jamal Chappelle, Marcus Begley, and

24 Bryan Shields.

25      Q.   So is it Marcus Begley, not John

 1   Begley?

 2        A.   John M. Begley.  Yeah, Marcus

 3   Begley.  John M. Begley.

 4        Q.   Anyone in addition to the people

 5   you just named?

 6        A.   No.

 7        Q.   "At this meeting, Mr. Taylor

 8   informed his superiors, including Jamal

 9   Chappelle, that he had made complaints to the

10   FRA against John" -- and that is Marcus

11   Begley?

12        A.   Uh-huh.

13        Q.   -- "due to his March 6, 2014,

14   threat to terminate Mr. Taylor for writing up

15   defects."

16             And why did this suddenly come up

17   on November 20 of 2015?

18        A.   Because Marcus Begley threatened me

19   again.

20        Q.   Okay.  What did Mr. Begley threaten

21   you with?

22        A.   He said I was going to be

23   terminated, you know, for writing up a

24   defect.

25        Q.   Where did he make that threat to

1    you?

2         A.    On the phone.

3         Q.    Anyone else present to hear that

4    threat?

5         A.    It was me -- no, no one present.

6         Q.    Okay.  Do you know what

7    precipitated that threat that was in November

8    of 2015?

9         A.    Yes.  What precipitated that threat

10   was that I had defects that I needed to work

11   on.  It was 30 days, that it about to go

12   overdue.  And I was saying he was trying to

13   take my gang away to move them somewhere

14   else.

15              I said, "Well, how I'm going to

16   finish these defects?"

17              You know, he was saying, "That's

18   not my problem."  You know, that what Marcus

19   Begley said.

20        MR. SMITH:

21              That means slow down.

22        THE WITNESS:

23              Oh, I'm sorry.

24        MR. SMITH:

25              Okay.

BY MS. SCHOONMAKER:

Q.   So where in that did he threaten to fire you?

A.   On the phone.

Q.   And what was he going to fire you for?

A.   Writing up defects.

Q.   Was Marcus Begley still your supervisor at the time you were fired?

A.   No, he was not.

Q.   Okay.  When did he stop being your supervisor?

A.   It was in 2016.  I can't recall the exact months and date.  But it was in 2016.

Q.   Do you know why he stopped being your supervisor?

A.   He retired.

Q.   Exhibit 6 goes on to say, "On December 9, 2015, a train derailment occurred on Track No. 16 in Avondale, Louisiana. After the derailment, FRA Inspector Nicholas Roppolo inspected the track along with an FRA Deputy Regional Administrator, Mr. Taylor, Brad Usea, U-S-E-A, and Nicholas Isaac.

"Mr. Taylor, Mr. Usea, and

1   Mr. Isaac, who were the only persons present

2   who were qualified under 49 C.F.R. Section

3   213.7 to inspect railroad tracks, all agreed

4   that the derailment was caused by 'butted

5   knuckles,' a human factor derailment.

6           "However, Union Pacific falsely

7   reported the derailment as being caused by a

8   'wide gauge,' a 'track caused' derailment.

9           "On January 3, 2016, Mr. Roppolo

10  contacted Mr. Taylor regarding the inaccurate

11  reporting.  Mr. Taylor informed Mr. Roppolo

12  that he did not order that the report list

13  the derailment as 'track caused,' and that

14  the false report was made by someone else

15  without Mr. Taylor's knowledge or consent."

16          Who was that someone else?

17      A.    Tobe Allen.

18      Q.    Who?

19      A.    Tobe Allen.

20      Q.    T-O-B-E?

21      A.    Uh-huh.

22      Q.    Is that a yes?

23      A.    Yes.

24      Q.    And what was Tobe Adam's job at

25  that time?

1      A.    Allen, A-L-L-E-N, Tobe Allen.

2      Q.    What was Mr. Allen's job at that

3  time?

4      A.    His job was Director of Train

5  Operations.

6      Q.    A DTO?

7      A.    DTO.

8      Q.    "On January 12, 2016, Mr. Roppolo

9  contacted Mr. Begley to inform him of the

10  false report and direct that the inaccuracy

11  be corrected.  Mr. Roppolo noted that, during

12  his inspection, nothing indicated that the

13  gauges were wide.

14           "Mr. Roppolo asked whether persons

15  not qualified under Section 213.7 were

16  inspecting railroad tracks and reporting

17  incorrect causes, in light of the fact that

18  the report was contrary to the conclusions of

19  all of the qualified inspectors who were

20  present.

21           "During the first week of

22  February 2016, Mr. Begley called Mr. Taylor

23  and told him that he would 'pay' for his

24  November 20, 2015, comments regarding

25  whistleblower complaints."

1          Did he call you on the phone?

2     A.    Yes.

3     Q.    Did you record that conversation?

4     A.    No, I did not.

5     Q.    Did anyone else hear that

6  conversation?

7     A.    No.

8     Q.    "Mr. Roppolo asked Mr. Taylor if

9  Union Pacific employees received 'push back'

10  from their superiors after reporting unsafe

11  track conditions.  Mr. Taylor answered

12  'yes.'"

13          When in 2016 did Mr. Begley retire?

14     A.    It was in 2016.  I can't recall the

15  exact dates.

16     Q.    It would have been sometime after

17  the first week of February 2016; right?

18     A.    Yes.  Yes.

19     Q.    And it would have been sometime

20  before October 4th, 2016, because that's when

21  Mr. Oldham was your supervisor; right?

22     A.    Correct.

23     Q.    Okay.  Is it correct that

24  Mr. Oldham replaced Mr. Begley in the

25  position?

1    A.    No.

2    Q.    Okay.  What happened?

3    A.    Bryan Shields replaced Mr. Begley.

4    Q.    Okay.  So Mr. Begley retired well

5    before October 4th of 2016 because your boss

6    in October of 2016 was Mr. Oldham; right?

7    A.    That is correct.

8    Q.    So Bryan Shields got the position

9    when Mr. Begley retired; right?

10   A.    Yes.

11   Q.    So that would have been April of

12   '16; right?  According to your Charge of

13   Discrimination, you say in April 2016 you

14   were denied a promotion to the DTM job;

15   right?  You can look at Exhibit 3.

16   A.    No, no, no.  That's April 2016.

17   Q.    And that's when -- then Mr. Begley

18   was the DTM; right?

19   A.    Yes.

20   Q.    Okay.  So we know now that

21   Mr. Begley retired --

22   A.    Uh-huh.

23   Q.    -- around April of 2016?

24   A.    Around that time.

25   Q.    Right.

1      A.    Okay.

2      Q.    And Bryan Shields got that job;

3 right?

4      A.    Yes.

5      Q.    And then shortly thereafter,

6 Mr. Oldham got the job of DTM; correct?

7      A.    Correct.

8      Q.    All right. So how did Mr. Begley,

9 between the first week of February 2016 and

10 his retirement sometime around April of 2016,

11 how did he make you pay for your November 20,

12 2015, comments regarding whistleblower

13 complaints?

14      A.    Can you repeat the question again?

15      Q.    How did Mr. Begley make you pay for

16 your November 20, 2015, whistleblower

17 complaints as you say he threatened you to do

18 so in the first week of February 2016?

19      A.    I was noting that -- that

20 Mr. Marcus -- John M. Begley told me I would

21 pay for making those comments and everything.

22 So I just knowed that he threatened me and

23 said that I would pay for making those

24 comments.

25      Q.    So how did he make you pay before

1    he retired a couple of months later?

2         A.   I didn't say he made me pay.  I

3    said he threatened me.

4         Q.   Okay.

5         A.   Yes.

6         Q.   So he never actually made you pay;

7    he just threatened to make you pay?

8         A.   Right.

9         Q.   "On October 4, 2016, Mr. Taylor was

10   not feeling well when he reported to work.

11   His blood pressure was elevated due to

12   job-related stress."

13             What job-related stress was causing

14   your blood pressure to elevate?

15        A.   The job-related stress would be

16   them threatening me.

17        Q.   Who threatening you?

18        A.   That would be Mark Oldham; Marcus

19   Begley, John M. Begley, during a period of

20   time.  What you had was a culture here and a

21   pattern, you know.  I'm speaking from 2014 up

22   to 2016 --

23        Q.   Again, I'm going to interrupt you.

24        MR. SMITH:

25             Don't interrupt.

BY MS. SCHOONMAKER:

    Q.   Okay.  Go ahead.  I just want to focus you on what my question was.  But if you want to just answer it without answering the question, that's fine.

    MR. SMITH:

        I disagree.

    MS. SCHOONMAKER:

        That's fine.  Go ahead.

    MR. SMITH:

        Don't interrupt him.

BY MS. SCHOONMAKER:

    Q.   Go ahead.

    A.   This come from a month or two of threats throughout my career with Union Pacific Railroad.

    Q.   My question was:  What was causing the elevation of your blood pressure on October 4th, 2016, that was due to job-related stress?

        And are you telling me that things Mr. Begley did to you before he retired six months before then were causing you to have elevated blood pressure on October 4th?

    A.   I'm telling you that at that

1  particular time, the FRA was on its -- we was

2  on FRA compliance.  They put us on an FRA

3  compliance order.

4          So they was coming to my territory

5  periodically because I had a crew or route.

6  So they was on my territory telling me what I

7  need to do about fixing the track.  And my

8  managers kept threatening me about doing what

9  the FRA was telling me to do.

10         As I reported in 2014, 2016, these

11 threats was ongoing.  I did not list every

12 time the manager threatened me.  I did not

13 list it down.  I want to put down some of

14 them, record it.  But I did not list every

15 time that the manager threatened me.

16         So I had the pressure of the FRA,

17 Robert Faaborg, Nick Roppolo come to me.  And

18 I'm riding with the FRA inspectors.  And they

19 telling me, "Johnny, this what you need to

20 do."

21         But I had my managers telling me,

22 "If you do this, Johnny, I'm going to

23 terminate you."

24         So that's where the stress that I

25 was under while I was working with Union

```
 1    Pacific Railroad.  So it was a culture.  It
 2    was apparent.  It's not just one individual
 3    time.  It was several times by different
 4    managers.
 5         Q.   Well, you know, that's not the
 6    explanation that's in Exhibit 6.  It says,
 7    "Mr. Taylor met with his supervisor, Mark
 8    Oldham, and explained that he felt stressed
 9    because he believed he was being denied
10    promotions in retaliation for reporting
11    unsafe conditions to the FRA."
12              Do you see that?
13         A.   Yes.  Can I explain?
14         Q.   Well, let me ask a question.  You
15    answered my question.  I have another one.
16              So before October 4th of 2016, when
17    was the last time you were denied a
18    promotion?  Did you apply for the
19    promotion -- did you apply for the position
20    when Bryan Shields left the DTM job that Mark
21    Oldham got?
22         A.   No.  But let me explain myself.
23         Q.   No, no, no.  Just answer the
24    question.  Okay?
25         MR. SMITH:
```

```
1              He just said no.
2              I thought you had answered the
3      question.
4         MS. SCHOONMAKER:
5              Yeah, yeah.  But he said that --
6         THE WITNESS:
7              I said no, but let me explain
8      myself.
9         MS. SCHOONMAKER:
10             -- "Let me explain."
11             I said, "No.  Just please answer
12     the question."
13        MR. SMITH:
14             Okay.  Can you repeat the question,
15     please, ma'am?
16        MS. SCHOONMAKER:
17             I asked him if he had applied for
18     the job that became open of DTM when Bryan
19     Shields left.  And he said no.
20        THE WITNESS:
21             And I requested to explain myself.
22        MR. SMITH:
23             I'll let you explain.
24        MS. SCHOONMAKER:
25             Later on your lawyer can come back
```

1    and let you explain.

2    BY MS. SCHOONMAKER:

3         Q.   Mr. Oldham became your boss in

4    September of 2016; correct?

5         A.   About that time, yes.

6         Q.   And he replaced Bryan Shields?

7         A.   That is correct.

8         Q.   So the last time you applied for a

9    promotion was in April of 2016; right?

10        A.   That is incorrect.

11        Q.   Okay.  When is the last time you

12   applied for a promotion between April of 2016

13   and September of 2016?

14        A.   July 2016.

15        Q.   Which promotion did you apply for

16   then?

17        A.   I applied for the tie gang.

18        Q.   For the what?

19        A.   Tie gang.

20        Q.   Tie gang?

21        A.   Uh-huh.

22        Q.   Were you denied that promotion as

23   well?

24        A.   Yes.

25        Q.   Did you apply for any other

1    promotions between July 2016 and October 4 of

2    2016?

3         A.    Can you repeat the dates?

4         Q.    July of 2016 and October 4 of 2016.

5         A.    The position that Mark Oldham

6    received, they do not post DTM and MTP

7    positions on the website so I can apply for

8    them.

9              Chief Engineer Mark Wheeland make

10   his decisions.  And I questioned why they do

11   not post those jobs.  They do not post those

12   jobs for Manager of Track Project for the

13   Livonia service, for the sub service unit.

14   And they do not post the job for Director of

15   Track Maintenance.

16              So I couldn't apply for it because

17   they do not post it.  They just assigned the

18   jobs to the individuals.

19        MS. SCHOONMAKER:

20              Objection.  Nonresponsive.

21   BY MS. SCHOONMAKER:

22        Q.    Between July of 2016 and October 4

23   of 2016, did you apply for any other

24   promotions?

25        A.    No, I did not.

1      Q.   Okay.  So which denial of promotion
2  was causing you to have high blood pressure
3  on October 4th, 2016?
4      A.   The nonpromotion with Mark Oldham.
5      Q.   So you didn't get promoted when
6  Mark -- Mark Oldham got promoted in September
7  of 2016; right?
8      A.   Yes.
9      Q.   And that caused your blood pressure
10 to be elevated in October 4th of 2016; right?
11     A.   What caused my blood pressure to be
12 elevated is the stress of them challenging me
13 and threatening me about my job, and also me
14 not being promoted.
15     Q.   Well, that's not what Exhibit 6
16 says.
17     MR. SMITH:
18          Well, I object to the
19 characterization.
20          You've already testified about it.
21     MS. SCHOONMAKER:
22          Objection.  Form.
23 BY MS. SCHOONMAKER:
24     Q.   "Mr. Taylor met with his
25 supervisor, Mark Oldham, and explained that

1   he felt stressed because he believed he was

2   being denied promotions in retaliation for

3   reporting unsafe conditions to the FRA."

4        A.    Uh-huh.

5        Q.    The last time you were denied a

6   promotion was when Mark Oldham got promoted

7   in September of 2016; right?

8        A.    Yes.

9        Q.    Okay.  By October 4 of 2016, how

10  many years had you been taking blood pressure

11  medicine?

12       A.    Maybe one year.

13       Q.    Do you know why you started taking

14  it to begin with?

15       A.    I was going to my doctor.  And he

16  was saying that, you know, by me exercising

17  and everything, that my blood pressure was a

18  little high.  So he prescribed medication for

19  me.

20       Q.    Because you were exercising, your

21  blood pressure --

22       A.    He's saying because my exercising,

23  it wasn't keeping my blood pressure down.  By

24  my eating habits and my exercising.  So he

25  prescribed medication for me to help manage

1    my blood pressure.

2         Q.   Okay.

3              "Mr. Oldham took Mr. Taylor home,

4    stating that Mr. Taylor was either being

5    terminated or placed on unpaid administrative

6    leave."

7              Now, you told Mr. Oldham that you

8    were feeling stressed.  And you told him your

9    blood pressure was up; is that right?

10        A.   I told Mr. Oldham that at that

11   particular time on October 4th, that I wasn't

12   feeling good.

13        Q.   Right.  So what is your complaint

14   that he took you home when you said you

15   weren't feeling good?

16        A.   My complaint was that my blood

17   pressure was elevated and I just came from

18   the doctor.  And I told him I wasn't feeling

19   good and everything.  And that's when he told

20   me that I wasn't fit to do my job.

21        Q.   Do you think it was wrong of him to

22   drive you home when you said you were sick?

23        A.   I think it was wrong of him to not

24   give me medical attention at the time that I

25   was sick.  I think it was wrong for him to

1   drive me home and drop me off without making

2   sure that I had the proper medical attention

3   at the time.

4           I think it was wrong that he didn't

5   contact the nurse and have me talk to the

6   nurse the day that I said I was sick.  I

7   think it was wrong that he didn't let me talk

8   to the EAP that day that I said I was sick.

9           He waited 24, 30 hours later and

10  everything before he helped me get any type

11  of medical help.

12          I think it was wrong that that

13  decision should not be made by Mark Oldham

14  because he's not a medical person.  He should

15  have contact, not his supervisor, because

16  Mark Wheeland is scheduling -- I'm sorry.

17  Mark Wheeland --

18          Slow down?

19      MR. SMITH:

20          Uh-huh.

21      THE WITNESS:

22          Okay.  I'm sorry.  I apologize.  I

23  just talk fast.

24          Mark -- he contacted his

25  supervisor, Mark Wheeland.  But Mark Wheeland

1  is not a medical doctor.  I'm sorry.  Mark

2  Wheeland is not a medical doctor.  And he

3  didn't get me no medical attention that I

4  deserved or what Union Pacific Railroad

5  trained managers to do.

6          The first thing is to look out for

7  the health and welfare of your managers or

8  your employees -- sorry.  And you make sure

9  that they have the proper medical attention.

10         He called me on October 5th, trying

11  to get me medical attention, which was 30 --

12  24 to 30 something hours, I mean, later.

13  BY MS. SCHOONMAKER:

14     Q.    Did you seek medical attention on

15  October 4th, 2016?

16     A.    Yes, I did.  I went to the -- on

17  October the 4th?

18     Q.    Yeah, October the 4th.

19     A.    Yes, I did.  I went to the doctor

20  that morning.

21     Q.    Was that before or after Mr. Oldham

22  took you home?

23     A.    That was before Mr. Oldham took me

24  home.

25     Q.    So you had already seen a doctor

1    that day?

2         A.    Right.

3         Q.    What did the doctor tell you about

4    your medical situation?

5         A.    The doctor said continue to take my

6    medications.

7         Q.    Okay.  So after Mr. Oldham took you

8    home, did you go back to the doctor's?

9         A.    No.  I did not go back to the

10   doctor.

11        Q.    So why did Mr. Oldham need to take

12   you to the doctor?

13        A.    Well, Mr. Oldham need to take me to

14   the doctor because that's Union Pacific

15   Railroad policy is that you call EAP when

16   a -- and you give them some type of medical

17   attention when they have a problem.  That's

18   our policy that we do as managers.  You get

19   some type of medical attention.

20             If he was so concerned about my

21   health, why he didn't need medical attention

22   that particular day?

23        Q.    But you had already seen a doctor;

24   right?

25        A.    Yes, I have seen a doctor.

1      Q.   And you didn't choose to go back

2   later that day to a doctor on your own;

3   right?

4      A.   No, I did not.

5      Q.   Exhibit 6 goes on to say, "On

6   November 1, 2016, during a meeting on the

7   'business car train' between Greg Workman,

8   Chief Engineer of Union Pacific Railroad; and

9   Mark Wheeland; and Chief Engineer of the

10  Southern Region and Mark Oldham, Director of

11  Track Maintenance of Livonia, Louisiana

12  Service Unit, Mr. Workman asked Mr. Taylor if

13  he was 'in bed with the FRA.'.

14          "Mr. Taylor responded that if any

15  individual associated with the FRA were to

16  ask him a question, he would answer

17  honestly."

18          There was a little bit of a typo

19  here.  Mark Wheeland.  It's not "and" Chief

20  of the Southern Region.  It's Mark Wheeland,

21  a Chief Engineer of the Southern Region";

22  right?

23      A.   Yes.

24      Q.   And Mr. Workman, at that time, was

25  the chief engineer of the Union Pacific;

1   right?

2        A.   Yes.

3        Q.   So am I understanding correctly

4   that Mr. Workman, Mr. Wheeland, Mr. Oldham,

5   and you were all together when Mr. Workman

6   allegedly made this comment to you?

7        A.   That is correct.

8        Q.   Okay.  Where were you going on the

9   business train?

10       A.   From Livonia to Avondale.

11       Q.   And why were you using a business

12  train?

13       A.   Every year, Greg Workman take the

14  business train.  He ride across the

15  territory.  MTMs are required to ride the

16  business train.

17       Q.   Right.  So this was Greg Workman

18  connecting with people like you who worked in

19  that particular area?

20       A.   Yes.  You can call it that.

21       Q.   Okay.  Well, what would you call

22  it?

23       A.   I call it he ride across the

24  territory to see the train ride, if it was a

25  smooth train ride and everything.  I call it

1  business.  He was just business, riding

2  across the territory to make sure that the

3  business train had a smooth ride.

4       MS. SCHOONMAKER:

5            Can we take our lunch break now?

6       MR. SMITH:

7            Perfect.

8            (OFF RECORD)

9            (LUNCH RECESS)

10  BY MS. SCHOONMAKER:

11       Q.   What did you understand Mr. Workman

12  to mean when he asked you, according to you,

13  if you were in bed with the FRA?

14       A.   That Union Pacific Railroad took

15  negatively that I was reporting the

16  information to the Federal Railroad

17  Administration, which was part of my job duty

18  to do.

19       Q.   Going back to Exhibit 6 on OSHA 4,

20  it states you "received numerous threats of

21  termination from Union Pacific employees for

22  taking tracks out of service due to unsafe

23  conditions.

