# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JOHNNY TAYLOR                                          CIVIL ACTION

VERSUS                                                 18-1110-SDD-EWD

UNION PACIFIC RAILROAD
COMPANY, INC.

## RULING

This matter is before the Court on the *Motion for Summary Judgment*[1] filed by Defendant, Union Pacific Railroad Company, Inc. ("Union Pacific" or "UP"). Plaintiff Johnny Taylor ("Taylor") filed an *Opposition*,[2] to which Union Pacific filed a *Reply*.[3] For the reasons that follow, the Court finds that the *Motion* shall be DENIED.

## I.   BACKGROUND FACTS

Plaintiff Johnny Taylor worked for Union Pacific Railroad Company for more than ten years, from September 12, 2007 until his termination on February 27, 2018.[4] When he was terminated, Taylor was the Manager of Track Maintenance for the Livonia Service Unit in Louisiana.[5] In that role, he was charged with "ensuring UP remained in compliance with Federal Railroad Administration ("FRA") regulations and protecting the public and the environment by inspecting and maintaining UP's track."[6] Over the years, Taylor filed a number of employment-related complaints with Union Pacific,[7] but his performance

---

[1] Rec. Doc. No. 31.
[2] Rec. Doc. No. 34.
[3] Rec. Doc. No. 36.
[4] Rec. Doc. No. 31-3, p 4, 5 (*Deposition of Johnny Taylor*).
[5] Rec. Doc. No. 31-2, p. 1.
[6] Rec. Doc. No. 31-1, p. 3.
[7] Rec. Doc. No. 1, p. 12.

63304

reviews were generally good.[8] After a series of events discussed in greater detail *infra*, Taylor was terminated. He filed this lawsuit on December 31, 2018, alleging that his termination violated the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, because he was terminated for engaging in certain activities protected under that statute.

The instant *Motion for Summary Judgment* is primarily focused on two events that occurred shortly before Taylor's termination: (1) Taylor taking the Avondale Switch 16 track out of service on January 10, 2018 and (2) Taylor issuing a slow order for a particular section of track in White Castle, Louisiana. The parties do not dispute that Taylor took these actions. Union Pacific contends, however, that Taylor's disrespectful conduct surrounding those actions was only the latest example of Taylor's "significant performance issues" and history of "insubordination and outright refusal to alter his behavior."[9] Specifically, Union Pacific alleges that Taylor acted insubordinately by refusing to provide updated measurements when his direct supervisor, Kenneth Stuart ("Stuart"), requested them, and by failing to provide thorough enough responses to inquiries from Jacob Gilsdorf ("Gilsdorf"), the General Director for Southern Region Engineering and Stuart's supervisor, in connection with the slow order in White Castle. Union Pacific also maintains that Taylor's interactions with Stuart and Gilsdorf were argumentative and frequently involved Taylor hanging up the phone abruptly.

Union Pacific urges the Court to grant summary judgment because, it argues, Taylor cannot make out a *prima facie* case of discrimination under the FRSA and, even if

---

[8] *See* Rec. Doc. No. 31-9 (UP's Exhibit G) at p. 53, 61, 65, 69 (showing that Taylor was rated as a "Good Performer" in 2014, 2015, 2016, and 2017); Rec. Doc. No. 34-2, p. 88 (a Performance Commendation received by Taylor on October 5, 2017).

[9] Rec. Doc. No. 31-1, p. 1.

63304

he could, "UP can demonstrate that it would have terminated Taylor's employment"[10] anyway, regardless of the allegedly protected activity. Taylor counters that there are genuine issues of material fact standing in the way of summary judgment. After reviewing the parties' briefs and the applicable law, the Court agrees with Taylor.

## II.    LAW AND ANALYSIS

### a.  Summary Judgment Standard

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact.[12]  A court must deny the motion for summary judgment if the movant fails to meet this burden.[13]

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[14] This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim.[15] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[16]

A court may not make credibility determinations or weigh the evidence in ruling on

---

[10] Rec. Doc. No. 31-1, p. 2.
[11] Fed. R. Civ. P. 56.
[12] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).
[13] *Id.*
[14] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted).
[15] *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990).
[16] *Anderson*, 477 U.S. at 249 (citations omitted).

a motion for summary judgment.[17] The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.[18]  Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.[19]

   b.  Discrimination Under the Federal Railroad Safety Act

Section 20109 of the Federal Railroad Safety Act provides, in pertinent part, that

> A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . reporting, in good faith, a hazardous safety or security condition. . .[or] refusing to authorize the use of any safety-related equipment, track, or structures, if the employee is responsible for the inspection or repair of the equipment, track, or structures, when the employee believes that the equipment, track, or structures are in a hazardous safety or security condition…[20]

Under the statute, an employee's refusal is protected under the above provision if:

> (A) the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;
> (B) a reasonable individual in the circumstances then confronting the employee would conclude that--
> > (i) the hazardous condition presents an imminent danger of death or serious injury; and
> > (ii) the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal; and
> (C) the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work, or not to authorize the use of the hazardous equipment, track, or structures, unless the condition is corrected immediately or the equipment, track, or structures are repaired properly or replaced.[21]

---

[17] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[18] *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).
[19] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[20] 49 U.S.C. § 20109(b).
[21] *Id*.
63304

