1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF LOUISIANA

3

4  JOHNNY TAYLOR           : CIVIL ACTION

5  VERSUS                  : NO. 18-1110-SDD-EWD

6  UNION PACIFIC RAILROAD
   COMPANY                 : NOVEMBER 3, 2021
7
   ========================================================
8          CONTINUED JURY TRIAL (AFTERNOON SESSION)
           BEFORE THE HONORABLE SHELLY D. DICK
9          UNITED STATES CHIEF DISTRICT JUDGE

10                      VOLUME 4

11              A P P E A R A N C E S

12

   FOR THE PLAINTIFF:
13
       SMITH LAW FIRM
14     BY: ROBERT MOSELEY SCHMIDT, ESQ.
       BY: J. ARTHUR SMITH, III, ESQ.
15     830 NORTH STREET
       BATON ROUGE, LOUISIANA 70802
16

17  FOR THE DEFENDANT:

18     FRASER, WHEELER, BERGSTEDT & COURTNEY, L.L.P.
       BY: DAVID ANDREW FRASER, ESQ.
19     4350 NELSON ROAD
       POST OFFICE BOX 4886
20     LAKE CHARLES, LOUISIANA 70606-4886

21     SEYFARTH SHAW LLP
       BY: LINDA C. SCHOONMAKER, ESQ.
22     BY: BRIAN A. WADSWORTH, ESQ.
       700 MILAM STREET
23     SUITE 1400
       HOUSTON, TEXAS 77002

24

25        REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
             UNITED STATES COURTHOUSE

777 FLORIDA STREET
BATON ROUGE, LOUISIANA 70801
(225) 389-3565
NATALIE_BREAUX@LAMD.USCOURTS.GOV

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
COMPUTER-AIDED TRANSCRIPTION SOFTWARE

1                     **I N D E X**

2   DEFENSE WITNESS:

3    JACOB GILSDORF                                    PAGE

4        CROSS-EXAMINATION BY MR. SCHMIDT            4

5        REDIRECT EXAMINATION BY MR. WADSWORTH       15

6   DEFENSE WITNESS:

7    GREGORY WORKMAN

8        DIRECT EXAMINATION BY MR. FRASER            18

9        CROSS-EXAMINATION BY MR. SCHMIDT            31

10  DEFENSE WITNESS:

11   MARK WHEELAND

12        DIRECT EXAMINATION BY MS. SCHOONMAKER       34

13        CROSS-EXAMINATION BY MR. SCHMIDT            68

14  MOTIONS ARGUMENT                                  75

15

16

17

18

19

20

21

22

23

24

25

 1              **(NOVEMBER 3, 2021 AFTERNOON SESSION)**

 2                         **PROCEEDINGS**

 3          **THE COURT:**  BRING IN THE JURY.

 4          **(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

 5          **THE COURT:**  ALL RIGHT.  BE SEATED.  OKAY.

 6   IT'S THE PLAINTIFF'S CROSS-EXAMINATION OF MR.

 7   GILSDORF.

 8                    **CROSS-EXAMINATION**

 9   **BY MR. SCHMIDT:**

10      **Q**    ALL RIGHT, MR. GILSDORF.  WERE YOU AWARE

11   THAT KENNETH STUART RECOMMENDED THAT MR. TAYLOR BE

12   FIRED?

13      **A**    NO, SIR.

14      **Q**    OKAY.  AND I BELIEVE MR. WADSWORTH ASKED YOU

15   IF YOU RECOMMENDED THAT MR. TAYLOR BE FIRED, BUT YOU

16   DID NOT GIVE A *YES* OR *NO* ANSWER, DID YOU?

17      **A**    I DID NOT RECOMMEND A TERMINATION.  I SIMPLY

18   STATED THE FACTS OF WHAT I FOUND, WHICH WAS, YOU

19   KNOW, HOW -- PRESENTED HOW MR. TAYLOR'S BEHAVIOR WAS

20   AND WHAT RULES THAT IT DID NOT COMPLY WITH.  SO I DID

21   NOT MAKE A RECOMMENDATION EITHER WAY.

22      **Q**    AND YOU PROVIDED THAT INFORMATION TO MARK

23   WHEELAND?

24      **A**    YES, SIR.

25      **Q**    OKAY.  ALL RIGHT.  MR. WADSWORTH ASKED YOU

1  SOME QUESTIONS ABOUT DERAILMENTS.  IF I UNDERSTAND

2  YOUR TESTIMONY, DERAILMENTS AREN'T REALLY THAT BIG OF

3  A DEAL.  CORRECT?

4      A    NO, SIR, I DIDN'T -- I DIDN'T SAY THAT.

5  SIMPLY DEFINED WHAT A DERAILMENT WAS CLASSIFIED AS.

6      Q    WELL, YOU TESTIFIED THAT THEY'RE NOT ALWAYS

7  CATASTROPHIC.  CORRECT?

8      A    YEAH, THEY'RE IN DIFFERENT SIZES.  IT COULD

9  BE BIG TO LITTLE.

10      Q    AND PEOPLE HAVE DIED AS A RESULT OF

11  DERAILMENTS.  CORRECT?

12      A    YES.

13      Q    OKAY.  AND HAZARDOUS CHEMICALS HAVE BEEN

14  SPILLED AS A RESULT OF DERAILMENTS, LEADING TO LARGE-

15  SCALE EVACUATIONS.  CORRECT?

16      A    YES, SIR, THAT HAS HAPPENED.

17      Q    YOU WOULD AGREE THAT TRACKS BEING OUT OF

18  SERVICE CAN AFFECT UNION PACIFIC'S PROFIT.  CORRECT?

19      A    I DON'T SEE THAT -- WE DON'T LOOK AT IT AS

20  PROFITS.  IF WE TAKE A TRACK OUT OF SERVICE, WE CAN

21  SAY DISRUPT OR DELAY TRAIN DEPARTURES.  THAT DOES

22  HAPPEN.

23      Q    SO IT'S IMPOSSIBLE FOR TRACKS BEING OUT OF

24  SERVICE TO AFFECT UNION PACIFIC'S PROFITS?

25      A    I'M SORRY.  CAN YOU REPEAT THAT?

**1**     Q    ARE YOU TESTIFYING THAT IT IS IMPOSSIBLE FOR

**2**   TRACKS BEING OUT OF SERVICE TO NEGATIVELY IMPACT

**3**   UNION PACIFIC'S PROFITS?

**4**     A    *TRACKS BEING OUT OF SERVICE THAT WOULD*

**5**   *NEGATIVELY IMPACT THE PROFITS.*  NO, I DON'T AGREE

**6**   WITH THAT BECAUSE THERE IS OTHER ROUTES AROUND.

**7**   THERE'S NOT JUST ONE WAY.  WE CAN WORK AROUND IT.

**8**     Q    OKAY.

**9**         **MR. SCHMIDT:**  CAN WE LOOK AT PLAINTIFF'S

**10**  EXHIBIT NO. 17, WHICH HAS BEEN PREADMITTED.  SO ON

**11**  PAGE 385 -- ACTUALLY, YEAH, STOP THERE.

**12**  **BY MR. SCHMIDT:**

**13**    Q    THIS EMAIL ON THE BOTTOM FROM DANNY JAQUESS,

**14**  IT READS:  *JOHNNY, WE HAVE 4 TRACKS OUT OF SERVICE IN*

**15**  *AVONDALE (11 TO 12 ON THE WEST END, 15 10 16 ON THE*

**16**  *EAST END).  NOW THAT THE WEATHER IS PASSING US, WHAT*

**17**  *IS THE PLAN TO GET THESE BACK?  WE CAN'T SURVIVE*

**18**  *WITHOUT THESE TRACKS.  BUSINESS IS TOO GOOD.*

**19**         SO DO YOU DISAGREE WITH MR. JAQUESS'

**20**  STATEMENT THAT UNION PACIFIC CAN'T SURVIVE WITHOUT

**21**  THOSE TRACKS BECAUSE BUSINESS IS TOO GOOD?

**22**    A    I BELIEVE THAT HE'S MAKING A BUSINESS CASE,

**23**  THAT HE PROBABLY NEEDS SOME TRACKS BACK IN SERVICE TO

**24**  OPERATE FLUENT AND EFFICIENCY.

**25**    Q    THANK YOU.  AND YOU WOULD AGREE THAT IF A

1   CRITICAL TRACK IS OUT OF OPERATIONS, THAT IT COULD

2   HAMPER UNION PACIFIC'S OPERATIONS.  CORRECT?

3      A    YES.  IF A CRITICAL TRACK WAS OUT OF

4   SERVICE, YES, IT COULD HAMPER THE OPERATIONS, YES.

5      Q    OKAY.  ALSO I BELIEVE YOU TESTIFIED EARLIER

6   THAT IF ONE OF YOUR SUBORDINATES TAKES MEASUREMENTS

7   THAT YOU BELIEVE ARE INCORRECT, YOU CAN GO WITH THEM

8   AND SHOW THEM HOW TO DO IT CORRECTLY.  RIGHT?

9      A    WHAT I SAID IS THAT IF I FELT THAT SOMEONE

10  TOOK MEASUREMENTS INACCURATELY, I WOULD SHOW THEM HOW

11  TO DO THAT.  I'VE NEVER HAD TO DO THAT.  I WAS JUST

12  GIVING THAT AS AN EXAMPLE.

13     Q    AND YOU DID NOT DO THAT WITH MR. TAYLOR.

14  CORRECT?

15     A    NO, SIR.

16        MR. SCHMIDT:  LET'S LOOK AT JOINT EXHIBIT

17  NO. 14.

18  BY MR. SCHMIDT:

19     Q    AND YOU WERE SURELY FAMILIAR WITH THIS

20  WHISTLEBLOWER POLICY.  CORRECT?

21     A    YES, SIR.

22     Q    OKAY.  AND YOU WERE AWARE THAT THE

23  WHISTLEBLOWER POLICY PROHIBITS RETALIATION AGAINST

24  EMPLOYEES FOR ENGAGING IN CERTAIN ACTIVITIES.

25  CORRECT?

1    **A**    ABSOLUTELY.

2    **Q**    DOES ANYTHING IN THIS POLICY SAY THAT THERE

3 HAS TO BE CATASTROPHIC DAMAGE BEFORE AN EMPLOYEE'S

4 ACTIONS ARE PROTECTED UNDER THIS POLICY OR THE FRSA?

5    **A**    NO.

6    **Q**    ARE YOU AWARE OF ANY FRA REGULATIONS THAT

7 YOU UNDERSTAND TO MEAN THAT THERE MUST BE

8 CATASTROPHIC DAMAGE BEFORE AN EMPLOYEE CAN TAKE A

9 TRACK OUT OF SERVICE?

10   **A**    NO, SIR.

11   **Q**    OKAY.

12       **MR. SCHMIDT:**  ALL RIGHT.  LET'S LOOK AT

13 DEFENDANT'S EXHIBIT NO. 8.  SORRY.  JOINT EXHIBIT NO.

14 6.  CAN WE SCROLL DOWN, PLEASE.  KEEP SCROLLING DOWN.

15 OKAY.

16 **BY MR. SCHMIDT:**

17   **Q**    SO IN THIS EMAIL YOU ASKED MR. TAYLOR FOR

18 SOME INFORMATION.  CORRECT?

19   **A**    YES.

20   **Q**    AND I UNDERSTAND THAT IT WAS NOT THE SAME

21 INFORMATION BEING REQUESTED BY MR. STUART.  CORRECT?

22   **A**    CORRECT.

23   **Q**    OKAY.  YOU ASKED HIM SIX QUESTIONS.

24       **MR. SCHMIDT:**  CAN WE SCROLL UP.

25 **BY MR. SCHMIDT:**

1    **Q**   HE PROVIDED ANSWERS TO 1, 2, 3 AND 6.  AND

2   AS -- DURING YOUR TESTIMONY YESTERDAY, I BELIEVE YOU

3   RECOGNIZED THAT NOS. 4 AND 5 ASKED FOR ATTACHMENTS

4   AND THAT THERE ARE ATTACHMENTS HERE BELOW IN THIS

5   EMAIL.

6              AND YOU WOULD AGREE THAT MR. TAYLOR

7   PROVIDED YOU WITH ALL THE INFORMATION YOU REQUESTED

8   AT THIS POINT IN TIME.  CORRECT?

9    **A**   YES, SIR.

10   **Q**   AND YOU DIDN'T ENCOUNTER ANY RESISTANCE FROM

11  HIM IN PROVIDING THIS INFORMATION.  CORRECT?

12   **A**   NO, SIR, NOT ON THIS REQUEST.

13   **Q**   OKAY.

14     **MR. SCHMIDT:**  LET'S LOOK AT JOINT EXHIBIT

15  NO. 9.  OKAY.  SO LET'S SCROLL DOWN.  OKAY.

16  **BY MR. SCHMIDT:**

17   **Q**   SO YOUR FIRST EMAIL TO MR. TAYLOR HERE ASKED

18  *WHAT IS THE ROOT CAUSE.*  AND MR. TAYLOR RESPONDED

19  *TIES.*  CORRECT?

20   **A**   YES, SIR.

21   **Q**   OKAY.  SO --

22     **MR. SCHMIDT:**  LET'S SCROLL UP.

23  **BY MR. SCHMIDT:**

24   **Q**   YOU ASKED HIM SEVERAL MORE QUESTIONS.  AND

25  THEN --

1          MR. SCHMIDT:  SCROLL UP, PLEASE.

2    BY MR. SCHMIDT:

3      Q    -- HE PROVIDED SOME OF THE INFORMATION YOU

4    REQUESTED.  CORRECT?

5      A    I'M SORRY?

6      Q    HE PROVIDED SOME OF THE INFORMATION YOU

7    REQUESTED.  CORRECT?

8      A    YES, SOME OF THE INFORMATION WAS ACCURATE ON

9    THE VTI FORM.  THE ROOT CAUSE WAS NOT, THAT'S

10   CORRECT.

11     Q    NO.  BUT IN THIS EMAIL HE PROVIDED ANSWERS

12   TO SOME OF THE QUESTIONS YOU ASKED.  CORRECT?

13     A    NO, SIR.

14     Q    NO?  SO YOUR TESTIMONY IS THAT YOU WERE NOT

15   PARTLY SATISFIED WITH THE INFORMATION HE PROVIDED

16   HERE?

17     A    IT DID NOT ANSWER MY ORIGINAL QUESTION ON

18   WHAT THE ROOT CAUSE WAS, NO, SIR.

19     Q    WELL, I'M NOT ASKING YOU IF IT ANSWERED THE

20   ROOT CAUSE.  I'M ASKING IF IT ANSWERED SOME OF THE

21   QUESTIONS THAT YOU HAD ASKED IN YOUR PREVIOUS EMAIL.

22     A    NO, SIR.

23          MR. SCHMIDT:  LET'S LOOK AT PAGES 57 TO 58

24   OF MR. GILSDORF'S DEPOSITION, WHICH -- SORRY.  ON THE

25   PDF IT'S PAGE 45.  ACTUALLY, I THINK IT MIGHT EVEN BE

1   THE PREVIOUS PAGE.

2   BY MR. SCHMIDT:

3       Q    OKAY.  SO READING FROM LINE 4 HERE DOWN

4   THROUGH PAGE --

5            MR. SCHMIDT:  SORRY.  KEEP GOING.

6   BY MR. SCHMIDT:

7       Q    -- THROUGH LINE 9 OF THE NEXT PAGE, COULD

8   YOU READ THAT TO YOURSELF FOR ME, PLEASE.

9       A    YES.  CAN YOU SCROLL DOWN.  AND YOU SAID TO

10  LINE 24?  I'M SORRY.

11      Q    TO LINE 9.

12      A    OH, OKAY.

13      Q    AND I'LL ACTUALLY ASK YOU TO KEEP READING --

14           MR. SCHMIDT:  CAN WE SCROLL DOWN, PLEASE.

15  BY MR. SCHMIDT:

16      Q    -- THROUGH THE END OF THAT PAGE.

17      A    OKAY.

18      Q    OKAY.  SO YOU DID TESTIFY AT YOUR DEPOSITION

19  THAT YOU WERE SATISFIED WITH A PORTION OF MR.

20  TAYLOR'S RESPONSE.  CORRECT?

21      A    A PORTION, YES.

22      Q    OKAY.

23           MR. SCHMIDT:  SO LET'S GO BACK TO JOINT

24  EXHIBIT NO. 9.

25  BY MR. SCHMIDT:

1    Q    AND THEN IN THIS EMAIL FROM YOU AT THE TOP

2    OF THE PAGE, YOU ASKED HIM FOR TWO MORE PIECES OF

3    INFORMATION.  CORRECT?  YOU ASKED HIM FOR THE

4    INSPECTION OF THE TIES FOR EVERY 30-FOOT SEGMENT, THE

5    COUNT, AND IF THERE ARE ANY TIES THAT ARE NOT

6    EFFECTIVELY DISTRIBUTED THAT WOULD WARRANT A SCHEDULE

7    FOR A REPAIR PER FRA REQUIREMENTS.

8              AND THOSE ARE THE ONLY TWO THINGS YOU

9    ASKED HIM FOR IN THIS EMAIL.  CORRECT?

10   A    YES.

11   Q    AND THEN YOU HAD A PHONE CALL WITH MR.

12   TAYLOR.  CORRECT?

13   A    THAT'S CORRECT.

14   Q    OKAY.  DID YOU EVER ASK HIM FOR ANY MORE

15   INFORMATION BEYOND WHAT IS IN THIS EMAIL?

16   A    ONLY WHAT'S IN THE EMAIL.

17   Q    OKAY.

18   A    IS WHAT I ASKED HIM FOR, YES.

19   Q    OKAY.  AND YOU ALSO TESTIFIED EARLIER

20   REGARDING OCCASIONS IN WHICH MISTER -- YOU WITNESSED

21   MR. TAYLOR GETTING UPSET.  CORRECT?

22   A    YES, SIR.

23   Q    OKAY.  HOW MANY TIMES DID THIS HAPPEN THAT

24   YOU WITNESSED?

25   A    THE FIRST TIME WAS WHEN I WAS WITH MR.

1  STUART WHEN MR. TAYLOR CALLED HIM.  THAT WAS ONE.

2  MR. TAYLOR GOT THAT WAY WITH ME ON THE PHONE.  THAT

3  WOULD BE TWO.  OTHER THAN THAT, IT WAS THE TWO

4  MEETINGS THAT -- THOSE WERE THE TWO ERRATIC TIMES

5  THAT I WITNESSED IT.  OTHER THAN THAT, WE HAD TWO

6  MEETINGS THAT I CAN REFER TO, BUT IT WASN'T ERRATIC,

7  YELLING BEHAVIOR.

8      Q    OKAY.  SO THE PHONE CALL WITH MR. STUART IN

9  WHICH YOU WERE IN THE CAR WITH MR. STUART.  CORRECT?

10     A    YES, SIR.

11     Q    AND THEN THE PHONE CALL WITH YOU?

12     A    YES, SIR.

13     Q    THOSE ARE THE TWO TIMES THAT YOU RECOGNIZED

14 HIM AS BEING ERRATIC, BUT TWO MEETINGS YOU SAID HE

15 WAS NOT.  AM I UNDERSTANDING THAT CORRECTLY?

16     A    WELL, THE AGGRESSIVE BEHAVIOR AS FAR AS KIND

17 OF YELLING, YOU KNOW, ATTACKING, THAT'S -- IS WHAT

18 I'M CALLING ERRATIC.

19     Q    OKAY.  AND THAT WAS JUST THOSE TWO PHONE

20 CALLS, NOT THE TWO MEETINGS LATER.  CORRECT?

21     A    THAT'S CORRECT.  THOSE TWO PHONE CALLS IS

22 WHAT I PERSONALLY WITNESSED.

23     Q    SO IN EACH OF THOSE TWO PHONE CALLS, MR.

24 TAYLOR EXPRESSED THAT HE FELT THAT SOMEONE WAS

25 TELLING HIM TO DO SOMETHING THAT WOULD VIOLATE THE

1   LAW.  CORRECT?

2      **A**   ALL I REMEMBER HIM SAYING WAS YELLING THAT I

3   HAD TO KIND OF COMPREHEND WHAT WAS BEING SAID, AND

4   WHAT WAS GOING ON CAUGHT ME OFF SURPRISE WITH MR.

5   STUART WHEN I WAS IN THE CAR.  AND, YES, HE WAS

6   SAYING *I'M NOT GOING TO TAKE THIS TRACK OUT OF*

7   *SERVICE*.

