1      UNITED STATES DISTRICT COURT

2      MIDDLE DISTRICT OF LOUISIANA

3

4   JOHNNY TAYLOR                    : CIVIL ACTION

5   VERSUS                           : NO. 18-1110

6   UNION PACIFIC RAILROAD           : NOVEMBER 4, 2021

7   COMPANY, INC.                    : VOLUME IV OF IV

8   ================================================================
      **TRIAL BY JURY BEFORE**
9      **THE HONORABLE SHELLY D. DICK**
      **UNITED STATES CHIEF DISTRICT JUDGE**
10  ================================================================

11      A P P E A R A N C E S

12  FOR THE PLAINTIFF:

13      BY:  J. ARTHUR SMITH, III, ESQ.
              ROBERT M. SCHMIDT, ESQ.
14      SMITH LAW FIRM
        803 NORTH STREET
15      BATON ROUGE, LOUISIANA 70802

16  FOR THE DEFENDANT:

17      BY:  DAVID A. FRASER, ESQ.
        FRASER, WHEELER, BERGSTEDT & COURTNEY, LLP
18      4350 NELSON ROAD
        LAKE CHARLES, LOUISIANA 70606

19

20      BY:  LINDA C. SCHOONMAKER, ESQ.
              BRIAN A. WADSWORTH, ESQ.
21      700 MILAM STREET, SUITE 1400
        HOUSTON, TEXAS  77002

22

23          **REPORTED BY: GINA DELATTE-RICHARD,CCR**

24          **UNITED STATES COURTHOUSE**
            **777 FLORIDA STREET**
25          **BATON ROUGE, LOUISIANA 70801**
            **(225) 389-3564**

| | |
|---|---|
| 1 | (NOVEMBER 4, 2021) |
| 2 | (CLOSING ARGUMENTS) |
| 3 | THE COURT:  OKAY.  GOOD MORNING. |
| 4 | IS THERE ANYTHING THAT WE NEED TO DISCUSS BEFORE THE |
| 5 | JURY COMES IN? |
| 6 | MR. SMITH:  NOT FROM THE PLAINTIFF'S STANDPOINT, |
| 7 | YOUR HONOR. |
| 8 | THE COURT:  EVERYTHING GOOD? |
| 9 | MS. SHOONMAKER:  NOTHING FROM DEFENDANT. |
| 10 | THE COURT:  ALL RIGHT.  LET'S BRING THE JURY IN. |
| 11 | MR. SCHMIDT, WILL YOU BE CLOSING? |
| 12 | MR. SCHMIDT:  MR. SMITH IS. |
| 13 | THE COURT:  MR. SMITH, IF YOU WANT TO RESERVE TIME, |
| 14 | YOU'LL NEED TO LET ME KNOW HOW MUCH TIME YOU WANT TO RESERVE. |
| 15 | MR. SMITH:  I'D LIKE TO RESERVE 15 MINUTES, YOUR |
| 16 | HONOR. |
| 17 | THE COURT:  15 MINUTES, OKAY. |
| 18 | MR. SMITH:  YES, YOUR HONOR. |
| 19 | GOOD MORNING.  BE SEATED. |
| 20 | OKAY, LADIES AND GENTLEMEN, WE HAVE REACHED THE |
| 21 | POINT WHERE THE LAWYERS ARE GOING TO PRESENT CLOSING |
| 22 | ARGUMENTS.  THEY HAVE A STRICT LIMIT OF NOT TO EXCEED ONE |
| 23 | HOUR. |
| 24 | MR. SMITH HAS INDICATED TO THE COURT THAT HE'S GOING |
| 25 | TO RESERVE 15 MINUTES FOR WHAT'S KNOWN AS A REBUTTAL CLOSING. |

1  SO FIRST YOU'LL HEAR FROM MR -- WELL, FIRST YOU'LL HEAR FROM

2  THE PLAINTIFFS, THEN FROM THE DEFENDANTS AND THEN THE

3  PLAINTIFFS CAN REBUT MOMENTARILY OR FOR A FEW MINUTES AND THE

4  COURT WILL KEEP A TIMER.

5           MR. SMITH, YOU MAY PROCEED.

6                **(PLAINTIFF'S CLOSING ARGUMENT)**

7           **MR. SMITH:**  FIRST OFF, I WANT TO THANK YOU FOR YOUR

8  SERVICE.  I KNOW YOU HAVE IMPORTANT THINGS TO DO IN YOUR LIVES

9  AND I APPRECIATE YOUR SERVICE.  OUR JUDICIAL SYSTEM COULDN'T

10 FUNCTION UNLESS PEOPLE LIKE YOU ARE WILLING TO DO THEIR DUTY.

11          I JUST WANT TO TELL YOU AT THE OUTSET THAT -- AND I

12 THINK YOU PROBABLY KNOW THIS -- BUT JURIES HAVE TREMENDOUS

13 DUTIES AND RESPONSIBILITIES UNDER OUR SYSTEM OF JUSTICE.

14          IN THIS CASE, AND IN MANY OTHER CASES, YOU HAVE THE

15 ACTUAL POWER TO RIGHT A WRONG IN THIS CASE BY YOUR VERDICT.

16 BUT AS I MENTIONED TO YOU, THIS CASE IS LARGER THAN JOHNNY

17 TAYLOR.  THIS IS ABOUT RAILROAD SAFETY AND THIS IS ABOUT THE

18 PROTECTION OF OUR CHILDREN AND OUR GRANDCHILDREN FROM THE

19 CRUSHING EFFECTS -- POTENTIAL CRUSHING EFFECTS OF DERAILMENTS.

20          AND MR. TAYLOR WAS TRYING TO DO THE RIGHT THING AND

21 CARRY OUT HIS RESPONSIBILITIES AND WE BELIEVE WE HAVE PROVEN

22 THAT AND WE'D LIKE TO ASK YOU TO SEND A MESSAGE TO UNION

23 PACIFIC AND OTHER RAILROAD COMPANIES WHO -- WHO -- WHO

24 RETALIATE AGAINST PEOPLE FOR DOING THE RIGHT THING IN -- IN

25 THESE CASES.

1      I WANT TO FIRST GIVE YOU -- THERE'S BEEN A LOT OF

2   DETAIL IN THIS CASE, AND I THINK IT WAS PROBABLY NECESSARY,

3   BUT I'D LIKE TO ASK YOU TO FOCUS ON THE TREES RATHER THAN THE

4   LEAVES.  DON'T GET HUNG UP IN THE MINOR DETAILS.

5      ONE OF THE THINGS -- ONE OF THE THINGS TO KEEP IN

6   MIND IS THAT ONE OF OUR MAIN CLAIMS IS THAT THE TERMINATION IS

7   THE MAIN FORM OF RETALIATION.  HE WAS TERMINATED BECAUSE HE

8   EXERCISED HIS PROTECTED ACTIVITY.  AND LOOKING AT KENNETH

9   STUART'S TESTIMONY KIND OF GIVES YOU A GOOD BIRD'S EYE VIEW

10  INTO THIS.

11      HE SAID THAT HE RECOMMENDED THE DECISION TO

12  TERMINATE MR. TAYLOR TO JACOB GILSDORF WHO PASSED IT ON THE

13  LINE TO MR. WHEELAND WHO DID THE FINAL DEED.  KENNETH STUART

14  TESTIFIED THAT MR. TAYLOR WAS "DEFIANT" AND "INSUBORDINATE."

15  AND HE SAID HE -- HE SAID THAT BECAUSE HE FELT THAT WAY

16  BECAUSE MR. TAYLOR SAID HE WAS NOT GOING TO PUT THE TRACK BACK

17  IN SERVICE.  THAT'S CLEAR -- THAT'S CLEAR RETALIATION.  AND,

18  YOU KNOW, THESE WORDS LIKE *DEFIANT* AND *INSUBORDINATION*, THESE

19  ARE SUBJECTIVE ADJECTIVES.  THEY DON'T IN AND OF THEMSELF MEAN

20  VERY MUCH.  THESE ARE ADJECTIVES THAT COMPANIES USE FROM TIME

21  TO TIME TO JUSTIFY DISCRIMINATION, JUST BY SAYING THOSE KINDS

22  OF ADJECTIVES WITHOUT ANY REAL PROOF OF THEM.

23      MR. STUART WENT ON TO SAY THAT WHAT THEY SPOKE

24  ABOUT, HE AND MR. TAYLOR, WAS MR. TAYLOR'S, AND I QUOTE, "WAY

25  OF TELLING ME HE WAS NOT GOING TO PUT IT BACK IN SERVICE."

1   THAT'S WHAT HE CHARACTERIZED AS INSUBORDINATION AND DEFIANCE.

2   AND NO MATTER HOW YOU CUT IT THAT IS DISCRIMINATION AND THE

3   USE OF THOSE WORDS IS SIMPLY A MASK OR A COVER FOR

4   DISCRIMINATION.

5        HE TESTIFIED THAT -- WELL, THE TESTIMONY IS, IS THAT

6   THIS RECOMMENDATION OF HE AND GILSDORF WAS SENT UP THE LINE

7   AND MR. WHEELAND MADE THE FINAL DECISION.

8        I WANT TO TURN TO THE JURY CHARGES.  THE COURT HAS

9   PROVIDED COUNSEL WITH COPIES OF THE JURY CHARGES THAT SHE WILL

10  GIVE TO YOU ABOUT WHAT THE LAW IS AND HOW IT APPLIES TO THIS

11  CASE.

12       BASICALLY FROM THE JURY CHARGES WE KNOW AND WE LEARN

13  THAT THE ELEMENTS OF THE CLAIM THAT MR. TAYLOR MUST PROVE BY A

14  PREPONDERANCE OF THE EVIDENCE, MORE LIKELY THAN NOT, NOT PROOF

15  BEYOND A REASONABLE DOUBT, IS THAT:

16       NUMBER ONE, HE ENGAGED IN ACTIVITY PROTECTED BY THE

17  FEDERAL RAILROAD SAFETY ACT.

18       NUMBER TWO, UNION PACIFIC WAS AWARE, ACTUAL OR

19  CONSTRUCTIVELY, THAT MR. TAYLOR ENGAGED IN PROTECTED ACTIVITY.

20       AND NUMBER THREE, THAT THE CIRCUMSTANCES OF THE CASE

21  RAISED AN INTERFERENCE THAT MR. TAYLOR'S PROTECTED ACTIVITY

22  WAS A CONTRIBUTING FACTOR TO HIS -- TO HIS TERMINATION.  AND

23  THAT CONTRIBUTING FACTOR LANGUAGE IS PRETTY IMPORTANT.

24       THE JUDGE WILL ALSO INSTRUCT YOU ABOUT WHAT

25  PROTECTED ACT -- ON EACH ELEMENT, AND WE'LL TELL YOU ABOUT

1    WHAT PROTECTED ACTIVITY IS UNDER THE LAW.  BASICALLY IT'S --

2    THE RAILROAD SAFETY ACT PROTECTS THE EMPLOYEES WHO REPORT IN

3    GOOD FAITH A HAZARDOUS SAFETY OR SECURITY CONDITION OR WHO

4    REFUSED TO AUTHORIZE THE USE OF A TRACK UNDER CERTAIN

5    CIRCUMSTANCES.

6            THE COURT WILL ALSO INSTRUCT YOU THAT ENTERING SLOW

7    ORDERS OR REMOVING TRACKS FROM SERVICE BECAUSE OF A DEFECT AND

8    REFUSING TO OBEY UNSAFE ORDERS CONSTITUTE PROTECTED ACTIVITY.

9            SO THERE'S A LOT OF PROTECTED ACTIVITY IN THIS CASE,

10   AND I THINK THAT'S BEEN CLEARLY PROVEN.  SORT OF THE

11   CATEGORIES OF THE PROTECTED ACTIVITY -- THERE'S BASICALLY FOUR

12   CATEGORIES:  REMOVING TRACKS FROM SERVICE ON THREE OCCASIONS,

13   REFUSING TO PLACE A TRACK BACK IN SERVICE, ISSUING SLOW ORDERS

14   AND REPORTING UNSAFE CONDITIONS.

15           MR. TAYLOR MUST SHOW BY A PREPONDERANCE OF THE

16   EVIDENCE THAT HE ACTED IN GOOD FAITH.  WELL, HE DID.  I THINK

17   THE EVIDENCE CLEARLY SHOWS THAT.  HE THOUGHT HE WAS DOING HIS

18   JOB.  THEY TALK ABOUT SWITCH 16 A LITTLE BIT, THAT WAS ONE OF

19   THE THINGS THAT WAS DISCUSSED A LOT IN THE CASE.  THE EVIDENCE

20   SHOWS THAT MR. TAYLOR MEASURED THE TRACK ON NOVEMBER 24TH,

21   2017 AND AGAIN ON JANUARY 4TH, 2018.

22           THERE'S NO EVIDENCE THAT'S BEEN SUBMITTED IN THIS

23   TRIAL THAT THOSE MEASUREMENTS WERE NOT ACCURATE.  AND THERE'S

24   NO EVIDENCE THAT HAS BEEN SUBMITTED IN THIS TRIAL THAT THOSE

25   MEASUREMENTS WERE NOT PROPERLY TAKEN.  THEY WERE DONE AND

1    APPROVED BY BOTH MR. TAYLOR, THE CIVIL ENGINEER, MANAGER OF

2    TRACK MAINTENANCE AND MR. NICHOLAS ISAAC WHO WAS THE TRACK

3    INSPECTOR ACTING UNDER HIM.  THEY CONCURRED.  THESE

4    MEASUREMENTS SHOWED THAT THE TRACK WAS OUT OF ALIGNMENT,

5    SEVERELY OUT OF ALIGNMENT, AND THE SWITCHES WERE TOO SMALL.

6              MR. TAYLOR ALSO MET WITH THE MANAGER OF PROJECT'S

7    DESIGN FROM OMAHA CHARLES POWERS TO LOOK AT THE TRACK AND

8    MR. POWERS CONCURRED WITH MR. TAYLOR'S OPINION.  MR. KENNETH

9    STUART TESTIFIED THAT IF THE MEASUREMENTS WERE CORRECT THAT

10   MR. TAYLOR HAD DONE, THEN THE TRACK SHOULD NOT BE IN SERVICE.

11   BUT HE INSISTED ON MEASUREMENTS -- HE INSISTED ON NEW

12   MEASUREMENTS WHERE THERE'S NO EVIDENCE THAT THE OLD -- I SAY

13   OLD.  I MEAN THEY WERE TAKEN LAST ON JANUARY 4TH.  YOU KNOW,

14   NO EVIDENCE THAT THEY WERE NOT ACCURATE OR NOT PROPERLY DONE.

15             AND THIS IS PARTICULARLY TRUE SINCE YOU NEED TO

16   CONSIDER THAT THERE WERE THREE DERAILMENTS ON THIS TRACK IN A

17   TWO-MONTH PERIOD.  THREE DERAILMENTS.  SO WE SUBMIT THAT

18   MR. TAYLOR WAS OBVIOUSLY ACTING IN GOOD FAITH WHEN HE TOOK

19   THIS TRACK OUT OF SERVICE.  IT WAS DANGEROUS.  IT COULD HAVE

20   KILLED SOMEBODY.  IT COULD HAVE CRUSHED A CHILD.  IT COULD

21   HAVE CRUSHED A SWITCHMAN.  YOU KNOW, THERE'S A HUGE DANGER

22   ASSOCIATED WITH THESE TRAINS.

23             ANOTHER ACTIVITY, PROTECTED ACTIVITY, THAT THE

24   EVIDENCE SHOWS THAT MR. TAYLOR ACTED IN GOOD FAITH WAS THE

25   AVONDALE TAIL TRACK, TAKING IT OUT OF SERVICE MARCH 28TH,

1   2017.  MR. TAYLOR AND MR. ISAAC AT THE TIME DETERMINED THAT

2   THE SWITCHES NEEDED TO BE REPLACED AND THEY WERE TOO CLOSE

3   TOGETHER.  MARK -- THE EVIDENCE SHOWS THAT MARK OLDHAM, WHO IS

4   MR. STUART'S PREDECESSOR, HAD THE JOB THAT MR. STUART HELD

5   AFTER MR. STUART CAME INTO OFFICE, BUT MR. OLDHAM AGREED TO

6   THE REPAIRS THAT NEEDED TO BE DONE AND MR. TAYLOR DID THEM

7   AFTER THE FUNDING WAS SECURED.

8         ANOTHER PROTECTED ACTIVITY IS WITH THE MAIN LINE --

9   NUMBER ONE MAIN LINE.  MR. TAYLOR DETERMINED THAT THERE WAS A

10   DEFECTIVE FROG AND HE REPAIRED IT THAT DAY.  SLOW ORDERS IS

11   ALSO A FORM OF REPORTING ACCORDING TO THE LAW.  THE WHITE

12   CASTLE SLOW ORDER WAS DONE AND REFUSING TO TAKE THE TRACK OFF

13   THE SLOW ORDER WAS DONE PURSUANT TO UNION PACIFIC POLICY THAT

14   IF THERE'S A HIGH VTI A SLOW ORDER IS APPROPRIATE.

15         THERE'S JUST NOTHING -- THERE'S NOTHING IN THIS

16   RECORD THAT SHOWS MR. TAYLOR WAS NOT ACTING IN GOOD FAITH.  HE

17   WAS SIMPLY DOING HIS JOB AND TRYING TO DO THE RIGHT THING.

18         THE NEXT CATEGORY OF PROTECTED ACTIVITY THAT THIS

19   EVIDENCE HAS SHOWN IS REPORTS OF SAFETY VIOLATIONS.  THE ACT

20   ALSO PROHIBITS RAILROADS FROM RETALIATING AGAINST EMPLOYEES

21   WHO PROVIDE INFORMATION TO OR PARTICIPATE IN AN INVESTIGATION

22   BY REPORTING POTENTIAL VIOLATIONS OF LAW EITHER TO THE FEDERAL

23   RAILROAD ADMINISTRATION OR PERSON WITH SUPERVISORY AUTHORITY

24   OVER MR. TAYLOR.  THE EVIDENCE CLEARLY SHOWS THAT THAT

25   OCCURRED IN THIS CASE.

1    THIS IS -- THERE'S JUST NOT ANY EVIDENCE TO THE FACT

2  THAT MR. TAYLOR DID NOT MAKE THESE REPORTS.  AND THERE'S NOT

3  ANY EVIDENCE THAT HE DIDN'T ACT IN GOOD FAITH.  HE HONESTLY

4  BELIEVED THOSE COMPLAINTS AND HE TOLD YOU WHY AND EXPLAINED TO

5  YOU WHY.

6    THE NEXT ELEMENT, THAT'S WHAT THE LAW CALLS PARTS OF

7  THE CASE, THE NEXT ELEMENT IS THAT UNION PACIFIC KNEW OR

8  SHOULD HAVE KNOWN ABOUT THE PROTECTED ACTIVITY.  IT'S OBVIOUS

9  THAT THEY KNEW OR SHOULD HAVE KNOWN ABOUT THAT.  IF THEY

10  DIDN'T KNOW THEY SHOULD HAVE KNOWN AND THEY SHOULD HAVE PICKED

11  UP THE PHONE AND FOUND OUT ABOUT IT.

12    I MEAN THE FINAL LETTER THAT MR. GILSDORF SENDS

13  MR. WHEELAND, YOU KNOW, REFERS TO MR. TAYLOR'S WHISTLEBLOWING

14  ACTIVITY.  SPECIFICALLY REFERS TO IT.  SO THAT WAS

15  SPECIFICALLY CONSIDERED IN THE TERMINATION DECISION.  DID

16  MR. WHEELAND PICK UP THE PHONE AND SAY, *WHAT IS THIS ABOUT THE*

17  *WHISTLEBLOWING ACTIVITY?  MAYBE I SHOULD LOOK INTO THIS.*  NO.

