1                     UNITED STATES DISTRICT COURT

2                    MIDDLE DISTRICT OF LOUISIANA

3

4  JOHNNY TAYLOR               *        CIVIL ACTION

5  VERSUS                  *        NO. 18-1110

6  UNION PACIFIC RAILROAD    *        NOVEMBER 1, 2021

7  COMPANY, INC.             *        VOLUME I OF IV

8  * * * * * * * * * * * * * * *

9

10             EXCERPT OF TRIAL BY JURY BEFORE
              THE HONORABLE SHELLY D. DICK
11        UNITED STATES CHIEF DISTRICT JUDGE

12

13  <u>APPEARANCES</u>:

14  FOR THE PLAINTIFF:        SMITH LAW FIRM
                     BY:  J. ARTHUR SMITH III, ESQ.
15                      ROBERT M. SCHMIDT, ESQ.
                     803 NORTH STREET
16                     BATON ROUGE, LOUISIANA 70802

17  FOR THE DEFENDANT:        FRASER, WHEELER, BERGSTEDT &
                     COURTNEY, LLP
18                     BY:  DAVID A. FRASER, ESQ.
                     4350 NELSON ROAD
19                     LAKE CHARLES, LOUISIANA 70606

20  FOR THE DEFENDANT:        SEYFARTH SHAW, LLP
                     BY:  LINDA C. SCHOONMAKER, ESQ.
21                      BRIAN A. WADSWORTH, ESQ.
                     700 MILAM STREET, SUITE 1400
22                     HOUSTON, TEXAS 77002

23  OFFICIAL COURT REPORTER:  SHANNON L. THOMPSON, CCR
                     UNITED STATES COURTHOUSE
24                     777 FLORIDA STREET
                     BATON ROUGE, LOUISIANA 70801
25                     SHANNON_THOMPSON@LAMD.USCOURTS.GOV
                     (225)389-3567

1         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                COMPUTER-AIDED TRANSCRIPTION SOFTWARE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2                                                              PAGE

3    **PRELIMINARY INSTRUCTIONS**                              4

4    **OPENING STATEMENTS:**
         MR. SMITH, ESQ.                                       18
5        MS. SCHOONMAKER, ESQ.                                 31

6    **PLAINTIFF'S WITNESS:**
     **JOHNNY TAYLOR**
7        DIRECT EXAMINATION BY MR. SCHMIDT                     35

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **(NOVEMBER 1, 2021)**

2          **REPORTER'S NOTE:**  (VOIR DIRE EXAMINATION WILL NOT BE

3   MADE A PART OF THIS TRANSCRIPT, AS IT WAS NOT REQUESTED.)

4          **THE COURT:**  LADIES AND GENTLEMEN, NOW THAT YOU HAVE

5   BEEN SWORN, I WILL GIVE YOU SOME PRELIMINARY INSTRUCTIONS TO

6   HELP GUIDE YOUR PARTICIPATION IN THIS TRIAL.

7               THERE IS A JURY DELIBERATION ROOM RIGHT -- I'M

8   GOING TO GIVE YOU SOME OF THE -- KIND OF THE P'S AND Q'S, AND

9   THEN I'LL GIVE YOU THE INSTRUCTIONS.  THERE'S A JURY

10  DELIBERATION ROOM.  YOU'LL GO OUT THIS DOOR RIGHT HERE AND

11  YOU'LL GATHER THERE.  AND WHEN YOU LEAVE IN THE MORNING -- OR

12  WHEN YOU LEAVE IN THE AFTERNOONS OR COME IN IN THE MORNINGS,

13  YOU'LL SEE THERE'S AN EXIT HERE THAT YOU'LL COME IN AND OUT OF.

14  AND THE COURT SECURITY OFFICER WILL MAKE SURE THAT YOU GET IN

15  AND OUT OF THE BUILDING SAFELY.

16              THERE WILL BE A COURT SECURITY OFFICER STATIONED

17  OUTSIDE YOUR DOOR AT ALL TIMES.  SO IF YOU SHOULD EVER --

18  SOMETHING SHOULD COME UP AND YOU NEED TO LET THE COURT KNOW

19  YOU'VE GOT AN EMERGENCY OR SOMETHING LIKE THAT, YOU CAN

20  COMMUNICATE TO THE COURT SECURITY OFFICER AND WE'LL GET THAT

21  INFORMATION.

22              THIS WILL BE WHERE YOU WILL SIT.  DO THE THREE

23  OF YOU HAVE A VIEW OF THAT MONITOR?  YOU CAN SEE THAT?

24  **(WHEREUPON, JURORS NODDED THEIR HEADS IN THE AFFIRMATIVE.)**

25          **THE COURT:**  OKAY.  IF THERE'S DOCUMENTARY EVIDENCE,

10:38 1  PAPER, YOU WILL BE ABLE TO SEE IT ON THAT MONITOR.  THE REST OF

2  YOU THAT ARE IN THE JURY BOX HAVE THE MONITORS.  BUT FOR SOCIAL

3  DISTANCING REASONS, WE ARE DOING THIS.

4          WE DO HAVE A MASK MANDATE.  I REALIZE THAT THE

5  GOVERNOR LIFTED THE MASK MANDATE FOR THE STATE, BUT HERE IN THE

6  COURTHOUSE, BECAUSE WE HAVE SUCH CLOSE PROXIMITY AND YOU'RE

7  GOING TO SPEND A GOOD AMOUNT OF TIME HERE, WE WILL ENFORCE THE

8  MASK MANDATE.  AND YOU'LL NOTICE THAT THE LAWYERS WILL ALL HAVE

9  ON MASKS.  ALL THE COURT STAFF HAVE ON MASKS.  SO WE WOULD ASK

10  THAT YOU ABIDE BY THAT GENERAL ORDER OF THE COURT WHILE YOU'RE

11  IN THIS BUILDING.

12          WHEN WITNESSES TAKE THE STAND, THEY WILL BE

13  PERMITTED TO REMOVE THEIR MASK AND WEAR A CLEAR SHIELD, AND

14  THAT WAY YOU CAN SEE THEIR FACE AND THEIR FACIAL EXPRESSIONS

15  BECAUSE IT WILL ULTIMATELY BE YOUR ROLE TO JUDGE THE

16  CREDIBILITY OR THE BELIEVABILITY OF WITNESSES.  SO YOU MAY WANT

17  TO SEE THEIR FACES.

18          ALL RIGHT.  NOW THAT YOU HAVE BEEN SWORN, THE

19  COURT WILL GIVE YOU SOME PRELIMINARY INSTRUCTIONS TO GUIDE YOUR

20  PARTICIPATION IN THIS TRIAL.  IT WILL BE YOUR DUTY TO FIND FROM

21  THE EVIDENCE PRESENTED IN OPEN COURT WHAT THE FACTS ARE.  YOU,

22  AND YOU ALONE, ARE THE JUDGES OF THE FACTS.  YOU WILL APPLY

23  THOSE FACTS TO THE LAW AS THE COURT INSTRUCTS YOU.  YOU MUST

24  FOLLOW THE LAW AS THE COURT INSTRUCTS, WHETHER OR NOT YOU AGREE

25  WITH IT.  NOTHING THAT I DO OR SAY DURING THIS TRIAL -- OR THAT

10:39  1  ANY MEMBER OF THE COURT STAFF DOES OR SAYS DURING THIS TRIAL --

2  SHOULD BE TAKEN BY YOU AS ANY INDICATION OF WHAT YOUR VERDICT

3  SHOULD BE.  YOU, AND YOU ALONE, SHOULD DETERMINE YOUR VERDICT.

4          THE EVIDENCE FROM WHICH YOU WILL FIND FACTS WILL

5  CONSIST OF THE TESTIMONY OF WITNESSES, DOCUMENTS, OR OTHER

6  THINGS THAT ARE RECEIVED INTO THE RECORD AS EXHIBITS, AND ANY

7  FACTS THAT THE PARTIES AGREE ON OR STIPULATE.  IF THE PARTIES

8  AGREE ON ANY FACTS, THE COURT WILL TELL YOU WHAT THOSE FACTS

9  ARE AND YOU WON'T HAVE TO DETERMINE THOSE BECAUSE THEY'VE

10  AGREED THAT THOSE PARTICULAR ELEMENTS OR PARTICULAR FACTS ARE

11  THE FACTS THAT APPLY.

12          THERE ARE THINGS THAT ARE NOT EVIDENCE, AND

13  THOSE ARE THINGS THAT YOU SHOULD NOT CONSIDER.  I WILL LIST

14  THOSE FOR YOU:  STATEMENTS, ARGUMENTS, AND QUESTIONS BY THE

15  LAWYERS ARE NOT EVIDENCE.  ANYTHING THAT COMES OUT OF A

16  LAWYER'S MOUTH IS NOT EVIDENCE.  IT'S THAT SIMPLE.  WHAT IS

17  EVIDENCE ARE THE DOCUMENTS THAT ARE ADMITTED INTO TESTIMONY

18  THAT YOU WILL SEE ON YOUR SCREEN AND THE TESTIMONY OF WITNESSES

19  THAT ARE SWORN IN, TAKE AN OATH, AND TESTIFY FROM THIS WITNESS

20  STAND.  ANYTHING ELSE IS NOT EVIDENCE.

21          OBJECTIONS TO QUESTIONS ARE NOT EVIDENCE.  THE

22  LAWYERS HAVE AN OBLIGATION TO THEIR CLIENTS TO MAKE OBJECTIONS

23  WHEN THEY BELIEVE THAT EVIDENCE IS BEING OFFERED FOR A -- THAT

24  IS IMPROPER UNDER THE RULES OF EVIDENCE.  WE HAVE RULES THAT

25  APPLY TO WHAT EVIDENCE IS ADMISSIBLE AND WHAT IS NOT.  YOU

10:41  1  SHOULD NOT BE INFLUENCED BY THE FACT THAT THERE'S AN OBJECTION.
       2  YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION, NOR SHOULD YOU
       3  BE INFLUENCED BY THE COURT'S RULING ON THE OBJECTION.  IF AN
       4  OBJECTION IS SUSTAINED, YOU IGNORE THE QUESTION; AND IF THERE
       5  WAS AN ANSWER THAT WAS GIVEN BEFORE THE OBJECTION WAS RULED
       6  UPON, YOU SHOULD IGNORE THAT ANSWER.  IF IT'S OVERRULED, YOU
       7  TREAT THE ANSWER JUST AS YOU WOULD ANY OTHER ANSWER.
       8            IF YOU ARE INSTRUCTED THAT A PARTICULAR ITEM OF
       9  EVIDENCE IS RECEIVED FOR A LIMITED PURPOSE, YOU SHOULD FOLLOW
      10  THAT INSTRUCTION.
      11            TESTIMONY THAT THE COURT HAS EXCLUDED OR ASKED
      12  YOU OR TOLD YOU TO DISREGARD IS NOT EVIDENCE AND SHOULD NOT BE
      13  CONSIDERED BY YOU.
      14            ANYTHING THAT YOU SEE OR HEAR OUTSIDE OF THE
      15  COURTROOM OR ANYTHING YOU MAY HAVE SEEN OR MAY HAVE HEARD
      16  OUTSIDE THE COURTROOM IS NOT EVIDENCE.  THE JURY SELECTION WAS
      17  NOT EVIDENCE.  ANYTHING YOU HEARD ME ASK OR YOU HEARD OTHER
      18  MEMBERS OR THE PROSPECTIVE JURORS RESPOND, THAT'S NOT EVIDENCE
      19  IN THIS CASE.
      20            THERE ARE TWO KINDS OF EVIDENCE:  "DIRECT" AND
      21  "CIRCUMSTANTIAL."
      22            "DIRECT EVIDENCE" IS THE DIRECT PROOF OF A FACT,
      23  SUCH AS THE TESTIMONY OF AN EYEWITNESS AS TO WHAT THEY SAW OR
      24  WHAT SPECIFICALLY THEY SAW.
      25            "CIRCUMSTANTIAL EVIDENCE" IS LIKEWISE EQUALLY

10:42 1   VALUABLE EVIDENCE, BUT IT IS PROOF OF ONE FACT FROM WHICH YOU

2   CAN INFER OR CONCLUDE ANOTHER FACT.  SO THAT'S A LOT OF WORDS,

3   A LOT OF MUMBO JUMBO.  SO IT'S VERY SIMPLE.  IF SOMEBODY COMES

4   IN THIS COURTROOM DRIPPING WET, WITH AN UMBRELLA AND A

5   RAINCOAT, YOU CAN INFER THAT IT'S RAINING OUTSIDE, EVEN THOUGH

6   YOU DON'T KNOW THAT IT'S RAINING.  YOU CAN'T SEE THAT IT'S

7   RAINING.  YOU CAN INFER THAT.  THAT IS CIRCUMSTANTIAL EVIDENCE.

8   SO THE PROOF OF ONE FACT THROUGH INFERENCE BY ANOTHER FACT.

9           IT WILL BE UP TO YOU TO DECIDE WHAT WITNESSES TO

10   BELIEVE AND WHAT WITNESSES NOT TO BELIEVE, AND HOW MUCH OF ANY

11   WITNESS'S TESTIMONY TO ACCEPT OR REJECT.  THE COURT WILL GIVE

12   YOU SOME MORE INSTRUCTIONS AT THE END OF THIS CASE THAT WILL

13   GUIDE YOU IN DETERMINING THE CREDIBILITY OR BELIEVABILITY OF

14   WITNESSES.

15           YOU WILL BE PERMITTED TO TAKE NOTES.  I WILL

16   GIVE YOU SOME INSTRUCTIONS ABOUT YOUR NOTES.  YOU HAVE A NOTE

17   PAD AND A PEN IN YOUR BAG.  YOU WILL BE PERMITTED TO TAKE

18   NOTES.

19           WHEN YOU DELIBERATE, YOU'LL GET THE DOCUMENTARY

20   EVIDENCE.  THERE IS A SCREEN, AND YOU WILL SEE IT WHEN YOU GO

21   IN THERE.  THERE'S A SCREEN, AND THE DOCUMENTARY EVIDENCE WILL

22   BE AVAILABLE TO YOU, AND YOU CAN SCROLL THROUGH AND LOOK AT THE

23   PAPERWORK THAT'S BEEN ADMITTED AS EVIDENCE.  YOU WILL NOT,

24   HOWEVER, GET TO HEAR THE TESTIMONY OF THE WITNESSES AGAIN.  SO

25   TESTIMONY OF WITNESSES IS EVIDENCE, JUST AS PAPERWORK THAT'S

10:44   1   ADMITTED INTO EVIDENCE IS EVIDENCE.  YOU'LL HAVE TO LISTEN TO

2   THE WITNESSES AND GO ON YOUR MEMORY AND YOUR RECALL OF THEIR

3   TESTIMONY.  AND THAT'S WHY THE COURT ALLOWS YOU TO TAKE NOTES.

4                  THE BURDEN OF PROOF IN THIS CASE IS THE BURDEN

5   OF PROOF THAT APPLIES IN CIVIL CASES.  THE PLAINTIFF, MR.

6   TAYLOR, HAS THE BURDEN OF PROVING HIS CASE BY WHAT IS CALLED A

7   "PREPONDERANCE OF THE EVIDENCE."  THAT MEANS THAT THE PLAINTIFF

8   HAS TO PRODUCE EVIDENCE WHICH WHEN CONSIDERED IN LIGHT OF ALL

9   OF THE FACTS LEADS YOU TO BELIEVE THAT WHAT THE PLAINTIFF

10   CLAIMS IS MORE LIKELY TRUE THAN NOT.

11                  TO PUT IT DIFFERENTLY, IF YOU WERE TO PUT THE

12   PLAINTIFF'S EVIDENCE AND THE DEFENDANT'S EVIDENCE ON TWO SIDES

13   OF THE SCALE, IF THE PLAINTIFF TIPS THE SCALE IN HIS FAVOR,

14   THEN THAT WOULD BE A PREPONDERANCE.

15                  ON THE OTHER HAND, IF THE DEFENSE -- AND THEY

16   DON'T HAVE THE BURDEN.  BUT IF THE SCALE -- IF THE PLAINTIFF

17   DOESN'T TIP THE SCALE, THEN YOU WOULD FIND FOR THE DEFENDANT.

18                  IF THE PLAINTIFF FAILS TO MEET THE BURDEN OF

19   PREPONDERANCE, THEN THE VERDICT MUST BE FOR THE DEFENDANT.  IF

20   THE PLAINTIFF MEETS THE BURDEN OF PREPONDERANCE, MORE LIKELY

21   THAN NOT, OR MORE PROBABLY THAN NOT, THEN THE VERDICT WOULD BE

22   FOR THE PLAINTIFF.

23                  THOSE OF YOU WHO HAVE SAT ON CRIMINAL CASES OR

24   HAVE HEARD OF THE TERMS "PROOF BEYOND A REASONABLE DOUBT"

25   SHOULD PUT THAT OUT OF YOUR MIND.  THAT DOES NOT APPLY IN THIS

10:45 1   CASE.  THIS IS A CIVIL CASE, NOT A CRIMINAL CASE, AND IT IS A

2   PREPONDERANCE OF THE EVIDENCE STANDARD.

3            THE COURT WILL GIVE YOU DETAILED INSTRUCTIONS ON

4   THE LAW AT THE END OF THE CASE, AND THOSE INSTRUCTIONS WILL

5   CONTROL YOUR DELIBERATIONS AND YOUR DECISION.

6            BUT IN ORDER TO HELP YOU FOLLOW THE EVIDENCE, I

7   WILL GIVE YOU A BRIEF SUMMARY OF THE CLAIMS THAT THE PLAINTIFF

8   IS MAKING.

9            THE PLAINTIFF IN THIS CASE IS MR. JOHNNY TAYLOR.

10   THE DEFENDANT IS UNION PACIFIC RAILROAD.  MR. TAYLOR WAS

11   EMPLOYED BY UNION PACIFIC RAILROAD FROM 2007 UNTIL 2018,

12   ULTIMATELY BECOMING THE MANAGER OF TRACK MAINTENANCE.  IN THAT

13   POSITION MR. TAYLOR WAS RESPONSIBLE FOR ENSURING THAT THE

14   RAILROAD FOLLOWED CERTAIN SAFETY STANDARDS.  MR. TAYLOR CLAIMS

15   THAT HE TOOK UNSAFE TRACKS OUT OF SERVICE AND TOOK OTHER

16   ACTIONS RELATED TO SAFETY THAT HE CONTENDS ARE PROTECTED OR

17   WERE PROTECTED BY THE FEDERAL RAILROAD SAFETY ACT.  MR. TAYLOR

18   CLAIMS THAT UNION PACIFIC THREATENED TO FIRE HIM AND RETALIATED

19   AGAINST HIM AND ULTIMATELY TERMINATED HIM AS A RESULT OF HIS

20   ABIDANCE BY THOSE FEDERAL SAFETY REGS.

21            IN RESPONSE, UNION PACIFIC DENIES THAT AND

22   CLAIMS THAT MR. TAYLOR WAS TERMINATED BECAUSE HE HAD

23   SIGNIFICANT JOB PERFORMANCE ISSUES AND WAS INSUBORDINATE.

24   UNION PACIFIC CLAIMS THAT MR. TAYLOR DID NOT ENGAGE IN

25   ACTIVITIES THAT WERE PROTECTED BY THE FEDERAL RAILROAD SAFETY

10:46   1    ACT, AND THAT EVEN IF HE HAD OR DID, THEY WOULD HAVE TERMINATED

2    HIM ANYWAY BECAUSE OF JOB PERFORMANCE ISSUES.

3                   NOW, A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

4                   FIRST, AND VERY IMPORTANTLY, YOU ARE NOT TO

5    DISCUSS THIS CASE OR ANYTHING ABOUT IT WITH EACH OTHER OR

6    ANYONE ELSE.  UNTIL YOU RETIRE TO DELIBERATE AT THE END OF THIS

7    CASE, YOU SIMPLY SHOULD NOT TALK ABOUT THIS CASE, EVEN AMONGST

8    YOURSELVES.  THE LAW EXPECTS THAT YOU WILL DELIBERATE BASED ON

9    ALL OF THE EVIDENCE, SO THAT'S WHY WE ASK THAT YOU NOT TALK

10   ABOUT WHAT'S HAPPENED THUS FAR.  AT THE END OF THE CASE, YOU'LL

11   BE ABLE TO TALK ABOUT IT ALL.

12                   THE SAME THING WITH FAMILY, FRIENDS.  YOU CAN

13   SAY THAT YOU'RE SERVING ON A CIVIL JURY IN FEDERAL COURT, BUT

14   THAT SHOULD BE THE END OF YOUR DISCUSSION ABOUT THIS CASE.

15                   DO NOT READ OR LISTEN TO ANYTHING THAT TOUCHES

16   ON THIS CASE.  IF ANYONE SHOULD TRY TO TALK TO YOU ABOUT THIS

17   CASE, PLEASE BRING IT TO THE COURT'S ATTENTION THROUGH THE

18   SECURITY OFFICER IMMEDIATELY.

19                   VERY IMPORTANTLY, DO NOT DO ANY RESEARCH OR MAKE

20   ANY INVESTIGATION ABOUT THIS CASE ON YOUR OWN.

21                   WE ARE ALL VERY CURIOUS, AND THAT'S OUR NATURE

22   AS HUMAN BEINGS TO BE CURIOUS, AND WE HAVE ALL THESE WONDERFUL

23   TECHNOLOGIES THAT ARE RIGHT HERE AT OUR HANDS.  THE COURT ASKS

24   THAT YOU NOT TAKE ADVANTAGE OF THAT TECHNOLOGY.  IF YOU HEAR A

25   TERM IN THIS CASE AND YOU WANT TO LOOK IT UP, DON'T DO IT.

10:48  1   THESE LAWYERS ARE HIGHLY TRAINED AND THEY'RE SUPPOSED TO GIVE

2   YOU ALL OF THE INFORMATION THAT YOU NEED TO DECIDE THIS CASE.

3   YOU SHOULD NOT DO ANY INDEPENDENT RESEARCH.  YOU SHOULD NOT

4   LOOK AT GOOGLE MAPS.  YOU SHOULD NOT GOOGLE A TERM.  YOU SHOULD

5   NOT GOOGLE THE PLAINTIFF.  YOU SHOULD NOT GOOGLE THE DEFENDANT.

6   YOU SHOULD DO NO INDEPENDENT RESEARCH.  THESE LAWYERS ARE VERY

7   SKILLED.  AND IT IS THEIR RESPONSIBILITY TO BRING YOU THE

8   EVIDENCE THAT YOU NEED TO DECIDE THIS CASE.  AND YOU SHOULD NOT

9   DO ANY INDEPENDENT RESEARCH.

10              DO NOT FORM ANY OPINION UNTIL ALL OF THE

11   EVIDENCE IS IN.  KEEP AN OPEN MIND UNTIL YOU START YOUR

12   DELIBERATIONS AT THE END OF THE CASE.

13              WE WILL TAKE A SHORT BREAK, AND THEN THE TRIAL

14   WILL BEGIN.  SO THE WAY THAT THE TRIAL WILL GO IS THAT EACH

15   SIDE WILL MAKE AN OPENING STATEMENT.  THAT OPENING STATEMENT --

16   AS I MENTIONED TO YOU, WHAT THE LAWYERS SAY IS NOT EVIDENCE.

17   THAT OPENING STATEMENT IS NEITHER EVIDENCE NOR IS IT ARGUMENT.

18   IT IS, RATHER, AN OUTLINE OF WHAT THE PARTY EXPECTS TO BE ABLE

19   TO PROVE IN THIS CASE.  THEY OFFER IT TO YOU AS A KIND OF A

20   CHART OR A THUMBNAIL OF WHAT THEY INTEND TO PROVE, TO GIVE YOU

21   SOME BEARING WITH RESPECT TO THEIR POSITIONS.

22              AFTER THE OPENING ARGUMENTS THE PLAINTIFF WILL

23   PRESENT HIS WITNESSES AND THE DEFENDANTS MAY CROSS-EXAMINE

24   THOSE WITNESSES.  THEN THE DEFENDANT, UNION PACIFIC, WILL

25   PRESENT ITS WITNESSES AND THE PLAINTIFF MAY CROSS-EXAMINE THOSE

10:49 1  WITNESSES.  AFTER THAT AND ALL THE EVIDENCE IS IN, THE

2  ATTORNEYS WILL MAKE CLOSING ARGUMENTS, WHICH WILL SUMMARIZE AND

3  INTERPRET -- GIVE YOU THEIR INTERPRETATION OF WHAT THE EVIDENCE

4  SHOWED.

5          THE COURT WILL GIVE YOU INSTRUCTIONS ON THE LAW,

6  AND THEN YOU WILL RETIRE TO DELIBERATE ON YOUR VERDICT.  THOSE

7  ARE THE INITIAL INSTRUCTIONS OF THE COURT.

8          WHEN WE TAKE BREAKS -- I MAY NOT TELL YOU AT

9  EVERY BREAK.  I MAY NOT REITERATE TO YOU:  DON'T DISCUSS THE

10  CASE AMONG YOURSELVES.  DON'T DISCUSS THE CASE WITH ANYBODY.

11  DON'T GET ON SOCIAL MEDIA.  DON'T DO ANY INVESTIGATION.  DON'T

12  DRIVE BY TO SEE SOMETHING.  JUST LIVE YOUR LIVES AND COME BACK

13  AND LISTEN TO THE EVIDENCE AS IT IS PRESENTED TO YOU.

14          ALL RIGHT.  SO WE'RE GOING TO TAKE ABOUT A

15  TEN-MINUTE BREAK TO LET EVERYBODY STRETCH THEIR LEGS, USE THE

16  FACILITIES, LET THE LAWYERS ASSEMBLE THEIR NOTES.  SO YOU'LL GO

17  RIGHT IN HERE TO THE JURY ROOM, AND YOU'LL SEE THERE'S WATER

18  AND SNACKS AND RESTROOMS AND ALL OF THAT.  SO WE WILL SEE YOU

19  BACK IN ABOUT TEN MINUTES.

20          ALL RISE FOR THE JURY.

21          AND Y'ALL CAN COME THIS WAY.  I MEAN, MAKE IT

22  EASY ON YOURSELF, YOU CAN GO THAT WAY.

23      **(WHEREUPON, THE JURY EXITED THE COURTROOM.)**

24      **THE COURT:**  OKAY.  WE WILL BE IN RECESS FOR A FEW

25  MINUTES, AND THEN WE'LL GO OVER YOUR STIPULATIONS AND YOUR

10:51  1  EVIDENTIARY ADMISSIONS.

2                    **(WHEREUPON, THE COURT WAS IN RECESS.)**

3              **THE COURT:**  BE SEATED.

4                    OKAY, COUNSEL.  THE STIPULATION ON BACK PAY HAS

5  BEEN FILED IN THE RECORD AT RECORD DOCUMENT 68.  SINCE IT'S

6  REALLY A LEGAL ISSUE, THE COURT WOULD NOT INSTRUCT THE JURY ON

7  THAT UNLESS YOU HAVE SOME REASON THAT YOU THINK THAT THE COURT

8  SHOULD.

9              **MR. SCHMIDT:**  NONE THAT I CAN THINK OF, YOUR HONOR.

10             **MS. SCHOONMAKER:**  NO, YOUR HONOR.

11             **THE COURT:**  OKAY.  I HAVE HERE THE LIST OF EXHIBITS

12  THAT HAVE BEEN -- THAT THE PARTIES HAVE AGREED TO BE

13  PREADMITTED.  I'LL GO OVER THOSE REAL QUICK AND JUST ADMIT

14  THOSE INTO EVIDENCE.  THE ONES THAT ARE NOT -- THAT THE COURT

15  DOES NOT CALL OUT, YOU'LL HAVE TO GO THROUGH THE OLD-FASHIONED

16  METHOD OF ADMITTING THOSE.

17                   THE FOLLOWING EXHIBITS ARE ADMITTED:  P-4, P-10,

18  P-11, P-13, P-14, P-15, P-16, P-17, P-18, P-19, P-25, P-26,

19  P-27, P-28, P-29, P-30, P-34, AND P-36 THROUGH 45 ARE ALL

20  ADMITTED.

21                   OKAY.  DEFENDANT'S EXHIBITS D-1, D-2, D-4, D-5,

22  D-6, D-7, D-8, D-10, D-11, AND D-17 ARE ALL ADMITTED.

23                   ALL RIGHT.  AND THEN THERE ARE SOME JOINT

24  EXHIBITS.  DO THE PARTIES WISH TO MOVE JOINTLY THE ADMISSION OF

25  JOINT EXHIBITS 1 THROUGH 27?

11:04 1            **MR. SCHMIDT:**  YES, YOUR HONOR.

2            **THE COURT:**  ANY OBJECTION?

3            **MR. WADSWORTH:**  NO, YOUR HONOR.

4            **THE COURT:**  ALL RIGHT.  JOINT EXHIBITS 1 THROUGH 27

5    ARE ADMITTED.

6                ARE THERE ANY STIPULATIONS OF FACT THAT THE

7    PARTIES WISH THE COURT TO READ TO THE JURY?  WE DON'T HAVE TO

8    DO IT NOW.  WE CAN DO IT LATER IF THERE ARE SOME THAT -- AND WE

9    CAN ACTUALLY DO IT IN THE CLOSING CHARGES IF THEY ARE PRETTY,

10   YOU KNOW, KIND OF BASIC.  I KNOW THE DATES OF EMPLOYMENT I

11   THINK WERE STIPULATED; THAT KIND OF THING.

12               ALL RIGHT.  ANYTHING ELSE THAT WE NEED TO DO

13   HOUSEKEEPING-WISE BEFORE WE BRING IN THE JURY?

14           **MR. SMITH:**  YES, YOUR HONOR.  ACTUALLY, TWO THINGS.

15   PLAINTIFF WISHES TO MOVE FOR SEQUESTRATION OF THE WITNESSES AT

16   THE APPROPRIATE TIME.  I DON'T KNOW IF NOW IS THE --

17           **THE COURT:**  THIS IS THE APPROPRIATE TIME.

18               WHAT'S THE SECOND THING?

19           **MR. SMITH:**  THE SECOND THING IS I REQUEST THE COURT'S

20   GUIDANCE ON AN ISSUE ABOUT -- PERTAINING TO MY OPENING

21   STATEMENT.

22           **THE COURT:**  OKAY.

23           **MR. SMITH:**  THERE IS A SAFETY COMPLIANCE ORDER THAT

24   WAS ISSUED BY THE FEDERAL RAILROAD ADMINISTRATION IN NOVEMBER

25   OF 2016.

11:05  1           **THE COURT REPORTER:**  I CAN'T HEAR YOU.

2           **THE COURT:**  ACTUALLY, I CAN.  ISN'T THAT INTERESTING?

3   I USUALLY CAN'T HEAR A THING.  I SHOULDN'T SAY THAT.  I

4   ACTUALLY CAN HEAR.  OKAY.

5           **MR. SMITH:**  WOULD YOU LIKE ME TO START OVER, YOUR

6   HONOR?

7           **THE COURT:**  YES, PLEASE.

8               LET ME DO THE SEQUESTRATION, AND THAT WAY I

9   DON'T FORGET TO DO IT.

10           **MR. SMITH:**  OKAY.

11           **THE COURT:**  IF YOU ARE IN THE COURTROOM AND YOU PLAN

12   TO BE OR YOU BELIEVE THAT YOU ARE GOING TO BE A WITNESS IN THIS

13   CASE, YOU'LL BE ASKED TO WAIT OUTSIDE UNTIL YOU ARE CALLED.

14   AND YOU'RE NOT TO DISCUSS YOUR TESTIMONY OR YOUR PROPOSED

15   TESTIMONY WITH ANY PERSON.

16               I DON'T KNOW YOUR WITNESSES, OBVIOUSLY, SO BOTH

17   PARTIES NEED TO ENFORCE THE RULE OF SEQUESTRATION.  THE COURT

18   WILL ENTER AN ORDER OF SEQUESTRATION OF ALL THE WITNESSES.  IF

19   YOU'VE GOT A WITNESS THAT COMES INTO THE COURTROOM, I'LL NEED

20   YOU ALL TO LET THEM KNOW THAT THE RULE OF SEQUESTRATION HAS

21   BEEN INVOKED.

22               OKAY.  NOW, YOU NEED GUIDANCE ON?

23           **MR. SMITH:**  THERE IS A DOCUMENT CALLED "COMPLIANCE

24   AND SAFETY AGREEMENT" THAT WAS ENTERED INTO AND SIGNED BY BOTH

25   UNION PACIFIC AND THE FEDERAL RAILROAD ADMINISTRATION

11:07 1    NOVEMBER OF 2016.  IT'S A PART OF THE -- WE WISH TO HAVE IT A

2    PART OF PLAINTIFF'S CASE.  IT'S DIRECTLY RELEVANT.  THE

3    DEFENDANTS HAVE OBJECTED TO IT.  AND BASICALLY WHAT I'M ASKING

4    FOR THE COURT'S GUIDANCE, MAY I MENTION IT BY WAY OF OVERVIEW

5    IN THE OPENING STATEMENT, OR WOULD YOU LIKE FOR ME TO DEFER ANY

6    MENTION OF THAT?

7              **THE COURT:**  NO.  I MEAN, IF THEY'VE OBJECTED TO IT

8    AND IT'S NOT IN EVIDENCE, IT WOULD NOT BE APPROPRIATE FOR YOU

9    TO MENTION IT IN YOUR OPENING.

10             **MR. SMITH:**  THANK YOU VERY MUCH, YOUR HONOR.

11             **THE COURT:**  ALL RIGHT.  ANYTHING ELSE

12   HOUSEKEEPING-WISE?

13             **MR. WADSWORTH:**  NOTHING FROM THE DEFENDANT, YOUR

14   HONOR.

15             **THE COURT:**  IS IT MS. SCHOONMAKER OR SHOEMAKER?  HOW

16   DO YOU PRONOUNCE IT?

17             **MS. SCHOONMAKER:**  SCHOONMAKER, LIKE SCHOOL, YOUR

18   HONOR.

19             **THE COURT:**  SCHOONMAKER, OKAY.

20             ALL RIGHT.  BRING IN THE JURY.

21             **(WHEREUPON, THE JURY ENTERED THE COURTROOM.)**

22             **THE COURT:**  BE SEATED.

23             OKAY, LADIES AND GENTLEMEN.  THE TRIAL WILL

24   BEGIN NOW.  WE WILL START WITH OPENING STATEMENTS BY THE

25   PLAINTIFF.

11:08  1            MR. SMITH, YOU ARE SOFTSPOKEN, SO USE THE MIC AS

       2    BEST YOU CAN.

       3            IF YOU ALL HAVE TROUBLE HEARING, RAISE YOUR

       4    HAND, OKAY, SO THAT WE CAN MAKE SURE THAT YOU ALL HEAR

       5    EVERYTHING.

       6            **MR. SMITH:**  THANK YOU, YOUR HONOR.

       7            GOOD MORNING, LADIES AND GENTLEMEN OF THE JURY.

       8    I AM J. ARTHUR SMITH III.  MOST PEOPLE CALL ME ART SMITH.  AND

       9    I AM REALLY PROUD TO STAND BEFORE YOU TODAY AND REPRESENT

      10    MR. JOHNNY TAYLOR.  THIS CASE IS IMPORTANT TO HIM AND HIS

      11    FAMILY.  IT'S ALSO IMPORTANT TO THIS COMMUNITY.  IT'S ALSO

      12    IMPORTANT TO THIS STATE.  AND I'M GOING TO GIVE YOU A GUIDELINE

      13    OF THE EVIDENCE, LIKE THE JUDGE SUGGESTED I COULD DO.  AND I'LL

      14    TRY MY BEST TO DO THAT.

      15            BUT FIRST I WANT TO TELL YOU A LITTLE BIT ABOUT

      16    MYSELF.  WE'VE HAD A LOT OF QUESTIONS ABOUT WHO YOU ARE AND

      17    YOUR CHILDREN AND ALL THAT.  I WAS BORN AND RAISED IN MONROE,

      18    LOUISIANA.  MY MOTHER WAS A HOUSEWIFE.  MY FATHER WAS A LIFE

      19    INSURANCE SALESMAN.  I WENT TO LSU AND BEGAN PRACTICE A MERE 50

      20    YEARS AGO.  I HAVE THREE CHILDREN:  ONE IS A LAWYER, ONE IS A

      21    DOCTOR, AND ONE IS THE HAPPIEST MOTHER OF THREE BABY CHILDREN

      22    YOU'VE EVER SEEN.  AND I'M VERY PROUD OF ALL OF THEM.  I HAVE

      23    SEVEN GRANDCHILDREN.  AND, OF COURSE, THEY'RE THE MOST

      24    BEAUTIFUL GRANDCHILDREN ANYBODY EVER SAW, AT LEAST IN MY

      25    OPINION.

11:10    1        GOING TO THE CASE, ONE OF THE THINGS YOU NEED TO

2    KNOW, I BELIEVE, IS WHAT ARE THE RULES OF THE ROAD.  IF WE GO

3    ON AN INTERSTATE HIGHWAY AND WE'RE NOT LOOKING WHERE WE'RE

4    GOING AND WE HAVE A HEAD-ON COLLISION WITH SOMEBODY ELSE OR WE

5    INJURE THEM, WE KNOW WHAT THE CONSEQUENCES ARE GOING TO BE.

6    WE'RE GOING TO BE RESPONSIBLE FOR THAT ACCIDENT.

7        BUT THERE ARE RULES THAT ALSO APPLY TO RAILROAD

8    COMPANIES, SUCH AS UNION PACIFIC RAILROAD.  AND THOSE ARE THE

9    RULES THAT COME INTO PLAY IN THIS CASE.  EMPLOYERS IN THOSE

10    SITUATIONS MUST COMPLY WITH FEDERAL LAW WHICH PROTECTS RAILROAD

11    SAFETY OR THERE ARE CONSEQUENCES.  AND YOU ARE TO DECIDE

12    WHETHER THEY'VE COMPLIED AND WHETHER THERE ARE CONSEQUENCES.

13        THE RULES IN THIS SITUATION, I'LL JUST GIVE YOU

14    A ROADMAP TO THEM.  THE FEDERAL RAILROAD SAFETY ACT SETS FORTH

15    THE PROPOSITION THAT IT'S UNLAWFUL FOR A RAILROAD CARRIER, SUCH

16    AS UNION PACIFIC, TO TERMINATE AN EMPLOYEE'S EMPLOYMENT IF IT

17    IS -- IF THE TERMINATION IS DUE TO THE EMPLOYEE IN GOOD FAITH

18    AND REASONABLY REPORTING A VIOLATION OF FEDERAL LAW WHICH HE

19    BELIEVES TO BE ACCURATE.

20        YOU CAN'T FIRE AN EMPLOYEE FOR DOING THAT, FOR

21    BEING A WATCHDOG OR A REPORTER OF SAFETY INFORMATION.  THE

22    EMPLOYER, THE RAILROAD COMPANY, CAN'T FIRE AN EMPLOYEE FOR

23    REPORTING IN GOOD FAITH HAZARDOUS SAFETY CONDITIONS THAT

24    PERTAIN TO THE RAILROAD.  AND AN EMPLOYER, SUCH AS UNION

25    PACIFIC, CANNOT DISCHARGE AN EMPLOYEE FOR REFUSING TO AUTHORIZE

11:12 1   THE USE OF ANY TRACK IF THE EMPLOYEE IS RESPONSIBLE FOR THE

2   MAINTENANCE AND INSPECTION OF THE TRACK AND THE EMPLOYEE

3   BELIEVES THAT THE TRACK PRESENTS A HAZARDOUS SAFETY CONDITION.

4   THOSE ARE THE RULES.

5        NOW, I WANT TO TELL YOU ABOUT WHO WE ARE SUING

6   AND WHY.  IT MIGHT BE EVIDENT TO YOU.  BUT JUST TO BE CLEAR, WE

7   ARE SUING THE UNION PACIFIC RAILROAD BECAUSE THEY FIRED

8   MR. TAYLOR FOR VIOLATIONS.  AND THEY VIOLATED THE RULES THAT I

9   HAVE JUST MENTIONED.  THE EMPLOYEES OF UNION PACIFIC WERE

10   WORKING IN THE COURSE AND SCOPE OF THEIR EMPLOYMENTS.  AND THEY

11   DID THE TERMINATION -- DID THE OTHER ACTIONS THAT GIVE RISE TO

12   THIS LITIGATION.

13        WHY ARE WE SUING?  AND THIS NEXT QUESTION I'D

14   LIKE TO BRING UP WITH YOU.  WELL, THESE WHISTLEBLOWER ACTS ARE

15   REALLY IMPORTANT.  IT'S NOT JUST TO PROTECT THE ONE INDIVIDUAL

16   EMPLOYEE SUCH AS JOHNNY TAYLOR.  IT'S ALSO IMPORTANT TO PROTECT

17   OUR COMMUNITY AND OUR FAMILIES AND OUR CHILDREN AND OUR

18   GRANDCHILDREN.  WE DON'T KNOW WHO IS GOING TO BE OUR SUPERVISOR

19   TOMORROW, AND THESE RULES ARE RULES THAT ARE WISELY MADE BY THE

20   CONGRESS TO PROTECT RAILROAD SAFETY EMPLOYEES WORKING IN

21   CONNECTION WITH THE RAILROADS AND THE COMMUNITIES THROUGH WHICH

22   THE RAILROADS PASS.

23        THE SECOND REASON THAT WE'RE SUING IN THIS CASE

24   IS THAT UNION PACIFIC HAS REFUSED TO PROVIDE FULL AND FAIR

25   COMPENSATION FOR THE HARMS IT INFLICTED ON MR. TAYLOR.

11:14   1                    WITH THAT IN MIND, I WANT TO TELL YOU -- MY NEXT

2    STEP IS TO TELL YOU THAT THERE ARE FOUR PARTS OF THIS

3    RETALIATION CASE.  IT'S MUCH SIMILAR TO MANY OTHER

4    WHISTLEBLOWER CASES.

5                    FIRST, THE PLAINTIFF HAS TO SHOW -- AND AS JUDGE

6    DICK SAID -- BY A PREPONDERANCE OF THE EVIDENCE THAT HE

7    PARTICIPATED IN "PROTECTED ACTIVITY."  THAT'S A WORD YOU WILL

8    HEAR IN THE TRIAL.

9                    SECONDLY, THAT THE COMPANY WAS AWARE THAT HE HAD

10   PARTICIPATED IN PROTECTED ACTIVITY.

11                    THIRD, THAT THE EMPLOYEE SUFFERED AN ADVERSE

12   EMPLOYMENT ACTION.  TERMINATION IS AN ADVERSE EMPLOYMENT

13   ACTION.

14                    AND FOURTH, THAT THE PROTECTED ACTIVITY

15   CONTRIBUTED IN SOME WAY TO THE EMPLOYEE'S BEING TERMINATED,

16   EVEN THOUGH OTHER FACTORS MAY HAVE BEEN IN PLAY AS WELL.  BUT

17   IF THERE'S A RELATIONSHIP BETWEEN THE PROTECTED ACTIVITY AND

18   THE TERMINATION, THAT'S WHAT IS REQUIRED.

19                    AS TO EACH ELEMENT, THE EVIDENCE WILL SHOW THAT

20   MR. TAYLOR ENGAGED IN LEGALLY PROTECTED ACTIVITY.  AND THERE'S

21   A LOT OF EVIDENCE ON THIS.  BUT I JUST KIND OF WANT TO BOIL

22   DOWN THE MAIN POINTS FOR YOU.

23                    HE WAS THE MANAGER OF TRACK MAINTENANCE.  HE HAD

24   THE RESPONSIBILITY TO ENSURE SAFETY OF THE RAILROAD AND THE

25   PEOPLE WORKING IN OR IN CONNECTION WITH THE RAILROAD.  ON

11:15 1   MARCH 28, 2017, HE TOOK THE AVONDALE TAIL TRACK OUT OF SERVICE.

2   HE DETERMINED THAT IT WAS UNSAFE.  HE TOOK IT OUT OF SERVICE.

3            THE SECOND THING, THE MAIN EVENT, ON NOVEMBER 2,

4   2017, MR. TAYLOR TOOK THE NO. 1 MAIN LINE TRACK OUT OF SERVICE

5   AT AVONDALE, LOUISIANA.

6            JANUARY 10, 2018, MR. TAYLOR TOOK THE SWITCH 16

7   TRACK AT AVONDALE OUT OF SERVICE BECAUSE HE FOUND THAT IT WAS

8   SEVERELY OUT OF ALIGNMENT.

9            SO THESE ARE THE THREE MAIN PROTECTED ACTIVITIES

10  THAT YOU NEED TO KEEP IN MIND.  AND THE SEQUENCING IN THIS

11  CASE, THE SEQUENCING OF WHAT HAPPENED TO MR. TAYLOR, IS GOING

12  TO BE REAL IMPORTANT FOR YOU TO DETERMINE THE ULTIMATE ISSUES

13  IN THIS CASE.

14            THERE WERE ALSO REPORTS THAT MR. TAYLOR MADE TO

15  THE FEDERAL RAILROAD ADMINISTRATION.  ON JANUARY 22, 2018, HE

16  ISSUED -- I'M SORRY.  HE SUBMITTED SEVERAL COMPLAINTS TO THE

17  FEDERAL RAILROAD ADMINISTRATION REGARDING UNION PACIFIC'S

18  SAFETY VIOLATIONS.  JANUARY 22, 2018, HE ISSUED A SLOW ORDER

19  FOR A TRACK IN WHITE CASTLE.  HE DECLINED TO PUT THE SWITCH 16

20  TRACK BACK INTO SERVICE.  AND ON JANUARY 22, 2018, HE DECLINED

21  TO REMOVE THE SLOW ORDER.

22            THESE WERE DUTIES THAT MR. TAYLOR HAD THE

23  RESPONSIBILITY FOR UNDER FEDERAL LAW AS THE MANAGER OF TRACK

24  MAINTENANCE.  THAT WAS HIS JOB TO DO.  AND THE EVIDENCE WILL

25  SHOW THAT EACH TIME HE TOOK A TRACK OUT OF SERVICE OR DID A

11:17 1  SLOW ORDER, HE HAD A REASONABLE AND GOOD FAITH BELIEF THAT IT

2  CREATED A SAFETY OR HAZARDOUS CONDITION.  AND HE BASED THAT

3  GOOD FAITH BELIEF ON THE FACT THAT HE IS A DEGREED CIVIL

4  ENGINEER.  HE HAS A DEGREE IN MATHEMATICS.  HE WORKED FOR UNION

5  PACIFIC TEN AND A HALF YEARS, TEN AND A HALF YEARS.

6  BEFORE THAT HE WORKED FOR THE MISSISSIPPI

7  DEPARTMENT OF TRANSPORTATION AS A MANAGER OR SUPERVISOR OVER

8  RAILROAD SAFETY.

9  AND SO THIS IS JUST SORT OF AN OVERVIEW OF THE

10  PROTECTED ACTIVITY HE ENGAGED IN IN CONNECTION WITH HIS JOB.

11  THE EVIDENCE WILL SHOW THAT IT'S OBVIOUS THAT UNION PACIFIC

12  KNEW OF HIS PROTECTED ACTIVITY AND KNEW THAT HE HAD TAKEN

13  SWITCH 16 OUT OF SERVICE AND KNEW THAT MR. TAYLOR DID SO

14  BECAUSE HE CITED SAFETY CONCERNS.  AND THERE WERE SAFETY

15  CONCERNS.

16  NOW, THE NEXT PART OF THE CASE THAT YOU NEED TO

17  LOOK AT, WELL, WAS THERE A RELATIONSHIP BETWEEN THE PROTECTED

18  ACTIVITY AND THE TERMINATION?  THAT'S CALLED "CAUSATION."  WE

19  BELIEVE THE EVIDENCE WILL SHOW THAT THERE IS CAUSATION IN THIS

20  CASE, THAT THE PROTECTED ACTIVITY CONTRIBUTED TO UNION

21  PACIFIC'S DECISION TO TERMINATE HIS EMPLOYMENT.

22  IN FACT -- AND I THINK THIS IS ONE I THINK THAT

23  YOU SHOULD LOOK AT REAL CLOSELY -- THERE'S PATTERN OF ACTIVITY

24  HERE.  IT'S NOT A ONE-TIME THING, BUT IT'S A PATTERN.  AND

25  THAT'S VERY IMPORTANT.  IT'S ALSO VERY IMPORTANT THAT UNION

11:19  1    PACIFIC PEOPLE WERE ANGERED BY HIS PROTECTED ACTIVITY.

      2                    FOR EXAMPLE, MARCH 28, 2017, HE REMOVED THE

      3    AVONDALE TAIL TRACK FROM SERVICE, AND DANIEL JAQUESS, THE

      4    DIRECTOR OF TRAIN SERVICES, BECAME BELLIGERENT WITH MR. TAYLOR

      5    AND CURSED AT HIM REGARDING TAKING THE TRACK OUT OF SERVICE.

      6                    THE PATTERN OF EVIDENCE, WE BELIEVE, WILL SHOW

      7    THAT EACH TIME MR. TAYLOR DID A PROTECTED ACTIVITY, HE GOT

      8    RESISTANCE AND PUSHBACK FOR IT BY UNION PACIFIC, AND OUR

      9    CONTENTION IS THAT THAT VIOLATED THE FEDERAL RAILROAD SAFETY

     10    ACT.

     11                    NOW, TALKING ABOUT THE SEQUENCE OF EVENTS I

     12    THINK IS, AGAIN, VERY IMPORTANT.  THERE WAS LESS THAN A

     13    TWO-MONTH PERIOD OF TIME BETWEEN MR. TAYLOR TAKING THE

     14    SWITCH 16 TRACK OUT OF SERVICE AND JANUARY 10, 2018, AND HIS

     15    TERMINATION OF FEBRUARY 27, 2018.  LESS THAN TWO MONTHS FOR A

     16    TEN-AND-A-HALF-YEAR EMPLOYEE.  THERE WAS ONLY ABOUT A ONE-MONTH

     17    DELAY BETWEEN MR. TAYLOR'S LAST REPORT TO THE FEDERAL RAILROAD

     18    ADMINISTRATION OF THE SAFETY PROBLEMS WITH UNION PACIFIC IN

     19    THIS UNIT, HIS LAST REPORT DATED JANUARY 24, 2018, WHEN HE

     20    REPORTED THAT MR. GILSDORF WAS ANTAGONISTIC AND HOSTILE TO

     21    MR. TAYLOR FOR THE SLOW ORDER ON THE WHITE CASTLE TRACK.

     22                    IT'S ALSO IMPORTANT TO UNDERSTAND AND REALIZE

     23    THAT THE REASONS THAT UNION PACIFIC CLAIMS THAT THEY TERMINATED

     24    MR. TAYLOR FOR WERE VERY DIRECTLY RELATED TO HIS PROTECTED

     25    ACTIVITY.

11:21  1                A LITTLE BIT MORE ABOUT MR. TAYLOR'S JOB.  HE

2    WAS BASICALLY A WATCHDOG, THE SAFETY WATCHDOG.  HE HAD

3    RESPONSIBILITIES UNDER FEDERAL LAW AND THE FEDERAL RAILROAD

4    ADMINISTRATION, WHICH SUPERVISES AND HEAVILY REGULATES THE

5    RAILROAD.  AND WE ALL KNOW, BUT IT'S WORTH REMINDING US OF,

6    THAT RAILROADS CERTAINLY PROVIDE VALUABLE SERVICES.  BUT THEY

7    CERTAINLY ALSO PROVIDE GRAVE RISKS TO PEOPLE AND CHILDREN AND

8    GRANDCHILDREN AND COMMUNITIES IF THEY'RE NOT PROPERLY

9    MAINTAINED.  I MEAN, DERAILMENTS WAS A MAJOR PROBLEM OF UNION

10   PACIFIC RAILROAD IN THIS CASE.  DERAILMENTS ARE ONE OF THE

11   THINGS THAT MR. TAYLOR WAS TRYING TO FIX.  AND SO YOU NEED TO

12   CONSIDER ALL THESE THINGS TOGETHER.

13                ALSO IN TERMS OF MR. TAYLOR'S JUDGMENT ABOUT

14   THESE BEING SAFETY RISKS, HE HAD NO DISCIPLINARY ACTION UNTIL

15   SHORTLY BEFORE HIS TERMINATION.  HE RECEIVED BONUSES EVERY

16   YEAR.  HE SERVED IN THE MILITARY.  AND AS A RESULT, IT WAS

17   INGRAINED IN HIM TO HAVE RESPECT FOR AUTHORITY AND RESPECT FOR

18   THE CHAIN OF COMMAND.

19                THE EVIDENCE WILL SHOW THAT AT THE LIVONIA UNIT,

20   UNION PACIFIC HAD A HISTORY OF SERIOUS PROBLEMS WITH

21   DERAILMENTS.  AND AS I SAID BEFORE, THAT'S WHAT MR. TAYLOR WAS

22   TRYING TO ADDRESS.

23                MR. TAYLOR WAS A BY-THE-BOOK WHISTLEBLOWER.  NO

24   SHORTCUTS FOR HIM.  AND IN EARLY 2017 THE FEDERAL RAILROAD

25   ADMINISTRATION BEGAN BEING MORE AGGRESSIVE ABOUT ENFORCING

11:23 1   RAILROAD SAFETY MEASURES.  AND THIS HAS A ROLE IN THIS CASE AS
       2   WELL.  SAFETY MEASURES THAT MR. TAYLOR COULD USE, AS I
       3   MENTIONED, WERE TAKING THE TRACK OUT OF SERVICE UNTIL IT CAN BE
       4   MADE SAFE OR A SLOW ORDER.  AND EACH TIME MR. TAYLOR TOOK A
       5   TRACK OUT OF SERVICE, HE DID SO FOR GOOD FAITH FOR SAFETY
       6   REASONS.  IT WAS JUSTIFIED.  EACH TIME UNION PACIFIC OFFICIALS
       7   RESISTED AND PUSHED BACK ON TAKING TRACKS OUT OF SERVICE.  THEY
       8   DID NOT LIKE IT BECAUSE IT COST THEM PROFITS.  AND IN SOME
       9   RESPECTS, THIS CASE IS ABOUT SAFETY VERSUS PROFITS.  AND IT
      10   SHOULDN'T MAKE -- WE BELIEVE THE EVIDENCE WILL SHOW THEY
      11   SHOULDN'T MAKE PROFITS ON THE BACK OF SAFETY AND TREATING THEIR
      12   EMPLOYEES THE WAY THAT MR. TAYLOR ALLEGED THAT HE WAS TREATED.
      13            THE COURT TOLD YOU THAT UNION PACIFIC'S BASIC
      14   REASON FOR TERMINATING MR. TAYLOR WAS PERFORMANCE REASONS.
      15   THEY MENTIONED INSUBORDINATION AND SOMETHING ELSE.  YOU'LL HAVE
      16   TO JUDGE WHETHER THAT'S CREDIBLE OR NOT.  AND IN JUDGING
      17   WHETHER IT'S CREDIBLE OR NOT, I WANT TO TELL YOU THAT
      18   DECEMBER 19, 2017, A MERE TWO MONTHS BEFORE MR. TAYLOR WAS
      19   TERMINATED AFTER TEN AND A HALF YEARS OF EMPLOYEE -- OF
      20   EMPLOYMENT, HE RECEIVED A 2017 PERFORMANCE EVALUATION WRITTEN
      21   BY MR. KENNY STUART, WHO WAS ONE OF THE SUPERVISORS INVOLVED IN
      22   THIS CASE.  WHAT DID THAT SAY?  WHAT IT SAYS IS THAT HE WAS A
      23   GOOD PERFORMER.  HE WAS A 3.0 SCORE.
      24            HE ALSO SAID, QUOTE:  "SINCE I'VE BEEN HERE YOU
      25   HAVE DONE A GOOD JOB MANAGING YOUR SLOWS," END QUOTE.  QUOTE:

11:25 1  "JOHNNY, YOUR INJURY-FREE DAYS OF 1223 DAYS IS VERY

2  IMPRESSIVE."  QUOTE:  "TAMPER PRODUCTION IS ON PLAN.  GREAT

3  JOB."  QUOTE:  "YOUR BUDGET IS VERY GOOD YEAR-TO-DATE."  AND

4  THEN, QUOTE:  "YOU LEAD YOUR TEAM IN A POSITIVE WAY, FROM WHAT

5  I'VE SEEN SO FAR.  MAKE SURE THAT EVERYONE ABOVE YOU KNOWS AND

6  UNDERSTANDS THE GOOD THINGS THAT YOU ARE DOING.  DON'T BE

7  AFRAID TO BRAG ON YOURSELF," TWO MONTHS BEFORE HIS TERMINATION

8  AFTER TEN AND A HALF YEARS.  ALSO, IN DECEMBER OF 2017, HE

9  RECEIVES A $15,000 PERFORMANCE BONUS FROM U.P.

10  JANUARY 10, 2018, HE TAKES SWITCH 16 OUT OF

11  SERVICE.  AFTER THREE DERAILMENTS -- THREE DERAILMENTS IN A

12  TWO-MONTH PERIOD AT THE SAME LOCATION, MR. KENNY STUART ADVISES

13  HIM TO PUT THE TRACK BACK IN SERVICE.  MR. TAYLOR DECLINED

14  BECAUSE HE FELT HE WAS RESPONSIBLE FOR SAFETY AT UNION PACIFIC.

15  AND THERE WAS A REASON HE DECLINED.  JANUARY 22, 2018,

16  MR. TAYLOR ISSUES A SLOW ORDER IN WHITE CASTLE.  MR. GILSDORF

17  TELLS MR. TAYLOR WHEN TO TAKE IT OFF.  MR. TAYLOR DECLINES TO

18  DO SO, FELT IT WAS UNSAFE AND SAID SO.

19  JANUARY 31, 2018, MR. TAYLOR IS PRESENTED WITH

20  WHAT THEY CALL A "PERFORMANCE IMPROVEMENT PLAN," A "PIP."

21  MR. TAYLOR DECLINED TO SIGN THAT, AND THE MAIN REASON HE

22  DECLINED TO SIGN IT WAS THAT HE FELT THAT THEY WERE TELLING HIM

23  NOT TO TAKE THE SAFETY MEASURES THAT HE HAD BEEN TAKING.  THEY

24  TRIED TO CHARACTERIZE HIS EXERCISE OF PROTECTED ACTIVITY AS A

25  PERFORMANCE ISSUE.  THAT'S IMPORTANT TO RECOGNIZE HERE WHEN YOU

11:27 1   HEAR THEIR CASE AND YOU DECIDE ABOUT HOW BELIEVABLE IT IS.
2   THEY WERE SAYING IT'S A PERFORMANCE ISSUE FOR HIM TO EXERCISE
3   HIS RIGHTS AND RESPONSIBILITIES UNDER FEDERAL LAW.  MR. TAYLOR
4   DID NOT SEE ANY WAY THAT THIS PLAN COULD IMPROVE HIS
5   PERFORMANCE.
6                FEBRUARY 27, TWO MONTHS AFTER MR. STUART'S
7   LETTER OF DECEMBER 17, THEY FIRE HIM.
8                AND THESE ARE THE CONTEXT FACTS.  THIS IS THE
9   GUIDELINE.  I'D LIKE FOR YOU -- I'D ASK YOU TO PLEASE KEEP
10   THESE CONTEXT FACTS IN MIND AS WE GO THROUGH THE EVIDENCE.
11                AS JUDGE DICK APTLY STATED TO YOU AND ACCURATELY
12   STATED TO YOU, IT IS THE JUROR'S JOB TO FIND THE FACTS, TO FIND
13   THE TRUTH.  YOU ESSENTIALLY HAVE A VERY, VERY IMPORTANT ROLE.
14   YOU'RE ESSENTIALLY DETECTIVES FOR THE TRUTH.  YOU NEED TO KEEP
15   YOUR EYES OPEN TO DETERMINE WHO'S TELLING THE TRUTH, EVEN IF
16   THEY SAY SOMETHING THAT -- THEY'RE TRYING TO SAY SOMETHING THAT
17   YOU DON'T BELIEVE IS ACCURATE OR TRUE.
18                I'M GOING TO TELL YOU A LITTLE BIT MORE ABOUT
19   CIRCUMSTANTIAL EVIDENCE.  THE COURT MENTIONED IT IN ITS OPENING
20   INSTRUCTION.  BUT CIRCUMSTANTIAL EVIDENCE IS WHERE YOU INFER
21   ONE FACT FROM ANOTHER FACT.  IT MIGHT NOT BE DIRECT PROOF OF
22   THE SECOND FACT.  AND I'M GOING TO APPLY THAT A LITTLE BIT BY
23   AN EXAMPLE THAT I LOVE TO APPLY.
24                ONE OF MY PRECIOUS GRANDDAUGHTERS IS NAMED IRIS.
25   IRIS IS BEAUTIFUL, WONDERFUL, BUT SHE'S A LITTLE BIT BAD.  AND

11:29 1   SO I HAVE -- I LIKE A HYPOTHET THAT -- THE HYPOTHET IS THAT

2   IRIS GOES IN -- A NEW BATCH OF COOKIES IS COOKED.  IRIS GOES

3   IN, TAKES THE TOP OFF THE COOKIES AND EATS MORE COOKIES THAN

4   SHE SHOULD.  THE COOKIES ARE ALL OVER HER FACE.  AND I COME IN

5   THERE AND I SAY, WHO ATE THE COOKIES?  WELL, IT WASN'T ME.  I

6   DIDN'T EAT THOSE COOKIES.  WELL, IT'S JUST LIKE THE MAN WITH

7   THE DRIPPING RAINCOAT IN JUDGE DICK'S ANALOGY, YOU CAN USE YOUR

8   COMMON SENSE TO FIND THAT IRIS WAS EATING THE COOKIES AND THAT

9   THE MAN IN THE DRIPPING RAINCOAT HAD BEEN IN RAIN.  YOU DON'T

10   HAVE TO BE BLIND TO COMMON SENSE.  IN FACT, WE ASK YOU TO USE

11   COMMON SENSE.  AND I'LL ASK YOU TO DRAW THE INFERENCE THAT

12   THERE WAS RETALIATION IN THIS CASE AGAINST MR. TAYLOR.

13               AND ALSO IN LOOKING AT THE DEFENDANT'S EVIDENCE,

14   YOU'RE GOING TO HAVE TO CONSIDER THE CREDIBILITY OF THE

15   EVIDENCE THAT AFTER TEN AND A HALF YEARS AND AFTER WHAT THEY

16   SAID ABOUT HIM ON DECEMBER 17, THAT ALL OF A SUDDEN HE BECOMES

17   THIS HORRIBLE EMPLOYEE, INSUBORDINATE AND ALL KIND OF STUFF

18   THEY PUT ON THE PAPERS.  YOU'VE GOT TO DETERMINE WHETHER THAT'S

19   JUST AN EXCUSE FOR RETALIATING AGAINST MR. TAYLOR.  THAT WILL

20   BE YOUR DETERMINATION.

21               WE'RE SEEKING IN THIS CASE -- WE'RE SEEKING

22   DAMAGES.  WE'RE SEEKING DAMAGES OF TWO KINDS.  BASICALLY, THE

23   FIRST KIND IS WHAT'S CALLED PUNITIVE -- "COMPENSATORY DAMAGES."

24   AND THAT'S BASICALLY WHATEVER DAMAGES YOU FEEL ARE APPROPRIATE

25   TO COMPENSATE HIM FOR WHAT HAPPENED TO HIM.  WHEN YOU GET THE

11:31 1   CASE AFTER THE TRIAL, YOU'LL GET A JURY VERDICT FORM.  AND IT

2   WILL HAVE BLANKS ON IT FOR YOU TO FILL IN IF YOU THINK AN AWARD

3   IS APPROPRIATE IN THOSE AREAS.

4                    AND THE COURT WILL EXPLAIN TO YOU THE LAW AS TO

5   WHAT APPLIES TO THOSE.  WE'RE SEEKING COMPENSATORY DAMAGES FOR

6   DEPRESSION, ANXIETY, LOSS OF ENJOYMENT OF LIFE.  HE CHANGED HIS

7   WHOLE LIFE.  THIS CHANGED HIS WHOLE LIFE.  HE WAS WORKING AND

8   REALLY PROUD.  HE FELT RESPECTED.  HE FELT HE HAD A GOOD JOB.

9   HE FELT HE HAD ADVANCEMENT.  HE WAS MAKING GOOD, GOOD MONEY.

10   AND THEN THEY JUST TOOK THE LEGS OUT FROM UNDER HIM SIMPLY

11   BECAUSE HE WAS DOING THE RIGHT THING.  IT CERTAINLY TOOK AWAY

12   HIS SELF-CONFIDENCE, SELF-ESTEEM, AND PRIDE FROM HIM AND CAUSED

13   HIM TO LOSE ENJOYMENT OF LIFE.

14                    HE ALSO SEEKS WHAT'S CALLED "PUNITIVE DAMAGES"

15   AGAINST THE RAILROAD COMPANY TO PUNISH THE RAILROAD COMPANY AND

16   DETER RAILROAD COMPANIES FOR VIOLATING SAFETY RULES AND

17   REGULATIONS AND FOR RETALIATING AGAINST PEOPLE WHO TRY TO

18   PROTECT THEMSELVES AND THEIR FAMILIES AND THEIR CO-EMPLOYEES

19   FROM SAFETY REGULATIONS.

20                    BUT, YOU KNOW, UNION PACIFIC IS A BIG COMPANY.

21   AND, YOU KNOW, MAKING A PUNITIVE DAMAGE AWARD OF $5 IS NOT

22   GOING TO DETER THEM.  SO WHEN YOU GO THROUGH THE EVIDENCE AND

23   YOU SORT IT OUT AND YOU THINK ABOUT WHAT'S TRUE AND NOT TRUE

24   AND WHAT REALLY HAPPENED, KEEP IN MIND THAT WHAT WE'RE ASKING

25   FOR IS DETERRENCE IN THESE KIND OF SITUATIONS SO THAT IT WON'T

11:33 1  HAPPEN AGAIN.

2            AT THE END OF THE TRIAL, WE WILL ASK YOU TO DO

3  THE RIGHT THING AND MAKE JUSTICE.  WE WILL ASK YOU TO PROTECT

4  THE PEOPLE IN THE COMMUNITY, MR. TAYLOR'S FAMILY, AND ALL THOSE

5  PEOPLE WHO RELY ON THEIR EMPLOYMENT FOR SUPPORTING THEIR FAMILY

6  WHEN THEY'RE SIMPLY DOING THE RIGHT THING.  THEY'RE SIMPLY

7  COMPLYING WITH THE LAW AND THEY GET PUSHBACK AND RESISTANCE

8  FROM THEIR EMPLOYER IN SO DOING.  THEY'RE FIRED AND LEGS TAKEN

9  OUT FROM UNDER THEM.  BUT ANYWAY, THAT'S WHAT I WANTED TO TELL

10  YOU ABOUT IN MY OPENING STATEMENT.

11            I APPRECIATE YOUR WILLINGNESS TO SERVE.  I HOPE

12  AND BELIEVE THAT IT'S GOING TO BE A VERY INTERESTING TRIAL.

13  AND WE APPRECIATE YOUR SERVICE.

14            **THE COURT:**  THANK YOU.

15            COUNSEL FOR THE DEFENDANT.

16            **MS. SCHOONMAKER:**  GOOD AFTERNOON, LADIES AND

17  GENTLEMEN.

18            AM I SPEAKING LOUDLY ENOUGH?

19            **THE COURT:**  YOU ARE.

20            **MS. SCHOONMAKER:**  PERFECT.

21            I THINK I SAID GOOD AFTERNOON.  GOOD MORNING,

22  LADIES AND GENTLEMEN OF THE JURY.  I'M LINDA SCHOONMAKER.  I AM

23  ONE OF THE LAWYERS WHO WILL BE REPRESENTING UNION PACIFIC

24  RAILROAD IN THIS TRIAL.  I JUST HAVE THE PRIVILEGE OF TALKING

25  TO YOU FIRST.  IN ADDITION TO ME, DAVID FRAZIER WILL BE

11:35 1  REPRESENTING UNION PACIFIC.  HE'LL BE QUESTIONING SOME

2  WITNESSES.  AND MY COLLEAGUE, BRIAN WADSWORTH, WILL ALSO BE

3  QUESTIONING WITNESSES.

4              FOR MOST OF HIS UNION PACIFIC CAREER, MR. TAYLOR

5  WAS A VALUABLE AND VALUED EMPLOYEE OF THE UNION PACIFIC.  SINCE

6  HIRING ON WITH THE UNION PACIFIC IN SEPTEMBER OF 2007, HE WAS

7  PROMOTED SEVERAL TIMES.  HE RECEIVED RAISES AND BONUSES.  AT

8  THE TIME HE LOST HIS JOB, HE WAS BEING PAID OVER $100,000 A

9  YEAR.

10             IN ADDITION TO HIS LAWYER, MR. TAYLOR HIMSELF

11  WILL TELL YOU HE THINKS HE LOST HIS JOB BECAUSE HE TOOK

12  RAILROAD TRACKS OUT OF SERVICE, MEANING THE TRAINS COULD NOT

13  ENTER THOSE TRACKS.  HE WILL TELL YOU HE LOST HIS JOB BECAUSE

14  HE ISSUED SLOW ORDERS, MEANING TRAINS HAD TO PROCEED MORE

15  SLOWLY ON SOME TRACKS THAT MR. TAYLOR AND THE MAINTENANCE CREW

16  HE WAS MANAGING WERE MAINTAINING.

17             ALTHOUGH MR. TAYLOR MAY BELIEVE THAT IS WHAT

18  CAUSED HIM TO LOSE HIS VERY GOOD JOB WITH UNION PACIFIC, THE

19  EVIDENCE WILL SHOW YOU THAT PARTICULAR CONDUCT OF MR. TAYLOR

20  WAS NOT WHY HE WAS TERMINATED BY MARK WHEELAND, A RETIRED UNION

21  PACIFIC EXECUTIVE, WHO WILL TELL YOU EXACTLY WHY HE MADE THAT

22  DECISION.

23             MR. TAYLOR NOT ONLY WORKED FOR THE UNION

24  PACIFIC, HE ALSO WAS A LEADER.  HE WAS A MANAGER OF TRACK

25  MAINTENANCE.  HE LED A LARGE TEAM OF UNION PACIFIC EMPLOYEES

11:36  1   CHARGED WITH THE RESPONSIBILITY FOR MAINTAINING A PORTION OF

2   UNION PACIFIC'S TRACK ON THE LIVONIA SERVICE UNIT.

3                    FOR REASONS UNKNOWN TO HIS UNION PACIFIC

4   MANAGERS, MR. TAYLOR WAS NOT PERFORMING HIS JOB AS A LEADER.

5   HIS MANAGERS DID NOT WANT TO FIRE HIM FOR THAT; INSTEAD, THEY

6   WANTED HIM TO SUCCEED.  MR. TAYLOR HAD INVESTED FOR MANY YEARS

7   IN UNION PACIFIC, AND UNION PACIFIC HAD INVESTED FOR MANY YEARS

8   IN MR. TAYLOR.  IT WAS BOTH A BAD OUTCOME FOR MR. TAYLOR AND A

9   BAD OUTCOME FOR THE UNION PACIFIC THAT MR. TAYLOR'S EMPLOYMENT

10  ENDED.

11                   THE EVIDENCE WILL SHOW THAT THE SOLUTION WAS A

12  PERFORMANCE IMPROVEMENT PLAN TO FOCUS MR. TAYLOR ON UNION

13  PACIFIC'S EXPECTATIONS OF HIM.

14                   YOU WILL HEAR TESTIMONY FROM MR. TAYLOR'S DIRECT

15  SUPERVISOR, KENNY STUART, AND JAKE GILSDORF, WHO'S SITTING

16  BEHIND ME, A UNION PACIFIC MANAGER WHO ALSO HAD RESPONSIBILITY

17  FOR MR. TAYLOR'S TEAM, ABOUT THOSE EXPECTATIONS.  YOU WILL HEAR

18  TESTIMONY FROM THEM ABOUT THE FACT MR. TAYLOR WOULD NOT EVEN

19  ACKNOWLEDGE THAT HE RECEIVED THE PERFORMANCE IMPROVEMENT PLAN,

20  AND THAT HE REFUSED TO WORK WITH THEM IN SUCCEEDING.

21                   YOU WILL HAVE THE OPPORTUNITY TO READ THE

22  PERFORMANCE IMPROVEMENT PLAN YOURSELF, JOINT EXHIBIT 12.

23  MR. MARK WHEELAND, AS I TOLD YOU, THE VICE PRESIDENT FOR THE

24  TRACK MAINTENANCE GROUP, WILL TESTIFY WHY HE DECIDED THAT

25  MR. TAYLOR'S EMPLOYMENT WOULD BE TERMINATED.  HE WILL TELL YOU

11:38 1  THAT IT IS NEVER AN EASY DECISION TO END A MANAGER'S CAREER,

2  PARTICULARLY WITH A MANAGER LIKE MR. TAYLOR, WHO HAD BEEN A

3  VALUED AND VALUABLE EMPLOYEE OF THE UNION PACIFIC.  BUT HE WILL

4  TELL YOU THAT HE MADE THE DECISION BASED ON MR. TAYLOR'S

5  CONDUCT, NOT THE CONDUCT THAT MR. TAYLOR CLAIMS CAUSED HIS

6  TERMINATION; INSTEAD, MR. TAYLOR'S CONDUCT THAT MADE CLEAR TO

7  MR. WHEELAND THAT MR. TAYLOR WOULD NOT EVEN TRY TO WORK AT

8  MEETING UNION PACIFIC'S EXPECTATIONS OF HIM AS A LEADER.

9       THANK YOU FOR TAKING TIME OUT OF YOUR LIVES TO

10  SERVE AS JURORS IN OUR CASE TODAY.  WE APPRECIATE YOU.

11       **THE COURT:**  OKAY.  THANK YOU.

12       LADIES AND GENTLEMEN, THAT CONCLUDES OPENING

13  STATEMENTS.

14       THIS IS A PERFECT OPPORTUNITY TO TAKE A LUNCH

15  BREAK.  WHEN WE RETURN FROM LUNCH -- OR FROM OUR NOON BREAK,

16  THE LAWYERS WILL BEGIN WITH THE PRESENTATION OF EVIDENCE,

17  BEGINNING WITH THE PLAINTIFF, WHO WILL CALL WITNESSES AND OFFER

18  EXHIBITS FOR YOUR CONSIDERATION.

19       SO WE WILL BE IN RECESS UNTIL 1:00 P.M.  THERE

20  ARE NUMEROUS EATERIES DOWNTOWN, AND IT'S A PRETTY DAY.  I HOPE

21  YOU FIND SOMETHING ENJOYABLE TO EAT.  WE WILL SEE YOU AT 1:00.

22       **(WHEREUPON, THE JURY EXITED THE COURTROOM.)**

23       **THE COURT:**  OKAY.  THE COURT WILL BE IN RECESS UNTIL

24  1:00.

25       **(WHEREUPON, THE COURT WAS IN RECESS.)**

01:01   1             **THE COURT:**  WE CAN BRING IN THE JURY.

  2               **(WHEREUPON, THE JURY ENTERED THE COURTROOM.)**

  3             **THE COURT:**  BE SEATED.

  4              AND, LADIES AND GENTLEMEN OF THE JURY, IF AT THE

  5  AFTERNOON BREAK YOU WANT TO LEAVE YOUR PLASTIC BAGS AND YOUR

  6  MATERIALS OR YOUR NOTES IN YOUR SEAT, YOU CAN.  NOBODY IS GOING

  7  TO BOTHER IT.  THERE IS A COURT SECURITY OFFICER IN HERE ALL

  8  THE TIME.  SO NOBODY WILL BOTHER YOUR THINGS IF YOU WANT TO

  9  LEAVE THEM BEHIND WHEN WE TAKE A BREAK OR EVEN TONIGHT, AS WE

10  LEAVE THE COURTROOM TONIGHT.

11             OKAY, MR. SCHMIDT.  CALL YOUR FIRST WITNESS.

12           **MR. SCHMIDT:**  I WOULD CALL THE PLAINTIFF, JOHNNY

13  TAYLOR, YOUR HONOR.

14             OKAY, MR. TAYLOR.  RIGHT UP HERE, SIR.

15                **JOHNNY TAYLOR,**

16  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

17            **THE COURT:**  AND YOU CAN TAKE YOUR MASK OFF, SIR.

18  THANK YOU.  WE HAVE FOUND IN THESE PROCEEDINGS THAT IF YOU PUT

19  THE MICROPHONE KIND OF UNDER IT, IT WILL -- YES.  WE'LL BE ABLE

20  TO HEAR YOU BETTER.

21             OKAY.  GO AHEAD, MR. SCHMIDT.

22               **DIRECT EXAMINATION**

23  **BY MR. SCHMIDT:**

24  **Q.**  GOOD AFTERNOON, MR. TAYLOR.

25            WOULD YOU STATE YOUR FULL NAME FOR THE RECORD,

01:17  1   PLEASE?

2   **A.**   JOHNNY TAYLOR.

3   **Q.**   AND HOW OLD ARE YOU?

4   **A.**   I AM 51 YEARS OLD.

5   **Q.**   OKAY.  WHERE WERE YOU BORN?

6   **A.**   I WAS BORN IN JACKSON, MISSISSIPPI.

7   **Q.**   AND DID YOU GRADUATE HIGH SCHOOL?

8   **A.**   YES.  I GRADUATED FROM PROVINE HIGH SCHOOL.

9   **Q.**   AND WHAT YEAR WAS THAT?

10   **A.**   1988.

11   **Q.**   AND AFTER YOU FINISHED HIGH SCHOOL, WHAT DID YOU DO?

12   **A.**   AFTER I FINISHED HIGH SCHOOL, I WENT TO THE UNITED STATES

13   ARMY FOR FOUR YEARS, FROM 1989 TO 1992.

14   **Q.**   AND WHAT RANK WERE YOU IN THE U.S. ARMY?

15   **A.**   WHEN I LEFT THE U.S. ARMY, I WAS A E-4.

16   **Q.**   WELL, THANK YOU FOR YOUR SERVICE, SIR.

17   **A.**   YOU'RE WELCOME.

18   **Q.**   ONCE YOU FINISHED YOUR CAREER IN THE MILITARY, WHAT DID

19   YOU DO AFTER THAT?

20   **A.**   ONCE I FINISHED MY CAREER IN THE MILITARY, I HAD

21   ODDS-AND-ENDS JOBS.  AND WHAT I DID -- I WENT BACK TO SCHOOL.

22   I WENT BACK TO JACKSON STATE UNIVERSITY.  I USED MY G.I. BILL

23   TO -- FIRST TO GET MY DEGREE IN MATHEMATICS FROM JACKSON STATE

24   UNIVERSITY.

25             AND THEN AFTER THAT, I WENT TO WORK FOR THE

01:19 1   MISSISSIPPI DEPARTMENT OF TRANSPORTATION.  AND WHILE WORKING

2   FOR THE MISSISSIPPI DEPARTMENT OF TRANSPORTATION, I GOT MY

3   SECOND BACHELOR'S OF SCIENCE DEGREE IN CIVIL ENGINEERING.

4   **Q.**   SO WHAT POSITION DID YOU HOLD IN THE MISSISSIPPI

5   DEPARTMENT OF TRANSPORTATION?  IF YOU COULD, DESCRIBE THAT JOB

6   AND YOUR JOB DUTIES FOR ME, PLEASE.

7   **A.**   YES.  I WAS A TRANSPORTATION'S PLANNER.  SO WE WAS

8   BASICALLY OVER THE STATE -- THE JURISDICTION OVER THE RAILROAD

9   GRADE CROSSINGS.  WE WOULD DO INSPECTIONS ON RAILROAD GRADE

10   CROSSINGS TO DETERMINE WHICH RAILROAD GRADE CROSSINGS NEED TO

11   BE UPGRADED FROM WHAT WE CALL A "PASSING" CROSSING TO AN

12   "ACTIVE" CROSSING.  AND IT'S JUST SIMPLY A CROSSING THAT HAVE

13   TWO CROSSBUCK SIGNS.  AND WE PUT TWO ACTIVE CROSSINGS WHERE WE

14   PUT IN SIGNALS AND GATES.

15        ALSO, I DID TRACK INSPECTIONS ON MISSISSIPPI -- AND

16   ON RAILROAD COMPANIES IN MISSISSIPPI.

17   **Q.**   AND WHAT YEARS WERE YOU EMPLOYED BY THE MISSISSIPPI DOTD?

18   **A.**   I WAS EMPLOYED FROM 2002 TO 2007.

19   **Q.**   AND IN 2007?

20   **A.**   IN 2007 I TRANSITIONED TO THE UNION PACIFIC RAILROAD

21   COMPANY AS A MANAGER IN TRAINING.

22   **Q.**   AS A MANAGER IN TRAINING?

23   **A.**   YES, SIR.

24   **Q.**   OKAY.  AND HOW LONG WAS THE TRAINING PROGRAM?

25   **A.**   ABOUT A YEAR AND A HALF TO GO THROUGH THE TRAINING

01:20 1    PROGRAM.  IT TOOK ABOUT A YEAR AND A HALF.

2    **Q.**    AND WHAT DID THAT TRAINING CONSIST OF?

3    **A.**    THAT TRAINING CONSISTED OF TEACHING US FEDERAL RAILROAD

4    ADMINISTRATION LAWS GOVERNING TRACK STANDARDS, HOW TO MAINTAIN

5    TRACK STANDARDS, WHAT THE STANDARDS ARE, AND HOW TO REMEDIATE

6    TRACK IF THEY BECOME OUT OF STANDARDS.  THEY ALSO TAUGHT ME

7    MANAGEMENT SKILLS, HOW TO DEAL WITH PEOPLE.  SO BASICALLY THEY

8    WAS TRAINING ME TO BE A MANAGER OF TRACK MAINTENANCE TO WHERE I

9    WOULD OVERSEE THE MAINTENANCE DEPARTMENT OF A SUBDIVISION.

10   **Q.**    AND ONCE THAT YEAR-AND-A-HALF TRAINING PROGRAM ENDED, DID

11   YOU BECOME A MANAGER OF TRACK MAINTENANCE?

12   **A.**    I BECAME AN ASSISTANT MANAGER OF TRACK MAINTENANCE IN

13   LUFKIN, TEXAS, AND I WAS THERE FOR MAYBE FOUR MONTHS.  AND THEN

14   I GOT A CALL TO GO TO MIDLAND, TEXAS -- ODESSA, TEXAS, TO

15   BECOME A MANAGER OF TRACK MAINTENANCE IN ODESSA, TEXAS, OVER

16   THE TOYAH SUB.  YES, THE TOYAH SUB.

17            **THE COURT:**  THE WHAT?

18            **THE WITNESS:**  T-O-Y-A-H.

19            **THE COURT:**  OKAY.

20            **THE WITNESS:**  YES.

21            **THE COURT:**  THANK YOU.

22   **BY MR. SCHMIDT:**

23   **Q.**    AND YOU SAID "SUB."  CORRECT?

24   **A.**    YES.

25   **Q.**    WOULD YOU EXPLAIN WHAT THAT MEANS, PLEASE?

01:22 1  **A.**   THE WAY UNION PACIFIC RAILROAD DOES IT, THEY SIDED -- THEY
2  DIVIDED THEY TRACKS UP INTO SUBDIVISIONS BECAUSE THEY HAVE SO
3  MANY THOUSANDS OF MILES OF TRACK.  SO EACH MTM WOULD HAVE
4  CERTAIN MILES OF TRACK.
5         FOR INSTANCE, ON THE TOYAH SUB I WAS RESPONSIBLE FOR
6  RIGHT AT -- IF I'M NOT MISTAKEN, IT'S BEEN A WHILE -- MAYBE
7  140, 150 MILES OF MAIN LINE TRACK, WHICH WAS CLASS 5.  THEY WAS
8  70-MILES-PER-HOUR TRACKS.  AND I HAD TWO YARDS -- NO, MAKE THAT
9  THREE YARDS.  I HAD THE BIG SCREEN YARD, THE ODESSA YARD, AND
10  THE MONAHAN YARD.
11  **Q.**   ALL RIGHT.  THERE WERE A COUPLE OF TERMS YOU USED THAT I'D
12  LIKE TO GO AHEAD AND ASK YOU ABOUT.  AND I APPRECIATE YOUR
13  PATIENCE IN THIS.  WOULD YOU EXPLAIN TO ME WHAT A "YARD" IS,
14  PLEASE?
15  **A.**   YES, SIR.  A YARD IS WHERE -- THE SIMPLEST WAY OF PUTTING
16  IT IS WHERE THEY BUILD THE TRAINS.  THEY SWITCH CARS AND THEY
17  MAKE UP A TRAIN.  THEY PUT CARS THERE, AND THEY SWITCH THEM IN
18  A SPECIFIC ORDER SO THEY CAN BE TRANSFERRED TO OUR CUSTOMERS,
19  U.P. CUSTOMERS.
20  **Q.**   ALL RIGHT.  AND I BELIEVE YOU MENTIONED "CLASS 5 TRACKS"?
21  **A.**   YES.
22  **Q.**   WOULD YOU EXPLAIN WHAT THAT MEANS, SIR?
23  **A.**   YES.  A CLASS 5 TRACK -- IT'S THE SPEED OF THE TRACK.  FOR
24  INSTANCE, CLASS 1, THAT MEANS THE MAXIMUM SPEED YOU CAN GO IS
25  10 MPH.  CLASS 2, THE MAXIMUM SPEED IS 25 MPH.  CLASS 3, THE

01:23 1    MAXIMUM SPEED IS 40 MILES PER HOUR.  AND THEN CLASS 4, THE
      2    MAXIMUM SPEED IS 60 MILES PER HOUR.  AND THEN CLASS 5, THE
      3    MAXIMUM SPEED IS 70 MILES PER HOUR FOR A FREIGHT TRAIN.  I DO
      4    NOT QUITE REMEMBER HOW FAST A PASSENGER TRAIN CAN GO.  BUT I DO
      5    REMEMBER THE FREIGHT TRAIN.
      6    Q.   AND HOW LONG WERE YOU IN THAT POSITION AT THAT LOCATION IN
      7    TEXAS?
      8    A.   IN TEXAS, 2010?  I WOULD SAY AROUND 2012.  I WAS ATTENDING
      9    A CONFERENCE, I WANT TO SAY IN FORT WORTH, WHEN THE CHIEF
     10    ENGINEER AT THE TIME WAS KEN SITO.  AND HE SAW ME AT THE
     11    CONFERENCE.  HE TOLD ME THAT HE WANTED ME TO GO TO AVONDALE.
     12    AND HE SAID I DIDN'T HAVE A CHOICE.  I HAD TO GO.  I SAID, YES,
     13    SIR, I'LL GO.
     14    Q.   IS THAT AVONDALE, LOUISIANA?
     15    A.   YES, AVONDALE, LOUISIANA.  YES, SIR.
     16    Q.   SO YOU WERE A MANAGER OF TRACK MAINTENANCE IN AVONDALE,
     17    LOUISIANA?
     18    A.   YES.  I BECAME A MANAGER OF TRACK MAINTENANCE IN AVONDALE,
     19    LOUISIANA, AROUND LATE DECEMBER 2012, I BELIEVE, YES.
     20    Q.   AND SO THAT POSITION -- IS IT OKAY WITH YOU IF I JUST CALL
     21    IT "MTM" SO I DON'T HAVE TO KEEP REPEATING THE WHOLE THING?
     22    A.   YES, SIR.
     23    Q.   OKAY.  WAS YOUR POSITION AS MTM IN AVONDALE, THAT WAS THE
     24    SAME POSITION YOU HELD AT THE TIME OF YOUR TERMINATION.
     25    CORRECT?

01:25 1  **A.**    THAT IS CORRECT, YES.

2  **Q.**    OKAY.  SO WHAT WERE YOUR DUTIES AS MTM?

3  **A.**    MY DUTIES AS MTM WAS I HAD STRICT FRA COMPLIANCE RULES TO

4  GO BY.  SO MY DUTY WAS TO MAKE SURE THAT THE TRACK MET THOSE

5  FRA -- FEDERAL RAILROAD ADMINISTRATION -- COMPLIANCE -- I MEAN,

6  COMPLIANCE STANDARDS.  SO I HAD A U.P. HANDBOOK, AND I ALSO HAD

7  MY FEDERAL RAILROAD ADMINISTRATION HANDBOOK.  AND BASICALLY WE

8  WOULD GO OUT; WE WOULD DO INSPECTIONS, AND WE WOULD LOOK AT THE

9  TRACK.  AND WE WOULD MAKE SURE THE TRACK IS MAINTAINED TO THE

10  STANDARDS OF THE FEDERAL RAILROAD ADMI- -- FEDERAL RAILROAD

11  TRACK SAFETY MANUAL.  AND IF IT'S NOT MAINTAINED TO THAT

12  STANDARD OR IF IT DEVIATES TO IT -- I MEAN, EXCUSE ME.  IF IT

13  DEVIATED FROM THEIR STANDARDS, THEN WE HAVE THREE CHOICES WE

14  CAN DO:  ONE OF THEM, WE CAN HALT OPERATIONS ON THE TRACK,

15  WHICH IS, IN UNION PACIFIC'S RAILROAD'S TERMS, WE SAY TAKE THE

16  TRACKS OUT OF SERVICE.  BUT IT'S THE SAME THING, JUST HALT

17  OPERATIONS; THAT'S THE FEDERAL RAILROAD ADMINISTRATION TERM.

18  THEY SAID HALT OPERATIONS.  BUT THE RAILROAD TERM, WE SAY

19  TAKING THE TRACK OUT OF SERVICE, AND IT MEAN THE SAME THING.

20          MY SECOND CHOICE IS TO SLOW ORDER THE TRACK.  AND

21  THAT SIMPLY MEAN IF I GO AND -- ON THE MAIN LINE, IF IT'S 70

22  MILES PER HOUR AND I HAVE A TIE CONDITION AND -- WHICH REQUIRED

23  12 TIES IN 39 -- 12 TIES IN 39 FEET.  IF I DO NOT HAVE 12 TIES

24  AND I ONLY HAD 8, I HAD TO DROP IT A CLASS, TO CLASS 4, 40 MPH.

25  THEN IF IT DON'T MEET THE CLASS SPECIFICATION OF 40 MPH WITH

01:27 1   TIES, THEN I HAD TO DROP IT DOWN TO 25 MPH.

2         AND THEN IF IT DON'T MET THE STANDARD FOR A 25 MPH,

3   THEN I HAD TO DROP IT DOWN TO 10 MILES PER HOUR.  AND THEN ONCE

4   THE TRACK DEVIATION IS NOT GOOD FOR 10 MILES PER HOUR, THAT'S

5   WHEN WE HAVE TO TAKE THE TRACK OUT OF SERVICE.

6   **Q.**   AND WERE YOU RESPONSIBLE FOR REPAIRING AND MAINTAINING THE

7   TRACKS THAT WERE UNDER YOUR SUPERVISION?

8   **A.**   YES, I WAS RESPONSIBLE FOR REPAIRING AND MAINTAINING.  I

9   HAD A SERVICING GANG.  AND BASICALLY THE JOB FOR THE SERVICING

10  GANG, WE HAD WHAT WE CALLED A "TAMPER" AND A "BALLAST

11  REGULATOR," AND THEY WOULD GO AND THEY WOULD DO THE TRACK

12  GEOMETRY, WHICH IS PROFILE ALIGNMENT.

13        SO THE MACHINE HAD A LASER ON IT.  SO IT WOULD ALIGN

14  THE TRACK ACCORDING TO THE FEDERAL RAILROAD ADMINISTRATION

15  STANDARDS.  AND IT WOULD TAKE THE TRACK -- IF IT HAD PROFILE,

16  IT WOULD AUTOMATIC, YOU KNOW, TAKE THE DIP.  "PROFILE" IS DIP.

17  WHEN THE TRACK DIP DOWN, IT WOULD TAKE THAT DIP OUT OF THE

18  TRACK AND MAKE IT TO FRA STANDARDS.

19        I HAD A TRACK GANG.  AND I HAD A TRACK GANG IN ADDIS,

20  AND I HAD ONE IN AVONDALE.  SO BASICALLY MY TRACK GANG WOULD GO

21  OUT, AND IF WE HAVE TIES THAT DO NOT MEET FRA STANDARDS, THEY

22  WOULD GO -- AFTER THE TRACK INSPECTOR WRITE THEM UP, THEY WOULD

23  GO AND REPLACE THOSE TIES.  ALSO, THE TRACK GANG WOULD FIX

24  SWITCH STANDS.  AND SIMPLY, A "SWITCH STAND" IS WHAT WE USED TO

25  MOVE THE RAIL TO SWITCH A TRACK FROM ONE TRACK TO ANOTHER ONE.

01:28  1        FOR INSTANCE, IF WE WANT TO GO DOWN TRACK 2, WE JUST

2    GET THE SWITCH STAND, TURN IT, AND IT WOULD ALIGN IT FOR TRACK

3    2.  SO IT'S JUST TO HAVE IT WHERE WE CAN GO DOWN EITHER TRACK.

4    SO WE WOULD MAINTAIN TIES.

5        I HAD A WELDING GANG THAT WOULD -- IN ADDIS AND

6    AVONDALE, AND THE WELDING GANG WOULD MAINTAIN THE RAIL.  AND

7    THAT'S THE METAL PART THAT THE TRAINS RUN OVER.  SO THEY WOULD

8    MAINTAIN THAT; BASICALLY, ANYTHING DEALING WITH THE TRACK --

9    WHETHER IT IS THE SWITCH, TURNOUT, RAIL, TIES, CONCRETE TIES,

10   RAILROAD GRADE CROSSINGS, SURFACE.  THE CONCRETE BOARDS YOU

11   SEE, THE WOODEN BOARDS YOU SEE AS YOU DRIVE YOUR CARS ACROSS A

12   GRADE CROSSING -- WE WOULD MAINTAIN THAT.  WE WOULD MAKE SURE

13   IT WAS A SMOOTH TRANSITION FROM OUR RAILROAD -- WELL, UNION

14   PACIFIC RAILROAD.  I KEEP SAYING OUR -- UNION PACIFIC RAILROAD

15   TO THE CITY AUTHORITY OR THE STATE AUTHORITY STREETS.

16   Q.   AND HOW MANY PEOPLE DID YOU HAVE UNDER YOUR SUPERVISION?

17   A.   I HAD TWO TRACK INSPECTORS AND 16 MEMBERS OF MY GANG; SO

18   18, 18 UNDER MY SUPERVISION.

19   Q.   ALL RIGHT.  AND I BELIEVE WHEN YOU WERE EXPLAINING YOUR

20   RESPONSIBILITIES A MOMENT AGO, YOU USED THE WORD "PROFILE."

21   WOULD YOU EXPLAIN TO ME WHAT "PROFILE" MEANS?

22   A.   YES.  PROFILE, JUST THINK OF IT AS A DIP.  IF THE RAIL IS

23   SUPPOSED TO BE STRAIGHT -- AND IF I CAN JUST USE MY HAND TO

24   SHOW.  BUT WHEN A TRAIN IS GOING -- IT SHOULD BE GOING STRAIGHT

25   AND LEVEL.  IF YOU HAVE PROFILE IN YOUR TRACK, YOUR WHEEL WOULD

01:30  1   DIP DOWN AND THEN COME BACK UP.  WELL, WE DIDN'T WANT PROFILE

2   IN OUR TRACK, BECAUSE IT COULD CAUSE THE KNUCKLES TO COME

3   LOOSE.  AND THEN IF YOU GOING 70 MILES PER HOUR AND YOUR

4   KNUCKLES COME LOOSE, IT WOULD AUTOMATICALLY THROW THE TRAIN

5   INTO EMERGENCY.  SO IMAGINE CARS GOING 70 MILES PER HOUR WITH

6   ALL THAT TONNAGE AND IT GOES INTO EMERGENCY, THAT WOULD CAUSE

7   THE CARS TO DERAIL.  ALSO THE PROFILE -- ALSO WOULD CAUSE THE

8   CARS TO DERAIL TOO, TO COME OFF THE RAIL AND GO ONTO THE

9   GROUND.  SO THAT'S VERY IMPORTANT THAT WE MAINTAIN PROFILE.

10           AND WE ALSO HAD CROSS LEVEL.  AND THAT'S SIMPLY IF

11   YOU HAVE TWO RAILS THAT THE TRAIN RUNNING ON -- IF YOU HAVE ONE

12   RAIL THAT DIPS DOWN MORE THAN THE OTHER RAIL, WELL, THAT WOULD

13   CAUSE THE WHEELS TO JUMP OVER THE TRACK AND DERAIL.  SO IMAGINE

14   IF YOU GOING 70 MILES PER HOUR WITH A TRAIN AND YOU GOT PROFILE

15   TWO OR THREE INCHES AND THE TRAINS HIT IT, IT WOULD JUST JUMP

16   OVER THE RAIL AND IT WOULD DERAIL THE TRAIN.  SO THAT'S WHY IT

17   WAS VERY IMPORTANT FROM A SAFETY ISSUE THAT WE MAINTAIN OUR

18   PROFILE, WHICH IS A DIP IN THE TRACK, AND A CROSS LEVEL, WHICH

19   IS WHEN ONE RAIL GO DOWN.

20           AND THEN THE OTHER THING WE HAVE TO MAKE SURE WE DID

21   WAS ALIGNMENT, ALL RIGHT.  SO THE RAIL ALIGNMENT IS THAT BOTH

22   RAILS SHOULD BE STRAIGHT.  AND WHEN YOU GIVE IT AN ALIGNMENT,

23   YOU MIGHT HAVE ONE RAIL THAT'S NOT STRAIGHT AND IT KIND OF GET

24   LIKE A CURVE AND IT CURVES OUT, ALL RIGHT.

25           SO IF THE ALIGNMENT IS NOT WITHIN THE REGULATIONS FOR

01:32  1    THE FEDERAL RAILROAD STANDARDS, WHAT WOULD HAPPEN IS -- FOR

2    THAT CLASS OF TRACK, WHAT WOULD HAPPEN IS IF THAT TRAIN IS

3    GOING, YOU KNOW, IT WOULD HIT THAT ALIGNMENT AND IT COULD CAUSE

4    THE RAIL -- I MEAN, THE WHEELS TO CLIMB OVER THE RAIL, AND THAT

5    WOULD CAUSE A DERAILMENT.  SO THAT'S WHY IT WAS VERY IMPORTANT

6    THAT WE MAINTAIN THE ALIGNMENT, THE PROFILE, AND -- ALIGNMENT,

7    PROFILE, AND CROSS LEVEL.

8         THE NEXT THING WAS THE TIES.  THE TIES WERE VERY

9    IMPORTANT BECAUSE THAT'S WHAT HOLDS THE SURFACE AND THAT'S

10   WOULD HOLDS THE TWO RAILS IN PLACE.

11        FOR INSTANCE, IF YOU HAVE YOUR TWO RAILS AND IF THE

12   TIES IS BAD, IT WOULD CAUSE THAT RAIL TO MOVE OUT.  THAT'S WHAT

13   WE WOULD CALL A WIDE GAUGE, BECAUSE THE STANDARD GAUGE -- HOW

14   WIDE THE RAILS ARE FROM ONE RAIL TO THE OTHER -- WAS 56 AND A

15   HALF.  BUT IF THE TIES ARE BAD, IT WOULD ALLOW THE RAIL TO MOVE

16   FROM 56 AND A HALF TO OVER 58 INCHES.  WELL, ACCORDING TO THE

17   WHEEL BASE, ONCE IT GETS PAST 58 INCHES, THE TRAIN WHEEL WOULD

18   FALL INSIDE THE RAIL.  AND WHEN THAT DOES, THAT CAUSE A

19   DERAILMENT.

20   Q.   AND A "DERAILMENT," IS THAT WHEN THE TRAIN ACTUALLY COMES

21   OFF THE TRACK?

22   A.   A DERAILMENT?  THAT'S WHEN THE TRAIN ACTUALLY COME OFF THE

23   TWO RAIL AND THEN ON THE GROUND, YES, SIR.

24   Q.   AND IS THAT DANGEROUS?

25   A.   YES, SIR.  BECAUSE WE CARRY HAZARDOUS MATERIAL:  AMMONIA

01:33  1   ACID, HYDROCHLORIC ACID.  AND ALSO ON MY TERRITORY WE WAS

2   CARRYING WHAT WE CALL "CRUDE OIL."  AND IT WAS OUT OF SOUTH

3   DAKOTA.  AND IT WAS VERY VOLATILE, WHICH IS WHEN YOU HAVE A

4   DERAILMENT, IF THOSE TANK CARS HIT THE GROUND, THEY WOULD

5   EXPLODE WITH THE CRUDE OIL ROUTE.  YOU KNOW, SO I HAD THE CRUDE

6   OIL ROUTE.  AND THAT'S WHY THE FRA WOULD CONSTANTLY COME ON MY

7   TERRITORY BECAUSE OF THE CRUDE OIL ROUTE.

8            AND ONE OF THE PROBLEMS I WAS HAVING WAS, YOU KNOW,

9   ONE OF MY FRA INSPECTORS WAS NICK ROPPOLO.  AND HE WOULD

10   FREQUENTLY COME IN ON MY TERRITORY BECAUSE I HAD A CRUDE OIL

11   ROUTE.  AND HE WAS COMING, LOOKING AT MY TERRITORY TO MAKE SURE

12   THAT IT WAS IN FRA COMPLIANCE.  AND THAT IS WHEN -- WHEN WE --

13   FRA COMPLIANCE -- THAT IS WHEN THEY DID A SERIES OF

14   INSPECTIONS.  AND AFTER THEY DID THOSE SERIES OF INSPECTIONS,

15   THEY PUT U.P. ON WHAT WE CALL A "COMPLIANCE AGREEMENT."

16   **Q.**   OKAY, MR. TAYLOR.  I'D LIKE TO BACK UP A LITTLE BIT.

17   **A.**   YES.

18   **Q.**   I'M GOING TO ASK YOU ABOUT THE YEAR 2014.  I WOULD LIKE TO

19   SHOW YOU JOINT EXHIBIT NO. 1, WHICH HAS BEEN PREADMITTED.

20   **A.**   OKAY.

21   **Q.**   NOW, CAN YOU TELL ME WHAT THIS DOCUMENT IS, SIR?

22   **A.**   THAT IS MY 2014 MANAGEMENT -- THAT'S MY 2014

23   END-OF-THE-YEAR PERFORMANCE.

24        **MR. SCHMIDT:**  AND CAN WE GO TO THE LAST PAGE OF THIS

25   DOCUMENT.

01:35 1  **BY MR. SCHMIDT:**

2  **Q.**   AND WHAT IS THE DATE OF THIS DOCUMENT?

3  **A.**   I SEE I SIGNED IT ON 12/26/2014, AND MR. BEGLEY SIGNED IT

4  ON 12/31/2014.

5  **Q.**   ALL RIGHT.  AND WHO IS MR. BEGLEY, JOHN BEGLEY?

6  **A.**   MR. BEGLEY WAS MY DTM AT THE TIME -- DIRECTOR OF TRACK

7  MAINTENANCE.  SO HE WAS MY SUPERVISOR AT THE TIME.

8  **Q.**   ALL RIGHT.  WAS HE YOUR DIRECT SUPERVISOR?

9  **A.**   YES, HE WAS MY DIRECT SUPERVISOR.

10  **Q.**   ALL RIGHT.  AND WHAT WAS YOUR OVERALL RATING FOR THIS

11  PERFORMANCE REVIEW?

12  **A.**   OVERALL RATING WAS A 3.0, GOOD PERFORMER.

13  **Q.**   WELL, OKAY.  SO PART OF YOUR JOB DUTIES, AS I UNDERSTAND

14  YOUR TESTIMONY FROM JUST A MOMENT AGO, WAS COMMUNICATING WITH

15  THE FEDERAL RAILROAD ADMINISTRATION.  AM I UNDERSTANDING THAT

16  CORRECTLY?

17  **A.**   THAT IS CORRECT.

18  **Q.**   OKAY.  WOULD YOU SAY YOU OWED OBLIGATIONS BOTH TO YOUR

19  EMPLOYER AT UNION PACIFIC AND ALSO TO THE FRA?

20  **A.**   YES.

21  **Q.**   OKAY.  COULD YOU EXPLAIN HOW SO?

22  **A.**   YES.  WITH THE FRA, IT WAS MY JOB DUTY TO MAKE SURE THAT I

23  MET THE STANDARDS THAT WAS SET BY THE FEDERAL RAILROAD

24  ADMINISTRATION.  AND THAT WAS MY JOB DUTY.  AND ALSO MY JOB

25  DUTY FOR UNION PACIFIC RAILROAD WAS TO MAKE SURE THAT THE TRACK

01:37 1  MET WITH THEIR STANDARD WITH THE FRA.  HOWEVER, YOU KNOW, I WAS

2  GETTING PUSHBACK FROM UNION PACIFIC RAILROAD FOR MAKING SURE

3  THE TRACK WAS MEETING FRA COMPLIANCE.

4        FOR INSTANCE, SLOW ORDERING.  IF WE PUT A SLOW ORDER

5  OUT THERE, I MEAN, IT WOULD GET -- I MEAN, IT WOULD GET HOSTILE

6  BECAUSE SLOW ORDERS SLOWED THE TRAINS DOWN.  AND WHEN YOU

7  SLOWED THE TRAINS DOWN, THAT MEANS IF THAT TRAIN IS GOING FROM

8  POINT A TO POINT B, INSTEAD OF ONE CREW DOING IT, IT MIGHT TAKE

9  TWO OR THREE CREWS TO DO IT.  AND THAT WOULD COST UNION PACIFIC

10 RAILROAD MONEY WITH OVERTIME.

11       SO IMAGINE IF YOU HAD SEVERAL SUBDIVISIONS THAT HAD A

12 LOT OF SLOW ORDERS OUT THERE.  AND UNION PACIFIC OWNED, LIKE, I

13 DON'T KNOW, 25,000 MILES OF TRACK, AND HOW MUCH MONEY THAT

14 WOULD COST.  BUT STILL THE TRACK HAD TO BE MAINTAINED WITH THE

15 FRA BECAUSE THAT'S THE FEDERAL RULES THAT WE HAD TO GO BY.  AND

16 MOST OF THE TIME, YOU KNOW, THAT WE HAD TO SLOW ORDER THE TRACK

17 BECAUSE WE -- THE TIE CONDITIONS MOSTLY THAT WE HAD TO SLOW

18 ORDER THE TRACK AND WE COULDN'T MEET U.P. GUIDELINES OF HAVING

19 NO SLOW ORDERS AT ALL BECAUSE THE TRACK DETERIORATE, ESPECIALLY

20 IN LOUISIANA WITH ALL THIS RAIN.  I MEAN, A LOT OF RAIN, RAIN,

21 WOODEN TIES -- WOODEN TIES DOESN'T DO GOOD IN THE RAIN.  SO

22 THEY DETERIORATE AT A FASTER RATE.  AND SO WHAT HAPPENED IS

23 THAT WHEN THE TIES STARTED TO DETERIORATE, YOU KNOW, MY GANG

24 CAN ONLY DO SO MUCH.

25       FOR INSTANCE, MY TRACK GANG CAN GO OUT AND THEY CAN

01:39 1    PUT IN MAYBE 20 TIES, 25 TIES ON THE MAIN LINE IN A DAY.  BUT

2    THE TIES WAS STILL DETERIORATING SO FAST THAT THE ONLY CHOICE I

3    HAD WAS TO SLOW ORDER IT, YOU KNOW, TO MAKE IT SAFE FOR TRAINS

4    TO GO OVER.

5    **Q.**   OKAY.  AND IN THE YEAR OF 2015, DID YOU RECEIVE A

6    PERFORMANCE EVALUATION?

7    **A.**   YES, I DID.

8    **Q.**   ALL RIGHT.  I WOULD LIKE TO SHOW YOU PLAINTIFF'S EXHIBIT

9    NO. 4, WHICH HAS BEEN PREADMITTED.

10           AND IS THIS YOUR PERFORMANCE EVALUATION FOR THE YEAR

11   2015?

12   **A.**   YES, IT IS.

13           **MR. SCHMIDT:**  ALL RIGHT.  CAN WE LOOK AT THE LAST

14   PAGE OF THIS DOCUMENT, PLEASE.

15   **BY MR. SCHMIDT:**

16   **Q.**   AND CAN YOU TELL ME WHAT THE DATE OF THIS DOCUMENT IS?

17   **A.**   I SIGNED IT ON 12/31/2015.  MY DIRECTOR OF TRACK

18   MAINTENANCE, MR. BEGLEY, SIGNED IT ON 12/31/2015.

19   **Q.**   OKAY.  AND WHAT WAS YOUR OVERALL RATING?

20   **A.**   MY OVERALL RATING WAS 3, GOOD PERFORMER.

21   **Q.**   IN THE YEAR 2016, DID YOU MAKE ANY REPORTS TO THE FRA?

22   **A.**   IN THE YEAR 2016, I DID.  WE HAD A DERAILMENT THAT

23   HAPPENED IN AVONDALE AND THE FRA INSPECTOR NICK ROPPOLO -- THE

24   FEDERAL RAILROAD ADMINISTRATOR INSPECTOR NICK ROPPOLO WAS THERE

25   INSPECTING TRACKS.  SO WE WAS WALKING WITH HIM, INSPECTING

01:41 1    TRACKS.  AND WE HAD A DERAILMENT ON THE EAST END OF THE NORTH

2    YARD IN AVONDALE.  SO BRAD USEA, NICK ROPPOLO, AND MYSELF, WE

3    WENT TO INVESTIGATE THE DERAILMENT.

4              IT WAS A BYPASS KNUCKLE.  IF I CAN EXPLAIN A "BYPASS

5    KNUCKLE"?  IF YOU HAVE A TRAIN AND THEY HAVE TWO KNUCKLES AT

6    THE BACK, AND ONCE THE TRAIN MET TOGETHER, THEY CONNECT AND

7    THEY FORM A LOCK, ALL RIGHT.  SO ON THIS PARTICULAR TIME,

8    INSTEAD OF THE KNUCKLES BEING OPEN SO WHERE THEY COULD CONNECT

9    AND MAKE A LOCK, ONE OF THE KNUCKLES WAS CLOSED.  SO WHEN THEY

10    TRIED TO CONNECT ONE RAIL CAR TO THE OTHER, IT COULDN'T CONNECT

11    BECAUSE IT WAS CLOSED, SO IT BYPASSED IT AND WENT TO THE SIDE,

12    AND IT CAUSED THE WHEEL TO JUMP OVER THE TRACK.  AND WHEN THE

13    WHEEL JUMPED OVER THE TRACK, IT CAUSED THE DERAILMENT.

14              SO WHEN WE WENT AND LOOKED, OUR INVESTIGATION AND

15    EVERYTHING AND NICK ROPPOLO, WHICH IS THE FEDERAL RAILROAD

16    ADMINISTRATOR -- FEDERAL RAILROAD ADMINISTRATOR TRACK SAFETY

17    INSPECTOR, HE LOOKED AT IT AND WE LOOKED AT IT AND WE

18    DETERMINED IT WAS THE BYPASS KNUCKLE, WHICH IS -- THAT CAUSED

19    THE DERAILMENT AND NOT THE TRACK.  SO IT WASN'T TRACK CAUSED.

20    IT WAS CAUSED BY HUMAN ERROR.  THEY CALL IT THE HUMAN FACTOR.

21    THEY DIDN'T MAKE SURE THAT THE KNUCKLE WAS OPEN.

22              SO WHAT HAPPENED WAS UNION PACIFIC RAILROAD PUT IT IN

23    THAT IT WAS TRACK CAUSED AND --

24    Q.    OKAY.  WHEN YOU SAY "PUT IT IN," WHAT DO YOU MEAN BY THAT?

25    A.    WELL, WE HAVE TO CODE OUR DERAILMENT WHETHER IT WAS HUMAN

01:43  1    FACTOR, TRACK CAUSED.  AND WE HAVE TO DO A REPORT TO THE

2    FEDERAL RAILROAD ADMINISTRATION.  SO EVERY DERAILMENT WE HAVE,

3    WE GOT TO PUT A CODE, AND WE HAVE TO SEND IT TO THE FEDERAL

4    RAILROAD ADMINISTRATION TO SHOW WHAT CAUSED THE DERAILMENT.

5         SO WHEN NICK ROPPOLO, THE FEDERAL RAILROAD SAFETY

6    INSPECTOR, LOOKED AT IT, HE DETERMINED IT WAS HUMAN FACTOR.  SO

7    I DON'T KNOW EXACTLY WHAT THE CODE WAS.  BUT WHEN THEY CODE IT

8    AND SENT IT TO THE FEDERAL RAILROAD ADMINISTRATION, THE CODE

9    WAS TRACK CAUSED.  SO HE LOOKED AT THE REPORT AND HE SAW THE

10    REPORT AND HE ASKED ME ABOUT IT.  WHEN HE CALLED ME, HE ASKED

11    ME ABOUT IT, AND I SAID, WELL, THEY PUT IT IN AS TRACK CAUSED.

12    THEY SAID IT WASN'T A HUMAN-FACTOR-CAUSED DERAILMENT.

13    Q.   AND WHAT WAS HIS RESPONSE?

14    A.   HE SENT AN EMAIL TO MARCUS BEGLEY AND MARK WHEELAND

15    QUESTIONING THEM WHY THEY CHANGED THE CODE TO TRACK CAUSE AND

16    NOT HAD IT AS HUMAN-FACTOR CAUSE.

17    Q.   ALL RIGHT.  I WOULD LIKE TO SHOW YOU WHAT'S BEEN MARKED AS

18    PLAINTIFF'S EXHIBIT 5, WHICH HAS NOT BEEN PREADMITTED.

19         MS. SCHOONMAKER:  BEFORE YOU PUBLISH IT, I'D LIKE TO

20    SEE THE DOCUMENT.

21         THE COURT:  MA'AM, I COULDN'T HEAR YOU.

22         IT'S NOT PUBLISHED UNTIL IT'S ADMITTED.

23         MS. SCHOONMAKER:  THANK YOU, YOUR HONOR.  SORRY.

24         THE COURT:  SO THE ONE THAT YOU ARE REFERRING TO IS

25    P-5?

01:45  1              **MS. SCHOONMAKER:**  THAT'S CORRECT, YOUR HONOR.

       2              **THE COURT:**  GO AHEAD, MR. SCHMIDT.

       3   BY MR. SCHMIDT:

       4   **Q.**   AND DO YOU RECOGNIZE THIS DOCUMENT, SIR?

       5   **A.**   YES.  YES.

       6   **Q.**   WOULD YOU TELL ME WHAT IT IS?

       7   **A.**   THIS IS THE EMAIL THAT NICK ROPPOLO WAS ASKING MARCUS

       8   BEGLEY ABOUT THE INVESTIGATION BY THE FRA.  SO THIS IS WHAT

       9   MARK WHEELAND SENT TO MARCUS BEGLEY, AND HE SAID: "THIS IS

      10   INVITING FURTHER INVESTIGATION TO OUR BUSINESS BY THE FRA.  PER

      11   MY PREVIOUS CORRESPONDENCE, THE CAUSE OF THIS DERAILMENT NEEDS

      12   TO BE CHANGED."

      13              SO MARK WHEELAND WAS TELLING THE TRANSPORTATION

      14   DEPARTMENT AND EVERYBODY THAT -- TO KEEP THE FRA FROM FULLY

      15   INVESTIGATING -- UNION PACIFIC RAILROAD TO CHANGE THE CODE BACK

      16   TO HUMAN FACTOR.

      17   **Q.**   AND, MR. TAYLOR, WHAT IS THE DATE ON THIS EMAIL?

      18   **A.**   1/14/2016.

      19   **Q.**   AND WERE YOU A RECIPIENT ON THIS EMAIL?

      20   **A.**   YES.  YES.  YES, I SEE MY NAME.  YES.

      21              **MR. SCHMIDT:**  YOUR HONOR, WE WOULD OFFER PLAINTIFF'S

      22   EXHIBIT 5 INTO EVIDENCE.

      23          **(WHEREUPON, THE COURTHOUSE TEMPORARILY LOST POWER.)**

      24              **THE COURT:**  OKAY.  WE CAN BRING THE JURY BACK IN.

      25                   SIR, YOU CAN GO BACK TO THE STAND.  THAT WAY WE

01:46 1    WILL BE READY TO ROLL.  THANK YOU.  WATCH YOUR STEP.

2           **(WHEREUPON, THE JURY ENTERED THE COURTROOM.)**

3           **THE COURT:**  BE SEATED.

4             OKAY, LADIES AND GENTLEMEN.  PATIENCE PAYS.  I

5    WAS JUST GETTING READY TO PULL THE PLUG ON THINGS WHENEVER WE

6    GOT OUR POWER BACK ON.

7             SO YOUR WITNESS, MR. SCHMIDT.  GO AHEAD AND

8    CONTINUE.

9    **BY MR. SCHMIDT:**

10   **Q.**  ALL RIGHT, MR. TAYLOR.  I BELIEVE WE WERE TALKING ABOUT

11   EXHIBIT P-5.

12           **THE COURT:**  YOU KNOW WHAT, DID I ADMIT IT?  P-5 IS

13   ADMITTED WITHOUT OBJECTION.

14           **MR. SCHMIDT:**  THANK YOU, YOUR HONOR.

15           **MS. SCHOONMAKER:**  THAT'S CORRECT.  THAT'S WHEN THE

16   POWER WENT OFF, YOUR HONOR.

17           **THE COURT:**  OKAY.

18           **MR. SCHMIDT:**  RIGHT.

19           **THE COURT:**  ADMITTED.

20           **MR. SCHMIDT:**  THANK YOU.

21   **BY MR. SCHMIDT:**

22   **Q.**  ALL RIGHT.  SO IF WE LOOK AT THE BOTTOM OF PAGE 554

23   THROUGH THE TOP OF THE NEXT PAGE, THIS IS AN EMAIL FROM

24   NICHOLAS ROPPOLO TO YOU, MR. BAGLEY, AND OTHERS.  IS THAT

25   CORRECT?

02:31 1 **A.** YES, SIR, THAT IS CORRECT.

2 **Q.** OKAY. AND DOES THIS EMAIL ADDRESS THE EVENTS THAT YOU

3 WERE DESCRIBING TO ME A MOMENT AGO INVOLVING THE INSPECTION OR

4 THE CAUSE OF A DERAILMENT?

5 **A.** YES, IT DOES.

6 **Q.** ALL RIGHT. MR. ROPOLLO MENTIONS 213.7. COULD YOU EXPLAIN

7 TO ME WHAT THAT MEANS?

8 **A.** YES, SIR. 213.7 MEANS THAT YOU WENT THROUGH THE TRAINING

9 TO BE QUALIFIED TO INSPECT TRACK AND DETERMINE THE DEFECTS AND

10 DETERMINE THE DEFECTS, HOW TO WRITE UP DEFECTS, AND YOU'RE

11 QUALIFIED TO LOOK AT TRACK AND DETERMINE IF THE TRACK CAUSED

12 THE DERAILMENT OR NOT.

13 **Q.** AND WHERE IT STATES MR. TAYLOR, MR. USEA, AND MR. ISAAC

14 WERE THE ONLY PERSONS ON SITE THAT I KNOW TO BE QUALIFIED UNDER

15 213.7, WERE THOSE THE ONLY PEOPLE THAT WERE ON THE SITE THAT

16 WERE QUALIFIED UNDER 213.7?

17 **A.** THAT IS CORRECT.

18 **Q.** OKAY. AND CAN YOU EXPLAIN TO ME WHO MR. ISAAC IS?

19 **A.** MR. ISAAC WAS THE TRACK INSPECTOR FOR AVONDALE AT THE

20 TIME.

21 **Q.** AND HE WORKED UNDER YOUR SUPERVISION?

22 **A.** HE WORKED UNDER MY SUPERVISION, THAT IS CORRECT.

23 **Q.** OKAY. AND WHO IS MR. USEA?

24 **A.** MR. USEA WAS A TRACK -- HE WAS A BACKHOE OPERATOR AT THE

25 TIME, BUT HE ALSO WAS 213.7 QUALIFIED 'CAUSE HE WAS ABLE TO

02:32 1   INSPECT AND MAINTAIN TRACK AND BRING THE TRACK BACK INTO FRA

2   COMPLIANCE.

3   **Q.**   AND WAS HE ONE OF YOUR SUBORDINATES AS WELL?

4   **A.**   YES, HE WAS.

5   **Q.**   AND U-Z-E-E, IS THAT THE CORRECT SPELLING OF HIS NAME?

6   **A.**   I BELIEVE IT IS U-S-E-A.

7   **Q.**   THANK YOU.

8         AND NICK ROPPOLO, WHO WROTE THIS EMAIL, HE WAS A FRA

9   INSPECTOR.  AM I UNDERSTANDING THAT CORRECTLY?

10   **A.**   YES, THAT IS CORRECT.

11   **Q.**   IS HE SOMEONE WITH WHOM YOU COMMUNICATED FREQUENTLY DURING

12   YOUR JOB AT UNION PACIFIC?

13   **A.**   YES, I COMMUNICATED FREQUENTLY WITH NICK ROPPOLO.

14         **MR. SCHMIDT:**  OKAY.  ALL RIGHT.  LET'S SCROLL UP TO

15   THE NEXT EMAIL FROM MARK WHEELAND ON JANUARY 14, 2016.

16   **BY MR. SCHMIDT:**

17   **Q.**   IT READS:  "THIS IS INVITING FURTHER INVESTIGATION INTO

18   OUR BUSINESS BY THE FRA.  PER MY PREVIOUS CORRESPONDENCE, THE

19   CAUSE OF THIS DERAILMENT NEEDS TO BE CHANGED."

20         WOULD YOU EXPLAIN WHAT MARK WHEELAND'S POSITION IS?

21   **A.**   MARK WHEELAND AT THE TIME WAS THE CHIEF ENGINEER FOR THE

22   SOUTHERN REGION FOR UNION PACIFIC RAILROAD.

23   **Q.**   OKAY.  HOW DID YOU INTERPRET THIS EMAIL FROM MR. WHEELAND?

24   **A.**   I INTERPRETED THIS EMAIL FROM MR. WHEELAND AS TO CHANGE

25   THE CODE BACK TO A HUMAN-FACTOR CAUSED DERAILMENT SO THE FRA

02:34 1   WOULD NOT CONTINUE TO DO INVESTIGATION IN BRINGING FURTHER

2   INVESTIGATION INTO THE COMPANY.

3   **Q.**   ALL RIGHT, MR. TAYLOR.  SO RIGHT NOW WE'RE TALKING ABOUT

4   JANUARY 2016.  I WOULD LIKE TO BACK UP A LITTLE BIT AND ASK YOU

5   A QUESTION ABOUT THE YEAR 2015.

6        DID YOU EXPERIENCE ANY BEHAVIOR THAT YOU WOULD

7   CONSIDER RETALIATORY OR THREATENING IN THE YEAR OF 2015?

8   **A.**   2015?

9   **Q.**   YES, SIR.

10   **A.**   YES.  IN 2015 I RECEIVED SOME THREATS ABOUT ME

11   SLOW-ORDERING THE TRACK AND WRITING UP DEFECTS.

12   **Q.**   OKAY.  COULD YOU TELL ME MORE ABOUT THAT, PLEASE?

13   **A.**   IN 2015 WE HAD THE FRA THAT WAS ON THE TERRITORY, AND THEY

14   WAS DOING INSPECTIONS.  AND I ENDED UP WRITING UP SOME DEFECTS

15   BEHIND THE FRA, AND I GOT RESISTANCE FROM WRITING UP DEFECTS.

16   **Q.**   FROM WHOM?

17   **A.**   I GOT RESISTANCE FROM MR. BEGLEY.

18   **Q.**   MR. BEGLEY, YOUR SUPERVISOR, WHO WE WERE DISCUSSING A

19   MOMENT AGO?

20   **A.**   YES.

21   **Q.**   AND WHAT WAS THE RESISTANCE?

22   **A.**   WRITING UP DEFECTS.  HE TOLD ME THAT IF I CONTINUED TO

23   WRITE UP DEFECTS THAT I WOULD NO LONGER HAVE A JOB WITH UNION

24   PACIFIC RAILROAD.

25   **Q.**   HOW DID THAT MAKE YOU FEEL WHEN HE TOLD THAT YOU?

02:36  1  **A.**   I ACTUALLY WAS VERY -- I WAS AFRAID WHEN HE SAID THAT.  I

2  MEAN, BECAUSE I REALLY NEEDED MY JOB, AND IT MADE ME FEEL VERY

3  DISCOMFOR- -- UNCOMFORTABLE ABOUT GOING AND WRITING UP DEFECTS

4  BECAUSE I WOULD GET PUSHBACK.  SO IT MADE ME VERY NERVOUS ABOUT

5  DOING MY JOB.

6  **Q.**   AND, MR. TAYLOR, YOU ARE MARRIED.  CORRECT?

7  **A.**   THAT IS CORRECT.

8  **Q.**   HOW LONG HAVE YOU BEEN MARRIED?

9  **A.**   THIRTY-TWO YEARS.

10  **Q.**   AND DO YOU HAVE ANY CHILDREN?

11  **A.**   YES, I DO.

12  **Q.**   HOW OLD ARE THEY?

13  **A.**   I HAVE A SON THAT IS 32 YEARS OLD.  MY YOUNGEST SON IS 30.

14  AND I HAVE A DAUGHTER THAT IS 29.

15  **Q.**   AND THIS WAS 2015.  SIX YEARS AGO, THEY WERE A BIT YOUNGER

16  THEN.  CORRECT?

17  **A.**   YES, THAT IS CORRECT.  YES.

18  **Q.**   ALL RIGHT.  WOULD YOU CONSIDER YOURSELF AT THIS TIME TO BE

19  THE PROVIDER OF YOUR FAMILY?

20  **A.**   YES, I WAS THE PROVIDER OF THE FAMILY.  I CONSIDERED

21  MYSELF TO BE THE PROVIDER OF THE FAMILY, PAYING THE MAJORITY OF

22  THE BILLS, PROVIDING MEDICAL CARE.  AND SO MY JOB WAS VERY

23  IMPORTANT TO ME, AND I NEEDED MY JOB.

24  **Q.**   THANK YOU.

25          SO FOR HOW LONG WAS MR. BEGLEY YOUR SUPERVISOR?

02:38  1    **A.**   MR. BEGLEY WAS MY SUPERVISOR, I WANT TO SAY, UP TO THE

2    FIRST -- THE BEGINNING OF 2016, LIKE JANUARY OR FEBRUARY OR

3    MARCH, WHEN HE ACTUALLY LEFT AND RETIRED.

4    **Q.**   AND WHO TOOK HIS PLACE AS YOUR SUPERVISOR?

5    **A.**   TOOK HIS PLACE?  WOULD BE SHIELDS, BRYAN SHIELDS TOOK HIS

6    PLACE.

7    **Q.**   ARE YOU FAMILIAR WITH MARK OLDHAM?

8    **A.**   YES, I AM.

9    **Q.**   OKAY.  AND WHO IS HE?

10   **A.**   MR. OLDHAM WAS MY SUPERVISOR, DIRECTOR OF TRACK

11   MAINTENANCE AFTER MARK SHIELDS LEFT.

12   **Q.**   OKAY.  IS IT MARK SHIELDS OR BRYAN SHIELDS?

13   **A.**   BRYAN SHIELDS.

14   **Q.**   RIGHT.

15   **A.**   EXCUSE ME.  BRYAN SHIELDS.

16   **Q.**   AND SO WHEN WAS THAT THAT MARK OLDHAM BECAME YOUR

17   SUPERVISOR?

18   **A.**   I THINK MARK BECAME LIKE IN SEPTEMBER 2016, AROUND THAT

19   TIME.

20   **Q.**   ARE YOU FAMILIAR WITH GREG WORKMAN?

21   **A.**   YES.

22   **Q.**   AND WHO IS GREG WORKMAN?

23   **A.**   AT THE TIME GREG WORKMAN WAS THE CHIEF ENGINEER OF UNION

24   PACIFIC RAILROAD.  SO HE WAS HEAD OF THE MAINTENANCE OF WAY

25   DEPARTMENT FOR UNION PACIFIC RAILROAD.

02:39  1   Q.   AND DID YOU EVER HAVE ANY ISSUES WITH GREG WORKMAN?

     2   A.   ONE TIME IN NOVEMBER OF 2016 ON THE BUSINESS TRAIN.

     3   Q.   ON THE WHAT?  I'M SORRY.

     4   A.   AROUND NOVEMBER 2016 ON THE BUSINESS TRAIN.  THE BUSINESS

     5   TRAIN IS WHERE THEY WOULD COME IN YOUR TERRITORY, AND THEY

     6   WOULD RIDE A TRAIN ACROSS YOUR TERRITORY TO SEE HOW THE TRAIN

     7   RIDE WAS, TO SEE IF IT WAS A SMOOTH RIDE OR NOT.  SO ON THE

     8   BUSINESS TRAIN, MR. WORKMAN ASKED ME WAS I IN BED WITH THE FRA.

     9   Q.   HE ASKED YOU IF YOU WERE IN BED WITH THE FRA?

    10   A.   YES.  THAT WHAT HIS WORDS, THAT I RECALL THAT HE SAID,

    11   YES.

    12   Q.   WHAT WAS THE CONTEXT OF THAT STATEMENT?  WHAT PROMPTED HIM

    13   TO SAY THAT?

    14   A.   I BELIEVE IT WAS BECAUSE OF REPORTS THAT I WAS MAKING TO

    15   THE FRA ABOUT CERTAIN SAFETY ISSUES THAT U.P. WAS NOT COMPLYING

    16   WITH.  ALSO, WHAT HAPPENED IN JANUARY OF 2016, WHEN WE REPORTED

    17   THAT THEY CHANGED THE CODE FROM A HUMAN FACTOR TO THE

    18   TRACK-CAUSED DERAILMENT WITH NICK ROPPOLO.

    19   Q.   AND WHAT WAS YOUR RESPONSE TO THAT QUESTION?

    20   A.   MY RESPONSE TO IT WAS THAT IF THE FRA ASKED ME A QUESTION,

    21   I'M GOING TO -- IT'S MY DUTY TO TELL THEM THE TRUTH.  I'M JUST

    22   GOING TO TELL THEM EXACTLY WHAT HAPPENED.

    23   Q.   AND HOW DID HE RESPOND TO THAT?

    24   A.   HE REALLY DIDN'T SAY ANYTHING AFTER THAT.  HE JUST LOOKED

    25   AT ME.  BUT HE DIDN'T SAY ANYTHING AFTER THAT.

02:41 1    **Q.**    ALL RIGHT, MR. TAYLOR.  I WOULD LIKE TO SHOW YOU JOINT

2    EXHIBIT NO. 2, WHICH HAS BEEN PREADMITTED.

3           AND IS THIS YOUR PERFORMANCE EVALUATION FOR THE YEAR

4    2016?

5    **A.**    THAT IS CORRECT.

6           **MR. SCHMIDT:**  ALL RIGHT.  CAN WE LOOK AT THE LAST

7    PAGE OF THIS DOCUMENT.

8    **BY MR. SCHMIDT:**

9    **Q.**    ALL RIGHT.  AND CAN YOU TELL ME WHAT THE DATES ARE ON THIS

10   DOCUMENT, PLEASE?

11   **A.**    IT LOOKS LIKE I SIGNED IT ON 12/22/2016.  AND MARK OLDHAM

12   SIGNED IT ON 12/23/2016.

13   **Q.**    ALL RIGHT.  AND YOUR OVERALL RATING ON THIS PERFORMANCE

14   REVIEW?

15   **A.**    MY OVERALL RATING WAS A 3, GOOD PERFORMER.

16          **MR. SCHMIDT:**  ALL RIGHT.  LET'S GO BACK UP TO

17   PAGE PLF558.

18   **BY MR. SCHMIDT:**

19   **Q.**    SO IF YOU LOOK AT MANAGER MID-YEAR FEEDBACK, UNDER

20   "COMMENTS BY BRYAN W. SHIELDS."  IS THAT YOUR SUPERVISOR THAT

21   WE WERE DISCUSSING A MINUTE AGO?

22   **A.**    YES.

23   **Q.**    ALL RIGHT.  AND WOULD YOU READ THAT COMMENT TO ME, PLEASE?

24   **A.**    THE ONE UNDER "MANAGER MID-YEAR FEEDBACK"?

25   **Q.**    DIRECTLY UNDER --

02:42 1   **A.**   OKAY.

2   **Q.**   RIGHT WHERE SHE HAS THE CLICKER.

3   **A.**   OKAY.  ALL RIGHT.  "OVERALL GOOD JOB ON YOUR -- MANAGING

4   YOUR TERRITORY.  YOUR SAFETY IS GREAT AND HUGE IMPROVEMENT OVER

5   THE LAST YEAR ON DERAILMENTS.  BUDGET IS TIGHT WITH OVERTIME A

6   LITTLE, BUT I THINK YOU CAN KEEP AN EYE ON IT AND KEEP IT UNDER

7   CONTROL.  KEEP UP THE GOOD WORK AND LOOK FORWARD TO A GREAT

8   2ND HALF AS WELL."

9   **Q.**   SO DID YOU CONSIDER THIS TO BE A POSITIVE PERFORMANCE

10   EVALUATION?

11   **A.**   YES, I DO.

12   **Q.**   I BELIEVE EARLIER IN YOUR TESTIMONY YOU REFERRED TO A

13   COMPLIANCE AGREEMENT BETWEEN UNION PACIFIC AND THE FRA.  AM I

14   REMEMBERING THAT CORRECTLY?

15   **A.**   THAT IS CORRECT.

16   **Q.**   ALL RIGHT.  I WOULD LIKE TO SHOW YOU EXHIBIT P-6, WHICH

17   HAS NOT BEEN PREADMITTED.

18          ALL RIGHT.  CAN YOU TELL ME WHAT THIS DOCUMENT IS,

19   SIR?

20   **A.**   THIS LETTER IS FROM THE FEDERAL RAILROAD ADMINISTRATION,

21   AND IT'S FROM FOIA, FREEDOM OF INFORMATION ACT.  AND IT'S

22   ADDRESSED TO ME, MR. TAYLOR.

23          **MR. SCHMIDT:**  OKAY.  CAN YOU SCROLL DOWN SOME,

24   PLEASE.  LET'S GO ON TO THE NEXT PAGE.

25   **BY MR. SCHMIDT:**

02:44 1    Q.   SO WAS THIS ATTACHED TO THE FOIA RESPONSE LETTER?

2    A.   YES, IT WAS.

3    Q.   OKAY.  WHAT IS THIS?

4    A.   THIS IS THE SAFETY COMPLIANCE AGREEMENT BETWEEN THE

5    FEDERAL RAILROAD ADMINISTRATION AND UNION PACIFIC RAILROAD

6    COMPANY.

7         MR. SCHMIDT:  LET'S GO DOWN TO THE LAST PAGE OF THIS

8    DOCUMENT.

9    BY MR. SCHMIDT:

10   Q.   ALL RIGHT.  SO THERE IS A SIGNATURE BY A CAMERON A. SCOTT,

11   EXECUTIVE VICE PRESIDENT, CHIEF OPERATING OFFICER OF UNION

12   PACIFIC RAILROAD COMPANY, DATED DECEMBER 22, 2016?

13   A.   YES, THAT IS CORRECT.

14   Q.   ALL RIGHT.  AND IS THERE ALSO A SIGNATURE BY SARAH

15   FEINBERG OF THE FEDERAL RAILROAD ADMINISTRATION ON THE SAME

16   DATE?

17   A.   YES, SIR, THAT IS CORRECT.

18        MR. SCHMIDT:  ALL RIGHT, YOUR HONOR.  WE'D OFFER P-6

19   INTO EVIDENCE.

20        MS. SCHOONMAKER:  NO OBJECTION, YOUR HONOR.

21        THE COURT:  ADMITTED.

22        MR. SCHMIDT:  I'M SORRY, YOUR HONOR.  I DIDN'T HEAR

23   THE COURT'S COMMENTS.  IS IT ADMITTED?

24        THE COURT:  YES, IT'S ADMITTED.

25        MR. SCHMIDT:  THANK YOU.

02:45 1        **THE COURT:**  YOU MAY PUBLISH IT.

2    **BY MR. SCHMIDT:**

3    **Q.**   AND HOW DID YOU BECOME FAMILIAR WITH THIS DOCUMENT?

4    **A.**   WELL, THE MAINTENANCE OF WAY -- THE MANAGER OF -- THE

5    MAINTENANCE OF WAY DIRECTOR CAME TO LIVONIA, AND HE PRESENTED

6    THIS DOCUMENT IN A PDF TO ALL THE TRACK INSPECTORS AND MTMS

7    THAT WORKED IN THE STATE OF LOUISIANA.  AND THAT'S HOW I BECAME

8    FAMILIAR WITH THIS DOCUMENT.

9    **Q.**   AND WHAT WAS THIS PERSON'S NAME?  YOU SAID HE WAS DIRECTOR

10   OF MAINTENANCE OF WAY?

11   **A.**   HE WAS THE DIRECTOR OF MAINTENANCE OF WAY.  I CANNOT THINK

12   OF HIS NAME AT THIS MOMENT.  IF IT COME TO ME, I'LL TELL.  BUT

13   I JUST CANNOT THINK OF HIS NAME.

14   **Q.**   OKAY.  AND WHAT DID HE SAY ABOUT THIS AGREEMENT?

15   **A.**   WELL, HE SAID THAT THIS AGREEMENT -- THAT ONE OF THE MAIN

16   THINGS THAT THE FRA WAS TALKING ABOUT IS THAT UNION PACIFIC

17   RAILROAD WAS NOT WRITING UP DEFECTS.  THEY WERE NOT PROPERLY

18   MAINTAINING THE TRACK.

19            THIS AGREEMENT CAME BECAUSE OF THE CRUDE OIL ROUTE,

20   WHICH MY TERRITORY WAS PART OF THE CRUDE OIL ROUTE.  AND THE

21   CRUDE OIL ROUTE WAS HIGHLY VOLATILE OIL THAT U.P. WAS SHIPPING.

22   AND IT CAME ABOUT BECAUSE THERE WAS A DERAILMENT UP NORTH, AND

23   IT INVOLVED CRUDE OIL.  AND THE FRA WAS GOING INSPECTING EVERY

24   TRACK ON THE UNION PACIFIC RAILROAD NETWORK WHERE CRUDE OIL

25   TRAINS WAS TRAVELING ACROSS.  AND THEY WAS MAKING SURE THAT OUR

02:47 1   TRACK WAS MAINTAINED SO THAT IT WOULDN'T DERAIL IN OTHER PARTS

2   OF UNION PACIFIC RAILROAD -- CRUDE OIL WOULDN'T DERAIL ON OTHER

3   PARTS OF UNION PACIFIC RAILROAD.  SO THE FRA INSPECTOR WOULD

4   COME TO OUR TERRITORY, AND THEY WOULD INSPECT OUR TRACKS TO

5   MAKE SURE THAT WE WAS IN COMPLIANCE.

6        ALSO, THE FRA WOULD ASK ME, "DID UNION PACIFIC

7   RAILROAD GO OVER THIS COMPLIANCE AGREEMENT WITH YOU?"  AND THE

8   FRA INSPECTOR WAS NICK ROPPOLO.  AND I SAID, "YES, THEY DID."

9   AND HE EXPLAINED THE COMPLIANCE AGREEMENT TO ME.  HE TOLD ME

10  THAT IF I DON'T MAINTAIN THE TRACKS ON MY TERRITORY, THAT IT

11  SUBJECTED ME TO CRIMINAL CHARGES AND ALSO FINES FOR NOT

12  MAINTAINING THE TRACK.

13       I WAS REQUIRED TO DO TWO TRACK INSPECTION EVALUATIONS

14  A MONTH ON MY TRACK INSPECTIONS TO MAKE SURE THAT THE TRACK WAS

15  IN COMPLIANCE.  AND I WAS VERY NERVOUS AND -- AT THE TIME

16  BECAUSE, AS I STATED BEFORE, HE VISITED MY TERRITORY A LOT

17  BECAUSE I HAD THE CRUDE OIL ROUTE.  SO IT FELT LIKE I WAS IN

18  WAR BETWEEN THE FRA AND UNION PACIFIC RAILROAD BECAUSE HE WAS

19  TELLING ME THAT, YOU KNOW, IF I DON'T WRITE UP DEFECTS, YOU

20  KNOW, I CAN GET A FINE OR I CAN FACE CRIMINAL CHARGES.  AND

21  UNION PACIFIC RAILROAD WAS SAYING, YOU KNOW, YOU WRITING UP TOO

22  MUCH DEFECTS.  YOU KNOW, THEY WAS TRYING TO RESIST IT AND GET

23  ME TO STOP.

24  **Q.**   SO NICHOLAS ROPPOLO FROM THE FRA ACTUALLY TOLD YOU THAT

25  YOU COULD FACE CIVIL FINES OR CRIMINAL PENALTIES?

02:49 1  **A.**  YES, HE DID.

2         **MS. SCHOONMAKER:**  OBJECTION.  HEARSAY, YOUR HONOR.

3         **MR. SCHMIDT:**  YOUR HONOR, IT'S NOT BEING OFFERED TO

4  SHOW THE TRUTH OF THE MATTER ASSERTED, BUT JUST TO SHOW THE

5  STRESS THAT MR. TAYLOR WAS UNDER AT THE TIME.

6         **THE COURT:**  NO.  THE OBJECTION IS SUSTAINED.

7         **MR. SCHMIDT:**  LET'S MOVE UP TO THE BOTTOM OF

8  PAGE 1531 OF THIS DOCUMENT AND THE TOP OF PAGE 1532, THAT

9  PARAGRAPH.

10  **BY MR. SCHMIDT:**

11  **Q.**  AND DOES THIS PARAGRAPH OF THIS AGREEMENT REFERENCE THE

12  FRA'S AUTHORITY TO IMPOSE CIVIL PENALTIES OR REQUEST THE U.S.

13  DEPARTMENT OF JUSTICE SEEK CRIMINAL PENALTIES?

14  **A.**  YES, IT DOES.  THAT'S WHAT I'M READING, YES.

15  **Q.**  THANK YOU.

16         SO WERE YOU HAVING ANY MAINTENANCE ISSUES WITH ANY OF

17  YOUR TRACKS AT THIS TIME IN EARLY 2017?

18  **A.**  YES, I WAS HAVING MAINTENANCE ISSUES WITH THE TAIL TRACK

19  IN AVONDALE.

20  **Q.**  OKAY.  SO AVONDALE, LOUISIANA, I'M NOT VERY FAMILIAR WITH

21  THAT AREA.  I'M SURE SOME MEMBERS OF THE JURY ARE NOT.  COULD

22  YOU TELL ME WHERE THAT IS?

23  **A.**  AVONDALE IS ON WHAT THEY CALL THE WEST BANK.  IT'S NEAR

24  WEST WEGO.  THAT'S WHERE IT'S LOCATED.  IT'S ON THE WEST BANK,

25  ON THE OTHER SIDE OF NEW ORLEANS, ON THE WEST BANK, AVONDALE.

02:51 1  **Q.**   AND THE UNION PACIFIC TRACKS THAT GO THROUGH AVONDALE, DO
2  THEY GO THROUGH COMMUNITIES?

3  **A.**   YES, THEY DO.  YES.

4  **Q.**   OKAY.  WHAT COMMUNITIES ARE THOSE?

5  **A.**   IN THE YARD, AVONDALE YARD, THERE'S A COMMUNITY THERE,

6  HOUSES BESIDES THE TRACKS IN THEIR YARD.  UNION PACIFIC

7  RAILROAD GOES THROUGH CITIES.  I WANT TO SAY VACHERIE, ALSO

8  ADDIS, PLAQUEMINE, MARINGOUIN, AND TO LIVONIA.  THOSE ARE SOME

9  OF THE MAJOR CITIES THAT WE GO THROUGH.

10  **Q.**   THANK YOU.

11         OKAY.  SO WHAT WERE THE PROBLEMS YOU WERE HAVING IN

12  AVONDALE?

13  **A.**   IN AVONDALE IT WAS THE TAIL TRACK, AND THE PROBLEM WAS

14  THAT WE WERE HAVING A LOT OF DERAILMENTS THERE.  AND WE WERE

15  TRYING TO FIGURE OUT WHY WE KEPT HAVING DERAILMENTS THERE

16  BECAUSE WE WERE -- WE KEPT DOING MAINTENANCE, PUTTING IN NEW

17  SWITCH PROTECTORS.  AND WE KEPT HAVING DERAILMENTS THERE.

18         SO WHAT I DID WAS I USED MY CIVIL ENGINEER DEGREE TO

19  FIGURE IT OUT.  AND WHAT IT WAS, WE HAVE TWO WHAT WE CALL

20  SWITCHES THAT WAS LIKE 7 FEET APART FROM ONE ANOTHER.

21  **Q.**   SO WHAT IS A "SWITCH"?

22  **A.**   A SWITCH IS A PART OF THE TRACK THAT -- WHAT IT DOES --

23  JUST LIKE THE NAME SWITCH.  IT TAKES YOU FROM ONE TRACK TO

24  ANOTHER TRACK.  SO IT'S -- IF A TRAIN RUN -- LET'S SAY THE

25  SWITCH CONNECTS TRACK 1 AND 2, ALL RIGHT.  SO IF YOU THROW THE

02:53 1    SWITCH ONE WAY, YOU CAN GO INTO TRACK 1.  AND THEN WE CAN LINE

2    THE SWITCH THE OTHER WAY, IT CAN GO INTO TRACK 2.  SO THAT'S

3    HOW WE GO FROM TRACK TO TRACK WITH SWITCHES.  SO...

4    **Q.**   ALL RIGHT.  AND DO THE FRA INSPECTORS EVER DISCUSS WITH

5    YOU THE ISSUES YOU WERE HAVING AT AVONDALE?

6    **A.**   YES.  THE FRA INSPECTOR INSTRUCTED ME THAT I NEEDED TO GET

7    THE DERAILMENTS IN AVONDALE UNDER CONTROL.  HE SAID I WAS

8    HAVING TOO MANY DERAILMENTS, AND I NEEDED TO GET IT UNDER

9    CONTROL.  AND THE TAIL TRACK WAS ONE OF THE MAIN TRACKS THAT I

10   WAS HAVING A LOT OF DERAILMENTS.

11   **Q.**   OKAY.  AND SO YOU DETERMINED THAT THE SWITCHES WERE TOO

12   FAR APART.  DID I UNDERSTAND YOUR TESTIMONY CORRECTLY?

13   **A.**   THEY WAS TOO CLOSE TOGETHER.

14   **Q.**   TOO CLOSE TOGETHER?

15   **A.**   YES.

16   **Q.**   THANK YOU.

17            DID YOU COME TO THAT CONCLUSION BY YOURSELF?

18   **A.**   I CAME TO THAT CONCLUSION MOSTLY -- AND ALSO I TALKED TO

19   SOME ENGINEERS OUT OF OMAHA THAT WAS DOWN THERE, 'CAUSE WE WAS

20   DOING A TRACK UPGRADE, AND THEY CONFIRMED THAT THE SWITCH WAS

21   TOO CLOSE TOGETHER.  AND ALSO, WHEN PHILLIP HAWKINS, WHICH WAS

22   THE MANAGER OF TRACK PROJECTS AT THE TIME, AND MARK OLDHAM,

23   WHEN THEY CAME THERE TO INSPECT THE SWITCH WITH ME, THEY ALSO

24   CAME TO THE SAME CONCLUSION, THAT THE ONLY WAY TO REPAIR THE

25   SWITCH WAS TO GET NEW SWITCHES AND MOVE THEM FARTHER APART.

02:54 1  **Q.**   ALL RIGHT.  YOU MENTIONED ENGINEERS OUT OF OMAHA.  DO YOU

2  MEAN UNION PACIFIC ENGINEERS?

3  **A.**   YES, SIR, UNION PACIFIC ENGINEERS.

4  **Q.**   AND WHAT'S IN OMAHA?

5  **A.**   OMAHA IS THE HEADQUARTERS FOR UNION PACIFIC RAILROAD.

6  **Q.**   OKAY.  SO WHAT DID YOU DO AFTER YOU AND YOUR COLLEAGUES

7  ARRIVED AT THAT CONCLUSION?

8  **A.**   WHAT WE DID AFTER WE REACHED THAT CONCLUSION, WHAT

9  HAPPENED, PHILLIP HAWKINS AT THE TIME START ORDERING NEW

10 SWITCHES AND NEW PANELS.  AND DURING THAT MAJOR PROJECT, WHAT

11 WE DID, WE MOVED THE SWITCH BACK 30 FEET SO THE TRAIN WOULD

12 HAVE ROOM TO -- THE WHEELS OF THE LOCOMOTIVE WOULD HAVE ROOM TO

13 TURN SO IT WOULD STOP FROM DERAILMENT.  SO WE MOVED THE SWITCH

14 BACK 30 FEET, WENT AND INSTALLED NEW SWITCHES, NEW RAILS, NEW

15 PANELS, NEW TIES, AND THAT PRETTY MUCH CORRECTED THE PROBLEM.

16 **Q.**   AND DID YOU TAKE THE TRACK OUT OF SERVICE BEFORE DOING

17 THAT WORK?

18 **A.**   YES, I TOOK THE TRACK OUT OF SERVICE.  AND THE TRACK WAS

19 OUT OF SERVICE FOR PROBABLY THREE MONTHS.  AND THE REASON IT

20 WAS OUT OF SERVICE FOR THREE MONTHS WAS BECAUSE WE HAD TO GET

21 THE FUNDING AND THE MATERIAL TO FIX THE TRACK.

22 **Q.**   SO WHEN ABOUT WAS IT THAT YOU TOOK THAT TRACK OUT OF

23 SERVICE?

24 **A.**   IT WAS AROUND MARCH 2017, AROUND MARCH 28, 2017, THAT IS

25 WHEN DANNY JAQUESS -- WHEN I TOOK THE TRACK OUT OF SERVICE.

02:56 1    THAT'S THE TIME THAT -- WHEN HE CURSED ME, CURSED ME OUT FOR

2    TAKING THE TRACK OUT OF SERVICE.

3    **Q.**    DANNY, WHAT WAS HIS LAST NAME?

4    **A.**    J-A-C-Q-U-E-S-S.  IF I'M PRONOUNCING IT RIGHT.

5    **Q.**    OKAY.  AND WHAT WAS HIS POSITION?

6    **A.**    HE WAS THE DIRECTOR OF TRAIN OPERATIONS AT THE TIME.

7    **Q.**    AND WHAT DOES THAT MEAN?

8    **A.**    THAT HE WAS IN CHARGE OF THE TRANSPORTATION SIDE, MAKING

9    SURE THAT THE RIGHT CARS GET ON THE RIGHT TRAIN, MAKING SURE

10   THE CARS GOT TO THEIR CUSTOMERS.  SO HE WAS JUST THE

11   TRANSPORTATION MANAGER.  HE WAS THE HEAD TRANSPORTATION MANAGER

12   IN AVONDALE.  SO HE WAS JUST MAKING SURE THAT, YOU KNOW, THAT

13   WE WERE GETTING THE CARS TO THE CUSTOMERS IN A TIMELY MANNER.

14   **Q.**    AND YOU SAID THAT HE CURSED AT YOU.  WHAT DID HE SAY?  YOU

15   DON'T NEED TO USE ANY CURSE WORDS, BUT IF YOU COULD TELL ME

16   WHAT HE SAID WITHOUT DOING THAT.

17           **MS. SCHOONMAKER:**  OBJECTION.  HEARSAY.

18           **MR. SCHMIDT:**  THIS IS A UNION PACIFIC EMPLOYEE, YOUR

19   HONOR.  THIS IS A STATEMENT OF A PARTY OPPONENT.  IT IS NOT

20   HEARSAY.

21           **THE COURT:**  OVERRULED.

22                YOU CAN SAY WHAT HE SAID.

23   **A.**    YES.  WHEN I WAS EXPLAINING TO HIM WHY I TOOK THE TRACK

24   OUT OF SERVICE AND EVERYTHING, HE TOLD ME, YOU KNOW, WHY THE F

25   YOU DO THAT?  AND HE GOT TO CURSING AND I START WALKING OFF.

02:57 1  HE SAID, WHERE THE F YOU GOING?  I'M TALKING TO YOU.  I FELT

2  LIKE HE WAS BEING VERY UNPROFESSIONAL WHEN I WAS TRYING TO

3  EXPLAIN IT TO HIM.  SO THAT'S THE WORD HE WAS USING, THE F

4  WORD.

5  **BY MR. SCHMIDT:**

6  **Q.**    AND HOW DID THAT MAKE YOU FEEL?

7  **A.**    THAT MADE ME FEEL DEGRADED BECAUSE I WAS JUST TRYING TO

8  EXPLAIN TO HIM THAT, YOU KNOW, WE KEEP HAVING PROBLEMS HERE,

9  AND THE REASON I WAS TAKING IT OUT OF SERVICE WAS BECAUSE OF

10  THE SAFETY ISSUES, YOU KNOW, BECAUSE OF THE DERAILMENT.  AND HE

11  SHOWED ME A FILM OF ONE OF THE SWITCHMEN, THE TRAINMEN RIDING

12  ON THE LOCOMOTIVE WHEN IT DERAILED.  AND I WAS LOOKING LIKE,

13  OH, MY GOD, YOU KNOW, HE COULD HAVE EASILY FELL OFF.  SO I

14  SAID, WE GONNA HAVE TO DO SOMETHING ABOUT THIS.

15  **Q.**    YOU SAID THERE ARE SWITCHMEN RIDING ON THE LOCOMOTIVE?

16  **A.**    YES.  THEY USUALLY RIDE ON THE LOCOMOTIVES, ON THE SIDE OF

17  THE LOCOMOTIVE TO GET TO A TRACK.  AND WHEN THE LOCOMOTIVE

18  STOPPED, HE WOULD GET OFF AND SWITCH.  YOU KNOW, TO SWITCH THE

19  TRACK SO HE CAN GO DOWN A DIFFERENT TRACK.  AND HE SHOWED ME A

20  FILM HE WAS RIDING ON IT, AND IT SCARED ME TO DEATH.  I SAID,

21  OH.

22          YOU KNOW, SO I THOUGHT HE UNDERSTOOD WHERE I WAS

23  COMING FROM, YOU KNOW, WHEN I WAS TELLING HIM ABOUT, YOU KNOW,

24  THIS IS ONE OF OUR EMPLOYEES RIDING ON THAT LOCOMOTIVE.  WE GOT

25  TO MAKE SURE THAT THEY'RE SAFE.  SO WE NEED TO DO SOMETHING

02:59 1   ABOUT THIS TRACK.

2   **Q.**   ARE THERE FREQUENTLY SWITCHMEN RIDING ON THE LOCOMOTIVES?

3   **A.**   YES, THEY RIDE ON THE LOCOMOTIVES, AND THEY ALSO RIDE ON

4   THE CARS.

5   **Q.**   ALL RIGHT.  AND YOU SAID THERE HAD BEEN SOME DERAILMENTS

6   AT THIS LOCATION.  DO YOU KNOW ABOUT HOW MANY DERAILMENTS THERE

7   HAD BEEN AT THIS POINT IN TIME?

8   **A.**   THAT I CAN COUNT AT THAT SAME LOCATION?  ABOUT 20 OR MORE.

9   **Q.**   DID YOU THINK THAT YOU HAD ANY OTHER OPTIONS BESIDES

10   TAKING THE TRACK OUT OF SERVICE?

11   **A.**   NO, SIR, I DID NOT.  BECAUSE EVERYTHING WE TRIED DID NOT

12   WORK.  AND THEN WHEN I DID MY RESEARCH, I MEAN, THAT TRACK --

13   BECAUSE THE SWITCH WAS SO CLOSE TOGETHER, IT CAUSED AN

14   ALIGNMENT ISSUE, WHICH WAS A FEDERAL RAILROAD ADMINISTRATION

15   ALIGNMENT ISSUE, BEING OVER FIVE INCHES.  AND I HAD NO OTHER

16   CHOICE, BECAUSE THE ONLY THING THAT WAS GOING TO FIX IT THAT,

17   FROM MY STANDPOINT IN LOOKING AT IT, WAS TO MOVE THE SWITCHES

18   BACK.

19            **THE COURT:**  SIR, WHAT WAS THE TIME FRAME?  WHAT WAS

20   THE TIME FRAME OF THIS?  THE TIME FRAME OF YOU TAKING THIS

21   TRACK OUT OF SERVICE?

22            **THE WITNESS:**  WELL, WE HAD A DERAILMENT THAT DAY, ON

23   MARCH 28.

24            **THE COURT:**  OF WHAT YEAR?

25            **THE WITNESS:**  IT WAS 2017.

03:00 1          THE COURT:  OKAY.  THANKS.

2   BY MR. SCHMIDT:

3   Q.    ALL RIGHT.  I'D LIKE TO SHOW YOU WHAT'S BEEN MARKED AS

4   PLAINTIFF'S EXHIBIT 1, WHICH HAS NOT BEEN PREADMITTED.

5          ALL RIGHT, MR. TAYLOR.  CAN YOU IDENTIFY THIS

6   DOCUMENT FOR ME?

7   A.    THIS IS THE FEDERAL RAILROAD ADMINISTRATION TRACK SAFETY

8   STANDARD COMPLIANCE MANUAL.

9   Q.    ALL RIGHT.  AND WAS PART OF YOUR JOB AT UNION PACIFIC TO

10  BE FAMILIAR WITH THIS MANUAL?

11  A.    YES, IT WAS PART OF MY JOB TO BE FAMILIAR WITH THIS

12  MANUAL.  THAT IS CORRECT.

13  Q.    WERE YOU PROVIDED WITH THIS MANUAL BY UNION PACIFIC?

14  A.    YES.

15  Q.    DURING YOUR EMPLOYMENT THERE?

16  A.    YES.

17          MR. SCHMIDT:  YOUR HONOR, WE OFFER PLAINTIFF'S

18  EXHIBIT 1 INTO EVIDENCE.

19          MS. SCHOONMAKER:  YOUR HONOR, WE OBJECT ON THE

20  GROUNDS OF RELEVANCY.  I'M TRYING TO COUNT THE NUMBER OF PAGES,

21  BUT I CAN'T BELIEVE THAT ALL THOUSAND OR SO PAGES OF THIS

22  DOCUMENT COULD HAVE ANY BEARING ON THE CLAIMS IN THIS LAWSUIT.

23          THE COURT:  SO YOUR OBJECTION IS AS TO RELEVANCE?

24          MS. SCHOONMAKER:  YES.

25          THE COURT:  BASED ON THE LENGTH OF THE DOCUMENT?

03:01   1           HAVE YOU GOT CERTAIN PAGES THAT YOU'RE MOST

2  INTERESTED IN, MR. SCHMIDT?

3          **MR. SCHMIDT:**  YES, YOUR HONOR.  I DO HAVE CERTAIN

4  PAGES I WAS GOING TO ASK HIM ABOUT.

5          **THE COURT:**  DO YOU WANT TO PUT THE WHOLE DOCUMENT IN,

6  OR DO YOU WANT TO PUT IN CERTAIN PAGES?  YOU'RE MOVING THE

7  WHOLE DOCUMENT?

8          **MR. SCHMIDT:**  IF IT WOULD CURE DEFENDANT'S OBJECTION,

9  WE CAN CERTAINLY ONLY OFFER THE PAGES THAT I ASK HIM ABOUT.

10          **MS. SCHOONMAKER:**  THAT WOULD BE FINE, YOUR HONOR, IF

11  WE KNOW THE PAGES.

12          **THE COURT:**  ALL RIGHT.  LET'S GO TO THE PAGES THAT

13  YOU'RE INTERESTED IN, AND YOU CAN -- AND THEN YOU CAN MOVE

14  THOSE FOR ADMISSION.

15          **MR. SCHMIDT:**  ALL RIGHT.  CAN WE GO TO BATES

16  NO. PLF1136, WHICH IS PAGE 94 OF THE PDF.

17          **THE COURT:**  MR. SCHMIDT, DO YOU HAVE A LIST OF THEM,

18  YOU THINK?  BECAUSE WE COULD JUST DO IT ALL AT ONE TIME.  IT

19  DOESN'T SOUND LIKE THAT UNION PACIFIC IS GOING TO OBJECT.  AND

20  THAT WAY YOU DON'T HAVE TO PUBLISH EACH PAGE INDIVIDUALLY.

21          **MR. SCHMIDT:**  YOUR HONOR, IF I COULD HAVE JUST A

22  MOMENT TO MAKE SURE I GOT ALL THE PAGES?

23          **THE COURT:**  SURE.

24             WHY DON'T WE DO IT THIS WAY.  IF THERE'S NOT

25  GOING TO BE AN OBJECTION AS TO THE RELEVANT PORTIONS OF P-1,

03:03  1    I'LL ADMIT P-1, SUBJECT TO YOU SUBSTITUTING IT WITH JUST THE

       2    PAGES THAT YOU EXAMINE THE WITNESSES ON.

       3              **MS. SCHOONMAKER:**  THAT WOULD BE FINE, YOUR HONOR.  WE

       4    MIGHT WANT TO RESERVE OUR OBJECTION, THOUGH, TILL WE HEAR WHAT

       5    THE QUESTIONS ARE GOING TO BE ABOUT.  BUT WE'RE FINE.

       6              **THE COURT:**  WELL, THE OBJECTIONS TO THE QUESTIONS ARE

       7    FINE.

       8              **MS. SCHOONMAKER:**  SURE.

       9              **THE COURT:**  THE QUESTION IS:  ARE YOU GOING TO OBJECT

      10    TO THE ADMISSION OF P-1, THE PORTIONS THAT HE EXAMINES ON?

      11              **MS. SCHOONMAKER:**  NO, YOUR HONOR.

      12              **THE COURT:**  ALL RIGHT.  SO P-1 IS ADMITTED.  AND

      13    PLAINTIFF'S COUNSEL WILL SUBSTITUTE FOR THE RECORD THOSE PAGES

      14    THAT ARE GERMANE TO THIS CASE.

      15              **MR. SCHMIDT:**  YES, YOUR HONOR.

      16    **BY MR. SCHMIDT:**

      17    **Q.**   SO, MR. TAYLOR, ON THIS PAGE WE HAVE SECTION 213.5,

      18    RESPONSIBILITY FOR COMPLIANCE.  ARE YOU FAMILIAR WITH THIS

      19    SECTION OF THIS MANUAL?

      20    **A.**   YES, I AM.

      21    **Q.**   ALL RIGHT.  AND THE FIRST LINE OF THIS SECTION READS:

      22    "EXCEPT AS PROVIDED IN PARAGRAPH (B) OF THIS SECTION, ANY OWNER

      23    OF TRACK TO WHICH THIS PART APPLIES WHO KNOWS OR HAS NOTICE

      24    THAT THE TRACK DOES NOT COMPLY WITH THE REQUIREMENTS OF THIS

      25    PART, SHALL" -- END QUOTE.  AND THEN IT CONTINUES.

03:04   1              BUT WHEN IT REFERS TO AN "OWNER OF THE TRACK," CAN
         2   YOU TELL ME WHO THAT WOULD BE?
         3   **A.**   FROM MY UNDERSTANDING FROM UNION PACIFIC RAILROAD, THAT I
         4   WAS THE OWNER OF THE TRACK FOR THE LIVONIA SUB, THE MANAGER OF
         5   TRACK MAINTENANCE.
         6   **Q.**   AND WAS THERE ANYONE ELSE WHO WAS THE OWNER OF THE TRACK?
         7   **A.**   THE OWNER OF THE TRACK ALSO WAS NICHOLAS ISAAC -- WOULD BE
         8   PART OF, 'CAUSE HE DOES TRACK INSPECTIONS; AND JOSH BORDELON,
         9   HE DOES TRACK INSPECTIONS.  SO THAT WOULD BE THE OWNERS OF THE
        10   TRACKS, YES.
        11   **Q.**   OKAY.  SO THEY USE THE WORD "OWNER."  DOES THAT ACTUALLY
        12   MEAN THAT YOU OWN THE TRACK, OR IS IT JUST THE WORD THEY USE IN
        13   THIS MANUAL?
        14   **A.**   "OWNER" MEAN THAT WE ARE RESPONSIBLE FOR THAT TRACK.  WE
        15   ARE RESPONSIBLE FOR DERAILMENTS.  WE ARE RESPONSIBLE FOR
        16   MAINTAINING THE TRACK.  WE ARE RESPONSIBLE FOR INSPECTING THE
        17   TRACK AND MAKING SURE THAT IT'S IN FRA COMPLIANCE.
        18   **Q.**   AND WHAT ABOUT YOUR SUPERVISOR, THE DIRECTOR OF TRACK
        19   MAINTENANCE, WOULD THAT PERSON ALSO BE AN OWNER OF THE TRACK
        20   UNDER THIS SECTION?
        21   **A.**   THEY WOULD BE OWNER TOO.  BUT THE MTM TRACK INSPECTORS
        22   WOULD BE THE PRIMARY OWNERS OF THE TRACK.
        23   **Q.**   SO ON MARCH 28, 2017, AS OWNER OF THE TRACK, DID YOU
        24   DETERMINE THAT THE AVONDALE TAIL TRACK WAS NOT IN COMPLIANCE
        25   WITH FRA STANDARDS?

03:05 1    **A.**   THAT IS CORRECT.

2    **Q.**   TO YOUR UNDERSTANDING, DOES THAT MEAN THAT YOU WERE

3    REQUIRED TO CHOOSE BETWEEN THESE THREE OPTIONS LISTED IN THIS

4    SECTION?

5    **A.**   THAT IS CORRECT.

6    **Q.**   AND WHICH OPTION DID YOU CHOSE?

7    **A.**   HALT OPERATIONS OVER THE TRACK.

8    **Q.**   OR IN LAYMAN'S TERMS, REMOVE IT FROM SERVICE.  IS THAT

9    CORRECT?

10   **A.**   YES.  IN LAYMAN'S TERMS, TAKE THE TRACK OUT OF SERVICE,

11   YES.

12   **Q.**   OKAY.  SO YOU MADE THE REPAIRS.  YOU DESCRIBED THOSE TO ME

13   EARLIER.  YOU SAID THEY TOOK ABOUT THREE MONTHS.  SO DOES THAT

14   MEAN THEY WERE COMPLETED AROUND JUNE OF 2017?

15   **A.**   ACTUALLY, IT WAS COMPLETED AROUND THE END OF AUGUST OR

16   SEPTEMBER.  THAT'S WHEN WE GOT -- THAT'S WHEN WE HAD ALL THE

17   MATERIAL IN.  AND WE DID IT IN CONJUNCTION WITH SOME PROJECT

18   THAT WAS GOING ON IN THE PLANT IN AVONDALE.  SO IT TOOK US TO

19   MAKE THE REPAIRS TO THE TRACK MAYBE THREE DAYS TO COMPLETE AND

20   MAKE THE REPAIRS TO THE TRACK AFTER WE GOT ALL THE MATERIALS

21   IN.

22   **Q.**   AND SO WAS THAT THE FIRST TIME YOU TOOK A TRACK OUT OF

23   SERVICE AT UNION PACIFIC?

24   **A.**   NO.  WE TAKE TRACKS OUT OF SERVICE FREQUENTLY.  THE ONLY

25   DIFFERENCE IS THAT WE CAN REPAIR IT ONE -- IN A COUPLE OF HOURS

03:07 1  OR WE CAN REPAIR IT, YOU KNOW, IN A DAY.  AND THE OTHER

2  DIFFERENCE IS THAT I HAD THE MONEY IN MY BUDGET TO REPAIR THE

3  TRACK.

4           THAT PARTICULAR TRACK, THE TAIL TRACK, I DIDN'T HAVE

5  THE MONEY IN MY BUDGET TO REPAIR IT, SO THAT'S WHY I NEEDED

6  HELP FROM MY IMMEDIATE SUPERVISOR TO GET FUNDING TO REPAIR THE

7  TRACK, BECAUSE IT WAS OVER MY BUDGET.

8  **Q.**   AND WHO WAS THE IMMEDIATE SUPERVISOR AT THAT TIME?

9  **A.**   IT WOULD BE MARK OLDHAM.  HE WAS THE DIRECTOR, AND HE WAS

10  THE DIRECTOR AT THAT TIME.

11  **Q.**   SO WAS THIS THE FIRST TIME THAT YOU TOOK A TRACK OUT OF

12  SERVICE FOR MORE THAN A DAY?

13  **A.**   YES.  YES.  FOR MORE THAN A DAY, YES.

14  **Q.**   AND IT WAS OUT FOR APPROXIMATELY FIVE MONTHS?

15  **A.**   THREE MONTHS.  THREE MONTHS.  LET ME SEE.  MARCH, APRIL,

16  MAY, JUNE, JULY.  YES, FIVE MONTHS, MY CORRECTION.  YES, FIVE

17  MONTHS.

18  **Q.**   AND DO YOU RECALL INVESTIGATING ANOTHER DERAILMENT IN MAY

19  OF 2017?

20  **A.**   YES.  WE HAD A DERAILMENT ON THE WEST END -- I MEAN, THE

21  NORTH END OF THE AVONDALE YARD.  THE NORTH YARD, YES.

22  **Q.**   OKAY.  AND WHO DID YOU INVESTIGATE THAT DERAILMENT WITH?

23  **A.**   I INVESTIGATED IT WITH MARK OLDHAM.

24  **Q.**   AND WHAT DID YOU DETERMINE WAS THE CAUSE OF THE

25  DERAILMENT?

03:08 1   **A.**   WE DETERMINED THE CAUSE OF THE DERAILMENT WAS NOT TRACK

2   CAUSED AT THE TIME.  WE DETERMINED IT WASN'T TRACK CAUSED.  WE

3   SAID IT WAS HUMAN-FACTOR CAUSED.  SO WE DETERMINED IT WASN'T

4   BECAUSE OF THE TRACK, YES.

5   **Q.**   SO DO YOU RECALL EXACTLY WHAT THE CAUSE IS -- WAS, OTHER

6   THAN JUST THAT IT WAS HUMAN FACTOR?

7   **A.**   YES.  WHEN THEY WERE SWITCHING, THEY USUALLY DO NOT --

8   WHAT THEY CALL -- UNCOUPLE ON TOP OF THE SWITCH.  THEY USUALLY

9   DO IT IN TANGENT TRACK.  SO IN AVONDALE THEY DO WHAT THEY CALL

10   KICKING CARS.  IT'S WHEN A LOCOMOTIVE GET UP TO A CERTAIN SPEED

11   AND THEN THE TRAIN WOULD UNCOUPLE.  BUT, YOU KNOW, USUALLY THEY

12   DON'T UNCOUPLE IN A SWITCH.  THEY UNCOUPLE ON AN IN TANGENT

13   TRACK.  AND THEY ENDED UP UNCOUPLING IN THE SWITCH AND IT

14   CAUSED THE CAR TO JUMP OVER THE RAIL.

15   **Q.**   AND DID UNION PACIFIC REPORT THE CAUSE OF THIS DERAILMENT

16   TO THE FRA?

17   **A.**   YES, THEY DID.

18   **Q.**   OKAY.  AND HOW DO YOU HAVE KNOWLEDGE OF THAT REPORT?

19   **A.**   I HAVE KNOWLEDGE OF THE REPORT THAT YOU CAN GO ON THEIR

20   WEBSITE AND LOOK AT IT.  AND ALSO NICK ROPPOLO ASKED ME ABOUT

21   IT.  AND THAT'S HOW I GOT KNOWLEDGE OF IT.

22   **Q.**   OKAY.  WHAT DID NICK ROPPOLO ASK YOU ABOUT IT?

23   **A.**   HE ASKED ME WHAT THE CAUSE OF IT WAS, AND I TOLD HIM THAT,

24   YOU KNOW, THAT IT WAS NOT TRACK CAUSED, IT WAS HUMAN FACTOR.

25   BUT AT THE TIME, YOU KNOW, UNION PACIFIC RAILROAD DID LIST IT

03:10 1    AS HUMAN FACTOR -- I MEAN, EXCUSE ME -- TRACK CAUSED, TRACK

2    CAUSED.

3    **Q.**    AND WHEN WAS IT THAT YOU INFORMED MR. ROPOLLO OF THIS?

4    **A.**    IT HAD TO BE IN LATE MAY, AROUND THAT TIME, 'CAUSE I THINK

5    I WAS BACK OFF OF VACATION.  IT HAD TO BE LATE IN MAY OF 2017.

6    **Q.**    AND DID YOU EVER DISCUSS THIS REPORT THAT YOU MADE TO

7    MR. ROPOLLO WITH ANYONE AT UNION PACIFIC?

8    **A.**    YES, I DID DISCUSS IT.

9    **Q.**    WHO IS THAT?  SORRY.  WHO WAS IT THAT YOU DISCUSSED IT

10    WITH?

11    **A.**    OH, AT UNION PACIFIC?  YES, I DISCUSSED IT WITH DANNY

12    JAQUESS.  IF I'M PRONOUNCING HIS NAME RIGHT.  I DISCUSSED IT

13    WITH HIM.

14    **Q.**    OKAY.

15    **A.**    THE DIRECTOR OF TRAIN OPERATIONS, YES.

16    **Q.**    ANYBODY ELSE?

17    **A.**    I DISCUSSED IT WITH MARK OLDHAM, YOU KNOW.

18    **Q.**    YOUR SUPERVISOR?

19    **A.**    MY SUPERVISOR.  THAT IS CORRECT.

20    **Q.**    HOW DID MR. JAQUESS AND MR. OLDHAM REACT WHEN YOU TOLD

21    THEM THAT?

22    **A.**    MR. JAQUESS, HE SAID THAT THEY WEREN'T CHANGING THE CODE

23    FROM TRACK CAUSE TO HUMAN FACTOR.  AND MARK OLDHAM, HE REALLY

24    DIDN'T PURSUE IT.  I TOLD HIM ABOUT IT, BUT HE WAS KIND OF

25    NONCHALANT ABOUT IT.

03:11 1   Q.   SO DO YOU RECALL ANY DERAILMENTS OCCURRING IN OCTOBER OF

2   2017?

3   A.   YES.  OCTOBER OF 2017 WE HAD A DERAILMENT ON SWITCH 16 ON

4   THE -- THAT WOULD BE THE SOUTH END OF THE AVONDALE YARD;

5   SWITCH 16.

6   Q.   SOUTH END OF AVONDALE YARD?

7   A.   AVONDALE YARD, YES.

8   Q.   IS THAT NEARBY A COMMUNITY?

9   A.   YES, SWITCH 16 IS NEAR A COMMUNITY.  YOU GOT A HIGHWAY

10   THAT RUN, YOU KNOW, JUST -- I DON'T KNOW, MAYBE A THOUSAND FEET

11   FROM THE TRACK, YOU HAVE A HIGHWAY.  YOU HAVE A BIG PLANT

12   THAT'S THERE, YOU KNOW, WITH WORKERS THERE.  YOU KNOW, SO, YES,

13   IT WAS NEAR A COMMUNITY.  IT WAS NEAR CIVILIANS, YES.

14   Q.   ALL RIGHT.  SO WHAT DID YOU DO IN RESPONSE TO THAT

15   DERAILMENT?

16   A.   WELL, IN RESPONSE TO THAT DERAILMENT ON THAT PARTICULAR

17   DAY, WE WENT AND LOOKED AT IT, AND AT FIRST THEY SAY IT WAS THE

18   SWITCH POINT.  SO WE ENDED UP REPLACING THE SWITCH POINT AND

19   THE STOCK RAIL.

20   Q.   SORRY.  WHO SAID IT WAS THE SWITCH POINT?

21   A.   WE CAME TO A CONCLUSION.  IT WAS PHILLIP HAWKINS AND -- I

22   THINK IT WAS PHILLIP HAWKINS THAT CAME DOWN THERE THAT DAY, AND

23   WE LOOKED AT IT AND -- ALONG WITH DANNY.  AND HE SAID IT WAS

24   THE SWITCH POINT, AND WE ENDED UP REPLACING THE SWITCH POINT ON

25   THAT DERAILMENT.

03:13  1    **Q.**   AND HOW LONG DID THAT TAKE?

2    **A.**   TO REPLACE THE SWITCH POINT?  MAYBE THREE OR FOUR HOURS TO

3    REPAIR THE TRACK AND REPLACE THE SWITCH POINT.

4    **Q.**   AND SO WAS THE TRACK BACK IN SERVICE THE SAME DAY?

5    **A.**   YES.

6    **Q.**   AND ARE YOU FAMILIAR WITH KENNY STUART?

7    **A.**   YES.

8    **Q.**   AND CAN YOU TELL ME WHO HE IS?

9    **A.**   KENNY STUART WAS MY DIRECTOR OF TRACK MAINTENANCE AT THAT

10   TIME.

11   **Q.**   SO WAS HE YOUR DIRECTOR OF TRACK MAINTENANCE AFTER MARK

12   OLDHAM?

13   **A.**   YES.

14   **Q.**   AND ABOUT WHEN DID THAT CHANGE TAKE PLACE?

15   **A.**   OH, THAT CHANGE TOOK PLACE OCTOBER, THE FIRST OF OCTOBER.

16   **Q.**   OF 2017?

17   **A.**   '17.  THAT IS CORRECT, YEAH.

18   **Q.**   ALL RIGHT.  AND DID YOU PERFORM ANY WORK ON THE NO. 1

19   MAIN LINE TRACK IN AVONDALE, LOUISIANA, IN NOVEMBER OF 2017?

20   **A.**   YES.  THE FROG, THE FROG, YES.

21   **Q.**   OKAY.  AND CAN YOU TELL ME WHEN THAT WAS AND WHAT

22   HAPPENED?

23   **A.**   IT WAS AROUND NOVEMBER, THE FIRST OF NOVEMBER OF 2017.

24   WHEN THAT HAPPENED, THE FROG WAS NOT IN FRA COMPLIANCE, SO WE

25   HAD TO SHORTLY PULL THE MAIN LINE OUT OF SERVICE TO REPAIR THE

03:15 1  FROG.

2  **Q.**   OKAY.  SO WHAT IS THE "MAIN LINE"?

3  **A.**   OKAY.  THE MAIN LINE IS CONSIDERED A MAIN LINE BECAUSE IT

4  ONLY HAVE ONE-WAY TRAFFIC.  SO IT'S THE PART OF THE RAILROAD

5  THAT WOULD GET YOU FROM -- HAVE A TRAIN TO TRAVEL FROM AVONDALE

6  TO LIVONIA.  THEY TRAVEL ON THE MAIN LINE, THE NO. 1 MAIN LINE;

7  NO. 2 MAIN LINE; THE SINGLE MAIN LINE.  SO THEY HAD A TRACK --

8  THEY HAD A TRAIN COME OUT OF THE YARD AT AVONDALE AFTER BEING

9  BUILT AND TRAVEL TO LIVONIA TO THE HUMP YARD IN LIVONIA ON THE

10  MAIN LINE.

11  **Q.**   AND IS THAT A TRACK THAT GETS A LOT OF TRAFFIC?

12  **A.**   THAT'S A TRACK THAT GETS A LOT OF TRAFFIC.  AND THAT'S A

13  HIGH SPEED TRACK.  SO USUALLY THOSE TRACKS IS 60 MPH ON THOSE

14  TRACKS.

15  **Q.**   AND YOU USED THE WORD "FROG."  CAN YOU TELL ME WHAT A

16  "FROG" IS?

17  **A.**   A FROG IS LOCATED ON THE SWITCH, AND IT'S PART OF THE

18  TRANSITION TOO.  WHEN YOU LINE THE SWITCH, THE FROG HELP IT

19  TRANSFER FROM ONE SWITCH TO ANOTHER SWITCH.  SO IT'S PART OF

20  THE SWITCH, AND IT IS LOCATED, I WOULD SAY, IN THE MIDDLE OF

21  THE SWITCH.  AND IT HELP TO ALSO TRANSFER A TRAIN FROM TRACK A

22  TO TRACK B.

23  **Q.**   OKAY.  SO WHAT DID YOU DO -- I'M SORRY.  STRIKE THAT.

24       SO DID YOU TAKE THE TRACK OUT OF SERVICE TO PERFORM

25  THE WORK?

03:16 1   **A.**   YES.

2   **Q.**   AND FOR HOW LONG WAS IT OUT OF SERVICE?

3   **A.**   MAYBE TWO HOURS, AT THE MOST.

4   **Q.**   OKAY.  SO LESS THAN A DAY?

5   **A.**   YEAH, LESS THAN A DAY.

6   **Q.**   OKAY.  AND HOW DID UNION PACIFIC RESPOND, IF UNION PACIFIC

7   RESPONDED TO YOU TAKING THAT TRACK OUT OF SERVICE IN PERFORMING

8   THOSE REPAIRS?

9   **A.**   THAT IS WHEN KENNY STUART, MY DIRECTOR OF TRACK

10   MAINTENANCE, SAID IF I TAKE THE TRACK OUT OF SERVICE, YOU KNOW,

11   THAT HE WAS GONNA -- WELL, HE THREATENED TO FIRE ME.

12   **Q.**   CAN YOU EXPLAIN THAT?

13   **A.**   WELL, HE SAID, THAT, YOU KNOW, IF I TAKE THE TRACK OUT OF

14   SERVICE, YOU KNOW, THERE WOULD BE CONSEQUENCES ABOUT HAVING MY

15   JOB FOR TAKING THE TRACK OUT OF SERVICE.  YOU KNOW, EVEN THOUGH

16   I EXPLAINED TO HIM THAT THEY HAD A DEFECT AND, YOU KNOW, IT

17   DIDN'T TAKE LONG TO FIX.

18   **Q.**   ALL RIGHT.  AND WHAT WAS THE CONTEXT OF THIS CONVERSATION?

19   WAS IT A MEETING?  WAS IT A PHONE CALL?

20   **A.**   THE CONTEXT OF THE CONVERSATION WAS -- IT WAS OVER THE

21   CONFERENCE CALL.

22   **Q.**   A CONFERENCE CALL?

23   **A.**   YEAH, IT WAS OVER THE CONFERENCE CALL.

24   **Q.**   AND WHO ELSE WAS ON THE CALL?

25   **A.**   LET'S SEE IF I CAN REMEMBER THE MTMS BACK THEN.  IT'S BEEN

03:18 1   A WHILE.  SO I'M TRYING TO REMEMBER THE MTMS THAT WAS ON THE

2   CALL.  I KNOW --

3   **Q.**   IT'S OKAY IF YOU DON'T REMEMBER THE NAMES.

4   **A.**   YEAH.  YEAH.  YEAH.

5   **Q.**   BUT IT WAS YOU AND THE OTHER MTMS?

6   **A.**   OTHER MTMS, YES.

7   **Q.**   AND MR. STUART?

8   **A.**   AND MR. STUART, YES.

9   **Q.**   OKAY.  AND HOW MANY MTMS WERE THERE?

10   **A.**   I BELIEVE FOUR -- FOUR TO FIVE MTMS.

11   **Q.**   ALL RIGHT.  SO MR. STUART THREATENED TO FIRE YOU FOR

12   TAKING THE TRACK OUT OF SERVICE?

13   **A.**   YES.

14   **Q.**   AND HOW DID YOU RESPOND TO THAT?

15   **A.**   I RESPOND TO HIM WITH I QUOTED FRA REGULATIONS THAT, YOU

16   KNOW, IF THE FROG DON'T MEET THE STANDARD THAT, YOU KNOW, THE

17   REGULATIONS, FROM WHAT I UNDERSTOOD, HAD TO BE TAKEN OUT OF

18   SERVICE AND REPAIRED SO THAT A TRAIN CAN TRAVEL ACROSS IT

19   SAFELY WITHOUT DERAILMENT.

20   **Q.**   SO DID YOU DETERMINE THAT TAKING THE TRACK OUT OF SERVICE

21   WAS NECESSARY FOR SAFETY REASONS?

22   **A.**   YES.  FOR SAFETY REASONS, I DETERMINED TAKING THE TRACK

23   OUT OF SERVICE WAS NECESSARY -- TO TAKE IT OUT OF SERVICE TO DO

24   THE PROPER REPAIRS ON IT TO MAKE IT SAFE FOR TRAIN OPERATIONS.

25   **Q.**   AND ON THIS PHONE CALL, DID YOU HANG UP ON KENNY STUART?

03:19 1  **A.**   NO, SIR, I DID NOT.

2  **Q.**   AND WERE THERE ANY DERAILMENTS IN NOVEMBER OF 2017?

3  **A.**   YES.  THERE WERE TWO ON SWITCH 16.  THERE WERE TWO

4  DERAILMENTS.

5  **Q.**   AND WHEN WAS THE FIRST ONE?

6  **A.**   I WANT TO SAY IT WAS AROUND NOVEMBER 22, 2017.

7  **Q.**   DID YOU TAKE ANY PICTURES OF THAT DERAILMENT?

8  **A.**   YES, I DID.

9  **Q.**   ALL RIGHT.  I WOULD LIKE TO SHOW YOU PLAINTIFF'S

10  EXHIBIT 8, WHICH HAS NOT BEEN PREADMITTED.

11      SO DO YOU RECOGNIZE THESE PHOTOGRAPHS, MR. TAYLOR?

12  **A.**   YES, THAT'S THE DERAILMENT.  THAT'S THE SWITCH -- PART OF

13  SWITCH 16, THAT'S WHEN THE LOCOMOTIVE CAME OFF THE TRACK AND

14  THE -- YOU CAN SEE A TANK CAR.  I'M NOT FOR SURE WHAT THEY HAD

15  IN IT.  BUT THOSE ARE THE TANK CARS CARRYING HAZARDOUS

16  MATERIAL.  YOU CAN SEE THAT THE RAIL IS ROLLED OVER.  AND I

17  RECOGNIZE THE ONE POINTING THE FINGER IS DANNY JAQUESS.

18  **Q.**   OKAY.  SO DID YOU TAKE THIS PICTURE?

19  **A.**   YES.  WE'RE REQUIRED TO TAKE PICTURES OF DERAILMENTS TO

20  SEND IT TO OUR SUPERVISORS.  SO WE'RE REQUIRED TO TAKE THE

21  PICTURES OF IT, YES.

22  **Q.**   AND WHAT DID YOU TAKE THE PICTURE WITH?

23  **A.**   I TOOK THE PICTURE WITH A UNION PACIFIC RAILROAD-ISSUED

24  PHONE.  IT WAS AN IPHONE.

25  **Q.**   SO DOES THIS PHOTOGRAPH ACCURATELY DEPICT THE SCENE OF THE

03:21 1    DERAILMENT AT SWITCH 16 ON NOVEMBER 21, 2017?

2    **A.**   IT DOES.

3          **MR. SCHMIDT:**  ALL RIGHT, YOUR HONOR.  WE'D OFFER

4    PLAINTIFF'S EXHIBIT NO. 8 INTO EVIDENCE.

5          **MS. SCHOONMAKER:**  NO OBJECTION FROM DEFENDANT, YOUR

6    HONOR.

7          **THE COURT:**  ADMITTED.

8    **BY MR. SCHMIDT:**

9    **Q.**   ALL RIGHT.  SO YOU SAID THIS DERAILMENT WAS AT SWITCH 16.

10    IS THAT THE SAME LOCATION AS THE OCTOBER DERAILMENT?

11    **A.**   YES, SAME LOCATION.

12    **Q.**   SO IS THIS THE SECOND DERAILMENT AT SWITCH 16 WITHIN THE

13    COURSE OF A MONTH?

14    **A.**   YES, SIR, THAT IS CORRECT.

15    **Q.**   ALL RIGHT.  I WOULD LIKE TO SHOW YOU PLAINTIFF'S EXHIBIT

16    NO. 9, WHICH, AGAIN, IS NOT PREADMITTED.

17          ALL RIGHT.  AND DID YOU TAKE THIS PICTURE, SIR?

18    **A.**   YES.

19    **Q.**   WHAT DID YOU USE TO TAKE THIS PICTURE?

20    **A.**   I USED A UNION PACIFIC RAILROAD-ISSUED IPHONE TO TAKE THE

21    PICTURE.

22    **Q.**   MR. TAYLOR, I'M NOT SURE WHAT JUST HAPPENED, BUT YOUR

23    VOICE JUST BECAME MUFFLED.

24    **A.**   I SAID I USED A UNION PACIFIC RAILROAD-ISSUED IPHONE TO

25    TAKE IT -- TO TAKE THE PICTURE, SIR.

03:22 1  Q.   THANK YOU.

2            AND WHEN AND WHERE DID YOU TAKE THIS PICTURE?

3  A.   I TOOK THIS PICTURE AT AVONDALE -- AVONDALE AT SWITCH 16.

4  AVONDALE.

5  Q.   OKAY.  AND WHAT IS THE DATE OF THIS PICTURE?

6  A.   THE DATE SHOULD BE 11/22/2017.

7  Q.   AND SO DOES THIS PICTURE ACCURATELY REFLECT THE CONDITION

8  OF THE DERAILMENT AT SWITCH 16 ON THAT DATE?

9  A.   YES.

10           **MR. SCHMIDT:**  ALL RIGHT, YOUR HONOR.  WE'D OFFER

11  PLAINTIFF'S EXHIBIT NO. 9 INTO EVIDENCE.

12           **MS. SCHOONMAKER:**  NO OBJECTION, YOUR HONOR.

13           **THE COURT:**  ADMITTED.

14  BY MR. SCHMIDT:

15  Q.   AND WAS ANYBODY ON THE TRAIN AT THE TIME OF THIS

16  DERAILMENT?

17  A.   YES.  THEY WAS RIDING THE FRONT OF THE TRAIN.

18  Q.   WAS THAT PERSON INJURED?

19  A.   NO, HE WASN'T INJURED.  NO.

20  Q.   SO WHAT DID YOU DO IN RESPONSE TO THIS DERAILMENT?

21  A.   IN RESPONSE TO THIS DERAILMENT?  SO WHEN WE DID OUR

22  INVESTIGATION AGAIN, WE END UP SPIKE LINING THE SWITCH DURING

23  THIS DERAILMENT.  SO WE SPIKE LINED THE SWITCH DURING THIS

24  DERAILMENT.

25  Q.   AND WHAT IS THAT?

03:23  1   **A.**   HUH?

2   **Q.**   YOU'RE SAYING "SPIKE LINING."  CORRECT?

3   **A.**   RIGHT.

4   **Q.**   AND WHAT DOES THAT MEAN?

5   **A.**   SPIKE LINING THE SWITCH, IT'S BEHIND THE FROG TO THE OTHER

6   SWITCH.  THERE'S A RAIL ABOUT 30 FEET LONG.  SO WE TOOK THE

7   RAIL AND WE TRIED TO GET SOME OF THE ALIGNMENT OUT BY SPIKE

8   LINING IT, BY MOVING IT OVER TO THE RIGHT OR MOVING IT OVER TO

9   THE LEFT, TO TRY TO ADJUST IT, YOU KNOW, TO GET THE ALIGNMENT

10   OUT TO SEE WOULD THAT PREVENT DERAILMENTS FROM OCCURRING THERE.

11   **Q.**   AND HOW LONG DID IT TAKE TO PERFORM THOSE REPAIRS?

12   **A.**   WE FINISHED IN A DAY.

13   **Q.**   AND DID YOU DO ANYTHING ELSE IN RESPONSE TO THIS

14   PARTICULAR DERAILMENT?

15   **A.**   WE SPIKE LINED IT.  THAT WAS THE MAJOR THING THAT WE DID.

16   WE SPIKE LINED THE SWITCH, THE RAIL BEHIND THE FROG.

17   **Q.**   DID YOU TAKE ANY MEASUREMENTS?

18   **A.**   YES, WE TOOK MEASUREMENTS.

19   **Q.**   AND WHEN DID YOU TAKE MEASUREMENTS?

20   **A.**   WE TOOK MEASUREMENTS AFTER WE FIXED THE TRACK.  IT WAS ON

21   NOVEMBER 24 THAT WE TOOK MEASUREMENTS.  AND WHAT I DID WAS --

22   WE KEPT HAVING DERAILMENTS THERE, SO I DID MORE RESEARCH.  SO I

23   LOOKED AT THE SWITCH, AND I TOOK MEASUREMENTS TO DETERMINE WHAT

24   WAS THE SIZE OF THE SWITCH.  AND COME TO FIND OUT THAT WAS A

25   NO. 7 SWITCH.  SO I TOOK MEASUREMENTS TO SHOW THAT THE NO. 7

03:25 1    SWITCH HAD A DEGREE OF CURVATURE OF 30 DEGREES, AND IT WAS

2    CAUSING SEVERE ALIGNMENT.

3         SO ON THE 24TH I TOOK A MEASUREMENT OF THIS SWITCH.

4    AND IT WAS BECAUSE KENNY STUART, YOU KNOW, TOLD ME TO TAKE

5    MEASUREMENTS AND GIVE IT -- AND SEND AN EMAIL TO HIM, SO THAT'S

6    WHAT I DID.

7    **Q.**   OKAY.  SO ON NOVEMBER 21 IS THE DERAILMENT.  YOU MAKE THE

8    REPAIRS, GET THE TRACK BACK UP AND RUNNING.  AND THEN THREE

9    DAYS LATER, ON THE 24TH, YOU PERFORM THESE MEASUREMENTS?

10   **A.**   YES.

11   **Q.**   AND CAN YOU EXPLAIN IN THE MOST BASIC TERMS THAT YOU CAN

12   WHAT THOSE MEASUREMENTS SHOWED?

13   **A.**   IN BASIC TERMS, THE MEASUREMENTS SHOWED THE ALIGNMENT.  SO

14   ON A SWITCH, THE LOWER THE NUMBER, THE GREATER DEGREE OF

15   CURVATURE FROM THE SWITCH POINT TO THE FROG.  SO A NO. 7 SWITCH

16   WOULD HAVE MORE DEGREE OF A CURVATURE THAN A NO. 9 SWITCH.

17        FOR INSTANCE, A NO. 7 SWITCH MIGHT HAVE CLOSE TO

18   30 DEGREES OF CURVATIVE COMPARED TO A NO. 9 SWITCH MIGHT HAVE

19   8 DEGREES.  SO THAT MAKE A BIG DIFFERENCE WHEN IT COME TO

20   ALIGNMENT.

21        SO I TOOK THE MEASUREMENT TO SHOW THE ALIGNMENT IN

22   THE SWITCH AND TO SHOW THAT THE ALIGNMENT IN THE SWITCH DID NOT

23   MET THE SPECIFICATION OF THE TRAINS THAT WERE GOING ACROSS THE

24   TRACK.

25   **Q.**   SO AM I UNDERSTANDING CORRECTLY, THAT THERE WAS TOO MUCH

03:27 1    CURVATURE IN THE TRACK FOR THE TRAINS THAT WERE GOING ACROSS

2    IT?

3    **A.**   YES.

4    **Q.**   THANK YOU.

5          ALL RIGHT.  SO WHAT DID YOU DO WITH THOSE

6    MEASUREMENTS ONCE YOU TOOK THEM?

7    **A.**   I SUBMITTED IT TO KENNY STUART.

8    **Q.**   AND HOW LONG DID IT TAKE YOU TO PERFORM THE MEASUREMENTS?

9    **A.**   THREE HOURS OR MORE, 'CAUSE I MUST HAVE MEASURED LIKE TEN

10   TIMES, YOU KNOW, JUST TO MAKE SURE I WAS DOING IT CORRECTLY.  I

11   WANTED TO MAKE SURE I WAS DOING IT CORRECTLY.  SO IT TOOK ME

12   ABOUT TWO AND A HALF TO THREE HOURS TO DO THE MEASUREMENTS.

13   **Q.**   DID YOU SAY YOU RECHECKED THEM TEN TIMES?

14   **A.**   YES, SIR.

15   **Q.**   OKAY.  WHO WAS PRESENT WHEN YOU DID THOSE MEASUREMENTS?

16   **A.**   NICK ISAAC WAS PRESENT WITH ME WHEN I DID THOSE

17   MEASUREMENTS.

18   **Q.**   NICK ISAAC, THE TRACK INSPECTOR?

19   **A.**   THAT IS CORRECT, SIR.

20   **Q.**   ALL RIGHT.  AND WAS THE TRACK IN SERVICE WHEN YOU

21   PERFORMED THOSE MEASUREMENTS?

22   **A.**   YES, IT WAS IN SERVICE.  YES.

23   **Q.**   OKAY.  I WOULD LIKE TO SHOW YOU PLAINTIFF'S EXHIBIT

24   NO. 10, WHICH HAS BEEN PREADMITTED.

25          ALL RIGHT.  AND CAN YOU TELL ME WHAT THIS DOCUMENT

03:28 1   IS, SIR?  SORRY.

2          **MR. SCHMIDT:**  LET'S SCROLL THROUGH THE DOCUMENT.  CAN

3   WE GO BACK UP TO THE LAST PAGE OF THE EMAIL.

4   **BY MR. SCHMIDT:**

5   **Q.**   ALL RIGHT.  CAN YOU TELL ME WHAT THIS IS, SIR?

6   **A.**   THIS IS THE INFORMATION THAT I SENT TO KENNY STUART, CLIFF

7   BOWMAN, DANIEL JAQUESS, AND NICK ISAAC, THE MEASUREMENT OF THE

8   SWITCH 16.

9   **Q.**   OKAY.  AND THIS IS BASED ON THE MEASUREMENTS THAT YOU TOOK

10  THAT SAME DAY, ON NOVEMBER 24?

11  **A.**   YES, SIR.

12         **MR. SCHMIDT:**  OKAY.  LET'S SCROLL DOWN TO THE NEXT

13  PAGE.  I'M SORRY.  THE NEXT ONE.  NO, THE NEXT ONE AFTER THAT.

14  **BY MR. SCHMIDT:**

15  **Q.**   ALL RIGHT.  AND CAN YOU TELL ME WHAT THESE PICTURES ARE?

16  **A.**   THAT IS THE PICTURE OF SWITCH 18 -- 16 SWITCH.  THAT'S THE

17  PICTURE I TOOK, ALONG WITH MY MEASUREMENTS.

18  **Q.**   OKAY.  AND THIS THING RIGHT ABOVE THE PAGE NUMBER, WHAT IS

19  THAT?

20  **A.**   OH, THAT'S THE SWITCH STAND; THAT'S WHAT I WAS SAYING.

21  THE TRAINMEN, OR ANYBODY, CAN TAKE THAT SWITCH STAND BY THE

22  HAND, MOVE IT, AND IT WOULD MOVE THE TRACK.  SO YOU CAN GO DOWN

23  EITHER TRACK 16 -- I THINK IT'S 15 OR 16 OR 17, YEAH.

24  **Q.**   OKAY.  AND THESE PICTURES WERE ATTACHED TO THAT EMAIL?

25  **A.**   YES.

03:30  1          **MR. SCHMIDT:**   AND CAN WE GO DOWN TO THE NEXT PAGE,

2      PLEASE.  AND THE NEXT ONE.

3      **BY MR. SCHMIDT:**

4      **Q.**   IF YOU COULD TELL ME WHAT THIS CHART IS.

5      **A.**   YES.  SERIES 1 IS THE EXISTING ALIGNMENT.  AND SERIES 2 IS

6      WHERE THE ALIGNMENT NEED TO BE.

7      **Q.**   OKAY.  SO THE BLUE LINE ON THIS GRAPH SHOWS WHERE THE

8      ALIGNMENT ACTUALLY WAS?

9      **A.**   UH-HUH.

10     **Q.**   AND THE RED SHOWS WHAT IT SHOULD HAVE BEEN?

11     **A.**   YES.

12     **Q.**   OKAY.  SO CAN YOU INTERPRET THIS CHART FOR ME, JUST TELL

13     ME WHAT IT MEANS.

14     **A.**   IF YOU SCROLL UP, THAT'S THE NEXT PAGE.  OKAY.  WHAT IT

15     SPIKED UP TO ON THE BLUE LINE, YOU HAVE A 20.5 DEGREES.  AND

16     THEN YOU HAVE WHERE IT WENT TO 13.5.  AND THEN YOU SEE WHEN IT

17     WENT DOWN, IT WAS DOWN TO 4.  THEN IT WENT BACK UP TO 32.  SO

18     THOSE ARE THE DEGREES OF CURVATIVE.  AND WHAT YOU WANT, YOU

19     WANT YOUR NUMBERS TO BE MORE CLOSE TOGETHER.

20          FOR INSTANCE, YOU WANT THAT 4 TO BE AS CLOSE TO 32 --

21     28 AS POSSIBLE.  SO THE ALIGNMENT WAS OFF BECAUSE GOING THROUGH

22     THAT CURVE, IT WAS GOING TO A 1, IT'S A 25-DEGREE CURVATURE.

23     THEN ALL OF A SUDDEN IT WENT TO A 4-DEGREE CURVATURE.  THEN ALL

24     OF SUDDEN IT JUMPED UP TO 30.5-DEGREE CURVATURE.  THEN ALL OF A

25     SUDDEN, YOU KNOW, IT WENT BACK TO 4.  THEN IT JUMPED BACK UP TO

03:31 1    32.  SO IT SHOULD BE MORE OF SMOOTH ONE, LIKE THE RED LINE.

2    IT'S LIKE THE RED LINE DOESN'T SPIKE AS MUCH AS THE BLUE ONE.

3    IT'S MORE UNIFORM.

4    **Q.**   AND IS THAT DANGEROUS?

5    **A.**   YES, THAT CAUSE ALIGNMENT IN THE TRACK.  ERRATIC ALIGNMENT

6    IS WHAT CAUSE THE WHEELS TO JUMP OVER THE RAIL AND DERAIL.

7          **MR. SCHMIDT:**  ALL RIGHT.  LET'S MOVE BACK UP TO THAT

8    LAST EMAIL, PLEASE.

9    **BY MR. SCHMIDT:**

10   **Q.**   SO THE SECOND ITEM ON THIS LIST, THE LAST SENTENCE OF THAT

11   READS:  "THE MAXIMUM CURVE VALUE THAT I WAS FOUND WAS

12   19 DEGREES FOR 4-AXLE LOCOMOTIVES."

13          CAN YOU TELL ME WHAT THAT MEANS?

14   **A.**   YES.  I HAD A COPY OF THE LOCOMOTIVE SPECS FOR DIFFERENT

15   LOCOMOTIVES THEY WAS USING IN THE YARD.  SO I WAS LOOKING

16   THROUGH THEY SPECS TO SEE WHAT THE DEGREE OF CURVATURE THAT

17   THEY CAN SAFELY NAVIGATE THROUGH WITHOUT DERAILING.

18          SO WHAT I FOUND THAT THE MAXIMUM CURVE VALUE I FOUND

19   IN ONE LOCOMOTIVE WAS 19 DEGREES.  AND THE REST OF THEM WAS

20   16 DEGREES.  SO THE DEGREE OF CURVATURES WAS UP TO

21   32.5 DEGREES, AND THAT WAS THE MAXIMUM.  SO THAT 19-DEGREE

22   CURVATURE FOR THE 4-AXLE LOCOMOTIVE, YOU KNOW, IT'S -- WOULD

23   MAKE IT DIFFICULT FOR IT TO GO THROUGH SOMETHING THAT CURVES

24   32.5 DEGREES.

25   **Q.**   OKAY.  AND NO. 3, WHAT DOES IT MEAN THAT "THE SPREAD

03:33 1   BEHIND THE FROG OF SWITCH 18 WAS PURPOSELY SPIKED OUT OF

2   COMPLIANCE"?

3   **A.**   WHAT THAT MEAN IS THAT THEY LAID THE SWITCH IN A CURVE,

4   ALL RIGHT.  SO SINCE THE SWITCH WAS LAID IN A CURVE, THEY

5   COULDN'T FOLLOW THE U.P. TRACK DRAWING STANDARDS FOR SPIKE

6   LINING THE SWITCH, BECAUSE IF THEY DID IT COULD CONNECT TO THE

7   OTHER TRACK THAT GOES TO TRACKS 15 AND 16.  SO THEY HAD TO

8   INTENTIONALLY PUT MORE CURVATURE IN THE RAIL -- BEHIND THE RAIL

9   TO MAKE IT CONNECT TO TRACKS 15 AND 16.  IT'S JUST THE WAY THE

10  YARD WAS DESIGNED.

11  **Q.**   AND WHEN YOU SAY "OUT OF COMPLIANCE," DOES THAT MEAN --

12  COMPLIANCE WITH WHAT?

13  **A.**   IT'S A TRACK MAINTENANCE STANDARDS --

14  **Q.**   OKAY.

15  **A.**   -- THAT UNION PACIFIC HAS.  IT'S DRAWINGS.  AND IT TELLS

16  YOU WHAT THE SPIKE LINE DEGREE IS SUPPOSED TO BE OF A SWITCH.

17  SO IT GIVE YOU A DRAWING, AND YOU CAN USE THAT DRAWING TO BRING

18  IT BACK IN COMPLIANCE.

19         SO EVERY SWITCH HAVE A DRAWING THAT U.P. HAD TO SHOW

20  YOU HOW THE SPIKE LINE SHOULD BE DONE FROM BEHIND THE FROG OF

21  THE SWITCH.  I WAS GOING OFF THE DRAWING FROM A NO. 7 SWITCH,

22  AND IT DIDN'T MATCH UP WITH THE STANDARD, THE TRACK STANDARD.

23  **Q.**   AND THESE STANDARDS THAT YOU MENTIONED, ARE THEY UNION

24  PACIFIC STANDARDS OR FRA STANDARDS?

25  **A.**   THEY ARE UNION PACIFIC RAILROAD DESIGN STANDARDS FROM

03:34 1  SPECS FROM THE COMPANY WHEN THEY DESIGN THE SWITCH.  SO EVERY

2  SWITCH HAVE A SPECIFIC DESIGN THAT THEY HAVE SO THAT TRAIN CAN

3  SAFELY PASS THROUGH THEM.

4  **Q.**   SO AM I CORRECT IN UNDERSTANDING THAT EVERYTHING IN THIS

5  EMAIL -- THESE 1, 2, 3 -- THAT ALL HAS TO DO WITH THE ALIGNMENT

6  OF THE TRACK?

7  **A.**   THAT IS CORRECT.

8  **Q.**   OKAY.  I WOULD LIKE TO SHOW YOU PLAINTIFF'S EXHIBIT

9  NO. 11, WHICH HAS BEEN PREADMITTED.

10          AND CAN YOU TELL ME WHAT THIS EMAIL IS AT THE TOP OF

11  THE PAGE HERE, SIR?

12  **A.**   THAT WAS DANNY JAQUESS EMAILING.  AND HE SAYS:  "AS OF

13  APPROXIMATELY 0030, WE ARE ON THE GROUND AGAIN AT THE SAME SPOT

14  WITH LIGHT POWER."

15  **Q.**   SO WHAT DOES THAT MEAN, THAT FIRST SENTENCE?

16  **A.**   THAT MEAN THAT THERE WAS A DERAILMENT AND THE TRAIN CAME

17  OFF THE TRACK AT SWITCH 16 AGAIN.

18  **Q.**   AND WHAT'S THE DATE OF THIS?

19  **A.**   11/27/2017.

20  **Q.**   AND SO THIS WAS THREE DAYS AFTER YOUR MEASUREMENTS?

21  **A.**   YES.

22  **Q.**   AND HOW MANY DERAILMENTS IS THIS NOW AT SWITCH 16?

23  **A.**   THAT'S THE THIRD ONE.

24  **Q.**   SINCE WHEN?

25  **A.**   OCTOBER.

03:36 1    Q.    OKAY.

2    A.    YEAH.

3    Q.    SO LESS THAN TWO MONTHS?

4    A.    LESS THAN TWO MONTHS, THAT IS CORRECT.

5    Q.    ALL RIGHT.  THE NEXT SENTENCE:  "WE NEED TO MEET IN

6    AVONDALE TOMORROW AND DISCUSS OPTIONS THAT DON'T INVOLVE

7    REMOVING THE YARD FROM SERVICE OR SAYING WE CAN'T RUN ENGINES

8    THROUGH THE AREA."

9            HOW DID IT MAKE YOU FEEL TO READ THAT SENTENCE?

10   A.    I FELT VERY NERVOUS READING THAT BECAUSE HE BASICALLY WAS

11   TAKING AWAY THE OPTION OF TAKING THE TRACK OUT OF SERVICE AND

12   RESTRICTING CERTAIN LOCOMOTIVES FROM GOING THROUGH THAT TRACK.

13   SO HE WAS RESTRICTING SOME OF THE OPTIONS I HAVE FOR

14   REMEDIATING THE TRACK.

15   Q.    WHEN YOU SAY YOU WERE "NERVOUS," WERE YOU SCARED OF

16   ANYTHING IN PARTICULAR HAPPENING?

17   A.    YES.  YOU KNOW, I WAS SCARED OF, YOU KNOW, IF IT CAME DOWN

18   TO TAKING THAT TRACK OUT OF SERVICE, THAT, YOU KNOW, I MIGHT

19   END UP GETTING FIRED, YOU KNOW.  SO I WAS NERVOUS ABOUT THAT

20   'CAUSE HE STATED THAT, YOU KNOW, THAT OPTION WAS OFF THE TABLE.

21   SO THAT'S WHY I WAS NERVOUS ABOUT MY JOB.

22   Q.    COULD YOU MOVE A LITTLE CLOSER TO THE MICROPHONE FOR THE

23   NEXT ANSWER?

24   A.    YES.

25   Q.    THANK YOU.

03:38   1              **THE COURT:**  MR. SCHMIDT, WE'RE GOING TO TAKE ABOUT A

2   15-MINUTE RECESS, LET EVERYBODY STRETCH THEIR LEGS, IF THIS IS

3   A GOOD STOPPING POINT?  IT SEEMED LIKE YOU WERE --

4              **MR. SCHMIDT:**  THIS IS A FINE STOPPING POINT, YOUR

5   HONOR.

6              **THE COURT:**  ALL RIGHT.

7              **MR. SCHMIDT:**  THANK YOU.

8              **THE COURT:**  OKAY, LADIES AND GENTLEMEN.  WE'LL TAKE

9   ABOUT A 15-MINUTE RECESS.  WE'LL COME BACK AT 3:25.

10              **THE DEPUTY CLERK:**  THE CLOCK IS WRONG.

11              **THE COURT:**  OKAY.  SO WE WILL BACK HERE AT 4:00.

12              **(WHEREUPON, THE JURY EXITED THE COURTROOM.)**

13              **THE COURT:**  THE COURT WILL BE IN RECESS.

14              **(WHEREUPON, THE COURT WAS IN RECESS.)**

15              **THE COURT:**  BRING IN THE JURY.

16                  WE ARE GOING TO GO UNTIL ABOUT 5:15.

17                  HOW MUCH LONGER DO YOU THINK YOU HAVE,

18   MR. SCHMIDT?

19              **MR. SCHMIDT:**  IT'S HARD TO SAY, YOUR HONOR.  I WOULD

20   HOPE TO BE DONE BY THEN.

21              **THE COURT:**  OKAY.  LET'S SEE IF WE CAN FINISH IT UP,

22   AND THAT WAY WE CAN TAKE A BREAK AT A LOGICAL SPOT.

23              **(WHEREUPON, THE JURY ENTERED THE COURTROOM.)**

24              **THE COURT:**  ALL RIGHT.  BE SEATED.

25                  OKAY.  WE ARE GOING TO ATTEMPT TO GET THROUGH

04:04 1  THE DIRECT EXAMINATION OF MR. TAYLOR.  COUNSEL TELLS THE COURT

2  THAT HE THINKS HE WILL BE DONE BY 5:00 OR 5:15, SO KEEP YOUR

3  FINGERS CROSSED.

4  MR. SCHMIDT, YOUR WITNESS.

5  **MR. SCHMIDT:**  THANK YOU, YOUR HONOR.

6  **BY MR. SCHMIDT:**

7  **Q.**  ALL RIGHT, MR. TAYLOR.  DID YOU TAKE ANY PHOTOGRAPHS OF

8  THE NOVEMBER 27, 2017 DERAILMENT?

9  **A.**  YES.  I BELIEVE I TOOK SOME PHOTOGRAPHS, YES.

10  **Q.**  ALL RIGHT.  I'D LIKE TO SHOW YOU PLAINTIFF'S EXHIBIT

11  NO. 12, WHICH IS NOT PREADMITTED.

12  ALL RIGHT, MR. TAYLOR.  DID YOU TAKE THIS PHOTOGRAPH?

13  **A.**  YES, I DID.

14  **Q.**  AND DID YOU TAKE IT WITH YOUR COMPANY PHONE?

15  **A.**  YES, SIR.

16  **Q.**  AND WHAT DOES IT SHOW?

17  **A.**  IT SHOWS THAT THE LOCOMOTIVE DERAILED AGAIN AT SWITCH 16.

18  **Q.**  SO THIS WAS TAKEN AT SWITCH 16?

19  **A.**  YES.

20  **Q.**  AND WHAT IS THE DATE OF THIS PHOTOGRAPH?

21  **A.**  NOVEMBER 27, 2017.

22  **MR. SCHMIDT:**  ALL RIGHT, YOUR HONOR.  WE'D OFFER

23  PLAINTIFF'S EXHIBIT 12 INTO EVIDENCE.

24  **MS. SCHOONMAKER:**  NO OBJECTIONS, YOUR HONOR.

25  **THE COURT:**  ADMITTED.

04:05 1   BY MR. SCHMIDT:

2   **Q.**   AND WAS A SWITCHMAN RIDING THIS LOCOMOTIVE AT THE TIME OF

3   THE DERAILMENT?

4   **A.**   I DON'T KNOW IF A SWITCHMAN WAS RIDING THIS AT THIS TIME

5   OF THE DERAILMENT.  I'M NOT FOR SURE.

6   **Q.**   OKAY.  AND DID YOU INVESTIGATE THE CAUSE OF THIS

7   DERAILMENT?

8   **A.**   YES, I DID.

9   **Q.**   WHEN?

10   **A.**   NOVEMBER 27 I INVESTIGATED THIS CAR DERAILMENT.  YEAH,

11   NOVEMBER 27.  YES.

12   **Q.**   ALL RIGHT.  DID YOU INVESTIGATE IT WITH ANYBODY ELSE?

13   **A.**   YES.  KENNY STUART WAS THERE.  PHILLIP HAWKINS WAS THERE.

14   DANNY JAQUESS WAS THERE, AND ALSO DARIN MUSICK.  IF I'M

15   PRONOUNCING HIS NAME CORRECTLY.

16   **Q.**   AND WHAT DID YOU DETERMINE THE CAUSE OF THE DERAILMENT TO

17   BE?

18   **A.**   I WAS THINKING IT WOULD BE ALIGNMENT WITH THE SWITCH -- I

19   MEAN, WITH SWITCH 16.

20   **Q.**   DID THE REST OF THE TEAM AGREE WITH YOU?

21   **A.**   NO, THEY DID NOT.

22   **Q.**   WHAT DID THEY THINK THE CAUSE OF THE DERAILMENT WAS?

23   **A.**   THEY SAID THE DERAILMENT WAS CAUSED BY A LOCOMOTIVE

24   SNUBBING THAT WAS DEFECTIVE.

25   **Q.**   AND SO WHAT DID YOU DO?

04:06  1    **A.**   WELL, SINCE THEY DETERMINED THAT IT WAS THE LOCOMOTIVE WAS
       2    THE CAUSE OF THE DERAILMENT, WE REPAIRED THE TRACK.  WE SPIKE
       3    LINED IT AGAIN, AND WE PUT IT BACK IN SERVICE.
       4    **Q.**   ALL RIGHT.  I'D LIKE TO SHOW YOU EXHIBIT -- PLAINTIFF'S
       5    EXHIBIT NO. 15, WHICH HAS BEEN PREADMITTED.
       6         AND CAN YOU TELL ME WHAT THIS DOCUMENT IS, SIR?
       7    **A.**   THIS IS A DOCUMENT FROM PHIL -- FROM KENNY STUART -- NO,
       8    PHILLIP HAWKINS TO KENNY STUART.
       9         **MR. SCHMIDT:**  CAN WE SCROLL DOWN A LITTLE BIT?
      10    **BY MR. SCHMIDT:**
      11    **Q.**   THIS EMAIL AT THE BOTTOM IS AN EMAIL FROM YOU.  CORRECT?
      12    **A.**   YES, THAT IS CORRECT.
      13         **MR. SCHMIDT:**  OKAY.  CAN WE SCROLL DOWN TO WHERE WE
      14    CAN SEE THIS WHOLE EMAIL?
      15    **BY MR. SCHMIDT:**
      16    **Q.**   CAN YOU TELL ME WHAT YOU'RE SAYING IN THIS EMAIL, IN
      17    LAYMAN'S TERMS?
      18    **A.**   IN LAYMAN TERMS, I WAS ASKING KENNY STUART TO -- IS IT
      19    POSSIBLE THAT WE CAN APPLY WITH THE FEDERAL RAILROAD
      20    ADMINISTRATION TO MAKE THIS FRA-EXCEPTED TRACK.  AND THEN IF IT
      21    MADE IT FRA-EXCEPTED TRACK, WE CAN SAFELY RUN TRAINS OVER IT SO
      22    I WOULDN'T HAVE TO -- 'CAUSE WHAT WE HAD, WE HAD A RAIL THAT
      23    WAS ENCASED IN CONCRETE.  AND IN ORDER TO FIX IT, YOU HAD TO
      24    RIP UP ALL THE CONCRETE.  HOWEVER, IF WE MADE IT FRA-EXCEPTED
      25    TRACK, IT WOULD STILL MEET FRA STANDARDS AND SAFE FOR CARS TO

04:08 1   GO OVER IT, AND THEY CAN KEEP THE TRACK IN SERVICE.

2   **Q.**    OKAY.  SO "EXCEPTED TRACK" MEANS THAT ONLY CERTAIN TYPE OF

3   CARS CAN GO OVER THE TRACK?

4   **A.**    THAT IS CORRECT.

5   **Q.**    BECAUSE IT'S NOT SAFE FOR CERTAIN OTHER CARS?

6   **A.**    THAT IS CORRECT.

7   **Q.**    OKAY.  SO YOUR REASONS FOR REQUESTING THAT THESE TRACKS BE

8   MADE FOR EXCEPTED TRACK, WERE THEY RELATED TO SAFETY?

9   **A.**    THEY WERE RELATED TO SAFETY.  THAT IS CORRECT, YES.

10           **MR. SCHMIDT:**  OKAY.  AND LET'S SCROLL UP A LITTLE

11   BIT.

12   **BY MR. SCHMIDT:**

13   **Q.**    AND THEN CAN YOU READ WHAT KENNETH STUART'S RESPONSE WAS

14   ON DECEMBER 22?

15   **A.**    HE SAID:  "WHY WOULD WE MAKE THESE EXCEPTED TRACK?  WHAT

16   BENEFIT DOES IT HAVE TO US?"

17   **Q.**    HOW DID YOU FEEL ABOUT YOUR SUPERVISOR MAKING THIS

18   STATEMENT?

19   **A.**    IT DISTURBED ME A LITTLE.  BECAUSE, YOU KNOW, HE SAYING

20   WHAT MAKE IT BENEFIT TO US?  THE BENEFIT WOULD BE THAT, YOU

21   KNOW, IT WOULD STILL -- WOULD MAKE THE TRACK SAFE AND IT

22   WOULD'VE BEEN IN SERVICE.  AND I DIDN'T UNDERSTAND WHY HE HAD

23   EXCEPTION TO IT, YOU KNOW, OF DOING THAT.  I MEAN, IT WOULD

24   HAVE BEEN SAFE.  I MEAN, THE SAFETY PROBLEM WOULD HAVE BEEN

25   MET.

04:10 1   Q.   ALL RIGHT.  I'D LIKE TO SHOW YOU JOINT EXHIBIT NO. 3.

2            AND CAN YOU TELL ME WHAT THIS DOCUMENT IS?

3   A.   THIS IS MY 2017 PERFORMANCE -- MANAGEMENT END-OF-THE-YEAR

4   PERFORMANCE.

5            MR. SCHMIDT:  OKAY.  CAN WE SCROLL ALL THE WAY DOWN

6   TO THE BOTTOM OF THIS DOCUMENT, PLEASE.

7   BY MR. SCHMIDT:

8   Q.   ALL RIGHT.  AND CAN YOU TELL ME WHAT THE DATE OF THESE

9   SIGNATURES ARE?

10  A.   I SIGNED IT 12/27/2017.  KENNY STUART SIGNED IT

11  12/29/2017.

12  Q.   OKAY.  AND CAN YOU REMIND ME, AGAIN, WHAT THE DATE OF YOUR

13  TERMINATION WAS FROM UNION PACIFIC?

14  A.   FEBRUARY 27, 2018.

15  Q.   SO THIS EVALUATION WAS APPROXIMATELY TWO MONTHS BEFORE

16  YOUR TERMINATION?

17  A.   YES, SIR.

18  Q.   OKAY.  AND WHAT WAS YOUR OVERALL RATING?

19  A.   3, GOOD PERFORMER.

20           MR. SCHMIDT:  OKAY.  CAN WE SCROLL UP TWO PAGES TO

21  PAGE U.P.-TAYLOR 31.

22  BY MR. SCHMIDT:

23  Q.   ALL RIGHT.  SO UNDER "MANAGER COMMENTS" IN THIS FIRST

24  BLOCK, UNDER 2.2, IT SAYS:  "SINCE I HAVE BEEN HERE YOU HAVE

25  DONE A GOOD JOB MANAGING YOUR SLOWS.  YOU STILL HAVE A COUPLE

04:11 1    THAT ARE GETTING OLD AND YOU WILL NEED TO KEEP FOCUS ON THE

2    OLDER ONES TO REMOVE THEM IN A TIMELY MANNER."

3              DID YOU INTERPRET THIS AS A POSITIVE COMMENT?

4    **A.**   I DID.

5              **MR. SCHMIDT:**  OKAY.  LET'S GO TO THE NEXT PAGE,

6    PLEASE, DOWN TOWARDS TO THE BOTTOM OF WHAT'S SHOWN ON THE

7    SCREEN.  NOW IT'S ABOUT IN THE MIDDLE, UNDER "MANAGER

8    COMMENTS."

9    **BY MR. SCHMIDT:**

10   **Q.**   "YOU LEAD YOUR TEAM IN A POSITIVE WAY FROM WHAT I HAVE

11   SEEN SO FAR.  MAKE SURE THAT EVERYONE ABOVE YOU KNOWS AND

12   UNDERSTANDS THE GOOD THINGS THAT YOU ARE DOING.  DON'T BE

13   AFRAID TO BRAG ON YOURSELF."

14             DID YOU INTERPRET THAT TO BE A POSITIVE COMMENT?

15   **A.**   I DID.

16   **Q.**   OKAY.  AND WHO WAS IT THAT WAS MAKING THIS COMMENT?

17   **A.**   DIRECTOR OF TRACK MAINTENANCE, KENNY STUART.

18   **Q.**   KENNY STUART, OKAY, WHO WAS YOUR DIRECTOR OF TRACK

19   MAINTENANCE?

20   **A.**   YES.

21             **MR. SCHMIDT:**  OKAY.  LET'S GO TO THE NEXT PAGE,

22   PLEASE.

23   **BY MR. SCHMIDT:**

24   **Q.**   THE FIRST PARAGRAPH:  "JOHNNY, YOUR INJURY-FREE DAYS OF

25   1223 IS VERY IMPRESSIVE.  YOU KNOW THAT SAFETY REQUIRES

04:12  1  TEACHING AND TRAINING.  ALSO TAKES COACHING TO IMPROVE.  WITH

2  THE COACHING TO IMPROVE WE BECOME A BETTER TEAM.  YOU NEED TO

3  HAVE SCHEDULED, STRUCTURED SAFETY MEETINGS WITH THE TSC IN

4  ATTENDANCE AS MUCH AS POSSIBLE."

5          WHAT IS "TSC"?

6  **A.**   TSC?  THAT'S THE SAFETY COORDINATOR.  UNION PACIFIC

7  RAILROADS USED TO HAVE DISTRICT SAFETY COORDINATORS, AND THEY

8  WOULD COME AND EXPLAIN TO MY TEAM THE NEW SAFETY RULES.  SO

9  HE'S A SAFETY COORDINATOR FOR UNION PACIFIC RAILROAD.

10  **Q.**   OKAY.  AND DID YOU INTERPRET THIS PARAGRAPH AS POSITIVE

11  FEEDBACK?

12  **A.**   YES.

13  **Q.**   AND THEN IF YOU'LL LOOK AT -- WITHOUT SCROLLING DOWN OR

14  ANYTHING -- THE LAST PARAGRAPH THAT'S SHOWN ON HERE.  "YOUR

15  BUDGET IS VERY GOOD YTD."

16          DOES THAT MEAN "YEAR TO DATE"?

17  **A.**   YES.

18          **MR. SCHMIDT:**  MY MONITOR IS FLICKERING IN AND OUT.

19  OKAY.  IT SEEMS TO BE GOOD.

20  **BY MR. SCHMIDT:**

21  **Q.**   "ONCE YOU HAVE YOUR HEADCOUNT CORRECT, YOU WILL NEED TO

22  MONITOR YOUR OT."  WHAT IS "OT"?

23  **A.**   OVERTIME.

24  **Q.**   OKAY.  AND DO YOU KNOW WHAT HE'S REFERENCING WITH YOUR

25  HEADCOUNT AND GETTING IT CORRECT?

04:14 1   **A.**  MY HEADCOUNT WITH MY WELDERS, I WAS SHORT ONE WELDER IN

2   ADDIS AND ONE WELDER IN AVONDALE.  SO I DIDN'T MEET MY

3   HEADCOUNT FOR MY WELDERS.

4   **Q.**  OKAY.  SO COULD YOU EXPLAIN WHAT IT IS THAT HE MEANS IN

5   THAT SENTENCE, OR HOW YOU INTERPRETED IT?

6   **A.**  HOW I INTERPRETED IT IS THAT THE REASON MY WELDERS WASN'T

7   PERFORMING IS BECAUSE THAT THEY DIDN'T HAVE THE PROPER

8   HEADCOUNT.  IT TAKES TWO WELDERS TO DO WELDING SAFELY.  AND I

9   ONLY HAD ONE ON EACH GANG.  SO I HAD TO COMBINE THOSE TWO

10   TOGETHER:  ONE OUT OF ADDIS, AND ONE OUT OF AVONDALE.

11         AND IF I HAD MY WELDING GANG UP TO PAR, YOU KNOW, I

12   WOULD BE ABLE TO MEET MY NUMBERS AND MY GOALS FOR MY WELDING

13   TARGETS.

14   **Q.**  AND SO THIS PARAGRAPH, DO YOU INTERPRET IT AS BEING

15   POSITIVE OR NEGATIVE?

16   **A.**  I INTERPRETED IT AS BEING POSITIVE.

17   **Q.**  OKAY.  ALL RIGHT.  I'D LIKE TO LOOK AT PLAINTIFF'S EXHIBIT

18   NO. 16, WHICH IS PREADMITTED.

19         AND CAN YOU TELL ME WHAT THIS DOCUMENT IS?

20   **A.**  THEY CALL IT THE MIP AWARD.  BUT THAT WAS MY BONUS THAT I

21   RECEIVED ON 2/12/2018 THAT WAS DEPOSITED INTO MY BANK ACCOUNT.

22   **Q.**  OKAY.  SO UNDER "CASH EARNINGS" UNDER "DESCRIPTION," THE

23   FIRST ENTRY UNDER THAT LINE IS "MIP AWARD."  IS THAT WHAT YOU

24   SAID JUST A MINUTE AGO?

25   **A.**  YES.

04:15 1    Q.    ALL RIGHT.  AND WHAT DOES THAT MEAN?

2    A.    THAT WAS FOR BEING A GOOD PERFORMER IN 2017.  UNION

3    PACIFIC RAILROAD REWARDED ME WITH A $15,000 BONUS.

4    Q.    OKAY.  AND IT'S A PERFORMANCE-BASED BONUS?

5    A.    THAT'S A PERFORMANCE-BASED BONUS.

6    Q.    FOR YOUR PERFORMANCE IN 2017?

7    A.    THAT IS CORRECT.

8    Q.    OKAY.  WHAT IS A "SURVEY"?

9    A.    A SURVEY IS WHEN SURVEYORS COME OUT OF OMAHA AND THEY

10    SURVEY THE TRACK.  AND THEY HAVE INSTRUMENTS THAT THEY USE TO

11    DO THE SURVEY WITH.  AND WHAT THEY DO, THEY DETERMINE HOW THE

12    TRACK IS LAID AND IF THE TRACK IS LAID PROPERLY, ACCORDING TO

13    FRA AND U.P. STANDARDS.

14    Q.    AND WAS A SURVEY EVER PERFORMED ON THE AVONDALE YARD?

15    A.    YES, IT WAS.

16    Q.    OKAY.  WHEN WAS THAT?

17    A.    IT WAS IN DECEMBER OF 2017.

18    Q.    WHO PERFORMED THE SURVEY?

19    A.    CHARLES POWERS SENT HIS CREW DOWN THERE TO PERFORM THE

20    SURVEY.

21    Q.    AND WERE YOU PRESENT FOR IT?

22    A.    YES.

23    Q.    AND WHAT TOOK PLACE DURING THIS MEETING?

24    A.    THEY SURVIVED THE YARD, SWITCH 16.  THEY SURVEYED THE YARD

25    AND SWITCH 16, AND THEY HAD INSTRUMENTS.  THEY WERE CONNECTED

04:17 1   TO A GPS, AND THEY SURVIVED THE YARD IN DECEMBER.  IT TOOK THEM

2   ABOUT THREE OR FOUR HOURS TO DO THE SURVEY, TO COMPLETE THE

3   SURVEY.

4   **Q.**   AND DID YOU DO ANYTHING AT THIS MEETING?

5   **A.**   WHILE THEY WERE DOING THE SURVEY, I HELPED WITH ON-TRACK

6   PROTECTION TO MAKE SURE THAT THERE WERE NO CARS OR ANYTHING TO

7   INTERFERE WITH THEM SURVEYING, TO KEEP THEM SAFE.  SO I HELPED

8   WITH ON-TRACK SAFETY.

9   **Q.**   DID YOU MEET WITH MR. POWERS AGAIN AFTER THAT?

10   **A.**   MR. POWERS WASN'T THERE IN DECEMBER.  HE SENT HIS

11   SURVEYING TEAM.  BUT I DID MEET WITH MR. POWERS ON JANUARY 4,

12   2018.

13   **Q.**   OKAY.  AND WHAT TOOK PLACE AT THIS JANUARY 4, 2018

14   MEETING?

15   **A.**   WE MET AT SWITCH 16, AND WE INSPECTED THE TRACK.  AND

16   MR. POWERS CONFIRMED THAT THE TRACK WAS NOT LAID CORRECTLY,

17   AND IT HAD NO. 7 SWITCHES IN IT.  AND HIS RECOMMENDATION WAS TO

18   GET THE LINEMEN OUT -- IS TO REPLACE THE NO. 7 SWITCHES WITH

19   NO. 9 SWITCHES AND -- WITH SOME OTHER SWITCHES, AND THAT WOULD

20   CORRECT THE DEFECT IN TRACK SWITCH 16.

21   **Q.**   OKAY.  AND MR. POWERS, WHAT IS HIS POSITION EXACTLY?

22   **A.**   HE WAS A MANAGER OUT OF OMAHA.

23   **Q.**   OKAY.

24   **A.**   I MEAN, EXCUSE ME.  HE WAS A ENGINEER OUT OF OMAHA.

25   **Q.**   OKAY.  AND DID YOU TAKE ANY MEASUREMENTS ON JANUARY THE

04:19 1  4TH?

2  **A.**   YES.  I REMEASURED THE SWITCH AGAIN, TO MAKE SURE THAT I

3  WAS GETTING THE SAME NUMBERS THAT I HAD ON NOVEMBER 24.  AND I

4  DID.  SO I REMEASURED AGAIN, AND I STILL WAS GETTING THE SAME

5  MEASUREMENTS, YES.

6  **Q.**   OKAY.  SO YOU RETOOK THE SAME MEASUREMENTS YOU HAD TAKEN

7  ON NOVEMBER 24?

8  **A.**   YES.

9  **Q.**   OKAY.  AND THE NUMBERS HAD NOT CHANGED?

10  **A.**   NO.

11  **Q.**   OKAY.  WHO ELSE WAS PRESENT AT THIS MEETING?

12  **A.**   MR. POWERS AND MYSELF, WE WAS PRESENT WHEN WE WAS

13  INSPECTING THE TRACK.

14  **Q.**   OKAY.  WAS ANYBODY ELSE PRESENT AT ANY POINT DURING THAT

15  MEETING?

16  **A.**   NO, NOT THAT I CAN RECALL RIGHT NOW.

17  **Q.**   ALL RIGHT.  SO WHAT DID YOU DO NEXT?

18  **A.**   I IMMEDIATELY CALLED KENNY STUART AND TOLD HIM THAT I MET

19  WITH MR. POWERS, AND I SAID HE CONFIRMED THE SAME THING I WAS

20  SAYING, THAT THE NO. 7 SWITCHES WAS CAUSING THE DEFECT, AND WE

21  NEED TO UPGRADE TO NO. 9.  AND HE TOLD ME THAT KENNY STUART AND

22  ALSO JACOB GILSDORF WAS COMING TO THE TERRITORY ON JANUARY 9 TO

23  LOOK AT THE TRACK, TO INSPECT TRACK SWITCH 16.

24  **Q.**   OKAY.  WAS IT COMMON FOR YOUR MANAGERS TO INSPECT TRACK

25  WITH YOU?

04:20 1    A.   IT'S VERY COMMON TO INSPECT TRACK WITH ME, YES, THAT'S

2    THEIR PROCEDURE.  IF I HAVE A PROBLEM WITH A TRACK, THEY

3    SUPPOSED TO COME AND LOOK AT IT WITH ME, YES.

4    Q.   AND SO WHAT WAS THE PURPOSE OF YOU ASKING THEM TO MEET

5    YOU?

6    A.   THE PURPOSE OF THEM ASKING TO MEET ME, THAT I WANTED TO BE

7    TRANSPARENT AND COOPERATIVE.  I WANTED TO SHOW THEM MY

8    FINDINGS.  AND I WANTED TO GIVE THEM AN OPPORTUNITY, YOU KNOW,

9    IF THEY CAN COME UP WITH ANYTHING THAT COULD BE DONE TO TAKE

10   THE DEFECTS OUT OTHER THAN REPLACING NEW SWITCHES.  SO IT WOULD

11   HAVE BEEN AN OPEN CONVERSATION, LIKE LETTING THEM SEE WHAT THEY

12   SEE, WHAT THEY ARE LOOKING AT.  AND WE WAS GOING TO TALK IT OUT

13   ON THAT DAY, JANUARY 9.

14   Q.   SO YOU WANTED TO WORK TOGETHER WITH THEM TO --

15   A.   YES.

16   Q.   -- GO OVER THE PLAN?

17   A.   YES.  YES.  I WAS EXCITED THEY WAS COMING, SO WE CAN WORK

18   TOGETHER, YES.

19   Q.   OKAY.  AND YOU MENTIONED JACOB GILSDORF.  CORRECT?

20   A.   YES.

21   Q.   WHAT WAS HIS POSITION?

22   A.   HE WAS THE DIRECTOR OF MAINTENANCE OF WAY AT THE TIME.

23   Q.   ALL RIGHT.  AND IS MR. GILSDORF IN THIS COURTROOM?

24   A.   YES.

25   Q.   COULD YOU INDICATE WHERE HE IS?

04:21  1    **A.**    I CAN'T SEE WITH THAT MONITOR.

       2    **Q.**    IT'S OKAY.

       3    **A.**    YEAH, HE HAD THAT -- YEAH.

       4    **Q.**    OKAY.  SO DID THEY MEET WITH YOU?

       5    **A.**    YES, THEY DID.

       6    **Q.**    AND WHAT WAS THE DATE OF THAT MEETING?

       7    **A.**    IT WAS JANUARY 9, 2018.

       8    **Q.**    OKAY.  SO THIS IS FIVE DAYS AFTER YOU MET WITH MR. POWERS?

       9    **A.**    YES.

      10    **Q.**    OKAY.  AND WHAT DID YOU DISCUSS DURING THIS MEETING?

      11    **A.**    I WAS TRYING TO GET THEM TO LOOK AT THE TRACK, BUT THEY

      12    REFUSED TO LOOK AT THE TRACK WITH ME.  SO THEY REFUSED TO LOOK

      13    AT THE TRACK, AND WE WENT INSIDE THE MAINTENANCE OF WAY

      14    BUILDING.  IT WAS JACOB GILSDORF, KENNY STUART, AND MYSELF.

      15    AND I WAS EXPLAINING TO JACOB GILSDORF ABOUT MY MEASUREMENTS,

      16    YOU KNOW, ON THE 24TH, AND HOW I REMEASURED THEM ON JANUARY 4.

      17    AND I WAS EXPLAINING TO HIM ABOUT HOW WE NEEDED TO UPGRADE THE

      18    SWITCHES FROM NO. 7 TO NO. 9 TO GET THE DEFECTS OUT.  AND AT

      19    THE END OF THAT MEETING, JACOB GILSDORF TOLD ME TO TAKE THE

      20    TRACK OUT OF SERVICE.

      21    **Q.**    OKAY.  SO DID THEY SAY WHY THEY WOULDN'T LOOK AT THE TRACK

      22    WITH YOU?

      23    **A.**    THEY DIDN'T GIVE ANY REASON WHY.  I THOUGHT THAT WAS VERY

      24    ODD THAT THEY REFUSED TO LOOK AT THE TRACK WITH ME.  I FELT

      25    VERY STRANGE ABOUT IT BECAUSE THAT'S THEIR JOBS TO LOOK AT THE

04:22 1    TRACK AND HELP ME WITH SAFETY.  SO I WAS ASKING FOR THEIR HELP

2    AND THEIR INPUT, BUT THEY REFUSED TO DO IT.

3    **Q.**    OKAY.  NOW, DID MR. STUART SAY ANYTHING DURING THIS

4    MEETING?

5    **A.**    HE DIDN'T SAY TOO MUCH.  HE DIDN'T SAY TOO MUCH.  IT WAS

6    MOSTLY JACOB GILSDORF TALKING.  SO I CAN'T RECALL HIM SAYING

7    TOO MUCH.

8    **Q.**    ALL RIGHT.  SO YOU SAID HE INSTRUCTED YOU TO TAKE THE

9    TRACK OUT OF SERVICE.  DID YOU TAKE THE TRACK OUT OF SERVICE?

10    **A.**    I TOOK IT OUT OF SERVICE ON JANUARY 10.  I TOOK IT OUT OF

11    SERVICE.

12    **Q.**    SO THAT'S THE NEXT DAY?

13    **A.**    YES.

14    **Q.**    OKAY.  ALL RIGHT.  WHAT IS "SPIKE LINING"?

15    **A.**    SPIKE LINING IS WHEN YOU GO BEHIND THE FROG -- THERE'S A

16    RAIL ABOUT 39 FEET, USUALLY ABOUT 39 FEET, MAYBE MORE.  AND

17    WHAT YOU DO IS YOU ADJUST THE ALIGNMENT, ACCORDING TO THE U.P.

18    SCHEMATIC DRAWING.  SO YOU MIGHT HAVE TO PUSH THE RAIL TO THE

19    LEFT OR RIGHT SO MANY INCHES TO GET IT IN COMPLIANCE.

20    **Q.**    AND DID YOU DISCUSS SPIKE LINING WITH MR. STUART AND

21    MR. GILSDORF ON JANUARY 9?

22    **A.**    YES.  I DISCUSSED SPIKE LINING.  AND I EXPLAINED TO THEM

23    THAT I TRIED IT SEVERAL TIMES.  AND I EXPLAINED TO THEM THAT

24    THE DEFECT WAS IN BETWEEN THE SWITCH -- THE HEAD OF THE SWITCH

25    AND THE FROG, AND SPIKE LINING WAS NOT GOING TO CORRECT THAT,

04:24 1    NOT IN FRONT OF THE FROG.

2    **Q.**   YOU SAID YOU DID TELL THEM DURING THIS MEETING THAT YOU

3    HAD JUST RETAKEN THE MEASUREMENTS ON JANUARY 4?

4    **A.**   YES.

5    **Q.**   OKAY.  SO WHAT WERE YOUR REASONS FOR TAKING SWITCH 16 OUT

6    OF SERVICE?

7    **A.**   MY REASON FOR TAKING SWITCH 16 -- MY REASON -- SEVERAL

8    REASONS:  ONE OF THE REASONS WAS THAT THEY HAD EXCESSIVE

9    ALIGNMENT IN THE TRACK.  THEY HAD NO. 7 SWITCHES THAT NEEDED TO

10   BE UPGRADED, FROM THE RECOMMENDATION OF CHARLES POWERS, 'CAUSE

11   HE SAID THAT THE NO. 7 SWITCHES WAS TOO SMALL AND WE NEED TO

12   UPGRADE IT.  AND ALSO JACOB GILSDORF TOLD ME TO TAKE IT OUT OF

13   SERVICE.

14   **Q.**   ALL RIGHT.  I'D LIKE TO SHOW YOU JOINT EXHIBIT NO. 5.

15          ALL RIGHT.  SO DO YOU RECOGNIZE THIS EMAIL CHAIN?

16   **A.**   YES.

17   **Q.**   THESE ARE BETWEEN YOU AND MR. STUART.  CORRECT?

18   **A.**   THAT IS CORRECT.

19          **MR. SCHMIDT:**  OKAY.  SO LET'S MOVE DOWN TO THE

20   BOTTOM.  SORRY.  YEAH, RIGHT THERE.

21   **BY MR. SCHMIDT:**

22   **Q.**   SO DOWN BELOW, THESE ARE THE MEASUREMENTS FROM THE 24TH

23   THAT WE WERE LOOKING AT A FEW MINUTES AGO.  CORRECT?

24   **A.**   RIGHT, THAT'S CORRECT.

25          **MR. SCHMIDT:**  SO CAN WE SCROLL UP A LITTLE BIT.

04:26  1   **BY MR. SCHMIDT:**

2   **Q.**   SO DOWN AT THE BOTTOM OF PAGE 289 AT 1:42 P.M., AM I

3   CORRECT IN UNDERSTANDING THAT YOU WERE RESENDING THOSE

4   NOVEMBER 24 MEASUREMENTS TO MR. STUART ON JANUARY 10?

5   **A.**   YES.

6   **Q.**   AM I READING THAT CORRECTLY?

7   **A.**   YES.

8   **Q.**   OKAY.  AND WHAT WAS HIS RESPONSE?

9   **A.**   HE TOLD ME TO SPIKE LINE IT AGAIN.  AND HE ALSO SAID FOR

10   ME TO SEND MY TAMPER DOWN THERE TO SURFACE THE SWITCHES.

11   **Q.**   WELL, HIS RESPONSE TO THE EMAILS, THOUGH.

12   **A.**   OH.  "THESE MEASUREMENTS ARE OVER 6 WEEKS OLD.  DID YOU

13   MEASURE IT TODAY?"

14   **Q.**   OKAY.  AND YOU HAD JUST MET WITH HIM THE PREVIOUS DAY AND

15   TOLD HIM THAT YOU HAD RETAKEN THE MEASUREMENTS ON JANUARY 4.

16   CORRECT?

17   **A.**   THAT'S CORRECT, YES.

18   **Q.**   OKAY.  SO HOW DID YOU FEEL WHEN HE TOLD YOU THE

19   MEASUREMENTS WERE OVER 6 WEEKS OLD?

20   **A.**   I FELT VERY UNCOMFORTABLE BECAUSE HE WAS THERE THE DAY

21   BEFORE, AND I WANTED TO SHOW HIM THE MEASUREMENTS.  THEY'RE THE

22   SAME.  I WAS GOING TO SHOW HIM, YOU KNOW, STEP BY STEP.  AND BY

23   HIM SAYING THAT MADE ME VERY UNCOMFORTABLE BECAUSE TO GET

24   RESISTANCE AND PUSHBACK -- WHEN WE WAS THERE BEFORE, HE REFUSED

25   TO LOOK AT THE TRACK -- NERVOUS -- I GOT NERVOUS THEN.

04:27  1    **MR. SCHMIDT:**  OKAY.  AND CAN WE SCROLL UP.

2    **BY MR. SCHMIDT:**

3    **Q.**   YOUR RESPONSE TO HIM IS:  "DID YOU FORWARD THE INFORMATION

4    TO CHIEF ENGINEERING MARK WHEELAND.  LIKE YOU SAID INITIALLY."

5         CAN YOU EXPLAIN WHAT THAT MEANS?

6    **A.**   YES.  THAT IT WAS AGREED THAT HE WAS GOING TO SEND THE

7    INFORMATION TO MARK WHEELAND TO GET FUNDING TO REPAIR THE

8    TRACK.  AND I ASKED HIM DID HE FORWARD THE INFORMATION -- MY

9    DRAWING TO MARK WHEELAND AND DID HE TALK TO MARK WHEELAND ABOUT

10   GETTING FUNDING TO REPAIR THE TRACK.

11   **Q.**   OKAY.  AND THEN WHAT WAS MR. STUART'S RESPONSE?

12   **A.**   "GET YOUR TAMPER HEADING SOUTH TO THE YARD AND WE MAY NEED

13   TO DO SOME SPIKE LINING."

14   **Q.**   ALL RIGHT.  AND YOU TESTIFIED THAT THE DAY BEFORE THAT YOU

15   HAD EXPLAINED TO THEM WHY SPIKE LINING WOULDN'T FIX THE

16   PROBLEM.  CORRECT?

17   **A.**   THAT IS CORRECT.

18   **Q.**   ALL RIGHT.  AND CAN YOU READ YOUR RESPONSE?

19   **A.**   "CANNOT SPIKE LINE THE SWITCH.  THE ENGINEER OUT OF OMAHA

20   WALK THE YARD WITH ME ON JANUARY 4" -- IT SAYS 2017, BUT IT

21   SHOULD BE 2018.  "HE SAID THE SWITCHES WERE LAID INCORRECTLY,

22   TRACK NEED TO BE UPGRADED TO CORRECT THE PROBLEM."

23   **Q.**   OKAY.  AND WHAT HAPPENED AFTER THIS EMAIL EXCHANGE?

24   **A.**   KENNY STUART -- IT WAS A PHONE CONVERSATION AFTER THAT.

25   **Q.**   OKAY.  DID HE CALL YOU OR DID YOU CALL HIM?

04:28 1   **A.**   I CAN'T REMEMBER IF I CALLED HIM.  BUT I DO KNOW WE HAD A

2   PHONE CONVERSATION.

3   **Q.**   AND WHAT DID YOU DISCUSS?

4   **A.**   WE DISCUSSED THE TRACK, AND I EXPLAINED TO HIM THAT WE MET

5   THE DAY BEFORE AND I INVITED Y'ALL TO LOOK AT THE TRACK. YOU

6   KNOW, Y'ALL REFUSED TO LOOK AT IT.  AND I TOLD HIM THAT, YOU

7   KNOW, I TOOK THE MEASUREMENTS AND SPIKE LINING WAS NOT GOING TO

8   WORK, AND KENNY STUART TOLD ME TO PUT THE TRACK BACK IN

9   SERVICE.

10   **Q.**   HE TOLD YOU TO PUT THE TRACK BACK INTO SERVICE?

11   **A.**   YES, HE DID.

12   **Q.**   AND WHAT WAS YOUR RESPONSE TO THAT?

13   **A.**   I RESPONDED TO HIM.  I SAID:  "NO, I'M NOT GOING TO PUT IT

14   BACK IN SERVICE."  'CAUSE WE ALREADY HAD A DISCUSSION THAT WE

15   WERE GOING TO TAKE IT OUT OF SERVICE AND MAKE THE PROPER

16   REPAIRS TO IT.  SO I REFUSED TO PUT IT BACK IN SERVICE AFTER

17   THAT.

18   **Q.**   DURING THIS PHONE CALL DID HE ASK YOU TO BEGIN TO RETAKE

19   THE MEASUREMENTS THAT YOU HAD TAKEN ON NOVEMBER 24 AND

20   JANUARY 4?

21   **A.**   NO, HE DID NOT.

22   **Q.**   OKAY.  AND IN THIS EMAIL THAT WE'RE LOOKING AT --

23         **MR. SCHMIDT:**  CAN WE SCROLL DOWN JUST ONE MORE TIME,

24   PLEASE.

25   **BY MR. SCHMIDT:**

04:30   1   **Q.**   OKAY.  SO IN THIS EMAIL RIGHT HERE IT SAYS:  "THESE

2   MEASUREMENTS ARE OVER 6 WEEKS OLD.  DID WE MEASURE IT TODAY?"

3          DOES HE MENTION THE AGE OF THE MEASUREMENTS, AGAIN,

4   IN THIS EMAIL CHAIN?

5   **A.**   NO, HE DID NOT.

6   **Q.**   OKAY.  WHEN YOU REFUSED THE INSTRUCTION TO PUT THE TRACK

7   BACK INTO SERVICE, WHAT WERE YOUR REASONS FOR DOING SO?

8   **A.**   MY REASONS FOR DOING SO WAS BECAUSE THE THREE DERAILMENTS

9   WE HAD, IT CAUSED THE TRACK TO BE UNSAFE.  IT HAD A FRA DEFECT,

10   AN ALIGNMENT OVER FIVE INCHES.  WE NEEDED NEW SWITCHES, WHICH

11   WAS THE RECOMMENDATION FROM CHARLES POWERS, THE ENGINEER OUT OF

12   OMAHA, AND JACK GILSDORF TOLD ME TO TAKE IT OUT OF SERVICE.

13   **Q.**   OKAY.  DID MR. STUART HAVE THE AUTHORITY TO PUT THE TRACK

14   BACK INTO SERVICE?

15   **A.**   YES, MR. STUART HAS THE AUTHORITY TO PUT THE TRACK BACK IN

16   SERVICE.

17   **Q.**   AS FAR AS YOU KNOW, DID HE?

18   **A.**   AS FAR AS I KNOW, HE NEVER PUT THE TRACK BACK IN SERVICE.

19          **MR. SCHMIDT:**  ALL RIGHT.  LET'S LOOK AT JOINT EXHIBIT

20   NO. 6, PLEASE.  ALL RIGHT.  LET'S SCROLL DOWN.  SORRY.  GO BACK

21   UP A LITTLE BIT, UP TO THE NEXT PAGE BEFORE.

22   **BY MR. SCHMIDT:**

23   **Q.**   OKAY.  SO DO YOU RECOGNIZE THIS EMAIL?

24   **A.**   YES.

25   **Q.**   AND MR. GILSDORF IS ASKING YOU FOR SOME INFORMATION.

04:32 1  CORRECT?

2  **A.**   THAT IS CORRECT.

3        **MR. SCHMIDT:**  OKAY.  CAN WE SCROLL UP A LITTLE BIT.

4  **BY MR. SCHMIDT:**

5  **Q.**   ALL RIGHT.  SO IS THIS YOUR RESPONSE TO MR. GILSDORF?

6  **A.**   YES, IT IS.

7  **Q.**   AND YOU'RE PROVIDING THE INFORMATION THAT HE REQUESTED?

8  **A.**   YES.

9  **Q.**   OKAY.  SO FOUR AND FIVE ARE BLANK.  RIGHT?

10  **A.**   YES.

11        **MR. SCHMIDT:**  OKAY.  BUT IF WE SCROLL BACK DOWN TO

12  MR. GILSDORF'S EMAIL.

13  **BY MR. SCHMIDT:**

14  **Q.**   NUMBER 4 IS TAKE SOME CLEAR PICTURES AND ATTACH THEM BACK

15  ON THE EMAIL; NO. 5 IS SCREEN-SHOT A ZTS MAP AND HIGHLIGHT THE

16  SWITCH ON THE ZTS?

17  **A.**   YES.

18  **Q.**   SO DID YOU UNDERSTAND NOS. 4 AND 5 TO BE ASKING FOR

19  ATTACHMENTS?

20  **A.**   YES.

21        **MR. SCHMIDT:**  OKAY.  CAN WE SCROLL BACK UP AGAIN.

22  STOP, PLEASE.

23  **BY MR. SCHMIDT:**

24  **Q.**   ALL RIGHT.  SO DOWN HERE, IS THIS A LIST OF ATTACHMENTS TO

25  THAT EMAIL?

04:33 1  **A.**  YES.  YES.  YES.

2  **Q.**  SO DID YOU PROVIDE ALL OF THE INFORMATION THAT

3  MR. GILSDORF WAS ASKING FOR?

4  **A.**  YES.  YES, I DID.

5  **Q.**  ALL RIGHT.  LET'S LOOK AT PLAINTIFF'S EXHIBIT NO. 17,

6  WHICH HAS BEEN PREADMITTED.

7       ALL RIGHT.  DO YOU RECOGNIZE THESE EMAILS?

8  **A.**  YES, I RECOGNIZE THEM.  YES.

9       **MR. SCHMIDT:**  ALL RIGHT.  SO ON PAGE 385, WHICH IS

10  THE FIRST PAGE, IF WE CAN JUST SCROLL DOWN.

11  **BY MR. SCHMIDT:**

12  **Q.**  THIS IS AN EMAIL FROM DANNY JAQUESS OR JAQUESS.  CORRECT?

13  **A.**  YES.

14  **Q.**  HE SAYS:  "JOHNNY, WE HAVE 4 TRACKS OUT OF SERVICE IN

15  AVONDALE (11-12 ON THE WEST END AND 15-16 ON THE EAST END).

16  NOW THAT THE WEATHER IS PASSING US, WHAT IS THE PLAN TO GET

17  THESE BACK?  WE CAN'T SURVIVE WITHOUT THESE TRACKS.  BUSINESS

18  IS TOO GOOD."

19       HOW DID YOU FEEL ABOUT RECEIVING THIS EMAIL?

20  **A.**  I FELT VERY UNCOMFORTABLE.  I FELT LIKE I WAS BEING

21  ATTACKED BECAUSE I EXPLAINED TO THEM WHY 15 AND 16 WAS OUT OF

22  SERVICE, BECAUSE THEY NEEDED NEW SWITCHES, AND THAT WAS ABOVE

23  MY BUDGET.

24       ELEVEN AND 12, WE PUT THOSE BACK IN SERVICE.

25       BUT 15 AND 16, I FELT UNCOMFORTABLE THAT HE LISTED

04:34 1   THOSE SWITCHES AND EVERYTHING BECAUSE IT WAS ABOVE MY HEAD.  I
     2   DIDN'T HAVE THE FUNDING TO FIX IT.  SO I FELT ATTACKED WHEN HE
     3   SENT THAT.
     4   **Q.**   AND WHAT ABOUT THE STATEMENT "BUSINESS IS TOO GOOD."  HOW
     5   DID THAT MAKE YOU FEEL?
     6   **A.**   IT MAKE IT SEEM LIKE THAT, YOU KNOW, WE LOSING MONEY.  I
     7   WANT YOU TO PUT THE TRACK BACK IN SERVICE, EVEN THOUGH, YOU
     8   KNOW, IT'S UNSAFE IS HOW I TOOK THE INFORMATION.
     9   **Q.**   SO THE REASON SWITCH 16 WAS OUT OF SERVICE AT THIS POINT,
    10   WAS IT BECAUSE YOU DID NOT WANT TO REPAIR IT?
    11   **A.**   NO.
    12   **Q.**   OKAY.
    13   **A.**   IT WAS BECAUSE THAT FROM THE ESTIMATE THAT I CALCULATED,
    14   IT WOULD HAVE BEEN CLOSE TO $500,000 TO $1 MILLION TO REPAIR
    15   THE SWITCH, TO GET NEW SWITCHES AND REPAIR IT, SO THAT WAS
    16   ABOVE MY BUDGET.  AND THAT'S THE REASON I WENT TO JACOB
    17   GILSDORF AND KENNY STUART FOR HELP.  I CANNOT APPROVE A BUDGET
    18   LIKE THAT.  IT HAS TO COME FROM ABOVE.
    19        SO FROM THE MILITARY TRAINING, I USED MY CHAINS OF
    20   COMMAND.  SO I WENT TO MY SUPERIOR AND I ASKED THEM FOR HELP,
    21   AND THEY REFUSED TO HELP ME.  ALL I WANTED WAS HELP.  I WAS
    22   GOING TO FIX THE TRACK IF THEY GAVE ME THE MATERIAL.  BUT THEY
    23   JUST REFUSED TO HELP ME.
    24   **Q.**   DID YOU FREQUENTLY WORK ON TRACKS TO GET THEM BACK INTO
    25   SERVICE?

04:36 1    A.    ALL THE TIME.

2    Q.    THE DEFECTS THAT LEAD YOU TO TAKE SWITCH 16 OUT OF

3    SERVICE, DID YOU CAUSE THEM?

4    A.    NO.  IT WAS BECAUSE THE SWITCH THAT WAS INSTALLED IN IT

5    WAS TOO SMALL.  I DIDN'T CAUSE IT.  I MEAN, I --

6    Q.    DID ANYONE AT UNION PACIFIC -- I'M SORRY.  DO YOU NEED A

7    MOMENT?

8    A.    I'M SORRY.  YES, SIR, I WOULD'VE FIX THAT TRACK.  IF I HAD

9    THE MEANS TO DO IT, I WOULD'VE FIXED IT.  I WAS JUST ASKING FOR

10    HELP.

11          YOU CAN GO AHEAD.  I'M SORRY.

12    Q.    DON'T APOLOGIZE.

13          WHAT ARE YOU FEELING RIGHT NOW?

14    A.    I FEEL LIKE I'M BETRAYED.  AFTER ALL THEM YEARS, I FELT

15    LIKE I WAS BETRAYED.  I ASKED THEM FOR HELP, AND THEY REFUSED

16    TO HELP ME.  I FELT BETRAYED.  AFTER ALL THAT HARD WORK I DID

17    FOR UNION PACIFIC RAILROAD, AND I ASKED THEM FOR SOME HELP TO

18    FIX THE TRACK, AND THEY WOULDN'T GIVE ME HELP.

19    Q.    HAD YOU EVER HAD THAT EXPERIENCE WITH A MANAGER BEFORE?

20    A.    NO.  NO.  BUT THE TAIL TRACK, THEY HELPED ME.  THEY GOT

21    SWITCHES FOR ME, AND I FIXED THAT TRACK.  WE AIN'T HAVE NO MORE

22    PROBLEMS OUT OF IT.

23          BUT WHEN KENNY STUART AND JACOB GILSDORF AND MARK

24    WHEELAND CAME IN THERE, THAT'S THE ONLY TIME I HAD A PROBLEM

25    WHEN A MANAGER WOULDN'T HELP ME, WHEN I HAVE A PROBLEM THAT I

04:38  1   COULD NOT HANDLE.  AND I WENT TO THEM, AND I ASKED THEM FOR

       2   HELP.

       3   **Q.**   WHAT AREA OF THE TRACK WAS UNDER YOUR SUPERVISION AS

       4   MANAGER OF TRACK MAINTENANCE?

       5   **A.**   AVONDALE YARD WAS UNDER MY SUPERVISION AT TRACK

       6   MAINTENANCE.  I HAD 120 MILES OF MAIN LINE.  I HAD THE ADDIS

       7   YARD, AND I ALSO HAD THE YARD IN DONALDSONVILLE.

       8   **Q.**   WAS THERE AN EXPECTATION THAT WAS EVER COMMUNICATED TO YOU

       9   THAT THERE WERE NOT SUPPOSED TO BE ANY DEFECTS IN THE TRACK

      10   THAT YOU SUPERVISED?

      11   **A.**   NO.  NO, SIR.  NO EXPECTATION.  WE ALWAYS HAVE DEFECTS

      12   BECAUSE WE ACT.  I MEAN, WE GO LOOK AT THE TRACK; IF YOU SEE A

      13   DEFECT, YOU CORRECT IT.

      14   **Q.**   HOW MUCH OF YOUR JOB WAS CORRECTING DEFECTS?

      15   **A.**   NINETY-NINE PERCENT OF MY JOB WAS CORRECTING DEFECTS,

      16   'CAUSE WE DID INSPECTIONS FIRST, FOUND THE DEFECTS, AND THEN WE

      17   SENT THE GANG OUT THERE TO REPAIR THEM.

      18   **Q.**   ALL RIGHT.  SO YOUR RESPONSE TO MR. JAQUESS HERE WAS "I DO

      19   HAVE THE FUNDING" -- I BELIEVE THAT -- IS THAT SUPPOSED TO SAY

      20   DO NOT HAVE THE FUNDING?

      21   **A.**   YES, I DO NOT HAVE THE FUNDING.

      22   **Q.**   -- "THE FUNDING TO FIX TRACKS 15 & 16 ABOVE MY PAY GRADE.

      23   WE WILL BE WORKING ON TRACKS 11 AND 12 TODAY."

      24           **MR. SCHMIDT:**  CAN WE SCROLL UP A LITTLE BIT.

      25   **BY MR. SCHMIDT:**

04:39 1   Q.   AND MR. JAQUESS'S RESPONSE WAS:  "SO, YOU DO HAVE FUNDING?
   2   OR NO?
   3            "THANKS FOR GETTING ON THE 11 AND 12 TODAY."
   4            CORRECT?
   5   A.   YES.
   6   Q.   OKAY.  CAN YOU TELL ME WHAT "VTI" MEANS?
   7   A.   THAT'S A VEHICLE TRACK INTERACTION.  I BELIEVE THAT'S THE
   8   CORRECT NAME FOR IT.
   9   Q.   OKAY.  CAN YOU TELL ME WHAT IT IS?
  10   A.   IT'S A MILLION-DOLLAR EQUIPMENT THAT THEY HAVE ATTACHED TO
  11   THE LOCOMOTIVE, THEY GO AND TEST THE TRACK AS THE LOCOMOTIVE GO
  12   ACROSS IT.  SO IT TESTS THE TRACK FOR GEOMETRY DEFECTS.
  13   Q.   SO WHAT IS A "VTI HIT"?
  14   A.   A VTI HIT IS WHEN THAT LOCOMOTIVE GO ACROSS THE TRACK AND
  15   IT DETECTS A DEFECT.  AND ONCE IT DETECTS A DEFECTS, IT SENDS
  16   THE INFORMATION TO OMAHA, AND THEN I GET AN EMAIL TELLING ME TO
  17   GO OUT THERE AND VERIFY THAT THE DEFECT IS THERE.
  18   Q.   ALL RIGHT.  AND DO YOU RECALL RECEIVING A VTI HIT IN 2018?
  19   A.   YES.
  20   Q.   OKAY.  WHEN?
  21   A.   I HAD ONE AT WHITE CASTLE.
  22   Q.   OKAY.  DO YOU KNOW WHEN THAT WAS?
  23   A.   IT WAS ON JANUARY 22, 2018.
  24   Q.   OKAY.  SO TELL ME WHAT HAPPENED.
  25   A.   I HAD A VTI HIT THERE AT WHITE CASTLE, AND I HAVE THE

04:41 1  EMAIL.  SO IT WAS LATE THAT EVENING.  SO I WENT OUT TO LOOK AT

2  THE DEFECT.  SO I WENT THERE, AND I TOOK SOME MEASUREMENTS.  I

3  WATCHED THE TRAIN GO ACROSS THE TRACK AND I LOOK AT THE TIES.

4  I LOOKED AT THE TIES TO SEE WERE THE TIE'S GOOD.  AND AT THE

5  END OF THE INSPECTION, I FOUND THAT IT HAD LIKE 1.5 INCH

6  PROFILE AND ALSO THAT IT WAS DEFECTIVE TIES UNDER THE CROSSING

7  WHICH WAS ENCASED IN CONCRETE.

8  **Q.**   OKAY.  SO WHAT DID YOU DO?

9  **A.**   WELL, ACCORDING TO UNION PACIFIC RAILROAD THAT I SUPPOSED

10  TO PUT TOGETHER AN EXCEL FILE EXPLAINING WHAT CAUSED THE DEFECT

11  AND WHAT WE NEED TO DO TO REPAIR IT.  AND I'M SUPPOSED TO SEND

12  IT TO JACOB GILSDORF, MARK WHEELAND.  I THINK I SEND IT TO

13  KENNY STUART AND PHILLIP HAWKINS AND I WANT TO SAY BUD GOMEZ AT

14  THE TIME.  I WAS SUPPOSED TO SEND THAT INFORMATION.

15        **MR. SCHMIDT:**  ALL RIGHT.  CAN WE LOOK AT JOINT

16  EXHIBIT NO. 8.

17  **BY MR. SCHMIDT:**

18  **Q.**   AND SO CAN YOU TELL ME WHAT THIS IS?

19  **A.**   THIS IS THE INFORMATION THAT I FILLED OUT THAT WAS -- AND

20  I SENT IT TO MARK WHEELAND AND JACOB GILSDORF -- SUBDIVISION,

21  MAIN TRACK.  I HAVE THE MILE POST.  I HAD A BRIDGE, YES.  THEN

22  A DEFECT TYPE, I SAID, SURFACE AND LINE.  I DATED IT, AND I PUT

23  MY NAME.  AND I CALLED CARLOS TO LOOK AT THE BRIDGE.  AND I PUT

24  DOWN PROFILE 1.5 INCH AFTER I WATCHED THE TRAIN GO ACROSS IT.

25  AND I PUT DOWN CORRUGATED, NONE; RAIL JOINTS, NONE, WHICH

04:43 1   SIMPLY MEANS I WAS INSTRUCTED BY BUD GOMEZ, IF THERE'S NO

2   JOINTS THERE, JUST PUT NONE.  SO THOSE WASN'T THE CAUSE OF THE

3   DEFECT.  CORRUGATED RAIL, RAIL JOINTS -- CONDITION OF JOINTS IS

4   WHY I HAVE "NONE."

5            IN A SWITCH, RAILROAD OR ROAD -- THAT'S IN A SWITCH,

6   RAIL CROSSING OR ROAD, CROSSING APPROACH NORTH.  TANGENT, WHERE

7   THE TRACK WAS STRAIGHT.  WAS IT NEAR A BRIDGE?  I SAID YES.

8   AND I SLOW-ORDERED IT 25 MPH BECAUSE OF THE DEFECTIVE TIES

9   UNDER THE CONCRETE CROSSING.

10           **MR. SCHMIDT:**  AND CAN WE SCROLL DOWN A LITTLE TO

11   "UNDER ROOT CAUSE OF VTI EXCEPTION AND WHAT PERMANENT REPAIR

12   CONSISTED OF TO PREVENT EXCEPTION FROM REPEATING."

13   **BY MR. SCHMIDT:**

14   **Q.**   YOU PUT SOME INFORMATION UNDER THAT SECTION TOO.  CORRECT?

15   **A.**   YES.  I SAID:  PULL THE BOARDS, THE CONCRETE BOARDS,

16   INSTALL TIES IN THE CROSSING.  INSTALL SWITCH TIES IN

17   CPL 075 -- WHICH WAS THE SWITCH; SURFACE THROUGH CROSSING IN

18   SWITCH; WORK WILL BE DONE BY THE CROSSING GANG AND THE SWITCH

19   GANG, PART OF THE TIE GANG PROJECT.

20           THE TIE GANG WAS ON MY TERRITORY.  THEY WERE WORKING

21   IN WHITE CASTLE.  THEY WERE DOING THE -- FIXING A CROSSING,

22   MAYBE LESS THAN A HALF A MILE FROM THE ONE THAT I SLOW-ORDERED

23   TO 25 MPH.

24   **Q.**   OKAY.

25   **A.**   SO THAT WAS MY FINDING, AND THAT'S WHAT I SENT TO JACOB

04:45 1  GILSDORF.

2  **Q.**   ALL RIGHT.  IS THERE ANYTHING IN THIS FORM THAT YOU DID

3  NOT FILL OUT?

4  **A.**   LOOKING AT IT?  NO.  I DON'T SEE ANYTHING THAT I DID NOT

5  FILL OUT, NO.

6  **Q.**   OKAY.  AND YOU MENTIONED THE TIE GANG.  CAN YOU TELL ME

7  WHAT A "TIE GANG" IS?

8  **A.**   THE TIE GANG IS THE ONLY GANG THAT WE HAVE THAT WORK TO

9  PREVENT DEFECTS, AND THAT'S A LARGE PRODUCTION GANG WITH

10  SEVERAL -- EQUIPMENT -- YOU KNOW, MAYBE 100 PEOPLE WORKING.

11  AND WHAT THEY DO IS, THEY COME TO YOUR TERRITORY AND THEY HELP

12  MTMS OUT BY INSTALLING TIES, YOU KNOW.  AND THEY HAVE THE

13  CAPABILITY TO DO MORE THAN WHAT MY GANG CAN DO.  I MEAN, THEY

14  CAN COME TO YOUR TERRITORY, AND IN TWO WEEKS THEY CAN INSTALL

15  45,000 TIES OR MORE.

16       SO THEY WAS ON THE TERRITORY, WORKING ON MY TIE

17  CONDITIONS THAT I HAD, AND THEY WAS GOING THROUGH THERE PUTTING

18  IN NEW TIES TO MAKE MY RAILROADS BETTER.

19  **Q.**   ALL RIGHT.  LET'S LOOK AT JOINT EXHIBIT NO. 9.

20       AND DO YOU RECOGNIZE THESE EMAILS?

21  **A.**   THAT IS FROM JACOB GILSDORF.

22  **Q.**   AND THERE'S AN EMAIL FROM YOU ON HERE TOO, ISN'T IT?

23  **A.**   YES.  ADDRESSED TO ME, YES.

24  **Q.**   AND DO THESE EMAILS CONCERN THE VTI HIT THAT WE WERE JUST

25  DISCUSSING?

04:46 1  **A.**  YES, IT'S THE SAME VTI HIT.

2        **MR. SCHMIDT:**  OKAY.  CAN WE SCROLL DOWN.  KEEP GOING.

3  **BY MR. SCHMIDT:**

4  **Q.**  ALL RIGHT.  SO MR. GILSDORF ASKED YOU, "WHAT IS THE ROOT

5  CAUSE?  YOU DID NOT LIST WHAT THE ROOT CAUSE OF THE VTI WAS.

6  PLEASE ADVISE."  IS THAT CORRECT THAT YOU DID NOT LIST WHAT THE

7  ROOT CAUSE WAS?

8  **A.**  I FILLED OUT, IN THE SECTION WHERE IT SAYS "ROOT CAUSE" ON

9  THE SPREADSHEET, THAT MY PROFESSIONAL OPINION ABOUT INSPECTING

10  THE TRACK, WHAT THE ROOT CAUSE WAS.

11  **Q.**  OKAY.

12  **A.**  TIES.

13        **MR. SCHMIDT:**  LET'S SCROLL UP.  THANK YOU.

14  **BY MR. SCHMIDT:**

15  **Q.**  ALL RIGHT.  AND YOUR RESPONSE TO MR. GILSDORF WAS TIES.

16  CORRECT?

17  **A.**  RIGHT.  CORRECT.

18  **Q.**  OKAY.  AND THEN MR. GILSDORF RESPONDS BY ASKING YOU FOR

19  SOME MORE INFORMATION?

20  **A.**  YES.

21        **MR. SCHMIDT:**  OKAY.  CAN WE SCROLL UP.

22  **BY MR. SCHMIDT:**

23  **Q.**  AND YOU RESPONDED TO MR. GILSDORF AND PROVIDED SOME

24  INFORMATION?

25  **A.**  YES.  I SAY:  I ANSWERED THE QUESTION ON THE EXCEL

04:47 1   SPREADSHEET.  WE HAD MULTIPLE HITS AT THE LOCATION, SO I

2   SLOW-ORDERED THE TRACK 25 MILES PER HOUR, PER INSTRUCTION FROM

3   THE SOUTHERN REGION.  I PROTECTED THE TRACK.  I TALKED TO

4   PHILLIP HAWKINS.  HE SAID IT'S PART OF THE TIE PROJECT.  AND

5   THE NEXT HALF, WHEN THE CROSSING GANG GET BACK, HE WOULD HAVE

6   THEM WORK ON THE LOCATION.  I WATCHED THE TRAIN GO OVER THE

7   LOCATION.  IT HAD PROFILE UNDER THE LOAD.  THE U.P. 3931, IT

8   HAD PROFILE UNDER LOAD.  THE DRAW BARS WERE MOVING UP AND DOWN

9   SIGNIFICANTLY.

10        **MR. SCHMIDT:**  OKAY.  CAN WE SCROLL UP.

11   **BY MR. SCHMIDT:**

12   **Q.**   AND IN THE LAST EMAIL THAT WE SEE HERE, MR. GILSDORF IS

13   ASKING YOU SOME FURTHER QUESTIONS.  CAN YOU EXPLAIN TO ME WHAT

14   THE INFORMATION IS THAT HE'S REQUESTING OF YOU?

15   **A.**   HE SAID:  "SOME OF THE QUESTIONS NOT ANSWERED ON THE

16   SPREADSHEET IS THE REASON FOR MY FOLLOW-UP.  PLEASE PROVIDE

17   INSPECTION OF TIES EVERY 39 FEET.  PLEASE PROVIDE ME WITH THE

18   TIE COUNTS" -- "THOSE COUNTS.  I ALSO WANT TO KNOW IF THERE ARE

19   ANY TIES THAT ARE NOT EFFECTIVELY DISTRIBUTED THAT WOULD

20   WARRANT A SCHEDULE FOR REPAIR, PER FRA REQUIREMENTS."

21   **Q.**   OKAY.  SO WHAT DOES THAT MEAN?

22   **A.**   THAT MEANS IS THAT IF YOU TALKING ABOUT TIES PER 39 FEET,

23   THAT IS CLASS SPECIFIC.  THAT MEANS YOU HAVE TO SLOW ORDER IT.

24   THE TRACK WAS -- SO I SLOW-ORDERED IT 25 MPH.

25        IF YOU TALKING ABOUT "SCHEDULE FOR REPAIR," THAT

04:49  1   MEANS THAT YOU HAVE 30 DAYS TO FIX THE DEFECT, AND YOU STILL

2   CAN ALLOW THE TRAIN TO GO WHATEVER THE TRACK SPEED.  BUT IT DID

3   NOT HAVE THE TIES AT 39 FEET.  AND IT WAS THE CROSSING, AND I

4   TOLD HIM I COULDN'T ACCURATELY COUNTS THE TIES, 'CAUSE THEY WAS

5   ENCASED WITH CONCRETE.  AND THAT'S THE REASON I COULDN'T COUNT

6   THE TIES, 'CAUSE THEY WERE COVERED WITH CONCRETE.

7            IF YOU EVER GO ACROSS A CONCRETE CROSSING, THEY HAVE

8   CONCRETE BOARDS IN IT, SO YOU CANNOT SEE THE TIES.  BUT ALL THE

9   TIES OUTSIDE THE CONCRETE MET THE CROSSING -- MET THE STANDARD

10  FOR FRA.

11  Q.   DID YOU COMMUNICATE THAT TO MR. GILSDORF?

12  A.   YES.  WE HAD A PHONE CALL, AND I TOLD THEM THAT THE TIES

13  WAS ENCASED IN CONCRETE AND I COULD NOT COUNT THE TIES, IN THE

14  PHONE CALL WE HAD ON JANUARY 26 -- I MEAN, JANUARY 22, 2018.

15  AND I EXPLAINED TO HIM THAT I COULDN'T COUNT THE TIES, AND THAT

16  IS UNION PACIFIC RAILROAD PROCEDURE, FRA PROCEDURES, THAT, YOU

17  KNOW, YOU CAN'T COUNT THE TIES, BECAUSE THEY ENCASED WITH

18  CONCRETE.  AND I EXPLAINED THAT TO HIM.

19            AND IN PART OF THE PHONE CONVERSATION, HE WAS TRYING

20  TO GET ME TO TAKE THE SLOW ORDER OFF BY HAVING ME TO MAKE IT A

21  SCHEDULE FOR REPAIR, INSTEAD OF DEFECTIVE TIES, FOR 39 FEET.

22  SO HE INSTRUCTED ME TO TAKE THE SLOW ORDER OFF, AND I TOLD HIM,

23  NO, I WOULD NOT TAKE THE SLOW ORDER OFF BECAUSE IT WAS UNSAFE.

24  AND IT WAS A SAFETY ISSUE.  AND I DIDN'T WANT TAKE THE SLOW

25  LOAD OFF BECAUSE IT WAS -- THE CROSSING WAS IN THE NEIGHBORHOOD

04:51 1  WHERE PEOPLE STAYED LESS THAN 500 FEET FROM THE TRACK.  SO I

2  HAD A SAFETY ISSUE THERE.  SO THAT'S WHY I LEFT THE SLOW ORDER

3  ON.

4  **Q.**    WAS THERE A POLICY AS FOR WHAT YOU'RE SUPPOSED TO DO WHEN

5  THERE'S A HIGH VTI HIT?

6  **A.**    YES.  THE POLICY WAS THAT YOU AUTOMATICALLY PUT A 25 MPH

7  SLOW ORDER ON IT.

8  **Q.**    AND WHO COMMUNICATED THAT POLICY TO YOU?

9  **A.**    MARK WHEELAND.

10  **Q.**    OKAY.  AND WHAT WAS MARK WHEELAND'S POSITION?

11  **A.**    HE WAS THE CHIEF ENGINEER OF THE SOUTHERN REGION.

12  **Q.**    WAS HE MR. GILSDORF'S SUPERIOR?

13  **A.**    YES.

14  **Q.**    OKAY.  SO YOU TOLD MR. GILSDORF THAT YOU WOULDN'T TAKE THE

15  SLOW ORDER OFF DURING THAT CONVERSATION ON JANUARY 22?

16  **A.**    YES.  I TOLD HIM I WOULD NOT TAKE THE SLOW ORDER OFF.

17  **Q.**    OKAY.  DID YOU HANG UP ON MR. GILSDORF DURING THAT

18  CONVERSATION?

19  **A.**    NO, I DID NOT HANG UP ON MR. GILSDORF.  NO.

20  **Q.**    WHEN HE TOLD YOU TO TAKE THE SLOW ORDER OFF, DID YOU

21  DETECT ANY EMOTION IN HIS TONE OF VOICE?

22  **A.**    YEAH, I DETECTED EMOTION IN THE TONE OF HIS VOICE.  HE

23  SEEMED LIKE HE WAS UPSET WITH ME, YOU KNOW, FOR PUTTING THE

24  SLOW ORDER ON.  SO HE SEEMED LIKE HE WAS UPSET WITH ME, AND I

25  FELT LIKE HE WAS ATTACKING ME BECAUSE I WAS FOLLOWING STANDARD

04:52 1   FRA PROCEDURE AND U.P. PROCEDURE.  SO I FELT ATTACKED THAT DAY

2   THAT I FOLLOWED INSTRUCTIONS THAT WAS GIVEN TO ME.  SO, YES, I

3   GOT VERY NERVOUS BECAUSE, YOU KNOW, HE WAS ONE OF THE

4   HIGH-RANKING OFFICIALS FROM THE MAINTENANCE OF WAY ON UNION

5   PACIFIC RAILROAD.  SO THAT MADE ME NERVOUS ABOUT MY JOB.

6   **Q.**   DID HE GIVE YOU ANY FURTHER INSTRUCTIONS DURING THIS PHONE

7   CALL?

8   **A.**   HE STILL INSISTED ME TAKE THE SLOW OFF, AND HE STILL

9   INSISTED THAT I GO AND DO THE 39 FOOT COUNT.  AND I TOLD HIM I

10   WASN'T GOING TO TAKE THE SLOW ORDER OFF, AND THERE WAS NO WAY

11   POSSIBLE I CAN DO IT, YOU KNOW.  SO HE STILL PUSHED BACK ON THE

12   ANSWER THAT I GAVE HIM.

13   **Q.**   DID YOU DISCUSS SWITCH 16 DURING THIS CONVERSATION?

14   **A.**   YES, WE DISCUSSED SWITCH 16 DURING THIS CONVERSATION.  YOU

15   KNOW, HE WANTED ME TO PUT THAT TRACK BACK IN SERVICE 'CAUSE HE

16   FELT LIKE IT DIDN'T NEED NO. 7 SWITCHES.

17   **Q.**   AND DID HE TELL YOU THAT?

18   **A.**   YES.

19   **Q.**   OKAY.  AND WHAT DID YOU SAY?

20   **A.**   I TOLD HIM, NO, THAT I WAS NOT GOING TO PUT THAT SWITCH

21   BACK IN SERVICE 'CAUSE OF SAFETY REASONS.

22   **Q.**   WERE THE REASONS FOR REFUSING THAT INSTRUCTION THE SAME

23   REASONS THAT YOU REFUSED MR. STUART'S INSTRUCTION TO PUT THAT

24   TRACK BACK INTO SERVICE?

25   **A.**   THAT'S THE SAME REASONS, 'CAUSE THEY HAD SAFETY ISSUES,

04:53 1   AND I DIDN'T WANT TO HAVE ANOTHER DERAILMENT THERE.  SO YES.

2   **Q.**   AND DID YOU DISCUSS THE INCIDENT THAT WE WERE JUST TALKING

3   ABOUT FROM JANUARY 22?  DID YOU FURTHER DISCUSS THAT WITH

4   ANYONE AT UNION PACIFIC?

5   **A.**   I TRIED TO CALL MARK WHEELAND THAT SAME DAY TO HAVE A

6   DISCUSSION WITH HIM, AND I LEFT A MESSAGE ON HIS PHONE.  BUT HE

7   NEVER RETURNED MY PHONE CALL.

8   **Q.**   DO YOU RECALL A TOWN HALL MEETING IN JANUARY OF 2018?

9   **A.**   YES.

10   **Q.**   CAN YOU TELL ME WHAT HAPPENED AT THAT MEETING?

11   **A.**   AT THAT MEETING I HAD AN EMAIL FROM KENNY STUART THAT

12   AFTER THE MEETING TO MEET WITH JACOB GILSDORF, KENNY STUART,

13   AND PHILLIP HAWKINS, AND THEY WANTED TO TALK ABOUT SWITCH 16.

14   AND ALSO THEY WANTED TALK ABOUT THIS SLOW ORDER.

15         SO, YOU KNOW, AFTER THEY LEFT THE MEETING, I STAYED

16   OVER WITH THEM AND WE HAD A DISCUSSION ABOUT IT.  AND THEY WAS

17   SAYING IN THAT MEETING THAT I WAS BEING BELLIGERENT, I WAS

18   INSUBORDINATE.  AND THOSE ARE THE TERMS THEY USED TOWARDS ME.

19   AND I FELT BETRAYED BECAUSE I THOUGHT THAT WAS UNREASONABLE,

20   BECAUSE I WAS WORKING WITH THEM AND TRYING TO GET HELP.  BUT,

21   YOU KNOW, THEY ACCUSED ME OF BEING INSUBORDINATE, BUT I DON'T

22   SEE HOW, WHEN I ANSWERED THEIR QUESTIONS AND I WAS WORKING WITH

23   THEM.

24   **Q.**   HOW WERE YOU INSUBORDINATE, ACCORDING TO THEM?

25   **A.**   HE WAS SAYING I WAS INSUBORDINATE BECAUSE I DIDN'T SEND

04:55 1   THE MEASUREMENTS ON JANUARY 10 ABOUT THAT SWITCH.  HE SAID I

2   WAS BEING INSUBORDINATE ABOUT THAT.  AND I TOLD HIM, NO, I

3   WASN'T, BECAUSE ON JANUARY 9, I INVITED Y'ALL TO LOOK AT THE

4   TRACK AND Y'ALL REFUSED TO LOOK AT IT.  AND I WAS GOING TO SHOW

5   THEM THAT THE TRACK WAS STILL -- THE MEASUREMENTS WAS STILL THE

6   SAME.  THEN HE SAID I WAS BEING INSUBORDINATE ABOUT NOT SENDING

7   THE INFORMATION THAT HE REQUESTED WITH THE VTI HIT.  YOU KNOW,

8   I COULDN'T UNDERSTAND, BECAUSE I UNDERSTOOD IT THAT I ANSWERED

9   ALL HIS QUESTIONS AND EVERYTHING.  SO I DON'T UNDERSTAND WHY I

10  WAS BEING INSUBORDINATE.

11  Q.   WERE YOU DISRESPECTFUL DURING THIS MEETING?

12  A.   NO, I WASN'T DISRESPECTFUL.  I WAS TERRIFIED AND I WAS

13  NERVOUS AND I WAS UPSET, AND I WAS AFRAID FOR MY JOB AND

14  EVERYTHING, AND I WAS TO THE POINT THAT I WAS SO NERVOUS AND

15  THEY KEPT THREATENING ME ABOUT MY JOB.  AND I JUST KEPT SAYING,

16  WELL, WHATEVER UNION PACIFIC RAILROAD IS GONNA DO IT, DO IT.

17  YOU KNOW, I SAID THAT.  YOU KNOW, AND I KEPT SAYING IT:

18  WHATEVER UNION PACIFIC RAILROAD GONNA DO, DO IT, BECAUSE AT

19  THIS TIME I WAS JUST -- THEY WAS TRYING TO TAKE MY LIVELIHOOD

20  AWAY, AND I UNDERSTAND THAT.

21       SO IN THAT MEETING, YES, I SAID, YOU KNOW, WHATEVER

22  Y'ALL WANT TO DO TO ME, GO AHEAD AND DO IT.  BUT I WASN'T

23  BELLIGERENT.

24  Q.   WHAT DID YOU MEAN WHENEVER YOU SAID THAT?

25  A.   WELL, THEY WAS TALKING ABOUT FIRING ME.  SO I JUST SAID,

04:57 1   IF THAT'S WHAT Y'ALL GONNA DO, DO IT.  BUT, YOU KNOW, I'M NOT

2   GOING TO BREAK THE SAFETY RULES.  YOU KNOW, IF THAT'S WHAT

3   Y'ALL FEEL LIKE Y'ALL NEED TO DO, GO AHEAD AND DO IT.  BUT, YOU

4   KNOW, I'M NOT GOING TO PUT THE TRACK BACK IN SERVICE UNTIL IT'S

5   REPAIRED PROPERLY.  AND I'M NOT GOING TO TAKE THE SLOW ORDER

6   OFF UNTIL IT'S PREPARED PROPERLY.  SO...

7   **Q.**   DID YOU WANT TO BE FIRED?

8   **A.**   OF COURSE, NOT.  I LOVED MY JOB.  YOU KNOW, I MEAN, I

9   LOVED --

10   **Q.**   IT'S OKAY.

11   **A.**   I LOVED MY JOB.  I FELT LIKE I WAS PROTECTING THE

12   COMMUNITY.  I WAS DOING PUBLIC SERVICE, AND I LOVED MY JOB.  I

13   DIDN'T WANT TO LOSE MY JOB.  BUT I FELT LIKE I HAD TO MAKE A

14   CHOICE BETWEEN FOLLOWING THE FRA REGULATIONS AND DOING

15   SOMETHING THAT WAS SAFE, SO I HAD TO MAKE A CHOICE.  AND IF I

16   HAD TO DO IT OVER AGAIN, I'D DO THE SAME THING.  I'D DO THE

17   SAME THING AGAIN.  I WOULD DO THE SAME THING.  I WOULD DO THE

18   SAME THING.

19   **Q.**   I'M SORRY, MR. TAYLOR.

20   **A.**   I'M SORRY.

21   **Q.**   I DO NOT WANT TO UPSET YOU.

22   **A.**   THIS IS HARD FOR ME.  I'M SORRY.  I'M SORRY.  YOU CAN GO

23   AHEAD.

24   **Q.**   OKAY, SIR.  TAKE A BREATH, IF YOU NEED TO.

25   **A.**   I'M READY.

04:59 1  **Q.**   WHAT HAPPENED AFTER THAT MEETING?

2  **A.**   AFTER THAT MEETING, I REPORTED THEM TO OUR WHISTLEBLOWER

3  HOTLINE FOR UNION PACIFIC RAILROAD TO THE EEO.  I REPORTED AND

4  I TOLD THEM WHAT WAS HAPPENING TO ME, AND I REPORTED TO THE EEO

5  ON JANUARY 22, 2018.

6  **Q.**   DID YOU REPORT IT TO ANYONE ELSE?

7  **A.**   ON THE 24TH, I REPORTED IT TO ROBERT FAABORG, WHAT WAS

8  HAPPENING TO ME.  ALSO, MR. ROBERT FAABORG IS THE CHIEF FRA

9  INSPECTOR, RAILROAD INSPECTOR -- FEDERAL RAILROAD INSPECTOR.

10  AND I ALSO REPORTED IT TO NICK ROPPOLO, WHICH WAS THE RAILROAD

11  INSPECTOR AT THE TIME.

12  **Q.**   AND DID YOU TELL ANYONE AT UNION PACIFIC THAT YOU MADE

13  THAT REPORT TO MR. FAABORG?

14  **A.**   I CAN'T REMEMBER TELLING ANYBODY IN UNION PACIFIC THAT I

15  MADE THE REPORT TO FAABORG, NO.

16  **Q.**   OKAY.  THEN WHAT HAPPENED?

17  **A.**   THEN ON JANUARY 29, YOU KNOW, AFTER THAT MEETING ON THE

18  25TH, I DIDN'T COME IN JANUARY 29.  I SENT AN EMAIL 'CAUSE I

19  WAS JUST DISTORTED.  AND THEN MY WIFE WAS TAKING ME AROUND.

20  AND THEN I SAW AT MY HOUSE THAT SOMEONE WAS RINGING MY

21  DOORBELL.  AND I THINK MY WIFE HAD TAKEN ME TO PICK UP MY

22  MEDICATION.  AND IT WAS KENNY STUART AND PHILLIP HAWKINS, THEY

23  WAS AT MY HOUSE UNANNOUNCED, AND I LOOKED AT MY -- I HAVE A

24  CAMERA.

25           THEN I CALLED KENNY STUART, AND I ASKED HIM, I SAID,

05:01 1    WHY ARE YOU AT MY HOUSE?  HE SAY, WE NEED TO MEET WITH YOU AND

2    EVERYTHING.  AND I WAS LIKE, OKAY.  WELL, WHAT'S IT ABOUT?  HE

3    WOULDN'T TELL ME.  HE SAID, HE NEED TO MEET WITH YOU.

4             AND THEN WHEN I GOT THERE, YOU KNOW, I MEAN, I --

5    WHEN I GOT THERE AND I WENT TO THE HOUSE, AND THEY CAME OVER

6    AND KNOCKED ON THE DOOR.  SO, I MEAN, I HAD NO IDEA WHAT WAS

7    COMING, AND I OPENED THE DOOR, AND IT WAS KENNY STUART AND

8    PHILLIP HAWKINS SITTING THERE.  AND MY WIFE WAS AT THE HOUSE.

9    AND THEN THEY START TALKING TO ME IN FRONT OF MY WIFE.  THEY

10   TOLD ME THAT, WE PUTTING YOU ON ADMINISTRATIVE LEAVE.  RIGHT

11   THERE IN FRONT OF MY WIFE AT MY HOUSE.  AND THEY SAID, WE

12   TAKING YOUR U.P. TRUCK.  WE TAKING YOUR LAPTOP.  WE TAKING YOUR

13   PHONE.  RIGHT THERE IN FRONT OF MY WIFE.  AND MY WIFE GOT UPSET

14   AND STARTED CRYING.  IT WAS PROBABLY ONE OF THE MOST HORRIBLE

15   DAYS OF MY LIFE.  THEY CAME TO MY HOUSE AND TOOK EVERYTHING.

16            AND I ASKED THEM WHY THEY PUTTING ME ON

17   ADMINISTRATIVE LEAVE?  AND THEY SAID THEY DON'T KNOW WHY.  WE

18   WAS INSTRUCTED TO PUT YOU ON ADMINISTRATIVE LEAVE.  I SAID,

19   WHY?  WHAT DID I DO?  AND THEY COULDN'T TELL ME WHY THEY PUT ME

20   ON ADMINISTRATIVE LEAVE, AND I WAS TRYING TO CALM MY WIFE DOWN,

21   CAUSE SHE WAS JUST CRYING, AND I WAS TRYING TO CALM HER DOWN,

22   AND I DON'T KNOW WHY THEY DID ME LIKE THAT.  I FELT LIKE THEY

23   WAS TREATING ME LIKE A CRIMINAL, YOU KNOW.

24            I TRIED TO EXPLAIN TO THEM, I SAID, WHY Y'ALL DIDN'T

25   TELL ME ON THE PHONE?  YOU KNOW, I WOULD'VE NEVER TOLD Y'ALL TO

05:03 1  COME TO MY HOUSE.  AND WHY Y'ALL COME TO MY HOUSE AND DO THAT

2  IN FRONT OF MY WIFE?

3        YOU KNOW, I COULDN'T UNDERSTAND WHY THEY DID THAT.

4  **Q.**  WHY THEY CAME TO YOUR HOUSE, YOU MEAN?

5  **A.**  YEAH, WHY THEY CAME TO MY HOUSE.  THEY COULD HAVE HANDLED

6  IT BETTER.  THEY COULD HAVE TOLD ME TO MEET THEM SOMEWHERE

7  ELSE.  THEY DIDN'T HAVE TO COME TO MY HOUSE AND EMBARRASS ME IN

8  FRONT OF MY WIFE.

9  **Q.**  DO YOU RECALL A MEETING ON JANUARY 31, 2018?

10  **A.**  YES.  I HAD A MEETING WITH JACOB GILSDORF, AND I HAD A

11  MEETING WITH -- WHAT'S HIS NAME? -- BOWMAN, CLIFFORD BOWMAN.

12  AND AT THAT MEETING THEY WERE TRYING TO PUT ME ON THAT

13  PERFORMANCE IMPROVEMENT PLAN, SAYING THAT I HAVE PERFORMANCE

14  ISSUES, AND THEY KEPT TALKING TO ME ABOUT PUTTING ME ON IT.

15  AND I READ IT, AND THEY WAS TALKING ABOUT THAT VTI HIT, THAT I

16  HAD PERFORMANCE ISSUES ABOUT THAT VTI HIT.  AND THAT'S WHEN I

17  PUT THAT SLOW ORDER OUT THERE.

18        AND THEY ALSO WAS TALKING ABOUT TRACK 16, ABOUT WHEN

19  I TOOK THAT TRACK OUT OF SERVICE, THAT I HAD PERFORMANCE ISSUES

20  ABOUT IT.  AND I BELIEVE IN A STATEMENT SAYING -- THAT KENNY

21  STUART WROTE -- THAT I REFUSED TO ENGAGE IN A CONVERSATION WITH

22  HIM ABOUT OPTIONS ABOUT PUTTING AN OUT-OF-SERVICE TRACK BACK IN

23  SERVICE.  AND I DID.  I MEAN, I TOLD THEM THAT THEY NEEDED NEW

24  SWITCHES.  AND I MET THEM ON THE 9TH TO TRY TO EXPLAIN TO THEM

25  WHAT WAS GOING ON WHEN THEY REFUSED TO LOOK AT THE TRACK.  SO

05:04 1  THAT WAS WHAT THE PIP LETTER WAS ABOUT.

2  **Q.**   ALL RIGHT.  LET'S LOOK AT JOINT EXHIBIT NO. 12.

3       AND IS THIS THE PERFORMANCE IMPROVEMENT PLAN THAT WE

4  WERE JUST DISCUSSING?

5  **A.**   YES.

6  **Q.**   ALL RIGHT.  LET'S GO DOWN TO PAGE U.P. TAYLOR 41.

7       SO UNDER "BUILDS TRUST," THE SECOND PARAGRAPH RIGHT

8  NEXT TO "PERFORMANCE ISSUE" --

9  **A.**   YES.

10  **Q.**   -- READS:  "ON 11/20/18 YOU WERE INSTRUCTED BY SRMTM" --

11  IS THAT SENIOR MANAGER OF TRACK MAINTENANCE?

12  **A.**   YES.

13  **Q.**   SO IS THAT KENNY STUART?

14  **A.**   YES.

15  **Q.**   -- "TO PROVIDE CURRENT MEASUREMENTS ON A TRACK TAKEN OUT

16  OF SERVICE.  YOU PROVIDED DERAILMENT MEASUREMENTS FROM 6 WEEKS

17  PRIOR AND DID NOT PERFORM CURRENT MEASUREMENTS AS INSTRUCTED BY

18  THE SRMTM."

19       DOES THAT PARAGRAPH ACCURATELY STATE THE FACTS FROM

20  JANUARY 10, 2018?

21  **A.**   NO, IT DOES NOT.

22  **Q.**   OKAY.  AND THAT IS IN REFERENCE TO THE MEASUREMENTS OF

23  SWITCH 16, TO YOUR UNDERSTANDING.  CORRECT?

24  **A.**   YES.

25  **Q.**   OKAY.  AND THE PARAGRAPH RIGHT ABOVE THAT:  "ON 1/22/2018

05:06 1    YOU WERE ASSIGNED THE TASK OF GETTING MORE INFORMATION ON A

2    HIGH VTI NEAR A BRIDGE.  YOU WERE DISRESPECTFUL AND

3    INSUBORDINATE TO DIRECTOR MOW" -- IS THAT MR. GILSDORF?

4    A.   YES.

5    Q.   -- "WHEN YOU REFUSED TO GATHER ANY ADDITIONAL INFORMATION

6    AS INSTRUCTED BY DIRECTOR MOW."

7         DOES THAT ACCURATELY STATE THE FACTS OF WHAT HAPPENED

8    ON JANUARY 22, 2018?

9    A.   NO, IT DOESN'T.

10   Q.   AND HOW IS IT INACCURATE?

11   A.   BECAUSE I PROVIDED JACOB GILSDORF WITH ALL THE INFORMATION

12   HE REQUESTED, AND I EXPLAINED TO HIM THAT 'CAUSE THE CROSSING

13   HAD CONCRETE BOARDS THAT I COULD NOT GET AN ACCURATE COUNT OF

14   HOW MANY TIES WAS DEFECTIVE -- NON-DEFECTIVE IN 39 FEET.  AND I

15   SUBMITTED IT TO HIM WITH AN EMAIL.  AND I RESPONDED TO HIS

16   EMAIL AND ANSWERED HIS QUESTIONS.

17   Q.   AND THEN THE NEXT PARAGRAPH, IT SAYS:  "YOU PROVIDED

18   DERAILMENT MEASUREMENTS FROM 6 WEEKS PRIOR IN REFERENCE TO

19   JANUARY 10."

20        THE MEASUREMENTS THAT YOU SENT MR. STUART, WERE THEY

21   DERAILMENT MEASUREMENTS?

22   A.   NO, THEY WAS NOT.

23   Q.   WHAT ARE "DERAILMENT MEASUREMENTS"?

24   A.   DERAILMENT MEASUREMENTS IS TAKEN WHEN THE TRACK IS ALL

25   TORN UP FROM DERAILMENT.  THAT MEANS THAT THE RAIL IS OUT OF

05:07 1   PLACE AND EVERYTHING, AND YOU JUST TRY TO TAKE THE MEASUREMENTS

2   OF WHAT IS THE LEFT OF THE TRACK 'CAUSE THE TRACK IS DAMAGED

3   AND SEE CAN YOU DETERMINE WHAT CAUSED THE DERAILMENT.

4   **Q.**   AND THE MEASUREMENTS WERE TAKEN ORIGINALLY ON NOVEMBER 24,

5   2017.  CORRECT?

6   **A.**   THAT IS CORRECT.

7   **Q.**   AND WASN'T THE TRACK IN SERVICE AND OPERATIONAL THEN?

8   **A.**   YES, IT WAS.

9   **Q.**   OKAY.  AND THEN YOU ALSO RETOOK THE MEASUREMENTS ON

10   JANUARY 4?

11   **A.**   YES, I DID.

12   **Q.**   WHICH YOU'VE TESTIFIED THAT YOU TOLD MR. STUART?

13   **A.**   YES.

14   **Q.**   AND IS THERE ANY POSSIBLE WAY THAT THE MEASUREMENTS COULD

15   HAVE CHANGED DURING THAT TIME ANYWAY?

16   **A.**   THERE'S NO POSSIBLE WAY BECAUSE THE MEASUREMENTS WAS TAKEN

17   TO DETERMINE THE SIZE OF THE SWITCH.  SO THAT'S THE CURVE OF

18   THE RAIL BETWEEN THE FROG AND THE SWITCH POINT.  AND THE ONLY

19   WAY TO GET THAT CURVATIVE OUT IS THAT, YOU KNOW, YOU GOT TO GET

20   ANOTHER SWITCH, A BIGGER SWITCH.  SO THERE'S NO WAY IT COULD

21   HAVE CHANGED.  IT'S PART OF THE DESIGN OF THE SWITCH.

22        **MR. SCHMIDT:**  ALL RIGHT.  LET'S SCROLL DOWN.  ALL

23   RIGHT.  STOP.

24   **BY MR. SCHMIDT:**

25   **Q.**   SO THE ONE IN THE MIDDLE RIGHT HERE, NEXT TO "PERFORMANCE

05:09 1   ISSUES":  "ON 1/10/2018 YOU CALLED YOUR SENIOR MTM REGARDING A

2   TRACK THAT WAS TAKEN OUT OF SERVICE AND REFUSED TO ENGAGE IN A

3   DISCUSSION ABOUT OPTIONS TO PLACE THE TRACK BACK IN SERVICE,

4   ULTIMATELY, HANGING UP PREMATURELY AND ENDING THE CALL."

5          SO HOW DID YOU INTERPRET THE PHRASE ABOUT "REFUSED TO

6   ENGAGE IN A DISCUSS ABOUT OPTIONS TO PLACE THE TRACK BACK IN

7   SERVICE"?

8   **A.**   I INTERPRETED IS THAT THEY WANTED ME TO PUT THE TRACK -- A

9   UNSAFE TRACK BACK IN SERVICE, AND I INTERPRETED IS THAT MY

10  PROFESSIONAL OPINION, AFTER INSPECTING TRACK AND LOOKING WITH

11  THE ENGINEER OUT OF OMAHA, IS THAT IT NEEDED NEW SWITCHES.  AND

12  MY INTERPRETATION OF THAT IS THAT THEY DIDN'T AGREE WITH MY

13  PROFESSIONAL OPINION ABOUT THE TRACK, WHAT NEEDED TO BE DONE TO

14  CORRECT IT.

15  **Q.**   AND ON THE PHONE CALL ON JANUARY 10, DID MR. STUART

16  PROPOSE ANY OPTIONS?

17  **A.**   NO, HE DID NOT.

18  **Q.**   WHAT DID HE TELL YOU TO DO?

19  **A.**   HE TOLD ME TO PUT THE TRACK BACK IN SERVICE.

20  **Q.**   OKAY.  AND THAT IS REFERRED TO AS A PERFORMANCE ISSUE IN

21  THIS DOCUMENT?

22  **A.**   THAT'S WHAT IT SAYS:  "A PERFORMANCE ISSUE."

23  **Q.**   OKAY.  AND DID YOU HANG UP ON THIS PHONE CALL?

24  **A.**   NO, I DID NOT.

25  **Q.**   OKAY.  SO WOULD YOU SAY THAT THE FACTUAL STATEMENTS IN

05:10 1 THIS PARAGRAPH ARE TRUE OR FALSE?

2 **A.** THEY ARE FALSE.

3 **MR. SCHMIDT:** LET'S SCROLL DOWN.

4 **BY MR. SCHMIDT:**

5 **Q.** SO THE THIRD PARAGRAPH UNDER "MANAGER COMMENTS," IT READS:

6 "FAILURE TO SHOW PROGRESS THROUGHOUT THE DURATION OF THIS PIP

7 AND/OR ANY FUTURE INCIDENTS INVOLVING PERFORMANCE RELATED TO

8 THIS PIP WILL BE CAUSE FOR ACTION, UP TO AND INCLUDING

9 DISMISSAL."

10 HOW DID YOU INTERPRET THAT?

11 **A.** THAT THEY WAS TRYING TO FIRE ME.

12 **Q.** OKAY.

13 **A.** THAT IF I TOOK A TRACK OUT OF SERVICE BECAUSE THEY HAD

14 SAFETY ISSUES, THAT I WAS GOING TO GET FIRED.  IF I

15 SLOW-ORDERED ANOTHER TRACK BECAUSE IT HAD SAFETY ISSUES, THAT

16 I'M TRYING TO PROTECT THE PUBLIC, THAT I WAS GOING TO GET

17 FIRED.

18 **Q.** AND DID YOU SIGN THOSE DOCUMENTS?

19 **A.** NO, I DID NOT.

20 **Q.** WHY NOT?

21 **A.** BECAUSE I FELT LIKE THIS DOCUMENT WAS PREVENTING ME TO

22 PROTECT THE TRACK AND PROTECT -- PREVENTED ME TO SAFELY PROTECT

23 THE TRACK AND WOULD CAUSE SAFETY ISSUES, THAT I COULDN'T WRITE

24 UP DEFECTS OR TAKE A TRACK OUT OF SERVICE OR SLOW ORDER.  SO

25 THAT WOULD HAVE BEEN A SAFETY ISSUE.  SO IF I COME ACROSS IT,

05:11 1   YOU KNOW, IF I DID IT, I WAS GOING TO GET FIRED.  AND THEY WERE

2   PREVENTING ME FROM PROTECTING THE PUBLIC FROM HAVING A

3   DERAILMENT AND HAVING A MAJOR DISASTER BECAUSE THE TRACK WAS

4   NOT REMEDIATED PROPERLY.

5   **Q.**   OKAY.  SO HOW DID THE MEETING END?

6   **A.**   THE MEETING END WITH I REFUSED TO SIGN THE PIP LETTER, AND

7   THEY JUST TOLD ME AT THE END OF THE MEETING, WHEN I REFUSED

8   TO -- THEY SAID, THAT WOULD BE, ALL AND THEY SAID I CAN LEAVE

9   NOW.

10  **Q.**   AND WHAT WAS THE NEXT THING YOU -- WHAT WAS THE NEXT

11  CONTACT YOU HAD WITH UNION PACIFIC?

12  **A.**   THE NEXT CONTACT I HAD WITH UNION PACIFIC WAS ON

13  FEBRUARY 27, 2018, I GOT A PHONE CALL FROM KENNY STUART, AND

14  THEY TOLD ME TO MEET THEM AT STARBUCKS IN GONZALES.  IT WAS

15  KENNY STUART AND MARK WHEELAND.  AND THEN WHEN I WENT TO

16  STARBUCKS, MARK WHEELAND HANDED ME THE PAPERS AND SAID, WE

17  DECIDED TO TERMINATED YOU.  AND I ASKED HIM WHY.  HE DIDN'T

18  TELL ME WHY.  HE SAID, WE DECIDED TO TERMINATE YOU.  AND HE

19  GAVE ME THE LETTER IN STARBUCKS, AND THEY TERMINATED ME FROM

20  UNION PACIFIC RAILROAD.

21  **Q.**   AND THAT WAS FEBRUARY 27, 2018?

22  **A.**   THAT IS CORRECT.

23  **Q.**   AND WHAT WAS THE DATE OF YOUR 2017 PERFORMANCE REVIEW?

24  **A.**   DECEMBER 29, 2017.

25  **Q.**   SO YOU WENT FROM RECEIVING A POSITIVE PERFORMANCE REVIEW

05:13 1  TO TWO MONTHS LATER BEING TERMINATED.  WHAT CHANGED DURING THAT
2  TIME?
3  **A.**   WHAT CHANGED WAS THAT I REFUSED TO PUT THAT TRACK BACK IN
4  SERVICE BECAUSE IT HAD SAFETY ISSUES, AND I WASN'T GOING TO PUT
5  IT BACK INTO SERVICE UNTIL IT WAS REPAIRED PROPERLY.  AND I
6  REFUSED TO TAKE THAT SLOW ORDER OFF IN WHITE CASTLE, AND I
7  WASN'T GOING TO HAVE IT TAKEN OFF TILL THE TRACK WAS REPAIRED
8  PROPERLY, 'CAUSE I WAS DOING WHAT WAS SAFE FOR THE PUBLIC.
9  **Q.**   PRIOR TO BEING PLACED ON ADMINISTRATIVE LEAVE, DID YOU --
10  HAD YOU RECEIVED ANY TYPE OF DISCIPLINE DURING YOUR EMPLOYMENT
11  AT UNION PACIFIC?
12  **A.**   I NEVER RECEIVED ANY TYPE OF DISCIPLINE BEFORE WITH UNION
13  PACIFIC RAILROAD.  NONE.  NO DISCIPLINE.
14  **Q.**   ALL RIGHT.  LET'S LOOK AT PLAINTIFF'S EXHIBIT NO. 22.  AND
15  THIS HAS NOT BEEN PREADMITTED.
16        ALL RIGHT.  DO YOU RECOGNIZE THIS DOCUMENT, SIR?
17  **A.**   YES.
18  **Q.**   OKAY.  WHAT IS THIS DOCUMENT?
19  **A.**   IT'S A LIST OF COMPLAINTS THAT I HAVE TO UNION PACIFIC
20  RAILROAD.
21  **Q.**   DID YOU CREATE THIS LIST?
22  **A.**   NO, I DID NOT.
23  **Q.**   OKAY.  WHO CREATED THIS LIST?
24  **A.**   UNION PACIFIC RAILROAD.
25  **Q.**   OKAY.  AND HOW DID YOU RECEIVE THIS LIST?

05:15  1   **A.**   I RECEIVED IT DURING DECLARATION WHEN THEY WAS -- I MEAN,
       2   U.P. SENT IT TO US WHEN WE WAS DOING -- I REMEMBER SEEING THIS
       3   DOCUMENT AFTER U.P. SENT IT TO US AFTER WE WAS DOING -- I
       4   FORGOT WHAT YOU CALL IT.
       5   **Q.**   WAS IT DURING THIS LITIGATION?
       6   **A.**   YES.
       7   **Q.**   OKAY.  AND DOES THIS DOCUMENT ACCURATELY SET FORTH THE
       8   COMPLAINTS THAT YOU MADE WITHIN THE UNION PACIFIC EEO
       9   DEPARTMENT DURING YOUR EMPLOYMENT THERE?  AND WE CAN SCROLL
      10   DOWN TO THE NEXT PAGE WHENEVER YOU'RE READY.
      11   **A.**   YES.  YOU CAN SCROLL DOWN.  YOU CAN SCROLL DOWN.  YES.
      12         **MR. SCHMIDT:**  YOUR HONOR, I REALIZE IT'S 5:15 NOW.  I
      13   AM VERY CLOSE TO BEING DONE.  WOULD YOU LIKE ME TO CONTINUE AND
      14   FINISH UP?
      15         **THE COURT:**  HOW MUCH TIME DO YOU THINK YOU NEED?
      16         **MR. SCHMIDT:**  TEN MINUTES.
      17         **THE COURT:**  ALL RIGHT.  GO AHEAD.
      18         **MR. SCHMIDT:**  OKAY.
      19   BY MR. SCHMIDT:
      20   **Q.**   MR. TAYLOR, YOU ALLEGE THAT YOU HAVE BEEN HARMED AS A
      21   RESULT OF UNION PACIFIC'S CONDUCT IN THIS LAWSUIT.  CORRECT?
      22   **A.**   YES.
      23   **Q.**   OKAY.  HOW DO YOU ALLEGE THAT YOU HAVE BEEN HARMED?
      24   **A.**   I MEAN, IT CAUSED A LOT OF STRESS, ESPECIALLY AFTER I'D
      25   BEEN FIRED.  I WENT INTO A DEEP DEPRESSION.  I HAD PROBLEMS

05:17 1   SLEEPING.  I DIDN'T ENJOY DOING THINGS I LOVED DOING, LIKE

2   PLAYING MY GUITAR, GOING GOLFING.  I WOULD FREQUENTLY LEAVE MY

3   HOUSE FOR LIKE DAYS AND LEAVE WITH MY WIFE NOT KNOWING WHERE I

4   WAS.  I WOULD JUST LEAVE, 'CAUSE I WAS JUST SO UPSET.

5            IT CAUSED TROUBLE WITH MY MARRIAGE.  I WAS IN A DEEP

6   DEPRESSION.  I FELT LIKE I WAS BETRAYED.  I FELT LIKE I GAVE MY

7   LIFE TO UNION PACIFIC RAILROAD, AND THAT'S HOW THEY END UP

8   DOING ME.  EMOTIONALLY, THEY TOOK MY LIVELIHOOD.

9   **Q.**   DID YOU SUFFER ANXIETY?

10  **A.**   YES, I SUFFERED ANXIETY.  I SUFFER ANXIETY FOR IT.  I'VE

11  BEEN GETTING TREATMENT FOR IT.  YOU KNOW, I HAD TO GO SEE A

12  PSYCHIATRIST, AND HE BEEN HELPING WITH IT.  BUT I SUFFER A LOT

13  OF ANXIETY WITH IT, ABOUT WHAT HAPPENED AND EVERYTHING.

14  **Q.**   WHEN DID YOU FIRST START SEEING A PSYCHIATRIST?

15  **A.**   I FIRST START SEEING A PSYCHIATRIST MAYBE TWO THOUSAND --

16  END OF 2018, 2019.  I'M NOT FOR SURE.  I JUST GOT TO A POINT TO

17  WHERE I JUST WASN'T FUNCTIONING IN LIFE.  SO, I MEAN, I WOULD

18  SIT IN THE DARK FOR HOURS.  AND FINALLY MY WIFE CONVINCED ME TO

19  GO SEE A PSYCHIATRIST, AND I DID.

20  **Q.**   OKAY.  SO THE FEELINGS OF DEPRESSION THAT YOU WERE

21  DESCRIBING, HOW OFTEN WAS THAT AND FOR HOW LONG DID IT LAST?

22  **A.**   I WOULD SAY FROM -- MOSTLY FROM 2017, WHEN I HAD A BATTLE

23  BETWEEN THE FRA AND UNION PACIFIC RAILROAD.  I WAS UNDER SO

24  MUCH STRESS FROM 2017 UP TO TWO THOUSAND -- EARLY 2021.  AFTER

25  SEEING A PSYCHIATRIST, I FINALLY STARTED BACK DOING THINGS THAT

05:20  1   I LOVED DOING.  SO I CAME BACK -- SLOWLY BACK TO MY OLD SELF.

       2   SO FROM '17 TO 2021.

       3   **Q.**   AND COMPARING BEFORE AND AFTER YOUR TERMINATION, WHEN YOU

       4   WERE TERMINATED, DID IT GET WORSE OR BETTER OR STAYED THE SAME?

       5   **A.**   IT GOT WORSE AFTER I GOT TERMINATED.

       6   **Q.**   OKAY.

       7   **A.**   BECAUSE I WAS WORRIED BECAUSE MY WHOLE FINANCE WAS BUILT

       8   ON WHAT -- THE MONEY I WAS MAKING WITH UNION PACIFIC RAILROAD.

       9   AND THEY TOOK THAT MONEY AWAY, SO I WAS STRUGGLING TRYING TO

     10   MAINTAIN MY HOUSE, MY CAR.

     11       FOR ABOUT A YEAR AND A HALF, IT WAS DIFFICULT FOR ME

     12   TO GET A JOB BECAUSE, YOU KNOW, I GOT DEPRESSED ABOUT THAT.

     13   BECAUSE WHEN I APPLIED FOR THE JOB, THEY ASKED, "HAVE YOU BEEN

     14   FIRED?" AND I AIN'T WANT TO PUT FALSE INFORMATION ON MY

     15   APPLICATION, SO I TOLD THEM "I GOT FIRED."  BUT, YOU KNOW, THEY

     16   WOULDN'T LOOK AT ME AFTER THEN.  AND I COULDN'T GET A JOB,

     17   BECAUSE I DIDN'T HAVE ANY REFERENCES, BECAUSE UNION PACIFIC

     18   FIRED ME.  I MEAN, IT'S HARD TO GET ANOTHER JOB MAKING THAT

     19   TYPE OF MONEY WITHOUT A REFERENCE.  SO I WAS DEPRESSED ABOUT

     20   THAT.

     21   **Q.**   OKAY.  AND WHAT ABOUT THE ANXIETY AND TROUBLE SLEEPING?

     22   HOW FREQUENT WAS THAT AND HOW LONG DID IT LAST?

     23   **A.**   THAT LASTED FOR -- AFTER THE -- ABOUT A YEAR AND A HALF,

     24   YOU KNOW, HAVING PROBLEMS SLEEPING.  I JUST COULDN'T GO TO

     25   SLEEP AT NIGHT.  I'D JUST LAY THERE AND TOSS IN THE BED.  AND,

05:22  1    YOU KNOW, I WOULD SIT THERE THINKING ABOUT IT, YOU KNOW.  IT
       2    JUST KEPT RACING IN MY MIND ABOUT EVERYTHING THAT HAPPENED, WHY
       3    IT HAPPENED TO ME, WHAT DID I DO WRONG.  YOU KNOW, SO IT KEPT
       4    RACING IN MY MIND.  SO...
       5    **Q.**    AND DID THAT GET BETTER OR WORSE WHEN --
       6    **A.**    THAT GOT BETTER WITH MEDICATION.
       7    **Q.**    I'M SORRY.  WHEN YOU WERE TERMINATED, DID IT GET BETTER OR
       8    WORSE?
       9    **A.**    WHEN I WAS TERMINATED?  OH, MY SLEEPING GOT WORSE WHEN I
      10    WAS TERMINATED.
      11    **Q.**    OKAY.  AND SO SINCE YOU HAVE BEEN SEEING A PSYCHIATRIST
      12    AND TAKING MEDICATIONS, THOSE THINGS HAVE IMPROVED?
      13    **A.**    YES.
      14    **Q.**    OKAY.  ARE YOU BACK TO WHERE YOU WERE BEFORE ALL THIS
      15    HAPPENED?
      16    **A.**    I'M 95 PERCENT THERE.
      17    **Q.**    OKAY.  ARE THERE ANY THINGS THAT YOU USED TO ENJOY DOING
      18    THAT YOU STOPPED DOING AFTER YOUR TERMINATION?
      19    **A.**    YES.  I LOVED PLAYING MY GUITAR AND MAKING MUSIC, AND I
      20    REALLY ENJOYED DOING THAT, AND I JUST STOPPED DOING IT.  I
      21    MEAN, THAT'S ONE OF MY PASSIONS, YOU KNOW, PLAYING THE GUITAR,
      22    MUSIC.  I REALLY ENJOY GOING GOLFING, WATCHING A GOOD MOVIE,
      23    YOU KNOW, THINGS LIKE THAT.  I REALLY ENJOYING DO IT, AND I
      24    JUST HAVE NO DESIRE TO DOING IT AFTER I GOT FIRED.
      25             IT WAS A STRUGGLE, YOU KNOW, TO GET MYSELF IN THE

05:23 1   RIGHT FRAME OF MIND JUST TO PLAY WITH MY GRANDCHILDREN, AND,

2   YOU KNOW, IT WAS JUST A STRUGGLE FOR ME TO DO IT, YOU KNOW.

3   **Q.**   IS THERE ANYTHING ELSE THAT YOU STOPPED DOING AROUND THE

4   TIME YOU WERE FIRED?

5   **A.**   THAT'S IT.  I JUST DIDN'T ENJOY LIFE ANYMORE, AND I JUST

6   DIDN'T ENJOY LIFE ANYMORE.  AND I JUST -- SOMETIMES I THOUGHT,

7   YOU KNOW, IT WASN'T WORTH LIVING, YOU KNOW.  I GOT TO THAT

8   POINT.

9   **Q.**   HOW MUCH WERE YOU MAKING AT UNION PACIFIC AT THE TIME OF

10   YOUR TERMINATION?

11   **A.**   WITH MY BONUSES?  PROBABLY $120,000 OR MORE A YEAR.

12   **Q.**   ARE YOU EMPLOYED NOW?

13   **A.**   YES.

14   **Q.**   OKAY.  AND WHERE ARE YOU EMPLOYED?

15   **A.**   I'M EMPLOYED AT THE EAST BATON ROUGE PARISH SCHOOL SYSTEM.

16   I'M AN EIGHTH GRADE MATH TEACHER.

17   **Q.**   OKAY.  AND WHAT IS YOUR CURRENT SALARY?

18   **A.**   $46,000 A YEAR.

19   **Q.**   AND HOW LONG HAVE YOU BEEN EMPLOYED BY THE SCHOOL BOARD?

20   **A.**   SINCE TWO THOUSAND -- AUGUST OF 2019.

21   **Q.**   OKAY.  SO IN BETWEEN YOUR TERMINATION FROM UNION PACIFIC

22   IN FEBRUARY OF 2018 AND YOUR EMPLOYMENT FOR THE SCHOOL, IN

23   AUGUST OF 2019, DID YOU HAVE ANY OTHER EMPLOYMENT DURING THAT

24   TIME?

25   **A.**   NO, I DID NOT.

05:25 1   Q.   OKAY.  DID YOU LOOK FOR OTHER EMPLOYMENT DURING THAT TIME?

2   A.   YES.  YES.  I SEARCHED DILIGENTLY FOR OTHER EMPLOYMENT,

3   YES.

4   Q.   WHAT JOBS DID YOU APPLY FOR?

5   A.   I APPLIED FOR KCS RAILROAD.  I APPLIED FOR SEVERAL PLANTS,

6   LIKE EXXON PLANTS.  I APPLIED FOR BASF.  I APPLIED FOR

7   ENGINEERING FIRMS, SEVERAL PLANT JOBS AROUND HERE, MANAGEMENT

8   JOBS.  I APPLIED FOR LOWE'S.  I WAS JUST TRYING TO GET SOME

9   EMPLOYMENT, YOU KNOW.  I APPLIED WITH HOME DEPOT.  I WAS JUST

10  TRYING TO GET EMPLOYMENT.  SO...

11  Q.   ALL RIGHT.  LET'S LOOK AT PLAINTIFF'S EXHIBIT NO. 40,

12  WHICH IS PREADMITTED.

13       AND CAN YOU TELL ME WHAT THIS DOCUMENT IS?

14  A.   THIS IS THE JOBS I APPLIED FOR, FOR THE STATE OF LOUISIANA

15  DEPARTMENT OF TRANSPORTATION.

16  Q.   OKAY.  AND DID YOU CREATE THIS DOCUMENT?

17  A.   NO, I DID NOT.  NO, I DID NOT.

18  Q.   WHERE DID YOU GET IT FROM?

19  A.   NO, I DID NOT CREATE THIS DOCUMENT.

20  Q.   WHERE DID YOU GET IT FROM?

21  A.   I GOT IT OFF THE LOUISIANA JOB WEBSITE.  I PRINTED IT OFF

22  THERE.

23  Q.   OKAY.  THIS IS A PRINTOUT THAT -- FROM THE LOUISIANA

24  WEBSITE?

25  A.   YES.

05:27 1    **Q.**   OKAY.  AND DOES THIS ACCURATELY SHOW JOBS THAT YOU APPLIED

2    FOR?

3    **A.**   YES.

4    **Q.**   ALL RIGHT.  LET'S LOOK AT PLAINTIFF'S EXHIBIT NO. 44,

5    WHICH IS ALSO PREADMITTED.

6            AND CAN YOU TELL ME WHAT THIS DOCUMENT IS?

7    **A.**   THAT'S FOR ME APPLYING FOR JOBS.  YES.  I DON'T KNOW IF

8    THAT'S -- BUT THAT'S ME APPLYING FOR JOBS, DIFFERENT JOBS.

9            **MR. SCHMIDT:**  OKAY.  CAN WE JUST KIND OF SCROLL

10   THROUGH THE DOCUMENT.

11   **BY MR. SCHMIDT:**

12   **Q.**   CAN YOU TELL ME IF THESE ARE ALL JOBS THAT YOU APPLIED

13   FOR?

14   **A.**   YES, THESE ARE THE JOBS I APPLIED FOR.

15   **Q.**   OKAY.  AND LET'S LOOK AT PLAINTIFF'S EXHIBIT NO. 41.

16           AND CAN YOU TELL ME WHAT THIS DOCUMENT IS?

17   **A.**   THOSE ARE THE JOBS THAT I APPLIED FOR.

18   **Q.**   DID YOU PREPARE THIS DOCUMENT?

19   **A.**   THIS DOES LOOK LIKE I CREATED AN EXCEL SPREADSHEET TO ALL

20   THE JOBS THAT I WAS APPLYING FOR, AND I PUT IT ON THERE SO I

21   CAN KEEP UP WHO RESPONDED AND WHO DID NOT RESPOND.  SO IT LOOKS

22   LIKE SOMETHING I CREATED.

23   **Q.**   DO YOU KNOW HOW MANY JOBS YOU APPLIED FOR BETWEEN YOUR

24   TERMINATION AND YOUR EMPLOYMENT AS A TEACHER?

25   **A.**   IT WAS HUNDREDS.  I MEAN, IT WAS IN THE HUNDREDS.

05:29 1          **MR. SCHMIDT:**  OKAY, YOUR HONOR.  I TENDER THE

2     WITNESS.

3               **THE COURT:**  OKAY, LADIES AND GENTLEMEN.  THIS IS A

4     PERFECT TIME TO TAKE A BREAK.  I APOLOGIZE FOR KEEPING YOU A

5     FEW MINUTES LATE.  BUT I GUARANTEE YOU THE TRAFFIC IS JUST

6     GOING TO BE TERRIBLE.  SO YOU SIT HERE AND WORK OR YOU SIT IN

7     TRAFFIC.  SO PLEASE HEED THE ADMONITION OF THE COURT NOT TO

8     DISCUSS THIS WITH ANYONE, NOT TO DO ANY INDEPENDENT RESEARCH.

9     AND WE WILL RECONVENE TOMORROW MORNING AT 9:00 A.M.

10              **(WHEREUPON, THE JURY EXITED THE COURTROOM.)**

11              **THE COURT:**  OKAY.  WE WILL STAND IN RECESS UNTIL

12    9:00 A.M.

13     **(WHEREUPON, THE PROCEEDINGS WERE ADJOURNED UNTIL 11/02/2021.)**

14                                * * *

15

16                         **<u>CERTIFICATE</u>**

17          I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

18    UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

19    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

20    THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

21    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22

23                        *Shannon Thompson*

24                        SHANNON THOMPSON, CCR

25                        OFFICIAL COURT REPORTER