24            "On one such occasion, on March 28,

25  2017, a derailment occurred at the 'tail

 1    track' in the Avondale, Louisiana, yard.
 2    Approximately 20 derailments had taken place
 3    at this location during Mr. Taylor's tenure
 4    with Union Pacific.
 5             "Mr. Taylor removed the Avondale
 6    tail track from service after an incorrect
 7    design led to a derailment.
 8             "Daniel Jacques, Director of Train
 9    Service, became belligerent with Mr. Taylor
10    due to his taking the track out of service,
11    followed him, and cursed at him as he was
12    trying to exit the conversation.
13             "On March 28, 2017, Mr. Taylor
14    reported this incident to the Union Pacific
15    EEO."
16             Now, where did Mr. -- is it
17    Jacques?  Am I saying it right?
18        A.    Uh-huh.
19        Q.    Where did Mr. --
20        A.    Jacques.
21        Q.    Jacques?  Jacques?  Where did
22    Mr. Jacques become belligerent with you?
23        A.    On the day of the derailment.
24        Q.    Where?
25        A.    At the derailment site.

1      Q.   Okay.  Was anyone else present when

2  this was occurring?

3      A.   Jimmy Couget, Nicholas Isaac.

4      Q.   Jimmy --

5      A.   Couget and Nicholas Isaac.

6      Q.   And what were their jobs?

7      A.   Nick Isaac was my track inspector.

8      Q.   Okay.

9      A.   Jimmy Couget was the MYO.  And

10  there was more people there.  I just can't

11  recall the names at this time.

12      Q.   And, you know, you don't have to

13  worry about offending me.  What did

14  Mr. Jacques say when he cursed you?

15      A.   "Don't fucking walk away from me."

16      Q.   "On May 28, 2017, Mr. Taylor

17  investigated a derailment at Track 8 in

18  Avondale, Louisiana, along with Mark Oldham."

19          And Mr. Oldham was still your

20  supervisor at that time; right?

21      A.   That is correct.

22      Q.   "Mr. Oldham concluded that the

23  derailment was not caused by track

24  conditions, and reported this to Mr. Taylor

25  and those present.

1           "Nonetheless, on or about May 29 or
2    May 30, 2017, Union Pacific falsely reported
3    the derailment as track-caused.  Mr. Taylor
4    was on vacation at that time.  Upon returning
5    from vacation and discovering the false
6    report, Mr. Taylor informed Mr. Roppolo of
7    same."
8           How did you know that Mr. Oldham
9    concluded the derailment was not caused by
10   track conditions?
11        A.   Because we were there inspecting
12   the track.
13        Q.   And he said this to you?
14        A.   Yes.
15        Q.   And who else was present?
16        A.   Nicholas Isaac.
17        Q.   Anyone else?
18        A.   Nicholas Isaac, that's the only one
19   that was present when we was talking was
20   Nicholas Isaac.
21        Q.   Mr. Isaac was your track inspector?
22        A.   That is correct.
23        Q.   "On June 5, 2017, Mr. Taylor filed
24   a complaint with Union Pacific EEO regarding
25   Union Pacific's widespread falsification of

1  railroad report documents submitted by Union

2  Pacific to the FRA.

3          "On November 2, 2017, after

4  Mr. Taylor took the No. 1 Mainline Track out

5  of service in Avondale, Louisiana, Kenneth

6  Stuart threatened to take away Mr. Taylor's

7  welding gang, expressly stating that this

8  would be a consequence of taking the track

9  out of service.

10          "Mr. Taylor filed a complaint with

11  Union Pacific's EEO Department on the same

12  day."

13          What was Mr. Stuart's job?

14      A.   He was the Director of Track

15  Maintenance.  But they changed the position.

16  And I'm just not familiar what they call it

17  now.

18      Q.   At that time, though, back in 2017,

19  he was a DTM?

20      A.   That is correct.

21      Q.   Now, was Mr. Oldham still your DTM?

22      A.   No.

23      Q.   Did Mr. Stuart replace Mr. Oldham?

24      A.   That is correct.

25      Q.   And what happened to Mr. Oldham?

1          A.    I think he retired.

2          Q.    Okay.  So after Mr. Oldham's

3    retirement, Mr. Stuart was your boss; right?

4          A.    That is correct.

5          Q.    "Between November 9 and

6    November 21, 2017, three more derailments

7    occurred at the Avondale track.  Mr. Stuart

8    instructed Mr. Taylor to document the FRA

9    alignment defects that led to the derailments

10   and Email the documentation to Mr. Stuart, at

11   which point Mr. Stuart would forward the

12   documentation to Mark Wheeland.

13          "Mr. Taylor sent the documentation

14   to Mr. Stuart, but Mr. Stuart did not forward

15   the documentation to Mr. Wheeland."

16          How do you know that?

17         A.    I know that because January 9,

18   2018, Jacob Gilsdorf, Kenneth Stuart, and

19   Nicholas Isaac, they was there at the

20   Avondale yard.  And that's when Kenneth -- we

21   asked Kenneth Stuart did he forward to Mark

22   Wheeland.  And he says no, he did not.

23         Q.    When Mr. Stuart, according to you,

24   threatened to take away your welding gang,

25   who was present?

1      A.    He did it on the conference call.
2    So it would have been --
3      Q.    You don't have to tell me all the
4    names.  But it was at a conference call?
5      A.    It was on a conference call.
6      Q.    Number of people?
7      A.    Yes.
8      Q.    Okay.
9            "On December 20, 2017, Mr. Taylor
10   participated in a conference call that
11   included Wesley Dooley, a Union Pacific EEO
12   employee.  Mr. Dooley stated that if
13   Mr. Stuart had taken away Mr. Taylor's
14   welding gang, as he threatened to do, this
15   would have created a safety risk.
16           "However, Mr. Dooley opined that
17   there was no whistleblower violation, since
18   Mr. Taylor had not yet been terminated."
19           Mr. Dooley was an EEO investigator?
20     A.    That is correct.
21     Q.    And do you have any understanding
22   why he said that if your welding gang had
23   been taken away, that would have created a
24   safety risk?
25     A.    Because I would have no way to fix

1 the defects.

2   Q. Okay.

3     "On December 29, 2017, Mr." --

4   A. Can I explain something?

5   Q. Sure.

6   A. Okay. Mr. Dooley, on that call,

7 told me the call was recorded.

8   Q. Which call? On your call to

9 Mr. Dooley?

10   A. Yes. That phone call was recorded.

11   Q. With Mr. Dooley?

12   A. Yes.

13   Q. Okay.

14   A. And my wife -- I had my phone on

15 speakerphone, and my wife overheard the

16 conversation on that day. He specifically

17 said that this call was recorded by Union

18 Pacific Railroad. And I said okay.

19   Q. And that's the call with

20 Mr. Dooley?

21   A. Right.

22   Q. Not the conference call?

23   A. That's the call with Mr. Dooley,

24 the EEO investigator.

25   Q. And why was your wife listening on

1    the speakerphone?

2         A.    Well, she was just there beside me.

3    I had it on speakerphone and she was

4    listening.

5         Q.    "On December 29, 2017, Mr. Taylor

6    received a positive annual evaluation.

7    Nothing in the evaluation suggested that

8    Mr. Taylor had behaved inappropriately during

9    the December 20, 2017, conference call."

10             Who was on that December 20, 2017,

11   conference call besides you and Mr. Dooley

12   and your wife?

13        A.    That was it.  That's all I know of,

14   that it was my wife, Mr. Dooley, and myself.

15   That's -- on his end, I don't know.  He just

16   announced his name.  Mr. Dooley did.

17             So I don't know if anybody was

18   listening in on it from Union Pacific

19   Railroad.  But he just said that he was the

20   only one, that he announced his name.

21        Q.    And was there an accusation that

22   you had behaved inappropriately while you

23   were talking to Mr. Dooley?

24        A.    Oh, the accusation was made that I

25   was -- behaved inappropriately when I was

1    talking to Kenny Stuart on the conference

2    call on November the 2nd, 2017.  Kenny Stuart

3    made the accusation.

4         Q.   Okay.  Because this says, "Nothing

5    in the evaluation suggested that Mr. Taylor

6    had behaved inappropriately during the

7    December 20, 2017, conference call."

8              That should be referring to the

9    other conference call --

10        A.   Right.

11        Q.   -- with Mr. Stuart?

12        A.   With Mr. Stuart.

13        Q.   "Nothing in the evaluation

14   suggested that Mr. Taylor was a 'quarrelsome

15   employee.'  Mr. Taylor qualified for a

16   performance bonus for" -- I'm sorry.  "Mr.

17   Taylor qualified for a performance bonus for

18   2017.

19             "On January 9, 2018, Mr. Stuart

20   informed Mr. Taylor and Nicholas Isaac that

21   he did not send to Mr. Wheeland the

22   documentation provided by Mr. Taylor in

23   November of 2017."

24             Did he tell you why?

25        A.   No, he did not.  He did not.

1      Q.    "On January 10, 2018, Mr. Taylor

2    again took the Avondale track out of service

3    in response to the November 2017 derailments.

4    Mr. Stuart falsely accused Mr. Taylor of

5    failing to send him the derailment-related

6    documentation in November of 2017."

7            Who was present when he falsely

8    accused you of that?

9      A.    When he falsely accused me of this?

10   Those was made when we got the results back

11   from OSHA, the PPL letter.  And on the PPL

12   letter, there were -- Kenny Stuart said that

13   I didn't send the correct documents on that

14   PPL letter that I refused to sign which Union

15   Pacific Railroad said they fired me for.

16   So...

17     Q.    This says, "On January 10, 2018,

18   Mr. Taylor again took the Avondale track out

19   of service in response to the November 2017

20   derailments.

21            "Mr. Stuart falsely accused

22   Mr. Taylor of failing to send him the

23   derailment-related documentation in November

24   of 2017."

25            When did Mr. Stuart falsely accuse

1  you of that?  Was it on January 10th or

2  later?

3      A.   It would have to be -- it would be

4  on January 31st, 2018, when I was in the

5  office with Cliff Bowman and Jacob Gilsdorf,

6  the PIP letter.

7      Q.   And the PIP letter is your

8  Performance Improvement Plan?

9      A.   No.  Performance Improvement Plan?

10      Q.   That's what PIP --

11      A.   That's correct.  I corrected

12  myself.  Yes, it is.

13      Q.   Okay.

14      A.   Yeah.

15      Q.   "On January 22, 2018, Mr. Taylor

16  issued a slow order on a train track in White

17  Castle, Louisiana.  That same day, Mr. Taylor

18  filed a complaint with Union Pacific EEO

19  alleging harassment by Jacob Gilsdorf,

20  Kenneth Stuart, Mark Wheeland, Phillip

21  Hawkins, and Phil Kriefes," K-R-I-E-F-E-S.

22      A.   Uh-huh.

23      Q.   "That same day, Mr. Taylor sent an

24  Email to the persons against whom he

25  complained, informing them of his complaint.

1          "The Email also stated that
2    Mr. Taylor had informed Nicholas Roppolo
3    about the unsafe track in Avondale, which was
4    taken out of service on January 10."
5          So what was Jacob Gilsdorf's job in
6    relation to you?
7        A.   He was Director of Maintenance of
8    Way.
9        Q.   Okay.  But he wasn't your boss?
10       A.   He was not my boss.
11       Q.   Kenneth Stuart was your boss?
12       A.   Kenny Stuart.
13       Q.   Was Mark Wheeland the chief
14   engineer?
15       A.   Yes.
16       Q.   What job did Mr. Hawkins have then?
17       A.   Mr. Hawkins was the Manager of
18   Track Projects.
19       Q.   And what job did Phillip Kriefes
20   have?
21       A.   He was the other Maintenance of --
22   he was a General Director of Maintenance of
23   Way.  He was the other General Director of
24   Maintenance of Way.
25       Q.   Did Mr. Hawkins have the same job

1  that you did, the same level?

2      A.   No.  I mean, Mr. Hawkins was the

3  Manager of Track Projects.  So he was tie

4  gang, rail gangs.  He --

5      Q.   Was that -- go ahead.

6      A.   He did not have the same title.  He

7  was not an MTM.

8      Q.   And was he above you in some way?

9      A.   I can't answer that.  And the

10  reason I'm saying it, because I was in charge

11  of the track.  So he was in charge of

12  projects.  So my direct supervisor was Kenny

13  Stuart.

14          And sometimes he would, like, take

15  Kenny Stuart place when he's on vacation, you

16  know.  And I had to report to him.  But, I

17  mean, Union Pacific Railroad had to make the

18  determination was his job above managing

19  mine.

20      Q.   So what did these men do to harass

21  you?

22      A.   On the Email that I sent to Jacob

23  Gilsdorf on January 22nd, he accused me of

24  not having the root cause of the VTI hit. He

25  said that I did not have the root cause on my

1   Email that I sent him.  And he kept going
2   back and forth.
3           And I said, "I did put the root
4   cause on there."
5           I told him that the crossing needed
6   ties and the switch needed ties, and they had
7   profiled them.  And I actually put -- I put
8   out a tie condition slow order there at that
9   particular time.
10      Q.   And what did the others do to
11  harass you?
12      A.   Well, Mark Wheeland, Kenny Stuart,
13  yeah, all of them sat there.  And nobody came
14  to my defense when Jacob Gilsdorf was
15  harassing me.
16          All of them saw the Email that I
17  sent.  And I also sent the -- we had a VTI
18  hit on January the 10th.  And I sent them in
19  to the same individuals.  And there was no
20  complaints about what I sent in.
21          But on January 22nd, I did the same
22  thing and sent the information in to Jacob
23  Gilsdorf.  But all of a sudden, he accusing
24  me of not putting the root cause down there
25  for the VTI.

1     Q.   So was Mr. Gilsdorf who did the

2  harassing and the others just didn't come to

3  your defense?

4     A.   Yes.

5     Q.   Is that what you mean?  All right.

6        "Mr. Gilsdorf proceeded to harass

7  Mr. Taylor for taking the White Castle track

8  out of service, which Mr. Taylor had done

9  pursuant to Union Pacific policy."

10       This is the harassment you're

11  talking about; is that right?

12     A.   Right.

13     Q.   "Mr. Taylor reported this

14  harassment to the FRA for investigation on

15  January 24, 2018, pursuant to federal

16  regulations.

17       "On January 25, 2018, Mr. Taylor

18  participated in a meeting with Jacob

19  Gilsdorf, Kenneth Stuart, and Phillip

20  Hawkins."

21       Were those the only people who were

22  present in that meeting?

23     A.   That is correct.

24     Q.   "During that meeting, Mr. Gilsdorf

25  threatened to fire Mr. Taylor due to (i),

```
1    Mr. Taylor's allegedly 'quarrelsome behavior'
2    and other alleged bad conduct; (ii),
3    Mr. Taylor's alleged failure to provide the
4    necessary information to Mr. Stuart prior to
5    taking the Avondale track out of service on
6    January 10; and (iii), Mr. Taylor's alleged
7    failure to provide enough information prior
8    to his issuance of a slow order on
9    January 22.
10           "Contrary to Mr. Gilsdorf's
11   assertions, Mr. Taylor sent the necessary
12   information by Email on November 24, 2017;
13   January 20, 2018" --
14       MR. SMITH:
15           The 10th.
16       MS. SCHOONMAKER:
17           I'm sorry.
18           "January 10, 2018; January 11,
19   2018; and January 22, 2018.
20           "On January 29, 2018, Mr. Stuart
21   and Phillip Hawkins arrived at Mr. Taylor's
22   house unannounced and informed Mr. Taylor
23   that he was being placed on administrative
24   leave."
25           Did they tell you why?
```

1      THE WITNESS:

2           No.

3   BY MS. SCHOONMAKER:

4      Q.   Didn't give you any reason?

5      A.   They didn't give me no reason.

6      Q.   "Mr. Stuart and Mr. Hawkins

7   demanded Mr. Taylor's laptop, phone, and

8   truck keys.  That same day, Mr. Taylor filed

9   a complaint with Union Pacific EEO, alleging

10  retaliation as a result of this incident.

11          "On January 31, 2018, Mr. Taylor

12  met with Jacob Gilsdorf and Cliff Bowman at

13  the Livonia yard.  Mr. Gilsdorf and Mr.

14  Bowman asked Mr. Taylor to sign a document

15  agreeing to a disciplinary plan due to (i),

16  Mr. Taylor's allegedly 'quarrelsome behavior'

17  and other alleged bad conduct; (ii),

18  Mr. Taylor's alleged failure to provide the

19  necessary information to Mr. Stuart prior to

20  taking the Avondale track out of service on

21  January 10; and (iii), Mr. Taylor's alleged

22  failure to provide enough information prior

23  to his issuance of a slow order on January

24  22."

25          Is that the PIP you were talking

1    about?

2        A.   Yes.

3        Q.   "On February 1, 2018, Mr. Taylor

4    received a letter from Scott McMillan, a

5    Union Pacific EEO investigator, informing him

6    that an investigation had begun into

7    Mr. Taylor's January 22nd complaint.

8            "On February 8, 2018, Mr. Taylor

9    received a letter from Mr. McMillan informing

10   him that an investigation had begun into

11   Mr. Taylor's January 29, 2018, complaint.

12           "On February 27, 2018, Mr. Taylor

13   met Mr. Stuart and Mr. Wheeland at a

14   Starbucks in Gonzales, Louisiana, at which

15   Mr. Wheeland provided Mr. Taylor with a

16   termination letter.

17           "The same day, Mr. Taylor filed an

18   EEO report alleging that his termination was

19   in retaliation for filing EEO complaints."

20           Did you record that meeting at the

21   Starbucks?

22       A.   No, I did not.

23       Q.   Why not?

24       A.   I didn't record it because he gave

25   me a termination letter saying I was

1  terminated from the Union Pacific Railroad.

2  I didn't record it.

3      Q.   Other than giving you the letter,

4  was there any discussion at that meeting

5  about the reasons for your termination?

6      A.   He told me based on Kenneth -- no.

7  He told me based on Jacob Gilsdorf and Cliff

8  Bowman's recommendation, Union Pacific

9  Railroad decided to terminate me.

10     Q.   And who told you that?

11     A.   Chief Engineer Mark Wheeland.

12     Q.   Exhibit 6 goes on to talk about the

13  claims you assert here.

14          "Since his promotion to Manager of

15  Track Maintenance, Mr. Taylor has

16  unsuccessfully applied for numerous

17  promotions, including in May 2014,

18  January 2016, July 2016, September 2016, and

19  September 2017."

20          What promotion did you apply for in

21  May 2014?

22     A.   It will be Director of Track

23  Maintenance.

24     Q.   What promotion did you apply for in

25  January of 2016?

1    A.    2016, referring to the position

2    that came open on the Livonia sub with

3    Manager of Track Projects and Director of

4    Track Maintenance.

5    Q.    What position did you apply for in

6    July of 2016?

7    A.    It'll be the MTP, position for the

8    tie gang, two tie gangs that I put in.

9    Q.    What position did you apply for in

10   September of 2016?

11   A.    It will be the Director of Track

12   Maintenance for the Livonia Service Unit.

13   Q.    What position did you apply for in

14   September of 2017?

15   A.    It will be MTP, Manager of Track

16   Projects, for the Livonia Service Unit and

17   Director of Track Maintenance for the Livonia

18   Service Unit.

19   Q.    And is it your claim that the

20   reason you were not given these promotions

21   was because you reported safety violations?

22   A.    That's one of the reasons, yes.

23   Q.    What other reasons?

24   A.    For -- you have to go to which

25   particular day.

1      Q.    All right.  Go date by date and

2   tell me what the other reasons were.

3      A.    May of 2014, reporting safety

4   violations to Union Pacific Railroad.  2016,

5   reporting safety violations, reporting to the

6   FRA.  July 2, '16, the same thing, reporting

7   safety violations to the FRA.  September

8   2016, reporting safety violations to the FRA;

9   also, my discrimination report that I had.

10  September 2017, reporting safety violations

11  and reporting to the FRA.

12     Q.    I'd like you to look at what the

13  court reporter has marked as Exhibit 7 to

14  your deposition, which is a series of pages

15  and a document, UP-TAYLOR 1 through 47.  Have

16  you seen this document before?

17     A.    Yes.

18     Q.    You understand that this was a

19  response Union Pacific made to your FRSA

20  claim of May 2018?

21     A.    Yes.

22     Q.    Okay.  Under the facts in the

23  second paragraph, the document states,

24  "Leading up to his termination, Taylor had

25  received suggestions for improvement from his

1  then manager, Mark Oldham, during his 2017

2  mid-year review.

3          "Something that is troubling to me

4  is your attitude towards the management group

5  of Union Pacific Railroad which you are a

6  member of.  We should come to work every day

7  with a positive attitude for the employees

8  that we work with and the company that we

9  work for.

10          "How we interact with our coworkers

11  and our peers should have a positive result.

12  If not, it affects the attitudes of every

13  employee around us.

14          "I need your positive engagement on

15  our daily business activities.  You have an

16  open invitation to work through this with me.

17  But being more positive in your duties as a

18  manager is something that has to be done for

19  the whole team."

20          Do you agree with Mr. Oldham's

21  point of view, that members of the team

22  should come to work every day with a positive

23  attitude?

24      A.   Do I agree with it?

25      Q.   Yes.

```
 1        A.   Yes.
 2        Q.   Do you agree with him that how we
 3   interact with our coworkers and our peers
 4   should have a positive result?
 5        A.   I agree.  But let me explain
 6   myself.
 7        Q.   No.  I'm going to ask you the
 8   questions.  Okay?
 9        A.   Okay.
10        Q.   Do you agree with his appraisal
11   that if not, it affects the attitudes of
12   every employee around us?
13        A.   Can you rephrase the question?
14   Because I'm confused.  Are you saying do I
15   agree that I have the problem that Mr. Oldham
16   talking about?
17             I'm saying no, I do not.  I
18   disagree with what Mr. Oldham said about me
19   by having problems with my managers.  I do
20   not have any problem with my managers.  So I
21   disagree with what he's saying about me.
22             So that's where I'm confused on
23   the -- what you asking me because it's an
24   open-ended question.  Are you saying that I
25   have those things that Mr. Oldham is saying?
```

1   No.  Or did I --

2        Q.   Let me ask the question again.  You

3   listen to it --

4        A.   Okay.

5        Q.   -- and see if you can figure out

6   what I'm asking.  Okay?