To establish a *prima facie* case of discrimination under FRSA, a plaintiff must show that (1) he engaged in a protected activity; (2) the railroad was aware, actually or constructively, that the plaintiff engaged in the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action.[22] After a plaintiff has met his *prima facie* burden and provided some evidence that the protected activity was a "contributing factor" in the adverse employment action, the burden shifts to the defendant to show by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected behavior.[23]

c. Whether Plaintiff Taylor has Established a *Prima Facie* Case of Discrimination under FRSA

1) *Protected Activity*

To establish the first element of discrimination under FRSA, Taylor must make a showing that he engaged in a protected activity in good faith.[24] In his *Opposition to the Motion for Summary Judgment*, Taylor maintains that summary judgment should not issue because there are genuine issues of fact as to whether he engaged in protected activity. Taylor cites four examples of his allegedly protected activity: (1) taking tracks out of service; (2) refusal to put "Switch 16" back into service; (3) issuance of a slow order in White Castle, Louisiana; and (4) cooperation with the FRA and Reports to Union Pacific's EEO Department.[25] According to Union Pacific, none of the above actions "constitute

---

[22] *Davis v. Union Pac. R. Co.,* No. CIV.A. 12-2738, 2015 WL 5519115, at *1 (W.D. La. Sept. 17, 2015).
[23] 49 U.S.C. § 42121 (b)(2)(B)(ii); *Epple v. BNSF Ry. Co.,* No. 3:16-CV-1505-C, 2018 WL 10374615, at *3–4 (N.D. Tex. Feb. 9, 2018), *aff'd,* 785 F. App'x 219 (5th Cir. 2019).
[24] *Kuduk*, 768 F.3d at 789 (8th Cir. 2014).
[25] Rec. Doc. No. 34, p. 16, 22, 25, 27.

63304

protected activity recognized by FRSA"[26] and, as such, Taylor cannot make the requisite showing of discrimination and summary judgment should be granted.

Taylor explains that he removed various tracks from service during his tenure with Union Pacific, beginning with the Avondale "Tail Track," which he removed from service on March 28, 2017 because he "felt that another derailment was imminent if the track was not taken out of service to make repairs."[27] On November 2, 2017, he took the "No. 1 Mainline" track in Avondale out of service as well, based on his impression that it was defective and that, "if the defect was not repaired, it could result in a derailment at a track crossing, which could injure or kill any citizen at the crossing."[28] Similarly, Taylor took the "Switch 16" track at Avondale out of service on January 10, 2018 because the track was "severely out of alignment"[29] and risked causing a derailment. Union Pacific's *Motion* focuses primarily on Taylor's actions related to the Switch 16 track and his issuance of a "slow order" on a track in White Castle, Louisiana on January 22, 2018, as these were the allegedly protected activities undertaken closest in time to Taylor's termination.

Based on the evidence in the record, there is no *factual* dispute related to Taylor taking the Switch 16 track out of service on January 10, 2018: he did.[30] Nor is it disputed that he issued a slow order on January 22, 2018.[31] So, Union Pacific advances several purely *legal* arguments as to why taking a track out of service or issuing a slow order is not "protected activity" under the FRSA. First, it contends that "simply removing a track

---

[26] Rec. Doc. No. 31-1, p. 14.
[27] Rec. Doc. No. 34, p. 17.
[28] *Id*. at p. 18.
[29] *Id*.
[30] See Rec. Doc. No. 31-2, p. 5 at ¶10 ("Taylor. . .took the Avondale Switch 16 track out of service that day"); Rec. Doc. No. 34, p. 8 ("On January 10, 2018, Mr. Taylor took the Avondale Switch 16 track out of service. . .").
[31] See Rec. Doc. No. 31-2, p. 7 at ¶16 ("Taylor issued a 'slow order' for the track"); Rec. Doc. No. 34, p. 25 ("It is undisputed that Mr. Taylor issued a slow order on a track").
63304

from service does not qualify as a protected activity because it was part of Taylor's job duties."[32] Taylor counters that the "job duties exception" is not applicable here, because courts apply it based on the language of the underlying statute, and the FRSA does not contain such an exception. In fact, he argues, the FRSA "was specifically designed to protect individuals with job duties similar to Mr. Taylor's"[33] – namely, employees who are "responsible for the inspection or repair of the equipment, track, or structures."[34]

After reviewing relevant precedent, this Court agrees with Taylor. Union Pacific offers scant legal authority in support of its argument that performing job duties cannot be protected activity under FRSA. And, Taylor cites cases demonstrating that, although courts have sometimes held that an employee must "step outside his or her role" to be engaging in protected activity, courts apply that requirement by reference to the underlying statute. For example, in *Robinson v. Morgan Stanley*, the Administrative Review Board for the United States Department of Labor concluded that an employee who blew the whistle on a potential securities law violation engaged in protected activity even though she acted within the bounds of her job duties as an auditor, because the Sarbanes-Oxley Act "does not indicate that an employee's report or complaint about a potential violation must involve actions outside the complainant's assigned duties."[35] The United States District Court for the District of Connecticut followed *Robinson* in *Barker v. UBS AG*,[36] a case where an investment bank employee alleged protected activity based on actions she took in the course of her normal job duties. Conceding that other courts