8              AND I SPECIFICALLY REMEMBER KENNY SAID,

9   *I'M NOT ASKING YOU TO.  I'M JUST ASKING FOR*

10  *MEASUREMENTS*.  AND HE JUST KEPT GOING ON AND ON

11  UNTIL, YOU KNOW --

12     **Q**   AND HOW LONG DID EACH OF THOSE CONVERSATIONS

13  LAST?  THE ONE WITH MR. STUART AND THEN THE ONE WITH

14  YOU.

15     **A**   I DIDN'T TIME IT.  I MEAN, THEY WEREN'T THAT

16  LONG.  IT WAS PROBABLY -- I DON'T KNOW -- MAYBE 45

17  SECONDS.  I MEAN, IT SEEMED -- I DIDN'T TIME IT, SO

18  --

19     **Q**   OKAY.  A VERY SHORT PHONE CALL THEN?

20     **A**   YEAH.  IT WASN'T DRAGGING ON FOR MINUTES AND

21  MINUTES AND MINUTES.  IT WAS PRETTY ABRUPT AND, YOU

22  KNOW -- AND THEN TRY TO GET IT DE-ESCALATED,

23  AND ACTUALLY THEN IT WAS OVER, SO I DON'T REMEMBER

24  THE TIME LENGTH OF IT.

25     **Q**   AND THEN YOU TESTIFIED THAT THE FIRST TIME

1  YOU MET MR. TAYLOR IT WAS A PLEASANT AND PRODUCTIVE

2  MEETING.  CORRECT?

3      **A**   YES, IT WAS.

4      **Q**   AND HOW LONG WOULD YOU SAY THAT MEETING WAS?

5      **A**   YOU KNOW, WE WERE PROBABLY IN THERE FOR, I

6  WOULD SAY, AT LEAST AN HOUR TO TWO HOURS TALKING WITH

7  MR. TAYLOR.

8      **Q**   OKAY.  AND HE NEVER EXPRESSED AT THAT

9  MEETING THAT HE FELT THAT ANYBODY WAS ASKING HIM TO

10 VIOLATE THE LAW.  CORRECT?

11     **A**   NO.

12     **Q**   OKAY.

13         **MR. SCHMIDT:**  NO FURTHER QUESTIONS.

14         **THE COURT:**  ANY REDIRECT?

15         **MR. WADSWORTH:**  JUST A FEW QUESTIONS, IF I

16 MAY, YOUR HONOR.

17         **THE COURT:**  GO AHEAD.

18              **REDIRECT EXAMINATION**

19 BY MR. WADSWORTH:

20     **Q**   MR. GILSDORF, YOU WERE JUST SHOWN AN EMAIL

21 FROM DANNY JAQUESS THAT SAID *WE CAN'T SURVIVE WITHOUT*

22 *THESE TRACKS.  BUSINESS IS TOO GOOD.*

23              HAS UNION PACIFIC BEEN SURVIVING

24 WITHOUT TRACK 16?

25     **A**   YES, SIR.  IT'S STILL OUT OF SERVICE TODAY.

1    Q    AND UNION PACIFIC IS STILL SURVIVING?

2    A    YES, SIR.

3    Q    DID MR. TAYLOR EVER COME TO YOU AND SAY *I*

4 *DON'T KNOW HOW TO TAKE THE MEASUREMENTS ON TRACK*

5 *SWITCH 16.  CAN YOU SHOW ME HOW*?

6    A    NO, SIR.

7    Q    WOULD YOU HAVE DONE SO IF HE HAD ASKED FOR

8 THAT?

9    A    YES, SIR.

10   Q    YOU WERE SHOWN EXHIBIT J-9 REGARDING SOME

11 QUESTIONS AND THEN SHOWN YOUR DEPOSITION ABOUT SOME

12 OF THE QUESTIONS THAT MR. TAYLOR PARTIALLY ANSWERED.

13          DID MR. TAYLOR EVER PROVIDE YOU WITH

14 THE ROOT CAUSE ON THAT VTI HIT?

15   A    MR. TAYLOR DID NOT.

16   Q    AND WOULD YOU CHARACTERIZE MR. TAYLOR'S

17 BEHAVIOR ON THOSE TWO PHONE CALLS YOU HAD WITH HIM AS

18 INSUBORDINATE?

19   A    YES.  AND VERY RUDE, DISRESPECTFUL.

20   Q    WOULD EVEN SHORT MOMENTS OF INSUBORDINATION

21 BE IMPROPER UNDER UNION PACIFIC POLICY?

22   A    YES.  INSUBORDINATION IS NOT TO BE

23 TOLERATED.

24   Q    THANK YOU, MR. GILSDORF.

25          **MR. WADSWORTH:**  YOUR HONOR, THAT'S ALL I

1    HAVE.

2            THE COURT:  YOU MAY STEP DOWN.

3                 NEXT WITNESS.

4            MR. FRASER:  WE'RE GETTING HIM NOW, YOUR

5    HONOR.

6            THE COURT:  AND I DIDN'T HEAR WHO YOU SAID

7    YOU WERE CALLING.  WHO DID --

8            MR. FRASER:  MR. GREG WORKMAN.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  COME RIGHT UP HERE, SIR.

2    THEY'RE GOING TO GIVE YOU A SHIELD TO USE.

3          (WHEREUPON, GREGORY WORKMAN, BEING DULY

4    SWORN, TESTIFIED AS FOLLOWS.)

5          THE COURT:  ONCE YOU GET SITUATED, YOU CAN

6    TAKE YOUR MASK DOWN.  THANK YOU.

7          GO AHEAD, SIR.

8          MR. FRASER:  THANK YOU, YOUR HONOR.

9                  DIRECT EXAMINATION

10   BY MR. FRASER:

11       Q    MR. WORKMAN, GIVE US YOUR FULL NAME, PLEASE,

12   SIR.

13       A    GREGORY DEAN WORKMAN.

14       Q    AND ARE YOU CURRENTLY EMPLOYED?

15       A    I AM NOT.

16       Q    ALL RIGHT.  WHAT WAS YOUR LAST EMPLOYMENT?

17       A    I ENDED MY CAREER WITH UNION PACIFIC

18   MID-FEBRUARY OF 2020, AND I'M CURRENTLY RETIRED.

19       Q    WAS THAT A PLANNED RETIREMENT?

20       A    YES, IT WAS.

21       Q    LET ME ASK YOU TO BRIEFLY GO BACK AND GIVE

22   US THE VARIOUS WORK POSITIONS YOU HAVE HELD WITH

23   UNION PACIFIC THROUGH THE YEARS, STARTING WITH YOUR

24   FIRST JOB.

25       A    ALL RIGHT.  I STARTED IN JUNE 11, 1984, AS A

1  MANAGEMENT TRAINEE.  I SPENT MY FIRST FIVE YEARS IN

2  THE ENGINEERING DEPARTMENT, TWO DIFFERENT POSITIONS:

3  RUNNING A STEEL GANG FOR A COUPLE OF YEARS AND THEN

4  MANAGER OF TRACK MAINTENANCE FOR A COUPLE OF YEARS;

5  WAS ASKED TO COME INTO THE TRANSPORTATION PART OF THE

6  OPERATING DEPARTMENT; SPENT THE NEXT 30 YEARS

7  STARTING AT THE MYO FRONT-LINE TRANSPORTATION

8  POSITION, UP TO AND INCLUDING REGIONAL VICE PRESIDENT

9  OF THE SOUTHERN REGION; AND THEN IN 2015 BECAME CHIEF

10  SAFETY OFFICER FOR A SHORT SIX-MONTH TENURE, FOLLOWED

11  BY JUST OVER TWO YEARS AS VP OF ENGINEERING.  AND I

12  FINISHED MY CAREER AS SENIOR VICE PRESIDENT OF

13  OPERATIONS ON THE SOUTHERN REGION AT UNION PACIFIC.

14      Q    WHAT IS YOUR EDUCATIONAL BACKGROUND?

15      A    I'M A CIVIL-ENGINEERING-DEGREE GRADUATE FROM

16  PURDUE UNIVERSITY.

17      Q    WHEN YOU TALK ABOUT ENGINEERING AND THE

18  ENGINEERING DEPARTMENT, ARE YOU TALKING ABOUT THE GUY

19  THAT GETS TO SOUND THE HORN, OR ARE YOU TALKING ABOUT

20  THE GUY THAT WORKS ON THE TRACK?

21      A    WHEN I'M TALKING ABOUT THE ENGINEERING

22  DEPARTMENT, I'M TALKING ABOUT THE TRACK WORKERS,

23  SIGNAL WORKERS AND BRIDGE WORKERS.  THE LOCOMOTIVE

24  ENGINEERS THAT WOULD SOUND THE HORN WOULD FALL UNDER

25  THE MANAGEMENT OF THE TRANSPORTATION MANAGERS.

1  **Q**  AND TELL US AGAIN WHEN YOU LEFT UNION

2  PACIFIC.

3  **A**  FEBRUARY OF 2020.

4  **Q**  ALL RIGHT.  CONDENSE THIS AS BEST I CAN.  DO

5  YOU REMEMBER MEETING MR. JOHNNY TAYLOR, WHO IS HERE?

6  **A**  YEAH.  I BELIEVE I MET HIM BOTH IN WEST

7  TEXAS WHEN I WAS VICE PRESIDENT -- OR REGIONAL VICE

8  PRESIDENT ON THE SOUTHERN REGION, AND I BELIEVE I

9  ALSO CROSSED PATHS AGAIN WITH HIM WHEN HE WAS THE MTM

10  IN -- ON THE LIVONIA SUB BETWEEN NEW ORLEANS AND

11  BATON ROUGE WHEN I WAS THE VICE PRESIDENT OF

12  ENGINEERING.

13  **Q**  ALL RIGHT.  JUST TO GIVE OUR JURY SOME

14  PERSPECTIVE, DO YOU KNOW APPROXIMATELY HOW MANY

15  EMPLOYEES UNION PACIFIC HAS IN TOTAL THESE DAYS?

16  **A**  IN TODAY'S WORLD?

17  **Q**  YES, SIR.

18  **A**  I THINK WHEN I LEFT WE WERE AROUND FORTY-

19  TWO, FORTY-THREE THOUSAND.

20  **Q**  AND DO YOU KNOW HOW MANY MILES OF TRACK

21  UNION PACIFIC HAS?

22  **A**  ROUGHLY 32,000.

23  **Q**  OKAY.  AND YOUR JOB WHEN YOU WERE -- WAS IT

24  ASSISTANT VICE PRESIDENT OF ENGINEERING?

25  **A**  VICE PRESIDENT OF ENGINEERING.

1    Q    VICE PRESIDENT OF ENGINEERING.

2    A    AT THAT TIME I HAD CENTRALIZED ENGINEERING,

3 WHICH -- MY ACCOUNTABILITIES, THE DESIGN GROUP, THE

4 CONSTRUCTION GROUP, THE TRACK PROGRAMS GROUP, THE BIG

5 PRODUCTION GANGS THAT DID OUR RAIL AND TIE AND BRIDGE

6 RELAYS, AND THEN THE STANDARDS AND ASSESSMENT GROUP

7 WORKED FOR ME.

8         THE MAINTENANCE FORCES IN THE FIELD

9 WORKED FOR THE REGIONS.

10   Q    SO ROUGHLY HOW MANY REPORTS DID YOU HAVE

11 UNDER YOU?  HOW MANY EMPLOYEES?

12   A    IN ENGINEERING I HAD ROUGHLY 7,000

13 EMPLOYEES, 340 OF WHICH WERE IN MANAGEMENT.

14   Q    DO YOU RECALL WHETHER OR NOT MR. TAYLOR EVER

15 REPORTED DIRECTLY TO YOU?

16   A    COULD YOU SAY THAT AGAIN?

17   Q    DO YOU RECALL WHETHER OR NOT MR. TAYLOR EVER

18 REPORTED DIRECTLY TO YOU?

19   A    HE WAS NEVER A DIRECT REPORT.  WHEN I WAS

20 REGIONAL VICE PRESIDENT ON THE SOUTH FROM 2008 TO MID

21 '15, HE WOULD HAVE BEEN IN THE SOUTHERN REGION

22 ORGANIZATION THAT I MANAGED.

23   Q    LET ME GO BACK.  WHEN YOU WERE VICE

24 PRESIDENT OF ENGINEERING, WHO DID YOU REPORT TO?

25   A    I REPORTED TO THE EXECUTIVE VICE PRESIDENT

1  OF OPERATIONS, CAMERON SCOTT.

2      Q    DO YOU RECALL HOW MANY TIMES YOU MAY HAVE

3  INTERACTED WITH MR. TAYLOR?

4      A    I'M THINKING THOSE TWO TIMES THAT I

5  MENTIONED.  I THINK ONCE IN WEST TEXAS.  I DON'T KNOW

6  IF IT WAS 2009 OR '10.  I FIGURE IT WAS VERY EARLY IN

7  MY TENURE AS THE RVP.  AND THEN IT WOULD HAVE BEEN

8  EITHER 2016 OR 2017 INTERACTING WITH HIM ON AN

9  ENGINEERING INSPECTION SPECIAL ON THE SOUTHERN

10 REGION.

11     Q    ALL RIGHT.  THAT'S BEEN DESCRIBED AS THE

12 BUSINESS CAR, THE BUSINESS TRAIN.  IS THAT A TERM

13 YOU'RE FAMILIAR WITH?

14     A    YES.

15     Q    ALL RIGHT.  WHAT'S THE PURPOSE OF THE

16 BUSINESS TRAIN?  WHY WERE YOU ON THAT BUSINESS TRAIN

17 IN THE SOUTH?

18     A    THE PURPOSE OF THAT TRAIN, WE IN

19 ENGINEERING, THE CENTRALIZED ENGINEERING, WOULD TAKE

20 IT OUT THREE TIMES A YEAR AND TRY TO GET OVER AS MUCH

21 OF THE 32,000 MILES OF RAILROAD AS WE COULD.  THEY

22 WERE GENERALLY 12 -- 12-DAY TRIPS, 12- TO 14-HOUR

23 DAYS COVERING SIX OR SEVEN HUNDRED MILES A DAY.  AND

24 IT WAS AN ATTEMPT TO VALIDATE WHAT OUR ANALYTICS

25 SHOWED US AS FAR AS WHAT WE NEEDED TO DO WITH

1  UPCOMING TIE, RAIL, BRIDGE PROGRAMS.

2              THERE WOULD GENERALLY BE 15 OR 16

3  PEOPLE ON AN OBSERVATION CAR THAT HAD 30 SEATS, SO

4  THERE WAS ROOM FOR PEOPLE TO MOVE AROUND A LITTLE

5  BIT.  AND WE WOULD TALK ABOUT ISSUES THAT -- WITH

6  RESPECT TO TIE CONDITION, RAIL CONDITION AND JUST

7  VALIDATE VISUALLY AND FROM THE PEOPLE IN THE FIELD

8  WHAT OUR DATA IN OMAHA WAS TELLING US ANALYTICALLY

9  THAT WE NEEDED TO DO.

10     Q    AND THAT DATA WAS COMING TO YOU FROM -- FROM

11  WHAT SOURCES, SIR?

12     A    THAT DATA CAME TO ME FROM OUR ASSESSMENT

13  GROUP IN OMAHA.

14     Q    ON THAT TRIP ON THE BUSINESS CAR, DO YOU

15  RECALL HAVING A CONVERSATION WITH MR. TAYLOR?

16     A    NOT SPECIFICALLY.

17     Q    IT'S BEEN ALLEGED HERE -- AND I'LL READ TO

18  YOU WHAT HAS BEEN ALLEGED THAT YOU SAID TO HIM AND

19  ASK YOU TO COMMENT ON IT.

20              DID YOU EVER ASK MR. TAYLOR *ARE YOU IN*

21  *BED WITH THE FRA*?

22     A    NO.

23     Q    TELL US WHY YOU WOULD THINK YOU DID NOT SAY

24  THAT.

25     A    NO. 1, I KNOW THAT I WOULDN'T SAY THAT TO

1  SOMEBODY, ESPECIALLY THAT'S NOT IN MY ORGANIZATION.

2  NO. 2, I HAVE NO IDEA WHAT THEIR DAY-TO-DAY BUSINESS

3  ATMOSPHERE IS.  I HAVE NO CLUE WHAT THEIR

4  RELATIONSHIP IS WITH THE FRA.

5           AS A MANAGER, I MADE MY MONEY IN MY

6  CAREER BY BUILDING UP A POSITIVE SPIRIT IN THE

7  MANAGEMENT TEAM AND NOT DRAGGING ONE DOWN.  AND THERE

8  IS NO WAY I WOULD DRAG A MANAGER DOWN IN FRONT OF 15

9  OR 16 PEOPLE ON THE BACK END OF AN INSPECTION SPECIAL

10 LIKE THAT.

11    Q   JUST TO GIVE US SOME PERSPECTIVE, HOW WOULD

12 PEOPLE BE SEATED GENERALLY AND HOW WOULD THE TRIP

13 PROGRESS?

14    A   USUALLY ON THE FRONT ROW, THOSE TWO SEATS

15 WOULD BE THE MTM AND THE CHIEF -- ACTUALLY, THERE IS

16 THREE SEATS, BUT -- AN MTM AND A CHIEF ENGINEER AND

17 SOMETIMES SOMEBODY IN THE MIDDLE SEAT.  BUT USUALLY

18 THE OTHER TWO FRONT SEAT WOULD BE MAYBE A SIGNAL

19 MANAGER THAT WAS LOCAL AND ANYBODY ELSE THAT WANTED

20 TO MOVE UP TO THE FRONT FOR A SPECIFIC REASON ON THAT

21 TRIP.

22          I WOULD TEND TO SIT IN THE SECOND ROW

23 ON THE RIGHT SIDE.  AND MY ASSESSMENT GUY WAS USUALLY

24 TWO ROWS BEHIND ME.  THEN THE PEOPLE WERE SCATTERED

25 OUT SO THAT THEY HAD ROOM, BECAUSE THERE WOULD BE

1  LAPTOPS UP ON THE DESK AND BIG NOTEBOOKS WITH

2  INFORMATION AND ANALYTICS.  SO PEOPLE WERE GENERALLY

3  SPACED OUT.

4            BUT THE FRONT TWO LEFT WERE RESERVED

5  FOR THE CHIEF AND THE MTM OF THE TERRITORY; AND THAT

6  SECOND ROW RIGHT AISLE WE SAT IN, AT LEAST DURING MY

7  TIME AS VP OF ENGINEERING.

8     Q    SO IF YOU WENT FROM ONE MTM'S TERRITORY TO

9  ANOTHER, SOMEBODY'D GET OFF THE TRAIN, LIKELY

10 SOMEBODY ELSE'D GET ON?

11    A    CORRECT.

12    Q    DURING YOUR TIME WITH UNION PACIFIC, HAVE

13 YOU EVER ASKED AN EMPLOYEE TO LIE TO THE FRA?

14    A    I DID NOT.

15    Q    DURING YOUR EMPLOYMENT WITH UNION PACIFIC,

16 DID YOU EVER ASK AN EMPLOYEE TO DECEIVE THE FRA?

17    A    ABSOLUTELY NOT.

18    Q    TELL US A LITTLE BIT ABOUT THE COMPANY'S

19 RELATIONSHIP WITH FRA, IN YOUR EXPERIENCE.

20    A    IN MY EXPERIENCE, THE FRA WAS VERY

21 INTERTWINED WITH WHAT WE DID ON A DAY-TO-DAY BASIS.

22 THEY HAD INSPECTORS IN THE TRACK WORLD, THE SIGNAL

23 WORLD, OPERATING PRACTICES IN THE TRANSPORTATION

24 WORLD.  AND THEY WERE SOMEWHERE ON US EVERY DAY, WITH

25 MAYBE THE EXCEPTION OF SATURDAYS AND SUNDAYS BECAUSE

1    THEY TRIED TO KEEP OUR OVERTIME DOWN.

2              THE REGIONS -- FOR EXAMPLE, WHEN I WAS

3    RVP, WE HAD QUARTERLY MEETINGS WITH THE FRA WHERE WE

4    MET WITH ALL THEIR DISCIPLINES; WE TALKED ABOUT

5    STRATEGIES THAT WE HAD AS A COMPANY AND WHAT WE WERE

6    TRYING TO DO, FOR EXAMPLE, TO REDUCE DERAILMENTS,

7    REDUCE PERSONAL INJURIES, WHERE WE WERE GOING TO BE

8    SPENDING CAPITAL MONEY, LISTEN TO INPUT THAT THEY

9    MIGHT HAVE FROM BEING OUT AND ABOUT ON OUR RAILROAD.

10             AND THEN WHEN I WAS AT THE SYSTEM

11   LEVEL, BOTH ON THE CHIEF SAFETY OFFICER JOB AND THE

12   VP OF ENGINEERING, WE MET WITH THE FRA IN WASHINGTON,

13   D.C., ANNUALLY, SO I WOULD -- I DID THAT TRIP THREE

14   TIMES.

15     Q   YOU MENTIONED *THEY WERE ON US MOST EVERY*

16   *WEEKDAY.*  DO YOU MEAN ON YOUR TERRITORY?