18  NO.  HE NEVER EVEN TALKED TO MR. TAYLOR.  SO THEY EITHER KNEW

19  OR SHOULD HAVE KNOWN ABOUT -- YOU KNOW, ABOUT THIS PROTECTED

20  ACTIVITY.

21    FURTHER, THE TESTIMONY SHOWS THAT KENNY STUART KNEW

22  AND IT'S UNDISPUTED THAT MR. TAYLOR TOOK TRACK 16 OUT OF

23  SERVICE -- SWITCH 16 OUT OF SERVICE.  THE EVIDENCE ALSO SHOWS

24  THAT MR. TAYLOR REFUSED TO PUT IT BACK INTO SERVICE AND

25  MR. TAYLOR AND MR. WHEELAND BOTH TESTIFIED THAT HE DID REFUSE

1    TO PUT IT BACK IN SERVICE.

2            JACOB GILSDORF, IT'S UNDISPUTED THAT MR. TAYLOR

3    ISSUED THE SLOW ORDER.  THE EVIDENCE ALSO SHOWS THAT

4    MR. TAYLOR REFUSED TO TAKE IT OFF.  MR. TAYLOR TESTIFIED THAT

5    GILSDORF TOLD HIM TO TAKE THE TRACK OFF THE SLOW ORDER AND

6    MR. TAYLOR DECLINED TO DO SO.  IT'S ALSO CLEAR THAT GILSDORF

7    KNEW THAT MR. TAYLOR HAD FILED A WHISTLEBLOWER COMPLAINT AS HE

8    PUT IT IN THE E-MAIL THAT WAS THE BASIS FOR THE TERMINATION

9    DECISION BY MR. WHEELAND SPECIFICALLY REFERENCING

10   WHISTLEBLOWER ACTIVITY.  SO OBVIOUSLY THEY KNEW WHAT WAS GOING

11   ON.  THEY WERE JUST TRYING TO COVER IT UP.

12           THIS IS ONE OF THE THINGS IN THESE KIND OF

13   RETALIATION CASES THAT YOU HAVE TO KEEP IN MIND.  IT'S LIKE A

14   DISCRIMINATION CASE.  EMPLOYERS DON'T COME OUT AND SAY WELL,

15   WE DISCHARGED MR. JONES BECAUSE HE'S AN AFRICAN AMERICAN.  OR

16   THEY DISCHARGED MS. BROWN BECAUSE OF HER GENDER.  THE

17   EMPLOYERS KNOW THAT THOSE KINDS OF DISCRIMINATORY DISCHARGES

18   ARE ILLEGAL.

19           SO WHAT DO THEY DO?  THEY TRY TO COVER IT UP.  THEY

20   TRY TO PROVIDE MASKS FOR DISCRIMINATION/RETALIATION AND THOSE

21   ARE CALLED PRETEXT, AND WE BELIEVE THERE'S PLENTY OF EVIDENCE

22   OF PRETEXT IN THIS CASE.

23           THE EVIDENCE ALSO SHOWS THAT MR. STUART RECOMMENDED

24   THE TERMINATION THAT MR. WHEELAND USED -- RECOMMENDED THE

25   TERMINATION OF MR. TAYLOR.  MR. WHEELAND KNEW THAT MR. TAYLOR

1  HAD TAKEN SWITCH 16 OUT OF SERVICE, THAT MR. TAYLOR REFUSED TO

2  PUT IT BACK INTO SERVICE, THAT MR. TAYLOR HAD ISSUED THE SLOW

3  ORDER AND THAT MR. TAYLOR HAD SUBMITTED WHISTLEBLOWER

4  COMPLAINTS.

5          MR. WHEELAND TESTIFIED THAT MR. GILSDORF TOLD HIM

6  THAT BOTH MR. GILSDORF AND MR. STUART TOLD MR. TAYLOR TO PUT

7  SWITCH 16 BACK IN SERVICE.

8          NOW, THE NEXT -- THE NEXT ELEMENT OR PART OF THE

9  CASE, AND THE JUDGE WILL INSTRUCT YOU, IS THE PROOF OF

10  CONTRIBUTING FACTOR.

11          WE DON'T HAVE TO PROVE -- THE PLAINTIFF DOES NOT

12  HAVE TO PROVE THAT THE PROTECTED ACTIVITY WAS THE SOLE CAUSE

13  OF THE TERMINATION.  WE MERELY HAVE TO SHOW THAT -- THAT IT

14  WAS A CONTRIBUTING FACTOR.  AND THE COURT HAS APTLY DESCRIBED

15  CONTRIBUTING FACTOR IN HER INSTRUCTIONS AND I'M JUST GOING TO

16  TELL YOU A LITTLE BIT MORE ABOUT THAT.

17          A CONTRIBUTING FACTOR IS ANY FACTOR WHICH ALONE OR

18  IN CONNECTION WITH OTHER FACTORS TENDS TO AFFECT IN ANY WAY

19  THE OUTCOME OF THE DECISION.  JOHNNY TAYLOR IS NOT REQUIRED TO

20  SHOW THAT HIS PROTECTED ACTIVITY WAS A SIGNIFICANT,

21  MOTIVATING, SUBSTANTIAL OR PREDOMINANT FACTOR IN UNION

22  PACIFIC'S DECISION TO TERMINATE MR. TAYLOR.  SO THAT IS WHAT

23  WE ARE REQUIRED TO PROVE.  THAT IS WHAT WE PROVED AND WE

24  PROVED IT IN SEVERAL WAYS.  ONE IS WHAT IS CALLED TEMPORAL

25  PROXIMITY.

1    MS. JOHNSON, CAN YOU PULL THE TIMELINE UP, PLEASE.

2    THIS IS A LITTLE TIMELINE THAT WE'VE PREPARED BASED

3    ON THE EVIDENCE.  AND WHAT I'M GOING TO TELL YOU, THE TERM

4    *TEMPORAL PROXIMITY*, THAT'S A LEGAL TERM.  BUT WHAT IT MEANS IS

5    THERE'S A SHORT PERIOD OF TIME BETWEEN THE PROTECTED ACTIVITY

6    AND THE ADVERSE ACTION.  AND THAT'S HELPFUL, OR SHOULD BE

7    HELPFUL TO YOU, IN DETERMINING WHETHER THERE'S A CAUSAL

8    RELATIONSHIP BETWEEN THE PROTECTED ACTIVITY AND THE

9    TERMINATION.

10    12-29-2017 MR. TAYLOR RECEIVES A POSITIVE

11    PERFORMANCE REVIEW FROM MR. KENNY STUART.  AND HE SAID, AND I

12    QUOTE, "DON'T BE AFRAID TO BRAG ON YOURSELF," END QUOTE.  AND

13    THEN HE RECEIVES OR QUALIFIES FOR A $15,000 PERFORMANCE-BASED

14    BONUS, ALSO AT THE END OF 2017.

15    BUT THEN THE PROTECTED ACTIVITY COMES IN HERE.

16    01-10-2018, MR. TAYLOR TAKES SWITCH 16 OUT OF SERVICE.