7             Mr. Oldham said, "How we interact

8   with our coworkers and our peers should have

9   a positive result.  If not, it affects the

10  attitudes of every employee around us."

11            Do you agree with that observation

12  from Mr. Oldham?

13       A.   I disagree with it if it's applying

14  to me.

15       Q.   That's not my question.

16  MS. SCHOONMAKER:

17            Could you read back the question?

18  BY MS. SCHOONMAKER:

19       Q.   Just please answer my question.

20            (READ-BACK OF REQUESTED MATERIAL)

21       THE WITNESS:

22            I do not agree with it because

23  there's other factor to whether your superior

24  would know if you have an attitude toward

25  them.  So the thing I done in the past,

1    taking tracks out of service, would affect

2    the way my peers view me.  That's why I'm

3    having trouble answering your question and

4    everything.

5            Because I can have other actions

6    that me doing my job correctly that would

7    form my employees or peers to form a negative

8    view about me.

9            So that's why I'm saying I disagree

10   with with what Mr. Mark Oldham is saying if

11   it's talking about me.  Because I can do my

12   job and my employees can still say I do not

13   have a positive attitude because I refuse to

14   violate a FRA rule.

15           So it's kind of confusing to me.  I

16   cannot say yes or no to that because of

17   everything surrounding it.  I mean...

18       MS. SCHOONMAKER:

19           Objection.  Nonresponsive.

20       MR. SMITH:

21           I object to your objection.

22       MS. SCHOONMAKER:

23           Okay.

24   BY MS. SCHOONMAKER:

25       Q.   The document goes on to say on page

1   2, which is UP-TAYLOR 2, "In early January

2   2018, Director of Maintenance of Way, Jake

3   Gilsdorf, visited Louisiana to meet the

4   managers and get familiar with the territory.

5   He met Johnny Taylor for the first time and

6   recalls a pleasant conversation."

7           Is that your recollection of the

8   first time you met Mr. Gilsdorf, that it was

9   a pleasant conversation?

10      A.    It was a pleasant conversation.

11      Q.    Pardon?

12      A.    It was a pleasant conversation.

13      Q.    "A week or so later, Mr. Gilsdorf

14  had received a report of 'bad ties' on a

15  track that was taken out of service.

16  Gilsdorf called the employee who reported it,

17  who happened to be Taylor.

18          "As part of standard procedure, he

19  asked Taylor to gather additional information

20  on the defects and asked for a root cause as

21  to why the ties were bad.

22          "Taylor became disrespectful on the

23  call which ended abruptly when Taylor hung up

24  on him prior to the end of the conversation."

25          Why did you hang up on

1   Mr. Gilsdorf?

2      A.   I did not hang up on Gilsdorf.  And

3   that is incorrect.  Mr. Gilsdorf had asked --

4   talked about not the track out of service.

5   It was about the slow order on January 22nd

6   with a VTI hit.

7         And I slowed it.  I did not take

8   the track out of service on January 22nd.  I

9   slow-ordered the track on January 22nd.  And

10   I did not hang the phone up.

11         Mr. Gilsdorf instructed me to take

12   the slow order off, and I told him that I was

13   not going to take the slow order off on the

14   phone conversation on the 22nd behind the VTI

15   hit.  So I did not hang up on Mr. Gilsdorf.

16      Q.   "Gilsdorf then had to call MTP

17   Phillip Hawkins to go inspect the track since

18   Taylor refused."

19         Is that accurate?

20      A.   No.

21      Q.   "On January 25, 2018, Gilsdorf met

22   with Taylor, in person, to discuss needed

23   behavioral improvements arising from

24   Gilsdorf's interaction with Taylor and

25   Taylor's interactions with other managers.

 1    Kenny Stuart and Phillip Hawkins were also

 2    present during this meeting.

 3              "During this conversation, Taylor

 4    indicated he would not change any negative

 5    behaviors and was again argumentative.  As a

 6    result, Taylor was placed onto paid

 7    administrative leave."

 8              Do you remember that meeting?

 9         A.    Yes.  I remember the meeting.

10         Q.    Is that the way it occurred?

11         A.    No.

12         Q.    What do you dispute in what I just

13    read?

14         A.    I have no behavior problem.  I have

15    no disciplinary actions on me.  I have no

16    behavior problem.  Every year that I was an

17    MTM, I received a bonus.  I received three

18    good performance every year I was the MTM.  I

19    do not have a behavior problem.

20              It's my duty to report safety track

21    violations or safety track issues to Kenneth

22    Stuart and Jacob Gilsdorf.  They just get

23    upset when I explained it to them, especially

24    track -- Switch 16, you know.  They got upset

25    because it was going to take millions of

1    dollars to fix the track.

2         Q.    Did you say or indicate in that

3    meeting on January 25th, 2018, that you would

4    not change any negative behaviors?

5         A.    No.

6         Q.    Were you argumentative?

7         A.    No.

8         Q.    "On January 31, 2018, Gilsdorf and

9    Superintendent Cliff Bowman delivered a

10   Performance Improvement Plan, a PIP, to

11   Taylor.  He was not receptive to the

12   conditions of the PIP.

13            "Instead, Taylor denied having any

14   performance issues, refused to acknowledge

15   the PIP discussion, and maintained he was not

16   going to do anything differently."

17            Is that an accurate description of

18   your response to the PIP?

19        A.    Oh, yes.  Yes.  Yes, ma'am.

20        Q.    That is accurate?

21        A.    Uh-huh.

22        Q.    Okay.  So you denied having any

23   performance issue; correct?

24        A.    Yes, ma'am.

25        Q.    You refused to acknowledge the PIP

1    discussion; right?

2         A.    I refused to not -- and let me

3    explain.

4         Q.    No, no.  Let me just -- let me ask

5    the questions.

6         A.    Okay.

7         Q.    And you maintain that you were not

8    going to do anything differently; right?

9         A.    That's correct.

10        Q.    "Due to Taylor's refusal to engage

11   in any aspect of the PIP, Taylor was placed

12   back on paid whistleblower (sic) leave"; is

13   that correct?

14        A.    Paid whistleblower leave or

15   administrative leave?

16        Q.    I'm sorry.  Too much reading.

17   Thank you for correcting that.

18             "Due to Taylor's refusal to engage

19   in any aspect of the PIP, Taylor was placed

20   back on paid administrative leave."

21             Is that accurate?

22        A.    Yes.

23        Q.    Okay.  It also says that Union

24   Pacific believes you may have recorded the

25   conversation.  Is that incorrect?

1    A.   That's correct.  I recorded the

2    conversation.  I told them in the beginning

3    of the meeting I was recording the

4    conversation.

5    Q.   And where is that recording?

6    A.   It's in the law office.  I have a

7    copy of it.  I submitted it.  We have a copy

8    of it.

9    Q.   Okay.

10   MS. SCHOONMAKER:

11        Can we go off the record for a

12   minute?

13        (OFF-RECORD DISCUSSION)

14   BY MS. SCHOONMAKER:

15   Q.   I just want to be clear.  You

16   maintain that you never hung up on Jake

17   Gilsdorf; is that right?

18   A.   No.  I never hung up on Jake

19   Gilsdorf.

20   Q.   So if Mr. Gilsdorf says you did,

21   he's a liar?

22   A.   He's a liar.

23   Q.   So why did you refuse if you were

24   trying to hang onto your job?  Why did you

25   refuse to get involved in the PIP to hold

1    onto your job?

2        A.   Because the PIP letters was talking

3    about me taking the track out of service.

4    It's my job duty per FRA Regulation 213.5, if

5    I see a defect that do not warrant the train

6    to go over, it's my job duty to take the

7    track out of service.

8            That was on my PIP letter talking

9    about me taking the track out of service.  So

10   you telling me I cannot do my job.  So that's

11   why I told them on January 31st that I was

12   going to turn them in to the whistleblower.

13           It's my job.  Taking the track out

14   of service is my job duty.  I got strict FRA

15   regulations that I have to go by.  I'm doing

16   my job.  Every time I go out there and

17   inspect the track, there's going to be a

18   defect.  It might be a potential the track

19   might be out of service.  It might be

20   potential that it will be slower.  I'm doing

21   my job.

22       Q.   I'm filling in for your lawyer --

23       A.   Okay.

24       Q.   -- and telling you to slow down.

25       A.   Okay.

1      Q.   That's not a negative comment.   I
2   could just do this if you want
3   (demonstrating).
4      A.   Yes, ma'am.
5      Q.   I have to protect the court
6   reporter.
7      A.   Oh, I'm sorry.   Yes.
8      Q.   Do you acknowledge any performance
9   issues around the time of your --
10      A.   No.
11      Q.   -- termination?
12      A.   No.   I got a bonus every year,
13   above $12,000.   You know, how can I get a
14   bonus and be a bad employee at the same time?
15   It's confusing to me.
16           Employees, you know if you get in
17   trouble.   I mean, you give me a bonus and
18   then said you going to fire me the same year
19   that you gave me a bonus for?   It's
20   unreasonable to me.
21      Q.   So let's turn in Exhibit 7 to
22   UP-TAYLOR 40, which is your Performance
23   Improvement Plan in early --
24      A.   You said UP --
25      Q.   UP-TAYLOR 40 --

1     A.    Oh, okay.

2     Q.    -- your Performance Improvement

3  Plan in early 2018 that you refused to sign.

4     A.    Okay.

5     Q.    Okay.  The first part of the

6  Performance Improvement Plan talks about

7  coaches.

8         "Provides clear and consistent

9  feedback, encouragement, and development

10 guidance; corrects individuals' performance

11 based on clearly communicated objectives.

12         "While team testing, we came upon

13 your track inspector.  Track inspector took a

14 long time to find profiles, admitted that he

15 did not use them and he did not have all the

16 tools required of his position.

17         "Performance Issue."  And this is

18 talking about your performance issue, not the

19 track inspector's performance issue.  "Over

20 the last six months, the average coaching

21 percentage of service unit peers is

22 21 percent.  Your coaching rate is

23 11 percent.

24         "In addition, in the absence of

25 team testing, you report significantly fewer

1   coaching opportunities.  Coaching rates

2   should be comparable when you are testing by

3   yourself and when you are team testing.

4   Also, your coaching rate needs to be similar

5   to peers.

6           "You will need to set up a biweekly

7   call with MTP and/or senior MTM to go over

8   your testing plan, which includes where you

9   are testing, why you are testing there, what

10  you are testing for and what you observed.

11          "This call will also review team

12  testing activities/results versus individual

13  testing activities/results.

14          "Coaching should reflect

15  consistency throughout entire month and not

16  only on team testing days."

17          Now, did you understand that to be

18  critical of some of your performance?  I

19  mean, this was not a positive comment about

20  you; right?

21      A.  I don't understand the question you

22  asking me.

23      Q.  Did you understand this performance

24  issue, as stated, to be a criticism of your

25  performance?

A. No.

Q. You understood it to be a doing-a-great-job comment about your performance?

A. I understood it to be false.

Q. Okay. What's false about it? What was your coaching rate? Is that wrong? Is it not 11 percent?

A. I have to look at it to see. I couldn't tell you.

Q. But what's false about it then?

A. What's false about it is that we had a meeting with the lawyers. It was a meeting with the Livonia Service Unit. That's me.

And the lawyer said that we cannot put a set number on how many coaches we have because it'd be targeting the employees. And it said it's a potential violation of the Federal Railroad Safety Act.

So that's why I don't have a certain amount of coaches that I supposed to have. When I go out there and observe, I supposed to look at my employees, what they doing, and observe them at the time that I

1  seen them.

2          If they not obeying by the rules,

3  I'm supposed to be the coach.  But we

4  can't -- there's no set number of how many

5  coaching we supposed to have because it's a

6  violation of Federal Railroad Safety Act.

7          So I was following the lawyers from

8  Union Pacific Railroad advice.  And that's

9  what I was doing.  I was not making up

10  coaches to meet a -- try to meet a quota.

11  When I go out there, I look at my employees

12  and I coach them accordingly.

13      Q.   Which lawyer told you that?

14      A.   Jewell.  I have to get my research

15  and stuff.  But he was your lawyer with Union

16  Pacific Railroad.  I have to go back and look

17  at my notes and find out.

18      Q.   Male or female?

19      A.   Male.

20      Q.   Was that in 2017 or before then?

21      A.   That was before 2017, before

22  Kenneth Stuart even came on the territory.

23      Q.   Okay.  So when the management team

24  was trying to get you to work with them on

25  this PIP, did you bring up the fact that said

1   Rolf Jewell, the lawyer for Union Pacific,

2   said I'm not supposed to do that?

3      A.   We didn't even discuss that.  We

4   was -- from my recall and -- everything

5   discussing was mostly talking about the track

6   I took out of service.

7      Q.   Okay.  The next area for

8   improvement on your PIP was "Plans, Organizes

9   and Prioritizes."

10        "Structures work with effective

11   plans, identifies critical paths with the

12   completion of activities, and manages

13   resources based on value, importance, urgency

14   and other organizational factors.

15        "Your welding gangs are not

16   consistently performing the welding gang

17   responsibilities.  Your welders are doing

18   section gang work as often as they perform

19   welding activities.

20        "Service Unit expectation is that

21   welders are doing welder activities.  Your

22   welders are also improperly reporting

23   activities.  Welders are not meeting weekly

24   or monthly goals."

25        Accurate criticism?

1       A.    No.

2       Q.    What's inaccurate?

3       A.    My welding gang work on FRA

4    defects.  And my track inspector write up a

5    schedule for repair.

6              For instance, to replace weld

7    braces, I have to send my welding gang there

8    because they the only gang that can do it.

9    So they are working on FRA defects that my

10   track inspectors write up, assuming a weld is

11   not a FRA defect.

12             And the other thing is that Union

13   Pacific Railroad have PI welders, whereas

14   their only specific job is to eliminate

15   jumps.  They don't work on FRA defects.

16             Kenneth Stuart, whenever -- hardly

17   ever sent the PI welders to my territory.

18   Also, that I informed Kenneth Stuart in an

19   Email that my welding gang was short.  I

20   couldn't get -- fill anybody to fill the

21   position and everything.  I couldn't.  So I

22   had a one-man welding gang that was short.

23             So I was excluded for me to keep up

24   with the FRA defects.  So Kenny Stuart -- I

25   shouldn't have to make a choice with shooting

1    a weld and working on an FRA defect.  Union
2    Pacific Railroad is a billion dollar company.
3    They can hire more welders.  They can hire
4    more PI gang.
5            To sit there and make me have a
6    choice between shooting a weld and working on
7    a schedule for repair, a 213 defect, a --
8    sorry -- 213.9 defect is unfair towards me as
9    an MTM.
10       MS. SCHOONMAKER:
11            Did you get that?
12   BY MS. SCHOONMAKER:
13       Q.   Shooting a whale?  Is that what you
14   were saying?
15       A.   Right.  Yeah, shooting a weld.
16       Q.   Weld or a whale?
17       A.   W-E-L-D.
18       Q.   A weld.  Okay.
19       A.   Yeah.
20       Q.   "Performance Issue:  On October 27,
21   2017, you and I had a conversation about
22   making sure you had proper production
23   reporting for welding gangs."
24            Do you remember that conversation
25   with Mr. Stuart?

1      A.   Yes, I do.

2      Q.   "On 11/2/2017, welding expectations

3  were given to entire team on conference

4  call."

5           True?

6      A.   Yes.

7      Q.   "On 1/22/2018, you were again

8  informed that welding gangs need to properly

9  report their production."

10          True?

11     A.   Well, did he talk to me about it?

12 True.  But let me explain.

13     Q.   No.  I just asked you the question.

14 And I want you to just answer my question.

15     A.   Okay.  All right.

16     Q.   Your lawyer can always come back

17 and ask you the question.

18     A.   Okay.  Yeah.  He's talked with me

19 about it.  But I want to explain.

20     Q.   "Each of your welding gangs are

21 required to eliminate two mainline or siding

22 joints per week, totaling a minimum of six

23 welds per week."

24          Accurate statement?

25     A.   Uh --

1          Q.   I'll read it again.

2               "Each of your welding gangs are

3     required to eliminate two mainline or siding

4     joints per week, totaling a minimum of six

5     welds per week."

6               Accurate statement?

7          A.   I can't remember what the goal was.

8          Q.   "Your two welding gangs are

9     required to perform welding activities to

10    meet weekly and monthly welding goals.  You

11    will be required to prepare a welding plan to

12    be sent every Thursday.

13              "You will need to set up a time

14    every Thursday to go over plan versus

15    execution of welding activities of previous

16    week.  You will also need to review welding

17    reporting daily and ensure that reporting is

18    accurate and a true depiction of the work

19    that was completed for the day.  This report

20    will be reviewed during our Thursday

21    meeting."

22              Now, did you refuse to do that?

23         A.   No.  I didn't refuse to do it.  And

24    let me explain.

25         Q.   No, no.  I just want you to answer

1  my questions.

2       A.   No.  No.  Well, I have to explain

3  my information.

4       Q.   Well, you refused --

5  MR. SMITH:

6            I'll ask you.  Don't worry about

7  it.

8  BY MS. SCHOONMAKER:

9       Q.   You refused to sign the Performance

10  Improvement Plan?

11      A.   Uh-huh.

12      Q.   But what you're saying now, as we

13  sit here today, that refusal did not include

14  you refusing to do what was put down in

15  "Plans, Organizes and Prioritizes"; right?

16      A.   That is incorrect.

17      Q.   Okay.  What is incorrect?

18      A.   Huh?

19      Q.   What is incorrect about what I

20  said?

21      A.   It's incorrect because my welders

22  have -- schedule for repair --

23      Q.   No.  I'm not asking about the

24  welders.  I'm asking about what Johnny Taylor

25  agreed to do.  You refused to sign and work

1  with them, Union Pacific, on the Performance

2  Improvement Plan; right?

3      A.   I refused to sign the PIP letter

4  because everything on the PIP letter is not

5  true of me being a performance issue.

6      Q.   Okay.

7          "Builds Trust."

8          "Establishes open and trusting

9  relationships, treats all individuals fairly

10  and with respect; develops a climate where

11  individuals are committed to sharing

12  information.

13          "On 1/22/2018, you were assigned

14  the task of getting more information on a

15  huge (sic) VTI -- VTI -- near a bridge.  You

16  were disrespectful and insubordinate to the

17  Director of Maintenance of Way when you

18  refused to gather any additional information

19  as instructed by the Director of Maintenance

20  of Way."

21          Accurate; right?

22      A.   No.

23      Q.   What's inaccurate?

24      A.   I sent Jacob Gilsdorf on

25  January 22nd the Email explaining what was

1   the root cause of the VTI hit.  And he -- we

2   were going back and forth with the E-mails as

3   you will see.  And he asked to tell me a

4   question.  And I sent him an answer to it.

5           Everything on my Email that I sent

6   on an Excel spreadsheet was all the

7   information that he was looking for for the

8   VTI hit.  I was being harassed by the

9   Director of Maintenance.

10      Q.   "Performance Issue:  On 1/10/2018,

11  you were instructed by senior MTM to provide

12  current measurements on a track taken out of

13  service.

14          You provided derailment

15  measurements from six weeks prior and did not

16  perform correct (sic) measurements as

17  instructed by the senior MTM."

18          Accurate?

19      A.   Incorrect.

20      Q.   What's inaccurate?

21      A.   On November 24th, 2017, I sent

22  Kenny Stuart my graph of the tract showing

23  that they had a FRA defect.  It had more --

24  five inches of alignment on there.

25          Kenneth Stuart got the survey done

1     to see what can we do to correct that FRA

2     defect.  Kenneth Stuart knew that the track

3     had a defect in it since November 24th, 2017.

4            I took the track out of service

5     because it had a FRA defect.  And Union

6     Pacific Railroad was not going to fund to

7     have it fixed.

8            So by FRA regulations, I took the

9     track out of service for safety reasons so we

10    wouldn't have any more derailments there, a

11    chance of ammonia acid or hydrochloric acid

12    spilling.  They knew it was a problem at that

13    track.

14        Q.   "Specific Performance Levels to be

15    Met."

16            "When asked to provide information

17    regarding any specific duties that are

18    required of your position, you are expected

19    to provide the required information by the

20    date specified."

21            Am I understanding correctly you

22    refused to do that?

23        A.   I provided an Email on

24    January 10th.  I provided an Email on

25    January 22nd.  These are false allegations

1    against me.

2         Q.   I think you don't understand.  I'm

3    not talking about what happened in the past.

4              Your Performance Improvement Plan,

5    which you know is a plan to help you maintain

6    your employment but perform better, says,

7    "When asked to provide information regarding

8    any specific duties that are required of your

9    position, you are expected to provide the

10   required information by the date specified."

11             That is the performance level to be

12   met in the future.  Now, you refused to

13   execute the PIP; right?

14        A.   Yes.

15        Q.   So you refused, going forward in

16   the future when asked to provide information

17   regarding any specific duties that are

18   required of your position, you are expected

19   to provide the required information by the

20   date specified.  You refused to do that;

21   right?

22        A.   I was doing it all along.

23        MS. SCHOONMAKER:

24             Objection.  Nonresponsive.

25        THE WITNESS:

1           I don't understand your question.

2    BY MS. SCHOONMAKER:

3        Q.   If you were doing it all along and

4    they said, "In order to continue working here

5    you have to agree to do this in the future

6    and do it," you refused to sign the PIP;

7    right?

8        A.   I'm confused.  I don't understand

9    it.