---

[32] Rec. Doc. No. 31-1, p. 14.
[33] Rec. Doc. No. 34, p. 20.
[34] 49 U.S.C. §20109(b)(1)(C).
[35] *Robinson v. Morgan Stanley*, No. 07-070, 2010 WL 743929, at *1 (U.S. Dept. of Labor Jan. 10, 2010).
[36] 888 F. Supp. 2d 291, 297 (D. Conn. 2012).
63304

have held to the contrary, the District of Connecticut held that the plaintiff's actions were protected activity because the Sarbanes-Oxley Act under which the plaintiff sued includes no requirement that protected activity arises out of actions above and beyond the plaintiff's normal role. In the instant case, Union Pacific does not show that the FRSA includes such a requirement.

Moreover, the District Court for the District of Minnesota has held that applying the "job-duties exception" in the FRSA context "is not supported by the text of the statute, and would undermine Congress's intent in enacting the FRSA."[37] In even stronger terms, the same court in a different case reasoned that "the job-duties exception finds no support in the FRSA's text, case law, or public policy."[38] And, in *Rookaird v. BNSF Railway Company*, the United States Court of Appeals for the Ninth Circuit held that "an employee who simply performs basic job duties has not 'refused' to violate any rule or regulation unless those job duties are covered by a rule or regulation."[39] In other words, protected activity can arise from the performance of normal job duties if those duties are covered by a rule or regulation. Plaintiff Taylor's job duties unequivocally involved tasks and responsibilities that were covered by a rule or regulation; indeed, Union Pacific's own *Statement of Undisputed Facts* sets forth Taylor's job description as follows: "responsible for ensuring [Union Pacific] remained in compliance with Federal Railroad Administration (FRA) regulations. . ."[40] As such, Union Pacific's argument that Taylor cannot show protected activity based on his performance of job duties fails.

---

[37] *Sanders v. BNSF Ry. Co.,* No. 17-CV-5106, 2019 WL 5448309, at *10, n. 11 (D. Minn. Oct. 24, 2019).
[38] *Brisbois v. Soo Line R.R. Co.,* No. 15-CV-0570, 2016 WL 7423387, at *4 (D. Minn. Dec. 22, 2016).
[39] *Rookaird v. BNSF Ry. Co.,* 908 F.3d 451, 456 (9th Cir. 2018)(citing *Sievers v. Alaska Airlines, Inc.*, ARB No. 05-109, 2008 WL 316012, at *3–4 (Jan. 30, 2008)).
[40] Rec. Doc. No. 32-1, p. 1.
63304

Likewise, the Court is not persuaded by Union Pacific's argument that Taylor cannot show protected activity because he was "not *refusing* to do anything," when the FRSA states that an employee may not be retaliated against for "*refusing* to authorize the use of any safety-related equipment, track, or structures."[41] According to Union Pacific, jurisprudence requires that the plaintiff refuse an order, whether implicit or explicit, and, in its view, "Taylor makes no attempt to demonstrate that he refused to follow an explicit or implicit order."[42] Taylor disagrees. He explains that "each time [he] took a track out of service, he encountered resistance from Union Pacific in doing so."[43] In that way, Union Pacific's "behavior constituted implicit orders not to take tracks out of service and that, therefore, he 'refused' those implicit orders"[44] by repeatedly taking tracks out of service.

Union Pacific contends that Taylor's "implicit order" argument is on shaky ground because Taylor himself attests that, with respect to the "Switch 16" track at Avondale, his superior Jacob Gilsdorf "instructed [him] to take the track out of service if [he] felt that it was unsafe."[45] In Union Pacific's view, Taylor can hardly argue that he was refusing an implicit order not to take tracks out of service when, by his own attestation, he was specifically authorized to do so, and did. However, Union Pacific's characterization is based on a selective reading of Taylor's declaration; he also attests that he took the Switch 16 track out of service on January 10, 2018, as authorized by Gilsdorf the day

---

[41] 49 U.S.C. § 20109.
[42] Rec. Doc. No. 36, p. 3.
[43] Rec. Doc. No. 34, p. 21.
[44] *Id*.
[45] Rec. Doc. No. 34-5, p. 8.
63304

before, only to have his supervisor call him and instruct him "to put the track back into service."[46] Taylor refused.[47]

While Union Pacific suggests there was no order that could give rise to a "refusal" by Taylor, Taylor brings forth competent summary judgment evidence to demonstrate that, on other occasions, he was in fact discouraged or "implicitly ordered" not to take tracks out of service. Taylor testified at his deposition that Union Pacific higher-ups threatened to take away his welding gang as a punishment for taking the No. 1 Mainline Track at Avondale out of service in November 2017.[48] Likewise, Taylor attests in his *Declaration* that he was instructed by Kenneth Stuart to put the Switch 16 track back into service the very same day that he took it out of service.[49] Overall, the Court finds that there is a dispute of fact as to whether Taylor did not engage in protected activity because he "was not refusing to do anything."[50]

Union Pacific next attempts to defeat Taylor's showing of protected activity by arguing that, even if he took tracks out of service due to potentially hazardous conditions, Taylor has not successfully shown that the conditions "present[ed] an imminent danger of death or serious injury"[51] as required by FRSA. This is disingenuous. FRSA clearly requires only that "a reasonable individual in the circumstances then confronting the employee would conclude that"[52] an imminent danger existed. Taylor asserts that he "possessed a reasonable, good-faith belief that death or serious bodily injury was

---

[46] *Id*. at p. 9.
[47] *Id*. at p. 10.
[48] Rec. Doc. No. 34-1, pp. 103-105.
[49] Rec. Doc. No. 34-5, p. 10.
[50] Rec. Doc. No. 31-1, p. 14.
[51] *Id*. at p. 15.
[52] 49 U.S.C. § 20109.