17     A   SOMEWHERE ON THE RAILROAD INSPECTING EITHER

18   TRACKS, SIGNALS, OPERATING PRACTICES, RULES

19   COMPLIANCE.  THEY'D BE WITH EITHER MANAGERS OF TRACK

20   MAINTENANCE OR TRACK INSPECTORS, OR THEY WOULD BE

21   WITH TRANSPORTATION MANAGERS DOING FIELD TESTING TO

22   ENSURE THE TRAIN CREWS WERE COMPLYING WITH THE RULES

23   APPROPRIATELY.

24             THEY HAD INSPECTORS THAT WORKED INSIDE

25   OF -- WOULD COME TO LOCOMOTIVE SHOPS OR INSPECT

1    TRAINS IN THE YARD FOR ANY LOCOMOTIVE OR CAR DEFECTS.

2    I MEAN, THEY WERE PART OF OUR LIFE.  I MEAN, THEY

3    WERE -- AS MUCH AS YOU COULD HAVE WITH A REGULATORY

4    AGENCY, WE HAD A PARTNERSHIP WITH THE FRA.

5        Q    AND OCCASIONALLY WOULD THEY GIVE DIRECTIVES

6    OR ISSUE ORDERS OR WORK OUT SETTLEMENTS WITH YOU OVER

7    HOW CERTAIN THINGS SHOULD TAKE PLACE?

8        A    YEAH.  THEY WOULD DOCUMENT -- ON ANY ONE OF

9    THOSE INSPECTIONS THAT I MENTIONED, IF THERE WAS A

10   VIOLATION, WE COULD BE VIOLATED OR BE GIVEN A

11   VIOLATION.  WE HAD A COMPLIANCE AGREEMENT WITH THEM

12   IN -- THAT WE AGREED TO AT THE END OF 2016, I BELIEVE

13   IT WAS.  IT WENT THROUGH '17 AND '18.

14            BUT IT WAS IN RESPONSE TO A DERAILMENT

15   THAT WE HAD IN THE PACIFIC NORTHWEST WITH A CRUDE OIL

16   TRAIN.  AND THAT HAPPENED IN THE SUMMER AND THEY

17   WANTED TO DO SOMETHING OFFICIAL.  WE WENT TO

18   WASHINGTON, D.C., LAID OUT WHAT WE WERE DOING.  WE

19   TURNED THAT INTO A DOCUMENT, AND THAT BECAME OUR

20   COMPLIANCE AGREEMENT WITH THE FRA.

21       Q    WERE YOU IN YOUR -- WHEN YOU LAID OUT WHAT

22   YOU WERE DOING TO THEM, WAS THAT GIVING THEM A PLAN

23   ON HOW THAT SORT OF DERAILMENT COULD BE PREVENTED IN

24   THE FUTURE?

25       A    ABSOLUTELY.  AND EVERYTHING THAT WE HAD PUT

1   IN PLACE SINCE THAT DERAILMENT TO ENSURE THAT IT

2   NEVER HAPPENED AGAIN.

3       **Q**   WE'VE HEARD SOME TALK ABOUT CONTINUOUS

4   WELDED RAIL IN THIS CASE.  WHAT WAS YOUR GOAL IN THE

5   ENGINEERING DEPARTMENT IN TERMS OF CREATING

6   CONTINUOUS WELDED RAIL?

7           **MR. SCHMIDT:**  OBJECTION, YOUR HONOR;

8   RELEVANCE.

9           **THE COURT:**  WHAT'S THE RELEVANCE?

10          **MR. FRASER:**  IT'S -- WE HAD DISCUSSION ABOUT

11  WELDERS EARLIER, AND THEY WERE ASKED TO DO THIS KIND

12  OF WORK IN THE PERFORMANCE PLAN.

13          **THE COURT:**  OVERRULED.

14  BY MR. FRASER:

15      **Q**   YOU CAN ANSWER, SIR.

16      **A**   WELL, THE LONG-TERM GOAL WAS TO HAVE

17  EVERYTHING CONTINUOUS WELDED RAIL ON THE MAIN LINE.

18  AND WE WANTED TO HAVE EVERY JOINT ELIMINATED, BECAUSE

19  AT EVERY JOINT THAT YOU HAVE BETWEEN THESE

20  QUARTER-MILE STRINGS OF RAIL IS A GREATER RISK FROM A

21  PHYSICS STANDPOINT IN THE POUNDING A JOINT TAKES

22  VERSUS RAIL THAT RUNS CONTINUOUSLY.

23              AND FROM A DERAILMENT PREVENTION

24  STANDPOINT, IT'S MUCH EASIER TO BREAK A RAIL AT A

25  JOINT OR HAVE TRACK SURFACE ISSUES.  IF THE TRACK

1 GETS A LITTLE BIT CROSS LEVEL, YOU'LL POUND A JOINT,

2 YOU'LL GET MUD PUMPING UP THROUGH, SO YOU LOSE THE

3 DRAINAGE. DRAINAGE IS CRITICAL TO MAINTAINING GOOD

4 RAILROADS. SO WE WANTED TO BE JOINT-FREE ON THE MAIN

5 LINES.

6 Q AND WAS THAT POLICY DISSEMINATED TO MANAGERS

7 IN THE FIELD?

8 A YES. AND -- BUT I WILL SAY WE HAVE NEVER --

9 AND I DON'T KNOW THAT YOU'LL EVER GET TO JOINT-FREE

10 BECAUSE THERE IS THINGS THAT HAPPEN. YOU'LL HAVE A

11 BROKEN RAIL AND IT'S RAINING, AND YOU CAN'T WELD THAT

12 WHEN IT'S RAINING. SO THERE IS JOINTS IN THE

13 RAILROAD.

14 WE DID HAVE NUMBERS OF MANAGER OF TRACK

15 MAINTENANCES ACROSS THE RAILROAD THAT WOULD BE

16 JOINT-FREE FOR PERIODS OF TIME AND THEN BECOME

17 JOINT-FREE AGAIN. I MEAN, IT WAS A TARGET THAT WE

18 TRIED TO GET, BECAUSE IT HELPED PREVENT DERAILMENTS.

19 Q WERE YOU INVOLVED IN THE DECISION TO PLACE

20 MR. TAYLOR ON A PERFORMANCE IMPROVEMENT PLAN?

21 A I WAS NOT.

22 Q DID YOU EVER ASSESS MR. TAYLOR'S

23 PERFORMANCE?

24 A I -- ONE TIME IN EITHER 2016 OR '17 A

25 MANAGER FROM HR CAME TO ME IN OMAHA. THEY HAD A

1 VALUES LINE COMPLAINT. I BELIEVE IT WAS A VALUES

2 LINE COMPLAINT. AND IT CAME FROM MR. TAYLOR, I

3 BELIEVE. AND HE WAS CONCERNED OR COMPLAINING ABOUT

4 THE FACT THAT HE HADN'T BEEN PROMOTED. AND THEY

5 WANTED ME JUST TO TAKE A CURSORY LOOK AT WHAT I

6 THOUGHT. SO I JUST ASKED TO SEE HIS PERFORMANCE

7 REVIEWS SINCE HE'D BEEN THE MTM -- OR BEEN AN MTM.

8 AND I LOOKED AT THOSE AND SAW THAT

9 EVERY ONE OF THOSE YEARS UP TO THAT POINT HE HAD BEEN

10 RATED A THREE, WHICH IS CONSIDERED A GOOD PERFORMER.

11 BUT THE PEOPLE THAT GET PROMOTED GENERALLY HAVE SOME

12 ONE'S OR TWO'S -- MOSTLY TWO'S -- SCATTERED SOMEWHERE

13 IN THERE. THOSE WOULD BE THE HIGH PERFORMERS THAT

14 WE -- AND WE TRIED TO PROMOTE HIGH PERFORMERS AND

15 HIGH-POTENTIAL PEOPLE.

16 AND WHAT I TOLD THE VALUES LINE LADY IS

17 THE DISCUSSION NEEDED TO BE WITH MR. TAYLOR AND HIS

18 BOSS HOW DO WE GET JOHNNY TO THE NEXT LEVEL, BECAUSE

19 THAT'S WHAT'S GOING TO GET HIM PROMOTED. AND THAT

20 WAS MY FEEDBACK. AND I DIDN'T HEAR ANYTHING AFTER

21 THAT.

22 Q ALL RIGHT. ANY OTHER ASSESSMENT OF MR.

23 TAYLOR THAT YOU RECALL?

24 A NO, SIR.

25 Q DID YOU EVER KNOW THAT MR. TAYLOR WAS GOING

1    ON A PERFORMANCE IMPROVEMENT PLAN?

2        **A**    I DID NOT KNOW THAT.

3        **Q**    DID YOU KNOW THE CONTENTS OF THAT PLAN?

4        **A**    I DID NOT.

5        **Q**    WERE YOU IN ANY WAY INVOLVED IN THE DECISION

6    TO TERMINATE MR. TAYLOR'S EMPLOYMENT?

7        **A**    I WAS NOT.

8        **Q**    IN YOUR POSITION AT THE TIME OF TERMINATION,

9    WOULD THAT BE SOMETHING THAT WOULD ORDINARILY COME

10   THROUGH YOU OR NOT?

11       **A**    NO.

12       **Q**    ARE YOU AWARE OF THE UNION PACIFIC POLICY

13   WITH REGARD TO RETALIATION AGAINST EMPLOYEES?

14       **A**    I AM.

15       **Q**    ALL RIGHT.  AND JUST GENERALLY SPEAKING,

16   GIVE US THAT IN ONE LINE.

17       **A**    IT'S AGAINST POLICY TO RETALIATE AGAINST ANY

18   EMPLOYEE FOR REPORTING A SAFETY ISSUE OR AN ETHICS

19   ISSUE.

20       **Q**    THANK YOU, SIR.

21           **MR. FRASER:**  I HAVE NOTHING FURTHER.

22           **THE COURT:**  CROSS.

23                   **CROSS-EXAMINATION**

24   BY MR. SCHMIDT:

25       **Q**    GOOD AFTERNOON, MR. WORKMAN.  YOU TESTIFIED

1  THAT UNION PACIFIC HAS ABOUT 42,000 EMPLOYEES?

2     **A**   I BELIEVE THAT'S ROUGHLY WHERE WE WERE AT

3  WHEN I RETIRED.

4     **Q**   OKAY.  AND AT THE TIME YOU RETIRED, HOW MANY

5  EMPLOYEES WERE UNDERNEATH YOU, DIRECTLY OR

6  INDIRECTLY?

7     **A**   ROUGHLY 16,000.

8     **Q**   OKAY.  SO YOU TESTIFIED ABOUT THIS

9  CONVERSATION WITH MR. TAYLOR ON THE BUSINESS CAR/

10 TRAIN IN WHICH YOU DID NOT ASK HIM IF HE WAS IN BED

11 WITH THE FRA.  YOU TESTIFIED IMMEDIATELY BEFORE THAT

12 THAT YOU DIDN'T RECALL THE CONVERSATION.  CORRECT?

13    **A**   RIGHT.

14    **Q**   OKAY.

15       **MR. SCHMIDT:**  NO FURTHER QUESTIONS.

16       **THE COURT:**  ANY REDIRECT?

17       **MR. FRASER:**  NOTHING MORE, YOUR HONOR.

18       **THE COURT:**  YOU MAY STEP DOWN, SIR.

19       ANY OTHER WITNESSES?

20       **MS. SCHOONMAKER:**  YES, YOUR HONOR.

21 DEFENDANT CALLS MARK WHEELAND TO THE STAND.

22       **THE COURT:**  MR. WHEELAND.

23       YES, PUT YOUR MASK BACK ON.  THANK YOU, SIR.

24       MR WHEELAND, YOU CAN TAKE THE STAND.  YOU

25 WERE SWORN IN YESTERDAY, SO YOU REMAIN UNDER OATH,

1    SIR.   AND LIKE YESTERDAY, YOU CAN TAKE YOUR MASK OFF

2    WHEN YOU GET SITUATED.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (WHEREUPON, MARK WHEELAND, BEING PREVIOUSLY

2     DULY SWORN, TESTIFIED AS FOLLOWS.)

3                    DIRECT EXAMINATION

4     BY MS. SCHOONMAKER:

5          Q    GOOD AFTERNOON, MR WHEELAND.

6          A    GOOD AFTERNOON.

7          Q    I KNOW YOU'VE ALREADY INTRODUCED YOURSELF TO

8     THE JURY, BUT WOULD YOU PLEASE TELL THE JURY YOUR

9     EDUCATIONAL BACKGROUND.

10         A    I GRADUATED FROM BROWN UNIVERSITY WITH A

11    BACHELOR IN -- DEGREE IN GEOLOGICAL SCIENCES IN 1981.

12         Q    WHEN DID YOU BEGIN WORKING FOR THE UNION

13    PACIFIC RAILROAD COMPANY?

14         A    I ACTUALLY STARTED WORKING IN THE SUMMER OF

15    1979, AS A SUMMER JOB.  I WORKED TWO SUMMERS BEFORE I

16    GRADUATED AND, UPON GRADUATING, STARTED FULL-TIME.

17         Q    WHAT POSITIONS BEGINNING WITH THAT SUMMER

18    JOB HAVE YOU HELD WITH UNION PACIFIC DURING YOUR

19    CAREER?

20         A    BEGINNING WITH THE SUMMER JOB IN '79, I WAS

21    A TRACKMAN, THEN A WELDER HELPER.  UPON GRADUATION I

22    WAS ASSIGNED AS AN ASSISTANT ROADMASTER IN SOUTHERN

23    ILLINOIS, AND AT THE BEGINNING OF AUGUST OF 1981 I

24    WAS THEN PROMOTED TO -- ACTUALLY A LATERAL

25    TRANSFER -- TO ASSISTANT ROADMASTER IN CLINTON, IOWA,

1  IN 1983; PROMOTED TO ROADMASTER AT ELK GROVE,

2  ILLINOIS, IN 1985.

3     Q    IF I CAN INTERRUPT FOR A MINUTE, WOULD YOU

4  EXPLAIN TO THE JURY WHAT A ROADMASTER DOES.

5     A    A ROADMASTER IS BASICALLY THE SAME POSITION

6  AS A MANAGER OF TRACK MAINTENANCE.  THE ROADMASTER IS

7  IN CHARGE OF A SPECIFIC TERRITORY AND HAS A SPECIFIC

8  NUMBER OF PEOPLE ASSIGNED TO THE AREA OF THAT

9  TERRITORY TO EITHER INSPECT TRACK OR TO MAKE REPAIRS

10 TO THE TRACK.

11    Q    THANK YOU.  WOULD YOU CONTINUE WITH THE

12 HISTORY OF THE JOBS YOU OCCUPIED FOR UNION PACIFIC.

13    A    SURE.  AFTER THE ROADMASTER POSITION IN ELK

14 GROVE, I MADE A LATERAL MOVE TO WELDING SUPERVISOR IN

15 WEST CHICAGO, ILLINOIS.  AND THAT WAS IN 1989.

16 SUBSEQUENTLY MOVED TO MANAGER OF TRACK MAINTENANCE

17 POSITION -- AGAIN LATERALLY -- IN MISSOURI VALLEY,

18 IOWA, IN 1995; WAS PROMOTED TO MANAGER OF TRACK

19 PROJECTS IN SALT LAKE CITY IN 1998; ANOTHER LATERAL

20 TRANSFER AS MANAGER OF TRACK PROJECTS IN TUCSON,

21 ARIZONA, IN 2001; BACK TO SALT LAKE CITY AS DIRECTOR

22 OF TRACK MAINTENANCE IN 2004.  IN 2006 I WAS PROMOTED

23 TO GENERAL DIRECTOR OF TRACK PROGRAMS IN OMAHA AND

24 HAD A TITLE CHANGE THE FOLLOWING YEAR TO ASSISTANT

25 CHIEF ENGINEER OF TRACK PROGRAMS.

1     **Q**     IF I CAN INTERRUPT FOR A MINUTE, AS MR.

2  FRASER SAYS, IS THAT THE ENGINEER JOB ON THE RAILROAD

3  THAT SOUNDS THE WHISTLE?

4     **A**     NO.   THAT IS A POSITION IN THE ENGINEERING

5  DEPARTMENT THAT OVERSEES TRACK MAINTENANCE AND TRACK

6  CONSTRUCTION AND RENEWAL.

7     **Q**     PLEASE CONTINUE.

8     **A**     AND THEN IN 2009 I WAS PROMOTED TO ASSISTANT

9  VICE PRESIDENT OF TRACK PROGRAMS; HELD THAT POSITION

10  UNTIL 2013 WHEN I WAS LATERALLY MOVED TO THE CHIEF

11  ENGINEER POSITION ON THE NORTHERN REGION, ALSO

12  HEADQUARTERED IN OMAHA; AND THEN IN 2015 A LATERAL

13  TRANSFER TO SPRING, TEXAS, AS CHIEF ENGINEER ON THE

14  SOUTHERN REGION.

15     **Q**     AGAIN, NOT THE ENGINEER WHO SOUNDS THE

16  WHISTLE?

17     **A**     CORRECT.   AND THEN A POSITION/TITLE CHANGE

18  IN THE FALL OF 2018 FROM CHIEF ENGINEER TO ASSISTANT

19  VICE PRESIDENT OF TRACK MAINTENANCE.

20     **Q**     WAS THAT THE LAST POSITION THAT YOU HELD FOR

21  UNION PACIFIC?

22     **A**     YES.

23     **Q**     AND WHEN DID YOU STOP WORKING FOR UNION

24  PACIFIC?

25     **A**     SEPTEMBER OF 2020.

1  **Q**   AND WHY DID YOU STOP WORKING FOR UNION

2  PACIFIC?

3  **A**   I RETIRED.

4  **MS. SCHOONMAKER:**  MS. ABSHIRE, WOULD YOU

5  BRING UP JOINT 14.

6  **BY MS. SCHOONMAKER:**

7  **Q**   I'D LIKE YOU TO LOOK ON YOUR SCREEN AT THE

8  FIRST POLICY, UNION PACIFIC'S OSHA WHISTLEBLOWER

9  POLICY AND DIRECTIVE.

10  **MS. SCHOONMAKER:**  AND THEN, MS. ABSHIRE, IF

11  YOU CAN KEEP SCROLLING TO THE NEXT POLICY.  ONE MORE

12  PAGE I THINK.

13  **BY MS. SCHOONMAKER:**

14  **Q**   AND ALSO UNION PACIFIC'S BUILDING AMERICA,

15  FRSA WHISTLEBLOWER POLICIES.

16  WHILE YOU WERE EMPLOYED BY THE UNION

17  PACIFIC RAILROAD COMPANY, WERE YOU FAMILIAR WITH

18  THESE POLICIES ONCE THEY WENT INTO EFFECT?

19  **A**   YES, I WAS.