17    MR. TAYLOR REFUSES TO PUT SWITCH 16 BACK IN SERVICE AS

18    DIRECTED BY MR. STUART.

19    TWELVE -- 01-22-18, MR. TAYLOR ISSUES A SLOW ORDER

20    ON A TRACK IN WHITE CASTLE.  MR. TAYLOR REFUSES TO REMOVE THE

21    SLOW ORDER AS DIRECTED BY MR. GILSDORF AND MR. TAYLOR REFUSES

22    TO PUT SWITCH 16 BACK IN SERVICE AS DIRECTED BY MR. GILSDORF.

23    A FEW WEEKS -- THE NEXT MONTH MR. TAYLOR IS

24    PRESENTED WITH A PERFORMANCE IMPROVEMENT PLAN, SO-CALLED

25    PERFORMANCE IMPROVEMENT PLAN, WHICH HE DOES NOT SIGN, AND

1    FEBRUARY 27, 2018 MR. TAYLOR IS TERMINATED.

2            SO THAT IS A CLEAR PATTERN OF ACTIVITY.  I MEAN

3    ACCORDING -- ACCORDING TO UNION PACIFIC'S ARGUMENT, FROM

4    DECEMBER 29TH, 2017 TO FEBRUARY 27TH, 2018, MR. TAYLOR

5    SUDDENLY CHANGED AFTER TEN AND A HALF YEARS OF SUCCESSFUL

6    EMPLOYMENT.  THAT'S JUST NOT VERY LIKELY IN THE REAL WORLD AND

7    WE ASK YOU TO USE YOUR COMMON SENSE.

8            PEOPLE DON'T CHANGE LIKE THAT.  I MEAN HE WAS -- HE

9    WAS A VALUABLE EMPLOYEE AND YOU DON'T HAVE THAT CHANGE.  WHAT

10   YOU HAVE IS CREEPING IN HERE IN JANUARY OR IT IS -- EXERCISES

11   A PROTECTED ACTIVITY AND UNION PACIFIC'S RESISTANCE TO IT.

12   AND FINALLY SAYING, *WELL, YOU KNOW, WE'VE GOT TO GET RID OF*

13   *THIS GUY BECAUSE THIS IS PROTECTED ACTIVITY*.  THEY DIDN'T SAY

14   THAT, THEY DIDN'T TESTIFY TO THAT, BUT THAT'S REALLY, REALLY

15   WHAT HAPPENED.

16           MR. STUART ALSO TESTIFIED -- FURTHER EVIDENCE OF

17   CONTRIBUTING FACTOR.  MR. STUART ALSO TESTIFIED THAT IT WAS

18   ARGUMENTATIVE FOR MR. TAYLOR TO TELL THEM THAT HE HAD A

19   LAWYER.  MR. STUART TESTIFIED THAT IT WAS NOT OKAY FOR

20   MR. TAYLOR TO PUT THE TRACK OUT OF SERVICE BECAUSE HE HAD --

21   TO TAKE THE TRACK OUT OF SERVICE BECAUSE HE HAD A GUT FEEL.

22   THAT'S NOT -- THAT'S WHAT MR. STUART TESTIFIED, BUT THAT'S NOT

23   THE REASON MR. TAYLOR TOOK THE TRACK OUT OF SERVICE.  HE TOOK

24   IT OUT BECAUSE OF HIS MEASUREMENTS AND THE CONCURRENCE BY TWO

25   HIGHLY QUALIFIED PEOPLE WHO PARTICIPATED AND AGREED WITH HIM.

1      THE NEXT PART OF THE CONTRIBUTING FACTOR ANALYSIS

2  THAT I THINK IS IMPORTANT, AND THE JUDGE WILL TELL YOU THAT

3  ONE OF THE THINGS THAT YOU CAN LOOK AT TO DETERMINE IF THERE'S

4  A CONTRIBUTING FACTOR SHOWN, IS A CHANGE -- CHANGE IN

5  DEFENDANTS' ATTITUDE AFTER HE ENGAGED IN PROTECTED ACTIVITY.

6      WELL, YOU KNOW, THAT IS EVIDENT.  THAT IS EVIDENT

7  FROM THIS TIMELINE.  HE WAS A GREAT EMPLOYEE IN DECEMBER 2017.

8  HE GETS A $15,000 PERFORMANCE BONUS.  AND THEN, YOU KNOW, WHAT

9  HAPPENS TWO MONTHS LATER AFTER THE PROTECTED ACTIVITY.  WELL,

10  IT'S CERTAINLY A BIG CHANGE IN ATTITUDE.

11      MR. STUART TESTIFIED -- MR. STUART TESTIFIED THAT

12  MR. TAYLOR WAS A, QUOTE, "PRETTY GOOD TRACK GUY," QUOTE, "DID

13  PRETTY GOOD WORK."  MR. STUART TESTIFIED THAT THERE WAS NO

14  REASON THAT WE COULDN'T WORK THROUGH WHAT WE WERE GOING

15  THROUGH.  OBVIOUSLY THEY WERE HAVING SERIOUS PROBLEMS AND

16  OBVIOUSLY THEY WERE TRYING TO WORK THROUGH THE SOLUTION, BUT

17  THE SOLUTION THEY CHOSE IS TO GET RID OF THE WATCHDOG AND

18  THAT'S A CLASSIC, CLASSIC KIND OF COVERUP.

19      THE DEFENDANT KEEPS SAYING THAT MR. TAYLOR ENGAGED

20  IN PROTECTED ACTIVITY THE WHOLE TIME HE WORKED THERE; TOOK

21  TRACKS OUT OF SERVICE ALL THE TIME.  BUT THE FACT OF THE

22  MATTER IS THAT IN 2017 WAS THE FIRST DAY THAT HE TOOK THE

23  TRACK OUT OF SERVICE FOR MORE THAN A DAY.  BOTH THE TAIL TRACK

24  AND SWITCH 16 WERE BIG PROJECTS THAT NEEDED TO BE DONE.  AND

25  THE DIFFERENCE IN TAKING THOSE OUT OF SERVICE AND THE PRIOR

1  TRACK BEING TAKEN OUT OF SERVICE IS THAT THEY WERE JUST BIG

2  PROJECTS.  MR. TAYLOR'S MANAGERS AND SUPERVISORS HAD

3  PREVIOUSLY WORKED WITH HIM AND HELPED HIM THROUGH THESE TYPES

4  OF ISSUES.

5          SO THAT'S -- THAT'S THE PLAINTIFF'S CASE IN TERMS OF

6  WHAT WE -- WHAT WE CALL OUR ELEMENTS OF PROOF.

7          BUT WHAT DOES THE DEFENDANT SAY?  WELL, YOU'LL HAVE

8  TO HEAR FROM MR. FRASER TO TELL YOU WHAT THE DEFENDANTS SAY,

9  BUT THE WAY I HEARD IT WAS, WELL, EVEN IF HE ENGAGED IN

10 PROTECTED ACTIVITY AND EVEN IF WE RETALIATED AGAINST HIM WE

11 WOULD HAVE FIRED HIM ANYWAY.  AND THAT THE JUDGE WILL TELL YOU

12 IS A LEGALLY VALID DEFENSE IF IT'S PROVEN.

13         THE JUDGE WILL ALSO TELL YOU THAT THE DEFENDANT HAS

14 THE BURDEN OF PROVING THAT BY WHAT IS CALLED CLEAR AND

15 CONVINCING EVIDENCE.  IT'S BETWEEN -- PREPONDERANCE IS JUST

16 MORE LIKELY THAN NOT.  PROOF BEYOND A REASONABLE DOUBT IN A

17 CRIMINAL CASE IS A VERY STEEP, HARD BURDEN.  CLEAR AND

18 CONVINCING IS IN BETWEEN THAT.

19         BUT WHAT IT MEANS -- AS I SAY, IT'S A HARD BURDEN.

20 THE DEFENDANT MUST ESTABLISH THIS CLAIM BY EVIDENCE -- AND I'M

21 QUOTING FROM THE INSTRUCTIONS -- "SO CLEAR, DIRECT, WEIGHTY

22 AND CONVINCING AS TO ENABLE YOU TO COME TO A CLEAR CONVICTION

23 WITHOUT HESITANCY."  THAT'S WHAT CLEAR AND CONVINCING EVIDENCE

24 IS.

25         I BELIEVE, AND RESPECTFULLY SUBMIT, THAT THE

1    DEFENDANT UNION PACIFIC HAS NOT PROVED THAT THEY WOULD HAVE

2    FIRED MR. TAYLOR ANYWAY.  AND I'M GOING TO GO BACK TO THAT,

3    BUT I WANT TO TALK TO YOU ABOUT THIS SO-CALLED PERFORMANCE

4    IMPROVEMENT PLAN.

5         MR. TAYLOR TESTIFIED THAT HE BELIEVED THAT THIS

6    WOULD BE USED TO JUSTIFY HIS TERMINATION RATHER THAN HELP HIM.

7    MR. TAYLOR ALSO SAID THAT HE FELT THAT THE PIP WOULD REQUIRE

8    HIM TO PUT UNSAFE TRACKS BACK INTO SERVICE.  HE FELT IT WAS

9    MORE OF THE PATTERN OF PUSHBACK, MORE OF THE PATTERN OF

10   RESISTANCE THAT HE EXPERIENCED IN CONNECTION WITH UNION

11   PACIFIC'S RESPONSE TO HIS PROTECTED ACTIVITY.  BUT WHATEVER

12   THE REASON HE DID NOT SIGN, THAT DOESN'T MEAN THAT UNION

13   PACIFIC DIDN'T RETALIATE AGAINST HIM.  IT IS AN EXCUSE THEY

14   HAVE MADE, BUT IT DOESN'T FOLLOW THAT -- EVEN IF HE SHOULD

15   HAVE SIGNED THE PIP, THEN I UNDERSTAND MR. TAYLOR'S TESTIMONY

16   AS TO WHY HE DID NOT.  BUT IF YOU CONCLUDE THAT EVEN IF HE

17   SHOULD HAVE, WELL THAT STILL DOESN'T MEAN THAT HE WASN'T

18   RETALIATED AGAINST.

19        NOW, YOU HAVE THE SITUATION WHERE IN A LOT OF TIMES

20   IN EMPLOYMENT IF THE SUPERVISOR SAYS SOMETHING YOU DO IT, AND

21   WE ALL KNOW THAT AND WE HAVE TO FOLLOW THE COMMANDS OF THE

22   SUPERVISOR.  BUT THIS SITUATION IS DIFFERENT.  THIS SITUATION

23   IS GOVERNED BY THIS FEDERAL RAILROAD ADMINISTRATION; THE

24   FEDERAL REGULATORY AUTHORITY.

25        MR. TAYLOR HAD RESPONSIBILITIES, AS HE EXPLAINED,

1  AS, QUOTE, "THE OWNER," END QUOTE, OF THE TRACK.  HE HAD

2  RESPONSIBILITIES ON THAT COMPLIANCE ORDER THAT COULD HAVE LED

3  TO HIM HAVING CRIMINAL PENALTIES OR CIVIL PENALTIES, AND HE

4  HAD A RESPONSIBILITY UNDER THE LAW TO PROTECT.  HE WAS THE

5  SAFETY MAN.  HE WAS THE WATCH DOG.  HE HAD THE RESPONSIBILITY

6  TO PROTECT THE SAFETY OF THE CITIZENS AND THE COMMUNITIES FROM

7  WHAT WOULD HAPPEN IN A DERAILMENT, WHAT WOULD HAPPEN IF THESE

8  CARS SPILLED TOXIC CHEMICALS ALL OVER THE PLACE.  THAT'S WHAT

9  THEY WERE CARRYING THROUGH SEVERAL COMMUNITIES, AND MR. TAYLOR

10  NAMED THOSE COMMUNITIES IN HIS TESTIMONY.

11      SO, YOU KNOW, IT'S -- IF YOU LOOK AT HIS CASE FROM

12  THE STANDPOINT OF THE LAW AND THE FACTS, IT ALL FITS TOGETHER

13  VERY WELL.  I KNOW THAT UNION PACIFIC HAS ITS EXCUSES,

14  BUT THEY'RE JUST THAT IN OUR VIEW.

15      LET'S TALK ABOUT THE TERMINATION A LITTLE BIT.  WE

16  RESPECTFULLY SUBMIT THAT UNION PACIFIC'S REASONS FOR

17  TERMINATION WERE FALSE, PRETEXTUAL OR NOT WORTHY OF GRIEVANCE.

18  MR. STUART WAS ASKED WHY HE RECOMMENDED TERMINATION.  THEY

19  SAID HE WAS INSUBORDINATE AND THAT'S WHAT HE SAID.

20      YOU NEED TO CONSIDER, I RESPECTFULLY SUBMIT, THE

21  OVERALL CONTEXT OF THE SITUATION.  WE'RE DEALING WITH A TEN

22  AND A HALF YEAR EMPLOYEE, GOOD PERFORMANCE EVALUATIONS, NOT

23  ONLY IN DECEMBER 2017, BUT FOR THE FOUR OR FIVE YEARS BEFORE

24  THAT.  ALL OF THOSE PERFORMANCE EVALUATIONS WERE VERY

25  CONSISTENT.  NO PRIOR DISCIPLINE, NO PRIOR REPRIMANDS.

1   THERE'S NOTHING IN THIS RECORD TO SHOW THAT HE WAS A PROBLEM

2   EMPLOYEE.

3          MS. SCHOONMAKER ACTUALLY TEST- -- STATED IN HER

4   OPENING STATEMENT THAT MR. TAYLOR WAS A, QUOTE, "VALUABLE

5   EMPLOYEE," END QUOTE, AND, QUOTE, "DID A VERY GOOD JOB," END

6   QUOTE.

7          NOW, WE BELIEVE IT'S VERY UNLIKELY THAT A PERSON OF

8   MR. TAYLOR'S CHARACTER WOULD QUICKLY TURN INTO AN

9   INSUBORDINATE EMPLOYEE.  AND SO I THINK IT'S IMPORTANT FOR YOU

10  TO CONSIDER MR. TAYLOR'S CHARACTER.  HE AND HIS WIFE ARE

11  SERIOUS PEOPLE.  THEY'RE SUBSTANTIAL PEOPLE.  THEY'VE BOTH

12  DONE WELL IN THEIR LIVES.  MR. TAYLOR HAD A VERY SERIOUS

13  SETBACK WITH UNION PACIFIC.  THEY'RE EDUCATED.  MR. TAYLOR HAS

14  TWO DEGREES; ONE IN CIVIL ENGINEERING AND ONE IN MATHEMATICS.

15  HE HAD THE RIGHT NOT TO COMPLY WITH AN ILLEGAL ORDER AND THEY

16  KNEW THAT.  AND SO IT JUST SEEMS TO ME, I RESPECTFULLY SUBMIT,

17  THAT THESE REASONS THAT THEY HAVE AT THE END ARE CONTRIVED.

18  THEY'RE MADE UP.  THEY MADE UP THESE SUBJECTIVE

19  CHARACTERIZATIONS AND CLAIMED THAT THE PROTECTED ACTIVITY --

20  BECAUSE HE EXERCISED THE PROTECTED ACTIVITY THAT HE WAS

21  INSUBORDINATE AND ALL OF THAT STUFF.

22          EVEN IF YOU GIVE SOME CREDIT TO WHAT UNION PACIFIC

23  SAYS ABOUT MR. -- MR. TAYLOR AT THE VERY END, I THINK YOU NEED

24  TO CONSIDER, AND I RESPECTFULLY SUBMIT, THE CONTEXT OF THAT.

25  IF MR. TAYLOR GOT UPSET ON A COUPLE OF OCCASIONS, WELL THAT'S

1   LIFE.  I MEAN THAT HAPPENS, YOU KNOW.  THAT'S NO REASON TO

2   DISCHARGE A TEN AND A HALF YEAR MANAGERIAL EMPLOYEE.  HE

3   DIDN'T CUSS THEM.  HE DIDN'T USE ANY VIOLENCE OR ANYTHING LIKE

4   THAT.  IT'S JUST THAT THEY CHARACTERIZED HIS INSISTENCE ON

5   DOING HIS JOB IN A SAFE MANNER AS INSUBORDINATION.

6           BUT HE WAS FEELING -- HE WAS FEELING THAT PUSHBACK.

7   HE WAS FEELING THAT PRESSURE.  HE KNEW -- HE KNEW THAT HIS JOB

8   WAS ON THE LINE, BUT DOGGONE IT HE WAS GOING TO DO THE RIGHT

9   THING.  THAT'S THE BOTTOM LINE OF THIS CASE.  AND I ASK YOU TO

10  SUPPORT FULLY THAT DECISION, BECAUSE IT AFFECTS NOT ONLY

11  JOHNNY TAYLOR AND HIS FAMILY, BUT OUR COMMUNITY AS WELL.  IT'S

12  UNLIKELY IN REALITY THAT THE CLAIMS OF INSUBORDINATION AND

13  DISRESPECT ARE THE REAL REASONS FOR HIS TERMINATION.

14          I TOLD YOU ABOUT MY GRANDDAUGHTER IRIS EATING THE

15  COOKIES IN MY OPENING STATEMENTS AND JUDGE DICK TOLD YOU ABOUT

16  THE MAN WITH THE RAINCOAT, AND I ASKED YOU TO BE DETECTIVES

17  FOR THE TRUTH AND KEEP YOUR EYES AND EARS OPEN.

18          WELL, I RESPECTFULLY SUBMIT THAT IT'S IMPROBABLE AND

19  UNLIKELY AND UNTRUE THAT MR. TAYLOR BECAME THIS TERRIBLE

20  EMPLOYEE IN TWO MONTHS WHERE THERE WAS NO INTERVENING FACTORS

21  THAT SUGGESTED A SUBSTANTIAL CHANGE IN MR. TAYLOR'S ATTITUDE

22  OR LIFE OR DEMEANOR.  BASICALLY THE REASONS THEY'VE GIVEN ARE

23  INSUBORDINATION AND THOSE THINGS ARE BASICALLY A MASK, A

24  COVERUP.  THEY'RE A PRETEXT FOR THE RETALIATION.  BECAUSE THEY

25  DIDN'T WANT TO COME OUT AND SAY, LIKE EMPLOYEES WHO

1    DISCRIMINATE AGAINST THE AFRICAN-AMERICAN CITIZENS AND WOMEN,

2    THEY'RE NOT GOING TO COME OUT AND SAY, WELL, YEAH, WE

3    DISCRIMINATED.  WE TERMINATED HIM BECAUSE HE WAS

4    AFRICAN-AMERICAN.  THEY JUST DON'T DO THAT.  SO THIS IS

5    EXACTLY WHAT UNION PACIFIC IS DOING HERE, IS THEY'RE TRYING TO

6    CREATE EXCUSES FOR THEIR CONDUCT TO TRY TO COVER THEM UP.

7    THAT'S OUR LIABILITY CASE.

8         THE NEXT PART OF THE CASE IS OUR CLAIM FOR DAMAGES.

9    IT IS YOUR JOB TO DETERMINE, IF YOU FIND THE DEFENDANT IS

10   LIABLE, TO DETERMINE AN APPROPRIATE AMOUNT OF DAMAGES.  AND I

11   WILL SAY THAT IT'S IMPORTANT, IT'S IMPORTANT THAT UNION

12   PACIFIC HAVE CONSEQUENCES FOR THIS BEHAVIOR.  AND THESE

13   COMPANIES THEY -- THEY -- THE CONSEQUENCE IS MONEY AND IT'S

14   OUR ONLY -- IT'S THE ONLY WAY OUR JUSTICE SYSTEM HAS A --

15   REDRESSING A WRONG.  IT'S UNFORTUNATE THAT THAT'S, YOU KNOW,

16   THE ONLY WAY, BUT THAT'S THE WAY, BUT THERE SHOULD BE

17   CONSEQUENCES HERE.

18        THE COURT WILL INSTRUCT YOU ABOUT WHAT FACTORS TO

19   LOOK AT IN CONNECTION WITH THE AWARD OF DAMAGES.  I JUST WANT

20   TO TELL YOU THE TYPES OF DAMAGES THAT WE'RE SEEKING AND THE

21   AMOUNTS THAT WE'RE SUGGESTING.

22        THE PARTIES HAVE STIPULATED THAT MR. TAYLOR'S PAST

23   WAGE LOSS WAS $312,000 AND THE DEFENDANTS HAVE -- THEY CLAIM,

24   OR APPARENTLY WILL CLAIM, THAT MR. TAYLOR DIDN'T PROPERLY

25   MITIGATE HIS DAMAGES OR GO OUT AND LOCATE ALTERNATIVE

1   EMPLOYMENT, BUT THERE'S NO EVIDENCE IN SUPPORT OF THAT.  THE

2   EVIDENCE IS, IS THAT MR. TAYLOR TRIED HIS DOGGONEST, SUBMITTED

3   OVER 100 APPLICATIONS AND FINALLY FOUND A JOB AS A PUBLIC

4   SCHOOL TEACHER.

5          NOW, YOU KNOW, THAT'S A VERY IMPORTANT JOB AND I'M

6   GLAD HE IS A PUBLIC SCHOOL TEACHER BECAUSE I THINK HE CAN

7   CONTRIBUTE A LOT TO OUR CHILDREN, BUT THE FACT OF THE MATTER

8   IS, IS THAT THAT IS A MAJOR ALTERATION IN THE LIFE-STYLE AND

9   ENJOYMENT OF LIFE OF MR. TAYLOR AND HIS FAMILY GOING FROM A

10   JOB OF OVER $100,000 A YEAR TO A PUBLIC SCHOOL TEACHER JOB.

11   SO THAT IS A MAJOR SHAKEUP IN THEIR LIVES.

12          WITH RESPECT TO -- WE'RE ALSO CLAIMING EMOTIONAL --

13   MENTAL AND EMOTIONAL DAMAGES.  THAT'S BASICALLY ALL OF THE

14   DEPRESSION AND ANXIETY AND WITHDRAWAL THAT MRS. TAYLOR

15   TESTIFIED TO AND MR. TAYLOR TESTIFIED TO.  THEY DESCRIBED IT

16   IN DETAIL.  THEY TALKED ABOUT HOW LONG IT LASTED.  THEY TALKED

17   ABOUT HOW FREQUENTLY IT EXHIBITED ITSELF AND THAT'S THE

18   EMOTIONAL AND MENTAL DAMAGES STANDPOINT OF IT.

19          WE'RE SUGGESTING, MERELY OUR SUGGESTION, AN AWARD OF

20   $300,000 FOR BOTH EMOTIONAL AND MENTAL DAMAGES AND LOSS OF

21   ENJOYMENT OF LIFE.  I THINK THAT'S FAIR AND REASONABLE AND IT

22   WOULD REPRESENT A REPAIR OF MR. -- OF THE HARM DONE TO

23   MR. TAYLOR AND WOULD ALSO BE FAIR TO UNION PACIFIC.

24          NOW, THE LAST PART OF DAMAGES THAT I WANT TO TELL

25   YOU ABOUT ARE PUNITIVE DAMAGES.  THIS IS WHERE THE JURY

1   BECOMES THE CONSCIENCE OF THE COMMUNITY.  THIS IS WHERE THE

2   JURY HAS THE OPPORTUNITY TO TELL THE UNION PACIFIC RAILROAD IN

3   OUR COUNTRY THAT YOU SHOULDN'T -- YOU SHOULDN'T TREAT SAFETY

4   WATCHDOGS LIKE THIS.  YOU SHOULDN'T DESTROY THEIR CAREERS,

5   BECAUSE THEY'RE DOING THE RIGHT THING.  AND THIS IS YOUR

6   OPPORTUNITY TO SEND A MESSAGE.  THAT'S WHAT PUNITIVE DAMAGES

7   IS.  IT'S IN ADDITION TO COMPENSATORY DAMAGES AND IT IS TO

8   SEND A MESSAGE.  IT IS TO DETER.  IT IS TO MAKE COMPANIES LIKE

9   THIS THINK TWICE AND THINK LONG AND HARD BEFORE THEY RETALIATE

10  AGAINST WHISTLEBLOWERS.  AND THE AMOUNT OF PUNITIVE DAMAGES,

11  AS THE AMOUNT OF COMPENSATORY DAMAGES, IS UP TO YOUR GOOD

12  DISCRETION AND WE CERTAINLY ASK THAT YOU USE YOUR COMMON

13  SENSE.

14          WE'RE SUGGESTING A PUNITIVE DAMAGE AWARD AGAINST

15  UNION PACIFIC OF AT LEAST $500,000.  I RESPECTFULLY SUBMIT TO

16  YOU THAT WITH RESPECT TO A COMPANY LIKE UNION PACIFIC MONEY

17  TALKS, AND IF THEY GET AN AWARD OF PUNITIVE DAMAGES THAT'S

18  GOING TO HOPEFULLY CHANGE THEIR BEHAVIOR.  AT LEAST WE -- YOU

19  AND I AND OUR TEAM HERE WOULD HAVE DONE EVERYTHING WE CAN TO

20  TRY TO CHANGE UNION PACIFIC'S BEHAVIOR AND THEIR TREATMENT OF

21  THEIR SAFETY WATCHDOGS.  SO THE PUNITIVE DAMAGE AWARD IN THIS

22  CASE IS VERY IMPORTANT.

23          THE JUDGE WILL INSTRUCT YOU ABOUT WHAT WE HAVE TO

24  SHOW.  IN ORDER TO SUSTAIN AN AWARD OF PUNITIVE DAMAGES WE

25  HAVE TO SHOW THAT THE CONDUCT WAS WILLFUL AND MALICIOUS OR

1    INDIFFERENT TO THE FEDERALLY PROTECTED RIGHTS OF MR. TAYLOR.

2    I DON'T KNOW HOW IT COULD BE ANYMORE WILLFUL AND

3    MALICIOUS FOR THEM TO -- GO BACK TO KENNETH STUART'S

4    TESTIMONY.  I RECOMMENDED THAT HE BE TERMINATED BECAUSE HE WAS

5    INSUBORDINATE AND DISRESPECTFUL.  HOW WAS HE DIS- -- HOW --

6    EXCUSE ME.  HOW WAS HE DISRESPECTFUL AND INSUBORDINATE?

7    WELL, HE WAS TRYING TO TELL ME THE REASON HE DIDN'T

8    WANT TO PUT THE TRACK BACK IN SERVICE AND I CHARACTERIZED THAT

9    AS INSUBORDINATE AND DISRESPECTFUL AND I WROTE THAT UP THE

10   CHAIN OF COMMAND KNOWING HE'D BE FIRED.  OR THE EVIDENCE

11   SUPPORTS AN INFERENCE THAT MR. STUART KNEW THAT HE WOULD BE

12   FIRED.  HE DIDN'T SAY THAT DIRECTLY BUT IT CERTAINLY SUPPORTS

13   THAT INFERENCE.

14   SO THAT IS DELIBERATE -- THAT IS DELIBERATE ACTIVITY

15   AND THAT IS WILLFUL AND MALICIOUS AND THAT IS EXACTLY WHY THE

16   LAW SAYS IN THIS KIND OF SITUATION THE JURY HAS THE DISCRETION

17   TO ORDER AN AWARD OF PUNITIVE DAMAGES.  I THINK IT SHOULD NOT

18   BE A SMALL AWARD.  THE FIGURES I SUGGESTED OR A FIGURE I

19   SUGGEST ON PUNITIVE DAMAGES IS TOTALLY UP TO YOU.  IT COULD GO

20   MORE THAN THAT, IT COULD GO LESS AND IT COULD GO ZERO, BUT IT

21   SHOULDN'T GO LESS AND IT SHOULDN'T GO ZERO.

22   I JUST WANT TO CONCLUDE BY THANKING YOU AGAIN.  I'M

23   TELLING YOU THAT IN OUR VIEW IT'S REASONABLE AND JUST TO

24   RENDER A VERDICT FOR MR. TAYLOR AND USE YOUR COMMON SENSE.

25   THIS IS -- WE HAVE A TREMENDOUS ABILITY OR A TREMENDOUS GIFT

1  TO HAVE PEOPLE LIKE YOURSELVES AND THE LIFE EXPERIENCES OF

2  PEOPLE LIKE YOURSELVES, AND YOU CAN COMBINE THAT LIFE

3  EXPERIENCE TO FIGURE OUT THE TRUTH AND A JUST RESULT, BUT

4  THERE'S A MASSIVE AMOUNT OF LIFE EXPERIENCES THAT YOU CAN

5  BRING TO BEAR IN FINDING A JUST RESULT IN THIS CASE AND I

6  CERTAINLY ASK YOU TO DO THAT.  THANK YOU VERY MUCH.

7        **THE COURT:**  THANK YOU, SIR.

8        MR. FRASER.

9        **MR. FRASER:**  YOUR HONOR, MAY I BRING THIS UP WITH

10  ME?

11        **THE COURT:**  YOU MAY.

12        **(DEFENDANT'S CLOSING ARGUMENT)**

13        **MR. FRASER:**  GOOD MORNING.  I'M DAVID FRASER.  WE

14  MET EARLIER IN THE CASE.  I'VE BEEN UP AND DOWN A FEW TIMES AS

15  HAVE OTHERS FROM BOTH TABLES.

16        HERE'S WHAT I'D LIKE TO THANK YOU FOR.  I KNOW YOU

17  DIDN'T HAVE MUCH CHOICE ABOUT BEING HERE, SO THANKING YOU FOR

18  BEING HERE MAYBE IS NOT THE RIGHT THING.  BUT I WANT TO THANK

19  YOU FOR YOUR ATTENTION.  YOU GUYS HAVE PAID TREMENDOUSLY CLOSE

20  ATTENTION TO WHAT'S GOING ON AND THAT'S APPRECIATED BY

21  EVERYBODY THAT COMES INTO THIS COURTROOM LOOKING FOR JUSTICE.

22  MY CLIENT, UNION PACIFIC, WOULD LIKE ME TO EXPRESS OUR

23  APPRECIATION FOR YOU PAYING CLOSE ATTENTION AND GIVING THIS

24  CASE THE SCRUTINY THAT IT DESERVES.

25        THIS IS AN IMPORTANT CASE TO UNION PACIFIC.  THIS

1    WAS A MANAGER.  AND THE FACTS OF THE CASE WERE PRESENTED, I

2    THOUGHT, IN GREAT DETAIL BY A NUMBER OF DIFFERENT PEOPLE.  BUT

3    YOU ARE THE JUDGE OF THE FACTS.  YOU ALONE ARE THE JUDGE OF

4    THE FACTS.  WHAT I'M SAYING RIGHT NOW IS NOT EVIDENCE.  WHAT

5    YOU JUST HEARD FROM MR. SMITH, HE WOULD AGREE, IS NOT

6    EVIDENCE.  WE ARE SIMPLY ARGUING TO YOU.  SO YOU'VE ALREADY

7    HEARD ALL OF THE EVIDENCE.  I THINK YOU'VE GOT YOUR

8    IMPRESSIONS OF THE EVIDENCE.  DON'T ALLOW YOURSELF TO BE

9    SWAYED FROM WHAT YOU KNOW TO BE FACT BY SOMEONE ELSE TRYING TO

10   COLOR IT AS SOMETHING OTHER THAN A FACT.

11           THE REASON WE'VE GOT JURIES IN A CASE LIKE THIS IS

12   THAT WE WANT THE HUMAN ELEMENT INVOLVED.  THE GOOD OLE COMMON

13   SENSE OF PEOPLE LOOKING AT OTHER PEOPLE UNDER OATH, TELLING --

14   TELLING VERSIONS OF WHAT HAPPENED A YEAR OR TWO OR THREE AGO

15   AND YOU JUDGING THAT, JUDGING THE SITUATION.

16           IF THIS CASE WAS -- IF THIS CASE WERE SOMETHING THAT

17   COULD BE HANDLED BY A COMPUTER, YOU KNOW YOU JUST PUT IN THE

18   ELEMENTS AND IT CLICKS OUT A RESULT, THAT WOULD NOT BE RIGHT.

19   THAT WOULD NOT BE OUR JUSTICE SYSTEM THAT WE USE.  SO YOUR

20   COMMON SENSE, YOUR ABILITY TO HEAR AND PERCEIVE AND FOLLOW THE

21   DISCUSSION TO MAKE DECISIONS ABOUT THINGS, SOME AS YOU GO,

22   SOME AS THINGS ARE FINISHED, AND YOU MAY HAVE COME IN HERE

23   WITH SOME -- WITH SOME THOUGHTS, SOME IDEAS, MAYBE EVEN SOME

24   PREJUDICES, AND WE ARE ASKING THAT YOU ACT WITH YOUR COMMON

25   SENSE TO REVIEW THIS EVIDENCE AND GIVE A JUST RESULT.

1    IT MAY SEEM LIKE UNION PACIFIC THREW ALL THE BIG

2 DOGS AT THIS CASE.  WE HAD PEOPLE COME IN AND WE HAD PEOPLE GO

3 WAY OUT OF THEIR WAY TO COME DOWN HERE TO TALK TO YOU ABOUT

4 THIS CASE.  AND THE REASON FOR THAT IS THAT THEY WERE ALL

5 INVOLVED.  THEY WERE INVOLVED BECAUSE THIS WAS A MANAGER, THIS

6 WAS SOMEBODY UNION PACIFIC HAD INVESTED A LOT OF TIME AND

7 MONEY IN, TRAINING AND IT WAS SOMEONE -- THIS WAS ABOUT

8 SOMEONE WHO WAS VERY VALUABLE TO UNION PACIFIC.  AND THE IDEA

9 OF TERMINATING A MANAGER IS NOT SOMETHING UNION PACIFIC WANTS

10 TO DO.  HOW DO YOU -- HOW DO YOU REPLACE A TEN YEAR TRACK

11 MAINTENANCE MANAGER ON THE RAILROAD?  YOU DON'T PUT AN AD IN

12 THE PAPER AND GET MANY FOLKS LINING UP.  THIS IS SOMETHING

13 THAT HAS TO BE DEVELOPED OVER TIME.

14    MR. TAYLOR WAS A GOOD EMPLOYEE FOR A LOT OF YEARS

15 AND THEN SOMETHING HAPPENED AND IT BECAME IMPOSSIBLE TO KEEP

16 HIM.  WHAT HAPPENED?  WELL, THE ONLY THING THAT STANDS OUT IS

17 THAT HE REALLY WANTED THE JOB MR. OLDHAM HELD, WHICH WAS THE

18 JOB IMMEDIATELY ABOVE HIM.  BUT INSTEAD OF MR. TAYLOR GETTING

19 THE JOB, THEY GAVE IT TO MR. STUART.  MR. STUART LOOKS KIND OF

20 YOUNG.  FOR WHATEVER REASON, FOR WHATEVER REASON MR. TAYLOR

21 APPARENTLY CHANGED HIS CONDUCT OVER THAT OR AT LEAST IT

22 COINCIDED WITH THAT.  THERE MAY BE OTHER REASONS THAT WE DON'T

23 KNOW.  THAT'S THE ONLY THING THAT IS OBVIOUS IN TERMS OF THE

24 TIMELINE.

25    AND INSTEAD OF ACCEPTING MR. STUART'S GUIDANCE AND

1    INSTRUCTIONS AS HE HAD ALWAYS DONE FOR THE PERSON THAT HELD
2    THAT POSITION, HE STARTED KICKING BACK AND HE TOLD HIM NO, HE
3    WOULD NOT GO MEASURE THAT.  HE TOLD HIM -- AND HE EVEN TOLD
4    HIS PEOPLE THAT WORKED UNDER HIM, *NO, YOU DO NOT GO MEASURE*
5    *THAT FOR MR. STUART.*  AND HE FURTHER SAID, *NOT ONLY AM I NOT*
6    *GOING TO DO THIS, BUT I'M NOT GOING TO CHANGE MY WAYS.*

7            IT WAS NOT -- IT WAS NOT MR. TAYLOR TAKING A TRACK
8    OUT OF SERVICE OR SLOW ORDERING A TRACK THAT CAUSED HIM TO BE
9    TERMINATED.  HE HAD DONE THOSE TWO THINGS COUNTLESS TIMES OVER
10   TEN YEARS.  AND YOU KNOW WHAT YOU DO IF YOU TAKE A TRACK OUT
11   OF SERVICE; YOU GET MEASUREMENTS, RIGHT?  YOU GET MEASUREMENTS
12   SO THAT PEOPLE WHO DO REPAIR WORK WILL KNOW WHAT TO DO ABOUT
13   IT.  YOU'LL CONFIRM THAT IT DOES NEED TO BE TAKEN OUT OF
14   SERVICE.  IF A SWITCH IS BAD, TAKE THE TRACK OUT OF SERVICE
15   FOR THAT, YOU TAKE ALL YOUR MEASUREMENTS, LET THE ENGINEERING
16   DEPARTMENT IN OMAHA FIGURE OUT WHAT NEEDS TO HAPPEN.

17           WELL, INSTEAD OF DOING ANY OF THAT AS HE WAS
18   INSTRUCTED -- WELL, HE PROBABLY DIDN'T EVEN NEED TO BE
19   INSTRUCTED IN THE FIRST PLACE, BUT WHEN HE HAD NOT TAKEN
20   MEASUREMENTS HIS BOSS, MR. STUART, SAYS, *GET ME SOME*
21   *MEASUREMENTS AND LET'S LOOK AT IT.*  THAT'S NOT SAYING PUT IT
22   BACK IN SERVICE, AND THAT WAS NEVER SAID.  THAT WAS NEVER
23   SAID.

24           IN FACT, THAT TRACK IS STILL OUT OF SERVICE TODAY AS
25   YOU HEARD, OKAY?  BUT INSTEAD OF GETTING MEASUREMENTS