10       Q.   Okay.  We'll move on.

11            "Teamwork," another area in which

12   you appear to have significant challenges

13   according to Union Pacific.

14            "Works with others towards" --

15   MR. SMITH:

16            Objection to your characterization.

17   BY MS. SCHOONMAKER:

18       Q.   -- "common goals, understand the

19   responsibilities, activities, and ways to

20   foster business relationships."

21            "On January 25th, 2018, senior MTM,

22   Director, Maintenance of Way and MTP had a

23   meeting with you to discuss your behavior.

24   You indicated that you would not change any

25   negative behaviors."

```
 1              That's true; right?
 2       A.    No.
 3       Q.    You told me when I asked you a
 4  question about that earlier, that yes, you
 5  refused.
 6       MR. SMITH:
 7              Objection to the characterization.
 8  It assumes a fact not in evidence --
 9  BY MS. SCHOONMAKER:
10       Q.    Go ahead.
11       MR. SMITH:
12              -- that there were negative
13  behaviors.
14  BY MS. SCHOONMAKER:
15       Q.    Go ahead.  Go ahead, Mr. Taylor.
16  Did you refuse?
17       A.    I didn't have no negative behavior,
18  so that's why I refused to sign because I
19  didn't have any negative behavior.
20       Q.    Not a single one?
21       A.    No.
22       Q.    Perfect job performance in every
23  respect?
24       A.    Yes.  Because I got bonuses.
25       Q.    Well, I mean, you know there's a
```

1    range of bonuses given to people; right?

2         A.   Well, there's a range of bonuses.

3    No.  No.

4         Q.   Okay.

5         A.   I got good performance.

6         Q.   Okay.  But that's why you were

7    fired because your performance was good?

8         A.   Huh?

9    MR. SMITH:

10              Objection.  Argumentative.

11   BY MS. SCHOONMAKER:

12        Q.   Go ahead.  You were fired because

13   you had such good performance?

14   MR. SMITH:

15              Objection.  Argumentative.

16   BY MS. SCHOONMAKER:

17        Q.   Go ahead.  That's my question.

18   Were you fired because you had such good

19   performance?

20        A.   I was fired because I took a track

21   out of service.  And I slow-ordered the

22   track.  I was fired for following FRA

23   regulations.

24        Q.   You were directed for the future to

25   specifically communicate with respect

1  100 percent of the time.  Do you think that

2  was a requirement you should not have to

3  meet?

4      A.    I didn't have a problem with it.

5      Q.    So let's turn to UP-TAYLOR 43,

6  which is part of Exhibit 7.  This is a copy

7  of an Email from Jacob Gilsdorf to a number

8  of people.

9          "Today, myself and Superintendent

10  Cliff Bowman met with Johnny Taylor at the

11  Livonia headquarters building."

12          That's accurate; correct?

13      A.    Yes.

14      Q.    "We started the conversation off

15  with Mr. Taylor about his conduct as a

16  manager for Union Pacific Railroad.  We

17  discussed his recent conduct, acting

18  quarrelsome and disrespectful on the

19  engineering managers conference calls,

20  including hanging up on his superiors.

21          "We also discussed the recent

22  situations of insubordination when Mr. Taylor

23  was asked to obtain more details on a VTI

24  location where the initial investigation was

25  not detailed and no root cause was identified

1   and including measurements of a switch that

2   was asked for by his senior manager that

3   Mr. Taylor refused to do.

4           "We explained to Mr. Taylor that we

5   wanted to help him be successful as a manager

6   for Union Pacific and we would give him the

7   tools to help improve his performance in the

8   areas needing improvement with his conduct

9   and leadership responsibilities as a manager.

10          "Mr. Taylor said that he does not

11  have any performance issues."

12          Is that true?

13      A.   No.

14      Q.   That's what you just told me now.

15  Did you say that in that meeting?

16      A.   No.  Performance issues that -- no.

17      Q.   Did you say that you did not have

18  any performance issues?

19      A.   I told them that I did not have any

20  performance issues.

21      Q.   Did you tell them that you would

22  not sign the acknowledgment?

23      A.   I told them I would not sign the

24  PIP letter.

25      Q.   Did you tell them that you would

1  not give a commitment that you will change

2  your conduct as a manager for Union Pacific

3  Railroad?

4       A.   I told them that I don't have any

5  negative behavior in anything, that I was

6  going to continue to work professionally with

7  the Union Pacific Railroad.  I didn't have

8  any negative behavior, no.

9       Q.   Did you tell them you would not

10  give a commitment that you will change your

11  conduct as a manager for Union Pacific

12  Railroad?

13       A.   I told them that I don't have any

14  negative behavior and I didn't see where I

15  needed to change.

16       Q.   Did they explain to you that they

17  wanted you to be successful?

18       A.   Yeah.  They mentioned -- I wanted

19  to be successful, yeah.

20       Q.   Did they tell you they would give

21  you an action plan to improve your

22  performance?

23       A.   Yes.  But let me explain myself.

24  The action plan --

25       Q.   Wait, wait.  I just want you to

1    answer my questions.  Did they tell you that

2    they would give you an action plan to improve

3    your conduct as a front line leader for the

4    engineering department?

5         A.   As I stated before, that I disagree

6    with that performance claim, that it was not

7    me.  It was bogus.  So I disagreed with it,

8    what they were saying.  It was a bogus -- I

9    was doing my job as an MTM.

10        Q.   You received a letter advising you

11   of your termination from Mr. Wheeland; right?

12        A.   Right.

13        Q.   It was delivered to your home?

14        A.   No.  They gave it to me at

15   Starbucks in Gonzales.

16        Q.   Okay.  So it was given to you

17   immediately at this Starbucks meeting, not

18   subsequently delivered to your home; right?

19        A.   No.  They gave it to me

20   immediately, that is correct.

21        Q.   And your employment ended on

22   February 27, 2018; is that right?

23        A.   Yes.  That's what the letter says,

24   yes.

25        Q.   When is the first time you looked

1   for a job after that?

2       A.    March 1st, 2nd, 3rd, 5th.

3       Q.    And where did you start looking for

4   jobs?

5       A.    I started looking for jobs at Dow

6   Chemical Plant in their rail section.  I

7   started looking for jobs in Dow, Westlake

8   Chemical Plant, for the State of Louisiana.

9             I started, you know, studying to

10  get my insurance license.  I started looking

11  into passing my practice test to become a

12  teacher, which I only had one more test to

13  pass.

14            I put a job application in with

15  BASF -- it's a chemical plant -- for civil

16  construction engineer.  It was some type of

17  engineering job.

18            I can't remember without looking at

19  my documents, my Excel spreadsheet, to recall

20  all the applications that I put in.  But I

21  put in over 100 applications from the time I

22  got fired to up to present.

23      Q.    Right after you got fired, were you

24  looking for work every day?

25      A.    Yes.  I was looking for work every

 1   day.

 2        Q.   Has that kind of slowed down a

 3   little bit as time has passed?

 4        A.   No.  I haven't slowed down.  I

 5   still put in applications.  I had an

 6   interview with Stella-Jones.  They haven't

 7   got back with me.  I had an interview with

 8   Walmart, which I'm eligible for hire.  But

 9   they haven't called me.

10             I got a letter -- I mean a phone

11   call from the East Baton Rouge Parish School

12   District saying they want me to go to the

13   Human Resources tomorrow about being a

14   teacher.

15             I got an interview with Lowe's on

16   Friday.

17             So I'm actively looking for jobs.

18   I got two good potential, Walmart and being a

19   teacher, you know, of getting a job.  So

20   hopefully in the next week or so, that I

21   would have a job.

22        Q.   What kind of job would you get with

23   Walmart?

24        A.   The job with Walmart is a stocker

25   job.

1      Q.   Would you accept a stocker job?

2      A.   Oh, yes.  I put in an application

3  for Office Depot for a stocker job.  I put in

4  an application in -- yeah.  I put in an

5  application in Lowe's, because I have

6  interviews as a stocker job.

7           I mean, like I said, me working on

8  my teacher certification, I got one more test

9  to pass.  So I've been studying for the test

10 and putting in job applications.

11          I had one interview with the State

12 of Louisiana, but they passed me up for

13 working with the state.

14     MS. SCHOONMAKER:

15          Can we take a short break?

16     MR. SMITH:

17          Absolutely.

18          (OFF RECORD)

19          (RECESS)

20 BY MS. SCHOONMAKER:

21     Q.   Mr. Taylor, I'd like you to look at

22 what the court reporter has marked as Exhibit

23 8 to your deposition which includes a number

24 of documents marked PLF757, 756, 758,

25 UP-TAYLOR 174, UP-TAYLOR 175, UP-TAYLOR 169,

UP-TAYLOR 170.

I have not seen a number on the next -- oh, UP-TAYLOR 171, UP-TAYLOR 172 and 173, and PLF792 and UP-TAYLOR 176, 177, 178, 179, and PLF816, PLF807, and PLF808.  Do you see those documents?

A.   Yes.

Q.   And the reasons they're in such array is because I tried to put these together chronologically to make it easier for us to go over them.  All right?

A.   Uh-huh.

Q.   So the first page of Exhibit 8, which is PLF757, this is a Values Line complaint from you dated September 14th, 2016.  And you are reporting discrimination that has been ongoing since 2007; correct?

A.   Right.

Q.   And you called the Values Line at 2:40.

A.   Let me correct myself.  I said I was hired in 2007.

Q.   Well, okay.  So let's look at the summary information.  Do you see where it says, "Ongoing since 2007" for the "When"?

1   Look up in "Summary Information," not
2   "Incident Description."
3        A.   Okay.
4        Q.   It says "When:  Ongoing since
5   2007."  Do you see that?
6        A.   Yes.
7        Q.   And you made this report at 2:47
8   A.M.; right?
9        A.   Yes.
10       Q.   So what hours were you working at
11  that time back in September of 2016?
12       A.   On my days on, I was on call 24
13  hours.
14       Q.   Well, generally, what time did you
15  work?
16       A.   5:00 in the morning till sometimes
17  6, 7, 8:00 at night.
18       Q.   Okay.  Do you recall whether you
19  were making this report to the Values Line on
20  your day off or on a work day?
21       A.   This was -- I can't recall, you
22  know, it was on a work day or not.
23       Q.   But you generally weren't at work
24  at 2:00 in the morning; is that correct?
25       A.   So --

1      Q.   You generally were not at work at
2   2:00 in the morning; is that correct?
3      A.   That depends if I get called out or
4   not.  It all depends.
5      Q.   Did you get called out every day?
6      A.   Every other day.
7      Q.   Okay.  All right.
8           And this is not a trick question.
9   What I'm trying to figure out is you say you
10  were hired in 2007 with multiple credentials.
11  You feel you're being discriminated against
12  because of the time it has taken you to
13  advance in the company.  And at this point in
14  time, you've been with the company roughly
15  nine years; right?
16     A.   That is correct.
17     Q.   Okay.  What led you at almost 3:00
18  in the morning on September 14th of 2016 to
19  suddenly make this call about something that
20  had been going on for nine years?
21     MR. SMITH:
22          I'm going to object to this, to
23  facts not in evidence --
24     MS. SCHOONMAKER:
25          Okay.

1     MR. SMITH:

2          -- upon the nine years.

3  BY MS. SCHOONMAKER:

4     Q.   You can answer.  Why did you pick

5  up the phone at almost 3:00 in the morning in

6  September of 2016 to say, "It's taking too

7  much time for me to advance during the last

8  nine years"?

9     A.   Because that were my belief.  And I

10 felt like I was being discriminated against.

11 So according to my rights, I filed it.  I

12 believe that I was doing a good job and it

13 was time for me to be promoted.

14    Q.   Did something happen around

15 September 14th of 2016 that made you make

16 this call in the middle of the night?

17    A.   Yes.  Mark Oldham got promoted to

18 DTM of Livonia Service Unit.

19    Q.   And when did that occur?

20    A.   Around about the 1st of September,

21 2016.

22    Q.   And I'm just asking because it

23 might seem a little unusual to suddenly, in

24 the middle of the night, make a complaint

25 about something that has obviously been going

1    on for a long time.  So I'm trying to figure

2    out.  Could you not sleep or you were upset

3    about something at work specifically that

4    day?

5         MR. SMITH:

6              Object to the question.  It assumes

7    facts not in evidence.

8    BY MS. SCHOONMAKER:

9         Q.   Just trying to understand this.

10        A.   When I'm on call for Union Pacific

11   Railroad, I'm on call for 24 hours.

12        Q.   But you don't work 24 hours?

13        A.   It depends.

14        Q.   But not every day?

15        A.   Not every day, uh-uh.

16             Okay.  So I have anxiety about my

17   phone ringing at night.  And sometimes, you

18   know, it would affect my sleep, you know,

19   because I had anxiety that I had to keep my

20   phone beside my bed, that it may ring.

21             And sometimes when you have a phone

22   beside you that's subject to ring any time,

23   it's -- you know, it's kind of trouble for me

24   to fall asleep.  So at that particular time,

25   I probably was having trouble sleeping

1    because of my phone.  Or it's...

2         Q.    Anything else?

3         A.    All my life issues that I have.  My

4    reporting to the FRA.  We worried about, you

5    know, did I make the right decision that day

6    about the tracks so we didn't have a major

7    derailment.

8              Like safety issues.  You know, I

9    don't want anybody to die because I didn't

10   make the right decisions or my employee

11   didn't make the right decision.  I have the

12   weight of the public and environment on my

13   shoulders every time I go to sleep.

14             So it's a safety.  I'm a safety

15   guy.  I protect lives.  So I had that all on

16   my shoulder.  I'm concerned because I don't

17   want nobody to pass away or die because I'm

18   not doing what I supposed to do or Union

19   Pacific Railroad hindered me from doing what

20   I'm supposed to do.  So...

21        Q.    But your Values Line complaint in

22   September 2016 was the complaint why you

23   weren't advancing faster, not about your

24   fears and safety concerns; right?

25        A.    And all that included too.  Safety

1  concern, fears, and not being promoted.

2      Q.   Well, let's read what the incident

3  description says.

4          "Johnny was hired in 2007 with

5  multiple credentials.  He feels he is being

6  discriminated against because of the time it

7  is taking him to advance in the company.  It

8  is unknown who is responsible for this.

9          "Johnny is unsure of why he is not

10 advancing when others who come (sic) in with

11 him are.  He has not been approached about

12 any opportunities and those which he has

13 applied for he has been turned down for.

14         "Johnny has more experience and

15 credentials than some who have surpassed him.

16 He is an African-American male over the age

17 of 40 years of age and he believes that this

18 is why he is being overlooked.

19         "Johnny would like an equal

20 opportunity.  He would like this matter to be

21 made known and handled accordingly, including

22 but not limited to compensation for his

23 losses."

24         Did I read that correctly?

25     A.   Yeah.  You read it correctly.

1    Q.   Okay.  So what you were saying was

2    the reason you have been overlooked is

3    because you are African-American and over 40

4    years of age; right?

5         A.   On that particular complaint, that

6    is correct.

7         Q.   Right.  But you were talking about

8    safety and fears.  This had nothing to do

9    with safety claims; right?

10        A.   With that particular one, I didn't

11   put it on there.

12        Q.   That's right.

13        A.   Right.

14        Q.   So let's turn to 758.  This is a

15   Values Line complaint dated November 20,

16   2016, at 7:32 A.M.  And you are complaining

17   in this one about Mark Oldham; right?

18        A.   Uh-huh.

19        Q.   Is that a yes?

20        A.   Yes.

21        Q.   And the "When" is "Ongoing since

22   October 4th of 2016"; correct?

23        A.   That is correct.

24        Q.   So what happened on October 4th of

25   2016?

1      A.   On October the 4th, 2016, that when

2   Mark Oldham, when I told him that I was sick

3   and not feeling well, fired me.  And I

4   reported to the EEO.  And I reported to the

5   EEOC Commission.

6           I also was questioned about it by

7   the FRA, Nick Roppolo.  And I reported to

8   him.  I was just trying to get relief and

9   help from all the retaliation that was going

10  against me and everything.

11          On that particular incident, one of

12  them, the reason I reported it is because I

13  was on vacation.  And Mark Oldham and Phillip

14  Hawkins called an emergency meeting, town

15  hall meeting for my employees.

16          And my employee told them that they

17  had an FRA defect.  But he made them come to

18  the meeting anyway and the defect went

19  overdue.  I was on vacation.  And when I got

20  back, he confronted me on the conference call

21  about it.

22          And I was like, "Well, I didn't

23  call an emergency meeting.  You knew about

24  it."

25          And things that was going on, too,

1    is like every time I would talk to Mark
2    Oldham, he would come to me with Phil
3    Hawkins.
4         So I had two managers listening in
5    to me and I had nobody to be a witness for
6    me, which I felt it was unfair because they
7    going to say things about me.  And I have
8    nobody representing me.  But he got two
9    people sitting in with him.
10        So I wanted a fair representation
11   that, you know, to have somebody witness my
12   demeanor, how I was acting instead of two
13   managers coming against me and I was the only
14   one there.
15        That is one of the reasons that I
16   started recording phone conversations, to
17   have an accurate account of what happened
18   instead of having three managers going
19   against what I say.
20        Q.   What happened on October 4th, 2016?
21        A.   Mark Oldham fired me for being
22   sick.
23        Q.   And that's when you still continued
24   to get your paycheck; right?
25        A.   Huh?

1      Q.   That's when you still continued to

2   get your paycheck; right?

3      A.   Yeah.  I still continued to get my

4   paycheck.  But, you know, at the time that I

5   filed this, it was on October, around the

6   18th or 19th of October, or the 21st when

7   they finally had me come back to work.

8           So I don't get my paycheck.  Get

9   paid once a month.  So if I get paid for

10  October, I got paid in November.  So I didn't

11  know I was getting my check until November

12  until I got the check.  That was my big

13  concern.

14          You know, they ended up paying me.

15  But I had no proof that they were paying me

16  until November till I got my check because it

17  lags behind.  So at the time that I made this

18  report on October the 4th, 2016, you know, I

19  didn't know I was going to get paid for those

20  days because I didn't see the check yet.

21     Q.   This is the report you made on

22  November 20th, 2016.

23     A.   That is correct.  But you asked me

24  about --

25     Q.   Right.

1       A.    -- about October the 4th, 2016.

2       Q.    I asked you a simple question.

3  What happened on October 4th, 2016?

4       A.    Yes.  But if I'm not mistaken, you

5  asked me did I get paid for those days.  And

6  I was explaining to you, saying I didn't know

7  I was going to get paid to it until November

8  when I got the check.

9       Q.    All right.

10      A.    That's what I'm responding to.

11      Q.    I'm just clarifying.  Earlier you

12  told me you got paid.  And you told me it

13  doesn't show up on your personal record;

14  right?

15      A.    Huh?

16      Q.    A termination in 2017 does not show

17  up in your personal record; right?

18      A.    I don't see it in my personal

19  record, no.

20      Q.    Right.  Right.  Right.

21            This says -- and this is the call

22  you made at 7:30 in the morning on

23  November 20th, 2016.

24            "On October 4th, 2016, Johnny filed

25  a report against Mark Oldham and since then,

1    Johnny has been targeted by Mark.  When there

2    is communication between Johnny and Mark,

3    another manager is always present.

4                "Also, if Mark Emails Johnny, other

5    managers are copied on the Emails.  This has

6    not occurred until the report to the Equal

7    Employment Opportunity Commission was filed

8    against Mark.

9                "Johnny would like to report the

10   incident to the company so he cannot be

11   harassed anymore."

12               And what you are reporting is that

13   Mark Oldham only talks to you when there's

14   another manager present.  And if he Emails

15   you, he copies others; right?

16        A.   That is correct.

17        Q.   Then we have another report,

18   UP-TAYLOR 174 and 175, which is out of order.

19   Sorry about that.  Let's skip to the next

20   one.

21               Let's go to UP-169 and 170.  This

22   is the report date, March 28th, 2017.  Do you

23   see that?

24        A.   Yes.

25        Q.   This is -- you reported Daniel

1    Jacques on March 28, 2017.  And this happened

2    on March 28, 2017.

3                "On March 28, 2017, Johnny decided

4    to take a track out of service because it was

5    unsafe and there had been derailment earlier

6    in the day.  There have been ongoing problems

7    with this track including three derailments

8    over the past few years that Johnny knows of.

9                "There has been a major project to

10   correct this hazard but it was canceled due

11   to lack of funds.

12               "Daniel Jacques got upset that

13   Johnny closed the track and began cussing and

14   screaming at him in front of coworkers.

15   Jimmy and Nicholas both witnessed Daniel

16   cussing at Johnny and also can attest to the

17   unsafe conditions of the track.

18               "Daniel has shown a pattern of

19   disrespectful speech directed towards Johnny

20   in the past."

21               What did he do in the past?

22        A.    When my track inspector pulled the

23   track out of service because he found

24   weighted gauge, he would get upset with me.

25               He constantly said that he was

1    going to report me to the VP, which at the

2    time was Chad Wilburn and Brian McGavock,

3    about me taking tracks out of service, about

4    my track inspectors taking tracks out of

5    service, which is both our jobs.

6            And he -- so he was basically

7    reporting me for doing my jobs.  When I take

8    a track out of service, that stop his

9    operation.  And it stop UP from making money.

10           But I have FRA regulation to go by,

11   and I'm the safety guy for Union Pacific

12   Railroad.  And that's the track inspector job

13   to move it out of service.  So why he being

14   disrespectful to me because I'm doing my job?

15   Q.   Did you work for Daniel Jacques?

16   A.   They told me that Daniel Jacques

17   was like the -- in a way, over us and

18   everything.  In a way.