63304

imminent had he not taken the tracks out of service," based on his experience that derailments could easily lead to the death of railroad employees or the spilling of hazardous material. At his deposition, Taylor testified that the possibility of "ammonia acid or hydrochloric acid spilling"[53] due to hazardous track conditions prompted him to take the Switch 16 track out of service. Referring to previous incidents at Avondale, Taylor stated that he "took the track out of service because it had a FRA defect. . .So by FRA regulations, I took the track out of service for safety reasons so we wouldn't have any more derailments there. . ."[54] The credibility of Taylor's testimony on this topic, and the sincerity of his alleged good-faith belief as weighed against Union Pacific's suggestions of bad faith, is a question for the jury.

Taylor also contends that his issuance of a "slow order" on a train track in White Castle, Louisiana was protected activity under the FRSA. Union Pacific objects on the grounds that this is a "new argument and. . .departure from his *Complaint*."[55] While it is of course axiomatic that a complaint may not be amended via briefs, the Court finds that Taylor has not done so. The *Complaint*'s discussion of Taylor's alleged protected activity contains numerous mentions of his issuance of a "slow order."[56] Overall, Union Pacific has failed to carry its summary judgment burden to demonstrate that, as a matter of law, Taylor's actions were not protected activity under FRSA.

---

[53] Rec. Doc. No. 34-1, p. 145.
[54] *Id.*
[55] Rec. Doc. No. 36, p. 4.
[56] *See, e.g.,* Rec. Doc. No. 1, ¶ 30, 31, 33, 37, 41, 43.
63304

*2) Union Pacific's Awareness of the Protected Activity*

The second element Taylor must demonstrate to make out a *prima facie* case of discrimination under FRSA is that the railroad was aware that he engaged in the good faith protected activity. The record is clear: Union Pacific knew that Taylor took Switch 16 out of service, and it knew that he did so citing safety concerns. Among other evidence, Mark Wheeland, the Assistant Vice President of Track Maintenance for Union Pacific, testified at his deposition that Taylor "removed the track from service because he told Mr. Stuart that there was an alignment defect."[57] The safety implications of removing the track from service were also known; when asked if the Switch 16 track was safe to operate at the time that Taylor removed it from service, Stuart answered, "I have no idea."[58]

Union Pacific cites *Conrad v. CSX Transp., Inc.,*[59] for the proposition that "it is 'insufficient' to 'demonstrat[e] that an employer, as an entity, was aware of the protected activity."[60] Union Pacific contends that Mark Wheeland, the Assistant Vice President of Track Maintenance, was the "sole decisionmaker"[61] behind Taylor's termination and that Taylor has failed to demonstrate that Wheeland had knowledge of his protected activity. At his deposition, Wheeland agreed that he was "responsible for the decision to terminate" Taylor.[62] That decision, he testified, was "[b]ased on information that was provided to me by Mr. Gilsdorf."[63] It is true that Wheeland broadly denied having more detailed knowledge of the circumstances surrounding Taylor's termination. But the Court disagrees that

---

[57] Rec. Doc. No. 34-6, p. 17:1-3.
[58] Rec. Doc. No. 34-3, p. 52:19.
[59] 824 F.3d 103 (4th Cir. 2016).
[60] *Id*. at 108.
[61] Rec. Doc. No. 36, p. 4.
[62] Rec. Doc. No. 34-6, p. 38.
[63] *Id*.
63304

*Conrad* requires direct knowledge on the part of the decision maker. *Conrad* simply holds that "[t]he "knowledge" relevant for a retaliation claim under the FRSA must be *tied* to the decision-maker involved in the unfavorable personnel action."[64] The tie, in this case, is the email from Gilsdorf, who did have direct knowledge. The *Conrad* court approvingly cited *Kuduk v. BNSF Ry. Co.* for the proposition that "a lower-level supervisor's knowledge was not sufficient where the 'decision-makers had no knowledge—*actual or constructive*—of [the employee's] protected activity.'"[65] Indications of constructive knowledge on Wheeland's part are evident from the record. Union Pacific's Exhibit M[66] is an email from Gilsdorf. It is not clear whether Exhibit M is the email mentioned by Wheeland in his deposition, but the exhibit clearly shows that Mark Wheeland was one of the recipients and that Taylor's allegedly protected activity was discussed: "He [Taylor] told us that he had turned us into the whistle blowers act, and he has done nothing wrong. We tried to explain to Mr. Taylor that the meeting was based on his conduct as a manager, and has nothing to do with a track pulled from service."[67] Further, Wheeland testified at his deposition that he recalled "an issue where Mr. Gilsdorf asked Mr. Taylor for some information regarding a slow order that was placed. . ."[68] That slow order is one of the activities that Taylor now argues was protected under the FRSA. Based on the record, the Court disagrees that Taylor has failed to show actual or constructive knowledge by the decisionmaker.