20  **Q**   AND WERE YOU TRAINED ON THESE POLICIES?

21  **A**   YES, I WAS.

22  **Q**   AND YOU UNDERSTOOD -- OR DID YOU UNDERSTAND

23  BASED ON THESE POLICIES THAT IT WAS A VIOLATION OF

24  THE UNION PACIFIC'S POLICY TO RETALIATE AGAINST AN

25  EMPLOYEE WHO MADE A SAFETY-RELATED COMPLAINT?

1     **A**    YES, I DID.

2     **Q**    WHAT POSITION DID YOU HOLD IN 2017 AND 2018?

3     **A**    IN 2017 I WAS CHIEF ENGINEER ON THE SOUTHERN

4   REGION AND, AGAIN, THE TITLE CHANGE IN LATE 2018 TO

5   ASSISTANT VICE PRESIDENT OF TRACK MAINTENANCE.

6     **Q**    AND WERE THE DUTIES IN THOSE TWO TITLES THE

7   SAME?

8     **A**    THEY WERE BASICALLY THE SAME.  AS CHIEF

9   ENGINEER, MY TERRITORY WAS A LITTLE BIT SMALLER AND I

10  HAD OVERSIGHT FOR TRACK, BRIDGE AND SIGNAL FUNCTIONS.

11  AND THEN WHEN THE TITLE CHANGE HAPPENED IN 2018, MY

12  RESPONSIBILITY WAS SOLELY FOR TRACK BUT MY TERRITORY

13  WAS QUITE A BIT LARGER.  IN FACT, IT BECAME HALF THE

14  RAILROAD.

15    **Q**    AND WHAT WAS YOUR TEAM'S MISSION AT THAT

16  TIME?

17    **A**    AT THAT TIME IT WAS TO ENSURE THAT THE

18  INSPECTIONS WERE MADE ACCORDING TO FEDERAL

19  REGULATIONS AND THAT ANY DEFECTIVE CONDITIONS WERE

20  BROUGHT INTO COMPLIANCE BY MAKING REPAIRS.

21    **Q**    HOW DID IT ACCOMPLISH THAT MISSION?

22    **A**    UNDER MY DIRECTION THERE WERE SEVERAL

23  DIRECTORS OF TRACK MAINTENANCE.  I ALSO HAD TWO

24  GENERAL DIRECTORS OF MAINTENANCE.  AND THEN EACH

25  DIRECTOR OF TRACK MAINTENANCE HAD SEVERAL MANAGERS OF

1    TRACK MAINTENANCE ASSIGNED TO THEM.  AND EACH MANAGER

2    OF TRACK MAINTENANCE WAS RESPONSIBLE FOR A SPECIFIC

3    SEGMENT OF TRACK ON THAT DIRECTOR'S TERRITORY.  AND

4    THEN EACH MANAGER HAD ASSIGNED TO THEM TRACK

5    INSPECTORS AND THEN TRACK MAINTENANCE FORCES.

6              THE INSPECTOR'S SOLE RESPONSIBILITY WAS

7    TO INSPECT THE TRACK FOR DEFECTS THAT WERE NOT IN

8    COMPLIANCE WITH THE FEDERAL REGULATIONS.  AND THEN

9    THE MAINTENANCE CREWS WOULD MAKE REPAIRS TO THOSE

10   DEFECTIVE CONDITIONS.

11      Q    AND WAS IT YOUR EXPECTATION, AS THE LEADER

12   OF THE TEAM, THAT THOSE MAINTENANCE CREWS WOULD

13   MAINTAIN THE TRACK?

14      A    YES.

15      Q    AND WHAT WAS YOUR EXPECTATION WITH RESPECT

16   TO YOUR TEAM KEEPING THE TRACK MAINTAINED?

17      A    THE EXPECTATION WAS THAT THE INSPECTORS

18   WOULD NOTE DEFECTIVE CONDITIONS BASED ON WHAT THEY

19   WERE SEEING VISUALLY AND ALSO TAKING PHYSICAL

20   MEASUREMENTS, WEIGHING WHAT THEY WERE SEEING AND

21   MEASURING IT AGAINST THE STANDARDS, AND THEN

22   APPROPRIATELY PROTECTING THE TRACK WITH EITHER A SLOW

23   ORDER, WHICH IS A SPEED RESTRICTION WHERE THE SPEED

24   IS REDUCED TO ALLOW SAFE PASSAGE OF TRAINS BASED ON

25   THE CONDITION OF THE TRACK, OR MAKE AN IMMEDIATE

1 REPAIR IF IT WAS A MINOR DEFECT, OR ASSIGN THAT

2 DEFECTIVE CONDITION TO ONE OF THE MAINTENANCE TEAMS

3 UNDER THE MTM SO THEY COULD MAKE REPAIRS.

4    Q    WHAT IS THE TRAIN OPERATIONS GROUP AT UNION

5 PACIFIC?

6    A    THE TRAIN OPERATIONS GROUP IS THE PART OF

7 THE OPERATING DEPARTMENT THAT'S RESPONSIBLE FOR THE

8 OPERATION OF TRAINS, SWITCHING OF CARS IN YARDS, AND

9 ENSURING THAT THE EMPLOYEES WHO DO THAT WORK DO SO

10 SAFELY.

11    Q    HOW DID YOUR GROUP INTERACT WITH THE

12 OPERATIONS GROUP?

13    A    THE INTERACTION BETWEEN THE ENGINEERING AND

14 THE OPERATING GROUPS IS BASICALLY COORDINATING FOR

15 TIME ON THE TRACK TO EITHER MAKE INSPECTIONS OR MAKE

16 REPAIRS.  IF THERE WAS A CONDITION THAT WAS FOUND

17 THAT NEEDED TO BE PROTECTED WITH A SLOW ORDER, WE

18 WOULD NOTIFY THE DISPATCHING CENTER SO THAT THEY

19 COULD ENSURE THAT THE TRAINS WERE AWARE OF THE

20 RESTRICTED SPEED CONDITION AT THAT LOCATION.  WE

21 WOULD ALSO INTERACT WITH THE LOCAL OPERATING MANAGERS

22 AND YARD MASTERS AND TERMINAL FACILITIES TO

23 COORDINATE TIME TO MAKE REPAIRS ON YARD TRACKS, WHICH

24 WERE NOT CONTROLLED BY THE DISPATCHERS.

25    Q    WERE THERE EVER ANY COMPETING ISSUES BETWEEN

1  TRAIN OPERATIONS AND YOUR GROUP?

2      A    WELL, THE MISSION OF THE TRAIN OPERATIONS

3  GROUP IS TO OBVIOUSLY OPERATE TRAINS.  AND THE -- OUR

4  MISSION TO INSPECT TRACK AND MAKE REPAIRS TO THE

5  TRACK INVOLVES OUR REQUIRING -- REQUIRES US TO

6  ACTUALLY BE OUT ON THE TRACK.  AND WE CAN'T BE OUT ON

7  THE TRACK WHEN THE TRAINS ARE RUNNING, SO WE HAVE TO

8  ASK FOR TIME FROM THE DISPATCHING CENTER OR THE

9  OPERATIONS GROUP TO PERFORM THOSE FUNCTIONS.

10             AND WHEN WE'RE DOING THAT, TRAINS

11  CANNOT OPERATE ON THE SEGMENT OF TRACK THAT WE'RE

12  EITHER INSPECTING OR MAKING REPAIRS TO.

13      Q    WAS IT YOUR EXPECTATIONS THAT THERE WOULD BE

14  NO SURPRISES FOR TRAIN OPERATIONS BY YOUR GROUP?

15      A    THAT IS THE EXPECTATION, YES.

16      Q    WE'VE ALREADY HAD A GREAT DEAL OF TESTIMONY

17  ABOUT THE FEDERAL RAIL ADMINISTRATION, THE FRA, SO

18  I'M NOT GOING TO ASK YOU TO DESCRIBE IT AGAIN TO THE

19  JURY.

20             BUT DID YOUR RESPONSIBILITIES INCLUDE

21  INTERACTIONS WITH THE FRA BACK IN THE LAST POSITION

22  YOU HELD WITH UNION PACIFIC RAILROAD?

23      A    YES, THEY DID.

24      Q    DID YOUR TEAM MEMBERS INTERACT WITH THE FRA?

25      A    YES.

**1**      **Q**   AND HOW SO?

**2**      **A**   WELL, MY INTERACTIONS WITH THE FRA WERE

**3**   TYPICALLY ON A QUARTERLY BASIS WHERE WE MET WITH THE

**4**   REGIONAL ADMINISTRATOR AND HIS STAFF TO PROVIDE

**5**   UPDATES TO THEM BASED ON EACH ONE OF OUR FUNCTIONS;

**6**   EITHER ENGINEERING, MECHANICAL OR OPERATIONS.

**7**           THE DIRECTORS AND MANAGERS WOULD

**8**   TYPICALLY INTERACT WITH THE FRA WHEN AN INSPECTOR

**9**   THAT WAS ASSIGNED TO THE TERRITORY WOULD MAKE AN

**10**  INSPECTION OF THE TRACK.  THEY WOULD MAKE REGULAR

**11**  INSPECTIONS THROUGHOUT THE YEAR ACROSS THE REGION,

**12**  AND THEY WOULD DO THE SAME THING THAT OUR UNION

**13**  PACIFIC TRACK INSPECTORS WOULD DO.

**14**           THEY WOULD COMPARE THE CONDITIONS THAT

**15**  THEY WERE SEEING AND MEASURING AGAINST THE WRITTEN

**16**  STANDARDS IN THE FRA REGULATIONS.  AND IF THEY FOUND

**17**  CONDITIONS THAT DID NOT COMPLY, THEN THEY WOULD WRITE

**18**  DEFECTS.  AND THOSE DEFECTS WERE ALL SUBMITTED AT THE

**19**  END OF EACH INSPECTION DAY IN A REPORT THAT WAS

**20**  DELIVERED TO THE MANAGER OF TRACK MAINTENANCE AND THE

**21**  DIRECTOR.

**22**      **Q**   WHAT WERE SOME OF THE THINGS YOUR TEAM COULD

**23**  DO TO COMPLY WITH FRA REQUIREMENTS AND REGULATIONS?

**24**      **A**   WELL, WE USED TO CALL IT THE THREE R'S:

**25**  EITHER REPAIR, RESTRICT OR REMOVE.

1          *REPAIR* WOULD MEAN THAT YOU WOULD REPAIR

2     THE DEFECTIVE CONDITION IMMEDIATELY.  *RESTRICT* WOULD

3     BE TO REDUCE THE SPEED OF THE -- THE ALLOWABLE SPEED

4     THAT TRAINS COULD OPERATE OVER THAT LOCATION BY

5     PLACING A SLOW ORDER.  OR *REMOVE* WOULD BE TO REMOVE

6     THE TRACK FROM SERVICE UNTIL IT WAS REPAIRED AND

7     BROUGHT INTO COMPLIANCE.

8        **Q**   WE'VE ALREADY HAD TESTIMONY DESCRIBING A

9     DERAILMENT AND WHAT THAT MEANS.

10          BUT WHAT DOES UNION PACIFIC'S TRACK

11    MAINTENANCE TEAM MEMBERS, FROM YOUR POINT OF VIEW, DO

12    IN RESPONSE TO A DERAILMENT?

13       **A**   WHEN NOTIFIED OF A DERAILMENT, THE FIRST

14    THING IS TO MAKE SURE THAT EVERYBODY IS SAFE, THAT

15    THEY'RE -- EVERYBODY IS IN A POSITION OF SAFETY AND

16    THAT NOBODY WAS INJURED.

17          AND THEN ONCE WE'RE SURE OF THAT, WE GO

18    TO THE LOCATION, MAKE AN INVESTIGATION TO TRY TO

19    DETERMINE WHAT HAPPENED, WHAT CAUSED THE DERAILMENT

20    TO HAPPEN; ALSO TO ASSESS THE DAMAGES AND MAKE A PLAN

21    ON MAKING REPAIRS TO THE TRACK TO RESTORE IT BACK TO

22    SERVICE; AND THEN ASSISTING THE OPERATING AND

23    MECHANICAL TEAM WITH CLEARING THE LOCOMOTIVES AND

24    CARS FROM THE SITE SO THAT THE REPAIRS TO THE TRACK

25    CAN COMMENCE.

1      **Q**   I'M GOING TO ASK YOU ABOUT YOUR INTERACTIONS

2   WITH MR. TAYLOR.

3            DO YOU KNOW MR. TAYLOR, WHO IS SITTING

4   RIGHT BEHIND ME?

5      **A**   I DO.

6      **Q**   HOW DO YOU KNOW HIM?

7      **A**   I KNOW JOHNNY FROM WHEN I WAS CHIEF AND --

8   CHIEF ENGINEER ON THE REGION.  HE WAS THE MANAGER OF

9   TRACK MAINTENANCE THAT HAD RESPONSIBILITY FOR THE

10  LIVONIA SUBDIVISION BETWEEN LIVONIA, LOUISIANA, AND

11  AVONDALE.

12     **Q**   DID MR. TAYLOR EVER REPORT DIRECTLY TO YOU?

13     **A**   NO, HE DID NOT.

14     **Q**   DID YOU EVER DIRECTLY SUPERVISE MR. TAYLOR?

15     **A**   NO.

16     **Q**   WHAT AUTHORITY, IF ANY, DID YOU HAVE OVER

17  MR. TAYLOR WHEN YOU WERE STILL WORKING LEADING THE

18  TEAM?

19     **A**   AS THE CHIEF ENGINEER ON THE REGION, MY

20  RESPONSIBILITY WAS FOR OVERSIGHT -- TECHNICAL

21  OVERSIGHT AND BASICALLY ANY PROMOTIONAL OR TRANSFER

22  MOVES BETWEEN -- ON THE MANAGEMENT TEAM AND OVERSIGHT

23  OF THE SAFETY OF THE GROUP.  IT WAS REALLY AN

24  OVERSIGHT FUNCTION.

25            THE MANAGERS OF THE TRACK MAINTENANCE

1  REPORTED TO THE DIRECTORS OF TRACK MAINTENANCE, WHO

2  THEN REPORTED TO THE SUPERINTENDENT ON THAT SERVICE

3  UNIT.  THAT WAS THEIR DIRECT LINE OF REPORT.  MINE

4  WAS WHAT WE CALL THE DASH-LINE RESPONSIBILITY, WHERE

5  MY RESPONSIBILITY WAS FOR THE TECHNICAL AND SAFETY

6  ASPECT OF THE ENGINEERING OPERATION.

7      Q    DID YOU HAVE THE AUTHORITY TO TERMINATE MR.

8  TAYLOR'S EMPLOYMENT?

9      A    YES.

10     Q    WHAT POSITION DID MR. TAYLOR HOLD IN 2017

11 AND 2018?

12     A    MANAGER OF TRACK MAINTENANCE.

13     Q    AND WHAT WERE HIS DUTIES, AS YOU UNDERSTOOD

14 THEM?

15     A    HIS DUTIES WERE TO ENSURE THE SAFETY OF THE

16 MEMBERS OF HIS TEAM; THAT THEY PERFORMED THEIR WORK

17 SAFELY AND THAT THE TRACK WAS INSPECTED ACCORDING TO

18 FRA REGULATIONS; AND THAT ANY DEFECTIVE CONDITIONS

19 NOTED IN THOSE INSPECTIONS WERE BROUGHT INTO

20 COMPLIANCE AND -- WITH REPAIRS BY HIS MAINTENANCE

21 TEAM.

22     Q    WERE THOSE THE EXPECTATIONS REGARDING THE

23 TRACK OVER WHICH HE HAD RESPONSIBILITY?

24     A    YES.

25     Q    DID MR. TAYLOR HAVE ANY DIRECT REPORTS?

1    **A**    YES.

2    **Q**    AND WHAT KIND OF POSITIONS OCCUPIED BY UNION

3    PACIFIC EMPLOYEES REPORTED TO HIM?

4    **A**    TRACK INSPECTORS, TRACK FOREMEN, TRACK

5    WELDERS, TAMPER OPERATORS, REGULATOR OPERATORS, TRUCK

6    DRIVER.  HE MAY OR MAY NOT HAVE HAD LABORERS UNDER

7    HIS DIRECTION AT THAT TIME.  I'M NOT SURE.

8    **Q**    WHAT WAS MR. TAYLOR REQUIRED TO DO IN HIS

9    POSITION AT UNION PACIFIC AS A MANAGER OF TRACK

10   MAINTENANCE IN THE EVENT OF A DERAILMENT ON HIS

11   TERRITORY?

12   **A**    AS I OUTLINED EARLIER, IT WOULD BE TO ENSURE

13   THAT THERE WERE NO INJURIES AND, IF THERE WERE, THAT

14   PEOPLE WERE TAKEN CARE OF PROPERLY, IF THERE WERE ANY

15   INJURIES INVOLVED DUE TO THE DERAILMENT; AND THEN TO

16   MAKE ASSESSMENT -- ONCE HE ARRIVED AT THE SITE, TRY

17   TO MAKE AN ASSESSMENT OF WHAT CAUSED THE DERAILMENT;

18   AND THEN TO GATHER INFORMATION REGARDING WHAT KIND OF

19   MATERIALS AND MANPOWER WOULD BE REQUIRED TO RESTORE

20   THE TRACK TO OPERATION.

21   **Q**    DID MR. TAYLOR'S JOB DUTIES CAUSE HIM TO

22   INTERACT WITH THE FRA?

23   **A**    YES.

24   **Q**    IN WHAT WAYS?