1   MR. TAYLOR SENT SOME OLD MEASUREMENTS THAT WERE NOT REALLY THE

2   RIGHT KIND OF MEASUREMENTS BUT HE SENT SOME OLD THINGS, AND

3   WHEN ASKED TO UPDATE THEM HE HUNG UP.  HE YELLED AND FUSSED

4   AND HE REFUSED TO DO IT, AND HE SAID, *I'M NOT GOING TO CHANGE.*

5   *I'M NOT GOING TO CHANGE AND I'M NOT GOING TO MAKE MY BEHAVIOR*

6   *ANY DIFFERENT FROM THE WAY IT IS NOW.*

7            IT IS STRICTLY -- UNDER THE EVIDENCE OF THIS CASE,

8   IT IS STRICTLY THAT BEHAVIOR OF MR. TAYLOR, PRIMARILY HIS

9   BEHAVIOR TOWARD MANAGEMENT, THAT WAS THE ULTIMATE CAUSE OF HIS

10  TERMINATION.  IF MR. TAYLOR CANNOT BE DISMISSED IN THIS CASE

11  WHEN CAN AN EMPLOYER DISMISS AN EMPLOYEE?

12           YOU CAN RECALL, AS WELL AS I CAN, ALL THE THINGS

13  THAT WENT ON.  FROM HANGING UP ON YOUR BOSS IN CONFERENCE

14  CALLS, TO FUSSING AND YELLING AT PEOPLE ON THE PHONE,

15  INCLUDING YOUR BOSS, IN CONFERENCE CALLS.  THE LIST -- THE

16  LIST IS PRETTY LONG.

17           IT WAS ABOUT ERRATIC BEHAVIOR.  IT WAS ABOUT A

18  STRANGE CIRCUMSTANCE WHERE MR. PHILLIP HAWKINS WAS AT THE HOME

19  AFTER THEY DELIVERED THE LETTER ABOUT THE ADMINISTRATIVE LEAVE

20  AND MR. TAYLOR COMING UP BEHIND HIM AND FRIGHTENING PHILLIP

21  INTO THINKING HE WAS ABOUT TO BE ACCOSTED.  WHAT DOES AN

22  EMPLOYER DO?

23           HIS AGGRESSIVE CONDUCT, AGGRESSIVE ARGUMENT WITH HIS

24  MANAGERS, HIS DARING HIS BOSS TO FIRE HIM, HIS SAYING, *I'M*

25  *RECORDING THIS CONVERSATION.* THERE'S NOTHING WRONG WITH

1   RECORDING A CONVERSATION, BUT IT DOES RAISE THE ISSUE WHERE IS

2   THAT RECORDED CONVERSATION?  WE'D ALL LIKE TO HEAR IT.  AND

3   HIS SAYING HE'S GOT A LAWYER.  THAT'S NO BIG DEAL, BUT

4   THAT'S -- IF YOU SAY THAT TO YOUR NEIGHBOR WHEN YOU'RE TALKING

5   ABOUT, YOU KNOW, IS THAT BUSH ON MY PROPERTY OR YOURS, THAT'S

6   KIND OF A THREAT.

7          YOU PROBABLY CAN RECALL SOME OTHER INSTANCES AS

8   WELL.  WE ALL HEARD THAT AND WE HEARD IT FROM MULTIPLE

9   SOURCES.  FIRST HAND ACCOUNTS CAME FROM MR. PHILLIP HAWKINS

10  WHO HEARD THE YELLING ON THE CALL, WHO HEARD MR. TAYLOR HANG

11  UP ON HIS BOSS AND OTHERS.  YOU HEARD IT FROM MR. STUART; MOST

12  OF THIS WAS DIRECTED STRAIGHT AT HIM.  HE IS THE ONE WHO GOT

13  THE JOB MR. TAYLOR WANTED.  AND YOU HEARD IT FROM

14  MR. GILSDORF, WHO'S BEEN IN THE COURTROOM WITH US, AND

15  TESTIFIED THAT HE ALSO OBSERVED AND HEARD THAT SAME BEHAVIOR

16  FROM MR. TAYLOR.  WHAT IS AN EMPLOYER TO DO?

17          IF UNION PACIFIC CANNOT TERMINATE MR. TAYLOR UNDER

18  THESE CIRCUMSTANCES FOR THIS CONDUCT, WHEN HE'S A MANAGER AND

19  IS SUPPOSED TO BE WORKING WITH THE TEAM OF OTHER MANAGERS,

20  WHEN HE HAS A BOSS THAT HE'S IGNORING, DISRESPECTING, YELLING

21  AT, HANGING UP ON, TELLING HIM *I'M NOT GOING TO DO WHAT YOU*

22  *ASK AND I'M NOT GOING TO CHANGE MY BEHAVIOR*, THEN WHAT'S AN

23  EMPLOYER TO DO?  IF TERMINATION IS NOT JUSTIFIED IN THIS CASE

24  BASED ON THAT BEHAVIOR, THEN I DON'T KNOW THAT ANYBODY COULD

25  EVER LOSE A JOB.

1      WE KNOW THAT PEOPLE LOSE JOBS ALL THE TIME.

2   SOMEBODY GOES TO WORK AND THEY SMOKE SOME MARIJUANA AND THEY

3   GET FIRED.  SOMEBODY GOES TO WORK AND THEY GET THERE TEN

4   MINUTES LATE A FEW TIMES AND THEY GET FIRED.  WE KNOW THERE

5   ARE A LOT OF PETTY REASONS TO GET FIRED.  WHAT THESE MEN DO IS

6   IMPORTANT WORK.  AS MR. SMITH SAYS, IT IS SAFETY WORK.  YOU

7   CAN'T HAVE MANAGERS FEUDING WITH EACH OTHER OVER THINGS.

8      MR. TAYLOR HAD BEEN A PART OF A TEAM FOR TEN YEARS.

9   HE HAD RUN HIS GROUP OF PEOPLE.  THEY HAD DONE THINGS WELL.

10  OTHER MANAGERS HAD DONE THINGS WELL.  THEY HAD GOTTEN TOGETHER

11  ON CONFERENCE CALLS WITH THEIR BOSS AND THE BOSS ABOVE THAT

12  AND THEY HAD RECEIVED DIRECTIVES ON WHAT WE'RE GOING TO

13  EMPHASIZE THIS MONTH ABOUT SAFETY AS CHECKING FOR SO AND SO

14  AND THE NEXT MONTH IT'S GOING TO BE THIS AND YOU GUYS ALWAYS

15  REMEMBER WE'VE GOT THIS DIRECTIVE THAT WE TRY AS MUCH AS

16  POSSIBLE TO ELIMINATE JOINTS IN THE RAILROAD BECAUSE THAT WAS

17  FOR THE WEAK POINTS.  YOU REMEMBER THAT?  WE'D GET OUR WELDERS

18  TO WELD THOSE JOINTS BECAUSE IF YOU DON'T HAVE IT WELDED

19  YOU'VE GOT TO PUT THOSE BARS IN THERE BOLTED TOGETHER AND THEY

20  CAN CREATE PROBLEMS.  THAT'S THE KIND OF TALK THEY WOULD HAVE.

21  THAT'S THE KIND OF PROGRESS THEY WOULD TRY TO ACHIEVE AND THEY

22  WOULD GET TOGETHER AND TALK ABOUT IT.

23      MR. TAYLOR, UNFORTUNATELY, WENT FROM BEING A VERY

24  GOOD EMPLOYEE WHO WAS INTO ALL OF THAT.  HE WAS INTO ALL OF

25  THAT AND THAT WAS HIS JOB.  THOSE WERE HIS RESPONSIBILITIES.

1  HE HAD RECEIVED RAISES AND BONUSES.  HE WAS BEING PAID A LOT

2  OF MONEY.  A GOOD JOB; OVER $100,000.  AND HE WILL TELL YOU

3  THAT HE LOST HIS JOB BECAUSE HE TOOK THE TRACKS OUT OF SERVICE

4  OR BECAUSE HE SLOW ORDERED SOME TRACKS.  WE'RE TALKING ABOUT

5  TWO INSTANCES HERE.  THESE ARE TWO OF PROBABLY HUNDREDS OVER

6  TEN YEARS THAT HE TOOK OUT OF SERVICE OR SLOW ORDERED TO GET

7  WORKED ON.

8        WHAT WAS DIFFERENT HERE?  WHAT WAS DIFFERENT WAS NOT

9  THAT HE TOOK THOSE ACTIONS; THAT'S PERFECTLY WITHIN HIS JOB

10 RESPONSIBILITY.  WHAT WAS DIFFERENT WAS THE WAY HE INTERACTED

11 WITH HIS BOSS ABOUT IT, THE WAY HE DIDN'T FOLLOW THROUGH AS

12 YOU ALWAYS DO AND TAKE APPROPRIATE MEASUREMENTS RIGHT THEN,

13 NOT OLD ONES, BUT RIGHT THEN, AND GET THOSE MEASUREMENTS TO

14 THE PEOPLE WHO NEED IT.

15        HE WAS NOT ORDERED TO PUT THAT TRACK BACK IN

16 SERVICE.  THAT TRACK IS STILL OUT OF SERVICE TODAY YOU HEARD.

17 ALTHOUGH MR. TAYLOR MAY BELIEVE -- I'M READING TO YOU

18 SOMETHING THAT YOU HEARD IN OPENING STATEMENTS FROM MS.

19 SCHOONMAKER EARLIER.  ALTHOUGH MR. TAYLOR MAY BELIEVE THAT

20 THAT IS WHAT CAUSED HIM TO LOSE HIS VERY GOOD JOB WITH UNION

21 PACIFIC, THE EVIDENCE WILL SHOW YOU THAT PARTICULAR CONDUCT OF

22 MR. TAYLOR WAS NOT WHY HE WAS TERMINATED BY MARK WHEELAND.

23        THE FACT THAT HE EXERCISED HIS JOB AND TOOK A TRACK

24 OUT OF SERVICE OR SLOW ORDERED A TRACK IS NOT THE ISSUE HERE.

25 THE ISSUE IS HOW HE DEALT WITH IT, HOW HE DEALT WITH HIS BOSS,

1  HIS BOSS'S BOSS, MR. HAWKINS WHO WAS AT THE SAME LEVEL WITH

2  HIM, HOW HE SAID HE WOULD NOT CHANGE.  WHAT IS AN EMPLOYER TO

3  DO?  WHAT DOES AN EMPLOYER DO?

4  THIS IS AN IMPORTANT JOB.  HE'S GOT IMPORTANT

5  RESPONSIBILITIES.  EVERY DAY THEY'VE GOT TO BE CHECKING THAT

6  TRACK.  EVERY DAY THERE ARE ISSUES THAT COME UP.  IF WE'RE

7  CAUGHT UP IN THIS KIND OF STUFF, *I'M NOT GOING TO CHANGE, I'M*

8  *GOING TO STOP DOING WHAT I'VE DONE FOR TEN YEARS AND I'M NOT*

9  *GOING TO BE LISTENING TO YOU*.  HOW DO YOU GO ABOUT YOUR

10  BUSINESS?  HOW SAFE IS THAT?

11  LET ME MENTION A COUPLE OF THINGS QUICKLY FROM WHAT

12  CAME FROM THE EARLIER CLOSING STATEMENT BY THE PLAINTIFF AND

13  I'LL JUST RUN THROUGH A FEW THINGS THAT YOU HEARD.

14  ONE THING WAS ABOUT -- GENERALLY ABOUT RAILROAD

15  SAFETY AND ITS, WHAT IS CALLED NOWADAYS, *THE REPTILE THEORY*.

16  THE ARGUMENT IS ALWAYS MADE THAT THIS CASE, WHATEVER CASE IT

17  IS, THIS CASE IS VERY IMPORTANT BECAUSE WE'RE HELPING PROTECT

18  THE PUBLIC, SO YOU'VE GOT TO RULE OUR WAY TO PROTECT THE

19  PUBLIC.  REPTILES APPARENTLY JUST RUN AT THE SIGHT OF ANYTHING

20  THAT APPEARS TO BE A DANGER.

21  PLEASE DON'T BE SWAYED BY THE FACT THAT, THERE'S AN

22  ARGUMENT MADE, WE NEED TO SEND A MESSAGE.  THE MESSAGES HAVE

23  BEEN SENT.  THE GUYS -- THE VERY IMPORTANT GUYS AT UNION

24  PACIFIC IN THE TRACK DEPARTMENT HAVE BEEN HERE.  THEY KNOW

25  WHAT THIS CASE IS ABOUT.  THEY KNOW IT'S ABOUT CONDUCT.  THEY

1    KNOW IT'S NOT ABOUT -- THEY KNOW IT'S NOT ABOUT PUNISHING A

2    WHISTLEBLOWER.  IT IS ABOUT SOMEONE'S CONDUCT.  THEY HAD

3    GOTTEN THE MESSAGE.  THEY LIVED THROUGH THIS NIGHTMARE OF A

4    MESSAGE AND THEY HAD TO FIRE A MANAGER, AND THAT IS AN AWFUL

5    THING TO HAVE HAPPEN.

6         THE PLAINTIFFS CLAIM THAT MR. TAYLOR WAS ORDERED TO

7    PUT THE TRACK BACK IN SERVICE AND YOU ALL HEARD IT'S STILL NOT

8    EVEN BACK IN SERVICE, AND YOU HEARD THE MANAGER SAY, *I TOLD*

9    *HIM TO TAKE IT OUT OF SERVICE IF THERE'S A QUESTION.  TAKE IT*

10   *OUT OF SERVICE.  I JUST WANT YOU TO FOLLOW-UP AND GET ME THE*

11   *MEASUREMENTS LIKE WE ALWAYS DO AND LET'S FIGURE OUT WHAT WE'VE*

12   *GOT TO DO TO MAKE IT BETTER OUT THERE.*

13        THE TIMELINE THAT WAS MENTIONED, WE TOTALLY DISAGREE

14   WITH.  NOT THAT THE DATES ARE INCORRECT.  THE DATES ARE

15   CORRECT.  WHAT IS INCORRECT ABOUT IT IS WHERE IT SAYS, ON SUCH

16   AND SUCH DATE MR. TAYLOR WAS ORDERED TO PUT A TRACK BACK IN

17   SERVICE OR HE WAS ORDERED TO LIFT A SLOW ORDER.  IT'S THOSE

18   LAST COMMENTS THAT WE OBJECT TO.  THE DATE IS NOT AN ISSUE.

19        LET ME EMPHASIZE THAT THIS CASE IS PRESENTED AS IF

20   THIS IS THE FIRST TIME MR. TAYLOR TOOK A TRACK OUT OF SERVICE

21   OR SLOW ORDERED SOMETHING.  THAT'S EVERYDAY AS YOU HEARD FROM

22   THE EVIDENCE.  THAT'S AN EVERYDAY OCCURRENCE.  NOT SOMETHING

23   THAT HE JUST POPPED UP AND DID.

24        MR. HAWKINS HOLDS THE SAME -- SAME JOB IN ANOTHER

25   AREA.  I'M SURE HE HAS TAKEN MANY TRACKS OUT OF SERVICE, HAS

1  SLOW ORDERED MANY TRACKS.  BUT WHAT HE HAS DONE IS, JUST LIKE

2  MR. TAYLOR DID FOR TEN YEARS, WHEN YOU DO THAT THERE'S CERTAIN

3  THINGS YOU DO, THE WAY YOU WRITE IT UP BECAUSE YOU WANT TO GET

4  IT FIXED.  YOU WANT TO FIGURE OUT THE PROBLEM AND GET IT

5  FIXED.  MR. STUART THE SAME.  MR. GILSDORF THE SAME.  THEY

6  HAVE DONE -- TAKEN THOSE ACTIONS MANY, MANY, MANY TIMES.  BUT

7  WHEN YOU DO IT, YOU DON'T JUST SIT DOWN AND SAY, BECAUSE I

8  SAID.  YOU TAKE THE MEASUREMENTS AND YOU WORK AS A TEAM TO

9  CORRECT THE PROBLEMS.

10       LET ME REMIND YOU JUST VERY BRIEFLY WHO WE HAD UP

11  HERE.  AND OF COURSE THE IMMEDIATE -- IMMEDIATE SUPERVISOR FOR

12  MR. TAYLOR WAS THE NEW MR. STUART WHO HAD MOVED IN AND KIND OF

13  TOOK THE JOB THAT MR. TAYLOR HAD WANTED.  WE HAD JAY GILSDORF

14  WHO WAS ABOVE HIM SITTING HERE WITH US, WHO WAS DIRECTLY

15  INVOLVED IN OBSERVING SOME OF THIS CONDUCT THAT LED TO THIS

16  TERMINATION.

17       WE HAD PHILLIP HAWKINS WHO OBSERVED A NUMBER OF

18  THOSE CONFERENCE CALLS AND GENERALLY OBSERVED MR. TAYLOR'S

19  BEHAVIOR AND EXPLAINED TO YOU THAT WHEN HE CAME BACK FROM

20  ODESSA THAT SOMETHING HAD CHANGED.  HE WAS JUST A DIFFERENT

21  PERSON AND HE BECAME VERY AGGRESSIVE AND HE -- HE JUST STARTED

22  ON A DOWNWARD SPIRAL THAT WAS VERY DAMAGING TO THE COMPANY,

23  BUT MORE THAN THAT IT WAS MORE DAMAGING TO HIM.

24       THEN WE HEARD FROM GREG WORKMAN WHO WAS THE -- JUST

25  TO GIVE YOU SOME REFERENCE, HE WAS THE GUY WITH THE KIND OF

1  BIG MULLET FROM PURDUE; A PURDUE GRADUATE.  I THINK HE WAS --
2  I THINK HE WAS SUPERVISING SOME 16,000 PEOPLE IN ONE OF THE
3  JOBS MENTIONED.  HE'S A BIGSHOT AND HE WAS HERE SIMPLY
4  BECAUSE.  HE CAME DOWN HERE SIMPLY BECAUSE HE DIDN'T LIKE
5  BEING ACCUSED OF SAYING SOMETHING LIKE, *ARE YOU IN BED WITH*
6  *THE FRA?*  THAT'S NOT SOMETHING THAT HE WOULD SAY AND HE WAS
7  ANXIOUS TO COME TELL YOU ABOUT THAT.

8          AND MARK WHEELAND WAS THE MAN WHO MADE THE VERY
9  DELIBERATE, PAINFUL DECISION TO TERMINATE MR. TAYLOR BASED ON
10  THE FACTS THAT WERE GATHERED FOR HIM.  AND NOT ONLY DID HE
11  JUST DELIBERATE ON IT, BUT HE RAN THIS ENTIRE SITUATION
12  THROUGH THE UNION PACIFIC ETHICS COMMITTEE THAT OVERSEES AND
13  APPROVES OR DISAPPROVES ACTIONS LIKE THIS.  THIS WAS NOT TAKEN
14  LIGHTLY.

15          MR. TAYLOR WAS VERY VALUABLE TO UNION PACIFIC.
16  UNION PACIFIC LOST A LOT WHEN IT LOST MR. TAYLOR.  BUT GIVEN
17  MR. TAYLOR'S CHANGE IN CONDUCT, GIVEN THE THREATS, GIVEN THE
18  FAILURE TO COOPERATE, FAILURE TO FOLLOW THROUGH ON ROUTINE
19  THINGS, FAILURE TO TAKE ORDERS, ADAMANT REFUSAL TO CHANGE HIS
20  BEHAVIOR, UNION PACIFIC HAD NO CHOICE.  NO EMPLOYER WOULD HAVE
21  A CHOICE WITH EVEN HALF OF THAT GOING ON.

22          NO MATTER WHAT KIND OF WORK YOU'RE IN NO BUSINESS
23  CAN SURVIVE WITH ONE OF ITS MANAGERS BEHAVING THAT WAY.  AND
24  IN THIS CASE THE WORK THESE PEOPLE DO IS WORK THAT IS SAFETY
25  RELATED AND IT COULD BE VERY DANGEROUS IF THE MANAGERS ARE NOT

1    GETTING ALONG AND IF THINGS ARE NOT BEING WORKED ON ACCORDING

2    TO PROCEDURES AND THE RULES.

3            I MADE A LITTLE LIST OF THE BAD CONDUCT AND I'M

4    GOING TO JUST MENTION IT QUICKLY.  YOU PROBABLY MAY RECALL

5    SOME OTHER INSTANCES FROM THE TESTIMONY, OTHER THINGS.  BUT

6    HANGING UP ON HIS BOSS AND OTHERS ON CONFERENCE CALLS,

7    SHOUTING, RAISING HIS VOICE, BEING ARGUMENTATIVE ON THOSE

8    CONFERENCE CALLS PROBABLY JUST BEFORE HANGING UP.  WE TALKED

9    ABOUT RECORDING CONVERSATIONS AND THREATENING THAT HE HAD A

10   LAWYER.  I DON'T CONSIDER THOSE TO BE BIG DEALS.  A LOT OF

11   FOLKS RECORD THINGS THESE DAYS.  I THINK IN THE CONTEXT, THE

12   WAY IT HAPPENED HERE, I THINK THAT WAS TAKEN AS A THREAT.  AND

13   THE IDEA OF HAVING A LAWYER IS NO BIG DEAL.  I CAN HARDLY

14   ARGUE THAT YOU SHOULDN'T HAVE A LAWYER.

15           AND HE MENTIONED HE WAS UNDER THE WHISTLEBLOWER LAW.

16   HE KNEW ABOUT THAT.  HE KNEW THAT TODAY WOULD COME.  AND UNION

17   PACIFIC UNDERSTANDS WHISTLEBLOWER RETALIATION AND THEY KNOW

18   BETTER.  THEY KNOW BETTER.  EVERY MAN THAT SAT IN THAT STAND

19   KNOWS ABOUT THAT AND THEY KNOW BETTER AND EVERY MAN THAT SAT

20   IN THAT STAND WAS INVOLVED IN THIS TERMINATION AND THEY WERE

21   NOT APOLOGIZING ABOUT IT, ALTHOUGH THEY FELT VERY BAD THAT IT

22   HAPPENED.

23           MR. TAYLOR WAS DESCRIBED AS VERY ERRATIC IN HIS

24   BEHAVIOR.  YOU'LL RECALL IN THE HOUSE WHEN THEY CAME WITH THE

25   ADMINISTRATIVE LEAVE IDEA, PHILLIP HAWKINS EXPLAINED HOW

1    MR. TAYLOR WOULD BACK OFF AND THEN WALK TOWARD THEM

2    AGGRESSIVELY AND RAISE HIS VOICE AND THEN TALK CALMLY AND IT

3    WAS VERY, VERY ODD.  AND THEN ON THE WAY OUT KIND OF WALKED UP

4    BEHIND PHILLIP TO THE POINT THAT HE WAS FRIGHTENED AND KIND OF

5    BOWED UP TO PROTECT HIMSELF.  THERE WAS NO EVIDENCE OF ANY

6    PREVIOUS GRUDGE BETWEEN THE TWO.  THIS IS JUST ODD BEHAVIOR

7    AND IT IS NOT BEHAVIOR THAT CAN BE EXCUSED BY AN EMPLOYER.

8    WHAT'S AN EMPLOYER TO DO?

9         HE EVEN TOLD OTHERS ON HIS TEAM NOT TO COMPLY WITH

10   THE REQUESTS FROM MR. STUART TO GET MEASUREMENTS.  HE DARED

11   HIS BOSS TO FIRE HIM.  WHAT'S AN EMPLOYER TO DO?

12        UNION PACIFIC SHOWED THROUGH MULTIPLE, VERY

13   CREDIBLE, WITNESSES THAT ALL THIS IS TRUE.  SADLY, VERY SADLY

14   ALL THIS IS TRUE.  SO WE WIND UP HERE TODAY.  MR. TAYLOR HAS

15   LOST A VERY GOOD JOB.  HE'S FOUND A JOB I HOPE HE'S SATISFIED

16   WITH.  MR. TAYLOR HAS AN ASSET THAT EVERYBODY NEEDS AND THAT

17   IS A SPOUSE WHO SEEMS VERY SUPPORTIVE AND SEEMS LIKE A

18   WONDERFUL LADY.

19        BY ALL ACCOUNTS MR. TAYLOR IS A WONDERFUL MAN.  WE

20   DON'T KNOW EXACTLY WHAT HAPPENED TO CHANGE HIS CONDUCT ON HIS

21   JOB, BUT WHATEVER HAPPENED MADE THAT CONDUCT TOTALLY

22   UNACCEPTABLE UNDER ANYBODY'S RULE, WHETHER YOU'RE WORKING IN A

23   DAYCARE OR IN A FACTORY OR IN AN OFFICE OR OUT ON THE

24   RAILROAD, ANY OF THOSE EMPLOYERS WOULD HAVE HAD TO TAKE THIS

25   ACTION.

1      UNION PACIFIC HAS GOT ITS RESOURCES AND THEY HAVE

2   LEARNED THAT MANAGERS ARE SO VALUABLE THAT THEY WANT TO KEEP

3   THEM ANY WAY THEY POSSIBLY CAN, SO THEY WORKED OUT THIS PLAN

4   FOR -- A PERSONAL PERFORMANCE PLAN THAT YOU'VE HEARD ABOUT.

5   THAT IS KIND OF A RESET.  LET'S SIT DOWN AND LET'S WIPE THE

6   SLATE CLEAN HERE.  LET'S TALK ABOUT WHAT WE EXPECT FROM YOU.

7      **MR. FRASER:**  WOULD YOU PUT THAT UP, PLEASE?