19           But Daniel is not in charge of the

20   track.  Union Pacific Railroad may be the

21   owner of the track.  And Daniel is not 213.7

22   qualified, so he cannot tell me when to take

23   a track out of service and when not to take a

24   track out of service or question my authority

25   about taking a track out of service or my

1   track inspector authority by taking a track
2   out of service, because it's not his job
3   duty.
4           The responsibility falls on me.  So
5   if I have a major derailment blow up a whole
6   town, they come looking at Johnny Taylor
7   because I'm the safety man.  I'm in charge of
8   the track.
9           So that's where my confusion with
10  Union Pacific Railroad is.  How can Danny
11  tell me what to do or say I'm being
12  insubordinate when I'm doing my job when I
13  have the responsibility of the track?  The
14  responsibility of the track is not Daniel.
15       Q.   Was he your boss?  That was my
16  question.  Was he your boss in March of 2017?
17       A.   March 2017, it'd be Mark Oldham.
18       Q.   Was he your boss, Danny?
19       A.   No.
20       Q.   "Johnny was just doing his job and
21  exercising his rightful authority to prevent
22  accidents.  The track is currently out of
23  service and does not pose an immediate threat
24  as long as it stays closed.
25           "Johnny wants Daniel to speak to

1   him with respect and to respect his decisions

2   as track manager."

3          Did you have any further problems

4   with Danny Jacques?

5      A.   Yes.  When I took the track out of

6   service in January the 10th.

7      Q.   Okay.  That's my question.

8      A.   Yes.

9      Q.   Okay.  Let's go back to UP-TAYLOR

10  174 and 175.  Those are the two pages

11  beforehand.

12     A.   You said 174?

13     Q.   And 175.  This is your report of

14  November 2nd, 2017, at 9:27 A.M.  And you

15  called in on November 7th -- I'm sorry -- on

16  November 2nd of 2016 to complain about

17  retaliation of whistleblowers that occurred

18  on March 28th of 2016.  Do you see that?

19     A.   I do not understand the question.

20     Q.   No.  I'm just trying to direct your

21  attention here.

22     A.   Okay.

23     Q.   Report date is November 2nd, 2017.

24  Do you see where the "When" is in this

25  summary information?  You're reporting

1    Mr. Stuart.  Do you see that?

2         A.    Yes.

3         Q.    Okay.

4               And this says, "On March 28, 2016,

5    Johnny reports he filed an ethics report, No.

6    125204249."

7               Do you see that?

8         A.    Yeah.

9         Q.    And that is a typo because you

10   actually made that report on March 28th of

11   2017; right?  Because that is the report we

12   were just talking about.

13        A.    Can I --

14        Q.    If you turn the pages two --

15        A.    Can I explain?

16        Q.    No, no.  I just want you to answer

17   the question.  And if you can't figure out

18   it's the wrong date, I can tell you to look

19   at the Report No. 125204249.

20              Go forward two pages to the report

21   we were just talking about.  And you can see

22   that the Report 125204249 was actually made

23   on March 28th, 2017.  Do you see that?

24              This is not criticizing you in any

25   way.  This is just pointing out the person

1    who took your report put down the wrong date.

2          A.    I agree with it.

3          Q.    All right.

4          A.    I agree with it.

5          Q.    Because you made the report --

6          A.    Right.

7          Q.    -- on March 28th, 2017.

8          A.    Okay.  You clarified.  I see where

9    you going, so thank you.

10         Q.    Right.  And that's when you

11   complained about Danny cursing you out;

12   right?

13         A.    That is correct.  That's correct.

14         Q.    All right.  So on November 2nd,

15   2017, you report that you and Kenneth Stuart

16   were discussing the duties of your welders.

17   And Kenneth told you he wanted to plan the

18   welders.

19              And you said to him he could plan

20   the welders but that you had some specific

21   defects you wanted welded.  And if they

22   weren't done before the due date on

23   November 8, 2017, you would take the tracks

24   out of service; right?

25         A.    Right.

1    Q.    And Kenneth, according to you, said

2    to you there would be consequences if you did

3    that?

4    A.    Uh-huh.

5    Q.    You explained company policy,

6    stating he's allowed to take the tracks out

7    of service if there are defects, and that you

8    have reported other instances of upper

9    management telling you there will be

10   consequences even though you know you're

11   following company rules.

12         And this is a violation of the

13   Railroad Safety Act of 1989, better known as

14   the Whistleblower Act, and that you feel

15   you're being retaliated against since you

16   reported the previous incident and was told

17   that you should not be threatened for

18   following company policy and taking tracks

19   out of service to repair defects.

20         So what are you complaining of

21   about here?  What happened to you?  Did you

22   not get promoted again?

23   A.    I'm complaining about me doing my

24   job duty, taking the track out of service.

25   And he threatened to fire me.

1      Q.   Well, did you get fired?

2      A.   No.  I did not get fired.

3      Q.   Okay.  Did you lose any pay?

4      A.   No, I did not.

5      Q.   Okay.  Did you take the tracks out

6    of service?

7      A.   Yes, I did.

8      Q.   What consequences did you have for

9    that?

10     A.   I did not receive any consequences.

11     Q.   Okay.  Let's go to UP-TAYLOR 176

12   and 177.  This is a report you made to the

13   Values Line dated January 22nd, 2018.  This

14   is ongoing since November 24 of 2017.

15          And you call back on January 23rd,

16   2018.  You wanted to add Jacob Gilsdorf's

17   name to the report because you're being

18   harassed by him.

19          "On January 22nd, 2018, Johnny was

20   following procedures and doing his job and

21   Jacob sent him a bunch of Emails inquiring

22   about the 'slow-orders' that he placed.

23   However, Johnny was simply following proper

24   company procedures.  Johnny felt harassed by

25   Jacob for doing what he was supposed to do.

1       "The company is on a Federal Rail
2   Administration compliance order for not
3   submitting slow-orders and repairing the
4   tracks.  However, every time the employees
5   submit slow-orders, they are harassed by
6   management.
7       "Johnny would like this persecution
8   and harassment to stop and to be able to do
9   his job as it should be done."
10      What is the nature of this FRA
11  compliance order?
12      A.   The nature of it is it's
13  (inaudible) because the crude oil route.  I
14  have a --
15      Q.   I'm sorry.  What was that again?
16      A.   A crude -- crude oil route.  So
17  Union Pacific Railroad transferred from BASF
18  oil that is highly --
19      Q.   Oil?
20      A.   Oil.
21      Q.   O-I-L?
22      A.   O-I-L.
23      -- that is highly volatile.  If it
24  derail, it can just about wipe out a whole
25  train.  The crude oil terminate on my

1    territory at St. James and at NuStar.

2            The FRA compliance order was simply

3    saying that Union Pacific Railroad was not

4    protecting the track.  They were not doing

5    all they need to do to prevent derailments.

6    They were not writing up all the defects.

7    They were not slow-ordering the tracks.

8            We were required to do extra

9    inspection to inspect curves that had lashed

10   through, to do a walking curve inspection.

11           And the FRA kept coming back and

12   made sure that we was writing up all the

13   defects, slow-ordering the tracks, and doing

14   everything within our power to prevent the

15   derailment to stop any harm or train

16   derailing and potentially blowing up a whole

17   town.  So it's all about safety and

18   protecting the public and environment.

19           On 2017, January of 2017, we had a

20   meeting at the Livonia Service Unit at the

21   Livonia yard.  And there went -- Russell

22   Rohlfs was the Maintenance of Way.  And he

23   came through.  And he had a PDF form.

24           And he showed us the compliance

25   order and what the FRA was saying about Union

1    Pacific Railroad.  And he instructed that --
2    the Manager of Track Maintenance and track
3    inspector was there -- what we need to do to
4    get off the compliance order.
5             And he instructed us that we need
6    to write up all defects, slow-order the
7    tracks, take tracks out of service, and
8    reduce our derailments.
9         Q.   Who?  Which name did you use for
10   that?
11        A.   Russell Rohlfs.  He was the -- at
12   that particular time, he was the Maintenance
13   of Way director, general director of
14   Maintenance of Way.
15        Q.   Russell Roth?
16        A.    Rohlfs.  I think it's R-O-H-L-E-F-S
17   (sic).
18        COURT REPORTER:
19             Say that again.  I'm sorry.  R-O --
20        THE WITNESS:
21             R-O-L-H-E -- I mean R-O-L-H-L-S
22   (sic), his last name.
23        COURT REPORTER:
24             Okay.
25        THE WITNESS:

1        Yes.

2        Nick Roppolo and Robert Faaborg

3   would come back to my territory to check to

4   see if I'm in compliance with the FRA

5   compliance order.

6        In other words, they come on my

7   territory.  And I ride with them.  And they

8   determine if I'm in compliance by how many

9   defects they write up.  If they write up a

10  bunch of defects, you know, I'm subject to

11  get a -- what they call a Code 1 violation.

12        So they place us on the compliance

13  orders.  And I have the FRA inspector come

14  back and checking us.  So that's why I

15  couldn't realize why my managers was

16  harassing me when they know it was on the FRA

17  compliance order and when they instructed me

18  to comply with the FRA compliance order.

19        So they were contradicting

20  themselves.  In front of the FRA, they said,

21  "Okay, you know.  We having our people write

22  up defects."  But when the FRA is off the

23  territory and we write up defects, then we

24  get harassed about it.

25  BY MS. SCHOONMAKER:

1      Q.   Have you ever seen a copy of this
2  compliance order?
3      A.   Yes.  I saw it on the PDF that --
4      Q.   What is the PDF?
5      A.   Where he had a screen projector.
6  And he put the compliance order on the screen
7  when he showed us in 2017 in the Livonia
8  yard, Russell Rohlfs did.
9      Q.   When in 2017?
10     A.   It was January 2017 when he did
11 that because we was just getting started on
12 the compliance order.  So he put it on the
13 projector on the screen and showed it to us.
14 And I was reading it, the compliance order.
15          And Nick Roppolo, when he come back
16 to me, discussed the compliance order with
17 me.  He said, "Did your manager tell you
18 about the compliance order?"
19          I said, "Yes, Nick Roppolo, they
20 did told me about the compliance order.  They
21 did tell me about the inspection.  They did
22 tell me about" -- I'm sorry.
23          Every time Nick Roppolo asked me
24 did they talk, did my manager talk to me
25 about the compliance order, my answer was,

1    "Yes, they did."

2           Kenny Stuart, Mark Oldham, all of

3    them talked to me about the compliance order.

4    My Maintenance of Way, at the time being

5    Russell Rohlfs, at the time Phil Kriefes.

6           Even Mark Wheeland talked to me

7    about the compliance order and doing the

8    compliance order.  Because they said the only

9    way we going to get off is by stopping,

10   managing defects and write up defects.

11        Q.    Let's turn to UP-TAYLOR 178 and

12   179.  This is a report you made on

13   January 30th, 2018, at 8:06 P.M.  Do you see

14   that?

15        A.    Yes.

16        Q.    And you are reporting Jacob

17   Gilsdorf and Kenneth Stuart and Phillip

18   Hawkins.  Do you see that?

19        A.    Yes.

20        Q.    And you are claiming they are

21   discriminating against you since January 10th

22   of 2018.  Do you see that?

23        A.    Right.

24        Q.    So this is your report as of

25   January 30th.

1            "On January 10, 2018, Johnny took a

2     track out of service for safety reasons.

3     Johnny got chastised by Jacob Gilsdorf,

4     Kenneth Stuart, and Phillip Hawkins.  Johnny

5     called the hotline on 1/22/2018 to report

6     this, Report No. 126808783.

7            "Johnny would like the investigator

8     to read that report so he or she can

9     understand what has been going on."

10           Did I read that correctly?

11     A.    Yes.

12     Q.    "On 1/29/2018, Johnny called out

13     because he was sick.  Erica took Johnny out

14     to get medication."

15           What kind of medication were you

16     taking back then?

17     A.    Oh, my blood pressure medicine.

18     Q.    Okay.  And so you had to get blood

19     pressure medicine because you were sick?

20     A.    No.  I was sick, but I needed more

21     blood pressure medicine.  So she took me out

22     to pick my blood pressure medicine up.

23     Q.    Okay.

24     A.    Yes.

25     Q.    So she didn't just go pick it up

1  herself?  She brought you with her?

2      A.    Yes.

3      Q.    Okay.  And what was wrong with you

4  that you couldn't go to work that day?

5      A.    What was wrong with me that I

6  couldn't go to work that day is because what

7  happened to me on the 25th when I had that

8  meeting with Jacob Gilsdorf, Kenny Stuart,

9  and -- the 25th of January when I had the

10  meeting with Kenny Stuart, Jacob Gilsdorf,

11  and Phillip Hawkins.

12          When he was sitting there talking

13  to me, falsely accusing me of my behavior and

14  talking about UP wasn't going to tolerate

15  this and he threatened to fire me and

16  everything, I got nervous because, you know,

17  I needed my job.

18          So I wasn't feeling well, so I

19  didn't go to work that day because I got

20  nervous because of the conversations we was

21  having.  And I was trying to realize why I'm

22  getting threatened about my job for taking

23  the track out of service on the 10th and then

24  the VTI hit.

25          So I was very nervous at that time.

```
1   So that's why my wife was driving me, because
2   I was nervous about my job and everything.
3        Q.   So you were too sick to go to work
4   on January 29th because of the meeting that
5   had occurred on January 25th?
6        A.   Correct.  Yes.
7        Q.   So did you work the 26th or the
8   27th or the 28th?
9        A.   The 26th, 27th, 28th, I was on my
10  off days.
11       Q.   How many off days do you get?
12       A.   I get three, six a month.  Six a
13  month.  But it started that Friday.  So I
14  don't know what day it was that Friday during
15  the week of the 22nd.  I don't know what day
16  it really fell on.
17            But it started Friday, Saturday,
18  Sunday.  And I was still -- even on my off
19  days being off, I still wasn't feeling good
20  because I was fearing losing my job.
21       Q.   Did you go to the doctor's?
22       A.   Oh, no.  I didn't go to the doctor.
23       Q.   "On his way to get his medication,
24  Johnny saw Kenneth and Phillip at Johnny's
25  front door ringing his bell."
```

1     A.     Right.

2     Q.     Okay.  So you were -- called in

3  sick.  You saw Union Pacific management at

4  your house.  And you weren't there; right?

5     A.     That is correct.

6     Q.     Okay.

7          "Johnny returned home and called

8  Kenneth to ask what he was doing at Johnny's

9  house.  Kenneth and Phillip returned to talk

10  to Johnny.  They came into his home.

11          "Johnny and Erica asked what they

12  needed.  Kenneth and Phillip told Johnny that

13  he was going on administrative leave, but

14  didn't say why.

15          "Johnny asked what it meant and

16  they didn't know what it meant.  Kenneth and

17  Phillip said they were going to tell Johnny

18  about it.

19          "Kenneth and Phillip took Johnny's

20  computer, work phone and work truck.  That

21  upset Erica, and she was crying.

22          "Johnny feels this was

23  inappropriate of them to come into his house

24  to tell Johnny that he was on administrative

25  leave.

1      "Johnny feels discriminated against

2  because he knows of no one that went through

3  what he did.  Johnny feels that it is because

4  he is African-American that Kenneth and

5  Phillip did that to him in front of his

6  wife."

7      What made you believe that, that it

8  had anything to do with you being

9  African-American?

10     A.   Because we get treated unfairly.

11 And I don't know of any person at UP that

12 they went to their house and put them on

13 administrative leave.  You come to my house

14 during business.  That's my sanctuary.

15 That's my peace.

16     Q.   It's also where your work truck and

17 your work stuff happens to be; right?

18     A.   It is where my work truck, but --

19     Q.   And you know when someone --

20 MR. SMITH:

21     Let him finish.

22 BY MS. SCHOONMAKER:

23     Q.   Go ahead.

24     A.   What I'm saying is:  Why Kenneth

25 Stuart and Philip Hawkins couldn't call me

1    and tell me, "Johnny, we putting you on

2    administrative leave and everything"?

3              They take this off campus and do it

4    somewhere else.  They do not have a right to

5    come on my property unless I invited them on

6    my property.  And they could have handled

7    that totally different.

8              They could have put -- they took me

9    to Starbucks when they gave me my termination

10    letter.  So they couldn't have me meet them

11    somewheres?  They didn't have to perform

12    there in front of my wife.

13         Q.   Did they ring the doorbell?

14         A.   Yes, they rang the doorbell.

15         Q.   Did you open the door?

16         A.   Huh?

17         Q.   Did you open the door if they rang

18    the --

19         A.   That is correct.

20         Q.   They didn't break into your house?

21         A.   Yeah.  I opened the door and see

22    what they want.  But like I said before, that

23    they -- on the phone when they was coming

24    over there, they weren't telling me that they

25    was putting me on administrative leave.

1    If they would have told me that
2  they were putting me on administrative leave,
3  I would have told them, "Do not come to my
4  house.  I will meet you somewhere else."
5    Q.    And Phillip, who was
6  African-American, did this to you to
7  discriminate against you because you're
8  African-American; right?
9    A.    Phillip is following the
10  instruction of Kenny Stuart, which is a white
11  male, and Jacob Gilsdorf, which is a white
12  male.
13    So the decision was made by Jacob
14  Gilsdorf, Kenny Stuart, and higher-up white
15  males to come on my house and pick my truck
16  up.  He was just following orders.
17    I wasn't filing against Phillip
18  Hawkins.  I'm filing to the decision-makers.
19  And all the decision-makers that decided to
20  come to my house were white males.
21    Q.    Well, you made this complaint
22  against Phillip as well, though, too.
23    A.    No.  This complaint was saying that
24  Phillip came with Kenny Stuart.
25    Q.    "Johnny feels that it is because he

1    is African-American that Kenneth and Phillip

2    did that to him in front of his wife."

3            Did they get that right when you

4    reported it?

5        A.   Yes.  I feel I was discriminated

6    because, you know, I was African-American.

7    That's my belief at the time.

8        Q.   After you were terminated, you

9    ceased to have medical insurance; right?

10       A.   Yes.

11       Q.   Did you replace that insurance?

12       A.    In periods of time.  We qualified

13   for, I guess, the Affordable Health Care Plan

14   under the State of Louisiana, because at the

15   time, my wife and I, we didn't have a job.

16           So it was periods that I was on the

17   Affordable Health Care Plan.  And there was a

18   period when my wife got a job that we got

19   kicked off the plan.  I have to look back in

20   my notes to get the exact dates.

21       Q.   Have you had health insurance

22   continuously since being fired at Union

23   Pacific?

24       A.   Off and on.

25       Q.   So the answer is no --

1     A.   No.  No.

2     Q.   -- not continuously?

3     A.   Yes.

4     Q.   Do you have any records showing

5  what you paid for the health insurance you

6  did have while you -- after your termination

7  from Union Pacific?

8     A.   I have some records, what I paid

9  for it.  And the rest of the workers, I guess

10  we had to get it from the Affordable Health

11  Care Plan, about how much the plan was and

12  what they covered.

13     Q.   And how would you make those

14  payments?  By check?  By credit card?

15     A.   Credit card.

16     Q.   Do you maintain credit card

17  records?

18     A.   I kept the receipts.

19     Q.   Okay.  Were you paying more for

20  your health insurance than when you worked

21  for Union Pacific, or less?

22     A.   I mean, can you rephrase the

23  question?

24     Q.   I'm trying to figure out if losing

25  your job at Union Pacific meant you had to

1    pay more for health insurance than you did

2    while you were working.

3         A.   At the time that I was on the

4    Affordable Health Care Plan, I mean, they

5    would take care of my insurance.  So I wasn't

6    paying anything.

7         Q.   Okay.  Have you paid anything for

8    insurance --

9         A.   Yes.

10        Q.   -- since you got fired?

11        A.   Uh-huh.

12        Q.   Is that yes?

13        A.   Yes.

14        Q.   How many months did you pay?

15        A.   Probably two months, three months

16   that I paid.

17        Q.   You only paid two or three months

18   of insurance since you got fired?

19        A.   Yes.

20        Q.   The months when you did pay, did it

21   cost you more than when you were paying for

22   insurance at UP or less?

23        A.   Oh, yes, it did.  It cost me more.

24        Q.   How much did it cost you roughly?

25        A.   My rough estimate, 2,000.

1      Q.   In total?

2      A.   Yeah.  It's a rough estimate.  It

3   is a rough estimate.

4      Q.   Do you currently have insurance,

5   health insurance?

6      A.   Currently, I am on with the

7   Affordable Health Care.  Currently, I am.

8      Q.   How about your wife?  Is she on

9   health insurance?

10      A.   Currently, she have her own health

11   insurance through her job.

12      Q.   And could you get on her health

13   insurance through her job?

14      A.   I couldn't afford it.

15      Q.   Okay.  So the answer is you could?

16   You're eligible, but it's too expensive?

17      A.   It's too expensive, yes.

18      Q.   Are you and your wife legally

19   married?

20      A.   Yes.

21      Q.   Okay.  What is the Widely Important

22   Goal Report?

23      A.   Oh, the Widely Report and Goal

24   Report is what Kenny Stuart came up with at

25   the end of November 2017 and December of

 1 | 2017.
 2 |       Kenny Stuart had a meeting with us
 3 | in Livonia.  And he was talking about the
 4 | derailments they now have at Avondale and
 5 | Beaumont.  Well, he was saying that Avondale
 6 | and Beaumont have the most derailments in the
 7 | year.  And he wanted to put together a plan
 8 | to prevent derailments at Avondale and
 9 | Beaumont.
10 |       So on my Widely Important Goals and
11 | everything, I was talking to him about the
12 | irregular alignment in Avondale yard.  And
13 | one of them was Switch 16.  They had
14 | irregular alignment because they had No. 7
15 | switches in there and it was too small for
16 | the current track that they was on.
17 |       So at that particular time, you
18 | know, I really thought that Kenny Stuart was
19 | trying to help me to eradicate the problem.
20 | But I find out he wasn't.
21 |    Q.  I asked because we were asked,
22 | "Please produce a full copy of the Widely
23 | Important Goal Report for the Livonia Service
24 | Unit that Kenneth Stuart presented to all
25 | Union Pacific Managers of Track Maintenance

1  in December 2018."