---

[64] *Conrad v. CSX Transportation, Inc.,* 824 F.3d 103, 108 (4th Cir. 2016) (emphasis added).
[65] *Id.*
[66] Rec. Doc. No. 31-15.
[67] Rec. Doc. No. 31-15, p. 2.
[68] Rec. Doc. No. 34-6, p. 14.
63304

Union Pacific also attempts to shifts the goalposts by arguing that, even if Taylor can show that it was aware he engaged in protected activity, "he cannot demonstrate that UP was aware that [he] engaged in these activities *in good faith*."[69] When he removed Track 16 from service, UP contends, he could not have been in good faith because he "did not have the objective basis to make this refusal,"[70] as evidenced by his failure to provide current track measurements when requested by his supervisor. Likewise, UP maintains that it "could not have known that he complained about the alignment of the track in good faith" because Taylor "failed to take the most basic steps to even determine if the track was out of alignment."[71] Essentially, UP argues that Taylor's bad faith was so obvious that it could not have been aware of any good-faith protected activity. This is not persuasive, especially since the Court found above that, under the relevant legal standard, Taylor's actions can be viewed as undertaken in good faith.

Moreover, as Taylor points out in his *Opposition*, the federal regulation setting forth "Procedures for the Handling of Retaliation Complaints Under . . .the Federal Railway Safety Act" requires only that the employer "knew or suspected that the employee engaged in the protected activity,"[72] not that they knew the protected activity was undertaken *in good faith*. At least one federal court has agreed that Union Pacific's interpretation is amiss; in the 2019 case *Wooten v. BNSF Railway Company*, the District Court for the District of Montana rejected a railroad defendant's "attempts to impose an additional burden on the FRSA plaintiff by requiring that he show that the decision-maker

---

[69] Rec. Doc. No. 31-1, p. 17 (emphasis added).
[70] *Id*. at p. 18.
[71] *Id*. at p. 19.
[72] 29 C.F.R. § 1982.104.
63304

knew the activity was done in good faith."[73] Indeed, that court opined, such an "additional requirement is unsupported and untenable in the face of the purpose behind the FRSA."[74]

### 3)  *Adverse Employment Action*

Taylor must also make a showing of the third element of discrimination under FRSA: that he suffered an adverse employment action. It is undisputed that Taylor was terminated[75] and that his termination is an adverse employment action.[76] Therefore, this element is satisfied.

### 4)  *Whether the Protected Activity was a "Contributing Factor" to Taylor's Termination*

A FRSA plaintiff must demonstrate that the circumstances surrounding the adverse employment action raise an inference that the protected activity was a contributing factor in the adverse action.[77] "The plaintiff-employee need only show that his protected activity was a "contributing factor" in the retaliatory discharge or discrimination, not the sole or even predominant cause."[78] "A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision."[79] When assessing the contributing factor issue, courts look to evidence such as "temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse

---

[73] *Wooten v. BNSF Ry. Co.,* 387 F. Supp. 3d 1078, 1096 (D. Mont. 2019), aff'd, 819 F. App'x 483 (9th Cir. 2020).

[74] *Id.*

[75] Rec. Doc. No. 31-1, p. 1; Rec. Doc. No. 34, p. 1.

[76] Rec. Doc. No. 31-1, p. 19 ("UP acknowledges that Taylor experienced an adverse employment action when UP terminated his employment").

[77] *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014).

[78] *Araujo v. New Jersey Transit Rail Operations, Inc.,* 708 F.3d 152, 158 (3d Cir. 2013)(citing 49 U.S.C. § 42121(b)(2)(B)(ii)).

[79] *Ameristar Airways, Inc. v. Admin. Rev. Bd.,* 650 F.3d 562, 567 (5th Cir. 2011)).

63304

action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity."[80] Courts may also conclude that a "contributing factor" is found where ""is presumed in situations where the employee's protected activity and the adverse action are 'inextricably intertwined.'"[81]

Union Pacific argues that "Taylor cannot demonstrate that any of his alleged protected activities were a contributing factor in his termination."[82] In its view, Taylor was terminated "because of performance issues"[83] that "predate his removal of the Switch 16 track from service."[84] Union Pacific's argument is at times unclear, since it portrays Taylor's failure to provide updated measurements as reason for termination, even though Kenneth Stuart testified at his deposition that removing the track from service "wasn't that big of a deal"[85] and he "never thought about it again."[86] In short, Union Pacific states that it "terminated [Taylor] because he refused to follow the instructions of his supervisors, which he admits to have done."[87] The competent summary judgment in the record does not support Union Pacific's assertion that Taylor admits to being insubordinate, however. In his view, his alleged "refusal" to provide a new set of measurements for the Switch 16 track was simply because he "had already provided the measurements on November 24, 2017 and it was not possible that the measurements could have changed."[88] Taylor

---

[80] *Ray v. Union Pac. RR. Co.,* 971 F. Supp. 2d 869, 885 (S.D. Iowa 2013).
[81] *Id.* at 866.
[82] Rec. Doc. No. 31-1, p. 20.
[83] *Id.*
[84] *Id.*
[85] Rec. Doc. No. 34-3, p. 53.
[86] *Id.*
[87] Rec. Doc. No. 31-1, p. 20.
[88] Rec. Doc. No. 34, p. 37-38.