25   **A**    WHENEVER AN FRA INSPECTOR WOULD WANT TO MAKE

1   AN INSPECTION OF HIS TERRITORY, IT WOULD BE MR.

2   TAYLOR'S RESPONSIBILITY TO MAKE SURE THAT EITHER HE

3   OR ONE OF HIS TRACK INSPECTORS WAS WITH THE --

4   ACCOMPANIED THE TRACK INSPECTOR FROM THE FRA WHILE

5   THEY WERE MAKING THE INSPECTION.  AND THEN ONCE THE

6   INSPECTION WAS TO COMPLETE, TO MAKE SURE THAT ALL

7   DEFECTS WERE PROPERLY PROTECTED WITH EITHER A SLOW

8   ORDER, REPAIRED IMMEDIATELY OR, IF NECESSARY, THE

9   TRACK WAS REMOVED FROM SERVICE TO PROTECT -- TO

10  PROTECT THE CONDITION.

11      Q    DURING YOUR EMPLOYMENT WITH UNION PACIFIC,

12  DID YOU EVER INSTRUCT AN EMPLOYEE TO LIE TO THE FRA?

13      A    NO.

14      Q    DURING YOUR EMPLOYMENT WITH UNION PACIFIC,

15  DID YOU EVER INSTRUCT AN EMPLOYEE TO DECEIVE THE FRA?

16      A    NO.

17      Q    AS THE CHIEF ENGINEER, WHAT WERE YOUR

18  EXPECTATIONS WITH RESPECT TO A UNION PACIFIC EMPLOYEE

19  DEALING WITH THE FRA?

20      A    MY EXPECTATION WAS THAT THEY WOULD EXTEND

21  RESPECT TO THAT INSPECTOR; THAT WHEN THE INSPECTOR

22  FOUND A CONDITION THAT WAS DEFECTIVE AND THEY WERE

23  NOTIFIED THAT THE INSPECTOR WAS WRITING A DEFECT,

24  THAT THEY ENSURED THAT IT WAS PROPERLY PROTECTED

25  IMMEDIATELY WITH EITHER AN IMMEDIATE REPAIR,

1 RESTRICTING IT WITH A SLOW ORDER, OR REMOVING THE

2 TRACK FROM SERVICE; AND THEN MAKING THE APPROPRIATE

3 PLANS TO MAKE SURE THAT THE TRACK WAS REPAIRED IN THE

4 APPROPRIATE AMOUNT OF TIME.

5    **Q**   WHAT DOES IT MEAN TO CLOSE OUT DEFECTS TO

6 THE FRA?

7    **A**   WHEN A DEFECT IS WRITTEN, YOU CAN REMEDIATE

8 IT BY SLOWING THE SPEED OF THE TRACK.  THAT'S PLACING

9 A SLOW ORDER.  YOU CAN MAKE A REPAIR IMMEDIATELY OR

10 YOU CAN REMOVE IT FROM SERVICE.  AND IF YOU DO THAT,

11 IT'S CONSIDERED PROTECTED, BECAUSE NO TRAIN CAN

12 OPERATE OVER THAT CONDITION.  IF THE TRACK IS ALLOWED

13 TO REMAIN IN SERVICE WITH EITHER A SLOW ORDER OR WHAT

14 WE CALL A 213.9(B) WHERE AN AUTHORIZED EMPLOYEE CAN

15 ALLOW TRAFFIC TO MOVE OVER THAT LOCATION AT A SPEED

16 OF 10 MPH, WE HAD 30 DAYS TO MAKE A REPAIR TO THAT

17 CONDITION.

18        ONCE THAT CONDITION WAS REPAIRED BY ONE

19 OF THE MAINTENANCE TEAMS OR IF THE TRACK INSPECTOR

20 REPAIRED IT IMMEDIATELY BECAUSE IT WAS A MINOR

21 DEFECT, THE DEFECT, WHICH WAS SHOWN IN OUR TMP

22 SYSTEM, TRACK MAINTENANCE PLANNING SYSTEM, IT WAS

23 SHOWN AS A DEFECT WITH THE LOCATION, WHAT THE DEFECT

24 WAS, AND THEN THE REPAIR DATE WOULD ALSO BE ENTERED

25 IN THE TMP.  AND THAT'S WHAT CLOSING OUT A DEFECT

1  WAS, IS WHEN IT WAS REPAIRED, THAT DEFECTIVE

2  CONDITION THAT WAS NOTED WAS CLOSED OUT BECAUSE THE

3  CONDITION WAS REPAIRED.

4      Q    IN YOUR ROLE AS THE CHIEF ENGINEER, DID YOU

5  EVER TERMINATE A MANAGER OF TRACK MAINTENANCE OR A

6  TRACK INSPECTOR FOR CLOSING OUT A DEFECT, AS YOU

7  DESCRIBED IT TO THE FRA, WHEN THAT DEFECT SHOULD NOT

8  HAVE BEEN CLOSED OUT BECAUSE, FOR EXAMPLE, THE REPAIR

9  HAD NOT BEEN ACHIEVED?

10     A    YES, I DID.

11     Q    WHY WOULD YOU DO THAT?

12     A    BECAUSE IT WAS AGAINST COMPANY POLICY AND IT

13  WAS A VIOLATION OF FEDERAL REGULATIONS.

14     Q    DURING YOUR EMPLOYMENT AT UNION PACIFIC,

15  WERE YOU AWARE OF MR. TAYLOR'S JOB PERFORMANCE?

16     A    PERIPHERALLY.

17     Q    WERE YOU AWARE THAT MR. TAYLOR REMOVED

18  SWITCH 16 AT THE AVONDALE YARD FROM SERVICE IN

19  JANUARY OF 2018?

20     A    YES, I WAS AWARE OF THAT.

21     Q    DO YOU KNOW WHY HE TOOK THE TRACK OUT OF

22  SERVICE?

23         MR. SCHMIDT:  OBJECTION, YOUR HONOR;

24  HEARSAY.  HE JUST TESTIFIED HE WAS ONLY AWARE

25  PERIPHERALLY.

1          THE COURT:  MA'AM?

2          MS. SCHOONMAKER:  I'M ASKING FOR HIS

3  PERSONAL KNOWLEDGE OF WHETHER HE KNEW WHY MR. TAYLOR

4  TOOK THE TRACK OUT OF SERVICE.

5          THE COURT:  OVERRULED.

6     A    TO MY KNOWLEDGE, WE HAD SOME DERAILMENTS

7  THAT HAD OCCURRED ON THE SWITCH -- MORE THAN ONE

8  DERAILMENT -- AND THERE WAS A CONCERN WITH THE

9  GEOMETRY OF THE SWITCH.

10 BY MS. SCHOONMAKER:

11    Q    WHAT'S *THE GEOMETRY OF THE SWITCH* MEAN?

12    A    BASICALLY THE GEOMETRY IS THE CURVATURE OF

13 THE SWITCH AND HOW THE WHEELS ON LOCOMOTIVES OR CARS

14 INTERACT WITH THE TRACK.

15    Q    WOULD THAT BE ALSO CALLED AN ALIGNMENT

16 DEFECT?

17    A    YES.

18    Q    WAS IT UNION PACIFIC'S PRACTICE TO OBTAIN

19 UPDATED MEASUREMENTS BEFORE A RAIL OR A TRACK IS

20 PULLED OUT OF SERVICE FOR AN ALIGNMENT DEFECT?

21    A    YES.

22    Q    WHY?

23    A    EVERY TYPE OF DEFECT HAS -- NOT EVERY TYPE.

24 MOST DEFECTS SUCH AS ALIGNMENT HAVE SPECIFIC

25 MEASUREMENTS THAT DICTATE THE ALLOWABLE SPEED THAT

1   CAN BE OPERATED OVER THAT TRACK.  AND ONCE THOSE

2   MEASUREMENTS EXCEED THE ALLOWABLE STANDARD, THEN YOU

3   EITHER HAVE TO REDUCE THE SPEED OR REMOVE THE TRACK

4   FROM SERVICE.

5              THERE ARE BASICALLY FIVE

6   CLASSIFICATIONS FOR TRACK SPEEDS WITH THE FRA FOR

7   FREIGHT OPERATIONS:  CLASS 1 THROUGH 5.  CLASS 5

8   ALLOWS THE HIGHEST SPEED OF OPERATION.  CLASS 1 IS

9   THE LOWEST, WHICH IS A MAXIMUM SPEED OF 10 MILES PER

10  HOUR.  SO IF AN ALIGNMENT MEASUREMENT DOES NOT MEET

11  THE STANDARD FOR CLASS 1, THEN THE TRACK MUST BE

12  REMOVED FROM SERVICE.

13     Q    WOULD SIX-WEEK-OLD MEASUREMENTS BE

14  SUFFICIENT TO MAKE THAT DETERMINATION?

15     A    NO.

16     Q    WHY NOT?

17     A    CONDITIONS CAN CHANGE.  WHEN TRAINS MOVE

18  OVER THE TRACK, THE TRACK CAN MOVE.  IT'S -- A

19  RAILROAD IS VERY DYNAMIC.  WHEN TRAIN LOCOMOTIVES AND

20  CARS INTERACT WITH THE TRACK, IT ACTUALLY MOVES.

21  SOMETIMES IT'S VERY UNNOTICEABLE, BUT IT DOES MOVE.

22  THINGS CHANGE.  AS WEATHER CONDITIONS CHANGE,

23  TEMPERATURES GO UP OR DOWN, THE RAIL EXPANDS AND

24  CONTRACTS.  THAT ALSO CAUSES MOVEMENT, ESPECIALLY IN

25  CURVES WHERE CURVES CAN -- THE ALIGNMENT OF A CURVE

1  CAN CHANGE JUST WITH THE CHANGES IN TEMPERATURE.

2      Q    DO YOU BELIEVE AN EMPLOYEE ACTS IN AN

3  INSUBORDINATE MANNER IF HE OR SHE REFUSES TO PROVIDE

4  UPDATED MEASUREMENTS WHEN REQUESTED BY A SUPERVISOR?

5      A    YES.

6      Q    NOW, IS A SLOW ORDER AN ORDER REDUCING THE

7  SPEED LIMIT, IF YOU WILL, ON A TRACK?

8      A    YES.

9      Q    AND WHAT ARE THE LEGITIMATE REASONS FOR

10  ISSUING A SLOW ORDER?

11     A    THE LEGITIMATE REASONS FOR ISSUING A SLOW

12  ORDER ARE IF THE EXISTING SPEED OF THE TRACK IS --

13  DOES NOT MEET THE MINIMUM REQUIREMENTS BASED ON THE

14  CONDITIONS THAT ARE FOUND THERE.

15     Q    WHO CAN ISSUE A SLOW ORDER?

16     A    A TRACK INSPECTOR, A MANAGER OF TRACK

17  MAINTENANCE, A DIRECTOR OF TRACK MAINTENANCE.  REALLY

18  ANYBODY WHO IS QUALIFIED UNDER THE FRA REGULATIONS,

19  PART 213.7, CAN PLACE A SLOW ORDER.

20     Q    TO MAKE SURE I UNDERSTAND, WAS IT NECESSARY

21  TO TAKE TRACK MEASUREMENTS BEFORE ISSUING A SLOW

22  ORDER?

23     A    YES.

24     Q    AND EXPLAIN WHY.

25     A    THE REASON WHY YOU NEED TO TAKE MEASUREMENTS

1  IS SO THAT THE PERSON PLACING THE SLOW ORDER KNOWS

2  WHAT THE APPROPRIATE SLOW-ORDER SPEED IS. EVERYTHING

3  IS BASED ON CLASS OF TRACK. EACH CLASSIFICATION OF A

4  TRACK HAS A SPECIFIC MEASUREMENT FOR THAT CONDITION.

5  AND THAT'S WHAT DICTATES THE SPEED.

6      Q    DID YOU REQUIRE YOUR TEAM TO DETERMINE THE

7  REPAIRS NECESSARY TO A TRACK AFTER ISSUING A SLOW

8  ORDER?

9      A    YES.

10     Q    WHY?

11     A    BECAUSE WE WANTED TO KNOW WHAT TYPE OF

12 MATERIALS WERE NEEDED TO MAKE THE REPAIRS, HOW LONG

13 THE PERSON PLACING THE SLOW ORDER ON THE TRACK

14 ESTIMATED IT WOULD TAKE FOR THE REPAIRS TO BE

15 EFFECTED, SO THAT WE JUST HAD AN IDEA OF HOW LONG THE

16 TRAIN OPERATIONS WOULD BE IMPACTED BY THAT SLOW

17 ORDER.

18     Q    WOULD YOU CONSIDER IT INSUBORDINATE IF AN

19 EMPLOYEE REFUSED TO PROVIDE HIS SUPERVISOR WITH

20 SPECIFICITIES REGARDING THE DEFECTS OF A TRACK WHEN

21 REQUESTED?

22     A    YES.

23     Q    DID YOU CONSIDER IT INSUBORDINATE IF AN

24 EMPLOYEE REFUSED TO PROVIDE THE NECESSARY TRACK

25 REPAIRS WHEN REQUESTED BY A SUPERVISOR?

1    **A**   YES.

2         **MS. SCHOONMAKER:**  MS. ABSHIRE, WOULD YOU

3    BRING UP JOINT EXHIBIT 11, PLEASE.

4    **BY MS. SCHOONMAKER:**

5    **Q**   MR WHEELAND, DO YOU RECOGNIZE THIS EMAIL?

6    **A**   I DO.

7    **Q**   WHAT WAS YOUR REACTION TO RECEIVING THIS

8    EMAIL?  AND FEEL FREE TO TAKE TIME TO REVIEW IT IF

9    YOU NEED TO DO THAT AGAIN.

10   **A**   MY REACTION WAS, QUITE FRANKLY, ONE OF

11   DISAPPOINTMENT.  MR. GILSDORF HAD EXPLAINED TO ME

12   WHAT HAD TRANSPIRED IN HIS CONVERSATION WITH MR.

13   TAYLOR.  AND I FELT THAT WHAT MR. GILSDORF WAS

14   REQUESTING OF MR. TAYLOR WAS VERY REASONABLE, AND I

15   AGREED THAT A PERFORMANCE IMPROVEMENT PLAN WAS

16   NECESSARY.

17   **Q**   AND, THEREFORE, WERE YOU INVOLVED IN THE

18   DECISION TO PLACE MR. TAYLOR ON A PERFORMANCE

19   IMPROVEMENT PLAN?

20   **A**   I WAS.

21   **Q**   WAS THAT A COMMON STEP YOU TOOK WITH RESPECT

22   TO YOUR TEAM?

23   **A**   I WOULDN'T CALL IT COMMON.  BUT IN MY TIME

24   WITH UNION PACIFIC, WE DID PLACE SEVERAL MANAGERS ON

25   PERFORMANCE IMPROVEMENT PLANS.

**1**      Q    WAS THE PURPOSE OF PUTTING THOSE MANAGERS

**2**  AND MR. TAYLOR ON A PERFORMANCE IMPROVEMENT PLAN TO

**3**  JUSTIFY FIRING THE EMPLOYEE?

**4**      A    NO.

**5**      Q    WHAT WAS THE PURPOSE?

**6**      A    THE PURPOSE WAS TO IDENTIFY SOME

**7**  DEFICIENCIES IN THEIR PERFORMANCE AND TO DEVELOP A

**8**  PLAN TO HELP THEM BECOME A BETTER MANAGER.

**9**          MS. SCHOONMAKER:  MS. ABSHIRE, IF YOU COULD

**10**  BRING UP JOINT EXHIBIT 12.

**11**  BY MS. SCHOONMAKER:

**12**      Q    MR WHEELAND, THIS IS MR. TAYLOR'S

**13**  PERFORMANCE IMPROVEMENT PLAN.  YOU'VE SEEN IT BEFORE,

**14**  HAVEN'T YOU?

**15**      A    YES.

**16**      Q    AND AT THE TIME YOU REVIEWED IT WHEN IT WAS

**17**  BEING ISSUED, DID YOU THINK IT WAS AN APPROPRIATE

**18**  PERFORMANCE IMPROVEMENT PLAN?

**19**      A    I DID.

**20**      Q    WHAT DID YOU UNDERSTAND THE PERFORMANCE

**21**  IMPROVEMENT PLAN REQUIRED OF MR. TAYLOR?  IF YOU WANT

**22**  TO ADD CERTAIN DETAIL, FEEL FREE TO READ THROUGH

**23**  THIS, UNLESS YOU HAVE A GENERAL UNDERSTANDING.

**24**      A    IT BASICALLY OUTLINED FOUR PERFORMANCE

**25**  ISSUES.  AND THEN FOR EACH ISSUE THERE WAS BASICALLY

1    A PERFORMANCE REQUIREMENT THAT WAS EXPECTED FOR HIM

2    TO MEET.

3         Q    DO YOU BELIEVE MR. TAYLOR COULD HAVE BEEN

4    SUCCESSFUL AND REMAINED EMPLOYED BY UNION PACIFIC IF

5    HE SIGNED AND COMPLIED WITH THE PERFORMANCE

6    IMPROVEMENT PLAN?

7         A    YES.

8         Q    WAS THAT YOUR INTENT AND GOAL FOR HIM?

9         A    YES.

10        Q    ARE YOU WELL FAMILIAR WITH FRA AND UNION

11   PACIFIC SAFETY STANDARDS?

12        A    YES.

13        Q    DID THIS PERFORMANCE IMPROVEMENT PLAN

14   REQUIRE MR. TAYLOR TO VIOLATE ANY FRA OR UNION

15   PACIFIC SAFETY STANDARDS?

16        A    NO.

17        Q    WERE YOU RESPONSIBLE FOR THE DECISION TO

18   TERMINATE MR. TAYLOR'S EMPLOYMENT?

19        A    YES.

20        MS. SCHOONMAKER:  MS. ABSHIRE, WOULD YOU

21   BRING UP JOINT EXHIBIT 13, PLEASE.  AND I'D LIKE YOU

22   TO SCROLL TO THE POINT WHERE MR WHEELAND CAN SEE THE

23   SIGNATURE.

24   BY MS. SCHOONMAKER:

25        Q    WHAT IS JOINT EXHIBIT 13, MR WHEELAND?

1    **A**    IT'S THE LETTER NOTIFYING MR. TAYLOR OF HIS

2   TERMINATION OF EMPLOYMENT FROM UNION PACIFIC

3   RAILROAD.

4    **Q**    AND YOU SIGNED IT.  IS THAT RIGHT?

5    **A**    I DID.

6    **Q**    DID YOU HAVE TO GET APPROVAL FOR YOUR

7   TERMINATION DECISION?

8    **A**    YES, I DID.

9    **Q**    FROM WHOM?

10    **A**    I FIRST HAD TO SEEK APPROVAL FROM MY

11   SUPERVISOR, WHO WAS CHAD WILBOURN, REGIONAL VICE

12   PRESIDENT OF THE SOUTHERN REGION.  AND ONCE I

13   RECEIVED HIS APPROVAL, OUR HR REP SENT A WRITTEN

14   REPORT OF OUR FINDINGS AND DETERMINATION TO THE

15   ETHICS COMMITTEE IN OMAHA.  NO MANAGER COULD BE

16   TERMINATED UNLESS IT WAS APPROVED BY THE ETHICS

17   COMMITTEE.

18    **Q**    AND DID YOU OBTAIN THE NECESSARY APPROVAL?

19    **A**    YES.

20    **Q**    DO YOU KNOW WHO GREGORY WORKMAN IS?

21    **A**    I DO.

22    **Q**    WAS MR. WORKMAN PART OF THE DECISION TO

23   TERMINATE MR. TAYLOR'S EMPLOYMENT?

24    **A**    NO.

25    **Q**    NOW, YOU UNDERSTAND THAT YOU WERE

1   TERMINATING MR. TAYLOR'S TEN-AND-A-HALF-YEAR CAREER

2   WITH UNION PACIFIC.

3       **A**    I DID.

4       **Q**    CORRECT?

5       **A**    YES.

6       **Q**    DID YOU MAKE THAT DECISION LIGHTLY?

7       **A**    NO, I DID NOT.

8       **Q**    WOULD YOU TELL THE JURY WHY YOU MADE THAT

9   DECISION.

10      **A**    I NEVER TAKE TERMINATING AN EMPLOYEE

11  LIGHTLY.  IT'S A VERY TOUGH DECISION TO MAKE.

12  MANAGERS OF TRACK MAINTENANCE REQUIRE A LOT OF

13  TRAINING.  IT'S A VERY DIFFICULT JOB.  AND YOU CANNOT

14  JUST HIRE SOMEONE AND IMMEDIATELY PUT THEM INTO A

15  MANAGER OF TRACK MAINTENANCE ROLE.  THERE IS A LOT OF

16  TIME AND TRAINING THAT'S REQUIRED TO MAKE A

17  SUCCESSFUL MANAGER OF TRACK MAINTENANCE.

18          WE NEED MANAGERS OF TRACK MAINTENANCE

19  AT UNION PACIFIC AND WE NEED THEM TO BE SUCCESSFUL.

20  IT IS NOT AN EASY THING TO TERMINATE A MANAGER.

21      **Q**    WHEN YOU MADE THE DECISION, WERE YOU ALSO

22  THINKING OF HIS FAMILY SITUATION?

23      **A**    I'M SORRY?

24      **Q**    WHEN YOU MADE THAT DECISION, WERE YOU ALSO

25  THINKING OF HIS FAMILY SITUATION UPON LOSING HIS JOB?

1       **A**   YES.

2       **Q**   DID YOU MAKE THE DECISION TO TERMINATE MR.

3   TAYLOR'S EMPLOYMENT BECAUSE HE TOOK ANY TRACKS OUT OF

4   SERVICE?

5       **A**   NO.

6       **Q**   DID YOU MAKE THE DECISION TO TERMINATE MR.

7   TAYLOR'S EMPLOYMENT BECAUSE HE ISSUED A SLOW ORDER?

8       **A**   NO.

9       **Q**   DID YOU MAKE THE DECISION TO TERMINATE MR.

10  TAYLOR'S EMPLOYMENT BECAUSE HE MADE A COMPLAINT TO

11  THE FEDERAL RAIL ADMINISTRATION?

12      **A**   NO.

13      **Q**   DID YOU KNOW AT THE TIME, BEFORE YOU

14  TERMINATED MR. TAYLOR'S EMPLOYMENT, THAT HE HAD MADE

15  A COMPLAINT TO THE FEDERAL RAIL ADMINISTRATION?

16      **A**   NO.

17      **Q**   DID YOU MAKE THE DECISION TO TERMINATE MR.