8      I HOPE EVERYBODY CAN SEE THAT.  WHAT I'D LIKE TO DO

9   IS TO SCROLL DOWN AND IF YOU WOULD LOOK -- STOP THERE.

10      NOTE UNDER PERFORMANCE IMPROVEMENT PLAN THE FIRST

11   THING THERE IS COACHES, DO YOU SEE THAT?  THAT'S WHAT MANAGERS

12   DO ON THE RAILROAD.  THEY CALL IT *COACHING*.  WHEN YOU SEE

13   OTHER EMPLOYEES, ESPECIALLY PEOPLE IN YOUR CREW, DOING A JOB

14   YOU GO OUT AND GIVE THEM SOME DIRECTION.  IF THEY'RE DOING IT

15   RIGHT, FINE, CONGRATULATE THEM.  IF THEY'RE DOING IT WRONG,

16   EXPLAIN TO THEM HOW YOU CAN GET HURT DOING THAT OR HOW THERE'S

17   A TOOL IT'LL MAKE THAT GO EASIER.

18      ALL THIS TALKS ABOUT IS JUST DOING COACHING.  THEY

19   WANT TO SEE AS MANY -- AND THEY WRITE-UP THE COACHING

20   WRITE-UPS.  YOU SEE A GUY WALKING ACROSS A TRACK AND DOING IT

21   WRONG AND DANGEROUS, YOU STOP HIM AND PULL HIM OFF TO THE SIDE

22   AND YOU COACH HIM ABOUT IT AND YOU WRITE-UP A LITTLE TICKET.

23   IT DOESN'T REALLY GO AGAINST HIM, BUT THEY WANT TO SEE

24   MANAGERS MANAGING.  THEY WANT TO SEE MANAGERS MANAGING AND

25   SAFETY IS A BIG DEAL, SO THEY WANT THEM TO WRITE-UP THEIR

1    COACHING INCIDENTS.  SO THIS IS AN ENCOURAGEMENT TO INCREASE

2    YOUR LEVEL OF COACHING.

3             BELOW THAT IS PLANS, ORGANIZERS -- ORGANIZES AND

4    PRIORITIZES.  AND THIS IS SIMPLY TALKING ABOUT THE WELDING

5    GANGS LIKE WE REFERRED TO.  EVERYBODY WHO TESTIFIED UP HERE

6    SAID WE NEED TO ELIMINATE JOINTS IN WELDS AND THIS IS SAYING

7    TRY TO KEEP YOUR WELDERS ON WELDING JOBS, TRY TO KEEP YOUR

8    WELDERS FOCUSED ON ELIMINATING TWO MAIN LINE OR SLIDING JOINTS

9    PER WEEK.  THAT'S A GOAL.  THAT'S A COMPANY-WIDE GOAL.  THAT'S

10   NOT PUNISHMENT TO MR. TAYLOR.  THAT'S REMINDING HIM OF THE

11   COMPANY-WIDE GOAL AND WHAT THEY REALLY WANT TO HAVE HAPPEN.

12             WOULD YOU SCROLL ON DOWN FURTHER?

13             NEXT IS BUILDS TRUST.  ESTABLISH OPEN AND TRUSTING

14   RELATIONSHIPS.  APPARENTLY MR. TAYLOR HAD THAT FOR THE BETTER

15   PART OF HIS TEN YEARS.

16             BUILDS TRUST WITH HIS OWN GANG, WITH OTHER PEOPLE HE

17   ENCOUNTERS, ESPECIALLY WITH OTHER MANAGERS BECAUSE THEY HAVE

18   TO WORK TOGETHER ON A LOT OF THINGS.

19             BUILDS TRUST WITH HIS SUPERVISORS AND THE

20   HIGHER-UPS.  AND YOU DON'T DISOBEY WHEN THEY ASK YOU TO DO

21   SOMETHING.  ESPECIALLY WHEN IT'S SOMETHING THAT YOU KNOW AHEAD

22   OF TIME IS SUPPOSED TO BE DONE.  IF YOU TAKE A TRACK OUT OF

23   SERVICE YOU GET MEASUREMENTS SO THAT YOU CAN SHOW, YEAH, THIS

24   REALLY DOES NEED TO BE OUT OF SERVICE AND YES, IT DOES NEED

25   SOME REPAIR.  SO LET'S EITHER DO IT OURSELVES IF WE KNOW HOW

| | |
|---|---|
| 1 | TO DO IT OR WE'LL SEND IT TO OMAHA AND THEY'LL FIGURE OUT A |
| 2 | WAY. |
| 3 | SKIP DOWN, PLEASE. |
| 4 | THE NEXT ONE IS TEAMWORK, WHICH IS MUCH THE SAME. |
| 5 | COMMON GOALS.  EVERYBODY IS IN IT FOR THE SAME |
| 6 | REASONS.  PEOPLE HAVE DIFFERENT SECTIONS OF TRACK AS THEIR |
| 7 | RESPONSIBILITY, BUT THEY'RE IN IT FOR THE SAME REASONS. |
| 8 | AND IT'S IMPORTANT TO GET ALONG WITH OTHER PEOPLE IN |
| 9 | EVERYTHING WE DO.  WHETHER IT'S THAT CHILDCARE WORKER OR IT'S |
| 10 | THE FACTORY WORKER OR IT'S THE OFFICE WORKER OR ANYBODY IN |
| 11 | BETWEEN.  YOU'VE GOT TO GET ALONG WITH OTHER PEOPLE TO GET THE |
| 12 | JOB DONE. |
| 13 | WOULD YOU BRING IT ON DOWN, PLEASE? |
| 14 | THEN THERE ARE OVERALL COMMENTS.  AND THERE WAS |
| 15 | FOLLOW-UP.  THEY WANTED REGULAR MEETINGS TO TALK ABOUT HOW HE |
| 16 | WAS DOING.  YOU DON'T JUST THROW SOMEBODY WHO'S STRUGGLING OUT |
| 17 | INTO THE COLD WORLD WITHOUT KEEPING AN EYE ON THEM.  SO IF HE |
| 18 | WAS STRUGGLING TO GET THESE THINGS DONE AND IF THERE COULD BE |
| 19 | SOME HELP GIVEN, HELP WOULD BE GIVEN.  SO STAY IN TOUCH. |
| 20 | WE'LL HAVE BIWEEKLY MEETINGS.  I THINK THAT MEANS EVERY TWO |
| 21 | WEEKS, BIWEEKLY. |
| 22 | AND THEN AT THE VERY END THERE IS THIS STATEMENT: |
| 23 | *FAILURE TO SHOW PROGRESS THROUGHOUT THE DURATION OF THIS* |
| 24 | *PERFORMANCE IMPROVEMENT PLAN OR ANY FUTURE INCIDENTS INVOLVING* |
| 25 | *PERFORMANCE RELATED TO THIS PERSONAL IMPROVEMENT PLAN WILL BE* |

1   *CAUSE FOR ACTION UP TO AND INCLUDING DISMISSAL.*

2            THINGS HAD REACHED A CRITICAL POINT BUT THIS WAS A

3   LIFELINE.  IF YOU'RE HAVING TROUBLE WE'LL GUIDE YOU THROUGH

4   IT.  JUST FOLLOW THIS AND WE'LL MAKE IT AND WE'LL GET BACK

5   TOGETHER.  BUT IF YOU DON'T, WE'VE GOT TO MOVE ON.  WE'VE GOT

6   WORK TO DO.  AND IT'S NOT JUST WORK, IT'S WORK THAT INVOLVES

7   SAFETY AND THAT'S IMPORTANT WORK.

8            AT THE BOTTOM THERE IS A PLACE TO SIGN FOR

9   ACKNOWLEDGMENT, NOT FOR AGREEMENT WITH EVERYTHING.  IT'S ALL

10  SUBJECT TO DISCUSSION, TO DEBATE, TO CHANGE.  IF THERE'S

11  ANYTHING ABOUT IT, IF YOU THINK IT'S PRESSURING YOU IN THE

12  WRONG DIRECTION, WE'LL TALK ABOUT IT.  THIS IS JUST AN

13  ACKNOWLEDGMENT THAT YOU GOT THIS.  IT'S A LIFELINE.

14            MR. TAYLOR SAID, *NO, NO, NO*.  AND HE THREW IT BACK

15  ON THE TABLE AND SAID HE WAS NOT CHANGING A THING.  THAT IS

16  THE SAD PART ABOUT THIS CASE.  BECAUSE IF YOU COULDN'T ANSWER

17  THE QUESTION EARLIER IT COMES UP AGAIN:  WHAT'S AN EMPLOYER TO

18  DO?

19            ABOUT A MONTH LATER MR. TAYLOR, HAVING BEEN OFF, WAS

20  TERMINATED AFTER CAREFUL CONSIDERATION UP THE LINE AND THROUGH

21  AN ETHICS COMMITTEE.

22            I'M GOING TO PUT THE VERDICT FORM UP HERE, AS

23  MR. SMITH DID, AND THIS IS WHAT YOU'LL HAVE WITH YOU IN THE

24  OTHER ROOM WHEN YOU DELIBERATE.  AND THESE ARE THE QUESTIONS

25  YOU'LL BE ASKED.  AND THE BLANKS FOR ANSWERS ARE OUT THERE AND

1   YOU'LL SEE -- BEFORE WE LOOK IN MUCH DETAIL, YOU'LL SEE THERE

2   ARE INSTRUCTIONS BETWEEN THE QUESTIONS, IF YOU ANSWERED YES GO

3   ON, IF YOU ANSWERED NO DON'T GO ON ANY FURTHER AND THAT SORT

4   OF THING.

5           BUT THE -- LET ME JUST TELL YOU UNION PACIFIC'S

6   POSITION ON THIS, IF I CAN.  IF YOU DON'T REMEMBER IT THAT'S

7   OKAY.  IT'S JUST HARD -- SOME OF THIS LANGUAGE IS KIND OF

8   HARD TO FOLLOW.

9           DID MR. TAYLOR ENGAGE IN A PROTECTED ACTIVITY?  THE

10  LAW DEFINES PROTECTED ACTIVITY TO INCLUDE SAFETY MATTERS.

11  WELL, HIS WHOLE JOB WAS SAFETY MATTERS.  I MEAN WOULDN'T YOU

12  THINK -- I WOULD THINK YOU'D CALL IT THAT BECAUSE HE'S

13  MAINTAINING THE RAILROAD.  HE'S INVOLVED WITH SAFETY TO SOME

14  EXTENT.  SO YOU CAN MAKE UP YOUR OWN MIND ABOUT THAT ONE.  I

15  WOULD SUGGEST THE ANSWER TO THAT IS PROBABLY YES, THAT HE WAS

16  ENGAGED IN ACTIVITY THAT WAS SAFETY RELATED.  THAT'S NOT WHAT

17  GOT HIM FIRED.  HE GOT FIRED FOR HIS CONDUCT BUT IT WAS NOT

18  SAFETY RELATED.  HIS CONDUCT WAS JUST HUMAN RELATED.

19          THE NEXT QUESTION IS DID HE PROVE -- DID THE

20  PLAINTIFF PROVE THAT HIS PROTECTED ACTIVITY WAS A CONTRIBUTING

21  FACTOR TO THE DECISION TO TERMINATE HIM?  AND THE ANSWER THERE

22  IS NO.  THE ANSWER THERE IS NO.

23          IF HE HAD BEEN FUSSING ABOUT THE LUNCHROOM IN THE

24  SAME WAY HE FUSSED ABOUT THESE THINGS, IF HE HAD THREATENED IN

25  THE SAME WAY ABOUT THE LUNCHROOM THE SAME WAY HE THREATENED

1  ABOUT THESE THINGS.  IF HE DARED TO BE FIRED BECAUSE OF THE

2  WAY HE WAS BEHAVING AND SAYING HE WASN'T GOING TO CHANGE, ALL

3  BECAUSE OF THE LUNCHROOM, HE WOULD HAVE BEEN TERMINATED.  THAT

4  WOULD MAYBE HAVE BEEN -- MAYBE HAVE BEEN JUST AS SAD.

5         UNDER THAT IF YOU DO ANSWER -- IF YOU ANSWERED THAT

6  NO YOU DO NOT HAVE TO GO THROUGH ANY FURTHER QUESTIONS.

7  BASICALLY THAT'S SAYING WHY WAS HE TERMINATED?  AND I AM

8  ARGUING TO YOU THAT IT WAS HIS CONDUCT, NOT THE ACTION HE TOOK

9  TO TAKE A TRACK OUT OF SERVICE.  IT WAS HIS CONDUCT.

10         BUT IF YOU GO FURTHER -- I HAVE TO ALWAYS SAY BUT IF

11  YOU GO FURTHER -- DID UNION PACIFIC PROVE BY CLEAR AND

12  CONVINCING EVIDENCE THEY WOULD HAVE TERMINATED THE PLAINTIFF

13  EVEN IF HE HAD NOT BEEN ENGAGED IN A PROTECTED ACTIVITY?  AND

14  THAT ANSWER IS ABSOLUTELY YES, THEY WOULD HAVE HAD TO

15  TERMINATE HIM.  AND THAT'S -- IF IT WAS ABOUT A LUNCHROOM OR A

16  PARKING SPACE OR WHATEVER, IF THAT HAD TRIGGERED ALL OF THIS,

17  HE WOULD HAVE BEEN FIRED BY UNION PACIFIC UNFORTUNATELY AND

18  YOU HEARD THAT FROM EVERY SINGLE WITNESS.  WE HAD PEOPLE ON

19  THE SAME LEVEL WITH MR. TAYLOR, THAT WAS PHILLIP HAWKINS.  WE

20  HAD PEOPLE JUST ABOVE MR. STUART, JUST ABOVE THAT.  JACOB

21  TESTIFIED ABOUT AND THE TWO HIGHER-UP PEOPLE ALL COULD TALK

22  ABOUT WHAT IT IS THAT CAUSED THE JOB ACTION TO BE TAKEN.

23         I WANT TO EXPLAIN SOMETHING VERY IMPORTANT TO YOU

24  AND THAT IS THIS:  WE HAVE ENTERED INTO A STIPULATION ABOUT

25  BACKPAY.  BACKPAY MEANS FROM THE TIME MR. TAYLOR WAS

1   TERMINATED UNTIL TODAY, ALL RIGHT?  BELIEVE IT OR NOT WE CAN

2   GET EXPERTS TO CALCULATE IT AND THE TWO EXPERTS DON'T COME UP

3   WITH THE SAME THING.  SO RATHER THAN HAVE A BATTLE BETWEEN THE

4   EXPERTS ABOUT WHAT THAT BACKPAY WAS, WE'VE AGREED THAT IF

5   BACKPAY IS OWED IT IS IN THAT AMOUNT AND IT'LL BE IN YOUR JURY

6   CHARGE; $312,000 OR SO, OKAY?

7           THAT STIPULATION DOES NOT MEAN WE AGREE THAT MONEY

8   IS OWED.  WE VERY STRONGLY BELIEVE THAT NO MONEY IS OWED IN

9   THIS CASE, BUT WE HAVE SAVED TIME FOR THIS TRIAL BY

10  ELIMINATING TESTIMONY ABOUT BACKPAY.  BUT IT'S SOMETHING THAT

11  CAN BE FIGURED.  OUR FIGURES WERE PRETTY CLOSE SO WE JUST

12  STIPULATED.  IF IT'S OWED, HERE'S THE AMOUNT.  SAVE US MAYBE

13  HALF A DAY, ALL RIGHT?  IT IS NOT IN ANY WAY AN ADMISSION THAT

14  ANYTHING IS OWED AT ALL.

15          THE NEXT IS ABOUT WHETHER WE SHOWED THAT MR. TAYLOR

16  MITIGATED HIS DAMAGES.  THAT MEANS REDUCED HIS DAMAGES.  WE

17  DID NOT PRESENT EVIDENCE TO SHOW THAT HE DOGGED IT OR DIDN'T

18  TRY TO -- DIDN'T TAKE A JOB THAT WAS OFFERED TO HIM, SO THE

19  ANSWER TO THAT IF YOU WOULD GET THERE IS NO.  WE DID NOT PROVE

20  THAT HE FAILED TO MITIGATE HIS DAMAGES.

21          AND THEN FOR THE OTHER QUESTIONS, THE PAIN AND

22  SUFFERING, THAT IS A VERY TOUGH THING TO PUT IN DOLLARS AND

23  CENTS.  WE'RE TALKING ABOUT AWARDING SOMEBODY MONEY HERE FOR

24  LOSING THEIR JOB IN THE SENSE IT WAS A CAREER.  AND WE'RE

25  TALKING ABOUT IN ADDITION TO HIS BACKPAY GIVING MONEY FOR HIS

1    EMOTIONAL SUFFERING AND STUFF LIKE THAT.  EMOTIONAL SUFFERING

2    GOES AWAY TO A CERTAIN EXTENT WHEN YOU RECEIVE YOUR BACKPAY.

3    BUT AN AWARD THERE -- IT'S POSSIBLE YOU COULD DECIDE IT SHOULD

4    BE JUSTIFIED AND I'D BE WRONG NOT TO TALK ABOUT A NUMBER.

5    EVEN THOUGH, AGAIN, I WANT TO MAKE SURE YOU UNDERSTAND, THE

6    FACT THAT I TALK ABOUT A NUMBER DOES NOT MEAN THAT I THINK

7    ANYTHING IS OWED.  I THINK A NUMBER IN THE $100,000 RANGE IS A

8    LOT OF MONEY.  BACKPAY AND $100,000 TO GET TO TODAY.

9         FOR FUTURE PAIN AND SUFFERING I CAN ONLY SAY THAT I

10   RECALL MRS. TAYLOR SAYING HE'S MUCH BETTER NOW, SO I DON'T

11   KNOW WHAT THAT SHOULD BE; 25, $50,000 IN THAT RANGE.

12        THE LAST QUESTION IS -- MAKES ME WANT TO USE A WORD

13   THAT I NEVER WANT TO USE IN TALKING TO A JURY.  I NEVER WANT

14   TO USE THE WORD RIDICULOUS, BUT IT COMES TO MIND WHEN WE'RE

15   TALKING ABOUT PUNISHMENT DAMAGES AGAINST UNION PACIFIC.  I

16   COULD SEE UNION PACIFIC BEING PUNISHED IF THEY ALLOWED

17   MR. TAYLOR TO STAY ON THE JOB AND IF THOSE JOB PERSONALITY

18   ISSUES THAT MR. TAYLOR DEVELOPED HAD CAUSED SOME KIND OF A

19   SERIOUS TRAIN WRECK, UNION PACIFIC WOULD BE ON THE SPOT,

20   BECAUSE IT HAD AMPLE FOREWARNING THAT IT HAD A MANAGER WHO WAS

21   NOT COOPERATING WITH OTHERS ON THE RAILROAD, WHO WAS HANGING

22   UP ON THEM IN CONFERENCE CALLS SO THEY COULDN'T COMMUNICATE,

23   WHO WAS NOT FOLLOWING THROUGH ON HIS BASIC DUTIES, WHO WAS

24   TELLING HIS BOSS, *I'M NOT GOING TO DO WHAT YOU TELL ME AND I'M*

25   *GOING TO TELL THE PEOPLE WORKING UNDER ME TO NOT DO IT TOO AND*

1    *FURTHER I'M NOT GOING TO CHANGE A THING.*

2         UNION PACIFIC WOULD BE IN VERY HOT WATER IF SOME

3    TRAIN HAD DERAILED OR A BIG ACCIDENT HAPPENED ON THAT

4    TERRITORY WHEN UNION PACIFIC KNEW ALL OF THAT.  CAN YOU

5    IMAGINE HOW YOU'D FEEL BEING A JUROR WITH SOME VERY INJURED

6    PEOPLE UP HERE ASKING YOU FOR DAMAGES AGAINST UNION PACIFIC

7    BECAUSE IT ALLOWED ITS RAILROAD TO GO TO POT BECAUSE ITS

8    MANAGEMENT WAS IN DISARRAY OVER THAT SECTION?  BECAUSE THAT

9    PERSON THAT WAS SUPPOSED TO BE IN CHARGE WAS GUILTY OF ALL

10   THAT I JUST MENTIONED AND UNION PACIFIC WAS WELL AWARE OF IT.

11        WHAT IS AN EMPLOYER SUPPOSED TO DO?  ASIDE FROM

12   COMMON SENSE TELLING YOU THEY NEED TO TERMINATE THAT MANAGER,

13   THE EXAMPLE I JUST GAVE INDICATES THE LAW WOULD TELL YOU

14   YOU'VE GOT TO TERMINATE THAT MANAGER.  YOU CAN'T ALLOW THAT.

15   SO UNION PACIFIC DID ULTIMATELY DO WHAT AN EMPLOYER HAS TO DO

16   ONLY AFTER THEY WENT SEVERAL LEVELS BEYOND -- ABOVE AND BEYOND

17   WHAT MOST WOULD HAVE DONE.

18        WOULD YOU PUT UP J-11, PLEASE?

19        IF YOU NEED A REVIEW OF WHAT WENT ON, IT'S FOUND IN

20   EXHIBIT J-11.  THAT WAS THE E-MAIL THAT MR. GILSDORF, JACOB,

21   SENT TO MR. WHEELAND AND OTHERS THAT DETAILED NOT OPINION, BUT

22   DETAILED THE FACTS OF WHAT HAD GONE ON, AND IT WAS BASED ON

23   THOSE FACTS AND THE REASONING THAT YOU AND I HAVE JUST BEEN

24   THROUGH, THAT MR. WHEELAND MADE THE PAINFUL DECISION TO

25   TERMINATE MR. TAYLOR.

1        I'M VERY PLEASED TO SEE THAT MR. TAYLOR HAS GOT

2   ANOTHER JOB THAT APPARENTLY HE'S GOOD AT AND IT WOULD BE VERY

3   REWARDING TO TEACH EIGHTH GRADE MATH.  I'M NOT SURE I COULD

4   PASS EIGHTH GRADE MATH.  HE'S GOT THAT.  HE'S GOT HIS WIFE AND

5   HE'S MOVED ON.  AND THAT'S VERY GOOD AND I COMMEND HIM FOR

6   PICKING HIMSELF UP AND DOING THAT.

7        BUT TO SUE UNION PACIFIC RAILROAD PLAYING TO BE A

8   WHISTLEBLOWER AND ASK FOR MONEY AFTER FORCING HIMSELF TO BE

9   TERMINATED FROM HIS JOB IS NOT SOMETHING I COULD JUST STAND BY

10  AND NOT SPEAK UP ABOUT.

11       WHEN YOU DELIBERATE IN THIS CASE I ASK YOU TO THINK

12  BACK TO EACH OF THE RECITATIONS OF FACT, NOT HERE'S WHAT I

13  HEARD, YOU KNOW, SOMEONE TELL ME.  IT'S NOT SECONDHAND.

14  RECITATIONS OF FACTS BY VERY RESPONSIBLE PEOPLE.  MR. HAWKINS,

15  MR. STUART, MR. GILSDORF WERE ALL VERY MUCH INVOLVED CLOSE

16  ENOUGH TO HAVE SEEN, CLOSE ENOUGH TO HAVE RECEIVED SOME OF

17  THIS ABUSE, CLOSE ENOUGH TO HAVE HEARD THE COMMENTS, CLOSE

18  ENOUGH TO KNOW THAT MR. TAYLOR HAD IN ADDITION TO -- IN

19  ADDITION TO PARTICIPATING IN THIS BAD BEHAVIOR, AND MAYBE THE

20  WORSE THING OF ALL IS, AFTER HE DID IT AND CONTINUED TO DO IT

21  HE SAID, *I'M NOT GOING TO CHANGE A THING*.

22       SO YOU THROW A LIFELINE ONE MORE TIME; PERSONAL

23  IMPROVEMENT PLAN.  YOU TRY TO TALK IT THROUGH WITH HIM.  HE

24  THROWS IT BACK ON THE TABLE AND SAYS, *NO, NO, NO.  I'M NOT*

25  *GOING TO CHANGE A THING.*  WHAT IS AN EMPLOYER TO DO?

1        I ASK YOU TO CONSIDER THAT AS YOU DELIBERATE IN THIS

2   CASE.  I DON'T THINK THE EVIDENCE COULD BE MORE CLEAR.  I

3   DON'T THINK THE WITNESSES THAT WE PRESENTED COULD BE ANYMORE

4   CREDIBLE.  THEY ARE SOLID PEOPLE.  AND I THINK THEY HAVE

5   PRESENTED THIS CASE VERY WELL AND I HOPE THAT YOU WILL DO THE

6   RIGHT THING.  I KNOW YOU WILL.  THANK YOU.

7        **THE COURT:**  THANK YOU.  MR. SMITH.