2          Are you aware of there being a WIG

3  report in December of 2018?

4      A.   It's December of 2017.

5      Q.   Well, that's not what we were asked

6  for.  So I'm trying to figure out what

7  does -- if there is a WIG report for

8  December 2018, what does that have to do with

9  your claims?

10     A.   It doesn't have anything to do with

11 my claim.  It was a mistake.  It should be

12 December of 2017.

13     Q.   And what are Code 1 violations?

14     A.   Code 1 violations are what the FRA

15 writes against you for what they call gross

16 neglect of a track.

17          So they see a defect.  And they

18 determine that, you know, you knew about it

19 and you just looked over it and didn't do

20 anything about it.  They call it gross

21 neglect.  And they write a Code 1 violation

22 where the company get fined.

23          And Union Pacific Railroad was

24 fined millions of dollars for Code 1

25 violations.  And that's one of the things

1   that my managers was coming at, saying that

2   we needed to cut down our Code 1 violations

3   so we can save Union Pacific Railroad money.

4           And I was following their directive

5   by taking tracks out of service, writing up

6   defects, and slow-ordering the tracks.

7       Q.   What is a VTI hit at 75.02 miles

8   per hour?

9       A.   Mile post.

10      Q.   Pardon?

11      A.   Mile post.  MP, it should be mile

12  post.  75.01 is the mile post where the VTI

13  occurred.

14      Q.   Okay.

15      A.   The mile post.  That's --

16      Q.   Not miles per hour --

17      A.   No.  Mile post.

18      Q.   -- as we were -- we were requested

19  to produce a computer-generated Email from

20  Union Pacific alerting you of a VTI hit at

21  75.02 miles per hour in January 2018.

22          That should be mile posts?

23      A.   Mile posts.

24      Q.   When is the last time you talked to

25  Nicholas Roppolo?

1   A.   It would be maybe two weeks ago I
2   talked to him.
3   Q.   What did you talk to him about?
4   A.   About getting the FRA's compliance
5   letter through FOIA through the FRA.
6   Q.   Slow down and tell me that again.
7   I didn't understand.
8   A.   Going through the FRA through FOIA,
9   the Freedom of Information Act, and getting
10  the FRA compliance order that Union Pacific
11  Railroad replaced on December 22nd, 2016.
12  Q.   And when had you last talked with
13  him before then?
14  A.   Oh, I can't recall.  It been a
15  while.
16  Q.   And have you proceeded with your
17  FOIA request?
18  A.   Yes.
19  Q.   Are you currently being sued by
20  Discover Bank?
21  A.   Yes.
22  Q.   What is the nature of that suit?
23  A.   Because I couldn't pay the credit
24  card.  And they sued me for the entire
25  balance.

         Q.   Is it true that you didn't pay the
credit card?

         A.   I couldn't afford to.  I lost my
job.

         Q.   Is it true you didn't pay the
credit card?

         A.   Yes, because I lost my job.

         Q.   Have you tried settling with them?

         A.   Yes.  Yes.

         Q.   Have you filed for bankruptcy since
you were fired?

         A.   No.

         Q.   Are you contemplating filing for
bankruptcy?

         A.   No.  I do have another lawsuit,
Grassy Finance, another lawsuit with a loan I
took out to pay off my credit card debts.
And I'm handling that lawsuit myself.  I'm
trying to.  But I do have another one.
G-R-A-S-S-Y.

         Q.   You applied for railroad
unemployment benefits after you were fired;
correct?

         A.   That is correct.

         Q.   Are you still receiving those

1   benefits?

2       A.   No.

3       Q.   Why did you cease receiving those

4   benefits?

5       A.   Because I extended the benefit.  I

6   ran out of benefits.

7       Q.   When is the last time you filed an

8   income tax return?

9       A.   2018.  I mean, I filed my income

10  tax return for -- yeah, for 2018.

11      Q.   You filed a return for the tax year

12  2018 in 2019?

13      A.   That is correct.

14      Q.   Do you have a copy of that return?

15      A.   I have a copy of all three of the

16  year returns, 2016, '17, and '18.  Rob

17  Schmidt has it.  I just gave it to him today.

18          The reason is we got a letter back

19  from the FRA stating -- I mean, excuse me --

20  the IRS -- I'm sorry -- that -- I don't know.

21  Something about the incorrect form.

22          So I went ahead and printed it.

23  And he told me bring it in today.  He was

24  going to give it to you.

25      Q.   He hasn't done that yet.  But

1    that's all right.

2         A.   Yes.

3         Q.   If you could share that with your

4    lawyer.  I didn't bring multi copies.  I'd

5    like you to --

6         MR. SMITH:

7              Let me just take a look at it

8    first.

9    BY MS. SCHOONMAKER:

10        Q.   -- look at what the court reporter

11   has marked as Exhibit 9 to your deposition,

12   which is a 1099 for 2018.

13             I believe that shows the benefits

14   you received from the Railroad Retirement

15   Board in unemployment benefits.

16        A.   Yes, ma'am.

17        Q.   Is that accurate?

18        A.   Yes.

19        Q.   And that's the accurate amount?

20        A.   Yes.

21        Q.   All right.  You can pass that to

22   the court reporter.

23        A.   (Complies.)

24        Q.   I also received a document from

25   your lawyer, a multipage document that ended

1  in PLF01484, indicating that you have paid

2  your lawyers a total of $19,754.08; is that

3  correct?

4       A.   Yes.

5       Q.   And it says the last time you made

6  a payment to them was May 20 of 2019 in the

7  amount of $2,000.  Have you made any payments

8  since then?

9       A.   Yes.

10      Q.   How much more have you paid?

11      A.   Approximately $1,800 more.

12      Q.   I'd like you to look at what the

13  court reporter has marked as Exhibit 10 to

14  your deposition and share it with your

15  lawyer.

16           It appears to be another form of a

17  1099 form showing you took distributions from

18  various -- call them investment accounts --

19  in 2018 and paid taxes on them; is that

20  correct?

21      A.   I took the advancement on it and

22  I'm currently paying taxes on it, yes.

23      Q.   Meaning that you did not pay the

24  tax in full when you filed your 2018 return?

25      A.   Yes.

1      Q.   You still owe tax to the IRS?

2      A.   That is correct.

3      Q.   And how much do you owe the IRS?

4      A.   Approximately $22,000.

5      Q.   Do they have any kind of lien

6 against any of your property?

7      A.   No.

8      Q.   Are you on a payment plan?

9      A.   Yes.

10      Q.   What is your payment plan?

11      A.   $300.

12      Q.   For what interval?

13      A.   A month.

14      Q.   And you owe them 23,000?

15      A.   Yes.

16      Q.   Okay.  Pass that back, Exhibit 10.

17         Now, there was federal income tax

18 withheld from your distributions --

19      A.   Yes.

20      Q.   -- in 2018.

21         But you still owed additional tax;

22 is that right?

23      A.   Yes.  Because I got penalized for

24 rejoining before I'm 59 1/2.

25      Q.   And do you owe any money to the

1    State of Louisiana as well for taxes on these

2    distributions?

3            A.    I owe them approximately $4,500.

4            Q.    Do you have a payment plan with

5    them?

6            A.    I do not have a payment plan as of

7    yet.

8            Q.    Have you made any payments to them?

9            A.    Not yet.

10           Q.    Have they taken possession of any

11   of the property or filed liens against any of

12   your property?

13           A.    No, not yet.

14           Q.    So no liens against you by the

15   State of Louisiana; right?

16           A.    No.

17           Q.    No liens against you by the federal

18   government, IRS; right?

19           A.    That is correct.

20           Q.    Your lawyer also produced some

21   prescription records, PLF01027 and 01028,

22   showing that you were taking a drug, then

23   Venlafaxine, 150 mg capsules.  Do you know

24   what that is?

25           A.    That's the Effexor.  I'm taking --

1    I guess the generic would be the Effexor.

2         Q.    And then the other drug, in

3    addition to the Trazodone, is Clonazepam.  Is

4    that the other drug you were telling me

5    about?

6         A.    Yes.

7         Q.    When you received railroad

8    unemployment benefits, how much were you

9    receiving?

10        A.    I have to look at my notes that I

11   sent in to you.  But it was like 700 and

12   something dollars.  I can't give you the

13   exact, but it was like 700 and something

14   dollars.

15        Q.    For what time period?  I mean, was

16   it per week?  Per month?

17        A.    The time period, I got it twice a

18   month.

19        Q.    And it was $700 twice a month?

20        A.    Yes.

21        Q.    I'd like you to look at what the

22   court reporter has marked as Exhibit 11 to

23   your deposition, which is PLF00715, a

24   performance commendation from your

25   supervisor -- a superintendent, Cliff Bowman,

1   who at that time in October of 2017 was the

2   superintendent of your service unit, the

3   Livonia Service Unit; correct?

4      A.   Yes.

5      Q.   It's "Dear Johnny:  Performance

6   Commendation.

7          "On behalf of Union Pacific, we

8   would like to convey our appreciation for

9   your performance and contribution to the

10   Avondale Team.

11          "Your example not only inspires

12   others but epitomizes what UP Courage to Care

13   is all about.

14          "MOP, Darrius Williams, has

15   personally requested this commendation for

16   your collaboration on a successful CTC

17   cut-in at Avondale Yard."

18          What was the CTC cut-in at Avondale

19   Yard?

20      A.   Oh, that was when they upgraded the

21   Avondale North Yard on the east end.  They

22   upgraded Westbridge.  And that's also when I

23   fixed the property repair, the track that was

24   taken out of service in May 28, 2017, because

25   they had irregular alignment when Danny

1    cursed me out.

2        Q.    "Keep up the good work and continue

3    in your efforts to gain knowledge in

4    supporting safety and service.  Your

5    endeavors and commitment to safety do not go

6    unnoticed.

7            "Thank you for your diligence,

8    dedication, and professionalism and continued

9    commitment to safety.  We are grateful to

10   have employees like you working for Union

11   Pacific and the Livonia Service Unit."

12           "Sincerely, Cliff Bowman,

13   Superintendent.

14           "Mr. Taylor, thank you is not

15   enough I understand.  Your leadership and

16   dedication are a huge part of this service

17   unit's success.  Thank you, sir."

18           Did I read that correctly?

19       A.    Yes.

20       Q.    I'd like you to look at what the

21   court reporter has marked as Exhibit 12 to

22   your deposition.  Have you seen Exhibit 12

23   before?

24       A.    Yes, I have.

25       Q.    Do I understand that Exhibit 12 is

1    the Complaint or lawsuit complaint your

2    attorneys filed on your behalf initiating

3    this lawsuit against Union Pacific; correct?

4         A.   Correct.

5         Q.   And you understand that you are

6    suing Union Pacific, claiming that they

7    violated the Federal Rail Safety Act; is that

8    correct?

9         A.   That is correct.

10        Q.   On page 2 of your Complaint,

11   Exhibit 12, you say, "On January 1, 2017, the

12   Federal Railroad Administration (FRA) placed

13   Union Pacific on an FRA Compliance Order for

14   three years due to Union Pacific's failure to

15   obey FRA Track Standard Regulations."

16             Is that the document you are

17   seeking through your FOIA request?

18        A.   Yes.

19        Q.   Turning to page 5 of your

20   Complaint, Exhibit 12, Paragraph 19, "On

21   October 4, 2016, Mr. Taylor was not feeling

22   well when he reported to work."

23             So you actually did go to work on

24   October 4th; right?

25        A.   Yes.  Yes.

1    Q.   "His blood pressure was elevated

2    due to job-related stress.  Mr. Taylor met

3    with his supervisor, Mark Oldham, Director of

4    Track Maintenance of Livonia, Louisiana

5    Service Unit, and explained that he felt

6    significant stress because of his belief that

7    he was being denied promotions in retaliation

8    for reporting unsafe conditions to the FRA."

9         Is that a correct statement?

10   A.   Yes.  I did tell him that I was not

11   feeling well, yes.

12   Q.   No.  Is what I just read a correct

13   statement?

14        Tell you what.  You read to

15   yourself everything in Paragraph 19, which

16   was written by your lawyers, and tell me if

17   everything in Paragraph 19 is correct.

18   A.   (Reading.)  Yes.  I was sick.

19   Q.   Pardon?

20   A.   Yes, I was sick.

21   Q.   That's not my question.  Is

22   everything that your lawyers wrote in

23   Paragraph 19 correct?

24   A.   Yeah.  I mean, they use the term

25   "stress" to describe my sickness.  Yes.

1      Q.   All right.  We'll do it line by
2   line.
3        MR. SMITH:
4            I think you just said yes.
5        THE WITNESS:
6            I said yes.
7   BY MS. SCHOONMAKER:
8      Q.   I thought you said to describe your
9   sickness.
10      A.   I said they used "stress" to
11   describe my sickness, and I said yes.
12      Q.   Okay.  All right.  Let's see.  All
13   right.  Let's do it line by line then.
14           "Mr. Taylor met with his
15   supervisor, Mark Oldham, Director of Track
16   Maintenance of Livonia, Louisiana Service
17   Unit, and explained that he felt significant
18   stress because of his belief that he was
19   being denied promotions in retaliation for
20   reporting unsafe conditions to the FRA."
21           Is that a true statement?
22      A.   That's a true statement.
23      Q.   "Mr. Oldham took Mr. Taylor home,
24   stating that Mr. Taylor was either being
25   terminated or being placed on unpaid

1   administrative leave."

2           Is that a true statement?

3       A.   Yes.  Yes.

4       Q.   "Mr. Taylor was ultimately placed

5   on paid administrative leave and returned to

6   work three weeks later."

7           Is that a true statement?

8       A.   That is correct.  They returned me

9   back to work.  They needed me.  Yes.

10      Q.   Let me finish speaking before you

11  speak, please.

12      A.   Okay.

13      Q.   "As justification for sending

14  Mr. Taylor home and placing him on leave,

15  Mr. Oldham later claimed that Mr. Taylor

16  stated that he did not feel safe working on

17  the tracks that day."

18          Is that a true statement?

19      A.   I wouldn't say I didn't feel safe

20  working on the tracks that day.  I was saying

21  that I wasn't well enough.  I was feeling

22  sick.

23          So I took myself to him.  I was

24  taking myself out the picture by not working.

25  But I don't know why they using the word

1   "safe," because I don't use the words -- you

2   know, using the word "safe" to describe my

3   condition.

4      Q.  I don't think you really understood

5   what I was asking you.  Let's try it again.

6   I just want to know if the statement that

7   your lawyers wrote in your mind is true.

8         "Mr. Oldham later claimed that

9   Mr. Taylor stated that he did not feel safe

10   working on the tracks that day."

11         Is that a true statement?

12      A.  Oh, that's a true statement, yeah.

13   "Mr. Oldham later claimed."  Okay.  Yes.

14   Yes.

15      Q.  Please let me finish the question

16   before you answer.

17      A.  Okay.

18      Q.  "Mr. Taylor denies ever having made

19   that statement."

20         Is that a true statement?

21      A.  Yes.  I did not say I did not feel

22   safe working on the tracks that day.  No, I

23   did not say.  I denied Mr. -- that I made

24   that claim that I did not feel safe on the

25   track.

1          If that's the question you asking

2     me, yes.  I did not make that claim that I

3     feel safe -- did not feel safe working on the

4     track.  Yes.

5          Q.   No.  The question I asked you was:

6     "Mr. Taylor denies ever having made that

7     statement."

8          Is that a true statement that I

9     just read to you?

10         A.   Yes.  From what I'm reading, yes.

11         Q.   Mr. Stuart, Kenny Stuart, was your

12    boss for a short period of time; right?

13         A.   That is correct.

14         Q.   Approximately how long was

15    Mr. Stuart your boss?

16         A.   He started working in October of

17    2017.

18         Q.   And he was your boss when you were

19    terminated?

20         A.   Yes.

21         Q.   And when was that?

22         A.   February 27, 2018.

23         Q.   Did you call him Kenny or Kenneth?

24         A.   I can't recall what I called him.

25    I can't recall.

1      Q.   Did you call him Mr. Stuart?

2      A.   I can't recall.  I -- no.  I can't

3  recall what I really called him.

4      Q.   In a typical work week, how many

5  times would you talk to him?

6      A.   Five days a week.

7      Q.   By phone?

8      A.   Conference call.  Yes, by phone.

9  Yes.

10      Q.   And this was not a conference call

11  just with you; right?  This was a lot of

12  different people?

13      A.   Right.

14      Q.   All right.  So you had a conference

15  call every day?

16      A.   Yes.

17      Q.   It started at 6:00 in the morning?

18      A.   Yes.  I think it was around that

19  time, 6:00 in the morning.

20      Q.   Is this an all service unit

21  conference call?

22      A.   No.  It just a conference call with

23  the MTMs.

24      Q.   And besides you, how many MTMs were

25  there on the call?

1      A.   I can estimate.  I mean, around
2   five.  I'm just estimating.
3      Q.   That's fine.
4      A.   Yeah.
5      Q.   Not one?  Not 50?
6      A.   No.
7      Q.   But more than one?
8      A.   Yeah, more than one.
9      Q.   How many days a week did you have
10  one-on-one communication with Mr. Stuart?
11      A.   I don't understand your question.
12  Are you asking by phone or Emails?
13      Q.   Either.  Any kind of communication.
14      A.   One-on-one communication with
15  Mr. Stuart?  Maybe once or twice a week.
16      Q.   Of those one to two times per week,
17  were most of those Email or did you have
18  phone conversations?
19      A.   Most of them was phone
20  conversations.
21      Q.   So tell me what Mr. Stuart did that
22  was wrong with respect to you.
23      A.   Mr. Stuart terminated me for taking
24  the Avondale track, Switch 16, out of
25  service, which is my job duty.

```
 1        Q.   Okay.  And let me get that exactly
 2   down.  He terminated you for taking the
 3   Avondale --
 4        A.   Track 16 --
 5        Q.   Track?
 6        A.   Avondale Switch 16 track out of
 7   service.
 8        Q.   The switch to 16 track.  Okay.
 9             Now, according to your personal
10   record, you've only been terminated once by
11   the Union Pacific when you got fired at the
12   end of February.
13             So what do you mean Mr. Stuart
14   terminated you for taking the Avondale Switch
15   16 track out of service?
16        A.   Mr. Stuart was present with Mark
17   Wheeland.  And he's the one, the originator
18   of the PIP letter, the PLL letter, that
19   stated it was performance issues by me taking
20   the Avondale Switch 16 track out of service.
21        Q.   So you think you got fired for
22   taking the Avondale Switch 16 track out of
23   service?
24        A.   Yes.
25        Q.   Just for that reason?
```

```
 1        A.   There's other reasons too.  I got
 2   terminated for reporting safety issues to
 3   Kenny Stuart and Jacob Gilsdorf.
 4        Q.   And you think that Mr. Stuart is
 5   the one who decided to fire you?
 6        A.   I think it was a combination of
 7   many managers that decided to fire me.
 8        Q.   Okay.
 9        A.   But he's included in there.
10        Q.   So do you know who actually made
11   the decision to fire you?
12        A.   I can only go back to y'all
13   discovery report that y'all listed Kenny
14   Stuart, Cliff Bowman, Mark Wheeland, and
15   Jacob Gilsdorf as making the decisions to
16   fire me from the discovery report.  I mean,
17   that's --
18             When the Union Pacific Railroad
19   sent their discovery report to me, that's
20   what they have on there, the decision people
21   who determined that I was terminated.
22        Q.   And what else did Mr. Stuart do
23   wrong?
24        MR. SMITH:
25             Object to the overbroad of the
```

1  question.  Y'all been talking about that all

2  day.

3  BY MS. SCHOONMAKER:

4      Q.  Go ahead.  You can tell me.

5      A.  He made a performance issue of me

6  taking the track out of service.

7      Q.  That's what you just told me.  The

8  Avondale switch?

9      A.  Right.  He made a performance issue

10 by me reporting to him that the Avondale

11 switch had a defect in it.

12     Q.  Okay.  What else did he do wrong?

13     MR. SMITH:

14         Objection to overbroad of the

15 question.

16     MS. SCHOONMAKER:

17         Go ahead.

18     MR. SMITH:

19         And repetitive.

20 BY MS. SCHOONMAKER:

21     Q.  You can answer.  Your lawyer will

22 tell you if you're not to answer.

23     A.  Oh, reporting safety issues, track

24 out of service.

25     Q.  What about reporting safety issues?

1    What did he do wrong?

2         A.   Well, on his PIP letter, he said

3    that I reported on January the 10th the

4    reason why I took the track out of service.

5              And he said it was a performance

6    issue, because he said that I did not send

7    the correct documents or what he called the

8    current documents for me taking the track out

9    of service on the PIP letter, on the PPL

10   letter.

11        Q.   The PIP?

12        A.   The PIP, yes, letter.

13             Jacob Gilsdorf for reporting a VTI

14   hit and reporting safety issues with the

15   track with the VTI hit.

16             Kenny Stuart for threatening to

17   fire me.  And he did fire me for taking the

18   track out of service.

19        MS. SCHOONMAKER:

20             Can we take a short break?

21        MR. SMITH:

22             Sure.

23        MS. SCHOONMAKER:

24             All right.

25             (OFF RECORD)

1          (RECESS)

2     BY MS. SCHOONMAKER:

3          Q.   Mr. Taylor, you told me before we

4     took a break that you thought that Mr. Stuart

5     was part of the decision-making for your

6     termination; correct?