63304

further alleges that when he tried to explain as much to Stuart, Stuart "immediately instructed him to place the track back into service."[89]

Taylor advances several arguments in support of his contention that his protected activity *was* a contributing factor in his termination. First, Taylor contends that his alleged insubordination is "inextricably intertwined with, and cannot be unwound from, Mr. Taylor's acts of taking Switch 16 out of service and refusing to place it back into service."[90] Moreover, he asserts, because he was terminated less than two months after taking Switch 16 out of service, the temporal proximity of the events lends itself to a "contributing factor" finding. And, while Union Pacific alleges that Taylor had performance issues predating the Switch 16 incident, Taylor points to his December 2017 performance review as evidence, that, in fact, his performance was viewed in an overall positive light by management, with the exception of a comment urging Taylor to be "more positive in [his] duties as a manager" because Stuart was troubled by his "attitude toward the management group of Union Pacific."[91] That comment aside, the review rated Taylor a "3 – Good Performer" and stating, "You lead your team in a positive way from what I have seen so far. Make sure that everyone above you knows and understand the good things that you are doing. Don't be afraid to brag on yourself."[92] The review also noted that Taylor's "budget is very good" and his "injury free days of 1223 is very impressive."[93] Interestingly, Stuart's final note in the "Manager Comments" section was "Next year will be all about derailment prevention."[94]  Taylor argues that the positive performance review

---

[89] *Id.*
[90] Rec. Doc. No. 34, p. 33.
[91] Rec. Doc. No. 34-2, p. 54.
[92] *Id.* at p. 53.
[93] *Id.* at p. 54.
[94] *Id.*

63304

from December 2017 raises an inference that Union Pacific's attitude toward him changed because of his protected activity.

Some of the evidence of Union Pacific's hostility that Taylor cites predates the Switch 16 incident. The parties essentially agree that the only adverse employment action that properly forms a basis for his claim is his termination, not other alleged adverse actions. Even considering only the evidence pertaining to the termination, the Court finds that Taylor has successfully opposed summary judgment on the issue of whether taking Switch 16 track out of service was a contributing factor in his termination. The Court credits Taylor's "inextricably intertwined" argument; even accepting Union Pacific's contention that Taylor's termination was the result of his insubordination related to Switch 16, the Court agrees that it is difficult to tease out the effect that the protected activity may have had on his ultimate termination. The temporal proximity of the protected activity and Taylor's termination also favors an inference that the activity was a contributing factor, especially in light of the evidence presented by Taylor that he received a "3 – Good Performer" rating in 2014, 2015, 2016, and 2017.[95]

Union Pacific asserts in its *Reply* brief that Taylor cannot show causation because "[i]t makes no sense that UP would retaliate against Taylor"[96] for removing tracks from service because that act is "small potatoes"[97] in light of the "hundreds, if not thousands, of slow orders and track removals a year."[98] This rather conclusory appeal to common sense does not prevent Taylor from carrying his burden. Nor is the Court persuaded that *Brisbois v. Soo Line Railroad Company* is controlling on the "contributing factor" issue.

---

[95] *See* Rec. Doc. No. 34-7 at p. 53, 61, 65, and 69.
[96] Rec. Doc. No. 36, p. 9.
[97] *Id*.
[98] *Id*.
63304

Union Pacific urges the Court to follow *Brisbois*, where the District Court for the District of Minnesota granted summary judgment in favor of the railroad defendant because, *inter alia*, the "evidence in the record is overwhelming that [the plaintiff] was not disciplined because she complained about safety, but solely because she was argumentative and defied her supervisor's instructions."[99] A closer examination of *Brisbois* reveals an important distinguishing fact: the safety violation that the Brisbois plaintiff reported was "complaining that [her supervisor] had allowed workers to walk on an unprotected track. The remedy was to tell the workers to stay off of the unprotected track."[100] The *Brisbois* court called that "small potatoes" and reasoned that the railroad would have little reason to terminate her for raising such a minor issue. Here, by contrast, Taylor has testified that the hostility he perceived from Union Pacific management was "because it was going to take millions of dollars to fix the track"[101] to remedy the defects Taylor raised.

*Brisbois* is also distinguishable insofar as the plaintiff therein was "formally disciplined for being argumentative and for defying her supervisor's instructions"[102] two months before the protected activity that she alleged led to her termination. Union Pacific attempts to analogize that fact to the instant case, arguing that Taylor's December 2017 performance review was "a negative review" and that Taylor merely "wants the Court to adopt an interpretation contrary to the evidence."[103] This can hardly be the case when Taylor's overall rating was "Good Performer" and, aside from one paragraph addressing Taylor's attitude, the comments were positive, even encouraging him to "brag" about his

---

[99] *Brisbois v. Soo Line R.R. Co.,* No. 15-CV-0570, 2016 WL 7423387, at *5 (D. Minn. Dec. 22, 2016).
[100] *Id.* at *6.
[101] Rec. Doc. No. 34-1, p. 127-128.
[102] *Brisbois.* at *5.
[103] Rec. Doc. No. 36, p. 9.