18  TAYLOR'S EMPLOYMENT BECAUSE HE HAD MADE A VALUES LINE

19  COMPLAINT TO UNION PACIFIC?

20      **A**   NO.

21      **Q**   DID YOU MAKE THE DECISION TO TERMINATE MR.

22  TAYLOR'S EMPLOYMENT BECAUSE HE RAISED A SAFETY ISSUE?

23      **A**   NO.

24      **Q**   MR WHEELAND, DID THE FACT THAT MR. TAYLOR

25  TOOK TRACKS OUT OF SERVICE, ISSUED A SLOW ORDER, MADE

1 | A COMPLAINT TO THE FRA, MADE A VALUES LINE COMPLAINT,

2 | OR RAISED A SAFETY ISSUE PLAY ANY ROLE IN YOUR

3 | RECOMMENDATION THAT MR. TAYLOR BE TERMINATED?

4 | **A** NO.

5 | **MS. SCHOONMAKER:** I TENDER THE WITNESS, YOUR

6 | HONOR.

7 | **THE COURT:** CROSS.

8 | WE HAVE A 2:30. YEAH, WE'RE GOING TO HAVE

9 | TO TAKE -- I DON'T WANT TO STOP YOU TEN MINUTES IN.

10 | I HAVE A 2:30 TELEPHONE STATUS CONFERENCE IN ANOTHER

11 | MATTER, SO -- THE COURT HAS TO TAKE THAT, SO WE'LL

12 | TAKE OUR BREAK NOW AND WE CAN COME BACK FOR CROSS.

13 | I DON'T THINK THAT THIS IS GOING TO

14 | TAKE LONG. I JUST HAVE TO SET A TRIAL DATE, SO WE'LL

15 | COME BACK AT QUARTER TO THREE. I'M GOING TO TRY TO

16 | COME BACK AT 20 TILL SO THAT Y'ALL CAN DO WHATEVER WE

17 | NEED TO DO ON THE JURY INSTRUCTIONS. AND THAT WAY WE

18 | CAN KIND OF ROLL RIGHT THROUGH. I'M ANTICIPATING

19 | THAT WE'RE CUTTING IT PRETTY CLOSE. AND THEN WE CAN

20 | TALK ABOUT WHETHER WE'RE GOING TO CLOSE TODAY OR WHAT

21 | WE'RE GOING TO DO.

22 | OKAY. WE'LL BE IN RECESS FOR A FEW

23 | MINUTES.

24 | **(WHEREUPON, A RECESS WAS TAKEN.)**

25 | **(WHEREUPON, THE JURY IS OUT OF THE**

1  COURTROOM.)

2         **THE COURT:**  WHY DON'T YOU GO AHEAD AND MAKE

3  YOUR OBJECTIONS FOR THE RECORD.  FOR THE RECORD, THE

4  COURT HAS PROVIDED DRAFT JURY INSTRUCTIONS TO COUNSEL

5  AS WELL AS THE DRAFT VERDICT FORM.

6             STARTING WITH THE PLAINTIFF, ARE THERE

7  ANY OBJECTIONS TO THE COURT'S JURY INSTRUCTIONS AS

8  PROPOSED?

9         **MR. SCHMIDT:**  THE ONLY OBJECTION WE HAVE,

10  YOUR HONOR, IS ON PAGE 7 OF 12 UNDER *CONTRIBUTING*

11  *FACTOR.*  PLAINTIFF WOULD PROPOSE LANGUAGE TO THE

12  EFFECT THAT HE COULD SHOW THAT HIS PROTECTED ACTIVITY

13  WAS A CONTRIBUTING FACTOR IN HIS TERMINATION BY

14  MAKING A SHOWING THAT HIS PROTECTED ACTIVITY WAS

15  INEXTRICABLY INTERTWINED WITH DEFENDANT UNION PACIFIC

16  RAILROAD'S TERMINATION OF HIM.

17         **THE COURT:**  OKAY.  THE COURT HAS CONSIDERED

18  THE PLAINTIFF'S OBJECTION.  THE PLAINTIFF PROPOSED A

19  CHARGE WHICH INCLUDED A NUMERICAL LIST ILLUSTRATING

20  VARIOUS WAYS IN WHICH MR. TAYLOR COULD PROVE THAT HIS

21  ALLEGED PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR

22  IN HIS TERMINATION.

23             IN THAT LIST, SPECIFICALLY ITEM NO. 6,

24  THE PLAINTIFF PROPOSES TO INCLUDE LANGUAGE THAT

25  CONTRIBUTING FACTOR CAN BE PROVEN BY A SHOWING THAT

1 TAYLOR'S PROTECTED ACTIVITY WAS, QUOTE, INEXTRICABLY

2 INTERTWINED WITH HIS TERMINATION.

3          THE DEFENDANTS OBJECTED, ARGUING THAT

4 THE FIFTH CIRCUIT RECENTLY RETREATED FROM THAT

5 LANGUAGE IN THE *YOWELL* CASE -- Y-O-W-E-L-L -- WHICH

6 IS AT 993 F.3D AT 418 (APRIL 2021).  IN THAT CASE THE

7 FIFTH CIRCUIT NOTED THAT OTHER CIRCUITS, INCLUDING

8 THE EIGHTH CIRCUIT, HAVE REJECTED THE RELEVANCE OF

9 INEXTRICABLY INTERTWINED EVENTS TO SHOW CONTRIBUTING

10 FACTOR UNDER FRSA, UNDER THE FEDERAL RAILROAD SAFETY

11 ACT.

12          THE SEVENTH AND SIXTH CIRCUITS LIKEWISE

13 REQUIRE MORE THAN A MERE CHAIN OR INTERTWINING OF

14 EVENTS TO SHOW CONTRIBUTING FACTORS -- OR A

15 CONTRIBUTING FACTOR.  THE FIFTH CIRCUIT STATED THAT

16 IT DOES NOT DISAGREE WITH THAT APPROACH.

17          ACCORDINGLY, THE COURT AGREES WITH THE

18 DEFENDANTS THAT THE *INEXTRICABLY INTERTWINED* LANGUAGE

19 SHOULD NOT BE INCLUDED IN THE JURY CHARGE, AND YOUR

20 OBJECTION IS NOTED FOR THE RECORD.

21          IS THAT THE ONLY OBJECTION THAT THE

22 PLAINTIFFS HAVE?

23          **MR. SCHMIDT:**  YES, YOUR HONOR.

24          **THE COURT:**  AND DOES THE PLAINTIFF HAVE ANY

25 OBJECTIONS TO THE VERDICT FORM?

1        **MR. SCHMIDT:**  NO, YOUR HONOR.

2        **THE COURT:**  OKAY.  DO THE DEFENDANTS HAVE

3   ANY OBJECTIONS TO THE JURY INSTRUCTIONS?

4        **MR. WADSWORTH:**  YES, YOUR HONOR, TWO BRIEF

5   OBJECTIONS.  THE FIRST, REQUESTING AN INSTRUCTION

6   REGARDING DISCRIMINATORY INTENT, FOLLOWING IN LINE

7   WITH THE EIGHTH JURY -- OR EIGHTH CIRCUIT PATTERN

8   JURY INSTRUCTIONS.

9        WE ACKNOWLEDGE, OF COURSE, THAT THE

10  FIFTH CIRCUIT HAS NOT SPOKEN ON THIS AND HAVE -- OR

11  ARE REQUESTING THAT THE COURT FOLLOW THE COURTS LIKE

12  THE EIGHTH CIRCUIT THAT HAVE PROVIDED FOR THAT

13  INSTRUCTION.

14       IN ADDITION, WE REQUEST THAT THE COURT

15  INSTRUCT THE JURY ON THE PUNITIVE DAMAGES CAP.

16       **THE COURT:**  OKAY.  WITH RESPECT TO THE

17  OBJECTION AS TO *DISCRIMINATORY INTENT* LANGUAGE, THE

18  DEFENDANT PROPOSED TO INCLUDE THE FOLLOWING IN THE

19  FRSA CHARGE:  QUOTE, THIRD, DEFENDANT UNION PACIFIC

20  INTENTIONALLY RETALIATED AGAINST PLAINTIFF BY

21  TERMINATING PLAINTIFF TAYLOR'S EMPLOYMENT DUE IN

22  WHOLE OR IN PART TO PLAINTIFF TAYLOR'S ENGAGING IN

23  PROTECTED ACTIVITY LISTED ABOVE IN THE FIRST ELEMENT.

24       THE PLAINTIFF OBJECTED BECAUSE THE

25  LANGUAGE SUGGESTED THAT THE PLAINTIFF WOULD BE

1  REQUIRED TO MAKE A SHOWING BEYOND WHAT HIS -- THAT

2  HIS CONTRIBUTED -- THAT HIS PROTECTED ACTIVITY WAS A

3  CONTRIBUTING FACTOR.

4          THE COURT DECLINES TO INCLUDE THE

5  DEFENDANT'S PROPOSED LANGUAGE IN THE JURY CHARGES.

6  THE DEFENDANTS CITED SEVERAL CASES IN SUPPORT OF THE

7  INCLUSION OF THE *DISCRIMINATORY INTENT* LANGUAGE,

8  NOTABLY *YOWELL*, WHICH THE COURT HAS PREVIOUSLY CITED.

9          IN THAT CASE, THE FIFTH CIRCUIT NOTED

10 THAT IN THE EIGHTH CIRCUIT THE CONTRIBUTING FACTOR

11 THAT AN EMPLOYEE MUST PROVE IS INTENTIONAL

12 RETALIATION PROMPTED BY THE EMPLOYEE ENGAGING IN

13 PROTECTED ACTIVITY.  THE FIFTH CIRCUIT HAS NOT YET

14 DECIDED WHETHER A FRSA CLAIMANT MUST PROVE

15 INTENTIONAL RETALIATION.  IN THE COURT'S VIEW,

16 RETALIATION IS, BY ITS NATURE, INTENTIONAL.

17          THE FIFTH CIRCUIT CONCLUDED THAT ON THE

18 FACTS BEFORE IT IN THE *YOWELL* CASE, IT DID NOT NEED

19 TO DECIDE THE CONTOURS OF THE INTENT ELEMENT.

20 LIKEWISE IN *EPPLE VS BNSF* -- *EPPLE* IS E-P-P-L-E -- AT

21 785 F.APP'X 219 (5TH CIRCUIT 2019), THE CIRCUIT

22 OBSERVED THAT WHETHER THE PLAINTIFF WAS OBLIGATED TO

23 ESTABLISH DISCRIMINATORY OR RETALIATORY MOTIVE WAS A

24 QUESTION THAT, AS THE COURT NOTED, QUOTE, HAS DIVIDED

25 OUR SISTER COURTS, CLOSE QUOTES, AND THEN WENT ON TO

1 HOLD THAT IT WAS NOT NECESSARY TO RESOLVE THE DISPUTE

2 IN THAT CASE.

3       BECAUSE THE DEFENDANT'S LANGUAGE

4 PROPOSES TO IMPOSE A REQUIREMENT THAT HAS NOT BEEN

5 UNIFORMLY ADOPTED ACROSS THE CIRCUITS AND WHICH THE

6 FIFTH CIRCUIT HAS TWICE RECENTLY DECLINED TO ADOPT,

7 THE COURT DECLINES TO INCLUDE THAT LANGUAGE IN THE

8 JURY CHARGE.

9       FURTHER, THE COURT FINDS THAT THE

10 PROPOSED LANGUAGE IS LIKELY TO CREATE OR LEAD TO JURY

11 CONFUSION BY IMPLYING THAT THERE IS AN ADDITIONAL

12 ELEMENT THAT THE PLAINTIFF MUST PROVE. AND AS THE

13 COURT NOTED, IN THIS COURT'S VIEW, THE NATURE OF A

14 RETALIATORY RESPONSE, WHICH IS WHAT'S ALLEGED, WOULD

15 INCLUDE SOME ELEMENT OF MENS REA OR INTENT. SO THAT

16 OBJECTION IS NOTED, AND THAT IS THE COURT'S RULING.

17       WITH RESPECT TO THE PUNITIVE DAMAGE

18 CAPS, THE COURT HAS SURVEYED THE LAW IN THE AREA AND

19 FINDS THAT THE BEST PRACTICE, ACCORDING TO MOST OF

20 THE -- TO THE MAJORITY OF THE REPORTED CASES, IS TO

21 TAKE NOTICE OF THE CAPS, WHICH IS $250,000, AND LET

22 THE JURY DELIBERATE ON THE PUNITIVE DAMAGES. AND IF

23 THEY SO FIND THAT PUNITIVE DAMAGES ARE AWARDABLE,

24 THEY MAKE THAT AWARD SUBJECT TO REMITTITUR BY THE

25 COURT, SHOULD THE AWARD EXCEED THE CAP AMOUNT.

**1**          AND THAT IS THE COURT'S RULING.  BOTH

**2** OF YOUR OBJECTIONS -- OR ALL OF YOUR OBJECTIONS ARE

**3** NOTED FOR THE RECORD.

**4**          OKAY.  NOW IN TERMS OF TIMING.  ABOUT

**5** HOW MUCH CROSS-EXAMINATION DO YOU ANTICIPATE, MR.

**6** SCHMIDT?

**7**     **MR. SCHMIDT:**  NOT MUCH FOR MR WHEELAND.

**8** MAYBE 20 MINUTES.

**9**     **THE COURT:**  OKAY.  AND THEN WILL THE

**10** DEFENDANTS BE IN A POSITION TO REST?

**11**     **MS. SCHOONMAKER:**  YES, YOUR HONOR, SUBJECT

**12** TO MAKING AN APPROPRIATE MOTION AT THE TIME

**13** CONVENIENT FOR THE COURT.

**14**     **THE COURT:**  OKAY.  SO 20 MINUTES PLUS A

**15** REURGED MOTION.

**16**          AND THEN WILL YOU HAVE REBUTTAL?

**17**     **MR. SMITH:**  NOT AT THIS TIME, I DON'T

**18** BELIEVE WE WILL, BUT I -- WE HAVEN'T FINISHED THE

**19** DEFENDANT'S CASE, SO I CAN'T BE SURE.  BUT I DON'T

**20** CONTEMPLATE IT.

**21**     **THE COURT:**  OKAY.  SO IT LOOKS LIKE WE'LL

**22** PROBABLY HAVE THINGS WRAPPED UP BY A QUARTER TO FOUR.

**23** I MEAN, I'M ANTICIPATING THAT THERE WILL BE -- YOU

**24** KNOW, WE WON'T GO AS QUICKLY AS EVERYBODY ALWAYS

**25** ANTICIPATES THAT THEY WILL.

**1**          WITH THAT BEING SAID, THEN IT IS THE

**2** COURT'S DESIRE TO RECESS AT WHENEVER YOU FINISH AND

**3** COME BACK TOMORROW MORNING FOR OPENING ARGUMENTS,

**4** LIMITED -- STRICTLY LIMITED TO AN HOUR.  AND I

**5** STRONGLY ENCOURAGE YOU TO WORK ON YOUR OPENING -- NOT

**6** OPENING -- CLOSING ARGUMENTS -- STRONGLY ENCOURAGE

**7** YOU TO WORK ON THOSE OVER THE EVENING TO GET THOSE AS

**8** PAIRED DOWN AS POSSIBLE SO THAT WE CAN GET THIS

**9** MATTER TO THE JURY.

**10**          AND THEN WE SHOULD HAVE THE MATTER TO

**11** THE JURY BY 11:00, 11:30 TOMORROW.  JUDICIAL POLICY

**12** ALLOWS THE COURT TO PROVIDE LUNCH FOR THEM IF THEY

**13** DELIBERATE OVER A MEAL TIME, SO WE COULD BRING LUNCH

**14** IN, AND THEN WE'LL JUST AWAIT OUR VERDICT, SO --

**15** OKAY.  THAT WILL BE THE WAY THAT WE WILL PROCEED.

**16**          IS THERE ANYTHING ELSE THAT WE NEED TO

**17** TAKE UP OUTSIDE THE PRESENCE OF THE JURY?

**18**          MR. SMITH:  NO, YOUR HONOR.

**19**          MS. SCHOONMAKER:  NOT FOR DEFENDANTS, YOUR

**20** HONOR.

**21**          THE COURT:  ALL RIGHT.  YOU CAN BRING THE

**22** JURY BACK IN.

**23**          MR. FRASER:  IS IT OKAY IF I GET THE

**24** WITNESS, YOUR HONOR?

**25**          THE COURT:  I'M SORRY?

1           **MR. FRASER:**  MAY I GET THE WITNESS, YOUR

2  HONOR?

3           **THE COURT:**  YES, PLEASE.  SAVE TIME.

4  THEY'RE BRINING IN THE WITNESS.  SORRY, LADIES AND

5  GENTLEMEN.  I THOUGHT HE WAS ALREADY HERE.

6           **(WHEREUPON, THE JURY IS IN THE COURTROOM.)**

7           **THE COURT:**  OKAY.  BE SEATED.  THE WITNESS

8  IS COMING BACK UP TO THE STAND.  MY APOLOGIES.  I

9  THOUGHT HE WAS ALREADY IN HERE.

10           YOU CAN RESUME THE STAND, SIR.  HAVE

11  YOU GOT A FACE SHIELD?

12           **MS. SCHOONMAKER:**  YES, WE DO.

13           **THE COURT:**  YOU MAY PROCEED, MR. SCHMIDT.

14                     **CROSS-EXAMINATION**

15  BY MR. SCHMIDT:

16     Q    ALL RIGHT.  MR WHEELAND, ARE YOU AWARE OF

17  KENNETH STUART RECOMMENDING JOHNNY TAYLOR'S

18  TERMINATION?

19     A    I DO NOT RECALL HAVING HEARD MR. STUART

20  RECOMMEND THAT, NO.

21     Q    SO THE DECISION TO TERMINATE MR. TAYLOR -- I

22  BELIEVE MS. SCHOONMAKER REFERRED TO IT AS A

23  RECOMMENDATION, BUT YOUR TESTIMONY WAS ACTUALLY THAT

24  YOU WERE RESPONSIBLE FOR THE DECISION TO TERMINATE

25  HIM.  CORRECT?

1    **A**    WELL, I MADE THE DECISION THAT BASED ON WHAT

2    HAD TAKEN PLACE, THAT IT WARRANTED TERMINATION.  AND

3    I MADE THE DECISION TO PROGRESS THAT AND SEEKING

4    APPROVAL.

5    **Q**    SO YOU MADE THE DECISION AND IT WAS APPROVED

6    BY AN ETHICS COMMITTEE?

7    **A**    YES.

8        **MR. SCHMIDT:**  AND CAN WE LOOK AT JOINT

9    EXHIBIT NO. 11.  CAN WE SWITCH?

10       **THE COURTROOM DEPUTY:**  I GOT YOU.  SORRY.

11       **MR. SCHMIDT:**  SORRY.

12   BY MR. SCHMIDT:

13   **Q**    SO YOUR DECISION TO TERMINATE MR. TAYLOR WAS

14   BASED SOLELY ON THIS EMAIL FROM MR. GILSDORF AND A

15   CONVERSATION WITH MR. GILSDORF.  CORRECT?

16   **A**    YES.

17   **Q**    OKAY.  AND YOU DIDN'T PERFORM ANY TYPE OF

18   INDEPENDENT INVESTIGATION OF THE FACTS FOR WHICH --

19   ON WHICH MR. TAYLOR'S TERMINATION WAS BASED.

20   CORRECT?

21   **A**    NO, I DID NOT.

22   **Q**    OKAY.  YOU NEVER TALKED TO MR. TAYLOR OR

23   ANYTHING?

24   **A**    NO.