8            *(REBUTTAL CLOSING BY PLAINTIFF)*

9        **MR. SMITH:**  I WOULD LIKE TO ANSWER MR. FRASER'S

10  QUESTION ABOUT WHAT AN EMPLOYER IS SUPPOSED TO DO OR WHAT

11  COULD THEY DO.  THERE ARE A WIDE RANGE OF MANAGERIAL TOOLS

12  THAT ARE AVAILABLE TO EMPLOYERS WITH RESPECT TO SITUATIONS

13  WHERE AN EMPLOYEE MIGHT BE PERCEIVED AS CREATING SOME KIND OF

14  PROBLEM.  IT'S CALLED, NUMBER ONE, HAVING AN HONEST,

15  FACE-TO-FACE COMMUNICATION WITH THEM AND FIND OUT REALLY

16  WHAT'S GOING ON.  WHAT IS THE ROOT OF THE TENSION AND HOW CAN

17  WE RESOLVE THE TENSION.  THAT NEVER HAPPENED IN THIS CASE.

18  FAR FROM IT.

19        MR. WHEELAND GOT THE LETTER, J-11, MR. FRASER HAS

20  TOLD YOU, READ IT, PROBABLY TOOK LESS THAN FIVE MINUTES.

21  NEVER TALKED TO JOHNNY TAYLOR, NEVER ASKED ABOUT THE FACT THAT

22  THE LETTER OF RECOMMENDATION OF TERMINATION SPECIFICALLY

23  REFERS TO JOHNNY TAYLOR'S WHISTLEBLOWING ACTIVITIES.  WHAT

24  COULD THE EMPLOYER DO?  INVESTIGATE THAT.  WHAT COULD THE

25  EMPLOYER DO IF THEY FELT -- AND I'LL TOUCH ON THIS IN A

1    MINUTE -- IF THEY FELT THERE WAS INAPPROPRIATE PERSONALITY

2    EXHIBITED THAT COULD BE A REPRIMAND, THAT CAN BE A COUNSELING

3    SESSION, THAT CAN BE A SUSPENSION, THAT COULD BE THOSE THINGS

4    TO MAKE IT CLEAR TO THE EMPLOYEE THAT WE DON'T LIKE WHAT YOU

5    SAID.  BUT WHAT YOU HAVE TO REALIZE IS THE CONTEXT OF ALL OF

6    THIS.

7            THESE MEETINGS, AT WHICH THERE APPARENTLY WAS SOME

8    TENSION, THESE MEETINGS WOULD HAVE NEVER HAPPENED BUT FOR

9    MR. TAYLOR'S PROTECTED ACTIVITY.  THAT'S WHAT THE MEETINGS

10   WERE ALL ABOUT.  IT WAS A PUSH AND PULL BETWEEN JOHNNY TAYLOR

11   AND KENNETH STUART ABOUT THE PROTECTED ACTIVITY AND THAT'S THE

12   CONTEXT.  AND REMEMBER I THINK IT'S SO TELLING -- REMEMBER

13   THAT KENNY STUART RECOMMENDED TERMINATION BECAUSE OF

14   INSUBORDINATION.  WHAT WAS INSUBORDINATION?  WELL, HE WAS

15   DISRESPECTFUL AND INSUBORDINATE.  HOW?  WELL, HE WAS TRYING TO

16   TELL ME -- AND THE WAY HE DID IT, TRIED TO TELL ME ABOUT HIS

17   RELUCTANCE TO TAKE THE TRACKS OUT OF SERVICE.

18           NOW THAT COULDN'T BE ANYMORE WOUND UP OR BOUND UP IN

19   THE OVERALL SITUATION HERE AND THEY WANT TO LOOK JUST AT THE

20   THINGS THAT THEY ALLEGE THAT MR. TAYLOR SAID INCORRECTLY.

21   WELL, YOU ARE THE JUDGES OF THE FACTS.  THE BIG BRASS FROM

22   UNION PACIFIC, THEY DON'T JUDGE THE FACTS, THE LAWYERS DON'T

23   JUDGE THE FACTS.  YOU DO.  AND THE WONDERFUL THING ABOUT OUR

24   JURY SYSTEM IS THAT BEFORE -- IN A COURT OF LAW BEFORE A JURY,

25   UNION PACIFIC RAILROAD CORPORATION AND JOHNNY TAYLOR STAND ON

1    EQUAL FOOTING.

2           YOU DON'T HAVE TO NECESSARILY ACCEPT AT FACEVALUE
3    WHAT THE U.P. BRASS SAYS.  YOU LOOK AT THE UNDERLYING FACTS.
4    YOU FIGURE OUT, ARE ANY OF THESE THINGS THAT THEY'RE SAYING
5    ABOUT JOHNNY TAYLOR'S CONVERSATIONS ON TWO OCCASIONS IS WHAT
6    IT BOILS DOWN TO, WAS THERE A RENDITION OF THAT?  WAS IT
7    COACHED?  WAS IT -- WAS IT GENUINE?  DID THEY EXAGGERATE?  THE
8    TALK ABOUT HOW DISRESPECTFUL MR. TAYLOR WAS, WAS THAT
9    EXAGGERATED?  I RESPECTFULLY SUBMIT THAT YOU SHOULD CONSIDER
10   THAT.  I BELIEVE IT WAS.  YOU BE THE JUDGE OF JOHNNY TAYLOR
11   AND HIS CHARACTER.  AND UNION PACIFIC WANTS TO SAY HE'S A
12   WONDERFUL -- WONDERFUL PERSON.  AND, YOU KNOW, THEY'RE JUST
13   DODGING AROUND AND AROUND AND AROUND AND AROUND IN CIRCLES.
14   THE BOTTOM LINE IS THE PROTECTED ACTIVITY WAS THE ROOT OF THE
15   TERMINATION AND BASICALLY MR. STUART ADMITTED IT.

16          NOW, THERE -- THE JUDGE WILL INSTRUCT YOU ABOUT
17   CONTRIBUTING FACTOR AND IT'S NOT SO COUTH LIKE I SAID EARLIER.
18   IF JOHNNY TAYLOR'S CONDUCT ENTERED INTO THE DECISION AND IF
19   THE PROTECTED ACTIVITY ENTERED INTO THE DECISION, THAT'S
20   ENOUGH.  THAT'S ENOUGH TO SHOW WHAT WE NEED TO SHOW.

21          **THE COURT:**  MR. SMITH, YOU HAVE FIVE MINUTES.

22          **MR. SMITH:**  THANK YOU VERY MUCH, YOUR HONOR.

23          I THINK THERE ARE A LOT OF FACTUAL DETAILS HERE THAT
24   I CAN NOT POSSIBLY COVER.  BUT YOU'VE HEARD THE EVIDENCE.  YOU
25   KNOW THAT STATEMENTS OF LAWYERS ARE NOT EVIDENCE.  YOU NEED TO

1   EVALUATE THE CREDIBILITY OF EACH -- OF EACH WITNESS.  AND, YOU

2   KNOW, THE BOTTOM LINE IS THAT THERE WAS NO DRASTIC SUDDEN

3   CHANGE IN JOHNNY TAYLOR AFTER TEN AND A HALF YEARS; THAT ALL

4   OF THAT IS JUST EXAGGERATED.  BUT EVEN IF THEY HAD A CONCERN,

5   I MEAN ALL THEY COULD DO IS DO SOME COUNSELING OR THINGS LIKE

6   THAT.  THAT'S WHAT YOU DO WITH VALUABLE EMPLOYEES.  YOU DON'T

7   JUST TERMINATE THEM AND DESTROY THEIR CAREERS.

8   　　　　　THANK YOU VERY MUCH.

9   　　　　　**THE COURT:**  THANK YOU.

10   　　　　　OKAY, LADIES AND GENTLEMEN.  YOU'VE BEEN VERY

11   ATTENTIVE FOR ABOUT TWO HOURS.  IT'S GOING TO TAKE THE COURT A

12   FEW MINUTES TO GIVE YOU SOME INSTRUCTIONS.  LET'S STRETCH OUR

13   LEGS.  WE'LL TAKE A TEN MINUTE RECESS.

14   　　　　　　　　　　　*(RECESS)*

15   　　　　　**THE COURT:**  OKAY.  BE SEATED REAL QUICKLY.

16   　　　　　TWO QUESTIONS:  ONE IS Y'ALL NEED TO GET WITH BARB

17   ABOUT YOUR EXHIBITS.  ARE WE ALL SQUARE ON THOSE?

18   　　　　　**MR. SCHMIDT:**  YOUR HONOR, WE'RE STILL JUST CHECKING

19   IT OVER, SO FAR WE'RE FINE.

20   　　　　　**THE COURT:**  ALL RIGHT.  WELL, KEEP LOOKING.

21   　　　　　OKAY.  I HEARD MR. FRASER TO CONCEDE, I THINK THE

22   WORDS HE USED WAS, WE DIDN'T PROVE FAILURE TO MITIGATE.  DID

23   YOU CONCEDE THAT IN YOUR CLOSING?

24   　　　　　**MR. FRASER:**  I THINK I DID, YOUR HONOR.

25   　　　　　**MS. SHOONMAKER:**  YES, HE DID YOUR HONOR.

1      **THE COURT:**  THEN WHY ARE WE HAVING IT ON THE VERDICT

2    FORM?

3      **MS. SHOONMAKER:**  I DON'T THINK IT NEEDS TO REMAIN ON

4    THE JURY VERDICT FORM.

5      **THE COURT:**  ALL RIGHT.  WE ARE GOING TO TAKE OFF 2B

6    AND 2C.  AND ON THE VERDICT FORM -- I MEAN ON THE INSTRUCTIONS

7    THE MITIGATION WAS ADDED AT -- DO YOU HAVE A PAGE NUMBER,

8    EMILY?  IT'S BACK TOWARD THE BACK WHERE THE DAMAGES ARE.

9    LET'S SEE.

10      **LAW CLERK:**  IT'S ON PAGE 9 OF 10.

11      **MS. SHOONMAKER:**  9 OF 11, JUDGE THE LAST PARAGRAPH

12    IS WHERE IT BEGINS.

13      **THE COURT:**  OKAY.  SO IT LOOKS LIKE AT THE BOTTOM OF

14    PAGE 9 WE TAKE OUT THE LANGUAGE STARTING AT "A PERSON WHO

15    CLAIMS" AND THAT LANGUAGE COMES OUT ALL THE WAY TO THE TOP OF

16    10 THROUGH THE END OF THAT PARAGRAPH.  ARE THE PARTIES IN

17    AGREEMENT WITH THAT?

18      **MS. SHOONMAKER:**  UNION PACIFIC RAILROAD IS, YOUR

19    HONOR.

20      **THE COURT:**  PLAINTIFFS?

21      **MR. SCHMIDT:**  YES, YOUR HONOR.

22      **THE COURT:**  OKAY.  JUST TO RECAPITULATE, THE COURT

23    WILL NOT INSTRUCT THE JURY ON MITIGATION OF DAMAGES BECAUSE

24    UNION PACIFIC CONCEDED THAT IN THEIR CLOSING, SO AT THE BOTTOM

25    OF PAGE 9 ON THE JURY INSTRUCTIONS, THE LAST FULL PARAGRAPH

1   THAT ENDS AT THE TOP OF PAGE 10, WILL NOT BE READ TO THE JURY.

2   AND ON THE VERDICT FORM THE TWO QUESTIONS 2B AND 2C WILL NOT

3   BE SUBMITTED TO THE JURY.  SO THE VERDICT FORM AND THE JURY

4   INSTRUCTIONS WILL BE ALTERED IN THAT REGARD.

5        ALL RIGHT.  DO YOU THINK THAT BASED ON THE CLOSINGS

6   THAT THERE NEED TO BE ANY OTHER MODIFICATIONS TO THE VERDICT

7   FORM OR TO THE JURY INSTRUCTIONS?

8        **MR. SMITH:**  YOUR HONOR, I UNDERSTOOD MR. FRASER TO

9   SAY THAT HE BASICALLY CONCEDED THE PROTECTED ACTIVITY ELEMENT.

10       **THE COURT:**  ACTUALLY HE DID.

11       **MR. SMITH:**  YES, YOUR HONOR.

12       **THE COURT:**  WHAT'S UNION PACIFIC'S POSITION ON THAT?

13       **MR. FRASER:**  YOUR HONOR, MY INTENT WAS NOT

14  NECESSARILY TO CONCEDE BUT TO SAY THAT I WOULD SUGGEST THAT

15  THEY COULD FIND THAT, THAT'S MY RECOLLECTION OF MY WORDING.

16  MY INTENT WAS NOT TO CONCEDE, BUT TO SAY THAT I COULD SUGGEST

17  THAT THEY COULD FIND THAT.  THAT'S MY RECOLLECTION OF MY

18  WORDING.  MY INTENT WAS NOT TO CONCEDE IT, BUT TO SUGGEST TO

19  THEM THAT THEY MAY WELL FIND THAT.  AND I'M NOT ARGUING ONE

20  WAY OR THE OTHER ABOUT IT.  I TRYING TO RECALL.

21       **THE COURT:**  OKAY.  I'M GOING TO LEAVE THE VERDICT

22  FORM AS IT IS FOR THE FOLLOWING REASON:  AT THE POINT THAT I

23  HEARD THE WORDS, BECAUSE I WAS A LITTLE SURPRISED BECAUSE, YOU

24  KNOW, I THOUGHT THAT THAT WAS -- THAT THAT WAS STILL UP FOR

25  GRABS, BUT AT THAT POINT MR. FRASER WASN'T HIGHLIGHTING OR DID

| | |
|---|---|
| 1 | NOT HAVE THE VERDICT FORM UP ON THE ELMO FOR THE JURY. |
| 2 | ON THE OTHER HAND, WHEN WE GOT TO MITIGATION HE |
| 3 | CLEARLY HAD THAT UP ON THE VERDICT FORM AND WHEN HE GOT TO 2B |
| 4 | AND 2C HE SAID WE HAVEN'T PROVEN THAT OR WORDS TO THAT EFFECT. |
| 5 | SO BECAUSE OF THAT LITTLE NUANCE, I'M GOING TO LET THE |
| 6 | PROTECTED ACTIVITY -- I'M GOING TO LET THE JURY DELIBERATE ON |
| 7 | THE PROTECTED ACTIVITY BECAUSE WE'VE SPENT, QUITE FRANKLY, |
| 8 | FOUR DAYS ARGUING OVER IT OR PUTTING ON EVIDENCE ABOUT IT. |
| 9 | MR. SCHMIDT, YOU HAVE SOMETHING TO SAY? |
| 10 | **MR. SCHMIDT:**  YOUR HONOR, MY RECOLLECTION IS THAT HE |
| 11 | DID HAVE THE VERDICT FORM UP WHEN HE MADE THAT STATEMENT. |
| 12 | **THE COURT:**  MY LAW CLERK IS SAYING YES, HE DID.  I |
| 13 | MEAN WE ARE IN SOMEWHAT OF A QUANDARY.  WE SPENT FOUR DAYS |
| 14 | ARGUING ABOUT PROTECTED ACTIVITY. |
| 15 | **MR. SMITH:**  WELL, MAYBE IT'S BECAUSE WE PROVED IT SO |
| 16 | WELL, YOUR HONOR, AND MR. FRASER IS JUST AN HONEST MAN. |
| 17 | **THE COURT:**  I DON'T DOUBT ANYBODY'S INTEGRITY OR |
| 18 | HONESTY.  WE'RE GOING TO LET THE JURY DELIBERATE ON IT.  WHAT |
| 19 | WAS SAID WAS SAID.  THEY WERE LISTENING AND WE'RE GOING TO LET |
| 20 | THE JURY DELIBERATE. |
| 21 | OKAY.  WE CAN BRING IN THE JURY. |
| 22 | *(JURY ENTERED COURTROOM)* |
| 23 | **THE COURT:**  BE SEATED. |
| 24 | OKAY.  WE ARE VERY, VERY CLOSE, LADIES AND |
| 25 | GENTLEMEN.  AT THIS POINT IT IS THE COURT'S OBLIGATION TO |