7          A.   Yes.

8          Q.   And you said you based that on our

9     discovery report; is that correct?

10         A.   I based it off the discovery report

11    and the PIP letter and the letter to Jacob

12    Gilsdorf to Mark Wheeland, what Mark Wheeland

13    told me on February 27th, 2018, that those

14    managers was the ones who made the decision

15    to fire me.

16         Q.   Right.  But I'm focusing on the

17    discovery report, because your attorneys

18    asked us an interrogatory question.

19              And we said that we had identified

20    the following individuals who were

21    responsible for its decision to terminate

22    plaintiff's employment or who have knowledge

23    of the reasons therefore.

24              And Mr. Stuart was one of the

25    people we identified as one of the

1  individuals who were responsible for the

2  decision to terminate your employment or who

3  have knowledge of the reasons therefore.

4          Is that the discovery report you're

5  talking about?

6      A.   Yes.

7      Q.   Okay.  Do you know who the ultimate

8  decision-maker for your termination was?  My

9  question is do you know, not do you think, do

10  you guess.  Do you know who made the decision

11  to terminate your employment?

12      A.   I can go by the termination letter

13  that was signed by Mark Wheeland, that he

14  said I was terminated.

15      Q.   Okay.

16      A.   Yes.

17      Q.   Do you know -- so you know that

18  your termination letter was signed by

19  Mr. Wheeland; correct?

20      A.   Uh-huh.

21      Q.   Is that a yes?

22      A.   Yes.

23      Q.   Do you know that Mr. Wheeland made

24  the decision to terminate your employment?

25      A.   That letter tell me he was involved

```
1    in the decision to terminate me.
2         MS. SCHOONMAKER:
3              Objection.  Nonresponsive.
4    BY MS. SCHOONMAKER:
5         Q.   Do you know who made the decision
6    to terminate your employment?
7         A.   Mark Wheeland, Cliff Bowman, Jacob
8    Gilsdorf, and Kenny Stuart.
9         Q.   That's not my question.  Let me try
10   to ask it this way.  Did anybody ever tell
11   you the person who ultimately made the
12   decision to fire you was -- fill in the name.
13   Did anybody ever tell you that?
14        A.   The person?
15        Q.   Did anybody ever tell you, "This is
16   the person who made the decision to fire
17   you"?
18        A.   No.  Nobody never told me that, no.
19        Q.   Did you ever read anything that
20   told you:  This is the person who made the
21   decision to fire you?
22        A.   Yes.
23        Q.   And what did you read that told
24   you:  This is the person who made the
25   decisions to fire you?
```

1      A.   The PIP letter where Union Pacific
2  Railroad said that that's the reason they
3  fired me, because I wouldn't sign it.   And
4  the originator was Kenny Stuart.
5           And also, I read the letter from
6  Jacob Gilsdorf to Mark Wheeland recommending
7  me for termination on the 1.6 conduct rule.
8           But also in that letter to Jacob
9  Gilsdorf sent to Mark Wheeland, he stated
10  that I said to the letter to the firing
11  managers that I was going to report them to
12  the whistleblower.
13      MS. SCHOONMAKER:
14           Objection.   Nonresponsive.
15           I'll pass the witness.
16      MR. SMITH:
17           I just have a few questions.
18  EXAMINATION BY MR. SMITH:
19      Q.   Just for clarification, Nick
20  Roppolo, who does he work for and what is his
21  job?
22      A.   Nick Roppolo worked for the Federal
23  Railroad Administration.   And he is a Federal
24  Railroad Administration track inspector for
25  the Federal Railroad Administration.

1    Q.   Okay.  And who is Robert Fasburg --
2  Faaborg?  Faaborg?
3    A.   Robert Faaborg is the chief
4  railroad inspector for the Federal Railroad
5  Administration.  He worked for the Federal
6  Railroad Administration.
7    Q.   Are those the two individuals from
8  the Federal Railroad Administration that you
9  dealt with most frequently in your job?
10    A.   Those are the two individuals that
11  I dealt with most frequently in my job.
12    Q.   Ms. Schoonmaker showed you some
13  reports that are identified as Exhibit No. 8.
14    A.   Uh-huh.
15    Q.   Do those represent calls you made
16  to Union Pacific Company about these
17  complaints?
18    A.   These complaints was called in to
19  Union Pacific Railroad.
20    Q.   Okay.  Did you type those reports?
21    A.   No.  I did not type these reports.
22    Q.   Okay.  Were you provided copies of
23  those reports after they were typed up?
24    A.   No.  I was not provided copies of
25  these reports.

1     Q.   Okay.  Do these reports reflect

2   verbatim what you told the person who

3   received the call?

4     A.   No, it does not.

5     Q.   Okay.

6          You mentioned earlier -- I just

7   want to clarify this -- that Union Pacific

8   made you the owner of the track.  What does

9   that mean?  Can you explain that?

10    A.   By FRA Regulation 213.5, Union

11  Pacific Railroad supposed to designate the

12  owner of the track.  And the owner of the

13  track for the Livonia sub is Johnny Taylor,

14  myself.

15         That mean that I have sole

16  responsibility of the track.  I'm in charge

17  of making sure the track is in compliance.

18  It also mean that I take responsibility.

19         If we have major derailments, I'm

20  the one that responsible for it.  If the FRA

21  inspector come on the territory and inspect

22  the track and he find a lot of defects, I'm

23  the one responsible for it.

24         I'm the one responsible for it if

25  we had a major derailment and we have

1    fatalities behind it.  So I'm responsible for
2    that.
3            So I'm the owner of the track.  The
4    sole responsibility fall under me, Johnny
5    Taylor, not Jacob Gilsdorf or Kenny Stuart or
6    Mark Wheeland.  Johnny Taylor.
7        Q.   Okay.  And how long did you hold
8    that position?
9        A.   I held that position for five
10   years.
11       Q.   Okay.  Now, have you reviewed your
12   Union Pacific personnel file?
13       A.   I have never looked in my Union
14   Pacific Railroad personnel file.
15       Q.   So you don't know exactly what's in
16   it?
17       A.   I do not.
18       Q.   Okay.  Exhibit No. 8, I'm going to
19   show you the first page.  It's Bates number
20   757.  And it says "Who, What, When, Service
21   Unit."  And it says, "Ongoing since 2007."
22   And it says "Discrimination."
23            Did you inform the person that took
24   this call that there had been discrimination
25   against you since 2007?

1      A.   No.  No.

2      Q.   Did you inform the person that you

3  believed that you were discriminated against?

4      A.   Yes.

5      Q.   Okay.  And did you inform the

6  person that you believed that you were

7  discriminated against on the basis of your

8  race?

9      A.   Yes.

10     Q.   Did you know for sure when you made

11 any of these reports to the Values Line what

12 the Union Pacific supervisors' motives were

13 in taking the actions against you?

14     A.   Did I know specific?

15     Q.   Were you sure it was -- in your

16 mind, were you sure it was racial

17 discrimination?

18     A.   In my mind, it was racial

19 discrimination at the time I made the

20 Value --

21     Q.   Okay.  But your lawsuit claims that

22 you were retaliated against because of your

23 reports to the -- or the disclosures to the

24 Federal Railroad Administration.

25     A.   I believed there was both

1  discrimination and also my reporting to the

2  Federal Railroad Administration.

3      Q.   Okay.

4          And then you were asked a question

5  about whether you would accept an action

6  plan.  And I don't recall your response, but

7  you wanted to explain.  And opposing counsel

8  would not let you explain.  Would you like to

9  explain that answer?

10     A.   Yes.  I would like to explain the

11  answer.

12          Per FRA Regulation 213.5, it's my

13  job duty to take a track out of service.  So

14  I wouldn't sign it because it can't be a

15  performance issue because that's my job duty

16  every day to go out there and do, take tracks

17  out of service, slow-order tracks, write up

18  defects, report safety concerns and issues to

19  my superiors.

20          So that mean that every time I go

21  out there and do work and stuff, it's just an

22  issue.  It's a job issue.  Well, that's just

23  the work that Union Pacific Railroad hired me

24  to do.

25          So I didn't sign the PIP letter

1  because when I read it and it was talking

2  about me taking the track out of service and

3  the VIT hit and we were reporting the safety

4  issues, you know, I told them that this is a

5  violation of the Whistleblower Act.

6           And you asking me to not obey

7  Federal Railroad track standards, and I'm not

8  going to sign this because that is my job

9  duty.

10     Q.   You said that you felt like the PIP

11 was bogus.  I think you said that.

12     A.   Uh-huh.

13     Q.   Did I hear you correctly when you

14 said that?

15     A.   Yes.

16     Q.   Okay.  What do you mean by that?

17 Explain that.

18     A.   I mean that they was firing me or

19 disciplining me, both of them, for doing my

20 job duties.  How can you discipline me for

21 doing my everyday job duty, which was

22 instructed by me from the Union Pacific

23 Railroad and also by the FRA inspectors?  And

24 also, I was following the track standards.

25           So I didn't sign it because I'm not

1   going to sign anything that would restrict me

2   from doing my job duty, which is safety,

3   which is protecting the public, preventing

4   major derailments, preventing derailments,

5   writing up defects, preventing people from

6   getting injured, preventing harm to the

7   environment.

8        Q.   Now, you were also asked a question

9   about your refusing to acknowledge the PIP

10  discussion.  And you said you wanted to

11  explain your answer to that.  Did you want to

12  explain it at this point in time?

13       A.   Right.  I refused it because it was

14  restricting me to not doing my job duty.  And

15  I was not going to sign a piece of document

16  that would stop me from following FRA track

17  standard rules, for following UP rules, and

18  protecting the environment, protecting

19  people, and providing safety to the

20  community.  I was not going to sign a

21  document that restricted me from doing that.

22       Q.   And you believed it was your legal

23  duty to carry out your job in a manner that

24  you have mentioned?

25       A.   Yes.

1      Q.   I'm going to show you in just a

2 minute, Exhibit No. 7.  You were asked also

3 about -- it's Bates No. 41.  You were asked

4 about this entry up here.  And it says -- and

5 I quote -- "On January 22nd, 2018, you were

6 again informed that welding gangs need to

7 properly report their production."

8           And you answered.  But you said you

9 wanted to explain.  And you were not allowed

10 the opportunity to explain.  Would you like

11 to explain that?

12      A.   Yes, I will.

13           My welders repair what we call

14 pull-aparts.  And that's a joint in the

15 railroad that connect with bolts.  And it was

16 pull-aparts.

17           So only my welders can fix it

18 because they have to put a stretcher on it,

19 pull it together, and put new bolts on it.

20 Because the rail is separating two to three

21 inches.  So a train cannot safely pass over

22 it.

23           I was instructed by Bryan Shields

24 and Darrell O'Quinn that we need to do

25 pull-aparts at the time that Bryan Shields

1    was a DTM, to code it as rail ends.

2            So when Kenneth Stuart came in, he

3    said, "Well, that's not the correct

4    reporting."

5            But I had an Email in January where

6    I specifically asked Kenny Stuart.  I said,

7    "Pick out what color you want my welders to

8    use for rail ends" in the Email.

9            I don't know the exact date.  But

10   it was an E-mail in January of 2018 where

11   Kenny Stuart never responded back to me what

12   color he wanted to use.

13           Kenny Stuart -- I was just trying

14   to get clarification because if you want me

15   to use something else, tell me which color to

16   use and we will start using it.  But he --

17   okay -- and we will start using it.  But

18   Kenny Stuart never responded to me.

19           I asked him about it on the

20   conference call.  Kenny Stuart responds to

21   me, "Well, you so smart, you figure it out

22   yourself."

23       Q.   Now, you've testified as to several

24   members of Union Pacific management harassing

25   you and retaliating against you for reports

```
 1   to the Federal Railroad Administration.
 2            I want to ask you about what you
 3   observed in terms of their attitudes about
 4   you taking tracks out of service and your
 5   reporting of that to the FRA.  I mean, did
 6   they express or did they exhibit an attitude
 7   about that?
 8        A.   Yes.  They had a very negative
 9   attitude about it.
10        Q.   What do you base that on?
11        A.   I base that off from the -- Danny
12   Jacques cursing me out.  I base it off of
13   their continuing to threaten me for
14   putting -- writing defects, taking track out
15   of service, saying that they going to fire
16   me.
17            I base it off of them going through
18   and actually firing me.  I base it off of
19   when they said they were going to fire me for
20   taking the track out of service.  They
21   eventually did fire me for taking the track
22   out of service.
23            It was a very hostile environment
24   that I was working with and everything
25   because I was -- my attitude that -- towards
```

1    the end of it, I was an enemy because I

2    talked to the FRA, which is part of my job.

3              I would talk to Nick Roppolo three

4    or four times a month.  Nick Roppolo stayed

5    in Gretna, Louisiana, so he would come back

6    and inspect my tracks more than any other

7    tracks because he was in close proximity.

8              Nick Roppolo would call me and ask

9    me things about the managers.  For instance,

10   in June of 2017, Nick Roppolo asked me about

11   what Union Pacific Railroad said that we were

12   going to do.  And that was saving our

13   tracking time on our computer for like one

14   day.

15             He asked me did Mark Oldham talk to

16   me about it.  And I told him Union Pacific

17   Railroad -- I told Mark -- Nick Roppolo, "No,

18   he did not talk to me about it."

19             And he said, "Wait a minute."

20             And he made a phone call to -- he

21   said he was going to call Mark Oldham.  And

22   he called Mark Oldham.  And he called me

23   back.  He said Mark Oldham was going to talk

24   about it.

25             Well, the very next day on a

1   conference call, Mark Oldham was talking

2   about the rule that we supposed to be

3   obeying.

4           But during that particular time

5   there in June of 2017, you know, that when

6   Mark Oldham false accused me of not getting

7   along with managers.

8           So it's like every time I did a

9   report to the FRA, I get something negative

10  done to me, whether they talking about firing

11  me or, you know, changing up my reviews.

12      Q.   Okay.  Did all these series of

13  events that you just described, did they have

14  any -- or did they make it more difficult for

15  you to have a positive attitude?

16      A.   Yes, it did.

17      Q.   Explain that.

18      A.    It make it more difficult because

19  every time I have a defect or I see I have to

20  have a track taken out of service, I was like

21  afraid to go to my manager because I know

22  they were going to argue with me, fuss at me,

23  or threaten to fire me.  So I was afraid to

24  go to them and say anything.

25          You know, I go out there and

 1  inspect tracks.  And I would walk.  And I
 2  would hope that I didn't find nothing that I
 3  have to report anything.  But I did.  And I
 4  report it.  And I got harassed about
 5  reporting it.
 6      Q.  Okay.  Now, let me make sure I
 7  understand this.  It says -- this is Exhibit
 8  No. 8.  And I'm going to show you Bates No.
 9  178.
10          Does this reflect your last report
11  to the Values Line concerning safety issues
12  before your termination?
13      MS. SCHOONMAKER:
14          Could you give me that Bates
15  number?
16      MR. SMITH:
17          Sure.  178.
18      MS. SCHOONMAKER:
19          Thank you.
20  BY MR. SMITH:
21      Q.  Just take a look at it.  Take your
22  time.
23      A.  (Reading.)  No, it do not.
24      Q.  Okay.
25      A.  Because --

1       Q.    When was the next one?

2       A.    Huh?

3       Q.    Did you make a report after that to

4  the Values Line, Union Pacific Values Line?

5              Let me make sure that you

6  understand.  This document is called "Values

7  Line" up at the top.

8       A.    Right.

9       Q.    My understanding from your

10  testimony was that you were -- this was a

11  mechanism that Union Pacific had for

12  receiving internal company complaints.

13      A.    Right.

14      Q.    Okay.  This reflects a complaint

15  that you made.  And the report date is

16  January 30, 2018.

17      A.    Right.

18      Q.    You made the original call on

19  January 30, 2018.  And you related some

20  description of the incident.

21              This report dated January 30, 2018,

22  was that the last report, to your knowledge,

23  that you made to this Union Pacific Values

24  Line?

25      A.    That is the last report.

1    Q.   Okay.  And what was your
2 termination date?
3    A.   February 27, 2018.
4    Q.   Right.  Twenty-seven days later.
5         Okay.  The report date is
6 January 30, 2018.  You were terminated the
7 next month on the 27th.
8    A.   That's not my last report.  I
9 corrected myself.  My last report was in
10 February of -- February 27 of 2017 when I
11 received a termination letter.
12    Q.   All right.
13    A.   Yes.
14    Q.   But before you were notified of
15 your termination, it was only about 27, 28
16 days after this report of January 30, 2018 --
17    A.   Yes.
18    Q.   -- that you were terminated?
19    A.   Yes.  Twenty-seven days.  That's
20 correct.
21    Q.   You were asked earlier some
22 questions about the value of and importance
23 of having a good attitude.  And you asked to
24 be able to explain your answer to that
25 question, but you were not allowed to

1  explain.  Would you like to explain your

2  answer to that question now?

3       A.   Yes.  Union Pacific Railroad

4  consider me not having a good attitude

5  because I stood up and told them that I was

6  not going to violate an FRA defect, a rule.

7            Union Pacific Railroad, on the

8  conference call at Mark Wheeland, Chad

9  Wilburn, Jacob Gilsdorf level, talked about

10  velocity and velocity being like 21.8.

11            And if velocity is 21.8, then Union

12  Pacific Railroad would make "X" amount of

13  money, where when you slower the track or

14  take a track out of service, you lower the

15  velocity.  So it mean Union Pacific Railroad

16  was losing money.

17            However, we had to protect the

18  tracks, you know, if we had a defect or

19  anything also on the track for safety issues,

20  safety reasons.

21            So that's why I was getting the

22  negative views, because the Maintenance of

23  Way, what we do is that when we go out there

24  and I go out there and do it, I'm killing

25  their velocity so they're not making money.

1          So that's why Union Pacific

2    Railroad managers was constantly on me and

3    the other track inspectors and everything,

4    because we was slowing down their velocity.

5          So I didn't play any ball with them

6    about helping them with their velocity.  If

7    there was a defect there, I was following FRA

8    track standard rules and Union Pacific

9    Railroad rules.

10          And I'll either slow-order the

11    track, take the track out of service, or put

12    213.9b remedy or schedule for repair.

13     Q.   On January 23 and 24, did you make

14    a report to Mr. Roppolo and Mr. Faaborg with

15    the FRA?

16     A.   Yes, I did.

17     Q.   And what was the substance of that

18    report?

19     A.   The substance of that report was me

20    taking the track, Avondale Switch 16 track

21    out of service on January 10, and Jacob

22    Gilsdorf harassing me about placing a slow

23    order on the VTI hit at Milepost 75.02 behind

24    a --

25          That report was about -- that

1    report to me was taking the track out of

2    service in Avondale on January 10th and

3    refusing to allow trains to go over the

4    track, and writing a slow order and putting a

5    slow order behind a VTI hit on January 22nd

6    of 2018.

7        Q.   Okay.  Now, do you know whether

8    Mr. Roppolo or Mr. Faaborg reported back to

9    Union Pacific regarding the substance of your

10    complaint?

11        A.   They never followed back up with

12    me.  He told me he was going to talk to them

13    about it, but he never followed back up and

14    said whether he did or not.

15        Q.   But he told you he would talk to

16    them?

17        A.   He told me he would talk to them.

18        Q.   How much sick leave time did you

19    take during your entire employment with Union

20    Pacific?  How many days, weeks, or months?

21        A.   In my ten-year tenure, once.  I

22    mean, once that I was out on October the 4th,

23    2016, that I told them that I was sick.

24        But all the other days that I can

25    recall, I worked for Union Pacific Railroad

1    because I had an important job.

2         Q.   Okay.  Did you ever receive any --

3    before the documents that we're talking

4    about, did you receive any discipline from

5    Union Pacific?

6         A.   No.  I haven't received any

7    disciplinary actions from them.

8         Q.   Okay.  Did you receive any

9    write-ups?

10        A.   No.

11        Q.   Okay.  As I understood your

12   testimony, you said you took the medication

13   or you began to take the medication Trazodone

14   before your termination from Union Pacific?

15        A.   That's correct.

16        Q.   Okay.  And you took -- you took

17   that for sleep?

18        A.   That's correct.

19        Q.   Okay.  And you're still taking that

20   for sleep?

21        A.   Yes.

22        Q.   Okay.  How do your sleep problems

23   before your termination from Union Pacific

24   compare to your sleep problems after your

25   termination from Union Pacific?

1       A.   Before, you know, I would get five

2   hours of sleep before my termination.  And

3   after, sometimes I would just lay awake

4   tossing in bed for hours now.  I get like one

5   hour of sleep.  And I would do it for days.

6            Just, you know, all these thoughts

7   going through my mind.  But my mind would

8   just race and I couldn't sleep at night.

9            My wife was saying that, you know,

10  that I was jumping and moving and just doing

11  all type of erratic behavior, you know, when

12  I'm laying in bed.

13           So after that, I would say I would

14  sleep like one or two hours a night after

15  this.

16      Q.   All right.  And how long did your

17  sleep problems to that extent continue after

18  your termination?

19      A.   Till May of 2019 when I went to see

20  Dr. Forgey.  And he put me on the Effexor and

21  Clonazepam.  And then my sleep problems

22  started to get better when he put me on the

23  extra medication.

24      Q.   Well, good.

25           Now, did you have any increased

1   problem with high blood pressure after

2   your -- after your termination, if you know?

3       A.   My blood pressure stayed the same.

4       Q.   It did?

5       A.   Yeah.  Between -- before I got

6   terminated, I determined my blood pressure

7   stayed the same because I wasn't getting no

8   sleep.  I couldn't sleep after the

9   termination.  My blood pressure stayed the

10  same.