63304

accomplishments.[104] With respect to the performance review, it is Union Pacific's interpretation that is contrary to the evidence.

At this *prima facie* stage, Taylor's burden is not overly rigorous – in fact, courts have held that his protected activity can be a contributing factor "even if [it] played only a very small role in [the employer's] decision-making process."[105] Taylor is "not required to show that his [protected activity] was the *only* reason or that no other factors influenced [Union Pacific's] decision to terminate him."[106] The Court finds that Taylor has adequately met that burden.

> d.  Whether Union Pacific Would Have Terminated Taylor Anyway

Under the burden-shifting framework of the FRSA, once Taylor makes a *prima facie* showing that protected activity was a "contributing factor" in his termination, the burden shifts to Union Pacific to show by clear and convincing evidence that they would have terminated him even in the absence of the protected activity. Taylor argues that Union Pacific can make no such case because there are genuine issues of material fact surrounding each of Union Pacific's proffered reasons that it would have terminated him regardless of the protected activity, and as to whether those reasons are pretextual. The Court agrees.

Union Pacific avers that "one of the reasons"[107] for Taylor's termination was insubordination. Elsewhere in its *Motion*, it describes the reason for his termination as "insubordinate, quarrelsome, and discourteous conduct."[108] As an initial matter, the Court

---

[104] Rec. Doc. No. 34-2.
[105] *Frost v. BNSF Ry. Co.,* 914 F.3d 1189, 1197 (9th Cir. 2019).
[106] *Id.* at 1196–97.
[107] Rec. Doc. No. 31-1, p. 20.
[108] *Id.* at p. 21.

63304

notes that these adjectives are inherently subjective and that a finding of "insubordinate, quarrelsome, and discourteous conduct" would likely require credibility determinations that are, of course, prohibited at the summary judgment stage. Taylor disputes that his behavior was inappropriate and calls Union Pacific's attempt to characterize it as such "pretextual."[109]

An example of "overt insubordination" cited by Union Pacific is Taylor's alleged refusal to provide Kenneth Stuart with updated measurements of the Switch 16 track. Again, it is not disputed that Taylor removed the track from service, nor is it disputed that Taylor did not send updated measurements.[110] But the characterization of his failure to do so as an insubordinate "refusal" for which Union Pacific would have terminated him is *not* beyond dispute based on the record. At his deposition, Taylor testified that it was incorrect that he refused to provide new measurements; in his view, he provided measurements on November 24, 2017, and Stuart then "knew the track had a defect in it."[111] Taylor argues in his *Opposition* that "it was not possible that the measurements could have changed"[112] between November 24 and January 10, 2018, when Stuart requested new ones.

Taylor also attests that, the day before Stuart's January 10 email requesting new measurements, he met with Stuart and explained the nature of the defect at Switch 16. He invited Stuart and Gilsdorf to come inspect the track with him, but they refused, which was, in Taylor's estimation, not standard practice; in fact, he could not recall a time when

---

[109] Rec. Doc. No. 34, p. 37.
[110] Rec. Doc. No. 31-3, p. 144.
[111] Rec. Doc. No. 31-3, p. 45.
[112] Rec. Doc. No. 34, p. 37.

63304

his supervisors declined to look at a track about which he had safety concerns.[113] According to Taylor, he responded to Stuart's January 10 request for new measurements by calling him and explaining that it was not possible for the measurements to have changed in the interim.[114] Moreover, based on the copies of Taylor and Stuart's emails in the record, it is apparent that Taylor did not explicitly *refuse* to provide new measurements, nor did he ignore Stuart's messages; the two engaged in a back-and-forth in which Taylor explained why spike-lining the track was not a feasible solution.[115] When Stuart sent a numbered list of questions on January 11, Taylor provided responses that same day.[116] In this Court's view, a material fact issue exists because a reasonable jury could conclude that Taylor was not insubordinate in violation of Union Pacific policy but, in fact, earnestly attempted to communicate with his supervisors.

The same can be said with respect to the conduct surrounding Taylor's issuance of a "slow order." Union Pacific takes issue with Taylor's allegedly insubordinate "refus[al] to provide [responses] in sufficient detail"[117] when Gilsdorf asked him for the root cause of the Vehicle Track Interaction ("VTI") hit on a section of track that Taylor was responsible for. But the record demonstrates that Taylor did respond with his opinion of the root cause – "ties."[118] As to a follow-up phone call between Taylor and Gilsdorf, the men offer conflicting testimony on what occurred; Gilsdorf recalls that Taylor "called [him] after that and said he wasn't going to give [him] any more information and hung up on [him]."[119]

---

[113] Rec. Doc. No. 34-5, p. 8.
[114] *Id*. at p. 9.
[115] Rec. Doc. No. 34-13.
[116] *Id*. at p. 8-9.
[117] Rec. Doc. No. 31-1, p. 9.
[118] Rec. Doc. No. 34-13, p. 19.
[119] Rec. Doc. No. 31-9, p. 26.