25   **Q**    SO IT'S SAFE TO SAY THAT MR. GILSDORF

1 INFLUENCED YOUR DECISION TO TERMINATE. CORRECT?

2    A   MY DECISION WAS BASED ON THE FACTS THAT MR.

3 GILSDORF PRESENTED TO ME.

4    Q   SO DURING THE MEETING -- OR SORRY.

5         YOU SAID THAT THE DECISION WAS BASED

6 OFF OF THIS EMAIL AND A CONVERSATION WITH MR.

7 GILSDORF. WAS THAT CONVERSATION IN PERSON OR BY

8 PHONE?

9    A   I DON'T RECALL.

10    Q   OKAY. WELL, DURING THIS CONVERSATION, WAS

11 THERE ANY DISCUSSION ABOUT A MEETING AT MR. TAYLOR'S

12 HOUSE AT WHICH HE WAS PLACED ON ADMINISTRATIVE LEAVE?

13    A   I DON'T RECALL THAT, NO.

14    Q   OKAY. SO YOU CAN'T TESTIFY THAT THAT WAS

15 ONE OF THE REASONS FOR MR. TAYLOR'S TERMINATION?

16    A   NO.

17    Q   OKAY. AND DID MR. GILSDORF IN THIS

18 CONVERSATION SAY ANYTHING TO YOU ABOUT WELDING

19 REQUIREMENTS AND WHETHER OR NOT MR. TAYLOR WAS

20 MEETING THEM?

21    A   I BELIEVE THAT WAS PART OF THE CONVERSATION,

22 BECAUSE THAT WAS PART OF HIS PERFORMANCE IMPROVEMENT

23 PLAN, WAS -- ONE OF THE STIPULATIONS WAS PERFORMANCE

24 OF HIS WELDING TEAM.

25    Q   SO THE CONVERSATION WITH MR. GILSDORF WAS

1  BEFORE MR. TAYLOR WAS PRESENTED WITH THE PERFORMANCE

2  IMPROVEMENT PLAN OR IT WAS AFTER?

3     **A**   I HAD A CONVERSATION WITH MR. GILSDORF BOTH

4  BEFORE AND AFTER.

5     **Q**   OKAY.  WELL, UP UNTIL NOW WE'VE BEEN TALKING

6  ABOUT ONE CONVERSATION.

7              WHICH CONVERSATION WITH MR. GILSDORF

8  WAS IT THAT YOU BASED YOUR DECISION -- ON WHICH YOU

9  MADE YOUR DECISION TO TERMINATE MR. TAYLOR?

10    **A**   IT WAS AFTER HE HAD MET WITH MR. TAYLOR IN

11 LIVONIA.  AND THEN THIS WAS THE EMAIL THAT WAS BASED

12 ON THAT MEETING.

13    **Q**   AND DURING THIS CONVERSATION DID YOU GO

14 THROUGH THE PERFORMANCE IMPROVEMENT PLAN?

15    **A**   NO.  I HAD REVIEWED THE PERFORMANCE

16 IMPROVEMENT PLAN PRIOR TO MR. GILSDORF PRESENTING IT

17 TO MR. TAYLOR.

18    **Q**   OKAY.  AND YOU NEVER PERSONALLY WITNESSED

19 MR. TAYLOR BEING INSUBORDINATE, DID YOU?

20    **A**   NO.

21    **Q**   AND YOU TESTIFIED YESTERDAY THAT A SLOW

22 ORDER SHOULD ALWAYS BE ISSUED IF THERE IS A HIGH VTI

23 HIT.  CORRECT?

24    **A**   YEAH.  OUR PROCEDURE WAS THAT WHEN THERE WAS

25 A HIGH VTI HIT, THAT IT WOULD AUTOMATICALLY REQUIRE A

1    10 MPH SLOW ORDER AND THEN A FOLLOW-UP INSPECTION AS

2    SOON AS POSSIBLE.

3        Q    AND THESE -- THE MEASUREMENTS THAT WE

4    DISCUSSED WITH RESPECT TO SWITCH 16 IN EARLY JANUARY

5    OF 2018 -- THERE WAS AN INCIDENT BETWEEN MR. TAYLOR

6    AND MR. STUART -- YOU DON'T HAVE ANY KNOWLEDGE OF

7    WHEN THOSE MEASUREMENTS WERE TAKEN, DO YOU?

8        A    I HAVE NO DIRECT KNOWLEDGE OF THAT, NO.

9        Q    OKAY.  AND YOU HAVE NO KNOWLEDGE OF WHETHER

10   THEY WERE DONE INCORRECTLY?

11       A    I DON'T KNOW THAT, NO.

12       Q    WHEN WAS THE LAST YEAR OF YOUR EMPLOYMENT

13   WITH UNION PACIFIC?

14       A    2020.

15       Q    2020.  WHAT WERE UNION PACIFIC'S ANNUAL

16   PROFITS IN 2020?

17       A    I DO NOT KNOW.

18       Q    WAS IT IN THE BILLIONS?

19       A    I DON'T KNOW WHAT IT WAS.  I DON'T REMEMBER.

20       Q    DO YOU REMEMBER WHAT IT WAS FOR THE YEAR

21   BEFORE THAT?

22       A    I DO NOT.

23       Q    OKAY.

24           MR. SCHMIDT:  MAY I CONFER VERY BRIEFLY WITH

25   COUNSEL, YOUR HONOR?

1          THE COURT:  YES.

2          MR. SCHMIDT:  ALL RIGHT.  I APOLOGIZE.

3  BY MR. SCHMIDT:

4     Q    SO THIS EMAIL MAKES A REFERENCE TO

5  ALLEGATIONS BY MR. TAYLOR OF A WHISTLEBLOWER

6  COMPLAINT.  CORRECT?

7     A    YES.  IT STATES THAT HE TOLD US THAT HE HAD

8  TURNED US INTO THE WHISTLEBLOWERS ACT AND HE HAD DONE

9  NOTHING WRONG.

10    Q    DID YOU DO ANYTHING TO INQUIRE INTO THAT

11 ALLEGATION, INTO WHAT THE WHISTLEBLOWER COMPLAINT WAS

12 ABOUT?

13    A    NO, I DID NOT.

14    Q    WOULD ANYTHING HAVE PREVENTED YOU FROM DOING

15 THAT?

16    A    NO.  BUT THE PRACTICE WAS, WHEN A

17 WHISTLEBLOWER COMPLAINT IS FILED INVOLVING ANY PART

18 OF MY AREA OF RESPONSIBILITY, I WOULD BE NOTIFIED

19 IMMEDIATELY.

20         MR. SCHMIDT:  NO FURTHER QUESTIONS.

21         THE COURT:  ANY REDIRECT?

22         MS. SCHOONMAKER:  NO REDIRECT, YOUR HONOR.

23            MAY THIS WITNESS BE EXCUSED?

24         THE COURT:  YOU MAY STEP DOWN, SIR.  YOU'RE

25 EXCUSED.

| | |
|---|---|
| 1 | ANY FURTHER WITNESSES? |
| 2 | **MS. SCHOONMAKER:** NO, YOUR HONOR. DEFENDANT |
| 3 | UNION PACIFIC RAILROAD COMPANY RESTS, SUBJECT TO |
| 4 | MAKING A MOTION AT THE COURT'S CONVENIENCE. |
| 5 | **THE COURT:** ANY REBUTTAL? |
| 6 | **MR. SMITH:** NO, YOUR HONOR. |
| 7 | **(DEFENSE RESTS.)** |
| 8 | **THE COURT:** OKAY. LADIES AND GENTLEMEN, THE |
| 9 | PARTIES HAVE RESTED. HUM, THREE O'CLOCK. IT'S GOING |
| 10 | TO BE ABOUT TWO HOURS IN CLOSING STATEMENTS WITH JURY |
| 11 | INSTRUCTIONS, WHICH WOULD PUT US -- THE COURT HAS TO |
| 12 | TAKE UP A MOTION OUTSIDE OF YOUR PRESENCE. WE'RE |
| 13 | GOING TO HAVE TO TAKE ABOUT A 15-MINUTE BREAK, SO |
| 14 | THAT WOULD PUT US PROBABLY ABOUT 5:30 BEFORE YOU |
| 15 | WOULD BEGIN DELIBERATING. |
| 16 | IT WOULD BE MY RECOMMENDATION THAT YOU |
| 17 | COME BACK IN THE MORNING, HEAR CLOSING ARGUMENTS, BE |
| 18 | FRESH AND DELIBERATE. DO I -- DO Y'ALL WANT TO DO |
| 19 | THAT? JUST GIVE ME A -- OKAY. I'M HAPPY TO LET YOU |
| 20 | POWER THROUGH, BUT -- SO WHAT WILL HAPPEN TOMORROW IS |
| 21 | WE'LL CONVENE AT 9 A.M. I'M GOING TO LET YOU GO FOR |
| 22 | THE DAY. WE'LL CONVENE AT 9 A.M. YOU WILL FIRST |
| 23 | HEAR CLOSING ARGUMENTS, THEN YOU'LL HAVE JURY |
| 24 | INSTRUCTIONS, AND THEN YOU'LL GET THE CASE TO |
| 25 | DELIBERATE. |

1          THE CHANCES ARE YOU'LL BE DELIBERATING

2   OVER THE LUNCH HOUR.  SO IF THAT'S THE CASE, THE

3   FEDERAL GOVERNMENT ACTUALLY ALLOWS US TO BUY YOU

4   LUNCH.  SO IF YOU'RE STILL DELIBERATING AT THE NOON

5   HOUR OR AROUND THAT TIME, WE'LL GET A LUNCH ORDER

6   FROM YOU AND YOU'LL BE ABLE TO CONTINUE YOUR

7   DELIBERATIONS THROUGH LUNCH.  OKAY?  SO YOU DON'T

8   HAVE TO PACK A LUNCH IS WHAT I'M SAYING.  EITHER

9   YOU'LL BE FINISHED AND YOU CAN GO HOME AND EAT OR

10  YOU'LL HAVE -- OR YOUR TAX DOLLARS WILL BUY YOU

11  LUNCH.

12          ALL RIGHT.  DON'T DISCUSS THE CASE,

13  DON'T DO ANY RESEARCH, AND WE'LL SEE YOU BACK -- IF

14  YOU'LL BE HERE SHARP AT NINE, WE'LL START SHARP AT

15  NINE.  OKAY.

16          **(WHEREUPON, THE JURY IS OUT OF THE**

17  **COURTROOM.)**

18          **THE COURT:**  BE SEATED.

19          OKAY.  UNION PACIFIC HAS A MOTION?

20          **MR. WADSWORTH:**  MAY I APPROACH THE PODIUM,

21  YOUR HONOR?

22          **THE COURT:**  YOU MAY.

23          **MR. WADSWORTH:**  THANK YOU, YOUR HONOR.

24          YOUR HONOR, UNION PACIFIC REURGES ITS

25  MOTION AS A MATTER OF LAW -- FOR JUDGMENT AS A MATTER

1  OF LAW.  I'LL BE EXTREMELY BRIEF, YOUR HONOR, UNLESS

2  YOU PREFER ME TO GO LONGER.

3          WE MOVE ON ALL THREE POINTS THAT WE

4  PREVIOUSLY MOVED ON.  WITH RESPECT TO CONTRIBUTING

5  FACTOR, I WOULD JUST ARGUE THAT THERE IS NO ACTUAL

6  TEMPORAL PROXIMITY.  MR. TAYLOR DURING HIS TESTIMONY

7  ADMITTED THAT HE TOOK TRACKS OUT OF SERVICE AND

8  ISSUED SLOW ORDERS THE ENTIRETY OF HIS CAREER AS AN

9  MTM.

10          MORE IMPORTANTLY, ONE OF THE PROTECTED

11  ACTIVITIES THAT MR. TAYLOR IS MOVING UNDER IS THE

12  REMOVAL OF THE AVONDALE TAIL TRACK FROM SERVICE,

13  WHICH WAS IN MARCH OF 2017, NEARLY ONE FULL YEAR

14  BEFORE HIS TERMINATION.

15          WITH RESPECT TO UNION PACIFIC'S

16  AFFIRMATIVE DEFENSE, THREE OF THE WITNESSES INVOLVED

17  IN THE TERMINATION -- MR WHEELAND, MR. GILSDORF AND

18  MR. STUART -- ALL TESTIFIED THAT HIS PROTECTED

19  ACTIVITIES PLAYED NO ROLE WHATSOEVER IN HIS

20  TERMINATION AND IN THE RECOMMENDATION FOR HIS

21  TERMINATION.  MOREOVER, THEY TESTIFIED THAT OTHER

22  MTM'S LIKE MR. TAYLOR HAD TAKEN TRACKS OUT OF SERVICE

23  AND HAD ALSO ISSUED SLOW ORDERS BUT THAT THOSE

24  INDIVIDUALS WERE NOT RECOMMENDED FOR TERMINATION, NOR

25  WERE THEY TERMINATED.

1    WITH RESPECT TO PUNITIVE DAMAGES, UNION

2  PACIFIC HAS PUT ON EVIDENCE THAT IT MAINTAINED

3  POLICIES IN COMPLIANCE WITH FRSA AND TO ENSURE THAT

4  IT COMPLIED WITH FRSA AND ALSO THE -- SIMILARLY, THE

5  WITNESSES TESTIFIED THAT THEY DID NOT VIOLATE FRSA

6  WHEN THEY MADE THE DECISION TO TERMINATE.

7    THAT'S ALL I HAVE, YOUR HONOR, UNLESS

8  YOU WOULD LIKE ANY MORE OR HAVE ANY FURTHER

9  QUESTIONS.

10    THE COURT:  WELL, YOU CAN TELL ME WHAT YOUR

11  -- YOU HAD THREE -- YOU SAID YOU HAD THREE AND I'VE

12  GOT TWO.  I WANT TO MAKE SURE THAT I ADDRESS

13  EVERYTHING, AND I'M NOT GOING TO LOOK BACK AT MY

14  NOTES.  CONTRIBUTING FACTOR, PUNITIVE DAMAGES.

15    MR. WADSWORTH:  SORRY.  FIRST ONE IS

16  CONTRIBUTING FACTOR; SECOND ONE IS UNION PACIFIC'S

17  AFFIRMATIVE DEFENSE --

18    THE COURT:  GOT YOU.

19    MR. WADSWORTH:  -- THAT IT WOULD HAVE

20  TERMINATED MR. TAYLOR REGARDLESS OF HIS ENGAGEMENT IN

21  PROTECTED ACTIVITY.  AND THEN THE THIRD, YOUR HONOR,

22  IS PUNITIVE DAMAGES.

23    THE COURT:  THANK YOU.

24    MR. WADSWORTH:  THANK YOU, YOUR HONOR.

25    MR. SCHMIDT:  YOUR HONOR, WITH RESPECT TO

1  THE CAUSATION ELEMENT, UNION PACIFIC HAS ONLY

2  ADDRESSED TEMPORAL PROXIMITY.  THEY HAVE NOT

3  ADDRESSED ANY OF THE SEVERAL OTHER ITEMS THAT WE HAVE

4  URGED TO SHOW THERE WAS A CONTRIBUTING FACTOR.

5          BUT AS FAR AS TEMPORAL PROXIMITY GOES,

6  THIS IS AN ARGUMENT THAT DEFENDANT MADE BEFORE ON

7  SUMMARY JUDGMENT THAT MR. TAYLOR ENGAGED IN PROTECTED

8  ACTIVITY THROUGHOUT HIS WHOLE TIME AT UNION PACIFIC

9  AND, YOU KNOW, THEREFORE THERE CAN'T BE TEMPORAL

10 PROXIMITY.  BUT AS THE EVIDENCE ESTABLISHED, WHILE

11 IT'S TRUE THAT MR. TAYLOR REGULARLY TOOK TRACKS OUT

12 OF SERVICE, THAT WAS GENERALLY ONLY FOR A DAY AT A

13 TIME JUST TO MAKE REPAIRS AND GET IT BACK UP AND

14 RUNNING.  THE FIRST TIME THAT HE EVER TOOK A TRACK

15 OUT OF SERVICE FOR MORE THAN A DAY WAS IN MARCH OF

16 2017.