1    INSTRUCT YOU ON THE LAW.  AS I TOLD YOU AT THE BEGINNING, YOU

2    ARE THE JUDGES OF THE FACT, BUT AT THIS POINT THE COURT WILL

3    GIVE YOU SOME INSTRUCTIONS ON WHAT THE LAW IS.

4         NOW THAT ALL OF THE EVIDENCE IN THIS CASE HAS BEEN

5    PRESENTED AND YOU HAVE HEARD THE FINAL ARGUMENTS OF THE

6    PARTIES, IT IS MY DUTY AS THE TRIAL JUDGE TO INSTRUCT YOU ON

7    THE RULES OF LAW THAT YOU MUST FOLLOW AND APPLY IN ARRIVING AT

8    YOUR DECISION IN THIS CASE.

9         IN EVERY JURY TRIAL THERE ARE TWO JUDGES:  I AM ONE

10   OF THE JUDGES AND YOU, THE JURY, ARE THE OTHER JUDGE.  IT IS

11   MY DUTY TO PRESIDE OVER THE TRIAL AND TO DECIDE WHAT EVIDENCE

12   IS PROPER FOR YOUR CONSIDERATION.  IT IS ALSO MY DUTY AT THE

13   END OF THE TRIAL TO EXPLAIN TO YOU THE RULES OF LAW WHICH

14   APPLY AND WHICH YOU MUST FOLLOW IN ARRIVING AT YOUR VERDICT.

15        IN THESE INSTRUCTIONS, FIRST, I WILL GIVE YOU SOME

16   GENERAL INSTRUCTIONS THAT APPLY IN EVERY CASE, LIKE

17   INSTRUCTIONS ON THE BURDEN OF PROOF, HOW TO JUDGE THE

18   BELIEVABILITY OF WITNESSES AND THEN I'LL GIVE YOU SOME

19   SPECIFIC RULES THAT GOVERN THIS PARTICULAR CASE.  FINALLY,

20   I'LL GIVE YOU SOME INSTRUCTIONS ON THE PROCEDURES THAT YOU

21   SHOULD FOLLOW DURING YOUR DELIBERATIONS.

22        AS JURORS YOU ARE THE JUDGES OF THE FACTS.  IN

23   DETERMINING WHAT ACTUALLY HAPPENED, THAT IS, IN REACHING YOUR

24   DECISION AS TO THE FACTS, IT IS YOUR SWORN DUTY TO FOLLOW THE

25   RULES OF LAW AS I EXPLAIN THEM TO YOU.  YOU HAVE NO RIGHT TO

1   DISREGARD OR GIVEN SPECIAL ATTENTION TO ANY ONE INSTRUCTION OR

2   TO QUESTION THE WISDOM OR CORRECTNESS OF ANY RULE OF LAW THAT

3   I STATE TO YOU.

4          YOU MUST NOT SUBSTITUTE OR FOLLOW YOUR OWN NOTION OR

5   OPINION AS TO WHAT THE LAW IS OR OUGHT TO BE.  IT IS YOUR DUTY

6   TO APPLY THE LAW AS I EXPLAIN IT TO YOU, WHETHER YOU AGREE

7   WITH IT OR NOT, AND REGARDLESS OF THE CONSEQUENCES.

8          IT IS ALSO YOUR DUTY TO BASE YOUR VERDICT SOLELY ON

9   THE EVIDENCE WITHOUT PREJUDICE OR SYMPATHY.  THAT WAS THE

10  PROMISE THAT YOU MADE AT THE BEGINNING OF THESE PROCEEDINGS

11  AND IT'S THE OATH THAT YOU TOOK BEFORE BEING ACCEPTED BY THE

12  PARTIES AS JURORS AND THE PARTIES HAVE A RIGHT TO EXPECT

13  NOTHING LESS.

14         IT IS YOUR DUTY AS JURORS TO FOLLOW THE LAW AS I

15  STATE IT TO YOU AND APPLY THAT LAW TO THE FACTS AS YOU FIND

16  THEM TO BE FROM THE EVIDENCE IN THIS CASE.  YOU ARE NOT

17  PERMITTED TO SINGLE OUT ANY ONE INSTRUCTION ALONE AS STATING

18  THE LAW.  RATHER, YOU MUST, INSTEAD, CONSIDER ALL OF THE

19  COURT'S INSTRUCTIONS AS A WHOLE.

20         NEITHER ARE YOU TO BE CONCERNED WITH THE WISDOM OF

21  ANY RULE OF LAW AS STATED BY ME.  REGARDLESS OF ANY OPINION

22  THAT YOU MAY HAVE AS TO WHAT THE LAW IS OR WHAT THE LAW OUGHT

23  TO BE, IT WOULD BE A VIOLATION OF YOUR SWORN DUTY AS JUDGES OF

24  THE FACTS TO BASE YOUR VERDICT ON ANYTHING OTHER THAN THE

25  EVIDENCE IN THIS CASE.

1     IN DECIDING THE FACTS OF THIS CASE AND IN REACHING

2  YOUR VERDICT, YOU MUST NOT BE SWAYED BY BIAS, PREJUDICE OR

3  SYMPATHY IN FAVOR OF ANY PARTY.  OUR SYSTEM OF LAW DOES NOT

4  PERMIT JURORS TO BE GOVERNED BY BIAS, PREJUDICE, SYMPATHY OR

5  PUBLIC OPINION.  THE PARTIES, THE PUBLIC AND THIS COURT EXPECT

6  THAT YOU WILL CAREFULLY AND IMPARTIALLY CONSIDER ALL OF THE

7  EVIDENCE IN THIS CASE AND THAT YOU WILL FOLLOW THE LAW AS

8  STATED BY THE COURT AND THAT YOU WILL REACH A FAIR, HONEST AND

9  IMPARTIAL JURY VERDICT REGARDLESS OF THE CONSEQUENCES AND

10  WITHOUT BIAS, PREJUDICE OR SYMPATHY FOR OR AGAINST ANY PARTY

11  IN THIS CASE.

12     AS STATED TO YOU EARLIER, AND AS I PREVIOUSLY

13  MENTIONED DURING THE COURSE OF THIS TRIAL, YOU ARE THE JUDGES

14  OF THE FACTS, THEREFORE IT'S YOUR DUTY TO DETERMINE WHAT THE

15  FACTS ARE.  IN SO DOING, YOU MUST CONSIDER ONLY THE EVIDENCE

16  THAT HAS BEEN ADMITTED IN THIS CASE.  THE TERM *EVIDENCE*

17  INCLUDES THE SWORN TESTIMONY OF THE WITNESSES WHO HAVE

18  TESTIFIED.  THE TERM *EVIDENCE* ALSO INCLUDES THE EXHIBITS THAT

19  HAVE BEEN ADMITTED AND THAT YOU WILL HAVE THE BENEFIT OF

20  REVIEWING AS YOU DELIBERATE.

21     STATEMENTS, OBJECTIONS AND ARGUMENTS MADE BY THE

22  LAWYERS ARE NOT EVIDENCE.  YOU ARE NOT PERMITTED -- YOU ARE

23  PERMITTED TO DRAW REASONABLE INFERENCES FROM THE TESTIMONY AND

24  EXHIBITS AS YOU FEEL ARE JUSTIFIED IN THE LIGHT OF COMMON

25  EXPERIENCE.  IN OTHER WORDS, YOU MAY MAKE LOGICAL DEDUCTIONS

1   AND REACH CONCLUSIONS WHICH REASON AND COMMON SENSE LEAD YOU

2   TO DRAW FROM THE FACTS WHICH HAVE BEEN ESTABLISHED BY THE

3   TESTIMONY AND THE EVIDENCE IN THIS CASE.

4          THE EVIDENCE YOU ARE TO CONSIDER CONSISTS OF THE

5   TESTIMONY OF THE WITNESSES AND THE DOCUMENTS OR EXHIBITS THAT

6   WERE ADMITTED INTO EVIDENCE, AND ANY FAIR INFERENCES AND

7   REASONABLE CONCLUSIONS THAT YOU DRAW FROM THE FACTS AND

8   CIRCUMSTANCES THAT HAVE BEEN PROVEN.

9          GENERALLY SPEAKING, THERE ARE TWO TYPES OF EVIDENCE:

10  DIRECT EVIDENCE, SUCH AS THE TESTIMONY FROM AN EYEWITNESS, OR

11  CIRCUMSTANTIAL EVIDENCE, WHICH PROVES ONE FACT THAT YOU CAN

12  LOGICALLY CONCLUDE FROM THE EXISTENCE OF ANOTHER FACT THAT HAS

13  BEEN PROVEN.  AS A GENERAL LAW -- I'M SORRY, AS A GENERAL RULE

14  THE LAW MAKES NO DISTINCTION BETWEEN DIRECT AND CIRCUMSTANTIAL

15  EVIDENCE, BUT SIMPLY REQUIRES THAT YOU FIND THE FACTS FROM A

16  PREPONDERANCE OF ALL THE EVIDENCE, BOTH DIRECT AND

17  CIRCUMSTANTIAL.

18         AS I HAVE SAID, YOU MUST CONSIDER ALL OF THE

19  EVIDENCE.  THIS DOES NOT MEAN, HOWEVER, THAT YOU MUST ACCEPT

20  ALL OF THE EVIDENCE AS TRUE OR ACCURATE.  YOU ALONE ARE TO

21  DETERMINE THE QUESTION OF CREDIBILITY OR TRUTHFULNESS OF EACH

22  WITNESS WHO HAS TESTIFIED IN THIS CASE AND THE WEIGHT TO BE

23  GIVEN TO HIS OR HER TESTIMONY.  IN WEIGHING THE TESTIMONY OF

24  WITNESSES, YOU MAY CONSIDER THE WITNESS'S MANNER AND DEMEANOR

25  ON THE WITNESS STAND, ANY FEELINGS OR INTEREST IN THE CASE OR

1   ANY PREJUDICE OR BIAS ABOUT THE CASE THAT THE WITNESS MAY HAVE

2   AND THE CONSISTENCY OR INCONSISTENCY OF THE WITNESS'S

3   TESTIMONY CONSIDERED IN THE LIGHT OF THE CIRCUMSTANCES.

4        SOME THINGS YOU MIGHT CONSIDER:  HAS THE WITNESS

5   BEEN CONTRADICTED BY OTHER CREDIBLE EVIDENCE?  HAS HE OR SHE

6   MADE STATEMENTS AT OTHER TIMES AND PLACES THAT ARE CONTRARY TO

7   THOSE MADE HERE ON THE WITNESS STAND?  YOU MUST GIVE THE

8   TESTIMONY OF EACH WITNESS THE CREDIBILITY THAT YOU THINK IT

9   DESERVES.  EVEN THOUGH A WITNESS MAY BE A PARTY TO THE ACTION

10   AND IS THEREFORE INTERESTED IN THE OUTCOME, THE TESTIMONY MAY

11   BE ACCEPTED IF IT IS NOT CONTRADICTED BY DIRECT EVIDENCE OR BY

12   ANY INFERENCE THAT MAY BE DRAWN FROM THE EVIDENCE IF YOU

13   BELIEVE THE TESTIMONY.

14        YOU ARE NOT TO DECIDE THIS CASE BY COUNTING THE

15   NUMBER OF WITNESSES WHO HAVE TESTIFIED ON OPPOSING SIDES.

16   WITNESS TESTIMONY IS WEIGHED.  WITNESSES ARE NOT COUNTED.  THE

17   TEST IS NOT THE RELATIVE NUMBER OF THE WITNESSES, BUT THE

18   RELATIVE CONVINCING FORCE OF THE EVIDENCE.  THE TESTIMONY OF A

19   SINGLE WITNESS IS SUFFICIENT TO PROVE ANY FACT, EVEN IF A

20   GREATER NUMBER OF WITNESSES TESTIFIED TO THE CONTRARY IF AFTER

21   CONSIDERING ALL OF THE OTHER EVIDENCE YOU BELIEVE THAT

22   WITNESS.

23        IN DETERMINING THE WEIGHT TO GIVE THE TESTIMONY OF A

24   WITNESS, CONSIDER WHETHER THERE WAS EVIDENCE THAT AT SOME

25   OTHER TIME THE WITNESS SAID OR DID SOMETHING OR FAILED TO DO

1   OR SAY SOMETHING THAT WAS DIFFERENT FROM THE TESTIMONY GIVEN

2   AT TRIAL.  A SIMPLE MISTAKE BY A WITNESS DOES NOT NECESSARILY

3   MEAN THAT THE WITNESS DID NOT TELL THE TRUTH AS HE OR SHE

4   REMEMBERS IT.  PEOPLE MAY FORGET SOME THINGS AND REMEMBER

5   OTHER THINGS INACCURATELY.

6          IF A WITNESS MADE A MISSTATEMENT, CONSIDER WHETHER

7   THAT MISSTATEMENT WAS AN INTENTIONAL FALSEHOOD OR SIMPLY AN

8   INNOCENT MISTAKE.  THE SIGNIFICANCE OF THAT MAY DEPEND ON

9   WHETHER IT HAS TO DO WITH AN IMPORTANT FACT OR ONLY AN

10  UNIMPORTANT DETAIL.

11         THE FACT THAT A PERSON BROUGHT A LAWSUIT AND IS IN

12  COURT SEEKING DAMAGES CREATES NO INFERENCE THAT THE PERSON IS

13  ENTITLED TO A JUDGMENT.  ANYONE MAY MAKE A CLAIM AND FILE A

14  LAWSUIT.  THE ACT OF MAKING A CLAIM IN A LAWSUIT BY ITSELF

15  DOES NOT IN ANY WAY TEND TO ESTABLISH THAT CLAIM AND IS NOT

16  EVIDENCE.

17         IN THIS CASE THE PLAINTIFF JOHNNY TAYLOR ASSERTS

18  THAT THE DEFENDANT UNION PACIFIC VIOLATED THE FEDERAL RAILROAD

19  SAFETY ACT BY TERMINATING HIM IN RETALIATION FOR ENGAGING IN

20  PROTECTED ACTIVITY UNDER THAT ACT.

21         INITIALLY, THE PLAINTIFF JOHNNY TAYLOR HAS THE

22  BURDEN OF PROVING THE ELEMENTS OF HIS CLAIMS BY A

23  PREPONDERANCE OF THE EVIDENCE.  TO ESTABLISH BY A

24  PREPONDERANCE OF THE EVIDENCE MEANS TO PROVE THAT SOMETHING IS

25  MORE LIKELY SO THAN NOT SO.  IF YOU FIND THAT THE PLAINTIFF

1   JOHNNY TAYLOR HAS FAILED TO PROVE ANY ELEMENT OF ONE OF HIS

2   CLAIMS BY A PREPONDERANCE OF THE EVIDENCE, THEN HE MAY NOT

3   RECOVER ON THAT CLAIM.

4         THE PLAINTIFF MUST ESTABLISH THE FOLLOWING ELEMENTS

5   BY A PREPONDERANCE OF THE EVIDENCE:

6         NUMBER ONE, THAT HE ENGAGED IN PROTECTED ACTIVITY

7   UNDER THE FEDERAL RAILROAD SAFETY ACT.

8         NUMBER TWO, THAT THE DEFENDANT, UNION PACIFIC, WAS

9   AWARE, ACTUALLY OR CONSTRUCTIVELY, THAT JOHNNY TAYLOR ENGAGED

10  IN PROTECTED ACTIVITY.

11        AND NUMBER THREE, THAT THE CIRCUMSTANCES RAISE AN

12  INFERENCE THAT THE PLAINTIFF JOHNNY TAYLOR'S PROTECTED

13  ACTIVITY WAS A CONTRIBUTING FACTOR IN HIS TERMINATION.

14        THE FRSA OR THE FEDERAL RAILROAD SAFETY ACT -- I MAY

15  CALL IT THE FRSA IN PARTS OF MY INSTRUCTIONS -- PROTECTS

16  EMPLOYEES WHO REPORT IN GOOD FAITH A HAZARDOUS SAFETY OR

17  SECURITY CONDITION.  ENTERING SLOW ORDERS AND REMOVING TRACKS

18  FROM SERVICE BECAUSE OF A DEFECT CONSTITUTE THE REPORTING OF A

19  HAZARDOUS CONDITION UNDER THE FRSA.

20        PLAINTIFF JOHNNY TAYLOR CLAIMS THAT HE ENGAGED IN

21  THE FOLLOWING ACTIVITIES AND THAT THE FOLLOWING ACTIVITIES

22  CONSTITUTE PROTECTIVE REPORTS:

23        NUMBER ONE, REMOVING UNION PACIFIC'S "TAIL TRACK"

24  FROM SERVICE IN AVONDALE, LOUISIANA ON MARCH 28TH, 2017.

25        NUMBER TWO, REMOVING UNION PACIFIC'S "NUMBER ONE

1   MAIN LINE" TRACK FROM SERVICE IN AVONDALE, LOUISIANA ON

2   NOVEMBER 2ND, 2017.

3          NUMBER THREE, REMOVING UNION PACIFIC'S "SWITCH 16"

4   TRACK FROM SERVICE IN AVONDALE, LOUISIANA ON JANUARY 10TH,

5   2018.

6          NUMBER FOUR, REFUSING TO PLACE "SWITCH 16" TRACK

7   BACK IN SERVICE ON JANUARY 10TH, 2018 DUE TO AN FRA DEFECT.

8          NUMBER FIVE, ISSUING A "SLOW ORDER" ON A UNION

9   PACIFIC TRACK IN WHITE CASTLE, LOUISIANA ON JANUARY 22ND,

10  2018.

11         AND NUMBER SIX, MAKING REPORTS OF UNSAFE CONDITIONS

12  AND IMPROPER ACTIVITIES TO REPRESENTATIVES OF THE FEDERAL

13  RAILROAD SAFETY ADMINISTRATION.

14         IN ORDER FOR THESE ACTIVITIES TO BE PROTECTED UNDER

15  THE FRSA, THE PLAINTIFF JOHNNY TAYLOR MUST SHOW THAT THEY WERE

16  PERFORMED IN GOOD FAITH.  IF PERFORMED IN GOOD FAITH, THE

17  ABOVE ACTIVITIES THAT I'VE LISTED ARE PROTECTED BY THE FRSA.

18         THE FRSA ALSO PROTECTS EMPLOYEES WHO REFUSE TO

19  AUTHORIZE THE USE OF TRAIN TRACKS UNDER CERTAIN CIRCUMSTANCES.

20  THE PLAINTIFF JOHNNY TAYLOR CLAIMS THAT ITEMS ONE THROUGH FOUR

21  ABOVE CONSTITUTE THOSE REFUSALS.  THE ONES THAT I JUST LISTED.

22         IN ORDER FOR SUCH ACTIVITIES TO CONSTITUTE PROTECTED

23  REFUSALS THE PLAINTIFF JOHNNY TAYLOR MUST SHOW:

24         ONE, THAT HE REFUSED AN EXPRESSED OR IMPLIED ORDER

25  BY UNION PACIFIC.

1        TWO, THAT HE BELIEVED THE TRACK WAS IN A HAZARDOUS

2   SAFETY OR SECURITY CONDITION.

3        NUMBER THREE, THAT THE REFUSAL WAS MADE IN GOOD

4   FAITH AND THAT NO OTHER REASONABLE ALTERNATIVE TO THE REFUSAL

5   WAS AVAILABLE TO PLAINTIFF JOHNNY TAYLOR.

6        NUMBER FOUR, THAT A REASONABLE INDIVIDUAL IN

7   PLAINTIFF JOHNNY TAYLOR'S CIRCUMSTANCES WOULD CONCLUDE THAT

8   THE HAZARDOUS CONDITION PRESENTED AN IMMINENT DANGER OF DEATH

9   OR SERIOUS INJURY, AND THAT THE URGENCY OF THE SITUATION DID

10  NOT ALLOW SUFFICIENT TIME TO ELIMINATE THE DANGER WITHOUT THE

11  REFUSAL.

12        AND NUMBER FIVE, PLAINTIFF JOHNNY TAYLOR, WHERE

13  POSSIBLE, NOTIFIED UNION PACIFIC OF THE EXISTENCE OF THE

14  HAZARDOUS CONDITION AND HIS INTENTION NOT TO AUTHORIZE USE OF

15  THE TRACK UNLESS THE CONDITION WAS CORRECTED IMMEDIATELY OR

16  THE TRACK REPAIRED OR REPLACED.

17        IF THE PLAINTIFF JOHNNY TAYLOR HAS SHOWN THE ITEMS

18  THAT I'VE JUST MENTIONED, ONE THROUGH FIVE, WITH RESPECT TO

19  ANY ONE OR MORE OF THE FOREGOING REFUSALS, THEN THAT

20  PARTICULAR REFUSAL IS PROTECTED BY THE FEDERAL RAILROAD SAFETY

21  ACT.

22        THE FEDERAL RAILROAD SAFETY ACT ALSO PROHIBITS

23  RAILROADS FROM RETALIATING AGAINST EMPLOYEES WHO PROVIDE

24  INFORMATION TO OR PARTICIPATE IN AN INVESTIGATION BY EITHER OF

25  THE FOLLOWING CONCERNING POTENTIAL VIOLATIONS OF THE LAW:

1          NUMBER ONE, A FEDERAL, STATE OR LOCAL REGULATORY

2    LAW -- REGULATORY OR LAW ENFORCEMENT AGENCY OR;

3          NUMBER TWO, A PERSON WHO HAD SUPERVISORY AUTHORITY

4    OVER THE PLAINTIFF JOHNNY TAYLOR OR WHO HAD THE AUTHORITY TO

5    INVESTIGATE, DISCOVER OR TERMINATE THE ALLEGED VIOLATION.

6          IN ORDER FOR SUCH A REPORT TO BE PROTECTED BY THE

7    FRSA, IT MUST BE MADE LAWFULLY AND IN GOOD FAITH.  THE

8    PLAINTIFF JOHNNY TAYLOR CLAIMS THAT HE ENGAGED IN SUCH

9    PROTECTED ACTIVITY BY:

10          NUMBER ONE, PROVIDING INFORMATION REGARDING UNSAFE

11    CONDITIONS AND IMPROPER ACTIVITIES TO REPRESENTATIVES OF THE

12    FEDERAL RAILROAD ADMINISTRATION;

13          AND NUMBER TWO, REPORTING PERCEIVED RETALIATION TO

14    UNION PACIFIC'S EEO DEPARTMENT.

15          IF THE PLAINTIFF JOHNNY TAYLOR SHOWS THAT HE TOOK

16    THESE ACTIONS LAWFULLY AND IN GOOD FAITH, THEY ARE PROTECTED

17    UNDER THE FEDERAL RAILROAD SAFETY ACT.

18          NEXT, PLAINTIFF JOHNNY TAYLOR MUST SHOW THAT THE

19    PERSON WHO MADE OR INFLUENCED -- PERSON OR PERSONS, WHO MADE

20    OR INFLUENCED THE DECISION TO TERMINATE HIM HAD ACTUAL OR

21    CONSTRUCTIVE KNOWLEDGE OF JOHNNY TAYLOR'S PROTECTED ACTIVITY

22    AT THE TIME OF HIS TERMINATION.

23          CONSTRUCTIVE KNOWLEDGE MEANS KNOWLEDGE THAT ONE

24    USING REASONABLE CARE OR DILIGENCE WOULD HAVE.  IF THE

25    PLAINTIFF JOHNNY TAYLOR SHOWS THAT THE DECISIONMAKER OR

1    DECISIONMAKERS SHOULD HAVE KNOWN OF HIS PROTECTED ACTIVITY IF
2    THEY USED REASONABLE CARE OR DILIGENCE TO LEARN OF THE
3    ACTIVITY IN THE PERFORMANCE OF THEIR JOB DUTIES, THEN JOHNNY
4    TAYLOR HAS MET THIS BURDEN ON THIS ELEMENT.

5            IT IS UNDISPUTED THAT MR. TAYLOR'S EMPLOYMENT WAS
6    TERMINATED BY THE DEFENDANT UNION PACIFIC RAILROAD.  HOWEVER,
7    IN ORDER TO SUCCEED ON HIS CLAIM, PLAINTIFF JOHNNY TAYLOR MUST
8    SHOW THAT HIS PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR IN
9    HIS TERMINATION.

10           A *CONTRIBUTING FACTOR* IS ANY FACTOR WHICH, ALONE OR
11   IN CONNECTION WITH OTHER FACTORS, TENDS TO AFFECT IN ANY WAY
12   THE OUTCOME OF THE DECISION.  PLAINTIFF JOHNNY TAYLOR IS NOT
13   REQUIRED TO SHOW THAT HIS PROTECTED ACTIVITY WAS A
14   SIGNIFICANT, MOTIVATING, SUBSTANTIAL OR PREDOMINATE FACTOR IN
15   UNION PACIFIC'S DECISION TO TERMINATE HIM.

16           EVIDENCE THAT JOHNNY TAYLOR'S PROTECTED ACTIVITY WAS
17   A CONTRIBUTING FACTOR IN HIS TERMINATION MAY INCLUDE:

18           ONE, TEMPORAL PROXIMITY OR IN CLOSE TIMING BETWEEN
19   THE PROTECTED ACTIVITY AND HIS TERMINATION.

20           TWO, INCONSISTENT APPLICATION OF THE DEFENDANT UNION
21   PACIFIC RAILROAD'S POLICIES.

22           NUMBER THREE, SHIFTING OR INCONSISTENT EXPLANATIONS
23   BY THE DEFENDANT UNION PACIFIC RAILROAD IN ITS ACTIONS.

24           NUMBER FOUR, INDICATIONS THAT DEFENDANT UNION
25   PACIFIC RAILROAD'S REASONS FOR TERMINATING PLAINTIFF JOHNNY