11      Q.   So you feel like your blood

12  pressure was controlled by medication?

13      A.   Yes.

14  MR. SMITH:

15       Okay.  That's all I have.  Thank

16  you, Mr. Taylor.

17  EXAMINATION BY MS. SCHOONMAKER:

18      Q.   I just have a few.

19       Mr. Taylor, do you know that

20  Trazodone is actually an antidepressant

21  medication?

22      A.   Yes.  I mean, Dr. Forgey explained

23  it to me.

24      Q.   Okay.

25      A.   But he also said used for sleep

1    too.

2         Q.   Looking at Exhibit 8 again, Exhibit

3    8, at UP-TAYLOR 178 to 179, what you

4    described to your attorney as your final

5    report to the Values Line before your

6    termination.

7         A.   Which one?

8         Q.   UP-TAYLOR 178 to 179, the report of

9    January 30, 2018.  You see that?  Are you

10   there?

11        A.   This is not my final report.  Not

12   on -- you talking about Report 1/30/2018?

13        Q.   Right.  Maybe I'm confused.  I

14   thought you just told your lawyer this was

15   your final report to the Values Line before

16   your termination.

17        A.   No, it wasn't.

18   MR. SMITH:

19             Before the termination.

20   THE WITNESS:

21             Oh, before the termination.  I'm

22   sorry.  Yes.  Yes.

23   BY MS. SCHOONMAKER:

24        Q.   And this is the report that's

25   UP-TAYLOR 178, 179 contained in Exhibit 8;

1    correct?

2        A.    Yes.

3        Q.    And your final complaint to the

4    Values Line was of race discrimination;

5    correct?

6        A.    No.

7        Q.    "Johnny feels discriminated against

8    because he knows of no one that went through

9    what he did.  Johnny feels that it is because

10   he is African-American that Kenneth and

11   Phillip did that to him in front of his wife.

12          "Johnny is the main provider of the

13   household.  Phillip is African-American.

14   However, Kenneth and Jacob, who are the

15   highest-ranking managers, are both Caucasian.

16          "Johnny feels that if he had been

17   Caucasian, he wouldn't have been treated that

18   way."

19          You'll agree with me that your

20   final report to the Values Line was

21   complaining about race discrimination?

22       A.    No.

23       Q.    Okay.  What were you complaining

24   about that wasn't race discrimination?

25       A.    Okay.  The document is not here.

1      MR. SMITH:

2           Wait.  Here.

3  BY MS. SCHOONMAKER:

4      Q.   Your lawyer will point out to you

5  where to read and testify.

6      THE WITNESS:

7           I'm getting confused about the

8  question.  She asked me if this was my

9  final --

10          Are you saying this is my final

11 report before I got fired; or are you saying

12 this is my final, period, with Union Pacific

13 Railroad?

14 BY MS. SCHOONMAKER:

15     Q.   That's not the question.  My

16 question is -- we won't even talk about final

17 reports if you're struggling with that.

18     A.   No.  I'm not --

19     Q.   You will agree with me that what

20 you are complaining about in Report

21 126853909, dated January 30th, 2018, says

22 "What:  Discrimination."

23          And it says in the body that you

24 feel you're discriminated against because

25 you're African-American.  Would you agree

1   with me that that is what you told the Values

2   Line?

3        MR. SMITH:

4             Objection.  You're taking it out of

5   context.  Look at the first paragraph.

6   BY MS. SCHOONMAKER:

7        Q.  Your lawyer is trying to teach you

8   where to testify.

9        MR. SMITH:

10            No, I'm not.  I'm asking you to not

11  ask the question out of context.

12       THE WITNESS:

13            (Reading.)  What I'm saying here is

14  that this is -- January 30, 2018, is the

15  final report that I made before I got fired.

16            But I also made a report on

17  February the 27th and 28th to the EEO asking

18  them was the investigation over with.  That's

19  what I'm trying to explain.

20            I reported to them again because

21  my -- it was still open.  And I made a report

22  to them.  I don't see this document in here.

23  BY MR. SMITH:

24       Q.  What documents did you review in

25  preparation for your deposition?

1        A.    I reviewed -- the documentation

2   that I reviewed -- I'm sorry.

3              The documentation that I reviewed

4   for my deposition is my calendar notes, which

5   I submitted to Union Pacific Railroad.

6        Q.    What are counter notes?

7        A.    Calendar notes.  It's like my notes

8   that I submit that I wrote down on my

9   everyday event.  I turned them in to Union

10  Pacific Railroad on the dates.  I reported to

11  my lawyer all the dates.  It's from what I've

12  written down for the past -- from 2014 up to

13  2018.

14       Q.    What else did you review?

15       A.    I reviewed all the documents.  Not

16  those documents you looking at because I

17  don't have access to those.  So to these

18  documents here, I don't have access to those.

19  This my first time seeing these documents

20  because I don't have access to them.

21       Q.    I don't know what documents you're

22  referring to.

23       A.    These documents here.

24       Q.    Are you talking about Exhibit 8?

25       A.    757, UP 75 -- Exhibit 8.  I don't

1  have access to those documents.

2      Q.   Okay.  So you know part of Exhibit

3  8 came from documents you produced?

4      A.   Huh?

5      Q.   Part of Exhibit 8 came from

6  documents that your attorney produced to us

7  and part came from Union Pacific.  So you did

8  have access.  But you --

9      A.   No, I did not, because I made a

10  phone call.  And they wrote this down.  But

11  what I'm looking at right now, Exhibit 8, was

12  from a phone call.  I called it in to the

13  Value hotline.  And the Union Pacific

14  Railroad have a third party that types it

15  out.

16      Q.   Right.

17      A.   So we did not send no documents to

18  Union Pacific Railroad because we didn't have

19  access to it.  Union Pacific Railroad sent

20  those documents to us if we have them.  I

21  didn't have those documents.

22          The only document I had is a letter

23  saying by Scott McMillan that says on

24  February 1st, February 18th, we started an

25  investigation.  Those are the only documents

1    they sent to me and by mail.

2          But I didn't get a chance to look

3    at those reports in Exhibit 8 and everything

4    because they are internal documents with

5    Union Pacific Railroad.

6          So that's why I said that you

7    missing some.  Because based off the

8    documents that I have that Scott McMillan

9    sent to me and all the other EEOs, I have

10   those documents.  And I reviewed both of

11   those.

12         And those documents do not go in

13   details like that.  It just said that we

14   started to do an investigation.  We into the

15   investigation, and we find that your claim

16   don't have no merits.

17   Q.   You understand your lawyer has had

18   these documents for a number of months?

19   A.   I didn't --

20   Q.   So it really doesn't matter.  You

21   had the ability to review them since your

22   lawyer had them.  But it's not a problem.  I

23   just want to know what you did review.

24   A.   Okay.

25   Q.   What else did you review?

1        A.    I reviewed the PIP letter, the PIP,

2    P-I-P letter; all the letters Jacob Gilsdorf

3    wrote; the one that Kuwamura wrote.

4            I reviewed that letter that he

5    wrote to Scott McMillan and why they said

6    they placed me on administrative leave

7    because I was 6.1 infraction.  Because they

8    placed me on administrative leave because of

9    the 6.1 infraction.

10           And I didn't find out that till

11   later.  But it was talking about conductors

12   and engineers moving trains.  And I'm not

13   even an engineer or conductor.

14       Q.    Anything else you reviewed?

15       A.    I reviewed the Emails from the FRA.

16   I looked at some of the track inspection from

17   the FRA that was submitted.  I looked at some

18   of the OSHA complaint documents, not all of

19   them.

20       Q.    Anything else you reviewed?

21       A.    That's all I can recall at this

22   time.

23       Q.    I'd like you to review what the

24   court reporter has marked as Exhibit 7,

25   specifically the Performance Improvement

| | |
|---|---|
| 1 | Plan -- |
| 2 | A.   Okay. |
| 3 | Q.   -- which is at UP-TAYLOR 40, 41, |
| 4 | and 42. |
| 5 | A.   Okay. |
| 6 | Q.   And what I would like you to do is |
| 7 | to read the specific performance levels to be |
| 8 | met in each category.  You see on the PIP, |
| 9 | the Performance Improvement Plan -- |
| 10 | A.   Uh-huh. |
| 11 | Q.   -- to the right for each category, |
| 12 | like "Coaches; Plans, Organizes and |
| 13 | Prioritizes"? |
| 14 | A.   Uh-huh. |
| 15 | Q.   Then each one has specific |
| 16 | performance levels to be met.  I would like |
| 17 | you to read each of those and then stop and |
| 18 | tell me after each category of performance |
| 19 | levels to be met, how you would fail to |
| 20 | protect people in the environment if you did |
| 21 | what you were told to do in this PIP.  Do you |
| 22 | understand that? |
| 23 | So read for each category the |
| 24 | specific performance levels to be met.  Then |
| 25 | after you finish each one, you tell me what |

1  in that narrative would result in you failing

2  to protect people in the environment if you

3  did it.

4       A.   (Reading.)  Oh, on the first one,

5  performance issues?

6       Q.   On the specific performance levels

7  to be met.  Is there anything in that

8  narrative that starts, "Coaching rate should

9  be comparable," that if you did it would

10  result in you failing to protect people in

11  the environment?

12       A.   Yes.  If I'm out there --

13       Q.   Read me what you would be doing if

14  you did this that would lead to failing to

15  protect people in the environment.

16       A.   "Coaching rates should be

17  comparable with your testing by yourself and

18  your team testing.  Also, your coaching rate

19  needs to be similar to peers."

20           In that particular one, in order

21  for my coaching rate to be similar to peers,

22  that mean I had to make a false report.  And

23  if I make a false report, then my employees

24  end up getting fired.

25           If my employees end up getting

1  fired, then -- I'm sorry.  I'm talking too
2  fast.  If my employees end up getting fired,
3  I don't have nobody to fixt my defect.
4          So that affect me with -- that
5  affect me as far as protecting the
6  environment and safety.  So I'm not going to
7  make a false report and get my employees
8  fired just for me to pull for someone else.
9          "Also, coaching rate needs to be
10 similar (reading)" --
11      MR. SMITH:
12          Stop.
13      THE WITNESS:
14          Okay.
15          "Also, your coaching rate needs to
16 be similar to peers.  You need to set up a
17 biweekly call with MTPs and senior MTM to go
18 over your testing plan which includes where
19 you are testing, where you -- why you are
20 testing, what you are testing for and what
21 you observed.
22          "This will also review team testing
23 activity result with individual testing
24 activity results.
25          "Coaching to reflect consistent

 1    throughout the entire month and not only on

 2    team testing days.

 3              "And coaching should reflect

 4    consistent throughout the entire month only

 5    to team testing days."  (AS READ BY WITNESS)

 6              Well, again, if -- I'm not going to

 7    falsely report to my employee about a

 8    coaching that don't exist and have my

 9    employees fired just to meet a team coaching

10    rate.  And then if all my employees are --

11    BY MS. SCHOONMAKER:

12        Q.   Slow down.

13        A.   I'm sorry.

14        Q.   You have to speak more slowly.

15    You'll be more understandable.

16        A.   Okay.  I cannot -- I would not meet

17    their commands by falsifying documents.  If I

18    falsify the document, that means that my

19    employees would get terminated.

20              And if my employees get terminated

21    because I falsified documents, that mean that

22    I wouldn't have anybody to repair the tracks.

23    So if I don't have anybody to repair the

24    tracks, I would have to start taking tracks

25    out of service.

1          So if I start taking tracks out of

2    service or I wouldn't have nobody to repair

3    the tracks, you know, that's a danger to the

4    environment, to the public.

5          "Plans and Organization

6    Priorities."

7          Q.   All right, sir.  This is what I

8    want you to do.  Read the specific

9    performance levels in that category and tell

10   me if doing anything you were directed to do

11   would cause you to fail to protect people in

12   the environment.

13          And you can answer that with a yes

14   or no.  And then I'll say, "Read me the thing

15   you were told to do that would cause you to

16   fail" --

17          A.   Oh, okay.

18          Q.   -- "to protect people in the

19   environment."  So start by reading silently.

20          A.   (Reading.)  Yes.

21          Q.   Okay.  Read to me the thing you

22   were instructed to do that would cause you to

23   fail to protect people in the environment.

24          A.   "Coaching rates should be

25   comparable with your testing" --

1     Q.  No, no, no.  We already did that

2  one.  We're on "Plans, Organizes" --

3     A.  Oh, okay.

4     Q.  -- "and Prioritizes."

5     A.  Okay.

6     Q.  Did you read that part silently to

7  yourself?  It starts with, "Each of your

8  welding gangs."

9     A.  Okay.  "Each of your" --

10     Q.  No, no.  Did you read that part

11  silently to yourself?

12     A.  Yes.

13     Q.  All of that?  All right.

14         So here's my question.  In what you

15  read under "Plans, Organizes and

16  Prioritizes," is there anything that if you

17  did what you were instructed to do there, you

18  would fail to protect people in the

19  environment?

20     A.  Yes.

21     Q.  Read to me what you were instructed

22  to do that would cause you to fail to protect

23  people in the environment.

24     A.  "Each of your welding gangs are

25  required to eliminate two mainline or siding

1    joints per week, totaling a minimum of six

2    welds per week.  CWR adjustment, DC defects,

3    pull aparts."  (AS READ BY WITNESS)

4         Q.   Anything else in this whole

5    category?

6         MR. SMITH:

7              You're talking about the first

8    paragraph or both --

9         MS. SCHOONMAKER:

10             No.  I'm talking about the whole

11   category.

12        MR. SMITH:

13             Well, look at the next page.

14   BY MS. SCHOONMAKER:

15        Q.   Did you read all of that too?

16        A.   Yes.

17        Q.   Okay.  Is there anything in the

18   second paragraph that if you did it would

19   cause you to fail to protect people in the

20   environment?

21        A.   "Your two welding gangs are

22   required to perform welding activities to

23   meet" -- okay.

24             "Your two welding gangs are

25   required to perform welding activities to

1   meet weekly and monthly welding goals,

2   (frogs, switch point and joint elimination).

3          "You will be required to prepare a

4   welding plan to be sent every Thursday.  You

5   will not -- you will need to set a time --

6   set up a time every Thursday to go over the

7   plan versus execution of welding activities

8   of previous week.

9          "You will also need to review

10  welding report daily and ensure that

11  reporting is accurate and a true depiction of

12  the work that was completed for the day.

13         "This report will be reviewed

14  during this Thursday meeting."  (AS READ BY

15  WITNESS)  The whole paragraph.

16      Q.   So if you reviewed the welding

17  reporting daily and made sure it was accurate

18  and a true depiction of the work that was

19  completed for the day, that review would

20  cause you to fail to protect people in the

21  environment?

22      A.   Yes.

23      Q.   How?

24      A.   Because this report was what Kenny

25  Stuart was instructing me to do to shoot

1   welds.  My welders do more than just shoot
2   welds.  They work in the yards on region rail
3   braces, which Kenny Stuart did not put this
4   in here.
5           So if my welders are working on an
6   FRA defect in the yard and not shooting the
7   weld, that still would cause a derailment if
8   it's not fixed.  That weld could potentially
9   harm the environment and people.
10      Q.   And how would your reviewing the
11  welding report daily harm people?
12      A.   Reviewing the welding report daily
13  would harm people because my welders are
14  working on FRA defects.
15      Q.   We're just talking about you
16  reviewing, you looking at the welding report
17  daily.  How would you doing that task cause
18  people to be harmed?
19      A.   And what I'm saying -- you got to
20  look at the totality.
21      Q.   No, no.  I'm asking you about that
22  particular task, not the total group task.
23  That particular task.
24      A.   That particular task is that I'm
25  having my welders to work on FRA defects.

1    And they would (inaudible) nobody, track

2    inspector or myself.

3              So they are going to work on FRA

4    defects.  And if they don't fix the defects,

5    the track would be out of service.  And then

6    I would get harassed by it.

7              So those in this particular

8    document here would prevent me from my

9    welding gang protecting the environment and

10   people.

11        Q.   Okay.  Let's move to "Builds

12   Trust."

13             "The specific performance levels to

14   be met:  When asked to provide information

15   regarding any specific duties that are

16   required of your position, you are expected

17   to provide the required information by the

18   dates specified."

19             How would doing that cause you to

20   fail to protect people in the environment?

21        A.   Because when I present the -- on a

22   date, I get harassed from that.  And I told

23   them the track is -- that it's unsafe.  So I

24   end up taking the track out of service.

25             I can present it to them.  They

1   have the measurements.  You know, if they
2   don't accept my measurements, okay.  But
3   those measurements are FRA defects.
4           And that would stop me from taking
5   the track out of service, prevent harm to
6   people and the environment.
7       Q.   "Teamwork.  You were directed --
8   your behavior on all conference calls and
9   other forms of communication must be
10  respectful and professional."
11          How would doing that cause you to
12  fail to protect people and the environment?
13      A.   Because on a conference call, they
14  constantly asked me to do -- to violate FRA
15  regulations, Union Pacific Railroad
16  regulations.  And I refused to do it.
17      MS. SCHOONMAKER:
18          I'll pass the witness.
19  EXAMINATION BY MR. SMITH:
20      Q.   I just want you to read the first
21  paragraph of your report on the Value Line of
22  January 30th, 2018, 27 days before you were
23  fired.  Just read that first paragraph on
24  that call.
25      A.   "On 1/10/2018, Johnny took --

1      Q.    Slow.

2      A.    "On 1/10/2018, Johnny took a track

3   out of service for safety reasons.  Johnny

4   got chastised by Jacob Gilsdorf and Kenny

5   Stuart and Phillip Hawkins.  Johnny called

6   the hotline on 1/22/2018 to report this."

7            The report number was 126808783.

8            "Johnny would like the investigator

9   to read that report so that he or she can

10  understand what was going on."  (AS READ BY

11  WITNESS)

12      MR. SMITH:

13            Okay.  Thank you, sir.  I don't

14  have any other questions at this time.

15      WITNESS EXCUSED AT 4:45 P.M.

16      ***************************

17

18

19

20

21

22

23

24

25

```
 1              REPORTER'S CERTIFICATION
 2
        This certification is valid only for a
 3   transcript accompanied by my original
     signature and original required seal on this
 4   page.
 5        I, DENISE M. CENTANNI, a Certified Court
     Reporter and Registered Professional Reporter
 6   in and for the State of Louisiana, as the
     officer before whom this testimony was taken,
 7   do hereby certify that JOHNNY TAYLOR, to whom
     oath was administered, after having been duly
 8   sworn by me upon authority of R.S. 37:2554,
     did testify as hereinbefore set forth in the
 9   foregoing 264 pages; that this testimony was
     reported by me in the Stenotype reporting
10   method, was prepared and transcribed by me or
     under my personal direction and supervision,
11   and is a true and correct transcript to the
     best of my ability and understanding; that
12   the transcript has been prepared in
     compliance with transcript format guidelines
13   required by statute or by rules of the board,
     and that I am informed about the complete
14   arrangement, financial or otherwise, with the
     person or entity making arrangements for
15   deposition services; that I have acted in
     compliance with the prohibition on
16   contractual relationships, as defined by
     Louisiana Code of Civil Procedure Article
17   1434 and in rules and advisory opinions of
     the board; that I have no actual knowledge of
18   any prohibited employment or contractual
     relationship, direct or indirect, between a
19   court reporting firm and any party litigant
     in this matter, nor is there any such
20   relationship between myself and a party
     litigant in this matter.  I am not related to
21   counsel or to the parties herein, nor am I
     otherwise interested in the outcome of this
22   matter.
23
     _____ _____
24   DENISE M. CENTANNI                  DATE
     Certified Court Reporter
25   Registered Professional Reporter
```

JOHNNY TAYLOR VERSUS UNION PACIFIC RAILROAD
COMPANY, INC.

WITNESS AMENDMENT(S)

    I, JOHNNY TAYLOR, have read or have had
the foregoing testimony given by me on 8/7/19
read to me and hereby certify that it is a
true and correct transcription of my
testimony with the exception of the following
corrections or changes, if any:

PAGE   LINE                  CORRECTION

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____



                    _____

                         JOHNNY TAYLOR

Routing:

Linda C. Schoonmaker, Esq.
J. Arthur Smith, III, Esq.
Denise M. Centanni, CCR, RPR

```
            BATON ROUGE COURT REPORTERS, LLC
                 12016 JUSTICE AVENUE
            BATON ROUGE, LOUISIANA  70816
Mr. Johnny Taylor
C/O J. ARTHUR SMITH, III, ESQ.
SMITH LAW FIRM
830 North Street
Baton Rouge, Louisiana  70802
In Re: JOHNNY TAYLOR VERSUS UNION PACIFIC
       RAILROAD COMPANY, INC.
```

Deposition Date:  8/7/19

Dear Mr. Taylor:

Enclosed is your deposition testimony you have requested to read and sign.  Also enclosed is an original amendment(s) page upon which you should make any notations of corrections or changes you feel should be made.  Please note such changes, if any, by page and line number.  You may attach additional pages, as needed.

Upon completion of reading the transcript and signing the correction page, please return only the signed amendments(s) page to our office at the address above. Whether or not you make corrections or changes to your testimony, you are to sign and return the amendment page within 30 days from receipt of the deposition.  In order to ensure that the aforementioned page is received, you may want to return same by certified mail.  You may keep the courtesy copy of the deposition for your records.

If you should have any questions or concerns, please feel free to call us at (225)292-8686 or (800)375-7906.  We request that you return the signed original amendment(s) page to our office as soon as possible so that it may be sent to the appropriate parties and attached to your deposition.

                        Respectfully,

                        BATON ROUGE COURT
                        REPORTERS, LLC
Enclosure


cc:

Linda C. Schoonmaker, Esq.
J. Arthur Smith, III, Esq.