63304

Taylor testified that "Mr. Gilsdorf instructed me to take the slow order off, and I told him that I was not going to take the slow order off on the phone conversation on the 22nd behind the VTI hit . . . I did not hang up on Mr. Gilsdorf."[120] Even Union Pacific's own *Motion* states that the men had "different recollection[s] of the call."[121] This is clearly indicative of a disputed fact issue. For the Court to make its own finding on this issue would require a credibility determination and a weighing of evidence that is inappropriate at the summary judgment stage.

Indeed, Union Pacific repeatedly contends that Taylor "hung up" the phone on Stuart and other supervisors. Stuart testified as much at his deposition, stating that:

> Johnny Taylor hung up on me on more than one occasion. When Johnny Taylor did not like the calls -- the way our conference calls were going, he would end his -- his talking with "Johnny out," and he would hang up on our conference calls.· So, yeah, I have -- I have a lot of -- lot of experience with Johnny with being hung up on.[122]

Taylor denies hanging up on his supervisors.[123] In his view, his supervisors "just get upset when I explained it to them. . .They got upset because it was going to take millions of dollars to fix the track."[124] The Performance Improvement Plan that Union Pacific created for Taylor alleges that, at various points, he was "argumentative"[125] or "disrespectful."[126] Taylor vehemently disputes these claims, testifying that he "do[es] not have a behavior problem."[127] Whether these disputed incidents were "quarrelsome behavior" or

---

[120] Rec. Doc. No. 34-1, p. 126.
[121] Rec. Doc. No. 31-1, p. 9.
[122] Rec. Doc. No. 31-4, p. 39.
[123] Rec. Doc. No. 34-5, p. 12. *See* also Rec. Doc. No. 34-1 at 130.
[124] Rec. Doc. No. 34-1, p. 127-128.
[125] Rec. Doc. No. 34-4, p. 77.
[126] *Id.*
[127] Rec. Doc. No. 34-1, p. 127.

63304

insubordination providing grounds for termination or a clash of communication styles is a question for the jury.

Union Pacific further argues that Taylor was ultimately terminated because of his "refusal to agree to a simple PIP"[128] (Performance Improvement Plan). In Union Pacific's view, Taylor's refusal "entitles UP to summary judgment" because Taylor "could have signed the PIP, abided by the simple requests, and he would not have lost his employment."[129] Union Pacific does not elaborate upon the proposition that not signing the PIP, no matter how "simple" it was, automatically entitles it to summary judgment. Like many of the facts in this case, Taylor's "refusal" to sign is subject to multiple characterizations; in Taylor's words, he did not sign the PIP because he believed "that the document would be used to justify his termination rather than to help him, and because the PIP would require him to 'correct' the behavior of refusing to put unsafe tracks back into service."[130] Additionally, Union Pacific's reliance on the Performance Improvement Plan muddies the waters, since the PIP included other issues that it does not cite in this case as its reasons for terminating Taylor (e.g., the PIP addresses Taylor's allegedly improper utilization of his welding gang and his allegedly lackluster "coaching rate").[131]

Even if the Court accepted the facts as presented by Union Pacific, it is not clear that Union Pacific would have carried its burden to show, by clear and convincing evidence, that it would have terminated Johnny Taylor anyway. After all, as discussed above, the evidence of Taylor's alleged insubordination is potentially pretextual insofar as

---

[128] Rec. Doc. No. 31-1, p. 22.
[129] *Id.* at p. 23.
[130] Rec. Doc. No. 34, p. 11.
[131] Rec. Doc. No. 31-16.

63304

it coexists in the record with evidence that Union Pacific was, at least, fairly satisfied with Taylor's performance. Stuart's note that Taylor should improve his "attitude toward the management"[132] in his December 2017 performance review was accompanied by various other positive statements about Taylor's performance and clearly contemplated entering 2018 with Taylor remaining in his job. "You lead your team in a positive way from what I have seen so far,"[133] Stuart added. Stuart's testimony arguably suggests that Taylor ending phone calls with "Johnny out" was routine; assessing the credibility of Union Pacific's argument that it became necessary to terminate him for such behavior is an inquiry best left to the jury.  Likewise, was Taylor's response to Stuart's request for information on Switch 16 *insubordinate* in its non-responsiveness? Again, these are questions for the jury.

Overall, although Union Pacific demonstrates that it had a policy addressing insubordination[134] and that it followed the appropriate procedure by providing Taylor with a Performance Improvement Plan, summary judgment is nevertheless inappropriate because there are genuine issues of material fact regarding Taylor's conduct that must be resolved by a jury. The FRSA requires only that Taylor make out a *prima facie* case of discrimination; Union Pacific, meanwhile, must show by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected behavior. Union Pacific may prove as much at trial, but, based on the record before the Court, it is not entitled to summary judgment, due to the existence various

---

[132] Rec. Doc. No. 31-6.
[133] *Id.* at p. 4.
[134] Rec. Doc. No. 31-15, p. 3.
63304

issues of material fact that can only be decided by a jury. Accordingly, Union Pacific's *Motion* shall be DENIED.

## III.    CONCLUSION

For the reasons set forth above, Union Pacific's *Motion for Summary Judgment*[135] is hereby DENIED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>March 12, 2021</u>.

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[135] Rec. Doc. No. 31.

63304