17          TEMPORAL PROXIMITY SHOWS THAT IN

18 DECEMBER OF 2017 MR. TAYLOR RECEIVED A POSITIVE

19 PERFORMANCE REVIEW AND QUALIFIED FOR A BONUS.  AND ON

20 JANUARY 10, 2018, HE TOOK SWITCH 16 OUT OF SERVICE

21 AND REFUSED TO PUT IT BACK IN SERVICE.  ON JANUARY

22 22, 2018, HE ISSUED THE SLOW ORDER ON WHITE CASTLE

23 AND REFUSED TO TAKE IT OFF.  ON JANUARY 31, 2018, HE

24 WAS GIVEN A PERFORMANCE IMPROVEMENT PLAN, WHICH HE

25 DOES NOT SIGN.  AND THEN ON FEBRUARY 27, 2018, HE WAS

1   TERMINATED.  THAT IS CERTAINLY TEMPORAL PROXIMITY.

2                   TO THE EXTENT THAT HIS PROTECTED

3   ACTIVITY FROM MARCH 2017 DOES OR DOES NOT PLAY INTO

4   THAT, WE WOULD RESPOND THAT HE HAD DIFFERENT MANAGERS

5   AT THAT TIME.  THE DECISION MAKERS OR THE -- WHO WERE

6   INVOLVED IN THE DECISION WERE NOT HIS SUPERIORS AT

7   THAT TIME, AND THEY RESPONDED TO IT VERY DIFFERENTLY

8   THAN HE DID -- THAN MR. STUART AND MR. GILSDORF DID.

9   THEY MET MR. TAYLOR AT THE TRACK AND AGREED WITH HIM

10  THAT HE SHOULD -- WITH THE REPAIRS THAT HE WANTED TO

11  DO AND ALLOWED HIM TO DO THEM; WHEREAS WITH MR.

12  STUART AND MR. GILSDORF, THEY WOULD NOT LOOK AT THE

13  TRACK WITH HIM.  JUST TOLD HIM TO PUT IT BACK IN

14  SERVICE.

15                  THERE IS ALSO THE CASE OF *RICHARD VS*

16  *BOARD OF SUPERVISORS*.  IT'S A LOUISIANA STATE CASE IN

17  WHICH THE COURT RECOGNIZED THAT A -- IF THERE IS AN

18  UNBROKEN CHAIN OF RETALIATORY CONDUCT, THEN TEMPORAL

19  PROXIMITY CAN BE STRETCHED FOR A LONGER PERIOD OF

20  TIME.

21                  HERE, EVERY TIME MR. TAYLOR ENGAGED IN

22  SOME KIND OF PROTECTED ACTIVITY, HE EXPERIENCED SOME

23  KIND OF PUSH-BACK FROM UNION PACIFIC.  THAT STARTED

24  MORE OR LESS WITH THAT MARCH 2017 TAKING THE TAIL

25  TRACK OUT OF SERVICE WHERE HE EXPERIENCED THREATS

1  BECAUSE OF THAT.  HE TOOK ANOTHER TRACK OUT OF

2  SERVICE LATER IN THE YEAR, EXPERIENCED THREATS

3  BECAUSE OF THAT.  AND THEN WE GET INTO THE TIMELINE

4  THAT I WAS JUST DISCUSSING WITH THE COURT.

5             THERE IS ALSO THE FACT THAT KENNETH

6  STUART DURING HIS TESTIMONY BASICALLY CHARACTERIZED

7  MR. TAYLOR'S PROTECTED ACTIVITY AS INSUBORDINATION.

8  HE TESTIFIED THAT IT WAS DEFIANT AND INSUBORDINATE --

9  THOSE WERE HIS WORDS -- FOR MR. TAYLOR TO SAY HE

10 WASN'T GOING TO PUT THE TRACK BACK INTO SERVICE.  HE

11 ALSO TESTIFIED THAT IT WAS ARGUMENTATIVE FOR JOHNNY

12 TO MENTION THAT HE -- FOR MR. TAYLOR TO MENTION THAT

13 HE HAD A LAWYER AND HAD FILED WHISTLEBLOWER

14 COMPLAINTS.

15             ANOTHER THING THAT CAN BE USED TO SHOW

16 THE CONTRIBUTING FACTOR ELEMENT IS THE EMPLOYER'S

17 CHANGE IN ATTITUDE AFTER A PROTECTED ACTIVITY.  HERE,

18 OF COURSE, THERE IS THE FACT THAT TWO MONTHS BEFORE

19 HE WAS TERMINATED HE RECEIVED A POSITIVE PERFORMANCE

20 EVALUATION AND A BONUS.  SEVERAL OF THE WITNESSES,

21 INCLUDING KENNETH STUART, HAVE TESTIFIED THAT MR.

22 TAYLOR WAS GOOD AT HIS JOB.  IN FACT, UNION PACIFIC

23 MENTIONED THAT IN THEIR OPENING STATEMENT.  SORRY.

24 IF I CAN BACK UP JUST A LITTLE BIT.

25             ANOTHER DIFFERENCE IN THE PROTECTED

1  ACTIVITY STARTING IN 2017 THAT WAS DIFFERENT FROM THE

2  PROTECTED ACTIVITIES THAT OCCURRED BEFORE WAS THAT

3  BOTH THE TAIL TRACK IN MARCH 2017 AND SWITCH 16 WERE

4  BIG PROJECTS THAT WOULD HAVE REQUIRED A BIG OPERATION

5  TO GET THEM BACK INTO SERVICE.

6          ALSO, INDICATIONS OF PRETEXT UNDER THE

7  CASE LAW CAN BE USED TO SHOW THE CONTRIBUTING FACTOR

8  ELEMENT.  HERE, THERE IS CONFLICTING TESTIMONY ALL

9  OVER THE PLACE.  MR. GILSDORF AND MR. STUART

10 EMPHATICALLY DENY THAT THEY INSTRUCTED MR. TAYLOR TO

11 PUT THE TRACK BACK INTO SERVICE.  MR WHEELAND

12 TESTIFIED THAT THEY TOLD HIM THAT THEY DID.

13          ALSO, THERE IS KENNETH

14 STUART'S RECOGNIZING TODAY OF HIS DEPOSITION

15 TESTIMONY IN WHICH HE TESTIFIED THAT IT WAS NOT OKAY

16 FOR MR. TAYLOR TO TAKE THE TRACK OUT OF SERVICE

17 BECAUSE HE DID SO ON A GUT FEEL.

18          SO, YOUR HONOR, WE RESPECTFULLY SUBMIT

19 THAT THE JURY COULD CERTAINLY FIND, BASED ON THIS

20 EVIDENCE, THAT HIS PROTECTED ACTIVITY WAS A

21 CONTRIBUTING FACTOR IN HIS TERMINATION.

22          AS FOR THE AFFIRMATIVE DEFENSE, UNION

23 PACIFIC HAS ONLY RAISED TWO THINGS TODAY.  ONE WAS

24 THAT IT -- THE UNION PACIFIC MANAGERS TESTIFIED THAT

25 THEY DID NOT BREAK THE LAW.  THE OTHER ONE IS THAT

1    THERE WERE OTHER PEOPLE WHO WERE ENGAGED IN PROTECTED

2    ACTIVITY THAT THEY DIDN'T FIRE.

3              SO, OF COURSE UNION PACIFIC'S WITNESSES

4    ARE NOT GOING TO TESTIFY THAT THEY BROKE THE LAW.

5    THEM SAYING THAT ALONE DOES NOT ENTITLE THEM TO THIS

6    AFFIRMATIVE DEFENSE.  AND MR. TAYLOR DOES NOT HAVE TO

7    SHOW THAT EVERY EMPLOYEE WHO EVER ENGAGED IN

8    PROTECTED ACTIVITY WAS RETALIATED AGAINST.  HE ONLY

9    HAS TO SHOW THAT HE HAS.

10             THIS IS NOT ENOUGH TO SHOW, BY CLEAR

11   AND CONVINCING EVIDENCE, THAT MR. TAYLOR WOULD NOT

12   HAVE BEEN FIRED IF HE HAD NEVER ENGAGED IN PROTECTED

13   ACTIVITY.

14             WHILE UNION PACIFIC HAS SAID A LOT OF

15   THINGS AND PUT A LOT OF THINGS DOWN ON PAPER ABOUT

16   WHAT A TERRIBLE EMPLOYEE MR. TAYLOR BECAME IN THE

17   LAST TWO MONTHS OF HIS EMPLOYMENT, THEY HAVE NOT

18   PROVEN IT BY CLEAR AND CONVINCING EVIDENCE.

19             ONE OF THE THINGS THAT THEY ACCUSED MR.

20   TAYLOR OF IS NOT PROVIDING ENOUGH INFORMATION

21   CONCERNING SWITCH 16.  MR. GILSDORF RECOGNIZED THAT

22   MR. TAYLOR GAVE HIM EVERYTHING THAT HE HAD REQUESTED

23   ABOUT SWITCH 16.  HE ANSWERED ALL OF HIS QUESTIONS

24   ABOUT IT.  IT'S NOT THAT MR. TAYLOR WAS TRYING TO NOT

25   PROVIDE ANY INFORMATION.  IN THAT CASE HE PROVIDED

1    EVERYTHING THAT WAS ASKED FOR.

2              THE ONLY THING HE ALLEGEDLY DIDN'T

3    PROVIDE WITH RESPECT TO SWITCH 16 WAS THOSE

4    MEASUREMENTS.  AND THERE WE HAVE A GRAVE DIFFERENCE

5    IN MR. TAYLOR'S TESTIMONY VERSUS MR. STUART'S.

6              MR. STUART TESTIFIED THAT MR. TAYLOR

7    SIMPLY REFUSED TO PERFORM THE MEASUREMENTS.  MR.

8    TAYLOR TESTIFIED THAT, ONE, HE HAD ALREADY

9    RE-PERFORMED THE MEASUREMENTS FOUR DAYS PRIOR; TWO,

10   WHEN MR. STUART BROUGHT THAT UP IN THE EMAIL, THERE

11   WAS A PHONE CALL AFTERWARDS.  AND DURING THE PHONE

12   CALL MR. TAYLOR EXPLAINED TO HIM THAT HE HAD JUST

13   REDONE THE MEASUREMENTS AND ALSO WHY THE MEASUREMENTS

14   COULD NOT HAVE CHANGED.  AND MR. STUART DID NOT AGAIN

15   TELL HIM TO GO TAKE THE MEASUREMENTS, SO HE DIDN'T

16   REFUSE TO DO ANYTHING.  THE JURY COULD CERTAINLY

17   CHOOSE TO FIND MR. TAYLOR'S TESTIMONY ON THAT POINT

18   CREDIBLE.

19              SO THE QUESTION IS, YOU KNOW, WOULD

20   UNION PACIFIC HAVE FIRED MR. TAYLOR FOR NOT PROVIDING

21   THOSE MEASUREMENTS IF THE TRACK WAS NEVER TAKEN OUT

22   OF SERVICE, OR WOULD IT HAVE FIRED HIM FOR NOT

23   PROVIDING ENOUGH INFORMATION ABOUT A SLOW ORDER IF HE

24   HAD NEVER ISSUED THE SLOW ORDER.  WE RESPECTFULLY

25   SUBMIT THAT UNION PACIFIC HAS NOT PROVEN THAT THE

1  ANSWER TO THOSE QUESTIONS IS *YES*, BY CLEAR AND

2  CONVINCING EVIDENCE.

3              AS FOR PUNITIVE DAMAGES, YOUR HONOR,

4  THE EVIDENCE ESTABLISHED THAT ALL OF THE WITNESSES

5  WERE WELL AWARE OF BOTH THE FRSA AND UNION PACIFIC'S

6  WHISTLEBLOWER POLICY.  THEY'RE ALSO WELL AWARE OF THE

7  COMPLIANCE ORDER THAT THEY WERE ALREADY KIND OF IN

8  HOT WATER WITH THE FRA, AND YET THEY STILL PUSHED

9  BACK AGAINST MR. TAYLOR EVERY TIME HE ENGAGED IN

10 PROTECTED ACTIVITY AND STILL TERMINATED HIM IN

11 RETALIATION FOR PROTECTED ACTIVITY.

12             SO WE CONTEND THAT THE EXISTENCE OF

13 THOSE POLICIES AND THEIR KNOWLEDGE OF THOSE POLICIES

14 DOES NOT SAVE UNION PACIFIC FROM PUNITIVE DAMAGES.

15 IN FACT, IF ANYTHING, THAT WEIGHS IN FAVOR OF

16 PUNITIVE DAMAGES.

17             THERE IS EVIDENCE -- AS I DISCUSSED,

18 MR. GILSDORF AND MR. STUART INSTRUCTED MR. TAYLOR TO

19 PUT THE TRACK BACK INTO SERVICE.  IT IS UNDISPUTED

20 THAT THEY HAD THE AUTHORITY TO PUT IT BACK INTO

21 SERVICE AND NEVER DID.  THE JURY COULD INFER FROM

22 THIS THAT THE REASON THEY DIDN'T PUT THE TRACK BACK

23 INTO SERVICE BUT ORDERED MR. TAYLOR TO DO IT INSTEAD

24 IS BECAUSE THEY DIDN'T WANT TO BE RESPONSIBLE TO THE

25 FRA FOR AN UNSAFE TRACK BEING PUT BACK INTO SERVICE,

1   BUT THEY WANTED MR. TAYLOR TO.

2                    A JURY COULD CERTAINLY INFER FROM THESE

3   FACTS THAT UNION PACIFIC WAS ACTING WITH MALICE AND

4   IN BAD FAITH.

5                    THAT'S ALL, YOUR HONOR.

6           **THE COURT:**  OKAY.  THE COURT HAS HEARD AND

7   CONSIDERED THE RENEWED MOTION FOR JUDGMENT AS A

8   MATTER OF LAW PURSUANT TO RULE 50.

9                    THE COURT IS UNABLE TO CONCLUDE THAT A

10  REASONABLE JURY WOULD NOT HAVE ANY LEGALLY SUFFICIENT

11  EVIDENCE TO FIND FOR THE PLAINTIFF IN THIS CASE, AND

12  SO THE COURT WILL DENY THE MOTION FOR JUDGMENT AS A

13  MATTER OF LAW.

14                   ON THE ISSUE OF CONTRIBUTING FACTOR,

15  THE COURT NOTES THAT IT NEEDS TO BE A CONTRIBUTING

16  FACTOR, NOT THE SOLE CONTRIBUTING FACTOR.  AND THERE

17  ARE A NUMBER OF WAYS THAT CONTRIBUTING FACTOR CAN BE

18  ESTABLISHED.  AS THE COURT NOTED AT THE CLOSE OF THE

19  PLAINTIFF'S CASE, THIS REALLY COMES DOWN TO THE

20  CREDIBILITY OF THE WITNESSES.  AND THAT'S NOT THE

21  DOMAIN OF THE COURT.  THAT'S STRICTLY THE JURY'S

22  DOMAIN.

23                   ON THE ONE HAND YOU HAVE THE UNION

24  PACIFIC WITNESSES SAYING THAT MR. TAYLOR DEVELOPED A

25  BAD ATTITUDE AFTER SOME YEARS OF SERVICE AND WAS

1 FIRED FOR WHAT THEY CONTEND IS INSUBORDINATION. ON

2 THE OTHER HAND, MR. TAYLOR CONTENDS THAT MORE RECENT

3 PEOPLE THAT WERE SUPERVISING HIM TOWARD THE END OF

4 HIS EMPLOYMENT TOOK THE JOB ACTION BECAUSE OF

5 PROTECTED ACTIVITY.

6            THERE IS NO QUESTION THAT THERE WAS A

7 JOB ACTION TAKEN, THERE IS NO QUESTION THAT THE

8 ACTIVITY IS PROTECTED UNDER THE FEDERAL RAILROAD

9 SAFETY ACT. THE QUESTION IS WHAT MOTIVATED THE

10 TERMINATION, AND THE COURT CAN'T MAKE THAT CALL.

11            THE COURT FINDS THAT THAT IS A

12 DETERMINATION LEFT TO THE SOUND DISCRETION OF THE

13 JURY, BECAUSE BUNDLED UP IN THAT DETERMINATION --

14 SHALL I USE THE WORD *INEXTRICABLY INTERTWINED* -- IN

15 THAT DETERMINATION IS CREDIBILITY OF THE WITNESSES,

16 AND SO THAT IS NOT APPROPRIATE ON A JUDGMENT AS A

17 MATTER OF LAW.

18            FOR THE SAME REASONS, THE CLEAR AND

19 CONVINCING BURDEN OF THE DEFENDANT'S AFFIRMATIVE

20 DEFENSE, IT REALLY IS THE SAME. IT'S THE FLIP SIDE

21 OF THE SAME POINT, I MEAN, WHAT MOTIVATED THIS

22 EMPLOYMENT, THIS JOB ACTION. AND THE COURT IS NOT

23 GOING TO TAKE THAT DETERMINATION AWAY FROM THE JURY

24 AT THIS STAGE.

25            WITH RESPECT TO PUNITIVE DAMAGES, WHILE

1　I THINK IT'S A VERY TOUCH BURDEN, THE FACT THAT UNION

2　PACIFIC HAD POLICIES AND TRAINED ON THE POLICIES, IF

3　THE JURY WERE TO BELIEVE THAT THE -- THESE -- THE

4　PREEMINENT MOTIVATION OR SOLE MOTIVATION WAS

5　PROTECTED ACTIVITY, THE JURY COULD CONCLUDE THAT

6　THERE WAS MALICE OR INDIFFERENCE TO THE RIGHTS THAT

7　UNION PACIFIC IS WELL AKIN TO AND WELL TRAINED ON AND

8　HAS PROMULGATED POLICIES ON.

9　　　　　　SO THE COURT IS INCLINED TO ACCEPT THE

10　PLAINTIFF'S ARGUMENT -- OR THE COURT IS PERSUADED, I

11　SHOULD SAY, BY THE PLAINTIFF'S ARGUMENT THAT THE FACT

12　THAT THERE IS SUCH A REPLETE REPOSITORY OF MATERIALS

13　ON PROTECTIONS TO WHISTLEBLOWERS AND PROTECTIONS TO

14　PERSONS WHO ARE -- WHO HAVE A JOB TO ENFORCE FEDERAL

15　RAILROAD SAFETY STANDARDS, IF THE JURY WERE TO

16　CONCLUDE THAT THAT'S THE REASON HE WAS FIRED, THEN

17　THE JURY NEEDS TO MAKE THE DECISION *WAS THAT DONE*

18　*MALICIOUSLY OR WITH INDIFFERENT -- WITH INDIFFERENCE.*

19　AND SO THE COURT DENIES THE JUDGMENT AS A MATTER OF

20　LAW FOR THE REASONS THAT I'VE STATED.

21　　　　　　OKAY.  WE WILL RECONVENE AT 9 A.M.

22　AGAIN, OPENING STATEMENTS, THEN THAT WILL BE FOLLOWED

23　BY THE COURT'S JURY INSTRUCTIONS.

24　　　　　　LET ME MAKE ONE MODIFICATION -- VERY

25　INSIGNIFICANT MODIFICATION TO THE JURY INSTRUCTIONS.

**1**  IN LOOKING AT THEM AGAIN, I TOLD YOU I WAS GOING TO

**2**  TAKE OUT THE HEADINGS.  THIS IS NOT GOING TO REQUIRE

**3**  A LOT.  BUT IT OCCURS TO ME THAT LEAVING IN THE

**4**  HEADINGS UNDER THE *PLAINTIFF'S BURDEN* -- SO IF WE

**5**  LOOK AT -- I THINK IT'S ON PAGE 4 -- ALL THOSE

**6**  HEADINGS WILL BE TAKEN OUT, INCLUDING THE *PLAINTIFF'S*

**7**  *BURDEN* HEADING WILL BE TAKEN OUT.

**8**       BUT *PROTECTED ACTIVITY* AND *ACTUAL OR*

**9**  *CONSTRUCTIVE KNOWLEDGE* AND *CONTRIBUTING FACTOR* I

**10**  WOULD PROPOSE -- BUT THE COURT WON'T KEEP THEM IN IF

**11**  Y'ALL DON'T WANT ME TO.  BUT I WOULD PROPOSE TO LEAVE

**12**  THOSE THREE KIND OF SUBHEADINGS IN, JUST IN THE EVENT

**13**  THAT THE JURY TAKES THIS BACK -- WHAT I'VE SEEN

**14**  HAPPEN IN THE PAST IS THEY'LL COME BACK WITH A

**15**  QUESTION, AND THE QUESTION IS CLEARLY IN THE JURY

**16**  INSTRUCTIONS.  BUT WHEN YOU HAVE 12 PAGES, IT'S HARD

**17**  FOR THEM TO FIND IT.  SO IT MAY KEEP US FROM HAVING

**18**  TO DIRECT THEM TO THE -- AND I TYPICALLY WILL JUST

**19**  SAY "YOU'RE DIRECTED TO THE JURY INSTRUCTIONS" AND

**20**  THEY HAVE TO GO HUNT AROUND SOME MORE.

**21**       SO WITH Y'ALL'S PERMISSION, I WOULD

**22**  PROPOSE TO LEAVE IN *PROTECTED ACTIVITY, ACTUAL OR*

**23**  *CONSTRUCTIVE KNOWLEDGE* AND *CONTRIBUTING FACTOR*.  BUT

**24**  I DON'T HAVE TO.

**25**       **MR. SMITH:**  THAT'S FINE WITH PLAINTIFFS,

1    YOUR HONOR.

2           **MS. SCHOONMAKER:**  THAT'S FINE WITH

3    DEFENDANTS, YOUR HONOR.

4           AND AT AN APPROPRIATE TIME, I ALSO HAVE

5    A QUESTION FOR THE COURT.

6           **THE COURT:**  OKAY.  I'M SORRY.  YOU SAID YOU

7    HAD A QUESTION?

8           **MS. SCHOONMAKER:**  FOR THE COURT.  IF THIS IS

9    AN APPROPRIATE TIME.

10          **THE COURT:**  YEAH, GO AHEAD.

11          **MS. SCHOONMAKER:**  DURING THE COURSE OF THE

12   TRIAL WE HAVE ADMITTED SEVERAL ADDITIONAL EXHIBITS.

13   SHOULD WE REACH AN AGREEMENT AS TO WHICH EXHIBITS ARE

14   CURRENTLY IN EVIDENCE SO THEY CAN BE SENT BACK TO THE

15   JURY, JUST SO WE DON'T HAVE ANY DISCREPANCY?

16          **THE COURT:**  YOU CAN COLLABORATE WITH THE

17   COURTROOM DEPUTY AND MAKE SURE SHE'S --

18          **THE COURTROOM DEPUTY:**  I'M GOING TO GIVE YOU

19   THE LIST.

20          **THE COURT:**  YEAH.

21          **MS. SCHOONMAKER:**  THANK YOU.  EVEN BETTER.

22          **THE COURT:**  SHE CAN GIVE YOU THE LIST AND

23   Y'ALL CAN LOOK.  AND IF YOU THINK THERE WAS ONE THAT

24   YOU GOT IN THAT WE DON'T SHOW YOU HAVE GOTTEN IN,

25   THEN WE CAN --

1    **THE COURTROOM DEPUTY:**  CHECK THE RECORD.

2    **THE COURT:**  -- WE CAN DEAL WITH THAT.  WE

3  CAN CHECK THE RECORD AND DEAL WITH THAT.

4    **MS. SCHOONMAKER:**  THANK YOU, YOUR HONOR.

5  THAT'S ALL FOR DEFENDANT.

6    **THE COURT:**  ANY OTHER HOUSEKEEPING OR OTHER

7  MATTERS?

8    OKAY.  WELL, LET'S GET STARTED -- I'LL

9  LEAVE THOSE THREE HEADINGS IN.  ALL THE OTHER

10  HEADINGS WILL COME OUT.  LET'S GET STARTED AT

11  STRAIGHT-UP NINE O'CLOCK AND THEN WE WILL SEE WHERE

12  IT TAKES US.  WE STAND IN RECESS.

13    **(WHEREUPON, THE PROCEEDINGS WERE**

14  **ADJOURNED UNTIL NOVEMBER 4, 2021, AT 9:00 A.M.)**

15    **C E R T I F I C A T E**

16    **I CERTIFY THAT THE FOREGOING IS A CORRECT**

17  **TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE**

18  **ABOVE-ENTITLED NUMBERED MATTER.**

19  **S:/NATALIE W. BREAUX**

20  **NATALIE W. BREAUX, RPR, CRR**

21  **OFFICIAL COURT REPORTER**

22

23

24

25