1    TAYLOR WERE FALSE, PRETEXTUAL OR UNWORTHY OF GRIEVANCE.

2            NUMBER FIVE, A CHANGE IN THE DEFENDANT UNION PACIFIC

3    RAILROAD'S ATTITUDE TOWARD PLAINTIFF JOHNNY TAYLOR AFTER

4    JOHNNY TAYLOR ENGAGED IN PROTECTED ACTIVITY.

5            IF YOU FIND THAT MORE PROBABLE THAN NOT THAT THE

6    PLAINTIFF JOHNNY TAYLOR ENGAGED IN PROTECTED ACTIVITY, THAT

7    DEFENDANT UNION PACIFIC HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE

8    OF THE PROTECTED ACTIVITY, AND THAT THE PROTECTED ACTIVITY WAS

9    A CONTRIBUTING FACTOR IN UNION PACIFIC'S DECISION TO TERMINATE

10   JOHNNY TAYLOR, THEN JOHNNY TAYLOR HAS PROVEN THE ELEMENTS OF

11   HIS CLAIM BY A PREPONDERANCE OF THE EVIDENCE.

12           IF ANY OF THESE ABOVE ELEMENTS HAS NOT BEEN PROVEN

13   BY PLAINTIFF JOHNNY TAYLOR BY A PREPONDERANCE OF THE EVIDENCE,

14   OR IF THE DEFENDANT UNION PACIFIC IS ENTITLED TO A VERDICT

15   UNDER ITS AFFIRMATIVE DEFENSE -- WHICH IS PROVIDED -- I'LL

16   PROVIDE YOU INSTRUCTIONS ON THAT MOMENTARILY -- THEN YOUR

17   VERDICT MUST BE FOR UNION PACIFIC.

18           YOUR VERDICT MUST BE FOR THE DEFENDANT UNION PACIFIC

19   IF UNION PACIFIC HAS PROVEN BY CLEAR AND CONVINCING EVIDENCE

20   THAT THEY WOULD HAVE TAKEN THE SAME ACTION OF TERMINATING THE

21   PLAINTIFF TAYLOR'S EMPLOYMENT EVEN IF THE PLAINTIFF HAD NOT

22   ENGAGED IN PROTECTED ACTIVITY.

23           CLEAR AND CONVINCING EVIDENCE IS EVIDENCE THAT

24   PRODUCES IN YOUR MIND A FIRM BELIEF OR CONVICTION AS TO THE

25   TRUTH OF THE MATTER SOUGHT TO BE ESTABLISHED.  IT IS EVIDENCE

1   SO CLEAR, DIRECT, WEIGHTY AND CONVINCING AS TO ENABLE YOU TO

2   COME TO A CLEAR CONVICTION WITHOUT HESITANCY.

3        IF YOU FIND IN FAVOR OF JOHNNY TAYLOR, THEN YOU MUST

4   DETERMINE WHETHER THE DEFENDANT UNION PACIFIC HAS CAUSED

5   PLAINTIFF JOHNNY TAYLOR'S DAMAGES, AND IF SO, YOU MUST

6   DETERMINE THE AMOUNT OF THOSE DAMAGES.  YOU SHOULD NOT

7   CONCLUDE BY THE FACT THAT I AM INSTRUCTING YOU ON DAMAGES THAT

8   I HAVE ANY OPINION AS TO WHETHER OR NOT THE PLAINTIFF JOHNNY

9   TAYLOR HAS PROVEN LIABILITY.

10        PLAINTIFF JOHNNY TAYLOR MUST PROVE HIS DAMAGES BY A

11   PREPONDERANCE OF THE EVIDENCE.  YOUR AWARD MUST BE BASED ON

12   EVIDENCE AND NOT SPECULATION OR GUESSWORK.  ON THE OTHER HAND,

13   PLAINTIFF JOHNNY TAYLOR NEED NOT PROVE THE AMOUNT OF HIS

14   LOSSES WITH MATHEMATICAL PRECISION, BUT ONLY WITH AS MUCH

15   DEFINITENESS AND ACCURACY AS THE CIRCUMSTANCES PERMIT.

16        IN CASES SUCH AS THIS, DAMAGES ARE MEANT TO RETURN

17   THE PLAINTIFF, IN THIS CASE JOHNNY TAYLOR, TO THE ECONOMIC

18   POSITION HE WOULD HAVE OCCUPIED HAD HE NOT BEEN TERMINATED.  A

19   PLAINTIFF WHO PREVAILS UNDER THE FRSA IS ENTITLED TO ALL

20   RELIEF NECESSARY TO MAKE HIM WHOLE.

21        YOU SHOULD CONSIDER THE FOLLOWING WITH RESPECT TO

22   ACTUAL DAMAGES:

23        THE PARTIES IN THIS CASE HAVE STIPULATED OR AGREED

24   TO A BACKPAY AMOUNT OF $312,349.36.  IF YOU FIND THAT

25   PLAINTIFF JOHNNY TAYLOR SHOULD BE AWARDED BACKPAY, THAT AMOUNT

1  WILL BE AWARDED.

2  THE AMOUNT OF COMPENSATORY DAMAGES SUSTAINED BY THE

3  PLAINTIFF JOHNNY TAYLOR, INCLUDING MENTAL AND EMOTIONAL

4  DISTRESS, INCONVENIENCE, LOSS OF ENJOYMENT OF LIFE OR ANY

5  OTHER DAMAGES THAT JOHNNY TAYLOR PROVES HE SUFFERED AS A

6  RESULT OF THE DEFENDANT UNION PACIFIC'S ACTIONS.

7  YOU ARE NOT TO CONSIDER REINSTATEMENT, FRONT PAY,

8  ATTORNEY'S FEES OR LITIGATION EXPENSES, AS THESE ARE REMEDIES

9  WHICH WILL BE DECIDED BY THE COURT IN THE EVENT THAT YOUR

10  VERDICT IS IN FAVOR OF JOHNNY TAYLOR.

11  PLAINTIFF JOHNNY TAYLOR SEEKS TO BE COMPENSATED FOR

12  MENTAL AND EMOTIONAL DISTRESS.  TO RECOVER COMPENSATORY

13  DAMAGES FOR MENTAL AND EMOTIONAL DISTRESS, THE PLAINTIFF MUST

14  PROVE THAT HE SUFFERED A SPECIFIC DISCERNIBLE INJURY WITH

15  CREDIBLE EVIDENCE.  HURT FEELINGS, ANGER AND FRUSTRATION ARE

16  PART OF LIFE AND ARE NOT THE TYPES OF HARM THAT COULD SUPPORT

17  A MENTAL ANGUISH AWARD.  EVIDENCE AND MENTAL ANGUISH NEED NOT

18  BE CORROBORATED BY DOCTORS, PSYCHOLOGISTS OR OTHER WITNESSES,

19  BUT THE PLAINTIFF JOHNNY TAYLOR MUST SUPPORT HIS CLAIMS WITH

20  COMPETENT EVIDENCE OF THE NATURE, EXTENT AND DURATION OF THE

21  HARM.  DAMAGES FOR MENTAL OR EMOTIONAL DISTRESS MUST BE BASED

22  ON EVIDENCE AT TRIAL.  THEY MUST NOT BE BASED ON SPECULATION

23  OR SYMPATHY.

24  THE PLAINTIFF JOHNNY TAYLOR ALSO CONTENDS THAT HE

25  SUFFERED LOSS OF ENJOYMENT OF HIS PERSONAL, PROFESSIONAL AND

1  FAMILY LIFE.  LOSS OF ENJOYMENT OF LIFE IS CONCEPTUALLY

2  DISTINCT FROM PAIN AND SUFFERING.

3  PAIN AND SUFFERING, BOTH PHYSICAL AND MENTAL, REFER

4  TO THE PAIN, DISCOMFORT, INCONVENIENCE, ANGUISH AND EMOTIONAL

5  TRAUMA THAT ACCOMPANIES AN EVENT SUCH AS TERMINATION.  LOSS OF

6  ENJOYMENT OF LIFE, IN COMPARISON, REFERS TO THE DETRIMENTAL

7  ALTERATIONS OF A PERSON'S LIFE OR LIFE-STYLE OR THE PERSON'S

8  INABILITY TO PARTICIPATE IN THE ACTIVITIES OR PLEASURES OF

9  LIFE THAT WERE FORMALLY ENJOYED PRIOR TO THE INJURY.  IN

10 CONTRAST TO PAIN AND SUFFERING, WHETHER OR NOT A PLAINTIFF

11 EXPERIENCES A DETRIMENTAL LIFE-STYLE CHANGE DEPENDS ON BOTH

12 THE NATURE AND SEVERITY OF THE INJURY AND THE LIFE-STYLE OF

13 THE PLAINTIFF PRIOR TO THE INJURY.

14 YOU MAY AWARD COMPENSATORY DAMAGES FOR THE PLAINTIFF

15 JOHNNY TAYLOR'S LOSS OF ENJOYMENT OF HIS PERSONAL,

16 PROFESSIONAL AND FAMILY LIFE, AS WELL AS MENTAL AND EMOTIONAL

17 PAIN AND SUFFERING, IF YOU FIND THAT THEY WERE CAUSED BY THE

18 DEFENDANT UNION PACIFIC'S ACTIONS TOWARD THE PLAINTIFF JOHNNY

19 TAYLOR.  ANY AWARD THAT YOU MAKE SHOULD BE FAIR IN LIGHT OF

20 THE EVIDENCE PRODUCED AT TRIAL.  NO EVIDENCE OF THE MONETARY

21 VALUE OF SUCH INTANGIBLE THINGS, SUCH AS PAIN AND SUFFERING,

22 HAS BEEN OR NEEDS TO BE AWARDED FOR THESE ELEMENTS -- NEEDS TO

23 BE INTRODUCED INTO EVIDENCE.  PARDON ME.  I'M GOING TO SAY

24 THAT SENTENCE AGAIN.  NO EVIDENCE OF THE MONETARY VALUE OF

25 SUCH INTANGIBLE THINGS, SUCH AS PAIN AND SUFFERING, HAS BEEN

1    OR NEEDS TO BE INTRODUCED INTO EVIDENCE.  NO EXACT STANDARD

2    EXISTS FOR FIXING THE COMPENSATION TO BE AWARDED FOR THESE

3    ELEMENTS OF DAMAGES.  THE DAMAGES YOU AWARD MUST BE FAIR

4    COMPENSATION, NO MORE AND NO LESS.

5          WHEN CONSIDERING THE AMOUNT OF COMPENSATORY DAMAGE

6    TO WHICH THE PLAINTIFF JOHNNY TAYLOR MAY BE ENTITLED, YOU

7    SHOULD CONSIDER THE NATURE, CHARACTER AND SERIOUSNESS OF ANY

8    EMOTIONAL PAIN, SUFFERING, INCONVENIENCE, MENTAL ANGUISH AND

9    THE LOSS OF ENJOYMENT OF LIFE THE PLAINTIFF HAS SUFFERED.  YOU

10   MUST ALSO CONSIDER ITS EXTENT OR DURATION AS ANY AWARD YOU

11   MAKE MUST COVER THE DAMAGES ENDURED BY THE PLAINTIFF SINCE THE

12   WRONGDOING TO THE PRESENT TIME, AND EVEN INTO THE FUTURE IF

13   YOU FIND AS FACT THAT THE EVIDENCE PRESENTED JUSTIFIES THE

14   CONCLUSION THAT THE PLAINTIFF JOHNNY TAYLOR'S EMOTIONAL PAIN

15   AND ITS CONSEQUENCES HAVE CONTINUED TO THE PRESENT TIME OR CAN

16   BE REASONABLY EXPECTED TO CONTINUE INTO THE FUTURE.

17         THERE IS NO EXACT STANDARD FOR DETERMINING ACTUAL

18   DAMAGES.  YOU ARE TO DETERMINE AN AMOUNT THAT WILL FAIRLY

19   COMPENSATE THE PLAINTIFF JOHNNY TAYLOR FOR THE HARM HE HAS

20   SUSTAINED.  DO NOT INCLUDE AS ACTUAL DAMAGES INTEREST ON WAGES

21   OR BENEFITS.

22         YOU MAY, IN ADDITION, AWARD PUNITIVE DAMAGES IF YOU

23   FIND THE DEFENDANT UNION PACIFIC RAILROAD ACTED WITH MALICE OR

24   WITH RECKLESS INDIFFERENCE TO THE RIGHTS OF OTHERS.  ONE ACTS

25   WITH MALICE WHEN ONE PURPOSEFULLY OR KNOWINGLY VIOLATES

1   ANOTHER'S RIGHTS OR SAFETY.  ONE ACTS WITH RECKLESS

2   INDIFFERENCE TO THE RIGHTS OF OTHERS WHEN ONE'S CONDUCT UNDER

3   THE CIRCUMSTANCE MANIFESTS A COMPLETE LACK OF CONCERN FOR THE

4   RIGHTS OR SAFETY OF ANOTHER.  PLAINTIFF JOHNNY TAYLOR HAS THE

5   BURDEN OF PROVING THAT PUNITIVE DAMAGES SHOULD BE AWARDED BY A

6   PREPONDERANCE OF THE EVIDENCE.

7          THE PURPOSE OF PUNITIVE DAMAGES IS TO PUNISH AND

8   DETER, NOT TO COMPENSATE.  PUNITIVE DAMAGES SERVE TO PUNISH A

9   DEFENDANT FOR MALICIOUS OR RECKLESS CONDUCT AND, BY DOING SO,

10  TO DETER OTHERS FROM ENGAGING IN SIMILAR CONDUCT IN THE

11  FUTURE.

12         YOU ARE NOT REQUIRED TO AWARD PUNITIVE DAMAGES.  IF

13  YOU DO DECIDE TO AWARD PUNITIVE DAMAGES, YOU MUST USE SOUND

14  REASON IN SETTING THE AMOUNT.  YOUR AWARD OF PUNITIVE DAMAGES

15  MUST NOT REFLECT BIAS, PREJUDICE OR SYMPATHY TOWARD ANY PARTY.

16  IT SHOULD BE PRESUMED THAT THE PLAINTIFF JOHNNY TAYLOR HAS

17  BEEN MADE WHOLE BY COMPENSATORY DAMAGES, SO PUNITIVE DAMAGES

18  SHOULD BE AWARDED ONLY IF DEFENDANT UNION PACIFIC'S MISCONDUCT

19  IS SO REPREHENSIBLE AS TO WARRANT THE IMPOSITION OF SANCTIONS

20  TO ACHIEVE PUNISHMENT OR DETERRENCE.

21         IF YOU DECIDE TO AWARD PUNITIVE DAMAGES, THE

22  FOLLOWING FACTORS SHOULD GUIDE YOU IN FIXING THE PROPER

23  AMOUNT:

24         NUMBER ONE, THE REPREHENSIBILITY OF THE DEFENDANT

25  UNION PACIFIC'S CONDUCT INCLUDING, BUT NOT LIMITED TO WHETHER

1  THERE WAS DECEIT, COVERUP, INSULT, INTENDED OR RECKLESS INJURY

2  AND WHETHER UNION PACIFIC RAILROAD'S CONDUCT WAS MOTIVATED BY

3  A DESIRE TO GENERATE MORE PROFIT.

4          NUMBER TWO, THE RATIO BETWEEN THE PUNITIVE DAMAGES

5  YOU ARE CONSIDERING AWARDING AND THE AMOUNT OF HARM THAT WAS

6  SUFFERED BY THE VICTIM OR WITH WHICH THE VICTIM WAS

7  THREATENED.

8          NUMBER THREE, THE POSSIBLE CRIMINAL AND CIVIL

9  SANCTIONS FOR COMPARABLE CONDUCT.

10          YOU MAY CONSIDER THE FINANCIAL RESOURCES OF THE

11  DEFENDANT UNION PACIFIC IN FIXING THE AMOUNT OF PUNITIVE

12  DAMAGES.

13          OKAY.  NOW SOME INSTRUCTIONS ABOUT YOUR

14  DELIBERATIONS.

15          IT NOW BECOMES YOUR DUTY TO DELIBERATE AND CONSULT

16  WITH ONE ANOTHER IN AN EFFORT TO REACH A VERDICT.  EACH OF YOU

17  MUST DECIDE THE CASE FOR YOURSELF, BUT ONLY AFTER AN IMPARTIAL

18  CONSIDERATION OF THE EVIDENCE WITH YOUR FELLOW JURORS.  DURING

19  YOUR DELIBERATIONS, DO NOT HESITATE TO RE-EXAMINE YOUR OWN

20  OPINIONS AND CHANGE YOUR MIND IF YOU ARE CONVINCED THAT YOU

21  WERE WRONG.  DO NOT GIVE UP ON YOUR HONEST BELIEFS BECAUSE

22  OTHER JURORS THINK DIFFERENTLY OR JUST TO FINISH THE CASE.

23          WHEN YOU GO INTO THE JURY ROOM TO DELIBERATE YOU MAY

24  TAKE WITH YOU -- I WILL GIVE YOU A COPY OF THIS CHARGE THAT

25  I'VE READ AND THE EXHIBITS THAT HAVE BEEN ADMITTED INTO

1   EVIDENCE AND YOUR NOTES.  YOU WILL ALSO HAVE A VERDICT FORM

2   AND I'LL TALK ABOUT THAT IN A MOMENT.

3              REMEMBER AT ALL TIMES THAT YOU ARE THE JUDGES OF THE

4   FACTS.  YOU HAVE BEEN ALLOWED TO TAKE NOTES DURING THE TRIAL.

5   ANY NOTES THAT YOU TOOK DURING THIS TRIAL ARE ONLY AIDS TO

6   YOUR MEMORY.  IF YOUR MEMORY DIFFERS FROM YOUR NOTES, YOU

7   SHOULD RELY ON YOUR MEMORY AND NOT YOUR NOTES.  THE NOTES ARE

8   NOT EVIDENCE.  IF YOU DID NOT TAKE NOTES, RELY ON YOUR

9   INDEPENDENT RECOLLECTION OF THE EVIDENCE AND DO NOT BE UNDULY

10  INFLUENCED BY THE NOTES OF OTHER JURORS.  NOTES ARE NOT

11  ENTITLED TO ANY GREATER WEIGHT THAN THE RECOLLECTION OR

12  IMPRESSION OF EACH JUROR ABOUT THE TESTIMONY.

13             WHEN I TELL YOU THAT YOU MAY BEGIN YOUR

14  DELIBERATIONS, ALL OF THE EXHIBITS WHICH HAVE BEEN INTRODUCED

15  INTO EVIDENCE AND ADMITTED INTO EVIDENCE WILL BE SENT TO THE

16  JURY ROOM TOGETHER WITH THE VERDICT FORM.

17             THE VERDICT FORM IS PROVIDED TO YOU AND THE JURY

18  FOREPERSON WILL USE THAT TO GUIDE YOU IN YOUR DELIBERATIONS.

19  YOU SHOULD GO THROUGH THE FORM JUST QUESTION BY QUESTION AND

20  FOLLOW THE INSTRUCTIONS AT THE END OF EACH QUESTION.

21  DEPENDING ON HOW YOU ANSWER A QUESTION, THEY'LL BE AN

22  INSTRUCTION THAT SAYS IF YOU ANSWERED YES GO TO THE NEXT

23  QUESTION, IF YOU ANSWERED NO SKIP THE NEXT QUESTION AND GO TO

24  SOMETHING ELSE.  SO WHOEVER YOUR JURY FOREPERSON IS PAY CLOSE

25  ATTENTION TO THE VERDICT FORM.  THAT WILL BE YOUR GUIDE FOR

1  YOUR DELIBERATIONS.

2           THE FIRST THING THAT YOU SHOULD DO WHEN THE COURT

3  TELLS YOU THAT YOU'RE FREE TO DELIBERATE IS TO SELECT A JURY

4  FOREPERSON.  AS I MENTIONED, THE JURY FOREPERSON WILL GUIDE

5  YOU IN YOUR DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.  IF

6  YOU'RE THE FOREPERSON DON'T WORRY, YOU DON'T HAVE TO SPEAK IN

7  COURT.  WHEN YOU COME IN THE FOREPERSON WILL DELIVER THE

8  VERDICT TO THE COURT SECURITY OFFICER WHO WILL DELIVER THE

9  VERDICT TO ME AND THE COURT WILL PUBLISH THE VERDICT, SO YOU

10  DON'T HAVE TO SPEAK.  BUT IN THE EVENT THAT THERE'S A

11  QUESTION, THE FOREPERSON IS THE PERSON THAT COMMUNICATES WITH

12  THE COURT.

13           YOUR VERDICT MUST BE UNANIMOUS.  AFTER YOU HAVE

14  REACHED A UNANIMOUS VERDICT, YOUR JURY FOREPERSON MUST FILL

15  OUT THE QUESTIONS -- FILL OUT THE ANSWERS ON THE WRITTEN

16  QUESTIONS ON THE VERDICT FORM AND SIGN AND DATE IT.

17           THE VERDICT FORM, YOU'LL TAKE THIS BACK.  YOU'LL

18  HAVE ONE VERDICT FORM.  IT COMPRISES -- IT'S SEVEN QUESTIONS

19  WITH INSTRUCTIONS AT THE END OF EACH QUESTION.

20           AS I MENTIONED, YOUR VERDICT MUST BE UNANIMOUS.

21  AFTER YOU'VE REACHED A UNANIMOUS VERDICT, YOUR FOREPERSON MUST

22  FILL OUT THE ANSWERS TO THE WRITTEN QUESTIONS ON THE VERDICT

23  FORM AND SIGN AND DATE IT.

24           AFTER YOU HAVE CONCLUDED YOUR SERVICE AND I HAVE

25  DISCHARGED THE JURY, YOU ARE NOT REQUIRED TO TALK WITH ANYONE

1    ABOUT THIS CASE.  IF YOU NEED TO COMMUNICATE WITH THE COURT

2    DURING YOUR DELIBERATIONS, THE JURY FOREPERSON SHOULD WRITE

3    THE INQUIRY ON A PIECE OF PAPER AND GIVE IT TO THE COURT

4    SECURITY OFFICER WHO WILL BE STATIONED OUTSIDE YOUR DOOR.

5             AFTER CONSULTING WITH THE ATTORNEYS, I WILL RESPOND

6    EITHER IN WRITING OR BY MEETING WITH YOU IN THE OPEN

7    COURTROOM.  IN THE EVENT THAT YOU HAVE THE NEED TO SEND OUT A

8    QUESTION KEEP IN MIND THAT YOU SHOULD NEVER DISCLOSE TO

9    ANYONE, NOT EVEN ME AND NOT IN YOUR NOTE, YOUR NUMERICAL

10   DIVISION ON ANY QUESTION.  IN OTHER WORDS, WE DON'T WANT TO

11   KNOW AND WE SHOULD NOT KNOW WHAT YOUR COUNT IS OR WHAT YOUR

12   VOTE IS AT ANY TIME.

13            YOU WILL HAVE THESE JURY INSTRUCTIONS.  THERE ARE A

14   FEW HEADINGS TO GUIDE YOU THAT CORRESPOND WITH THE VERDICT

15   FORM.  SO EVERYTHING THAT I'VE SAID IS IN THE INSTRUCTIONS.

16   THIS WILL PROBABLY ANSWER ANY QUESTIONS -- IT SHOULD ANSWER

17   ANY QUESTIONS THAT YOU HAVE AND THE VERDICT FORM WILL GUIDE

18   YOU IN YOUR DELIBERATIONS.

19            OKAY.  I'M GOING TO PERMIT YOU TO PROCEED TO THE

20   JURY ROOM.  DO NOT BEGIN YOUR DELIBERATIONS UNTIL I SEND WORD

21   THROUGH THE COURTROOM DEPUTY, THE BLONDE LADY, BARBARA ALCON,

22   IS GOING TO COME OPEN UP THE EVIDENCE FOR YOU AND SHE'LL TELL

23   YOU WHEN YOU CAN BEGIN YOUR DELIBERATIONS.

24            THANK YOU FOR YOUR SERVICE AND WE'LL SEE YOU WHEN

25   YOU'RE FINISHED.

1        *(AT WHICH TIME THE JURY EXITED THE COURTROOM TO BEGIN*

2                    *DELIBERATIONS).*

3            **THE COURT:**  BE SEATED.  SHE'S PICKING UP THE CLEAN

4    COPY OF THE VERDICT -- EXCUSE ME, THE INSTRUCTIONS OFF THE

5    PRINTER.  Y'ALL READ ALONG, I ASSUME.  ANY OBJECTIONS TO THE

6    COURT'S INSTRUCTIONS?

7            **MR. SMITH:**  NO, YOUR HONOR.

8            **MS. SHOONMAKER:**  NOT FROM THE DEFENDANT, YOUR HONOR.

9            **THE COURT:**  THE JURY VERDICT FORM HAS BEEN REVISED.

10   HAVE YOU LOOKED AT THE VERDICT FORM?  DID SHE GIVE YOU A

11   REVISED ONE YET?

12           **MR. SCHMIDT:**  WE DON'T HAVE THE REVISED ONE YET,

13   YOUR HONOR.

14           **THE COURT:**  OKAY.  SHE'S COMING.

15           THE JURY INSTRUCTIONS I'M HANDING TO THE LAW CLERK.

16   SHE'S GOING TO GIVE THOSE TO YOU.  YOU'LL SEE THAT THE

17   CHANGES -- IF YOU WANT TO JUST VERIFY THE CHANGES, THERE WAS

18   ONE SENTENCE TAKEN OUT ON PAGE 8 UNDER ITEM NUMBER 1.  THE

19   MITIGATION SENTENCE WAS REMOVED.  AND THEN ON PAGE 9 AND 10

20   THE LAST FULL -- THE FULL PARAGRAPH BEGINNING AT THE BOTTOM OF

21   PAGE 9 WAS REMOVED FROM THOSE JURY INSTRUCTIONS.  ONCE YOU'VE

22   HAD A CHANCE TO LOOK AT THOSE, INITIAL THE LAST PAGE AND THAT

23   WILL BE THE ACTUAL PIECE OF PAPER THAT WILL GO TO THE JURY.

24           OKAY.  AND THE VERDICT FORM CONTAINS THREE SUBPARTS

25   TO QUESTION NUMBER 1 AND FOUR SUBPARTS TO QUESTION NUMBER 2.

1          ARE WE ALL IN AGREEMENT WITH RESPECT TO THE VERDICT
2    FORM?
3          **MS. SHOONMAKER:**  YES, YOUR HONOR.
4          **THE COURT:**  PLAINTIFF?
5          **MR. SMITH:**  YES, YOUR HONOR.
6          **THE COURT:**  OKAY.  THE COURT WILL HAVE THE COURTROOM
7    DEPUTY DELIVER THE VERDICT FORM AND THE JURY INSTRUCTIONS AND
8    YOU CAN INFORM THE JURY ONCE THE EVIDENCE IS UNLOCKED THAT
9    THEY CAN BEGIN THEIR DELIBERATIONS.
10         THE JURY IS NOW DELIBERATING.
11         THE COURT WANTS TO THANK ALL OF THE LAWYERS IN THIS
12   CASE.  I HAVEN'T BEEN DOING THIS ALL THAT LONG, I GUESS EIGHT
13   AND A HALF YEARS, AND I WANT TO JUST SAY THIS IS PROBABLY ONE
14   OF THE EASIEST CASES I'VE EVER TRIED, AND THAT'S NOT BECAUSE
15   IT WAS EASY FACTUALLY OR UNDISPUTED, CERTAINLY IT WAS VERY
16   HIGHLY DISPUTED, BUT YOU ALL HAVE JUST REALLY DONE A
17   MAGNIFICENT JOB.  THIS IS THE WAY IT SHOULD GO.  I MEAN,
18   YOU'VE WORKED THINGS OUT.  I KNOW YOU HAD SOME DISPUTES OVER
19   EXHIBIT 1 BUT YOU WORKED IT OUT.  THE COURT REALLY APPRECIATES
20   YOUR COLLEGIALITY AND YOUR PROFESSIONALISM AND YOUR
21   PREPAREDNESS.  THANK YOU VERY MUCH AND WE'LL AWAIT THE JURY'S
22   VERDICT.
23                          *(RECESS)*
24                     C E R T I F I C A T E
25         I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

1    FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

2    NUMBERED MATTER.

3    **S:/GINA DELATTE-RICHARD, CCR**

4    GINA DELATTE-RICHARD, CCR

5    OFFICIAL COURT REPORTER

6            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING

7                 COMPUTER-AIDED TRANSCRIPTION SOFTWARE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25