1             UNITED STATES DISTRICT COURT

2             MIDDLE DISTRICT OF LOUISIANA

3

4   JOHNNY TAYLOR              *       CIVIL ACTION

5   VERSUS                     *       NO. 18-1110

6   UNION PACIFIC RAILROAD     *       NOVEMBER 2, 2021

7   COMPANY, INC.             *       VOLUME II OF IV

8   * * * * * * * * * * * * * *

9

10                  TRIAL BY JURY BEFORE
                 THE HONORABLE SHELLY D. DICK
11            UNITED STATES CHIEF DISTRICT JUDGE

12

13  APPEARANCES:

14  FOR THE PLAINTIFF:        SMITH LAW FIRM
                             BY:  J. ARTHUR SMITH, III, ESQ.
15                                ROBERT M. SCHMIDT, ESQ.
                             803 NORTH STREET
16                           BATON ROUGE, LOUISIANA 70802

17  FOR THE DEFENDANT:        FRASER, WHEELER, BERGSTEDT &
                             COURTNEY, LLP
18                           BY:  DAVID A. FRASER, ESQ.
                             4350 NELSON ROAD
19                           LAKE CHARLES, LOUISIANA 70606

20  FOR THE DEFENDANT:        SEYFARTH SHAW, LLP
                             BY:  LINDA C. SCHOONMAKER, ESQ.
21                                BRIAN A. WADSWORTH, ESQ.
                             700 MILAM STREET, SUITE 1400
22                           HOUSTON, TEXAS 77002

23  OFFICIAL COURT REPORTER:  SHANNON L. THOMPSON, CCR
                             UNITED STATES COURTHOUSE
24                           777 FLORIDA STREET
                             BATON ROUGE, LOUISIANA 70801
25                           SHANNON_THOMPSON@LAMD.USCOURTS.GOV
                             (225)389-3567



1    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
        COMPUTER-AIDED TRANSCRIPTION SOFTWARE
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           <u>INDEX</u>

2                                                              <u>PAGE</u>

3      **PLAINTIFF'S WITNESSES:**
       **JOHNNY TAYLOR**
4          CROSS-EXAMINATION BY MS. SCHOONMAKER              5
           REDIRECT EXAMINATION BY MR. SCHMIDT               15

5
       **JACOB M. GILSDORF**
6          DIRECT EXAMINATION BY MR. SCHMIDT                 19

7      **DOUGLAS J. TRAUTH, JR.**
           DIRECT EXAMINATION BY MR. SMITH                   48
8          CROSS-EXAMINATION BY MR. FRASER                   53

9      **KENNETH W. STUART, II**
           DIRECT EXAMINATION BY MR. SCHMIDT                 55
10
       **MARK A. WHEELAND**
11         DIRECT EXAMINATION BY MR. SMITH                   80

12     **NICHOLAS ISAAC**
           DIRECT EXAMINATION BY MR. SMITH                   92
13         CROSS-EXAMINATION BY MR. FRASER                   115

14     **ERICA L. TAYLOR**
           DIRECT EXAMINATION BY MR. SMITH                   122
15
       **DEFENDANT'S WITNESSES:**
16     **PHILLIP P. HAWKINS, JR.**
           DIRECT EXAMINATION BY MR. FRASER                  160
17         CROSS-EXAMINATION BY MR. SCHMIDT                  185

18     **KENNETH W. STUART, II**
           DIRECT EXAMINATION BY MR. WADSWORTH               191

19

20

21

22

23

24

25

1                **(NOVEMBER 2, 2021)**

2             **(CALL TO THE ORDER OF COURT)**

3      **THE COURT:**  GOOD MORNING.

4           BE SEATED MOMENTARILY.

5           I THINK WE'LL PROBABLY BE READY TO TAKE A LOOK

6 AT JURY CHARGES EITHER TOMORROW MORNING BEFORE COURT OR

7 TOMORROW AT NOON, SO MAKE ARRANGEMENTS TO BRING YOUR POWER BAR

8 OR WHATEVER.  I'LL TRY TO HAVE A DRAFT FOR YOU THIS AFTERNOON

9 AT THE CLOSE OF BUSINESS THAT YOU CAN TAKE HOME TO LOOK AT

10 TONIGHT SO THAT YOU CAN COMPARE IT TO WHAT YOUR VARIOUS

11 REQUESTS ARE.

12           IS THERE ANYTHING ELSE THAT WE NEED TO DO

13 HOUSEKEEPING-WISE?

14        **MS. SCHOONMAKER:**  NOT FROM THE DEFENDANT, YOUR HONOR.

15        **THE COURT:**  GREAT.

16        WE CAN BRING IN THE JURY.

17        **(WHEREUPON, THE JURY ENTERED THE COURTROOM.)**

18        **THE COURT:**  GOOD MORNING, EVERYONE.

19        **IN CONCERT:**  GOOD MORNING.

20        **THE COURT:**  BE SEATED.

21        OKAY, MS. SCHOONMAKER.  YOUR WITNESS.

22        **MS. SCHOONMAKER:**  THANK YOU, YOUR HONOR.  MAY I

23 PROCEED?

24        **THE COURT:**  YOU MAY.

25

09:04 1                    CROSS-EXAMINATION

2    BY MS. SCHOONMAKER:

3    **Q.**    GOOD MORNING, MR. TAYLOR.

4    **A.**    GOOD MORNING.

5    **Q.**    MR. TAYLOR, YOU WORKED FOR UNION PACIFIC RAILROAD COMPANY

6    FROM SEPTEMBER OF 2007 UNTIL LATE FEBRUARY OF 2018.  CORRECT?

7    **A.**    THAT IS CORRECT.

8    **Q.**    THAT WAS ALMOST TEN AND A HALF YEARS OF EMPLOYMENT.

9    RIGHT?

10   **A.**    THAT IS CORRECT.

11   **Q.**    YOU WERE A VALUABLE EMPLOYEE OF UNION PACIFIC RAILROAD,

12   WEREN'T YOU?

13   **A.**    YES.

14   **Q.**    AND YOU WERE A VALUED EMPLOYEE.  CORRECT?

15   **A.**    YES.

16   **Q.**    YOU WERE HIRED INTO A MANAGEMENT TRAINING PROGRAM BY UNION

17   PACIFIC IN 2008.  RIGHT?

18   **A.**    THAT IS CORRECT.

19   **Q.**    AND YOU PROGRESSED IN YOUR UNION PACIFIC CAREER FROM

20   ENGINEER ASSOCIATE TO ASSISTANT MANAGER OF TRACK MAINTENANCE TO

21   MANAGER OF TRACK MAINTENANCE.  CORRECT?

22   **A.**    CORRECT.

23   **Q.**    YOU RECEIVED RAISES; THERE WERE PAID BONUSES THROUGHOUT

24   YOUR ENTIRE CAREER.  CORRECT?

25   **A.**    THAT IS CORRECT.

09:05 1   **Q.**   YOUR LAST DIRECT MANAGER WHILE YOU WORKED FOR UNION

2   PACIFIC WAS KENNY STUART.  CORRECT?

3   **A.**   THAT IS CORRECT.

4   **Q.**   BEFORE THAT, YOUR MANAGER WAS MARK OLDHAM?

5   **A.**   YES.

6   **Q.**   AND MR. OLDHAM RETIRED FROM UNION PACIFIC IN 2017?

7   **A.**   THAT IS CORRECT.

8   **Q.**   YOU WANTED TO BE PROMOTED TO MR. OLDHAM'S JOB WHEN HE

9   RETIRED?

10   **A.**   YES.

11   **Q.**   BUT MR. STUART GOT THE JOB?

12   **A.**   YES.

13   **Q.**   AS A MANAGER OF TRACK MAINTENANCE, YOUR JOB WAS TO LEAD A

14   TEAM OF UNION PACIFIC EMPLOYEES?

15   **A.**   YES.

16   **Q.**   THE JOB OF YOUR TEAM UNDER YOUR LEADERSHIP WAS TO MAINTAIN

17   THE TRACKS TO THE REQUIRED STANDARDS AND MAKE REPAIRS?

18   **A.**   YES.

19   **Q.**   THE TRACKS YOU MAINTAINED WERE BOTH THE MAIN LINE TRACKS

20   AND THE YARD TRACKS?

21   **A.**   THAT IS CORRECT.

22   **Q.**   THE MAIN LINE TRACKS ARE USED BY TRAINS TO GET TO A

23   DESTINATION?

24   **A.**   YES.

25   **Q.**   AND THE YARD TRACKS ARE USED TO BUILD A TRAIN, AS YOU

09:06 1  SAID?

2  **A.**    YES.

3  **Q.**    AND THAT MEANS CONNECTING A LOCOMOTIVE TO SOME RAIL CARS.

4  CORRECT?

5  **A.**    YES.

6  **Q.**    YOU HAD THE AUTHORITY TO REDUCE THE SPEED OF A TRAIN ON

7  EITHER THE MAIN TRACKS OR THE YARD TRACKS?

8  **A.**    YES.

9  **Q.**    AND THAT'S CALLED A "SLOW ORDER"?

10  **A.**    YES.

11  **Q.**    KIND OF LIKE REDUCING A SPEED LIMIT IN A CONSTRUCTION ZONE

12  ON A HIGHWAY.  RIGHT?

13  **A.**    YES, THAT IS CORRECT.

14  **Q.**    YOU ALSO HAD THE AUTHORITY TO COMPLETELY STOP TRAIN

15  TRAFFIC ON A MAIN LINE TRACK OR A YARD TRACK?

16  **A.**    THAT IS CORRECT.

17  **Q.**    AND THAT'S CALLED "TAKING A TRACK OUT OF SERVICE"?

18  **A.**    YES.

19  **Q.**    AND YOU EXERCISED THAT AUTHORITY DURING YOUR ENTIRE UNION

20  PACIFIC CAREER.  CORRECT?

21  **A.**    YES.

22  **Q.**    AND YOU CONTINUED TO RECEIVE RAISES AND BONUSES.  RIGHT?

23  **A.**    YES.

24         **MS. SCHOONMAKER:**  I'D LIKE TO HAVE YOU LOOK AT JOINT

25  EXHIBIT NO. 4, MS. ABSHIRE.  THIS HAS BEEN ADMITTED OBVIOUSLY

09:07 1  AS A JOINT EXHIBIT.  RIGHT THERE IS PERFECTLY FINE.

2  **BY MS. SCHOONMAKER:**

3  **Q.**   IN FACT, AS WE LOOK AT JOINT EXHIBIT 4, THE SUPERINTENDENT

4  OF THE LIVONIA SERVICE UNIT COMMENDED YOU FOR YOUR PERFORMANCE

5  IN OCTOBER OF 2017.  CORRECT?

6  **A.**   YES.

7  **Q.**   AND MR. BOWMAN SAID:  "ON BEHALF OF UNION PACIFIC, WE

8  WOULD LIKE TO CONVEY OUR APPRECIATION FOR YOUR PERFORMANCE AND

9  CONTRIBUTION TO THE AVONDALE TEAM.  YOUR EXAMPLE NOT ONLY

10  INSPIRES OTHERS BUT EPITOMIZES WHAT U.P. COURAGE TO CARE IS ALL

11  ABOUT."

12         CORRECT?

13  **A.**   ARE YOU READING THE BOTTOM THAT'S WRITTEN IN INK?  'CAUSE

14  I CAN'T SEE THAT.

15  **Q.**   I AM READING THE FIRST PARAGRAPH.

16  **A.**   OH, YES.

17  **Q.**   DO YOU SEE THAT?

18  **A.**   YES, MA'AM.  YES, I SEE IT.

19  **Q.**   "YOUR EXAMPLE NOT ONLY INSPIRES OTHERS BUT EPITOMIZES WHAT

20  U.P. COURAGE TO CARE IS ALL ABOUT."

21         CORRECT?

22  **A.**   CORRECT.

23         **MS. SCHOONMAKER:**  AND, MS. ABSHIRE, COULD YOU BRING

24  UP JOINT EXHIBIT 3?  AND I'D LIKE YOU TO GO TO THE PAGE THAT'S

25  MARKED TAYLOR 33, IF YOU WILL STOP RIGHT THERE.

09:09 1  BY MS. SCHOONMAKER:

2  **Q.**   NOW THIS, MR. TAYLOR, WAS YOUR 2017 PERFORMANCE REVIEW

3  WITH UNION PACIFIC.  DO YOU SEE THAT?

4  **A.**   YES.

5  **Q.**   AND THERE'S A PORTION THAT WAS PUT INTO YOUR REVIEW THAT

6  STARTS ABOUT THE SECOND LINE FROM WHERE I SEE IT ON THE

7  MONITOR:  "WE SHOULD COME TO WORK EVERY DAY WITH A POSITIVE

8  ATTITUDE FOR THE EMPLOYEES THAT WE WORK WITH AND THE COMPANY

9  THAT WE WORK FOR.  HOW WE INTERACT WITH OUR CO-WORKERS AND OUR

10  PEERS SHOULD HAVE A POSITIVE RESULT."

11          YOU AGREE WITH ME THAT THAT'S A TRUE STATEMENT.

12  RIGHT?

13  **A.**   YES.  I MEAN, YES.

14          **MS. SCHOONMAKER:**  MS. ABSHIRE, COULD YOU BRING UP

15  PLAINTIFF'S 17, WHICH HAS BEEN ADMITTED INTO EVIDENCE AND COULD

16  WE GO DOWN TO THE BOTTOM?

17  BY MS. SCHOONMAKER:

18  **Q.**   NOW, YOUR LAWYER ASKED YOU ABOUT THIS.  THIS WAS AN EMAIL

19  SENT TO YOU FROM DANNY JAQUESS?

20  **A.**   YES.

21  **Q.**   AND MR. JAQUESS WAS NOT YOUR BOSS.  RIGHT?

22  **A.**   NO, HE WASN'T.

23  **Q.**   AND HE COULDN'T FIRE YOU?

24  **A.**   MARK WHEELAND.

25  **Q.**   PARDON?

09:10 1  **A.**  MARK WHEELAND.

2  **Q.**  AND MR. JAQUESS COULDN'T FIRE YOU.  RIGHT?

3  **A.**  NO.  NOT THAT I KNOW OF HE COULD NOT, NO.

4  **Q.**  OKAY.  BUT HE CURSED AT YOU AT LEAST ONCE IN THE

5  WORKPLACE.  RIGHT?

6  **A.**  YES.

7  **Q.**  AND THAT WAS WRONG.  RIGHT?

8  **A.**  YES.

9  **Q.**  BUT WHAT HE WANTED TO KNOW IN THIS EMAIL FROM YOU --

10       **MS. SCHOONMAKER:**  AND, MS. ABSHIRE, IF YOU'LL GO UP

11  TO THE TOP OF THE EMAIL.  KEEP GOING.  I'M SORRY.  IN THE

12  MIDDLE.  SORRY.  I'M HAVING TROUBLE FOLLOWING ALONG HERE.

13  **BY MS. SCHOONMAKER:**

14  **Q.**  OKAY.  DO YOU SEE WHERE IT SAYS:  "JANUARY 18, 2018, AT

15  7:12 A.M."?  DO YOU SEE THAT PART?

16  **A.**  YES.

17  **Q.**  "JOHNNY, WE HAVE 4 TRACKS OUT OF SERVICE."  AND DO YOU SEE

18  WHAT HE'S ASKING YOU?  "WHAT IS THE PLAN TO GET THESE BACK?"

19       CORRECT?

20  **A.**  YES.

21  **Q.**  TO GET THOSE TRACKS BACK IN SERVICE.  RIGHT?

22  **A.**  RIGHT.

23  **Q.**  SO WHAT HE WANTED TO KNOW WAS THE PLAN.  RIGHT?

24  **A.**  YES.

25       **MS. SCHOONMAKER:**  OKAY.  THANK YOU, MS. ABSHIRE.

09:11 1   **BY MS. SCHOONMAKER:**

2   **Q.**   NOW, YOU TESTIFIED WHEN YOUR ATTORNEY WAS QUESTIONING YOU

3   THAT THERE WERE MANY DERAILMENTS.  BUT DERAILMENT DOES NOT

4   NECESSARILY MEAN A CATASTROPHIC OCCURRENCE, DOES IT?

5   **A.**   YES.  YES, IT DOES.

6   **Q.**   EVERY DERAILMENT DOES NOT RESULT IN A CATASTROPHIC

7   OCCURRENCE IN WHICH LIVES ARE LOST, FOR EXAMPLE?

8   **A.**   NOT EVERY DERAILMENT LIVES ARE LOST.  BUT IT'S A POTENTIAL

9   OF LOSING A LOSS -- LIVES EVERY TIME A DERAILMENT HAPPENS.

10   **Q.**   AND A DERAILMENT DOES NOT NECESSARILY MEAN THAT THERE ARE

11   CARS THAT -- MULTIPLE RAIL CARS THAT COME OFF THE TRACKS.

12   RIGHT?

13   **A.**   SOMETIMES YOU MIGHT HAVE ONE CAR, TWO CARS COME OFF THE

14   TRACK, YES.

15   **Q.**   RIGHT.

16         BUT NOT EVEN EVERY TIME.  CORRECT?

17   **A.**   GENERALLY, THERE'S MORE THAN ONE CAR THAT COMES OFF THE

18   TRACK.

19   **Q.**   OKAY.  SO A "DERAILMENT" MEANS THAT ONE OR MORE WHEELS --

20   ONE OR MORE WHEELS OF A CAR LOSES CONTACT WITH THE RAIL TRACK.

21   RIGHT?

22   **A.**   YES.

23   **Q.**   SO ALL YOU NEED IS ONE WHEEL THAT LOSES CONTACT AND YOU

24   HAVE A DERAILMENT.  CORRECT?

25   **A.**   YES.

09:12  1    **Q.**   AND IN A YARD, A RAIL YARD, MANY DERAILMENTS INVOLVE JUST

2    A SINGLE LOCOMOTIVE WITH NO CARS ATTACHED DERAILING.  RIGHT?

3    **A.**   NOT FROM MY EXPERIENCE, NO.

4    **Q.**   OKAY.  BUT THAT WOULD MEAN THAT ONE WHEEL OF A LOCOMOTIVE

5    LOSES CONTACT WITH THE TRACK.  RIGHT?  THAT'S A DERAILMENT?

6    **A.**   IF ONE WHEEL OF THE LOCOMOTIVE COMES OFF THE TRACK, THAT

7    IS A DERAILMENT, YES.

8          **MS. SCHOONMAKER:**  MS. ABSHIRE, COULD YOU BRING UP

9    PLAINTIFF'S 11, PLEASE?

10   **BY MS. SCHOONMAKER:**

11   **Q.**   NOW, YOUR ATTORNEY QUESTIONED YOU ABOUT THIS EXHIBIT,

12   WHICH IS IN EVIDENCE.

13   **A.**   UH-HUH.

14   **Q.**   "AS OF APPROXIMATELY 0030, WE ARE ON THE GROUND AGAIN AT

15   THE SAME SPOT WITH LIGHT POWER."

16          AND WHAT THAT MEANS IS THAT THERE IS A SINGLE

17   LOCOMOTIVE IN THE YARD WITH NO CARS ATTACHED THAT HAS HAD AT

18   LEAST ONE WHEEL LOSE CONTACT WITH THE TRACK.  RIGHT?

19   **A.**   WHAT THAT MEANS IT WAS TWO LOCOMOTIVES CONNECTED TOGETHER.

20   **Q.**   OKAY.

21   **A.**   YEAH.  SO THOSE TWO LOCOMOTIVES DIDN'T HAVE CARS CONNECTED

22   TO IT, SO THAT'S THE EXAMPLE OF LIGHT POWER.

23   **Q.**   OKAY.

24   **A.**   SO IT'S TWO LOCOMOTIVES CONNECTED TOGETHER.

25   **Q.**   THANK YOU FOR CLARIFYING THAT.

09:14  1          DURING YOUR MEETING REGARDING THE PERFORMANCE

2    IMPROVEMENT PLAN, YOU WERE TOLD THAT UNION PACIFIC WANTED YOU

3    TO BE SUCCESSFUL.  RIGHT?

4    **A.**   YES.

5    **Q.**   AND THAT THE PLAN WAS AN ACTION PLAN TO IMPROVE YOUR

6    PERFORMANCE SO YOU COULD BE SUCCESSFUL.  RIGHT?

7    **A.**   THAT'S WHAT THEY SAID, YES.

8    **Q.**   AND YOU SAID, HOWEVER, THAT YOU WERE NOT GOING TO DO

9    ANYTHING DIFFERENTLY.  CORRECT?

10   **A.**   THAT IS CORRECT.

11   **Q.**   IN FACT, YOU CLAIM THAT EVERY CRITICISM IN THE PERFORMANCE

12   IMPROVEMENT PLAN WAS FALSE.  CORRECT?

13   **A.**   YES.

14   **Q.**   AND YOU REFUSED TO PARTICIPATE IN THE PLAN TO IMPROVE YOUR

15   PERFORMANCE AT ALL.  CORRECT?

16   **A.**   I REFUSED TO PARTICIPATE IN THE PLAN BECAUSE THEY WERE

17   PREVENTING ME FROM DOING MY SAFETY ACTIVITIES, PREVENTING ME

18   FROM GOING OUT THERE TO THE TRACK, PUTTING SLOW ORDERS OUT,

19   TAKING TRACKS OUT OF SERVICE FOR SAFETY ISSUES.  SO IT STOPPED

20   ME FROM PROTECTING THE ENVIRONMENT; PEOPLE.  IT WAS BECAUSE OF

21   SAFETY ISSUES; THAT'S WHY I REFUSED TO SIGN THE PIP LETTER.

22   **Q.**   AND, IN FACT, YOU REFUSED TO SIGN THE PAGE OF THE PLAN

23   THAT ONLY SAID YOU ACKNOWLEDGED RECEIVING IT.  IT DIDN'T ASK

24   YOU TO AGREE WITH IT.  RIGHT?

25   **A.**   I DON'T REMEMBER THAT PARTICULAR ONE.  WHEN I READ THE

09:15 1   PLAN, I DISAGREED WITH IT BECAUSE IT WOULD PREVENT ME FROM

2   BEING SAFE -- SAFETY.  AND MY BIGGEST THING WAS SAFETY.

3         **MS. SCHOONMAKER:**  MS. ABSHIRE, COULD YOU BRING UP

4   JOINT EXHIBIT 12, WHICH IS THE PERFORMANCE IMPROVEMENT PLAN?

5   LET'S GO TO THE LAST PAGE.  A LITTLE FURTHER.

6   **BY MS. SCHOONMAKER:**

7   **Q.**   DO YOU SEE ON THE LAST PAGE -- I BELIEVE IT'S THE LAST

8   PAGE OF THIS EXHIBIT -- IT SAYS:  "EMPLOYEE ACKNOWLEDGMENT.  I

9   HAVE READ THIS PERFORMANCE IMPROVEMENT PLAN."  IT DOESN'T SAY

10  I HAVE AGREED WITH THIS PERFORMANCE IMPROVEMENT PLAN.  RIGHT?

11  **A.**   YES.  IT DOES SAY I HAVE READ THIS PERFORMANCE IMPROVEMENT

12  PLAN.

13  **Q.**   AND YOU DID READ THE PERFORMANCE IMPROVEMENT PLAN.  RIGHT?

14  **A.**   I READ THE PERFORMANCE IMPROVEMENT PLAN, AND I DISAGREED

15  WITH IT, AND I WASN'T GOING TO PUT MY SIGNATURE ON ANYTHING ON

16  THAT PERFORMANCE IMPROVEMENT PLAN BECAUSE I FELT LIKE IT WAS

17  STOPPING ME FROM DOING MY FEDERAL OBLIGATION AND THAT IS SAFETY

18  AND PROTECTING THE TRACKS AND THE PUBLIC AND THE ENVIRONMENT.

19  **Q.**   YES?  AND, IN FACT, YOU TOLD YOUR MANAGEMENT VERY CLEARLY

20  THAT YOU ARE NOT GOING TO DO ANYTHING DIFFERENTLY OR

21  PARTICIPATE IN THE PERFORMANCE IMPROVEMENT PLAN.  RIGHT?

22  **A.**   THAT'S CORRECT.

23         **MS. SCHOONMAKER:**  YOUR HONOR, I'LL TENDER THE

24  WITNESS.

25         **THE COURT:**  ANY REDIRECT?

09:17   1          **MR. SCHMIDT:**  BRIEFLY, YOUR HONOR, IF THAT'S OKAY.

2                        **REDIRECT EXAMINATION**

3    **BY MR. SCHMIDT:**

4    **Q.**   ALL RIGHT, MR. TAYLOR.  MS. SCHOONMAKER ASKED YOU A

5    QUESTION ABOUT WHETHER YOU TOOK TRACKS OUT OF SERVICE

6    THROUGHOUT YOUR CAREER AT UNION PACIFIC.  WHEN WAS THE FIRST

7    TIME THAT YOU TOOK A TRACK OUT OF SERVICE FOR MORE THAN A DAY?

8    **A.**   MORE THAN A DAY?

9    **Q.**   YES, SIR.

10   **A.**   THAT WOULD HAVE BEEN THE TAIL TRACK IN MARCH OF 2028

11   [SIC], 2017, THAT WOULD'VE BEEN MORE THAN A DAY.

12   **Q.**   OKAY.  SO PRIOR TO THAT INCIDENT, ALL OF THE TRACKS YOU

13   TOOK OUT OF SERVICE, THEY WERE JUST -- YOU GOT THEM BACK UP AND

14   RUNNING THAT DAY?  IS THAT WHAT THAT MEANS?

15   **A.**   YES, I GOT THEM BACK UP AND RUNNING THAT DAY.

16   **Q.**   AND AS WE DISCUSSED YESTERDAY, THE AVONDALE TAIL TRACK WAS

17   OUT OF SERVICE FOR SEVERAL MONTHS?

18   **A.**   YES.  FIVE MONTHS, YES.

19   **Q.**   OKAY.  AND I BELIEVE YOU ALSO TESTIFIED YESTERDAY THAT THE

20   FRA INCREASED INSPECTIONS AND INCREASED PRESSURE ON YOU AND

21   YOUR TEAM IN THE BEGINNING OF 2017.  CORRECT?

22   **A.**   THAT'S CORRECT.  HE TOLD ME THAT I NEED TO GET MY

23   DERAILMENT UNDER CONTROL IN THE AVONDALE YARD, SO HE'S

24   INCREASING INSPECTION, YES.

25   **Q.**   THE PERFORMANCE COMMENDATION THAT MS. SCHOONMAKER SHOWED

09:18 1    YOU THAT YOU RECEIVED FROM CLIFF BOWMAN, WHAT WAS THE REASON

2    YOU WERE GIVEN THAT PERFORMANCE COMMENDATION?

3    **A.**   I WAS GIVEN THAT PERFORMANCE COMMENDATION BECAUSE OF --

4    WHEN WE REPAIRED THE TAIL TRACK, WE DID IT IN A TIMELY MANNER

5    AND NO ONE GOT INJURED AND IT WAS SUCCESSFUL.  AND WE DIDN'T

6    HAVE ANYMORE PROBLEMS OUT OF IT.  SO THAT'S WHY HE GAVE IT TO

7    ME, BECAUSE I DID A GOOD JOB WITH THE SAFETY ISSUE -- OF TAKING

8    AWAY A SAFETY ISSUE.

9    **Q.**   AND THE AVONDALE TAIL TRACK, YOU WORKED ON THAT ISSUE WITH

10   YOUR MANAGERS AT THE TIME?

11   **A.**   MARK OLDHAM, PHILLIP HAWKINS, I HAVE TO GIVE IT TO THEM,

12   THEY DID A WONDERFUL JOB WORKING WITH ME WITH THE TAIL TRACK

13   WITH GETTING ALL THE MATERIALS I NEEDED, GETTING ME ALL THE

14   CONTRACTORS I NEEDED TO REPAIR THAT TRACK.

15          SO MARK OLDHAM AND PHILLIP HAWKINS, THEY DID IT.  MY

16   HAT'S OFF TO THEM.  I COULDN'T DO IT WITHOUT THEM.

17   **Q.**   AND THAT WAS PRIOR TO KENNETH STUART AND JACOB GILSDORF?

18   **A.**   THAT WAS PRIOR TO KENNETH STUART AND JACOB GILSDORF.

19   **Q.**   AND WHEN DID MR. STUART AND MR. GILSDORF START?

20   **A.**   MR. GILSDORF START THE FIRST DAY IN OCTOBER 2017, YES.

21   FROM OCTOBER -- THE FIRST DAY OF OCTOBER OF 2017.

22          **MR. SCHMIDT:**  ALL RIGHT.  CAN WE LOOK AT JOINT

23   EXHIBIT 3.

24          **THE DEPUTY CLERK:**  AND YOU'RE SURE IT'S PLUGGED IN

25   THE WAY IT WAS PLUGGED YESTERDAY?

09:20 1          **MR. SCHMIDT:**  I COULD GET A PAPER COPY AND WE COULD
     2    PULL IT UP ON HERE.
     3          **THE DEPUTY CLERK:**  OKAY.
     4          **MS. SCHOONMAKER:**  DID YOU WANT US TO PULL IT UP FOR
     5    YOU?  IT'S A JOINT EXHIBIT.
     6          **THE DEPUTY CLERK:**  OKAY.
     7          **MR. SCHMIDT:**  SURE.  THANK YOU.
     8          **MS. SCHOONMAKER:**  SURE.
     9          **MR. SCHMIDT:**  I APPRECIATE THAT.  THAT'S THE PAGE I
    10    WANTED TO TALK TO HIM ABOUT.
    11    **BY MR. SCHMIDT:**
    12    **Q.**   ALL RIGHT, MR. TAYLOR.  THIS PARAGRAPH AT THE TOP THAT MS.
    13    SCHOONMAKER DISCUSSED WITH YOU, DOES ANYTHING IN THAT PARAGRAPH
    14    MENTION ANYTHING ABOUT YOU HANGING UP ON YOUR SUPERIORS?
    15    **A.**   NO, SIR, IT DOES NOT.
    16    **Q.**   DOES THE PARAGRAPH SAY ANYTHING ABOUT YOU BEING
    17    INSUBORDINATE?
    18    **A.**   NO, SIR, IT DOES NOT.
    19    **Q.**   OKAY.  AND DOWN AT THE BOTTOM OF THE PAGE, WHAT IS YOUR
    20    YEAR-END PERFORMANCE RATING?
    21    **A.**   IT SAYS 3, GOOD PERFORMER.
    22    **Q.**   SO DURING YOUR CAREER AT UNION PACIFIC, DID YOU HAVE
    23    KNOWLEDGE OF DERAILMENTS THAT TOOK PLACE?
    24    **A.**   YES.
    25    **Q.**   DID YOU HAVE KNOWLEDGE OF DERAILMENTS THAT TOOK PLACE

09:22 1  WHERE PEOPLE WERE INJURED?

2  **A.**   YES.

3  **Q.**   AND DID YOU HAVE KNOWLEDGE OF DERAILMENTS THAT TOOK PLACE

4  WHERE PEOPLE WERE KILLED?

5  **A.**   YES.

6  **Q.**   OKAY.  CAN YOU GIVE ME AN EXAMPLE OF ONE OF THEM?

7  **A.**   I HAVE KNOWLEDGE OF A DERAILMENT THAT TOOK PLACE WHERE ONE

8  OF THE U.P. EMPLOYEES WAS RIDING A CAR.  IT WAS A TRACK-CAUSED

9  DERAILMENT.  AND HE FELL OUT THE CAR, AND THE CAR RAN OVER HIM,

10  AND IT WAS A FATALITY.

11  **Q.**   AND MS. SCHOONMAKER ALSO ASKED YOU ABOUT THE MEETING IN

12  WHICH YOU WERE PRESENTED WITH THE PERFORMANCE IMPROVEMENT PLAN,

13  THE PIP?

14  **A.**   YES.

15  **Q.**   AND THAT YOU WERE TOLD THAT THEY JUST WANTED TO HELP YOU,

16  AND THAT WAS THE PURPOSE OF THE PERFORMANCE IMPROVEMENT PLAN?

17  **A.**   YES.

18  **Q.**   DID YOU BELIEVE THEM?

19  **A.**   NO.

20  **Q.**   AND WHAT DID YOU THINK THE PURPOSE OF THE PERFORMANCE

21  IMPROVEMENT PLAN WAS?

22  **A.**   THE PURPOSE OF THE PERFORMANCE IMPROVEMENT PLAN -- IF YOU

23  SCROLL DOWN -- IT SAYS:  IF I AIN'T MEET THOSE GOALS, I WAS

24  GOING TO BE TERMINATED.  WHEN I READ THAT, I WAS LIKE, NO, I'M

25  NOT SIGNING THIS.

09:23  1           **MR. SCHMIDT:**  OKAY.  NO FURTHER QUESTIONS, YOUR

2       HONOR.

3           **THE COURT:**  YOU MAY STEP DOWN.

4               NEXT WITNESS.

5           **MR. SCHMIDT:**  YOUR HONOR, THE PLAINTIFF CALLS JACOB

6       GILSDORF.

7           **THE COURT:**  LAST NAME IS?

8           **MR. SCHMIDT:**  GILSDORF, G-I-L-S-D-O-R-F.

9           **THE COURT:**  GOT IT.  THANK YOU.

10              YES.  WAIT AND TAKE YOUR MASK OFF WHEN YOU GET

11      ON THE STAND, PLEASE, SIR.

12                        **JACOB M. GILSDORF,**

13      **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

14          **MR. SCHMIDT:**  MAY I PROCEED?

15          **THE COURT:**  YOU MAY.

16                       **DIRECT EXAMINATION**

17      **BY MR. SCHMIDT:**

18      **Q.**   GOOD MORNING, MR. GILSDORF.

19      **A.**   GOOD MORNING.

20      **Q.**   WOULD YOU STATE YOUR FULL NAME FOR THE RECORD, PLEASE?

21      **A.**   YES.  JACOB MICHAEL GILSDORF.

22      **Q.**   ALL RIGHT.  AND YOU LIVE IN MONTGOMERY, TEXAS.  IS THAT

23      CORRECT?

24      **A.**   YES, SIR.

25      **Q.**   OKAY.  AND YOU'VE BEEN EMPLOYED BY UNION PACIFIC FOR ABOUT

09:25  1   23 YEARS NOW.  IS THAT CORRECT?

2   **A.**   YES, SIR.

3   **Q.**   AND YOU ARE CURRENTLY THE GENERAL DIRECTOR OF ENGINEERING

4   FOR THE SOUTHERN REGION?

5   **A.**   YES, SIR.

6   **Q.**   OKAY.  AND YOU'VE HELD THAT POSITION SINCE NOVEMBER OF

7   2017?

8   **A.**   YES, SIR.

9   **Q.**   OKAY.  AND YOU FIRST BECAME ACQUAINTED WITH JOHNNY TAYLOR

10  WHEN YOU TOOK THE GENERAL DIRECTOR POSITION.  CORRECT?

11  **A.**   YES, SIR.

12  **Q.**   AND PRIOR TO THAT, YOU HADN'T HAD ANY INTERACTION WITH

13  HIM?

14  **A.**   NO.  I DID NOT KNOW HIM PRIOR TO THAT.

15  **Q.**   OKAY.  AND YOU WERE MR. TAYLOR'S SUPERIOR.  CORRECT?

16  **A.**   I WAS OVER THAT ORGANIZATION.  MR. STUART WAS HIS DIRECT

17  REPORT.

18  **Q.**   OKAY.  AND YOU WERE MR. STUART'S SUPERIOR ALSO.  CORRECT?

19  **A.**   YEAH, I WAS OVER MR. STUART.  NOT HIS DIRECT REPORT, BUT

20  OVER THAT TERRITORY AND RESPONSIBLE FOR IT.

21  **Q.**   OKAY.  ALL RIGHT.  AND YOU MET WITH MR. TAYLOR AND MR.

22  STUART ON JANUARY 9 AT THE AVONDALE YARD.  CORRECT?

23  **A.**   YES, THAT'S WHERE I MET MR. STUART -- OR EXCUSE ME -- MR.

24  TAYLOR.

25  **Q.**   THAT WAS THE FIRST TIME YOU MET HIM?

09:26  1   **A.**   YES, SIR.

2   **Q.**   AND AT THAT MEETING HE EXPRESSED SOME CONCERNS ABOUT THE

3   ALIGNMENT AT SWITCH 16.  CORRECT?

4   **A.**   YES.  WHEN WE GOT TO MEET WITH HIM, HE DID BRING UP -- I

5   DON'T THINK HE SAID THE EXACT SWITCH.  BUT HE SAID HE HAD A

6   PROBLEM WITH A DERAILMENT LOCATION, AND HE WAS ASKING MY

7   ADVICE, YES.

8   **Q.**   OKAY.  AND HE DISCUSSED SOME MEASUREMENTS THAT HE HAD

9   TAKEN ON NOVEMBER 24, 2017?

10   **A.**   HE JUST SAID IT WAS OUT OF ALIGNMENT AND WAS NOT CORRECTLY

11   ALIGNED.

12   **Q.**   OKAY.  SO YOUR TESTIMONY IS THAT HE DIDN'T DISCUSS THESE

13   MEASUREMENTS?

14   **A.**   I DON'T RECALL HIM DISCUSSING MEASUREMENTS BESIDES IT WAS

15   OUT OF LINE, YEAH.

16   **Q.**   OKAY.  SO IF YOU DON'T RECALL, THEN YOU CAN'T REFUTE THAT

17   HE DISCUSSED THESE MEASUREMENTS AT THIS MEETING.  CORRECT?

18   **A.**   YEAH.  HE SAID, "IT WAS OUT OF LINE," MEANING MORE THAT IT

19   WAS, YOU KNOW, PAST FRA THRESHOLD, YES.

20   **Q.**   SURE.

21         BUT I ASKED YOU IF HE DISCUSSED THE MEASUREMENTS THAT

22   HE HAD TAKEN, AND YOUR TESTIMONY WAS THAT YOU DID NOT REMEMBER.

23   CORRECT?

24   **A.**   HE DIDN'T GIVE ME MEASUREMENTS.  ALL HE SAID WAS "THE

25   SWITCH WAS OUT OF LINE, AND IT WASN'T GOOD FOR ANY CLASS OF

09:27  1  TRACK" IS WHAT HE TOLD ME.

2  **Q.**   OKAY.  SO YOUR TESTIMONY IS THAT YOU DO REMEMBER AND HE

3  DIDN'T DISCUSS THE MEASUREMENTS?

4  **A.**   YEAH.  HE DID NOT DISCUSS SPECIFIC MEASUREMENTS, JUST SAID

5  IT WAS OUT OF LINE, YES.

6  **Q.**   OKAY.  AND MR. TAYLOR EXPRESSED HIS OPINION AT THIS

7  MEETING THAT THE SWITCHES NEEDED TO BE REPLACED.  CORRECT?

8  **A.**   I BELIEVE HE WAS SAYING THAT IT WAS NOT GOOD FOR ANY CLASS

9  OF TRACK.  HE ASKED WHAT -- IF IT WAS ME, WHAT WOULD I DO ABOUT

10  IT, AND I TOLD HIM I'D REMOVE IT OUT OF SERVICE UNTIL THERE WAS

11  A NEW PLAN TO DO SOMETHING WITH IT.

12  **Q.**   OKAY.  SO DID HE OR DID HE NOT MENTION THAT HE FELT THE

13  SWITCHES NEEDED TO BE REPLACED?

14  **A.**   I DON'T REMEMBER IF HE SAID, SWITCHES NEED TO BE REPLACED.

15  ALL I REMEMBER IS HIM SAYING, THAT IT WASN'T GOOD.  HE ASKED

16  WHAT I WOULD DO.  I TOLD HIM I'D TAKE IT OUT OF SERVICE, AND IF

17  THERE NEEDED TO BE ANOTHER PLAN, WE JUST NEED TO LOOK AT THAT.

18  **Q.**   OKAY.  SO YOU TOLD HIM THAT IF HE FELT THE TRACK WAS

19  UNSAFE, HE SHOULD TAKE IT OUT OF SERVICE.  CORRECT?

20  **A.**   ABSOLUTELY.

21         **MR. SCHMIDT:**  ALL RIGHT.  CAN WE LOOK AT JOINT

22  EXHIBIT NUMBER 6.  ARE WE STILL NOT CONNECTED TO THE --

23  **(WHEREUPON, THERE WAS AN OFF-THE-RECORD DISCUSSION WITH I.T.)**

24         **THE COURT:**  LET'S DO IT UNTIL HE FINISHES

25  TROUBLESHOOTING.  I'M GOING TO TRY TO GET TO THE BOTTOM OF THIS

09:29 1 BECAUSE THIS KEEPS HAPPENING OVER AND OVER AGAIN.

2    **MR. SCHMIDT:**  OKAY.  THANK YOU, MR. WADSWORTH.  I

3 REALLY APPRECIATE THAT.

4 **BY MR. SCHMIDT:**

5 **Q.**  JOINT EXHIBIT NO. 6, THESE ARE EMAILS BETWEEN YOU AND MR.

6 TAYLOR AND MR. STUART.  CORRECT?

7 **A.**  NO.  THAT'S AN EMAIL BETWEEN ME AND MR. STUART.

8    **MR. SCHMIDT:**  WELL, CAN WE SCROLL DOWN SOME.

9 **BY MR. SCHMIDT:**

10 **Q.**  AND THIS IS AN EMAIL FROM MR. TAYLOR.  RIGHT?

11 **A.**  YEAH.

12    **MR. SCHMIDT:**  OKAY.  AND IN THE MIDDLE OF PAGE 223,

13 WHICH IS THIS PAGE DOWN HERE, IF WE CAN JUST SCROLL DOWN JUST A

14 LITTLE BIT.

15 **BY MR. SCHMIDT:**

16 **Q.**  SO YOU ASKED MR. TAYLOR THESE SIX QUESTIONS.  CORRECT?

17 **A.**  THAT IS CORRECT.

18 **Q.**  ALL RIGHT.  AND YOU WOULD AGREE THAT HE PROVIDED ANSWERS

19 TO ALL THESE QUESTIONS.  CORRECT?

20 **A.**  HE DID.

21 **Q.**  OKAY.  AND YOU WOULD AGREE THAT YOU WERE SATISFIED WITH

22 THE INFORMATION THAT HE PROVIDED TO YOU REGARDING TAKING THE

23 TRACK OUT OF SERVICE.  CORRECT?

24 **A.**  YEAH.  I WAS TRYING TO GET A SENSE OF WHAT WAS CURRENTLY

25 IN THE TRACK TO SEE IF A PLAN COULD BE DEVELOPED.

09:30 1              **MR. SCHMIDT:**  ALL RIGHT.  LET'S GO DOWN TO PAGE 225.

2    **BY MR. SCHMIDT:**

3    **Q.**   SO THESE 1, 2, 3, DOWN HERE, THESE MEASUREMENTS THAT MR.

4    TAYLOR IS DESCRIBING, YOU WOULD AGREE THAT IF THOSE WERE THE

5    MEASUREMENTS AS OF JANUARY 10, 2018, THE PROPER THING TO DO WAS

6    TO TAKE A TRACK OUT OF SERVICE.  CORRECT?

7    **A.**   YES.  IF THOSE ARE ACTUAL MEASUREMENTS, ABSOLUTELY.

8    **Q.**   OKAY.  AND YOU WOULD AGREE THAT MR. TAYLOR WAS QUALIFIED

9    TO DETERMINE WHETHER FOUR- OR SIX-AXLE LOCOMOTIVES COULD SAFELY

10   TRAVERSE THE TRACK.  CORRECT?

11   **A.**   YEAH.  YOU COULD MAKE THAT JUSTIFICATION ON

12   CROSS-REFERENCING LOCOMOTIVES AND WHAT THEY'RE ABLE TO DO FOR

13   CURVATIVE, AND ALSO ON A TRACK ASPECT, YOU KNOW, BEING 217

14   QUALIFIED, YES.

15              **MR. SCHMIDT:**  ALL RIGHT.  CAN WE LOOK AT PLAINTIFF'S

16   EXHIBIT NO. 18, WHICH HAS BEEN PREADMITTED.

17              **THE DEPUTY CLERK:**  YOU'RE GOING TO HAVE TO PUT IT ON

18   THE DOCUMENT CAMERA, UNLESS THEY HAVE IT.  OH, OKAY.

19   **BY MR. SCHMIDT:**

20   **Q.**   ALL RIGHT.  AND THESE ARE EMAILS BETWEEN YOU AND MR.

21   STUART.  CORRECT?

22   **A.**   YES.

23   **Q.**   ALL RIGHT.  AND IT LOOKS LIKE MR. STUART FORWARDED TO YOU

24   AN EMAIL FROM MR. TAYLOR STATING THAT NEW SWITCHES WERE NEEDED

25   IN THE AVONDALE YARD.  CORRECT?

09:32 1  **A.**   I'M SORRY.  WHAT WAS YOUR QUESTION?

2  **Q.**   SO IN THIS EMAIL MR. STUART FORWARDED TO YOU AN EMAIL FROM

3  MR. TAYLOR WHICH STATED THAT HE FELT THE NEW SWITCHES WERE

4  NEEDED IN THE AVONDALE YARD.  CORRECT?

5  **A.**   YES.

6  **Q.**   OKAY.  AND YOU RESPONDED TO MR. BOWMAN ONLY:  "WE DON'T

7  NEED NEW SWITCHES.  I'LL HELP YOU THROUGH THIS."

8       CORRECT?

9  **A.**   NO, SIR.  I RESPONDED TO MR. STUART, IT LOOKS LIKE, WITH

10  CLIFF BOWMAN CARBON COPIED.

11  **Q.**   THAT'S CORRECT.  THANK YOU.

12       OKAY.  SO THE REASON FOR YOUR STATEMENT THAT "NEW

13  SWITCHES WERE NOT NEEDED" WAS THAT THE TRACK HAD ALIGNMENT

14  ISSUES.  CORRECT?

15  **A.**   AT THAT POINT I DIDN'T KNOW -- ONLY BESIDES THERE'S A

16  NO. 7 SWITCH, WHICH IS THE INFORMATION I HAD BEEN GIVEN SO FAR,

17  AND IT LOOKS LIKE MAYBE THE CURRENT SWITCHES JUST MAYBE NEEDED

18  TO BE MOVED.

19  **Q.**   YOU GAVE A DEPOSITION IN THIS CASE, DID YOU NOT?

20  **A.**   I DID.

21  **Q.**   AND WERE YOU UNDER OATH AT THAT DEPOSITION?

22  **A.**   YEAH.

23  **Q.**   AND WAS UNION PACIFIC'S COUNSEL PRESENT AT THAT

24  DEPOSITION?

25  **A.**   YES.

09:34   1         **MR. SCHMIDT:**  I THINK WE'RE GONNA HAVE TO HAVE OUR

2   MONITORS AND COMPUTER WORKING FOR THIS.

3         **THE COURT:**  OKAY.  WE'RE GOING TO TAKE A BREAK WHILE

4   I.T. FIXES THIS.  LET'S TAKE A TEN-MINUTE RECESS.

5             **(WHEREUPON, THE COURT WAS IN RECESS.)**

6         **THE COURT:**  OKAY.  I THINK WE'RE ALL SYSTEMS GO.  WE

7   CAN BRING IN THE JURY.

8      **(WHEREUPON, THERE WAS AN OFF-THE-RECORD DISCUSSION.)**

9        **(WHEREUPON, THE JURY ENTERED THE COURTROOM.)**

10         **THE COURT:**  ALL RIGHT.  BE SEATED.

11           OKAY.  I'M SORRY FOR THE DELAY, LADIES AND

12   GENTLEMEN.  I THINK IT WAS A CABLING ISSUE.  IT LOOKS LIKE

13   WE'VE GOT IT RESOLVED, I HOPE.

14           ALL RIGHT.  GO AHEAD, MR. SCHMIDT.

15   **BY MR. SCHMIDT:**

16   **Q.**  ALL RIGHT, MR. GILSDORF.  I'D LIKE TO SHOW YOU ON PAGES 43

17   TO 44 OF YOUR DEPOSITION IN THIS CASE, WHICH IS PAGE 34 OF THE

18   PDF.  ALL RIGHT.  SO, MR. GILSDORF, I'D ASK YOU TO READ JUST TO

19   YOURSELF LINES 12 THROUGH 21.

20   **A.**  OKAY.

21   **Q.**  OKAY.  SO YOU WOULD AGREE THAT THE REASON FOR YOUR OPINION

22   THE NEW SWITCHES WERE NOT NEEDED WAS BECAUSE THE TRACK HAD

23   ALIGNMENT ISSUES?

24   **A.**  CAN YOU REPEAT THAT AGAIN?

25   **Q.**  WOULD YOU AGREE THAT THE REASON FOR YOUR OPINION THAT NEW

09:56   1   SWITCHES WERE NOT NEEDED WAS BECAUSE THERE WERE ALIGNMENT

2   ISSUES IN THE TRACK?

3   **A.**   THAT'S CORRECT.   ALIGNMENT, YES.

4   **Q.**   OKAY.   AND YOU WOULD ALSO AGREE THAT IT'S POSSIBLE FOR A

5   TRACK TO HAVE ALIGNMENT ISSUES AND ALSO NEED NEW SWITCHES.

6   CORRECT?

7   **A.**   NEW SWITCHES ARE NICE.   THERE'S MORE THAN ONE WAY TO FIX

8   ALIGNMENT.

9   **Q.**   ALL RIGHT.   I'D LIKE TO SHOW YOU YOUR TESTIMONY ON PAGE 45

10   OF YOUR DEPOSITION, WHICH IS PAGE 35 OF THE PDF.

11           **MR. SCHMIDT:**   SCROLL DOWN A LITTLE BIT, PLEASE.

12   **BY MR. SCHMIDT:**

13   **Q.**   IF YOU LOOK AT LINES 11 THROUGH 15, I ASKED YOU:

14           "OKAY.   SO I UNDERSTAND THAT THEY'RE SEPARATE, BUT IS

15   IT POSSIBLE TO HAVE BOTH IS MY QUESTION?"

16           AND YOUR ANSWER WAS:

17           "YES.   IT'S POSSIBLE THAT YOU CAN HAVE A BAD SWITCH

18   THAT NEEDED TO BE REPLACED AND SOME BAD ALIGNMENT THAT NEEDED

19   TO BE ADDRESSED.   THAT IS POSSIBLE."

20           CORRECT?

21   **A.**   YES.

22   **Q.**   OKAY.   AND DO YOU DISAGREE WITH THAT TESTIMONY NOW?

23   **A.**   NO.

24   **Q.**   ALL RIGHT.   AND YOU WOULD ALSO AGREE THAT THE SIZE OF THE

25   SWITCH CAN AFFECT THE CURVATIVE OF THE TRACK.   CORRECT?

09:57 1  **A.**   THAT IS CORRECT.

2  **Q.**   OKAY.  AND YOU WOULD AGREE THAT SMALLER SWITCHES HAVE A

3  GREATER DEGREE OF CURVATIVE.  CORRECT?

4  **A.**   THAT'S CORRECT.

5  **Q.**   AND THAT NO. 7 SWITCHES ARE SMALLER THAN NO. 9 SWITCHES

6  AND WOULD, THEREFORE, CREATE A GREATER CURVE?

7  **A.**   A TIGHTER CURVE, YES, SIR.

8  **Q.**   A TIGHTER CURVE.

9        AND YOU NEVER INSPECTED THE SWITCHES OF THESE YARDS,

10  DID YOU?

11  **A.**   NO, SIR.

12  **Q.**   OKAY.  EVEN THOUGH MR. TAYLOR ASKED YOU TO LOOK AT THEM

13  WITH HIM?

14  **A.**   HE DID NOT ASK ME SPECIFICALLY TO GO LOOK AT THE SWITCHES,

15  NO.

16  **Q.**   OKAY.  SO YOUR TESTIMONY IS THAT HE DID NOT TELL YOU ON

17  JANUARY 9 -- OR HE DID NOT ASK YOU ON JANUARY 9 OF 2018 TO LOOK

18  AT THE SWITCHES WITH HIM AND MR. STUART?

19  **A.**   HE TOLD ME ABOUT THE SITUATION.  HE DIDN'T GO ASK ME TO

20  LOOK AT IT.  HE TOLD ME ABOUT THE SITUATION, AND HE WAS FACED

21  WITH THE SITUATION -- WHAT WOULD I DO.  I TOLD HIM I WOULD

22  REMOVE IT FROM SERVICE.

23  **Q.**   WASN'T THAT THE REASON FOR THE MEETING AT THE AVONDALE

24  YARD, WAS TO INSPECT THE YARD TOGETHER?

25  **A.**   NO, SIR.  WE WERE ACTUALLY DOWN THERE DOING WHAT WE CALL

09:58 1   LIKE AN SBAR.  IT'S WHERE A TEAM OF REGIONAL FOLKS COME DOWN

2   AND THEY GO OUT AND VISIT THE MANAGERS, VISIT THE FOLKS OUT IN

3   THE FIELD, AND WE DO THAT ALL ACROSS MR. STUART'S ASSIGNED

4   TERRITORY.  SO IT'S MORE LIKE A YEARLY REVIEW WITH THE

5   MANAGEMENT TEAM THAT WE USUALLY SPEND A WHOLE WEEK DOING.

6   Q.   OKAY.  SO AT THIS MEETING MR. TAYLOR DISCUSSED WITH YOU A

7   SURVEY THAT HAD BEEN DONE BY A UNION PACIFIC ENGINEER FROM

8   OMAHA.  CORRECT?

9   A.   YES, HE DID.

10   Q.   OKAY.  AND YOU WOULD AGREE THAT MR. TAYLOR, AS MANAGER OF

11   TRACK MAINTENANCE, IF HE UNDERSTOOD THE SURVEY, COULD MAKE THE

12   DETERMINATION THAT THE SWITCHES WERE LAID INCORRECTLY.

13   CORRECT?

14   A.   HE COULD ASSUME SO, YES.

15   Q.   HE COULD ASSUME SO OR HE --

16   A.   ASSUME SO.

17   Q.   -- COULD PROBABLY MAKE THE DETERMINATION?

18   A.   IF YOU HAVE THE PROPER MEASUREMENTS, YES, ABSOLUTELY.

19   Q.   OKAY.  AND NORMALLY THE PROJECT DESIGN TEAM OUT OF OMAHA

20   WOULD BE THE ONES WHO DETERMINED WHETHER SWITCHES WERE LAID

21   INCORRECTLY.  IS THAT CORRECT?

22   A.   THEY CAN SHOOT A SURVEY TO SHOOT LIKE A BEST FIT, IF WE

23   HAVE PROBLEMS.  OUR MEASUREMENTS, YOU KNOW, DO THEY MEET FRA

24   THRESHOLDS BASED ON, YOU KNOW, STRING LINING THE CURVE IS GONNA

25   TELL US IN THE FIELD IF WE'RE INBOUNDS, OUT OF BOUNDS; IF IT'S

10:00  1   NOT, THEN THAT'S WHEN WE GO TO THE SURVEY TEAM TO ASK THEM WHAT

2   WOULD FIT BEST.

3          ONCE THEY DO THE SURVEY AND WE CONTINUE TO MOVE

4   FORWARD, AT THAT POINT THEY WOULD COME OUT AND STAKE IT TO

5   ENSURE THAT EVERYTHING THEY SURVEYED LAYS IN THE CORRECT PLACE.

6   **Q.**   ALL RIGHT.  AND YOU DENY EVER TELLING MR. TAYLOR TO PUT

7   SWITCH 16 BACK INTO SERVICE.  CORRECT?

8   **A.**   I NEVER DID, NO.  I TOLD HIM TO TAKE -- TO REMOVE THE

9   SWITCH FROM SERVICE.

10  **Q.**   OKAY.  AND DO YOU DENY THAT KENNETH STUART TOLD MR. TAYLOR

11  TO PUT THE SWITCH 16 TRACK BACK INTO SERVICE?

12  **A.**   I NEVER HEARD MR. STUART TELL HIM PUT SWITCH 16 BACK IN

13  SERVICE.

14  **Q.**   OKAY.  AND YOU'RE FAMILIAR WITH MARK WHEELAND.  CORRECT?

15  **A.**   YES, SIR.

16  **Q.**   AND HE'S YOUR BOSS, ISN'T HE?

17  **A.**   HE WAS AT THE TIME.

18  **Q.**   HE WAS AT THE TIME?

19  **A.**   YES, SIR.

20  **Q.**   AND WOULD YOU AGREE THAT HE'S AN HONEST PERSON?

21  **A.**   VERY.

22  **Q.**   OKAY.  HAVE YOU EVER SEEN THE TRANSCRIPT OF HIS DEPOSITION

23  IN THIS CASE?

24  **A.**   I HAVE NOT.

25  **Q.**   OKAY.  ARE YOU AWARE THAT HE TESTIFIED THAT YOU TOLD HIM

10:01 1    THAT YOU DID TELL MR. TAYLOR TO PUT THE TRACK BACK INTO

2    SERVICE?

3    **A.**   NO, I HAVE NOT HEARD THAT.

4    **Q.**   AND MR. TAYLOR ISSUED A SLOW ORDER ON A TRACK IN WHITE

5    CASTLE, LOUISIANA, IN RESPONSE TO A VTI HIT ON JANUARY 22,

6    2018.  CORRECT?

7    **A.**   THAT'S CORRECT.

8         **MR. SCHMIDT:**  CAN WE LOOK AT JOINT EXHIBIT NO. 8.

9    **BY MR. SCHMIDT:**

10   **Q.**   AND THIS IS THE FORM THAT MR. TAYLOR PROVIDED TO YOU AFTER

11   THE VTI HIT.  CORRECT?

12   **A.**   THAT'S CORRECT.

13   **Q.**   AND THERE ARE NO BLANKS IN THIS DOCUMENT THAT ARE NOT

14   FILLED OUT, ARE THERE?

15   **A.**   OTHER THAN CROSS LEVEL, THE BLANKS ARE FILLED IN WITH

16   SOMETHING, YES.

17   **Q.**   OKAY.

18        **MR. SCHMIDT:**  AND CAN WE SCROLL DOWN A LITTLE.

19   **BY MR. SCHMIDT:**

20   **Q.**   YOU FOUND ROOT CAUSE OF VTI EXCEPTION AND WHAT PERMANENT

21   REPAIR CONSISTED OF TO PREVENT EXCEPTION FROM REPEATING.  MR.

22   TAYLOR WROTE IN THREE LINES OF INFORMATION THERE.  CORRECT?

23   **A.**   HE DID.

24   **Q.**   OKAY.  AND YOU CAN INFER FROM READING THOSE THREE LINES

25   THAT ARE WRITTEN UNDER "ROOT CAUSE," THAT THE ROOT CAUSE OF THE

10:02 1   VTI HIT WAS A PROBLEM WITH THE TIES.  CORRECT?

2   **A.**   IT DOES NOT STATE IN HERE WHAT THE ROOT CAUSE IS.

3   **Q.**   BUT THAT WAS NOT MY QUESTION.

4            MY QUESTION WAS WHETHER YOU CAN INFER FROM READING

5   THESE THREE LINES THAT THE PROBLEM IS TIES?

6   **A.**   THAT IS INCORRECT.

7   **Q.**   OKAY.  SO PULL BOARDS, INSTALL TIES IN CROSSING, INSTALL

8   SWITCH TIES IN CPL 075, THAT DOESN'T TELL YOU THAT THERE'S A

9   PROBLEM WITH THE TIES?

10  **A.**   THAT DOESN'T TELL ME WHAT SPECIFICALLY CAUSED THIS ISSUE.

11  **Q.**   OKAY.  ALL RIGHT.  LET'S LOOK AT JOINT EXHIBIT NO. 9.

12           AND THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND MR.

13  TAYLOR DISCUSSING THE VTI FORM THAT WE JUST LOOKED AT.

14  CORRECT?

15  **A.**   YES.

16           **MR. SCHMIDT:**  OKAY.  SO IF WE SCROLL DOWN A LITTLE

17  BIT, KEEP GOING.  LET'S GO TO THE NEXT PAGE.  KEEP GOING.

18  OKAY.  THANK YOU.

19  **BY MR. SCHMIDT:**

20  **Q.**   YOU ASKED MR. TAYLOR:

21           "WHAT IS THE ROOT CAUSE.  YOU DID NOT LIST WHAT THE

22  ROOT CAUSE OF THE VTI WAS.  PLEASE ADVISE."

23           AND THEN MR. TAYLOR'S RESPONSE WAS "TIES."  CORRECT?

24  **A.**   THAT'S WHAT IT SAYS.

25           **MR. SCHMIDT:**  AND THEN -- CAN WE KEEP SCROLLING UP.

10:04 1    BY MR. SCHMIDT:

2    **Q.**   YOU ASKED HIM SOME MORE INFORMATION AT 7:05 P.M.  YOU

3    ASKED HIM SOME MORE QUESTIONS?

4    **A.**   I DID.

5    **Q.**   OKAY.  AND THEN HE RESPONDED AFTER THAT WITH SOME MORE

6    INFORMATION.  CORRECT?

7    **A.**   HE DID RESPOND, YES.

8    **Q.**   OKAY.  AND THEN IF WE SCROLL UP TO THE VERY TOP EMAIL.

9    SO YOU ASKED HIM FOR TWO MORE ITEMS OF INFORMATION.  CORRECT?

10   THE COUNT OF TIES FOR EVERY 39-FOOT SEGMENT, AND IF THERE ARE

11   ANY TIES THAT ARE NOT EFFECTIVELY DISTRIBUTED THAT WOULD

12   WARRANT A SCHEDULE FOR REPAIR.  CORRECT?

13   **A.**   CORRECT.

14   **Q.**   OKAY.  AFTER THIS EMAIL EXCHANGE, YOU HAD A PHONE CALL

15   WITH MR. TAYLOR.  CORRECT?

16   **A.**   MR. TAYLOR DID CALL ME, YES.

17   **Q.**   HE CALLED YOU?

18   **A.**   YES.

19   **Q.**   AND DURING THIS PHONE CALL, YOU AGAIN INSTRUCTED MR.

20   TAYLOR TO COUNT THE TIES IN A 39-FOOT SEGMENT?

21   **A.**   YES.  I WAS EXPLAINING TO HIM, YOU KNOW, THE DETAILS THAT

22   WE WERE LOOKING FOR IN THE EMAIL CHAIN -- THE QUESTIONS.

23   **Q.**   OKAY.  AND MR. TAYLOR EXPLAINED TO YOU THAT HE COULD NOT

24   COUNT THOSE TIES BECAUSE THEY WERE ENCASED IN CONCRETE.

25   CORRECT?

10:05 1   **A.**   I DID NOT RECALL HIM SAYING THAT, NO.

2   **Q.**   YOU DON'T RECALL HIM SAYING THAT?  SO YOU CAN'T DENY THAT

3   HE SAID THAT THEN?

4   **A.**   I DON'T REMEMBER HIM SAYING THAT.  ALL HE SAID WAS, YOU

5   KNOW, PRETTY MUCH WHAT HE PUT IN HIS EMAIL, THAT, YOU KNOW, HEY

6   THERE'S A GANG COMING, A CROSSING GANG, THAT'S GOING TO BE

7   REPAIRING TIES OR A PROJECT AT THAT LOCATION, AND I EXPLAINED

8   TO HIM THAT'S NOT WHAT I'M LOOKING FOR.  I'M LOOKING FOR MORE

9   DETAILS THAT COULD BE OUTSIDE OF THAT, RIGHT.

10   **Q.**   OKAY.  AND YOU WOULD AGREE THAT HE COULD NOT HAVE COUNTED

11   THE TIES IF THEY WERE ENCASED IN CONCRETE.  CORRECT?

12   **A.**   IF IT'S IN A CROSSING, NO.  YOU WOULD HAVE TO PULL THE

13   PLANKS TO COUNT THE TIES.

14   **Q.**   THE PROCESS OF PULLING THE PLANKS AND TAKING THE TIES --

15   COUNTING THE TIES, HOW LONG DOES THAT TAKE?

16   **A.**   YOU KNOW, DO A ROAD CLOSURE, PULL SOME PLANKS, YOU'RE

17   PROBABLY LOOKING AT TWO HOURS MAYBE, JUST TO PULL THE PLANKS

18   OUT.

19   **Q.**   OKAY.  WOULD YOU AGREE THAT MARK WHEELAND HAS KNOWLEDGE OF

20   UNION PACIFIC'S POLICIES AND PROCEDURES REGARDING TRACK

21   MAINTENANCE?

22   **A.**   YES.

23   **Q.**   AND HE WORKED FOR UNION PACIFIC FOR OVER 40 YEARS.

24   CORRECT?

25   **A.**   YES, HE DID.

10:06  1   Q.   OKAY.  YOU'RE AWARE THAT HE TESTIFIED THAT MR. TAYLOR

2   COULD NOT HAVE COUNTED THE TIES IF THEY WERE ENCASED IN

3   CONCRETE?

4   A.   MAYBE IF YOU DID NOT PULL THE PLANKS, YOU WOULD NOT SEE

5   THE TIES.  BUT COULD YOU PULL THE PLANKS ON ANOTHER DAY?  YES,

6   YOU COULD.

7   Q.   OKAY.  AND THERE WASN'T ANY OTHER INFORMATION THAT YOU

8   REQUESTED FROM MR. TAYLOR ON THIS PHONE CALL, WAS THERE?

9   A.   I JUST ASKED HIM FOR THE DETAILS, EXPLAINED TO HIM WHY I

10   WAS LOOKING FOR THOSE DETAILS.

11   Q.   SO THOSE DETAILS, THAT'S WHAT I'M ASKING YOU ABOUT.  OTHER

12   THAN THE COUNT OF TIES EVERY 39 FOOT, WAS THERE ANY OTHER

13   INFORMATION YOU ASKED HIM FOR?

14   A.   CAN YOU SCROLL BACK ON THE EMAIL SO I CAN SEE WHAT WE

15   DISCUSSED?

16   Q.   SURE.

17   A.   SO I WAS ASKING HIM IF THERE WAS FOULED BALLAST,

18   OBVIOUSLY.  THAT'S MUD THAT CAN CAUSE SOME SURFACE DEFECTS

19   OUTSIDE OF JUST A CROSSING.  JUST BASED ON THE RESPONSE OF

20   "TIES," IT'S PRETTY VAGUE.  IT'S LIKE SAYING, HEY, I NEED MY

21   MOTOR FIXED.  THERE'S A LOT OF PARTS TO THE MOTOR:  THE SPARK

22   PLUG, THE RADIATOR.

23         THE SAME THING WITH THE RAILROAD TERMINOLOGY.

24   THERE'S A LOT OF DIFFERENT THINGS.  IF WE HAVE SOME MUD THAT'S

25   CAUSING SOME PROFILE, AS WE KIND OF EXPLAINED YESTERDAY, THE

10:08 1   RISK OF SNAPPING A RAIL, YOU KNOW, IS VERY HIGH ON A BAD WELD.

2          SO THAT'S WHAT I WAS TRYING TO CONVEY TO HIM IS, YOU

3   KNOW, A LITTLE MORE SPECIFICS TO UNDERSTAND WHAT REALLY IS

4   HAPPENING THERE SO WE FIX THE PROBLEM CORRECTLY.

5   **Q.**   AND YOU CLAIM THAT MR. TAYLOR HUNG UP ON YOU DURING THOSE

6   PHONE CALLS.  CORRECT?

7   **A.**   HE DID.

8   **Q.**   AND YOU DENY TELLING MR. TAYLOR TO REMOVE THE SLOW ORDER

9   DURING THIS PHONE CALL?

10   **A.**   I ABSOLUTELY DID NOT.

11   **Q.**   AND YOU DENY TELLING MR. TAYLOR TO PUT SWITCH 16 BACK INTO

12   SERVICE ON THIS PHONE CALL?

13   **A.**   ABSOLUTELY NOT.

14   **Q.**   AND THREE DAYS LATER, ON JANUARY 25, 2018, YOU MET WITH

15   MR. TAYLOR, MR. STUART, AND PHILLIP HAWKINS.  CORRECT?

16   **A.**   YES, SIR.

17   **Q.**   AND AT THIS MEETING YOU TOLD MR. TAYLOR THAT HE HAD BEEN

18   INSUBORDINATE BY NOT RETAKING THE MEASUREMENTS REQUESTED BY

19   KENNETH STUART ON JANUARY 10, BY NOT PROVIDING YOU WITH

20   SUFFICIENT INFORMATION ABOUT THE SLOW ORDER ON JANUARY 22, AND

21   BY HANGING UP ON HIS SUPERIORS.  CORRECT?

22   **A.**   YES, SIR.

23   **Q.**   OKAY.  AND HE DENIED BEING INSUBORDINATE AND HANGING UP.

24   CORRECT?

25   **A.**   HE DID NOT DENY IT.  HE TOLD ME "DO WHAT YOU GOT TO DO.

10:09 1   WHAT IS MY STATUS?"  HE WOULD NOT ENGAGE IN CONVERSATION WITH

2   ME ON THE TWO INCIDENTS THAT I HAD WITNESSED WITH CONDUCT.

3   SO...

4   **Q.**   ALL RIGHT.  LET'S LOOK AT JOINT EXHIBIT NO. 10.

5         SO DO YOU RECALL THIS EMAIL?

6   **A.**   I'VE SEEN IT, YES, SIR.

7   **Q.**   OKAY.  IT IS AN EMAIL FROM KEN KUWAMURA.  AM I SAYING THAT

8   CORRECTLY?

9   **A.**   KUWAMURA, YES, SIR.

10   **Q.**   KUWAMURA.  KEN KUWAMURA TO SEVERAL PEOPLE, INCLUDING

11   YOURSELF, OR I GUESS YOU'RE COPIED ON IT.  CORRECT?

12   **A.**   YES, SIR.

13   **Q.**   OKAY.  AND CYNTHIA KANABEL IS IN HR.  CORRECT?

14   **A.**   YES, SIR.

15   **Q.**   OKAY.  AND THIS DESCRIBES A MEETING BETWEEN YOU AND MR.

16   KUWAMURA.  CORRECT?

17   **A.**   YES.

18   **Q.**   AND MR. KUWAMURA WAS NOT ACTUALLY PRESENT FOR ANY OF THESE

19   INSTANCES WITH MR. TAYLOR.  HE WAS JUST BASING THIS OFF HIS

20   CONVERSATION WITH YOU.  CORRECT?

21   **A.**   THAT'S CORRECT.

22   **Q.**   OKAY.  AND IT DESCRIBES YOUR JANUARY 25 MEETING WITH MR.

23   TAYLOR?

24   **A.**   YES, SIR.

25   **Q.**   AND YOUR REASON FOR MEETING WITH MR. KUWAMURA WAS BECAUSE

10:11 1  YOU WANTED HR TO INTERVENE IN THE SITUATION WITH MR. TAYLOR.

2  CORRECT?

3  **A.**   HE WORKS HAND IN HAND WITH HR.  HE'S SOMEBODY THAT I KNOW

4  SO –- THAT HELPS OUT WITH HR.  SOMEONE I'M AROUND, I'M FAMILIAR

5  WITH, YES.

6  **Q.**   AND YOU TOLD MR. KUWAMURA THAT MR. TAYLOR CLAIMED HE WAS

7  BEING RETALIATED AGAINST?

8  **A.**   I'M SORRY?

9  **Q.**   YOU TOLD MR. KUWAMURA THAT MR. TAYLOR CLAIMED HE WAS BEING

10  RETALIATED AGAINST?

11  **A.**   I TOLD HIM THE CONVERSATION.  WHAT JOHNNY HAD SAID TO US

12  IN THE MEETING, YES, I RELAYED ALL THAT INFORMATION TO HIM.

13  **Q.**   AT THE END OF THIS FIRST PARAGRAPH, HE SAYS:  "AGAIN HE

14  USED THE WORDS 'RETALIATION' AND 'WHISTLEBLOWER' AND THAT HE

15  HAD AN ATTORNEY."

16         SO THAT WOULD BE BASED OFF YOUR DISCUSSION WITH HIM.

17  CORRECT?

18  **A.**   I'M SORRY?

19  **Q.**   THE LAST SENTENCE OF THIS FIRST PARAGRAPH, IT READS:

20  "AGAIN HE USED THE WORDS 'RETALIATION' AND 'WHISTLEBLOWER' AND

21  THAT HE HAD AN ATTORNEY."

22         SO THAT WAS BASED ON INFORMATION THAT YOU PROVIDED TO

23  MR. KUWAMURA.  CORRECT?

24  **A.**   YES.  THAT'S WHAT MR. TAYLOR KEPT TELLING ME, YES.

25  **Q.**   OKAY.  SO THE THIRD PARAGRAPH HERE:  "THE ORIGINAL REQUEST

10:12  1    FROM JAKE" -- WHICH I'M ASSUMING REFERS TO YOU.  CORRECT?

2    **A.**   YES, SIR.

3    **Q.**   OKAY.  "THE ORIGINAL REQUEST FROM JAKE WAS A SIMPLE

4    REQUEST FOR MORE INFORMATION ON A TRACK DEFECT FROM MR. TAYLOR.

5    HE HAD TURNED IN A REPORT THAT JUST STATED 'BAD TIES.'"

6         SO YOU TOLD MR. KUWAMURA THAT MR. TAYLOR HAD TURNED

7    IN A REPORT THAT JUST SAID "BAD TIES"?

8    **A.**   I EXPLAINED THE SITUATION OF WHY I WAS -- OF WHAT WAS

9    THERE, YES.

10    **Q.**   THE LAST PARAGRAPH:  "AFTER MEETING WITH JAKE WE AGREED

11    THAT MR. TAYLOR WAS BEING DISRESPECTFUL AND BELLIGERENT.  MR.

12    TAYLOR WILL BE PULLED OUT OF SERVICE ON MONDAY, JANUARY 29,

13    2018, ON A 6.1 INFRACTION.  LET ME KNOW IF YOU NEED ANYTHING

14    FROM ME LET ME KNOW."  I GUESS THAT'S A TYPO.

15         BUT MR. TAYLOR BEING "PULLED OUT OF SERVICE," THAT

16    REFERENCES HIM BEING PLACED ON ADMINISTRATIVE LEAVE.  CORRECT?

17    **A.**   THAT'S CORRECT.

18    **Q.**   OKAY.  WAS THAT YOUR DECISION OR MR. KUWAMURA'S DECISION?

19    **A.**   NO, THAT WAS NOT MY DECISION.  THAT'S A DECISION BETWEEN

20    EXECUTIVE AVP AND HR.

21    **Q.**   OKAY.  DID YOU AND MR. KUWAMURA DISCUSS AT ALL MR. TAYLOR

22    BEING PLACED ON ADMINISTRATIVE LEAVE?

23    **A.**   NO, WE DIDN'T DISCUSS THAT.  WE WENT THROUGH AND I TALKED

24    TO HIM, AND THEN IT GOES THROUGH THE CHAIN FROM THERE ON WHAT

25    THEY WANT TO DO, BASED ON WHAT INFORMATION I GIVE THEM.

10:14  1          **MR. SCHMIDT:**  ALL RIGHT.  LET'S LOOK AT JOINT EXHIBIT

       2  NO. 12.  LET'S GO TO THE FIRST PAGE, PLEASE.

       3  **BY MR. SCHMIDT:**

       4  **Q.**   SO THIS IS A PERFORMANCE IMPROVEMENT PLAN THAT YOU

       5  PRESENTED TO MR. TAYLOR DURING A MEETING ON JANUARY 31, 2018,

       6  WITH MR. TAYLOR AND CLIFF BOWMAN.  CORRECT?

       7  **A.**   THAT'S CORRECT.

       8  **Q.**   AND YOU DID NOT PLAY ANY ROLE IN DRAFTING THIS DOCUMENT?

       9  **A.**   I DID NOT CREATE THE DOCUMENT, NO.

      10  **Q.**   OKAY.  WHO DID?

      11  **A.**   KENNY STUART.

      12  **Q.**   KENNY STUART, OKAY.

      13          AND YOU PROVIDED INFORMATION TO MR. STUART IN

      14  CONNECTION WITH HIS DRAFTING OF THIS PLAN, DIDN'T YOU?

      15  **A.**   NO.  MR. STUART WAS PRESENT AT ALL OUR DEALINGS, AND HE

      16  DIRECTLY, YOU KNOW, SUPERVISED MR. TAYLOR.  SO HE HAD A LOT

      17  MORE UNDERSTANDING OF THE PAST OF MR. TAYLOR AND HIS EXPERIENCE

      18  AT THAT POINT.

      19  **Q.**   OKAY.  LET'S GO DOWN TO THE NEXT PAGE.

      20          SO UNDER "BUILDS TRUST," THAT FIRST PARAGRAPH, IT

      21  SAYS:  "ON 1/22/2018 YOU WERE ASSIGNED THE TASK OF GETTING MORE

      22  INFORMATION ON A HIGH VTI NEAR A BRIDGE.  YOU WERE

      23  DISRESPECTFUL AND INSUBORDINATE TO DIRECTOR MOW WHEN YOU

      24  REFUSED TO GATHER ANY ADDITIONAL INFORMATION AS INSTRUCTED BY

      25  DIRECTOR MOW."

10:15  1            SO, AGAIN, DIRECTOR OF MOW, THAT'S YOU.  CORRECT?

    2    **A.**   THAT WAS MY TITLE AT THE TIME.

    3    **Q.**   OKAY.

    4    **A.**   THAT'S TRUE.

    5    **Q.**   AND MR. STUART WAS NOT PRESENT FOR THAT INTERACTION, WAS

    6    HE?

    7    **A.**   NO.  HE WAS ON VACATION.

    8            ARE YOU TALKING ABOUT THAT SPECIFIC INTERACTION?

    9    **Q.**   THIS SPECIFIC INTERACTION.

   10    **A.**   THAT'S CORRECT.  HE WAS CARBON COPIED ON AN EMAIL, AND HE

   11    DID NOT WITNESS THE PHONE CALL, NO.

   12    **Q.**   OKAY.  AND SO THIS INFORMATION WAS INFORMATION THAT YOU

   13    PROVIDED TO MR. STUART.  CORRECT?

   14    **A.**   THAT'S RIGHT.

   15    **Q.**   OKAY.  AND THIS JANUARY 22 PHONE CALL, THAT'S THE PHONE

   16    CALL WE WERE DISCUSSING A FEW MINUTES AGO REGARDING THE SLOW

   17    ORDER AND THE VTI HIT.  CORRECT?

   18    **A.**   YES, THAT APPEARS TO BE RIGHT.

   19    **Q.**   AND DID YOU TELL MR. STUART THAT THE TIES IN QUESTION WERE

   20    ENCASED IN CONCRETE?

   21    **A.**   YEAH.  I EXPLAINED THE SITUATION TO HIM, AND ALSO, YOU

   22    KNOW, WHAT HAD TAKEN PLACE THAT NIGHT, THAT AFTERNOON, THAT

   23    DAY.  AND SO HE WAS AWARE OF THE SITUATION.

   24    **Q.**   OKAY.  SO YOU DID TELL HIM THE TIES WERE ENCASED IN

   25    CONCRETE?

10:16 1  **A.**   OH, NO.  I'M SORRY.  I TOLD HIM ABOUT THE SITUATION.  HE

2  SAW THE EMAIL GO BACK AND FORTH, SO HE WAS ON THAT EMAIL.  SO

3  HE SAW EVERYTHING THAT WAS STATED.

4  **Q.**   OKAY.  SO JUST ANSWER "YES" OR "NO," PLEASE.

5           DID YOU TELL HIM THAT THE TIES BEING DISCUSSED WERE

6  ENCASED IN CONCRETE?

7  **A.**   I DIDN'T HEAR THE LAST PART OF YOUR QUESTION.

8  **Q.**   THAT THE TIES WERE ENCASED IN CONCRETE, DID YOU TELL MR.

9  STUART THAT?

10  **A.**   I DON'T REMEMBER IF I DID OR NOT.

11  **Q.**   BUT YOU TESTIFIED EARLIER THAT MR. TAYLOR NEVER TOLD YOU

12  THAT THEY WERE.  CORRECT?

13  **A.**   I DON'T REMEMBER.

14  **Q.**   OKAY.

15  **A.**   I DON'T REMEMBER THAT CONVERSATION.

16  **Q.**   OKAY.  AND YOUR CONTENTION IS THAT MR. TAYLOR WAS NOT

17  INSUBORDINATE WITH YOU IN THE EMAIL EXCHANGE ON JANUARY 22, BUT

18  THAT HE WAS INSUBORDINATE DURING HIS PHONE CALL WITH YOU AFTER

19  THE EMAIL EXCHANGE.  CORRECT?

20  **A.**   THE PHONE CALL?  ABSOLUTELY.

21           AND THE EMAIL EXCHANGE, THE SPECIFIC QUESTIONS I WAS

22  ASKING HIM, I GAVE HIM EXAMPLES OF KIND OF WHAT I WAS LOOKING

23  FOR, JUST AS EXAMPLES, AND HE PRETTY MUCH TOLD ME IN THE EMAIL

24  I'VE ALREADY SAID WHAT I'M GONNA SAY, AND THAT WAS THE END OF

25  IT.

10:18  1            SO HE'S NOT MEETING THE EXPECTATIONS I'M ASKING HIM

     2   TO GET, WHICH I STILL HAD TO GET SOMEBODY ELSE OUT THERE

     3   BECAUSE HE WOULD NOT DO THAT.

     4   **Q.**   I'D LIKE TO SHOW YOU PAGES 60 TO 61 OF YOUR DEPOSITION,

     5   WHICH ARE PAGES 47 TO 48 OF THE PDF, DOWN TOWARDS THE BOTTOM

     6   AND INTO THE TOP OF THE NEXT PAGE.

     7            **MR. SCHMIDT:**  SCROLL DOWN A LITTLE BIT MORE, PLEASE.

     8   **BY MR. SCHMIDT:**

     9   **Q.**   OKAY.  SO TOWARDS THE BOTTOM OF THIS FIRST PAGE, WE'RE

    10   LOOKING AT --

    11            **MR. SCHMIDT:**  SORRY.  I'M SORRY.  SCROLL UP, PLEASE.

    12   **BY MR. SCHMIDT:**

    13   **Q.**   OKAY.  LINE 21 THROUGH 23, I ASKED YOU:

    14            "WAS THERE ANYTHING IN THE EMAIL THAT YOU WOULD

    15   CONSIDER INSUBORDINATE?"

    16            AND YOUR ANSWER WAS:

    17            "NO.  NOT INSUBORDINATE.  I MORE FELT LIKE MAYBE HE

    18   DIDN'T UNDERSTAND WHAT I WAS ASKING HIM AND THAT'S WHY I

    19   CLARIFIED EXACTLY ON THE TOP OF THE EMAIL WHAT I WAS -- THE

    20   LAST COUPLE ITEMS I DIDN'T HAVE CLARIFICATION ON THAT I NEEDED.

    21   AND THAT'S WHAT I DIDN'T GET ANSWERED."

    22            THEN THAT WAS YOUR TESTIMONY.  CORRECT?

    23   **A.**   YES.

    24   **Q.**   OKAY.  LET'S LOOK AT JOINT EXHIBIT NO. 11.

    25            AND THIS IS AN EMAIL THAT YOU SENT TO MARK WHEELAND,

10:20 1    CYNTHIA KANABEL, AND SEVERAL OTHERS ON JANUARY 31, 2018.

2    CORRECT?

3    **A.**   CORRECT.

4    **Q.**   OKAY.  AND MR. WHEELAND WAS AT THE TIME THE ASSISTANT

5    VICE-PRESIDENT OF ENGINEERING?

6    **A.**   YES, SIR.

7    **Q.**   AND THIS LETTER DESCRIBES THE MEETING BETWEEN YOU AND MR.

8    TAYLOR AND MR. BOWMAN ON JANUARY 31, AT WHICH YOU PRESENTED HIM

9    WITH THE PIP.  CORRECT?

10   **A.**   YES, SIR.

11   **Q.**   OKAY.  SO THE SECOND PARAGRAPH, THE SECOND LINE:  "WE

12   DISCUSSED HIS RECENT CONDUCT ACTING QUARRELSOME AND

13   DISRESPECTFUL ON THE ENGINEERING MANAGERS CONFERENCE CALLS,

14   INCLUDING HANGING UP ON HIS SUPERIORS."

15        SO YOU WERE NEVER ACTUALLY ON A CONFERENCE CALL WITH

16   MR. TAYLOR, WERE YOU?

17   **A.**   I WAS NOT.

18   **Q.**   OKAY.  SO WAS THAT INFORMATION PROVIDED TO YOU BY MR.

19   STUART?

20   **A.**   YES, SIR.

21   **Q.**   THE NEXT SENTENCE:  "WE ALSO DISCUSSED THE RECENT

22   SITUATIONS OF INSUBORDINATION WHEN MR. TAYLOR WAS ASKED TO

23   OBTAIN MORE DETAILS ON A VTI LOCATION WHERE THE INITIAL

24   INVESTIGATION WAS NOT DETAILED AND NO ROOT CAUSE WAS IDENTIFIED

25   AND INCLUDING MEASUREMENTS OF A SWITCH THAT WAS ASKED FOR BY

10:21  1    HIS SR. MANAGER THAT MR. TAYLOR REFUSED TO DO."

2             SO THE DETAILS ON THE VTI LOCATION, THAT DESCRIBES

3    THE INCIDENT BETWEEN YOU AND MR. TAYLOR ON JANUARY 22 OF '18.

4    CORRECT?

5    **A.**   AND I WANT TO GO BACK ONE MORE QUESTION.  SORRY ABOUT

6    THAT.  I WANT TO CLARIFY.  I WAS NOT A PART OF ANY OF THE

7    CONFERENCE CALLS, BUT I DID WITNESS MR. TAYLOR'S INTERACTION ON

8    A PHONE CALL CONVERSATION ON A SPEAKERPHONE HANGING UP ON MR.

9    STUART.  I JUST WANTED TO CLARIFY THAT.

10            IF YOU COULD REPEAT YOUR QUESTION, I'LL GO TO THE

11   NEXT ONE.

12   **Q.**   WELL, THE LAST SENTENCE OF THIS PARAGRAPH, IT REFERS TO

13   MR. TAYLOR BEING INSUBORDINATE BY NOT PROVIDING MORE DETAILS ON

14   THE VTI LOCATION.  THAT IS THE JANUARY 2, 2018 INCIDENT BETWEEN

15   YOU AND MR. TAYLOR.  CORRECT?

16   **A.**   YES, SIR.

17   **Q.**   OKAY.  AND THE REFERENCE TO MEASUREMENTS ON A SWITCH.

18   THAT WAS THE INCIDENT BETWEEN MR. TAYLOR AND MR. STUART ON

19   JANUARY 10 OF '18.  CORRECT?

20   **A.**   THAT'S CORRECT.

21   **Q.**   OKAY.  THE FIFTH PARAGRAPH, THE -- WHICH BEGINS WITH:

22   "MR. TAYLOR WAS NOT WILLING TO ACCEPT ANY HELP, ADVICE OR

23   GUIDANCE THAT WE HAVE TO OFFER HIM.  HE RECORDED THE MEETING

24   TODAY AND WAS OFTEN REFERRING BACK TO A TRACK THAT WAS TAKEN

25   OUT OF SERVICE AND THIS WAS RETALIATION, AND/OR HE IS RECORDING

10:23 1   FOR HIS ATTORNEY.  HE TOLD US THAT HE HAD TURNED US IN TO THE

2   WHISTLEBLOWERS ACT, AND HE HAS DONE NOTHING WRONG."

3              SO, I MEAN, YOU INCLUDED THOSE STATEMENTS IN THIS

4   EMAIL.  CORRECT?

5   **A.**   YES.  I WAS STATING THINGS THAT HE WAS SAYING, YES.

6   **Q.**   OKAY.  WERE YOU AWARE THAT MARK WHEELAND MADE THE DECISION

7   TO TERMINATE MR. TAYLOR BASED ON THIS EMAIL AND A CONVERSATION

8   THAT HE HAD WITH YOU?

9   **A.**   I WAS AWARE OF IT, YEAH.  I AM AWARE --

10  **Q.**   OKAY.

11  **A.**   -- OF THAT, YES.

12  **Q.**   NOTHING IN THIS DOCUMENT SUGGESTS THAT MR. TAYLOR FAILED

13  TO MAINTAIN HIS TRACKS PROPERLY, DOES IT?

14  **A.**   NO.  I BELIEVE THIS IS STRICTLY ON CONDUCT.

15  **Q.**   AND AT THE END OF YOUR EMAIL --

16             **MR. SCHMIDT:**  IF WE CAN SCROLL DOWN, PLEASE.  KEEP

17  GOING.

18  **BY MR. SCHMIDT:**

19  **Q.**   SO THAT IS RULE 1.6 OF UNION PACIFIC'S GENERAL CODE OF

20  OPERATING RULES?

21  **A.**   YES, SIR.

22  **Q.**   OKAY.  AND YOU HIGHLIGHTED "INSUBORDINATE, QUARRELSOME,"

23  AND "DISCOURTEOUS"?

24  **A.**   YES, SIR.

25  **Q.**   OKAY.  SO YOU WERE ALLEGING THAT MR. TAYLOR VIOLATED RULE

10:24 1   1.6 BY BEING INSUBORDINATE, QUARRELSOME, AND DISCOURTEOUS?

2   **A.**   YES, SIR.

3   **Q.**   SO WHEN YOU MET WITH MARK WHEELAND ABOUT THE ALLEGATIONS

4   IN THIS EMAIL, WAS IT BEFORE OR AFTER THE EMAIL?

5   **A.**   I MET WITH HIM PRIOR TO THIS EMAIL, IF I RECALL.

6   **Q.**   OKAY.  AND YOU TOLD MR. WHEELAND THAT ON JANUARY 10, 2018,

7   THAT MR. TAYLOR REFUSED TO RETAKE THE MEASUREMENTS THAT HE HAD

8   TAKEN IN NOVEMBER?

9   **A.**   I EXPLAINED THE WHOLE SITUATION, YEAH.  THE CURRENT

10   EVENTS, YES.

11   **Q.**   IS THAT WHAT YOU TOLD HIM?

12   **A.**   YES.

13   **Q.**   SO YOU DID TELL HIM?  IS THE ANSWER TO MY QUESTION "YES"?

14   **A.**   OKAY.  WELL, I WANT TO UNDERSTAND.  SAY IT ONE MORE TIME.

15   I'M SORRY.

16   **Q.**   SO YOU TOLD MR. WHEELAND THAT ON JANUARY 10, 2018, MR.

17   TAYLOR REFUSED TO RETAKE THE MEASUREMENTS HE HAD TAKEN IN

18   NOVEMBER?

19   **A.**   YES.

20   **Q.**   OKAY.  AND YOU DID NOT TELL HIM THAT MR. TAYLOR HAD

21   RETAKEN THE MEASUREMENTS SIX DAYS BEFORE ON JANUARY 4, DID YOU?

22   **A.**   NO.  I'M NOT AWARE OF THAT.

23   **Q.**   AND YOU ALSO TOLD MR. WHEELAND THAT HE REFUSED TO PROVIDE

24   YOU WITH A TIE COUNT ON JANUARY 22.  CORRECT?

25   **A.**   THAT'S CORRECT.

10:25 1   **Q.**   AND YOU DID NOT TELL HIM THAT THE TIES WERE ENCASED IN

2   CONCRETE, DID YOU?

3   **A.**   NO, THAT THE ROOT CAUSE WAS NOT IDENTIFIED.

4         **MR. SCHMIDT:**  OKAY.  I TENDER THE WITNESS, YOUR

5   HONOR.

6         **MR. WADSWORTH:**  YOUR HONOR, UNION PACIFIC RESERVES

7   ITS DIRECT EXAMINATION OF THIS WITNESS UNTIL ITS CASE IN CHIEF.

8         **THE COURT:**  OKAY.

9         **MR. WADSWORTH:**  THANK YOU.

10        **THE COURT:**  LADIES AND GENTLEMEN, THEY WILL CALL THIS

11  WITNESS BACK IN THEIR CASE IN CHIEF.

12             YOU MAY STEP DOWN, SIR.

13        **THE WITNESS:**  THANK YOU.

14        **THE COURT:**  NEXT WITNESS.

15        **MR. SMITH:**  WE'D LIKE TO CALL MR. DOUGLAS TRAUTH TO

16  THE STAND, YOUR HONOR.

17        **THE COURT:**  IS HE OUTSIDE?  SOMEBODY NEEDS TO GO GET

18  HIM.

19        **MR. SMITH:**  YES.

20        **MR. SCHMIDT:**  YES, YOUR HONOR.  I'LL GO GET HIM.

21                     **DOUGLAS J. TRAUTH, JR.**

22  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

23        **THE COURT:**  GO AHEAD, MR. SMITH.

24                     **DIRECT EXAMINATION**

25  **BY MR. SMITH:**

10:28  1  **Q.**   PLEASE STATE YOUR NAME AND RESIDENCE ADDRESS FOR THE

2  RECORD, SIR.

3              **THE COURT REPORTER:**  NO ADDRESS.

4  **A.**   DOUG TRAUTH, JR.  ADDRESS --

5              **THE COURT:**  YOU DON'T HAVE TO GIVE YOUR ADDRESS, JUST

6  YOUR CITY AND STATE.

7  **BY MR. SMITH:**

8  **Q.**   OKAY.  THE CITY?

9  **A.**   HARVEY, LOUISIANA.

10  **Q.**   OKAY.  AND WHAT'S YOUR FULL NAME, SIR?

11  **A.**   DOUGLAS JOSEPH TRAUTH, JR.

12  **Q.**   OKAY.  AND DID YOU PREVIOUSLY WORK FOR UNION PACIFIC

13  RAILROAD COMPANY?

14  **A.**   YES.

15  **Q.**   AND WHEN DID YOU WORK FOR THE COMPANY?

16  **A.**   FROM 1979 TO 2019.

17  **Q.**   OKAY.  AND WHAT WAS YOUR JOB WITH THE COMPANY?

18  **A.**   A WELDER, TRACK BUILDER.

19  **Q.**   OKAY.  AND WHAT ESSENTIALLY DOES A TRACK WELDER DO?

20  **A.**   REBUILD TRACK COMPONENTS THAT GET WORE DOWN FROM THE TRAIN

21  USAGE.

22  **Q.**   OKAY.

23  **A.**   REBUILDING THE --

24  **Q.**   AND WHAT AREA DID YOU WORK IN?  WHAT GEOGRAPHIC AREA?

25  **A.**   AVONDALE TO LIVONIA.

10:29 1    Q.    OKAY.  AND DO YOU KNOW JOHNNY TAYLOR?

2    A.    YES, I DO.

3    Q.    AND HOW DO YOU KNOW JOHNNY TAYLOR?

4    A.    HE WAS MY MANAGER.

5    Q.    OKAY.  AND WHAT WAS HIS JOB?  WHAT WAS YOUR UNDERSTANDING

6    OF HIS JOB?

7    A.    TO MANAGE THE WORKERS, TO GET THE JOBS DONE, TO MANAGE THE

8    DEFECTS.

9    Q.    OKAY.  AND WHAT DO YOU MEAN "MANAGE THE DEFECTS"?

10    A.    WELL, THE TRACK INSPECTOR WOULD WRITE UP DEFECTS THAT

11    NEEDED TO BE REPAIRED, AND IT WAS ONE OF JOHNNY'S JOBS TO GET

12    THE DEFECTS DONE.  AND THEY HAVE A 30-DAY TIME LIMIT ON MOST OF

13    THEM.

14    Q.    OKAY.  AND DID YOU UNDERSTAND THAT MR. TAYLOR, AS MANAGER

15    OF TRACK MAINTENANCE, HAD CERTAIN AUTHORITY TO PROPERLY MANAGE

16    THE TRACKS AND KEEP THEM SAFE?

17    A.    YES.

18    Q.    AND WHAT WAS YOUR UNDERSTANDING OF THAT AUTHORITY?

19    A.    SAY IT AGAIN.

20    Q.    WHAT WAS HIS JOB IN TERMS OF MANAGING THE TRACKS AND

21    KEEPING THEM SAFE, JUST FROM YOUR PERSPECTIVE?

22    A.    FROM MY PERSPECTIVE?  THE TRACK INSPECTOR WOULD GO OUT AND

23    CHECK THE YARD, CHECK THE MAIN LINES FOR GAUGE, ANY DEFECTS

24    HE'D SEEN, AND JOHNNY WOULD MANAGE THAT PORTION OF IT.

25    Q.    AND DID HE DO HIS JOB?

10:30  1   **A.**   YES.

2   **Q.**   DID HE DO HIS JOB WELL, IN YOUR OPINION?

3   **A.**   VERY WELL.

4   **Q.**   OKAY.  AND WHY DO YOU SAY THAT?

5   **A.**   JUST FROM EXPERIENCE, HE DID HIS JOB VERY WELL.

6   **Q.**   OKAY.  WHAT WAS HIS ATTITUDE AS A MANAGER?

7   **A.**   GOOD.

8   **Q.**   OKAY.  AND WHY DO YOU SAY THAT?

9   **A.**   HE TREATED ALL HIS EMPLOYEES FAIRLY, YOU KNOW.  HE WAS A

10   REALLY GOOD MANAGER TO WORK FOR.

11   **Q.**   OKAY.  WOULD YOU SAY HE HAD A POSITIVE ATTITUDE?

12   **A.**   YES.

13   **Q.**   OKAY.  NOW, DID YOU EVER WITNESS HIS INTERACTIONS WITH ANY

14   OF HIS SUPERVISORS?

15   **A.**   A FEW TIMES.

16   **Q.**   TELL US, DID YOU WITNESS MR. TAYLOR'S ATTITUDE WITH

17   RESPECT TO HIS INTERACTIONS WITH SUPERVISORS?

18   **A.**   YES.

19   **Q.**   OKAY.  AND WHAT OBSERVATIONS DO YOU HAVE OF HIS ATTITUDE

20   IN CONNECTION WITH INTERACTIONS WITH HIS SUPERVISORS?

21   **A.**   I THINK HE HANDLED HIMSELF PRETTY WELL.  I MEAN, HE NEVER

22   SEEMED TO GO OFF ON ANYBODY.

23   **Q.**   OKAY.

24   **A.**   OR GET, YOU KNOW, BELLIGERENT OR ANYTHING TO ANYBODY, NO.

25   **Q.**   WOULD YOU SAY THAT HE HAD A POSITIVE ATTITUDE AT ALL TIMES

10:31 1  YOU OBSERVED HIM?

2  **A.**   YES.

3  **Q.**   OKAY.  AND DID YOU EVER SEE HIM BE BELLIGERENT TO ANYBODY?

4  **A.**   NO.

5  **Q.**   EVER SEE HIM JUST BEING DISRESPECTFUL TO ANYBODY?

6  **A.**   NO.  NOT IN MY OPINION, NO.

7  **Q.**   DID YOU EVER SEE HIM BE QUARRELSOME TO ANYBODY?

8  **A.**   WELL, ON THE RAILROADS, YOU KNOW, SOMETIMES THAT'S JUST

9  THE NAME OF THE GAME.  YEAH, YOU WILL GET INTO DISPUTES.

10  **Q.**   THERE'S SOME BACK AND FORTH DISCUSSION, I GATHER, ABOUT --

11  **A.**   RIGHT.

12  **Q.**   -- WHAT YOU SHOULD DO AND WHAT YOU SHOULDN'T DO?

13  **A.**   CORRECT.

14  **Q.**   OKAY.  AND YOU OBSERVED THAT?

15  **A.**   UH-HUH.

16  **Q.**   DID YOU EVER SEE JOHNNY TAYLOR ACT INAPPROPRIATELY IN

17  THOSE DISCUSSIONS?

18  **A.**   NO.

19  **Q.**   IN YOUR OBSERVATION?

20  **A.**   IN MY OBSERVATION?  NO.

21  **Q.**   DID MR. JOHNNY EVER TELL YOU TO CODE NON-WELDING WORK AS

22  WELDING WORK?

23  **A.**   YES.

24  **Q.**   OKAY.  AND TELL US ABOUT THAT.  WHAT DID THAT INVOLVE?

25  **A.**   IT WAS A PARTICULAR JOB, THEY CALL THEM "PULL APARTS," AND

10:32 1   THEY DIDN'T HAVE A WORK CODE FOR IT.  SO TO KEEP THE PRODUCTION

2   GOING, WE HAD TO PUT SOMETHING IN THE COMPUTER, SO THAT WAS THE

3   -- THAT'S THE ONLY REASON WHY WE DID IT.

4   **Q.**   OKAY.  BUT YOU DID THAT?

5   **A.**   YEAH.

6   **Q.**   BUT WERE YOU STILL PAID AS A WELDER FOR DOING THAT?

7   **A.**   YES.

8            **MR. SMITH:**  YOUR HONOR, I TENDER THE WITNESS.

9                THANK YOU, SIR.

10           **THE COURT:**  CROSS.

11                        **CROSS-EXAMINATION**

12   BY MR. FRASER:

13   **Q.**   MR. TRAUTH, I'M DAVID FRASER.  I JUST WANT TO ASK YOU A

14   QUESTION OR TWO.

15   **A.**   UH-HUH.

16   **Q.**   EXPLAIN WHAT YOU MEAN BY "CODING WORK."  ARE YOU TALKING

17   ABOUT PUTTING WORK IN THE COMPUTER AND GIVING IT A CODE?

18   **A.**   YES.  EVERY JOB HAD PRETTY MUCH LIKE A SPECIFIC CODE

19   ASSIGNED TO IT.  IT WAS A FIVE-DIGIT CODE, AND YOU HAD TO PUT

20   THAT IN THE COMPUTER, HOW MANY HOURS YOU WORKED ON IT AND

21   EVERYTHING ELSE.  AND EACH JOB HAD A SPECIFIC CODE.

22   **Q.**   ALL RIGHT.  HOW DID YOU KNOW WHAT TO DO EVERY MORNING?

23   **A.**   JOHNNY WOULD LINE US UP IN THE MORNING WITH WHAT NEEDED TO

24   BE DONE.

25   **Q.**   OKAY.  AND WHAT YOU'RE EXPLAINING IS THAT THERE WAS A

10:34 1    NON-WELDING WORK THAT WAS CODED AS WELDING WORK ON THAT ONE
      2    OCCASION YOU RECALL?
      3    **A.**    YES.
      4    **Q.**    OKAY.  ANY OTHER OCCASIONS THAT COME TO MIND?
      5    **A.**    NO.
      6    **Q.**    OKAY.
      7    **A.**    AND THE REASON WHY THAT PARTICULAR JOB WAS ASSIGNED TO A
      8    WELDER WAS BECAUSE WE HAD THE EQUIPMENT ON THE TRUCK TO DO THAT
      9    JOB.
     10    **Q.**    OKAY.
     11    **A.**    IT WAS A SPECIAL PIECE OF EQUIPMENT THAT WE CALLED A "RAIL
     12    STRETCHER" THAT YOU HAD TO HAVE AND ONLY THE WELDING TRUCKS HAD
     13    THEM.
     14    **Q.**    OKAY.
     15    **A.**    SO THE WELDERS HAD TO GO DO THE JOB, AND A LOT OF TIMES
     16    WHEN YOU GOT TO THAT JOB YOU NEEDED A CUTTING TORCH ALSO.  AND
     17    THE ONLY TRUCKS THAT HAD RAIL PULLERS AND A TORCH WAS THE
     18    WELDING TRUCKS.
     19    **Q.**    HOW MANY WELDERS WERE THERE ON YOUR GANG?
     20    **A.**    WE HAD TWO.
     21    **Q.**    YOU HAD TWO WELDERS?
     22    **A.**    YEAH.
     23    **Q.**    ON YOUR GANG.  ALL RIGHT.  THAT'S ALL THE QUESTIONS I
     24    HAVE.  THANK YOU, SIR.
     25    **A.**    THANK YOU.

10:35  1             THE COURT:  ANY REDIRECT?

2             MR. SMITH:  NO, YOUR HONOR.

3             THE COURT:  YOU MAY STEP DOWN.

4                  IT'S 10:30, NEXT WITNESS.

5             MR. SCHMIDT:  THE PLAINTIFF CALLS KENNETH STUART,

6    YOUR HONOR.

7             THE COURT:  IS MR. TRAUTH RELEASED FROM HIS SUBPOENA?

8             MR. SCHMIDT:  YES, YOUR HONOR.

9             THE COURT:  OKAY.  YOU'RE FREE TO GO.

10                 SIR, YOU CAN DISPOSE OF YOUR FACE SHIELD, BUT

11   YOU'LL NEED TO WEAR A MASK WHILE YOU'RE IN THE BUILDING.  SO

12   YOU NEED TO PUT YOUR MASK ON, SIR.  THANK YOU.

13            THE WITNESS:  THANK YOU.

14            THE COURT:  IS SOMEBODY GETTING YOUR WITNESS?

15            MR. SCHMIDT:  WE CALL KENNETH STUART.

16            MS. SCHOONMAKER:  MR. WADSWORTH WENT TO SEE.  WE

17   ASKED HIM TO BE HERE AT 10:30.  WE'RE MAKING SURE HE IS.

18            MR. SCHMIDT:  OKAY.  GREAT.  THANK YOU.

19                       KENNETH W. STUART, II,

20   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

21            THE COURT:  ONCE YOU GET ON THE WITNESS STAND, YOU

22   CAN REMOVE YOUR MASK.  JUST KEEP YOUR FACE SHIELD ON.  YOU CAN

23   REMOVE YOUR MASK.  JUST KEEP YOUR FACE SHIELD ON.  THANK YOU.

24                 GO AHEAD.

25                       DIRECT EXAMINATION

10:37 1   **BY MR. SCHMIDT:**

2   **Q.**   GOOD MORNING, MR. STUART.

3         WOULD YOU STATE YOUR FULL NAME FOR THE RECORD,

4   PLEASE?

5   **A.**   KENNETH WAYNE STUART, II.

6   **Q.**   ALL RIGHT.  AND WHAT CITY AND STATE DO YOU LIVE IN?

7   **A.**   I LIVE IN WAXAHACHIE, TEXAS.

8   **Q.**   AND YOU HAVE BEEN EMPLOYED BY UNION PACIFIC FOR ABOUT 15

9   YEARS.  CORRECT?

10   **A.**   YES, SIR.

11   **Q.**   AND YOU ARE CURRENTLY THE DIRECTOR OF TRACK MAINTENANCE IN

12   FORT WORTH, TEXAS?

13   **A.**   YES, SIR.

14   **Q.**   OKAY.  AND BEFORE THAT, YOU WERE DIRECTOR OF TRACK

15   MAINTENANCE IN LIVONIA, LOUISIANA.  CORRECT?

16   **A.**   YES, SIR.

17   **Q.**   AND DIRECTOR OF TRACK MAINTENANCE, IS THAT THE SAME THING

18   AS SENIOR MANAGER OF TRACK MAINTENANCE?

19   **A.**   YES, SIR.

20   **Q.**   OKAY.  AND YOU WERE JOHNNY TAYLOR'S SUPERVISOR FROM

21   NOVEMBER OF 2017 UNTIL HIS TERMINATION IN FEBRUARY OF 2018.

22   CORRECT?

23   **A.**   YES, SIR.

24   **Q.**   AND BEFORE THAT, YOU DIDN'T HAVE ANY INTERACTIONS WITH

25   HIM, DID YOU?

10:38 1    A.   NO, SIR.

2    Q.   ALL RIGHT.  SO BETWEEN OCTOBER AND NOVEMBER OF 2017, THERE

3    WERE THREE DERAILMENTS THAT OCCURRED AT THE SWITCH 16 AREA OF

4    THE AVONDALE YARD.  CORRECT?

5    A.   I DON'T REMEMBER THREE.  BUT I DIDN'T GET THERE UNTIL

6    NOVEMBER.

7         MR. SCHMIDT:  OKAY.  CAN WE PULL UP PLAINTIFF'S

8    EXHIBIT NO. 13, WHICH HAS BEEN PREADMITTED.

9    BY MR. SCHMIDT:

10   Q.   ALL RIGHT.  SO THIS IS A PRINTOUT FROM UNION PACIFIC'S

11   COMPUTER SYSTEM.  CORRECT?

12   A.   YES, SIR.

13        MR. SCHMIDT:  ALL RIGHT.  CAN WE ZOOM IN A LITTLE BIT

14   ON IT.  IT'S KIND OF DIFFICULT TO READ.  YEAH, THANK YOU.

15   BY MR. SCHMIDT:

16   Q.   SO IF WE GO DOWN ON OCTOBER 15 OF 2017, IT REFERS TO A

17   DERAILMENT AT SWITCH 16.  CORRECT?

18   A.   YES, SIR, THAT IS CORRECT.

19   Q.   AND THEN IF WE SCROLL DOWN TO NOVEMBER 21, 2017, THERE IS

20   ANOTHER ONE.  THIS ONE REFERS TO SWITCH 15.  CORRECT?

21   A.   YES, SIR, THAT IS CORRECT.

22   Q.   ALL RIGHT.  AND THEN IMMEDIATELY BELOW THAT, THERE IS

23   ANOTHER DERAILMENT AT TRACK 15 ON NOVEMBER 27, 2017.  CORRECT?

24   A.   YES, SIR, THAT IS CORRECT.

25   Q.   ALL RIGHT.  SO THE OCTOBER 15 ONE WAS BEFORE YOU STARTED

10:40 1    IN LIVONIA.  CORRECT?

2    **A.**    YES, SIR.

3    **Q.**    ALL RIGHT.  AND AFTER THE NOVEMBER 21, 2017 DERAILMENT,

4    MR. TAYLOR AND HIS CREW REPAIRED THE TRACK AND GOT IT BACK UP

5    AND RUNNING THE SAME DAY.  CORRECT?

6    **A.**    I DON'T REMEMBER IF IT WAS THE SAME DAY.  I THOUGHT IT WAS

7    THE NEXT DAY.

8    **Q.**    OKAY.  BUT THE SAME DAY OR THE NEXT DAY?

9    **A.**    YES, SIR.

10    **Q.**    ALL RIGHT.  AND THEN YOU ASKED MR. TAYLOR TO TAKE SOME

11    MEASUREMENTS OF THE TRACK.  CORRECT?

12    **A.**    NO, SIR.

13    **Q.**    OKAY.  WELL, HE PERFORMED SOME MEASUREMENTS OF THE TRACK

14    ON NOVEMBER 24, DID HE NOT?

15    **A.**    ON THE 24TH?

16    **Q.**    YES, SIR.

17    **A.**    I DON'T REMEMBER THE MEASUREMENTS ON THE 24TH, NO, SIR.

18    **Q.**    OKAY.  LET'S LOOK AT PLAINTIFF'S EXHIBIT NO. 10, WHICH HAS

19    BEEN PREADMITTED.

20         ALL RIGHT.  AND THIS IS AN EMAIL FROM MR. TAYLOR TO

21    YOU PROVIDING THE MEASUREMENTS FROM SWITCH 16 ON NOVEMBER 24,

22    2017.  CORRECT?

23    **A.**    YES, SIR.

24    **Q.**    SO THESE MEASUREMENTS WERE TAKEN WHILE THE TRACK WAS STILL

25    IN SERVICE.  CORRECT?

10:41 1   **A.**   I'M ASSUMING, YES, SIR.

2   **Q.**   OKAY.  BECAUSE HE REPAIRED THE TRACK ON EITHER THE 21ST OR

3   THE 22ND, AND THEN THESE MEASUREMENTS WERE TAKEN ON THE 24TH.

4   AND THERE WASN'T ANOTHER DERAILMENT UNTIL THE 27TH.  CORRECT?

5   **A.**   NO, SIR.  I BELIEVE THESE WERE THE DERAILMENT MEASUREMENTS

6   THAT HE WAS GIVING ME.

7   **Q.**   SO THESE WERE MEASUREMENTS THAT YOU TOOK ON THE 21ST AFTER

8   THE DERAILMENT?

9   **A.**   THAT'S WHAT I BELIEVE, YES, SIR.

10   **Q.**   ALL RIGHT.  LET'S LOOK AT PLAINTIFF'S EXHIBIT NO. 11.

11          SO THIS IS AN EMAIL FROM DANNY JAQUESS TO YOU AND --

12   OR SORRY.  TO MR. TAYLOR, BUT YOU'RE COPIED ON IT.  CORRECT?

13   **A.**   YES, SIR.

14   **Q.**   AND THIS IS DATED NOVEMBER 27 AND REFERS TO ANOTHER

15   DERAILMENT ON NOVEMBER 27.  CORRECT?

16   **A.**   YES, SIR.

17   **Q.**   HE SAYS:  "WE NEED TO MEET IN AVONDALE TOMORROW AND

18   DISCUSS OPTIONS THAT DON'T INVOLVE REMOVING THE YARD FROM

19   SERVICE OR SAYING WE CAN'T RUN ENGINES THROUGH THE AREA."

20          DID YOU MET IN AVONDALE THE NEXT DAY?

21   **A.**   I BELIEVE I DID, YES, SIR.

22   **Q.**   OKAY.  WITH MR. TAYLOR, PHILLIP HAWKINS, AND DARIN

23   MUSICK?

24   **A.**   I DON'T REMEMBER WHO WAS THERE.  BUT I BELIEVE THAT

25   PHILLIP AND MR. MUSICK WOULD'VE BEEN THERE.

10:43  1  **Q.**   OKAY.  AND AT THIS MEETING MR. TAYLOR STATED THAT HE FELT

2  THAT THE DERAILMENT WAS CAUSED BY THE ALIGNMENT OF THE TRACK.

3  CORRECT?

4  **A.**   I DON'T REMEMBER THAT.

5  **Q.**   OKAY.  THE REST OF THE TEAM FELT THAT IT WAS NOT CAUSED BY

6  TRACK-RELATED ISSUES.  DO YOU REMEMBER THAT?

7  **A.**   I'D HAVE TO GO BACK TO WHAT THE CAUSE OF THE DERAILMENT

8  WAS.

9  **Q.**   OKAY.  BUT MR. TAYLOR AND HIS CREW REPAIRED THE TRACK AND

10  GOT IT BACK INTO SERVICE EITHER THAT DAY OR THE NEXT DAY AGAIN.

11  CORRECT?

12  **A.**   YES, SIR.

13  **Q.**   OKAY.  AND THESE MEASUREMENTS THAT ARE SHOWN IN THIS EMAIL

14  FROM MR. TAYLOR, YOU WOULD AGREE THAT IF THOSE MEASUREMENTS

15  WERE THE MEASUREMENTS ON NOVEMBER 28, 2017, THAT THE TRACK

16  SHOULDN'T HAVE GONE BACK INTO SERVICE?

17  **A.**   I DON'T SEE ANY MEASUREMENTS, SIR.  I SEE A RANGE OF

18  MEASUREMENTS.

19  **Q.**   OKAY.  DID YOU GIVE A DEPOSITION IN THIS CASE, MR. STUART?

20  **A.**   YES, SIR.

21  **Q.**   AND WERE YOU UNDER OATH AT THIS DEPOSITION?

22  **A.**   YES, SIR.

23  **Q.**   AND WAS UNION PACIFIC'S COUNSEL PRESENT AT THE DEPOSITION?

24  **A.**   YES, SIR.

25           **MR. SCHMIDT:**  ALL RIGHT.  CAN WE PULL UP MR. STUART'S

10:45 1  DEPOSITION, PLEASE.  LET'S LOOK AT PAGE 54 TO 55.

2  **BY MR. SCHMIDT:**

3  **Q.**   I WOULD ASK YOU TO READ TO YOURSELF LINES 6 THROUGH --

4        **MR. SCHMIDT:**  LET'S SCROLL DOWN.  KEEP GOING THROUGH

5  LINE 3 OF THE NEXT PAGE.

6  **A.**   CAN YOU SCROLL DOWN, PLEASE.

7        ALL RIGHT, SIR.

8  **BY MR. SCHMIDT:**

9  **Q.**   ALL RIGHT.  SO I ASKED YOU A QUESTION ABOUT THOSE

10  MEASUREMENTS LISTED AS 1, 2, AND 3.  CORRECT?

11  **A.**   YES, SIR.

12  **Q.**   AND YOUR OPINION WAS THAT IF THOSE WERE THE MEASUREMENTS,

13  THE MTM AND THE TRACK INSPECTOR HAD A RESPONSIBILITY NEVER TO

14  PUT THE TRACK BACK INTO SERVICE IF THOSE WERE THE MEASUREMENTS.

15  CORRECT?

16  **A.**   THAT IS CORRECT, SIR.

17  **Q.**   OKAY.  AND YOU MET WITH MR. TAYLOR AND JACOB GILSDORF AT

18  THE AVONDALE YARD ON JANUARY 9, 2018.  CORRECT?

19  **A.**   YES, SIR.

20  **Q.**   AND AT THIS MEETING MR. TAYLOR INFORMED YOU THAT HE HAD

21  MET WITH CHARLES POWERS FROM UNION PACIFIC'S ENGINEERING IN

22  OMAHA, NEBRASKA, AT THE AVONDALE YARD FIVE DAYS PRIOR.

23  CORRECT?

24  **A.**   I DON'T REMEMBER.  I REMEMBER SCHEDULING A SURVEY FOR THE

25  YARD.  I DON'T REMEMBER IF HE TOLD ME THAT AT THAT MEETING.

10:47 1    **Q.**   OKAY.  AND MR. TAYLOR ALSO TOLD YOU AT THIS MEETING THAT

2    THE MEASUREMENTS THAT HE SENT YOU ON NOVEMBER 24, HE HAD JUST

3    RETAKEN THEM ON JANUARY 4 AND RECONFIRMED THAT THEY WERE

4    CORRECT.  RIGHT?

5    **A.**   NO, SIR.

6    **Q.**   NO, HE DIDN'T SAY THAT?

7    **A.**   NO, SIR.

8    **Q.**   OKAY.  AND MR. TAYLOR EXPRESSED HIS OPINION THAT THE

9    SWITCHES NEEDED TO BE REPLACED.  CORRECT?

10   **A.**   YES, SIR.

11   **Q.**   AND THAT THERE WERE ALIGNMENT ISSUES WITH THE TRACK.

12   CORRECT?

13   **A.**   YES, SIR.

14   **Q.**   AND YOU AND MR. GILSDORF SUGGESTED THAT MR. TAYLOR SPIKE

15   LINE THE SWITCH.  CORRECT?

16   **A.**   I BELIEVE THAT WAS ONE OPTION, YES, SIR.

17   **Q.**   OKAY.  AND MR. TAYLOR EXPLAINED TO YOU THAT SPIKE LINING

18   WOULD NOT FIX THE DEFECT BECAUSE THE DEFECT WAS BETWEEN THE

19   HEEL OF THE SWITCH AND THE TOE OF THE FROG AND WOULD NOT BE

20   AFFECTED BY SPIKE LINING.  CORRECT?

21   **A.**   I DON'T REMEMBER HIM SAYING THAT, NO, SIR.

22   **Q.**   OKAY.  AND MR. TAYLOR ALSO REMINDED YOU THAT HE AND HIS

23   CREW HAD ALREADY TRIED SPIKE LINING THE SWITCH ON NOVEMBER 21

24   OF 2017 AFTER THE DERAILMENT THAT DAY.  CORRECT?

25   **A.**   I DON'T RECALL HIM SAYING THAT EITHER, SIR.

10:49 1   **Q.**   OKAY.  DID YOU OR MR. GILSDORF PROPOSE ANY OTHER SOLUTIONS

2   THAT WOULD'VE MADE THE TRACK SAFE TO OPERATE?

3   **A.**   I REMEMBER TALKING ABOUT BRINGING A TAMPER DOWN AND LINING

4   IT WITH A TAMPER AND SPIKE LINING, SIR.

5   **Q.**   OKAY.  AND MR. TAYLOR ASKED YOU AND MR. GILSDORF TO TAKE A

6   LOOK AT THE TRACK WITH HIM.  CORRECT?

7   **A.**   I BELIEVE HE DID, YES, SIR.

8   **Q.**   OKAY.  BUT YOU AND MR. GILSDORF DID NOT LOOK AT THE TRACK

9   WITH HIM, DID YOU?

10   **A.**   I DON'T BELIEVE WE DID, NO.

11   **Q.**   SHOULDN'T YOU HAVE, CONSIDERING THERE HAD BEEN THREE

12   DERAILMENTS AT THAT LOCATION?

13   **A.**   IT DEPENDS ON WHAT WAS GOING ON.  I DON'T REMEMBER WHAT WE

14   WERE DOING.  I THINK WE WERE DOING AN SBAR, AND THERE'S

15   OPPORTUNITIES TO LOOK AT IT AT ANOTHER TIME, SIR.

16   **Q.**   OKAY.  DIDN'T YOU TESTIFY PREVIOUSLY THAT YOU WOULD'VE

17   BEEN MORE INVOLVED IF THERE WERE THREE DERAILMENTS AT THE SAME

18   LOCATION OR IN A TWO-MONTH SPAN?

19   **A.**   I CAN'T REMEMBER.

20         **MR. SCHMIDT:**  ALL RIGHT.  LET'S LOOK AT PAGES 35 TO

21   36 OF MR. STUART'S DEPOSITION.

22   **BY MR. SCHMIDT:**

23   **Q.**   AND I WOULD ASK YOU JUST TO REVIEW FROM LINE 13 THROUGH --

24   GO DOWN TO THE NEXT PAGE, LINE 5 OF THE NEXT PAGE.

25   **A.**   OKAY.  CAN YOU SCROLL DOWN?  ALL RIGHT.

10:52  1    Q.   OKAY.  SO, AGAIN, YOUR TESTIMONY WAS THAT YOU WOULD HAVE
       2    BEEN MORE PERSONALLY INVOLVED IF THERE HAD BEEN THREE
       3    DERAILMENTS IN THE SAME LOCATION.  CORRECT?
       4    A.   THREE DERAILMENTS IN 12 DAYS?  YES, SIR.
       5    Q.   IN 12 DAYS?
       6    A.   I BELIEVE IT SAID BETWEEN NOVEMBER 9 AND DECEMBER 21.
       7    Q.   OKAY.  SO THAT DOESN'T APPLY IF THERE ARE THREE
       8    DERAILMENTS BETWEEN OCTOBER 15 AND NOVEMBER 21?
       9    A.   I DIDN'T REMEMBER THREE THERE.  THERE WAS TWO THERE.  ONE
      10    ON THE 16 -- WERE THEY BOTH ON THE 15 SWITCH?  AND I BELIEVE
      11    ONE WAS A MECHANICAL ISSUE.  SO THERE WAS ONE TRACK-CAUSED
      12    ISSUE, DERAILMENT THERE, WHILE I WAS THERE.  SO SOMETHING
      13    HAPPENING AT THE SAME LOCATION DUE TO TWO DIFFERENT CAUSES, I
      14    DON'T KNOW THAT I WOULD HAVE --
      15    Q.   OKAY.  AND YOU WOULD AGREE THAT MARK WHEELAND HAS A
      16    SUBSTANTIAL KNOWLEDGE OF UNION PACIFIC'S POLICIES AND
      17    PROCEDURES REGARDING TRACK MAINTENANCE.  CORRECT?
      18    A.   YES, SIR.
      19    Q.   AND HE WORKED FOR UNION PACIFIC FOR A VERY LONG TIME, OVER
      20    40 YEARS.  CORRECT?
      21    A.   I BELIEVE IT WAS OVER 40 YEARS.  I'M NOT SURE OF THE TIME.
      22    Q.   OKAY.  WERE YOU AWARE THAT HE TESTIFIED DURING HIS
      23    DEPOSITION THAT WHAT SHOULD HAVE HAPPENED WAS YOU AND MR.
      24    GILSDORF AND MR. TAYLOR INSPECT THE TRACK TOGETHER TO DETERMINE
      25    THE SOLUTION?

10:53 1   **A.**   NO.  I HAVE NO KNOWLEDGE OF HIS DEPOSITION.

2   **Q.**   OKAY.  IF I ASKED YOU TO ASSUME THAT THAT TESTIMONY IS IN

3   HIS DEPOSITION, WOULD YOU DISAGREE WITH THAT TESTIMONY?

4   **A.**   I WOULDN'T DISAGREE WITH MARK, NO, SIR.

5   **Q.**   OKAY.  BUT YOU DIDN'T GO INSPECT THE TRACK WITH MR.

6   TAYLOR, EVEN THOUGH HE ASKED YOU TO.  RIGHT?

7   **A.**   I DID NOT INSPECT IT WITH HIM ON THAT DAY.

8   **Q.**   OKAY.  DID YOU TELL HIM YOU WERE GOING TO LATER?

9   **A.**   I WAS DOWN THERE AT THE DERAILMENT, THE TRACK-CAUSED

10   DERAILMENT, AND I WAS THERE WHEN WE WERE TAKING MEASUREMENTS.

11   **Q.**   OKAY.  YOUR UNDERSTANDING OF THE FRA REGULATIONS THAT

12   APPLY TO MANAGERS OF TRACK MAINTENANCE AND TRACK INSPECTORS,

13   YOUR UNDERSTANDING IS THAT THEY REQUIRE A VISUAL INSPECTION IN

14   ORDER TO DETERMINE WHETHER A TRACK IS IN COMPLIANCE WITH FRA

15   STANDARDS.  CORRECT?

16   **A.**   YES, SIR.

17   **Q.**   OKAY.  AND MR. TAYLOR TOOK THE TRACK OUT OF SERVICE THE

18   NEXT DAY ON JANUARY 10.  CORRECT?

19   **A.**   I DON'T REMEMBER THE DATE, BUT IT COULD BE.

20   **Q.**   ALL RIGHT.  AND THEN AFTER HE TOOK THE TRACK OUT OF

21   SERVICE, YOU ASKED HIM TO SEND YOU MEASUREMENTS OF THE TRACK.

22   CORRECT?

23   **A.**   YES, SIR.

24   **Q.**   AND HE SENT YOU THE MEASUREMENTS THAT HE HAD PREVIOUSLY

25   DONE ON NOVEMBER 24.  CORRECT?

10:55 1   **A.**   YES, SIR.

2   **Q.**   AND WHICH HE HAD RETAKEN ON JANUARY 4.  CORRECT?

3   **A.**   I DON'T BELIEVE HE EVER RETOOK THE MEASUREMENTS.

4   **Q.**   OKAY.  SO HE DIDN'T TELL YOU THAT HE HAD RETAKEN THE

5   MEASUREMENTS?

6   **A.**   NO, SIR.  HE FORWARDED ME AN EMAIL FROM THE DERAILMENT --

7   FROM HIS DERAILMENT MEASUREMENTS.

8   **Q.**   OKAY.  LET'S GO BACK TO PLAINTIFF'S EXHIBIT NO. 10.

9       DOES ANYTHING IN THIS EMAIL SAY THAT THESE ARE

10   DERAILMENT MEASUREMENTS?

11   **A.**   NO, SIR.

12   **Q.**   OKAY.  SO WHAT IS THE BASIS FOR YOUR OPINION THAT THESE

13   ARE DERAILMENT MEASUREMENTS?

14   **A.**   THAT'S WHAT I REMEMBER.

15   **Q.**   OKAY.  AND BY DERAILMENT MEASUREMENTS, YOU MEAN

16   MEASUREMENTS THAT ARE TAKEN WHILE THE TRAIN HAS DERAILED BEFORE

17   THE TRACK HAS BEEN REPAIRED.  CORRECT?

18   **A.**   YES, SIR.

19   **Q.**   OKAY.  ALL RIGHT.  LET'S LOOK AT JOINT EXHIBIT NO. 5.

20       AND THESE ARE EMAILS BETWEEN YOU AND MR. TAYLOR ON

21   JANUARY 10, 2018.  CORRECT?

22   **A.**   YES, SIR.

23   **Q.**   ALL RIGHT.  AND THEY ARE DISCUSSING THE TRACK WHICH HE HAD

24   TAKEN OUT OF SERVICE.  CORRECT?

25   **A.**   YES, SIR.

10:57 1    Q.   ALL RIGHT.  THE SECOND EMAIL THAT APPEARS ON THIS PAGE IS

2    AN EMAIL FROM YOU:  "GET YOUR TAMPER HEADING SOUTH TO THE YARD

3    AND WE MAY NEED TO DO SOME SPIKE LINING."

4              AND MR. TAYLOR'S RESPONSE IS:  "YOU CANNOT SPIKE LINE

5    THE SWITCH.  THE ENGINEER OUT OF OMAHA WALKED THE YARD WITH ME

6    ON JANUARY 4, 2017.  HE SAID THE SWITCHES WERE LAID

7    INCORRECTLY, TRACK NEEDED TO BE UPGRADE TO CORRECT PROBLEM."

8              SO THESE ARE -- BOTH OF THOSE ARE THINGS THAT YOU'VE

9    DISCUSSED IN PERSON ON JANUARY 9, JUST THE DAY BEFORE.

10   CORRECT?

11   A.   SO MR. POWERS CAME AND HE IS A SURVEYOR.  AND THIS EMAIL

12   IS SOMEWHAT DECEIVING BECAUSE MR. POWERS IS NOT AN ENGINEER,

13   HE'S A SURVEYOR.  AND IT WOULDN'T BE IN HIS -- HE SIMPLY TAKES

14   -- HE SIMPLY SURVEYS THE TRACK AND SENDS IT TO OUR TRACK DESIGN

15   GROUP.

16   Q.   OKAY.  SO, MR. STUART, MY QUESTION WAS WHETHER THESE WERE

17   BOTH THINGS THAT YOU HAD DISCUSSED THE DAY BEFORE IN PERSON?

18   A.   YES, SIR.

19   Q.   OKAY.  AND SO YOU DID NOT REALIZE THAT CHARLES POWERS WAS

20   FROM THE DESIGN GROUP IN OMAHA?

21   A.   HE IS FROM THE DESIGN GROUP, BUT HIS JOB IS TO SURVEY THE

22   TRACK.

23   Q.   OKAY.  AFTER THIS EMAIL EXCHANGE YOU HAD A PHONE CALL WITH

24   MR. TAYLOR.  CORRECT?

25   A.   I MAY HAVE.  I DON'T REMEMBER.

10:59 1   Q.   OKAY.  LET'S MOVE DOWN A LITTLE BIT IN THIS EMAIL.

2           OKAY.  SO MR. TAYLOR RESENDS YOU THE MEASUREMENTS

3   FROM NOVEMBER 24.  YOU RESPOND:  "THESE MEASUREMENTS ARE OVER 6

4   WEEKS OLD.  DID WE MEASURE IT TODAY?"

5           SO YOUR ENTIRE REASON FOR REQUESTING THAT HE PERFORM

6   THESE MEASUREMENTS AGAIN WAS THAT YOU THINK THESE WERE

7   DERAILMENT MEASUREMENTS.  CORRECT?

8   A.   THAT IS CORRECT.

9   Q.   OKAY.  AND SO YOU TESTIFIED THAT YOU DON'T REMEMBER THE

10  PHONE CALL WITH MR. TAYLOR ON JANUARY 10?

11  A.   I DON'T REMEMBER.

12  Q.   OKAY.  SO IF YOU DON'T REMEMBER IT, THEN YOU CAN'T DENY

13  THAT YOU INSTRUCTED HIM TO PUT THE TRACK BACK INTO SERVICE, CAN

14  YOU?

15  A.   I NEVER TOLD HIM TO PUT THE TRACK BACK IN SERVICE.

16  Q.   OKAY.  BUT YOU DID THINK IT WAS IMPROPER FOR MR. TAYLOR TO

17  TAKE THE TRACK OUT OF SERVICE.  CORRECT?

18  A.   I THOUGHT IT WAS IMPROPER TO TAKE THE TRACK OUT OF SERVICE

19  WITHOUT TAKING THE MEASUREMENTS TO KNOW IF IT WAS GOOD FOR

20  BEING IN SERVICE OR NOT BEING IN SERVICE.

21  Q.   WITHOUT REDOING THE MEASUREMENTS THAT YOU'RE SAYING ARE

22  DERAILMENT MEASUREMENTS?

23  A.   YES, SIR.

24  Q.   OKAY.  AND YOU DID NOT AGREE WITH MR. TAYLOR THAT THE

25  TRACK WAS UNSAFE, DID YOU?

11:01 1   **A.**   I DID NOT KNOW BECAUSE I HAD NEVER SEEN THE TRACK
       2   MEASUREMENTS THAT TOOK IT OUT OF SERVICE.
       3   **Q.**   OKAY.  AND YOU WOULD AGREE THAT IF THE MEASUREMENTS THAT
       4   WE LOOKED AT WERE CURRENT MEASUREMENTS, THAT THE TRACK SHOULD
       5   BE TAKEN OUT OF SERVICE.  CORRECT?
       6   **A.**   SO THOSE MEASUREMENTS WERE -- IT'S A RANGE OF
       7   MEASUREMENTS.  I WOULD HAVE TO SEE THE MEASUREMENTS, THE ACTUAL
       8   STATIONS, THE 16-FOOT STATIONS, TO LOOK AT THAT AND SEE.
       9   **Q.**   OKAY.  AND WE DID LOOK AT YOUR DEPOSITION TESTIMONY
      10   EARLIER WHERE YOU SAID THAT IF THOSE MEASUREMENTS WERE CURRENT,
      11   THE TRACK SHOULD NOT BE IN SERVICE.  RIGHT?
      12   **A.**   THE FOUR AND A HALF TO EIGHT INCHES OF ALIGNMENT, YES,
      13   SIR.
      14   **Q.**   OKAY.  AND YOUR OPINION IS THAT THE DERAILMENT WAS CAUSED
      15   BY MR. TAYLOR NOT MAINTAINING THE TRACK PROPERLY.  CORRECT?
      16   **A.**   IF I REMEMBER CORRECTLY, IT WAS A SWITCH POINT DERAILMENT.
      17   SO, YES, THAT WOULD BE A MAINTENANCE ISSUE.
      18   **Q.**   OKAY.  BUT YOU CAN'T IDENTIFY ANY SPECIFIC WAY IN WHICH
      19   THE TRACK WAS NOT MAINTAINED PROPERLY, CAN YOU?
      20   **A.**   IF THE SWITCH POINT WAS WORN -- I CAN'T REMEMBER IF IT WAS
      21   GAPPED OR WORN.  A GAP SWITCH POINT WOULD BE TENSION ON THE
      22   SWITCH.
      23   **Q.**   SO YOU DON'T REMEMBER IF THAT WAS THE CASE OR NOT?
      24   **A.**   I DON'T REMEMBER.  WE CAN GO BACK AND LOOK AT THE
      25   DERAILMENT CAUSE.

11:03 1   **Q.**   OKAY.  AND, AGAIN, YOU NEVER LOOKED AT THE TRACK.

2   CORRECT?

3   **A.**   I WAS THERE THE DAY OF THE DERAILMENT.

4   **Q.**   AND IF YOU FELT THAT THE TRACK WAS SAFE, YOU COULD HAVE

5   PUT IT BACK INTO SERVICE.  CORRECT?

6   **A.**   YES, SIR.

7   **Q.**   AND YOU NEVER DID.  RIGHT?

8   **A.**   I NEVER DID, NO, SIR.

9   **Q.**   OKAY.  AND WHEN DID YOU MOVE FROM YOUR POSITION IN

10   LIVONIA, LOUISIANA?

11   **A.**   NOVEMBER 2018.

12   **Q.**   OKAY.  AND YOU NEVER PUT SWITCH 16 BACK IN SERVICE?

13   **A.**   NO, SIR.

14   **Q.**   OKAY.  AND SO YOU NEVER TOLD EITHER JACOB GILSDORF OR MARK

15   WHEELAND THAT THE MEASUREMENTS TAKEN ON NOVEMBER 24 WERE TAKEN

16   WHILE THE TRACK WAS OPERATIONAL?

17   **A.**   I DON'T REMEMBER EVERY SAYING THAT, NO.

18   **Q.**   OKAY.  AND YOU NEVER TOLD JACOB GILSDORF OR MARK WHEELAND

19   THAT MR. TAYLOR HAD REDONE THE MEASUREMENTS ON JANUARY 4, 2018,

20   DID YOU?

21   **A.**   CAN YOU SAY THAT AGAIN?

22   **Q.**   SURE.

23        YOU NEVER TOLD JACOB GILSDORF OR MARK WHEELAND THAT

24   MR. TAYLOR HAD RETAKEN THE MEASUREMENTS ON JANUARY 4, 2018, DID

25   YOU?

11:05  1    **A.**   NO, SIR.

2    **Q.**   AND YOU TOLD JACOB GILSDORF AND MARK WHEELAND THAT MR.

3    TAYLOR HUNG UP ON YOU ON JANUARY 10, 2018.  CORRECT?

4    **A.**   YES, SIR.

5    **Q.**   AND YOU TOLD JACOB GILSDORF AND MR. WHEELAND THAT MR.

6    TAYLOR WAS INSUBORDINATE TOWARDS YOU.  CORRECT?

7    **A.**   YES, SIR.

8    **Q.**   AND ONE OF THE WAYS IN WHICH YOU BELIEVED THAT MR. TAYLOR

9    WAS INSUBORDINATE WAS BY COMPLAINING OF WHAT HE CONSIDERED TO

10   BE IMPROPER OR ILLEGAL ACTIVITIES.  CORRECT?

11   **A.**   NO, SIR.

12        **MR. SCHMIDT:**  ALL RIGHT.  CAN WE LOOK AT PAGE 93 TO

13   94 OF MR. STUART'S DEPOSITION.  ALL RIGHT.  SCROLL DOWN,

14   PLEASE.  I'M SORRY.  SCROLL DOWN.  I THINK I HAVE THE WRONG

15   PAGE NUMBER.  KEEP GOING.  I APOLOGIZE.  I HAD THE WRONG PAGE

16   NUMBER.

17   **BY MR. SCHMIDT:**

18   **Q.**   SO, MR. STUART, ON PAGES 92 TO 93 OF YOUR DEPOSITION, I

19   ASKED YOU THE QUESTION:

20        "OKAY.  IN WHAT WAYS WAS MR. TAYLOR INSUBORDINATE?"

21        YOUR ANSWER WAS:

22        "I WOULD ASK HIM TO DO SOMETHING, AND HE WOULD

23   FLATOUT TELL ME, NO, HE'S NOT GOING TO DO THAT.  I WOULD ASK

24   HIM FOR MEASUREMENTS ON WHY A TRACK WAS OUT OF SERVICE, AND I

25   WOULD NEVER GET PROVIDED THOSE MEASUREMENTS.

11:07 1          "THERE WAS SEVERAL INSTANCES OF HIM TRYING TO MAKE IT

2    SOUND LIKE I WAS TELLING HIM TO BREAK THE LAW ON A CONFERENCE

3    CALL, AND HE WOULD JUST BE ARGUMENTATIVE.  WHEN I'D SAY, HEY,

4    HAVE YOUR WELDERS DO THIS, AND HE WOULD COME TO A POINT AND

5    HE'D SAY, YOU'RE TELLING ME NOT TO DO MY DEFECTS.  AND I'D SAY,

6    NO, DEFECT MANAGEMENT IS EXPECTED OUT OF AN MTM.  I EXPECT YOU

7    TO DO YOUR DEFECTS AND ELIMINATE JOINTS."

8          SO WAS THAT YOUR TESTIMONY?

9    **A.**   YES, SIR.

10   **Q.**   OKAY.  AND YOU CLAIM THAT MR. TAYLOR HUNG UP ON YOU ON

11   SEVERAL OCCASIONS.  CORRECT?

12   **A.**   YES, SIR.

13   **Q.**   WHEN WAS THE FIRST OCCASION?

14   **A.**   I DIDN'T WRITE THEM DOWN.  I DON'T REMEMBER.

15   **Q.**   ALL RIGHT.  LET'S LOOK AT JOINT EXHIBIT NO. 12.  LET'S

16   SCROLL TO THE FIRST PAGE SO WE CAN SEE WHAT IT IS.

17          AND DO YOU RECOGNIZE THIS DOCUMENT, SIR?

18   **A.**   YES, SIR.

19   **Q.**   AND YOU PREPARED THIS DOCUMENT, DIDN'T YOU?

20   **A.**   YES, SIR.

21   **Q.**   OKAY.  LET'S GO TO PAGE U.P. TAYLOR 40.

22          ALL RIGHT.  OR RIGHT HERE IN THE MIDDLE UNDER

23   "COACHES, PERFORMANCE ISSUE:  OVER THE LAST 6 MONTHS THE

24   AVERAGE COACHING PERCENTAGE OF SERVICE UNIT PEERS IS 21

25   PERCENT.  YOUR COACHING RATE IS 11 PERCENT.  IN ADDITION, IN

11:09 1    THE ABSENCE OF TEAM TESTING, YOU REPORT SIGNIFICANTLY FEWER

2    COACHING OPPORTUNITIES."

3              SO YOU NEVER TOLD MR. TAYLOR PRIOR TO THIS THAT HIS

4    COACHING WAS A PERFORMANCE ISSUE, DID YOU?

5    **A.**   WE WENT OVER COACHING WEEKLY ON A CALL, SO I MAY NEVER

6    HAVE DOCUMENTED IT.  BUT WE HAD TALKED SEVERAL TIMES ON CALLS.

7    **Q.**   SO YOU REMEMBER TELLING HIM THAT HIS COACHING WAS A

8    PERFORMANCE ISSUE ON PHONE CALLS PRIOR TO THIS DOCUMENT?

9    **A.**   I DON'T REMEMBER SPECIFICALLY SAYING THAT, NO.

10   **Q.**   OKAY.  LET'S GO TO THE NEXT PAGE.

11             SO RIGHT HERE NEXT TO PERFORMANCE ISSUE:  "ON

12   1/10/2018 YOU WERE INSTRUCTED BY SRMTM" -- THAT'S YOU.

13   CORRECT?

14   **A.**   YES, SIR.

15   **Q.**   -- "TO PROVIDE CURRENT MEASUREMENTS ON A TRACK TAKEN OUT

16   OF SERVICE.  YOU PROVIDED DERAILMENT MEASUREMENTS FROM 6 WEEKS

17   PRIOR AND DID NOT PERFORM CURRENT MEASUREMENTS AS INSTRUCTED BY

18   THE SRMTM."

19             SO THAT CONCERNS THE EMAILS THAT WE WERE LOOKING AT

20   JUST A MINUTE AGO REGARDING THE MEASUREMENTS ON SWITCH 16.

21   CORRECT?

22   **A.**   YES, SIR.

23   **Q.**   OKAY.  AND THE PARAGRAPH DIRECTLY ABOVE THAT DESCRIBES AN

24   INCIDENT ON JANUARY 22, 2018, WITH JACOB GILSDORF.  SO THAT

25   INFORMATION WAS GIVEN TO YOU BY MR. JACOB GILSDORF.  CORRECT?

11:10 1    A.   YES, SIR.

2              MR. SCHMIDT:  LET'S SEE.  CAN WE MOVE DOWN A LITTLE.

3    BY MR. SCHMIDT:

4    Q.   ALL RIGHT.  SO RIGHT HERE NEXT TO PERFORMANCE ISSUE:  "ON

5    1/10/2018 YOU CALLED YOUR SRMTM REGARDING A TRACK THAT WAS

6    TAKEN OUT OF SERVICE AND REFUSED TO ENGAGE IN A DISCUSSION

7    ABOUT OPTIONS TO PLACE THE TRACK BACK INTO SERVICE, ULTIMATELY

8    HANGING UP PREMATURELY AND ENDING THE CALL."

9              SO YOU DISAGREE WITH MR. TAYLOR'S TESTIMONY THAT YOU

10   INSTRUCTED HIM ON THIS CALL TO PLACE THE TRACK BACK INTO

11   SERVICE.  CORRECT?

12   A.   I DO.

13   Q.   OKAY.  WHAT OPTIONS DID YOU -- DID HE REFUSE TO DISCUSS?

14   A.   SPIKE LINING, SURFACING IT, AND GIVING ME THE CURRENT

15   MEASUREMENTS SO WE COULD SEE WHAT THEY ACTUALLY WERE.

16   Q.   OKAY.  SO HE JUST DIDN'T DISCUSS THOSE THINGS WITH YOU?

17   A.   MOST OF OUR CONVERSATIONS AROUND THAT TRACK RESULTED IN

18   JUST SAYING HE'S NOT PUTTING THE TRACK BACK IN SERVICE.  I'M

19   NOT PUTTING THE TRACK BACK IN SERVICE.  THERE WAS NO

20   DISCUSSION.  HE WASN'T INTERESTED IN TALKING ABOUT ANYTHING.

21   Q.   OKAY.  YOU SAID HE REFUSED TO DISCUSS SPIKE LINING.  SPIKE

22   LINING WAS DISCUSSED IN THE EMAILS WE LOOKED AT, WASN'T IT?

23   AND MR. TAYLOR EXPLAINED WHY IT WOULDN'T WORK?

24   A.   HE DIDN'T EXPLAIN WHY IT WOULDN'T WORK.  HE JUST SAID IT

25   WOULDN'T WORK.

11:12 1   Q.   OKAY.  LET'S LOOK AT JOINT EXHIBIT NO 3.

2              SO JUST A MINUTE AGO, WE WERE DISCUSSING THE PHONE

3   CALL ON JANUARY 10 AND YOU GAVE ME SOME EXAMPLES OF WHAT MR.

4   TAYLOR REFUSED TO DISCUSS WITH YOU DURING THAT PHONE CALL?

5   A.   YES, SIR.

6   Q.   OKAY.  DO YOU REALIZE THAT EARLIER IN YOUR TESTIMONY YOU

7   TESTIFIED THAT YOU DID NOT REMEMBER HAVING A PHONE CALL OR WHAT

8   OCCURRED DURING THE PHONE CALL?

9   A.   I REMEMBER THE BASIC CONVERSATIONS THAT WE HAD.  I DON'T

10   REMEMBER A SPECIFIC PHONE CALL.  I DON'T REMEMBER THE -- I

11   REMEMBER GENERAL CONVERSATIONS THAT WE HAD REGARDING IT.  I

12   DON'T REMEMBER SPECIFIC PHONE CALLS.

13   Q.   OKAY.  ALL RIGHT.  JOINT EXHIBIT NO. 3, SO THIS IS MR.

14   TAYLOR'S 2017 PERFORMANCE REVIEW, WHICH WAS DRAFTED BY YOU.

15   CORRECT?

16   A.   YES, SIR.

17   Q.   OKAY.  LET'S GO DOWN TO THE LAST PAGE.

18              AND YOU SIGNED THIS DOCUMENT ON NOVEMBER 29, 2017.

19   CORRECT -- DECEMBER 29, 2017.  CORRECT?

20   A.   YES, SIR.

21   Q.   ALL RIGHT.  AND YOU RATED MR. TAYLOR A 3, GOOD PERFORMER.

22   CORRECT?

23   A.   YES, SIR.

24   Q.   ALL RIGHT.  SO THIS WAS LESS THAN TWO MONTHS BEFORE MR.

25   TAYLOR'S TERMINATION.  CORRECT?

11:14 1   **A.**   YES, SIR.

2   **Q.**   ALL RIGHT.  LET'S GO UP TO PAGE U.P. TAYLOR 31.  LET'S GO

3   UP A LITTLE BIT MORE, PLEASE.

4         RIGHT NEXT TO THE CLICKER RIGHT THERE YOU STATE:

5   "SINCE I HAVE BEEN HERE YOU HAVE DONE A GOOD JOB MANAGING YOUR

6   SLOWS."  CORRECT?

7   **A.**   YES, SIR.

8   **Q.**   ALL RIGHT.  LET'S LOOK AT THE NEXT PAGE, THE NEXT PAGE

9   DOWN.

10         ALL RIGHT.  UNDER 7.1 UNDER "MANAGER COMMENTS," IT

11   READS:  "YOU LEAD YOUR TEAM IN A POSITIVE WAY, FROM WHAT I HAVE

12   SEEN SO FAR.  MAKE SURE THAT EVERYONE ABOVE YOU KNOWS AND

13   UNDERSTANDS THE GOOD THINGS YOU ARE DOING.  DON'T BE AFRAID TO

14   BRAG ON YOURSELF."

15         THOSE WERE YOUR WORDS TWO MONTHS BEFORE MR. TAYLOR'S

16   TERMINATION?

17   **A.**   THIS WAS DONE AT THE END OF NOVEMBER AND HANDED IN TO HIM,

18   REVIEWED WITH HIM IN DECEMBER.

19   **Q.**   OKAY.  AND YOU COULD HAVE CHANGED IT AT ANY POINT IN TIME

20   UP UNTIL THE DATE YOU SIGNED IT.  CORRECT?

21   **A.**   I DON'T BELIEVE SO, NO.

22   **Q.**   OKAY.

23   **A.**   I BELIEVE THAT IT'S FINALIZED AT THE END OF NOVEMBER.

24   **Q.**   ALL RIGHT.  WOULD YOU DISAGREE WITH MR. TAYLOR AND MR.

25   WHEELAND'S TESTIMONY THAT YOU COULD HAVE CHANGED IT AT ANY

11:15 1   POINT UP IN TIME -- AT ANY POINT IN TIME UP UNTIL YOU SIGNED

2   IT?

3   **A.**  I WOULDN'T DISAGREE WITH IT.  I WOULD JUST SAY I DIDN'T

4   KNOW THAT.

5   **Q.**  OKAY.  LET'S LOOK AT THE NEXT PAGE, THE FIRST PARAGRAPH.

6         "JOHNNY, YOUR INJURY-FREE DAYS OF 1223 IS VERY

7   IMPRESSIVE.  YOU KNOW THAT SAFETY REQUIRES TEACHING AND

8   TRAINING.  ALSO TAKES COACHING TO IMPROVE.  WITH THE COACHING

9   TO IMPROVE WE BECOME A BETTER TEAM.  WE NEED TO HAVE SCHEDULED,

10   STRUCTURED SAFETY MEETINGS WITH THE TSC IN ATTENDANCE AS MUCH

11   AS POSSIBLE."

12         THOSE ARE YOUR WORDS.  CORRECT?

13         **MR. WADSWORTH:**  OBJECTION, YOUR HONOR.

14         **THE COURT:**  THE NATURE OF YOUR OBJECTION?

15         **MR. WADSWORTH:**  THAT IT CALLS FOR SPECULATION, YOUR

16   HONOR.

17         **THE COURT:**  DO YOU WANT TO RESPOND?

18         **MR. SCHMIDT:**  I'M NOT ASKING HIM TO SPECULATE.  I'M

19   ASKING HIM IF THOSE ARE HIS WORDS.

20         **THE COURT:**  AND WHOSE WORDS ARE THEY?  HIS?

21         **MR. SCHMIDT:**  YES, MA'AM.

22         **MR. WADSWORTH:**  YOUR HONOR, MY UNDERSTANDING IS THOSE

23   ARE -- IF YOU SCROLL UP, SOME OF THOSE ARE NOT HIS WORDS.  DO

24   YOU SEE WHERE IT SAYS IN DARK:  "COMMENTS BY MARK THOMAS

25   OLDHAM"?

11:17  1          **THE COURT:**  OBJECTION SUSTAINED.

      2    **BY MR. SCHMIDT:**

      3    **Q.**    ARE THOSE YOUR WORDS?

      4    **A.**    I DON'T BELIEVE SO, NO.

      5    **Q.**    NOTHING IN THIS DOCUMENT SUGGESTS THAT MR. TAYLOR FAILED

      6    TO PROPERLY MAINTAIN HIS TRACKS, DOES IT?  WE CAN TAKE AS MUCH

      7    TIME AS WE NEED LOOKING THROUGH IT.  YOU MIGHT WANT TO START

      8    FROM THE BEGINNING.

      9    **A.**    SCROLL DOWN, PLEASE.  SCROLL DOWN, SCROLL DOWN.

     10          SO THERE'S A FEW MENTIONS OF DERAILMENTS, AND

     11    WIDE-GAUGE DERAILMENTS AREN'T ACCEPTABLE.  BUT NOTHING

     12    SPECIFIC, NO, SIR.

     13    **Q.**    OKAY.  AND NOTHING IN THIS DOCUMENT STATES THAT MR. TAYLOR

     14    IS INSUBORDINATE, DOES IT?

     15    **A.**    NO, SIR.

     16          **MR. SCHMIDT:**  YOUR HONOR, I TENDER THE WITNESS.

     17          **MR. WADSWORTH:**  YOUR HONOR, WE'D RESERVE OUR DIRECT

     18    EXAMINATION OF THIS WITNESS IN OUR CASE IN CHIEF.

     19          **THE COURT:**  SAME THING:  UNION PACIFIC WILL CALL MR.

     20    STUART BACK IN THEIR CASE IN CHIEF.

     21          OKAY.  YOU MAY STEP DOWN, SIR.

     22          PUT YOUR MASK BACK ON.  THANK YOU.

     23          HAVE WE GOT A SHORT WITNESS THAT YOU CAN TAKE,

     24    MR. SCHMIDT?

     25          **MR. SCHMIDT:**  I DON'T BELIEVE SO, YOUR HONOR.

11:20 1                        MARK WHEELAND.

2              **THE COURT:**  OKAY, MR. WHEELAND.

3              **MR. SCHMIDT:**  YOUR HONOR, MR. WADSWORTH IS CHECKING

4    OUTSIDE FOR ME.  HE'S NOT IN THE HALLWAY, BUT HE'S GOING TO GO

5    SEE IF HE CAN FIND HIM.

6              **MR. SMITH:**  YOUR HONOR, I DON'T WANT TO SPEAK TO

7    COUNSEL DIRECTLY, SO LET ME --

8              **THE COURT REPORTER:**  I CAN'T HEAR YOU.

9              **THE COURT:**  CAN'T HEAR YOU.

10                   AND WHAT DO YOU MEAN "YOU DON'T WANT TO SPEAK TO

11   COUNSEL DIRECTLY"?

12             **MR. SMITH:**  WELL, WITHOUT ADDRESSING THE COURT.  I

13   DIDN'T WANT TO VIOLATE ANY PROTOCOL.

14             **THE COURT:**  OKAY.  WELL, DO YOU HAVE A WITNESS THAT'S

15   READY OR NOT?  THAT'S THE QUESTION.

16             **MR. SCHMIDT:**  THEY ARE LOOKING FOR MARK WHEELAND.

17             **MR. SMITH:**  YES.  I'D RATHER TAKE MR. WHEELAND NEXT,

18   AND HE WAS SUPPOSED TO BE HERE.

19             **MR. SCHMIDT:**  OKAY.

20             **MR. SMITH:**  AND I THINK HE'S HERE OR VERY CLOSE TO

21   BEING HERE.

22             **MR. SCHMIDT:**  OKAY.  OKAY.  WE'LL JUST WAIT.

23             **THE COURT:**  OKAY.  WE'LL GIVE IT A MINUTE OR TWO.

24                   HE'S ON HIS WAY UP, LADIES AND GENTLEMEN.

25             **MR. SMITH:**  THANK YOU, YOUR HONOR.

11:22 1            **THE COURT:**  SIR, IF YOU'LL COME RIGHT UP HERE.  IF

2       YOU'LL STOP AND GET A SHIELD ON YOUR WAY UP.  ONE OF THESE

3       LAWYERS WILL HAND YOU A SHIELD.  THANK YOU.  COME RIGHT OVER

4       HERE IN FRONT OF THIS LADY IN THE GREEN SWEATER.

5                          **MARK A. WHEELAND,**

6       **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

7            **THE COURT:**  OKAY.  YOU CAN TAKE YOUR FACE MASK OFF.

8       YOU CAN TAKE YOUR FACE MASK DOWN.  THANK YOU.

9                       GO AHEAD, SIR.

10                        **DIRECT EXAMINATION**

11      **BY MR. SCHMIDT:**

12      **Q.**   GOOD MORNING, MR. WHEELAND.

13                WOULD YOU STATE YOUR FULL NAME FOR THE RECORD,

14      PLEASE?

15      **A.**   MARK A. WHEELAND.

16      **Q.**   AND YOU LIVE IN SPRING, TEXAS.  IS THAT CORRECT?

17      **A.**   YES.

18      **Q.**   OKAY.  AND YOU WERE EMPLOYED BY UNION PACIFIC FOR OVER 40

19      YEARS.  CORRECT?

20      **A.**   THAT IS CORRECT.

21      **Q.**   ALL RIGHT.  YOU RETIRED IN SEPTEMBER OF 2020?

22      **A.**   YES.

23      **Q.**   CONGRATULATIONS.

24                YOUR LAST POSITION AT UNION PACIFIC WAS

25      VICE-PRESIDENT OF TRACK MAINTENANCE.  IS THAT CORRECT?

11:28 1    **A.**   I WAS ASSISTANT VICE-PRESIDENT OF TRACK MAINTENANCE FOR

2    THE SOUTHERN REGION.

3    **Q.**   ASSISTANT VICE-PRESIDENT, OKAY, FOR THE SOUTHERN REGION.

4          AND YOU WERE IN THAT POSITION FROM 2015 UNTIL YOUR

5    RETIREMENT.  CORRECT?

6    **A.**   THAT IS CORRECT.

7    **Q.**   AND THAT POSITION USED TO BE CALLED CHIEF ENGINEER.

8    CORRECT.

9    **A.**   YES.  WHEN I INITIALLY MOVED TO SPRING, MY TITLE WAS CHIEF

10   ENGINEER.

11         NOVEMBER OF 2018, THERE WAS A REORGANIZATION AND A

12   TITLE CHANGE.  I WAS BASICALLY IN THE SAME POSITION, JUST A

13   CHANGE IN TITLE.

14   **Q.**   OKAY.  AND YOU HAVE HELD QUITE A FEW POSITIONS AT -- OR

15   YOU DID HOLD QUITE A FEW POSITIONS AT UNION PACIFIC.  CORRECT?

16   **A.**   YES, SIR.

17   **Q.**   AND ONE OF THOSE POSITIONS WAS MANAGER OF TRACK

18   MAINTENANCE.  CORRECT?

19   **A.**   YES.

20   **Q.**   AND THAT'S THE POSITION THAT JOHNNY TAYLOR HELD AT THE

21   TIME OF HIS TERMINATION.  CORRECT?

22   **A.**   YES.

23   **Q.**   AND ANOTHER POSITION THAT YOU HELD WAS DIRECTOR OF TRACK

24   MAINTENANCE, WHICH WAS THE SAME POSITION THAT KENNETH STUART

25   HELD AT THE TIME OF MR. TAYLOR'S TERMINATION.  CORRECT?

11:29 1   **A.**   YES.

2   **Q.**   OKAY.  AND YOU MADE THE DECISION TO TERMINATE JOHNNY

3   TAYLOR.  CORRECT?

4   **A.**   I WAS THE ONE WHO MADE THE DECISION TO PURSUE TERMINATION,

5   AND MY SIGNATURE IS ON THE LETTER.

6   **Q.**   AND YOU MADE THE DECISION BASED ON AN EMAIL FROM JACOB

7   GILSDORF IN A MEETING WITH JACOB GILSDORF.  CORRECT?

8   **A.**   IT DEPENDS ON WHICH LETTERS AND EMAILS YOU'RE REFERRING

9   TO.

10   **Q.**   WELL, THERE WAS ONLY ONE.  RIGHT?

11   **A.**   REGARDING MR. TAYLOR?

12   **Q.**   THAT YOU BASED YOUR DECISION OFF OF TO TERMINATE HIM?

13   **A.**   YES, THAT IS CORRECT.

14   **Q.**   OKAY.  LET'S LOOK AT JOINT EXHIBIT NO. 11.

15         SO THIS IS THE EMAIL THAT JACOB GILSDORF SENT YOU

16   THAT YOU BASED YOUR DECISION TO TERMINATE MR. TAYLOR ON.

17   CORRECT?

18   **A.**   THAT IS CORRECT.

19   **Q.**   OKAY.  WELL, THE SECOND PARAGRAPH DESCRIBES MR. TAYLOR

20   ACTING QUARRELSOME AND DISRESPECTFUL.  THAT'S NOT SOMETHING

21   THAT YOU EVER PERSONALLY WITNESSED, IS IT?

22   **A.**   NO, I DID NOT PERSONALLY WITNESS THAT.

23   **Q.**   OKAY.  SO THIS WAS JUST INFORMATION THAT WAS PROVIDED TO

24   YOU BY MR. GILSDORF.  CORRECT?

25   **A.**   CORRECT.

11:30 1    Q.   OKAY.  AND IT ALSO REFERENCES RECENT SITUATIONS OF
2    INSUBORDINATION WHEN MR. TAYLOR WAS ASKED TO OBTAIN MORE
3    DETAILS ON A VTI LOCATION WHERE THE INITIAL INVESTIGATION WAS
4    NOT DETAILED AND NO ROOT CAUSE WAS IDENTIFIED AND INCLUDING
5    MEASUREMENTS OF A SWITCH THAT WAS ASKED FOR BY HIS SENIOR
6    MANAGER THAT MR. TAYLOR REFUSED TO DO.  SAME THING WITH THOSE
7    INSTANCES, YOU WERE NOT ACTUALLY PRESENT FOR ANY OF THOSE
8    DISCUSSIONS OR INCIDENTS OR ANYTHING TO DO WITH THAT.  CORRECT?
9    A.   THAT IS CORRECT.
10    Q.   OKAY.  AND YOUR DECISION WAS JUST BASED OFF OF THE
11    INFORMATION THAT MR. GILSDORF PROVIDED TO YOU ABOUT THOSE
12    INCIDENTS.  CORRECT?
13    A.   CORRECT.
14    Q.   OKAY.  AND THIS EMAIL ALSO ALLEGES THAT MR. TAYLOR REFUSED
15    TO SIGN HIS PERFORMANCE IMPROVEMENT PLAN.  CORRECT?
16    A.   CORRECT.
17    Q.   AND IT ALSO REFERS TO MR. TAYLOR ALLEGING RETALIATION IN
18    MAKING WHISTLEBLOWER COMPLAINTS.  CORRECT?
19    A.   YES.  I DO SEE THAT, CORRECT.
20    Q.   OKAY.  DO YOU RECALL THERE BEING SEVERAL DERAILMENTS AT --
21    WELL, THREE TO BE EXACT -- AT SWITCH 16 IN AVONDALE, LOUISIANA,
22    AT THE END OF 2017?
23    A.   I DO RECALL THAT, YES.
24    Q.   OKAY.  AND YOU'RE AWARE THAT MR. TAYLOR TOOK SWITCH 16 OUT
25    OF SERVICE ON JANUARY 10, 2018, BECAUSE HE BELIEVED THERE WERE

11:32 1  ALIGNMENT ISSUES.  CORRECT?

2  **A.**   YES, THAT IS CORRECT.  HE REMOVED THE SWITCH FROM SERVICE.

3  **Q.**   OKAY.  SO MR. GILSDORF TOLD YOU THAT MR. TAYLOR REFUSED TO

4  PERFORM MEASUREMENTS OF THE TRACK ON JANUARY 10 AFTER TAKING IT

5  OUT OF SERVICE.  CORRECT?

6  **A.**   THAT IS CORRECT.

7  **Q.**   ALL RIGHT.  AND HE TOLD YOU THAT THE MEASUREMENTS THAT MR.

8  TAYLOR SENT HIM WERE MEASUREMENTS FROM NOVEMBER 24, AND THAT HE

9  DID NOT RECHECK THOSE MEASUREMENTS.  CORRECT?

10 **A.**   THAT IS MY UNDERSTANDING, YES.  THE MEASUREMENTS WERE

11 TAKEN QUITE SOME TIME PRIOR TO THE REQUEST BY MR. GILSDORF.

12 **Q.**   AND THAT UNDERSTANDING IS BASED ON INFORMATION PROVIDED TO

13 YOU BY MR. GILSDORF.  CORRECT?

14 **A.**   YES.

15 **Q.**   OKAY.  AND MR. GILSDORF TOLD YOU THAT THOSE NOVEMBER 24

16 MEASUREMENTS WERE DERAILMENT MEASUREMENTS THAT WERE TAKEN WHILE

17 THE TRACK WAS NOT OPERATIONAL.  CORRECT?

18 **A.**   THAT IS MY RECOLLECTION, YES.

19 **Q.**   OKAY.  AND MR. GILSDORF DID NOT TELL YOU THAT MR. TAYLOR

20 HAD REDONE THE MEASUREMENTS SIX DAYS EARLIER ON JANUARY 4,

21 2018, DID HE?

22 **A.**   NO, HE DID NOT.

23 **Q.**   DID ANYONE EVER TELL YOU THAT?

24 **A.**   NO.

25 **Q.**   AND MR. GILSDORF DID NOT TELL YOU THAT MR. TAYLOR PROVIDED

11:34  1  ALL OF THE INFORMATION THAT MR. GILSDORF HAD REQUESTED ABOUT

2  SWITCH 16, DID HE?

3  **A.**    NO, HE DID NOT.

4  **Q.**    AND MR. STUART AND MR. GILSDORF SUGGESTED THAT MR. TAYLOR

5  SPIKE LINE THE TRACK IN THAT LOCATION IN ORDER TO GET IT

6  OPERATIONAL AGAIN.  CORRECT?

7  **A.**    I DON'T RECALL THAT THEY MADE THAT SPECIFIC REQUEST.  I

8  JUST DON'T REMEMBER THAT.

9  **Q.**    OKAY.  AND YOU WOULD AGREE THAT UNION PACIFIC'S DESIGN

10  TEAM IN OMAHA WOULD BE QUALIFIED TO DETERMINE WHETHER THERE WAS

11  A PROBLEM WITH THE DESIGN OF THE TRACK.  CORRECT?

12  **A.**    NO, I WOULD NOT AGREE WITH THAT STATEMENT.

13  **Q.**    ALL RIGHT.  YOU GAVE A DEPOSITION IN THIS CASE, DID YOU

14  NOT?

15  **A.**    I DID.

16  **Q.**    OKAY.  AND WERE YOU UNDER OATH AT THAT DEPOSITION?

17  **A.**    I WAS.

18  **Q.**    AND WAS UNION PACIFIC'S COUNSEL PRESENT AT THAT

19  DEPOSITION?

20  **A.**    YES, THEY WERE.

21  **Q.**    OKAY.

22        **MR. SCHMIDT:**  CAN WE PULL UP PAGES 30 TO 31 OF MR.

23  WHEELAND'S DEPOSITION.

24  **BY MR. SCHMIDT:**

25  **Q.**    ALL RIGHT.  SO I'LL ASK YOU JUST TO READ TO YOURSELF,

11:36  1   STARTING FROM LINE 16 OF THIS PAGE GOING DOWN THROUGH LINE 7 OF

2   THE NEXT PAGE.

3   **A.**   OKAY. OKAY.

4   **Q.**   SO YOUR TESTIMONY AT THE TIME WAS THAT THE DESIGN TEAM WAS

5   QUALIFIED TO DETERMINE WHETHER THERE'S A DEFECT OR ISSUE OR

6   PROBLEM WITH THE DESIGN OF THE TRACK. CORRECT?

7   **A.**   YES.

8   **Q.**   OKAY. AND YOU WOULD ALSO AGREE THAT IF A SURVEY HAD BEEN

9   DONE, A UNION PACIFIC ENGINEER FROM THE DESIGN TEAM IN OMAHA

10   COULD REASONABLY MAKE A DETERMINATION AS TO WHETHER THE TRACK

11   NEEDED TO BE UPGRADED. CORRECT?

12   **A.**   ALL THE DESIGN ENGINEERS DO IS DESIGN TRACK FOR

13   CONSTRUCTION PROJECTS. THEY DO SURVEYS AND TAKE MEASUREMENTS

14   TO DESIGN TRACKS FOR CONSTRUCTION AND/OR REHABILITATION.

15   **Q.**   OKAY.

16   **A.**   IT'S NOT THEIR CAPACITY TO MAKE DETERMINATIONS ON WHETHER

17   A TRACK IS FIT FOR SERVICE.

18   **Q.**   OKAY. SO YOUR TESTIMONY IS THAT THEY ARE NOT QUALIFIED TO

19   DETERMINE WHETHER A TRACK NEEDS TO BE UPGRADED?

20   **A.**   THEY'RE QUALIFIED, BASED ON THE FEDERAL REGULATIONS. BUT

21   IT'S NOT THEIR -- IT'S NOT THE CAPACITY OF THEIR POSITION TO

22   MAKE THOSE DECISIONS.

23           **MR. SCHMIDT:**   OKAY. LET'S LOOK AT PAGES 28 TO 29 OF

24   MR. WHEELAND'S DEPOSITION.

25   **BY MR. SCHMIDT:**

11:38 1   Q.   OKAY.   SO THAT'S ACTUALLY RIGHT WHERE I WANT YOU TO LOOK.

2   SO IF YOU WOULD LOOK AT LINE NO. 13 OF THIS FIRST PAGE GOING

3   DOWN THROUGH LINE 5 OF THE NEXT PAGE.

4   A.   OKAY.   OKAY.

5   Q.   ALL RIGHT.   SO YOUR TESTIMONY AT THE TIME WAS THAT IF A

6   COMPLETE SURVEY HAD BEEN DONE, AN ENGINEER OUT OF OMAHA COULD

7   REASONABLY GIVE THE OPINION THAT THE TRACK NEEDED TO BE

8   UPGRADED.   CORRECT?

9   A.   IF HE HAD DONE A COMPLETE SURVEY, THAT WOULD BE HIS

10   OPINION, YES.

11   Q.   OKAY.   AND THAT WOULD BE REASONABLE TO GIVE THAT OPINION.

12   CORRECT?

13   A.   YES, IT WOULD BE REASONABLE.   AGAIN, IT WOULD BE HIS

14   OPINION.

15   Q.   OKAY.   AND SO YOU'RE AWARE THAT MR. TAYLOR DISAGREED WITH

16   MR. STUART AND MR. GILSDORF ABOUT WHAT NEEDED TO BE DONE TO

17   REPAIR SWITCH 16.   CORRECT?

18   A.   THAT'S MY UNDERSTANDING, YES.

19   Q.   OKAY.   AND YOU WOULD AGREE THAT THE PROPER SOLUTION WOULD

20   HAVE BEEN FOR MR. TAYLOR, MR. STUART, AND MR. GILSDORF TO LOOK

21   AT THE TRACK TOGETHER AND DECIDE WHAT TO DO.   CORRECT?

22   A.   THAT WOULD HAVE BEEN REASONABLE, YES.

23   Q.   OKAY.   SO NEITHER MR. STUART NOR MR. GILSDORF EVER TOLD

24   YOU THAT MR. TAYLOR ASKED THEM TO LOOK AT THE TRACK WITH HIM

25   AND THAT THEY REFUSED, DID THEY?

11:41 1   **A.**   NO, THEY DID NOT TELL ME THAT.

2   **Q.**   OKAY.  AND JACOB GILSDORF TOLD YOU THAT HE AND KENNETH

3   STUART TOLD MR. TAYLOR TO PUT SWITCH 16 BACK INTO SERVICE.

4   CORRECT?

5   **A.**   YES.

6   **Q.**   AND EITHER MR. GILSDORF OR MR. STUART COULD HAVE PUT THE

7   TRACK BACK INTO SERVICE IF THEY THOUGHT IT WAS SAFE TO OPERATE.

8   CORRECT?

9   **A.**   IF THEY HAD VISITED THE SITE AND DEEMED THE LOCATION SAFE

10   FOR TRAIN OPERATIONS, THEY COULD HAVE PLACED IT BACK IN

11   SERVICE.

12   **Q.**   BUT THEY WOULD HAVE HAD TO HAVE VISITED THE SITE TO MAKE

13   THAT DETERMINATION.  CORRECT?

14   **A.**   THAT WOULD BE REASONABLE THAT EITHER THEY VISIT THE SITE

15   OR THEY RECEIVE INFORMATION FROM A QUALIFIED INDIVIDUAL SUCH AS

16   MR. TAYLOR.

17   **Q.**   OKAY.  ALL RIGHT.  SO LET'S LOOK AT JOINT EXHIBIT NO. 9.

18   SO THIS IS AN EMAIL CHAIN FROM JANUARY 22 BETWEEN

19   JACOB GILSDORF AND JOHNNY TAYLOR ON WHICH YOU WERE COPIED.

20   CORRECT?

21   **A.**   YES.

22   **Q.**   OKAY.  AND IN THIS EMAIL AT THE TOP FROM MR. GILSDORF, THE

23   SECOND PARAGRAPH, IT SAYS:  "PLEASE PROVIDE A INSPECTION OF THE

24   TIES PER EVERY 39-FOOT SEGMENT."

25   SO YOU WOULD AGREE THAT MR. TAYLOR COULD NOT HAVE

11:42  1   PROVIDED THAT INFORMATION IF THE TIES WERE ENCASED IN CONCRETE.

2   CORRECT?

3   A.   I'M NOT SURE I UNDERSTAND YOUR QUESTION.

4         **MR. SCHMIDT:**  ALL RIGHT.  LET'S LOOK AT PAGE 36 OF

5   MR. WHEELAND'S DEPOSITION.  SORRY.  SCROLL UP JUST A LITTLE BIT

6   MORE.

7   **BY MR. SCHMIDT:**

8   Q.   OKAY.  AT THE BOTTOM OF PAGE 35, I ASKED YOU:

9         "SO IS IT ALWAYS IMPROPER TO ISSUE A SLOW ORDER ON A

10  TRACK WITHOUT THE MEASUREMENT OF TIES IN THE 39-FOOT AREA?"

11        YOU RESPONDED:

12        "IT'S NOT IMPROPER.  IT'S EXPECTED."

13        I ASKED:

14        "I'M SORRY.  I DIDN'T HEAR THAT, SIR."

15        YOU RESPONDED:

16        "IT'S NOT IMPROPER.  IT'S EXPECTED."

17        I ASKED:

18        "IF TRACK TRIES ARE ENCASED IN CONCRETE, WOULD A

19  PERSON INSPECTING THE TRACK HAVE BEEN ABLE TO PROVIDE THIS

20  INFORMATION?"

21        AND YOU RESPONDED:

22        "NO."

23        CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   OKAY.  AND MR. GILSDORF DID NOT TELL YOU THAT THE TIES HE

11:43  1   WAS ASKING MR. TAYLOR TO COUNT WERE ENCASED IN CONCRETE, DID

       2   HE?

       3   **A.**   NO, HE DID NOT TELL ME THAT.

       4   **Q.**   AND YOU WOULD AGREE THAT IF THERE IS A HIGH VTI HIT, A

       5   SLOW ORDER IS A PROPER RESPONSE.  CORRECT?

       6   **A.**   IF THERE'S A HIGH VTI HIT, A SLOW ORDER WAS AUTOMATICALLY

       7   PLACED ON THE TRACK PENDING AN INVESTIGATION BY A QUALIFIED

       8   INSPECTOR.  IT WAS THEN THE RESPONSIBILITY OF THAT QUALIFIED

       9   INSPECTOR TO DETERMINE WHETHER THE SLOW ORDER WAS APPROPRIATE

      10   OR IF IT COULD BE -- THE SPEED RESTRICTION COULD BE RAISED TO

      11   MEET THE CLASS OF TRACK THAT WAS APPROPRIATE FOR THE CONDITIONS

      12   THAT WERE FOUND, OR IF NO SLOW ORDER WAS NECESSARY AT ALL.

      13   **Q.**   THE QUALIFIED INSPECTOR BEING MR. TAYLOR OR THE TRACK

      14   INSPECTORS UNDER HIS SUPERVISION.  CORRECT?

      15   **A.**   YES.  ANY INDIVIDUAL WHO WAS QUALIFIED UNDER FRA

      16   REGULATION 213.7.

      17   **Q.**   OKAY.  AND SO MR. GILSDORF TOLD YOU THAT MR. TAYLOR

      18   REFUSED TO PROVIDE HIM WITH THE INFORMATION HE WAS ASKING FOR

      19   ON JANUARY 22, 2018.  CORRECT?

      20   **A.**   CORRECT.

      21   **Q.**   AND HE TOLD YOU THAT MR. TAYLOR HUNG UP ON HIM DURING THAT

      22   CONVERSATION.  CORRECT?

      23   **A.**   CORRECT.

      24        **MR. SCHMIDT:**  I TENDER THE WITNESS, YOUR HONOR.

      25        **THE COURT:**  ANYTHING?  YOU WANT TO TAKE HIM NOW OR IN

11:45 1  YOUR CASE IN CHIEF?

2  **MS. SCHOONMAKER:**  UNION PACIFIC WILL DO HIS DIRECT

3  TESTIMONY OF THIS WITNESS IN ITS CASE IN CHIEF.

4  **THE COURT:**  ALL RIGHT.  THANK YOU.

5  OKAY.  YOU MAY STEP DOWN.  IF YOU WOULD PUT YOUR

6  MASK BACK ON BEFORE YOU STEP BACK DOWN.

7  OKAY, LADIES AND GENTLEMEN.  IT IS 11:45, WE'LL

8  BE IN RECESS UNTIL -- WE'LL TAKE A LUNCH BREAK UNTIL 1:00.

9  PLEASE DON'T DISCUSS THE CASE WITH EACH OTHER OR ANYBODY ELSE,

10  AND DON'T DO ANY INDEPENDENT RESEARCH.

11  ALL RISE FOR THE JURY.

12  **(WHEREUPON, THE JURY EXITED THE COURTROOM.)**

13  **THE COURT:**  OKAY.  BE READY WITH YOUR NEXT WITNESS AT

14  1:00, PLEASE.

15  **(WHEREUPON, THE COURT WAS IN RECESS.)**

16  **THE COURT:**  OKAY.  ARE YOU READY WITH YOUR NEXT

17  WITNESS**?**

18  **MR. SMITH:**  NICHOLAS ISAAC, YOUR HONOR.

19  **THE COURT:**  OKAY.  WILL YOU GET HIM?  IS HE HERE IN

20  THE COURTROOM ALREADY?

21  **MR. SMITH:**  HE'S RIGHT HERE.

22  **THE COURT:**  OKAY.  WE CAN BRING IN THE JURY.

23  WHY DON'T YOU WAIT RIGHT THERE BY COUNSEL TABLE,

24  BECAUSE THEY'RE GOING TO HAVE TO WALK RIGHT NEXT TO YOU.  JUST

25  MOVE OVER A LITTLE BIT, BECAUSE THERE ARE SOME JURORS THAT ARE

01:10 1   GOING TO WALK RIGHT THERE TO GO TO THE BACK.  THANKS.

2                 **(WHEREUPON, THE JURY ENTERED THE COURTROOM.)**

3            **THE COURT:**  BE SEATED.

4                 OKAY.  CALL YOUR NEXT WITNESS, PLEASE.

5            **MR. SMITH:**  NICHOLAS ISAAC, YOUR HONOR.

6            **THE COURT:**  OKAY, MR. ISAAC.  IF YOU'LL STEP RIGHT UP

7   HERE, SIR.

8                         **NICHOLAS M. ISAAC,**

9   **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

10            **THE COURT:**  ONCE YOU GET SEATED, YOU CAN TAKE DOWN

11   YOUR MASK, SIR.  YES, THERE YOU GO.  THANK YOU.

12                 OKAY, MR. SMITH.  GO AHEAD.

13                      **DIRECT EXAMINATION**

14   **BY MR. SMITH:**

15   **Q.**   PLEASE STATE YOUR FULL NAME, SIR.

16   **A.**   NICHOLAS MAURICE ISAAC.

17   **Q.**   WERE YOU FORMERLY EMPLOYED BY THE UNION PACIFIC RAILROAD

18   COMPANY?

19   **A.**   YES, SIR.

20   **Q.**   AND FOR HOW LONG WERE YOU EMPLOYED?

21   **A.**   FROM 2006 TO PRESENT.

22   **Q.**   OKAY.  AND WHAT WAS YOUR WORK LOCATION?

23   **A.**   AVONDALE.

24   **Q.**   OKAY.  AND WHAT POSITIONS HAVE YOU HELD OVER, SAY, THE

25   LAST FIVE YEARS -- FIVE, SIX YEARS?

01:11 1    **A.**   TRACK INSPECTOR AND SAFETY COACH.

2    **Q.**   I'M SORRY.  TRACK INSPECTOR AND WHAT?

3    **A.**   AND SAFETY COACH.

4    **Q.**   OKAY.  HOW MANY POSITIONS HAVE YOU HELD WITH UNION

5    PACIFIC?

6    **A.**   I'VE BEEN A FOREMAN.  I MEAN, I'M SORRY.  I'VE BEEN A

7    TRACKMAN.  I'VE BEEN A WELDER.  I'VE BEEN A FOREMAN AND A

8    MACHINE OPERATOR.  SO I'VE DONE DID PRETTY MUCH EVERYTHING.

9    **Q.**   OKAY.  AND WHEN DID YOU BECOME A TRACK INSPECTOR?

10   **A.**   2016, I BELIEVE.

11   **Q.**   OKAY.  AND HOW LONG DID YOU HOLD THAT POSITION?

12   **A.**   UNTIL JULY 10 OF '18, I BELIEVE.

13   **Q.**   OKAY.  AND WHAT WERE THE CIRCUMSTANCES OF YOU NOT

14   CONTINUING TO HOLD THAT POSITION?

15   **A.**   I WAS TOLD THAT THEY WANTED CHANGE, AND BECAUSE I WAS LATE

16   ON A TRACK INSPECTOR EVAL- -- I'M SORRY -- ON A TRACK INSPECTOR

17   REPORT.

18   **Q.**   OKAY.  AND WHEN WAS THE LAST TIME YOU ACTUALLY PHYSICALLY

19   WORKED FOR UNION PACIFIC RAILROAD COMPANY?

20   **A.**   JULY 10 OF 2018.

21   **Q.**   OKAY.  ARE YOU FAMILIAR WITH JOHNNY TAYLOR?

22   **A.**   YES.

23   **Q.**   AND HOW ARE YOU FAMILIAR WITH HIM?

24   **A.**   HE WAS THE MANAGER OVER ME AT THE TIME.

25   **Q.**   OKAY.  FOR WHAT PERIOD OF TIME?

01:12 1    A.   FROM 2016 TILL, I GUESS, IF YOU WANT TO SAY '17 OR '18,
2    SOMEWHERE AROUND IN THAT AREA, TILL HE LEFT.
3    Q.   OKAY.  WERE YOU WORKING UNDER HIS SUPERVISION UNTIL HIS
4    TERMINATION?
5    A.   CORRECT.
6    Q.   OKAY.  AND IS IT FAIR TO SAY THAT YOU WERE HIS TRACK
7    INSPECTOR?  I MEAN, YOU WERE THE ONE THAT WORKED DIRECTLY WITH
8    HIM?
9    A.   CORRECT.
10   Q.   OKAY.  AND WHAT WERE YOUR DUTIES AS TRACK INSPECTOR?
11   A.   TO MAINTAIN TRACKS BETWEEN U.P. AND FRA GUIDELINES,
12   INSPECT BETWEEN THOSE U.P. AND FRA GUIDELINES.
13   Q.   OKAY.  DID YOU HAVE DUTIES AS YOU UNDERSTOOD YOUR JOB AND
14   OBLIGATIONS TO THE FEDERAL RAILROAD COMMISSION?
15   A.   YES.
16   Q.   OKAY.  AND WHAT WERE THOSE DUTIES AND OBLIGATIONS?
17   A.   MAKE SURE I MAINTAINED THOSE CLASS OF TRACK TO THE
18   STANDARDS -- INSPECTING THEM TO THOSE STANDARDS.
19   Q.   DO YOU KNOW WHAT A 231.7 QUALIFICATION IS?
20   A.   YES.
21   Q.   AND WHAT DOES THAT MEAN?
22   A.   THAT'S PRETTY MUCH -- IT GIVES YOU THE -- YOU HAVE THE --
23   YOU HAVE THE -- UNDER THOSE GUIDELINES YOU'D BE ABLE TO INSPECT
24   TRACK, BECAUSE YOU KNOW WHAT THE STANDARDS ARE FOR THE FEDERAL
25   GUIDELINES.

01:14 1   Q.   OKAY.  AND IS SOMEONE WHO'S QUALIFIED UNDER 213.7

2   AUTHORIZED TO DETERMINE WHAT THE CONDITION OF THE TRACK IS?

3   A.   CORRECT.

4   Q.   AND HOW WAS YOUR JOB DIFFERENT FROM JOHNNY TAYLOR'S JOB

5   WHILE YOU WORKED TOGETHER AT UNION PACIFIC?

6   A.   THE FREQUENCY OF ME INSPECTING TRACKS.  THE ONLY

7   DIFFERENCE BETWEEN HIM -- AS ME AND HIM IS HE HAD TO MAINTAIN A

8   BUDGET AND MANAGE ME IN THEIR TIME, SO TO SPEAK.

9   Q.   OKAY.  AND HOW OFTEN DID YOU SEE JOHNNY TAYLOR WHILE YOU

10   WORKED TOGETHER AT UNION PACIFIC?

11   A.   MOSTLY TWICE A MONTH FOR OUR TRACK INSPECTOR EVALUATIONS.

12   BUT IF I HAD SOMETHING CRITICAL COME UP, WE HAD -- MAYBE HAD TO

13   SCHEDULE A DIFFERENT TYPE OF MEETING.

14   Q.   OKAY.

15   A.   SO HE CAN COME IN AND WE GO OUT THERE AND LOOK AT TRACK

16   TOGETHER IF I WASN'T TOO SURE ABOUT A SITUATION.

17   Q.   OKAY.  TELL US ABOUT THESE TWICE-A-MONTH MEETINGS.  WHO

18   WOULD BE PRESENT AND WHAT WOULD BE DISCUSSED?

19   A.   THOSE WERE EVALUATIONS TO SEE HOW WELL I WAS DOING, AND

20   ALSO SOME AREAS I MAY NEED TO WORK IN TO IMPROVE ON MY TRACK

21   INSPECTOR ABILITIES.

22   Q.   OKAY.  DID YOU HAVE THE AUTHORITY, AS YOU UNDERSTOOD IT,

23   TO REMOVE TRACKS FROM SERVICE AND ISSUE SLOW ORDERS?

24   A.   CORRECT.

25   Q.   AND WHAT WOULD YOU -- WHAT WOULD YOU DO -- WOULD YOU

01:16 1   CONSULT MR. TAYLOR IF YOU HAD ISSUED A SLOW ORDER OR TOOK A

2   TRACK OUT OF SERVICE?

3   **A.**   YES.  AS A COURTESY, I WOULD SAY, HEY, JOHNNY, I'M GOING

4   TO TAKE THIS TRACK OUT OF SERVICE BECAUSE IT DIDN'T MEET THE

5   GUIDELINES, PER U.P./FRA GUIDELINES.  IT GIVES US THE NOTION TO

6   TAKE IT OUT OF SERVICE OR PUT A SLOW ORDER OR WHATEVER.

7   **Q.**   OKAY.  AND HOW WOULD YOU -- LOOKING BACK ON YOUR

8   RELATIONSHIP WITH MR. TAYLOR AND UNION PACIFIC, HOW WOULD YOU

9   CHARACTERIZE OR ASSESS MR. TAYLOR'S ABILITIES AND WORK ETHIC AS

10   A MANAGER?

11   **A.**   HE WAS A BETTER MANAGER THAN SOME WHEN IT CAME TO THAT

12   BECAUSE IF I ASKED -- HE DIDN'T REALLY COME DOWN ON ME.  HE

13   WOULD SAY, WELL, WHY DID YOU DO THIS?  OR WHY DID YOU COME UP

14   WITH THE REASON THAT YOU CAME UP WITH?  AND A LOT OF TIMES, YOU

15   KNOW, YOU HAD SOMETHING THAT WAS LIKE, WELL, I DON'T THINK YOU

16   SHOULD DO THIS, OR, YOU KNOW, IT WILL BE IN A MOTION FOR A

17   COACHING MORE OR LESS THAN HIM JUST, YOU KNOW, HEY, YOU

18   SHOULDN'T DO THIS AND DON'T DO THAT, AND THINGS OF THAT NATURE.

19   IT KIND OF CAME WHEREAS IT WAS EASIER -- IF YOU'RE A TRACK

20   INSPECTOR, IT'S EASIER FOR YOU TO DO YOUR JOB.

21   **Q.**   WOULD HE TRY TO BE COOPERATIVE WITH HIS PEOPLE WHO WORKED

22   UNDER HIM?

23   **A.**   YES.

24   **Q.**   AND DID HE GO BY THE BOOK?

25   **A.**   YEAH.

01:18  1   **Q.**   OKAY.  AND WHAT DO YOU MEAN BY THAT?

2   **A.**   WELL, YOU KNOW, HE -- IF WE HAD A DISAGREEMENT, WE'LL PULL

3   OUT THE TRACK MAINTENANCE HANDBOOK OR WHICHEVER RULE BOOK THAT

4   THEY CAME -- THAT WAS OUT; WE'LL LOOK AT IT, REVIEW IT.  AND,

5   YOU KNOW, HE WAS REALLY REASONABLE ABOUT IT.

6   **Q.**   OKAY.  AND WAS IT COMMON FOR THE UNION PACIFIC INSPECTORS

7   AND TRACK INSPECTORS AND OTHER PERSONNEL TO TALK AND TRY TO AIR

8   THEIR DISAGREEMENTS AND WORK THINGS OUT?

9   **A.**   YES, SIR.

10   **Q.**   OKAY.  YOU EVER SEE MR. TAYLOR DO THAT?

11   **A.**   YOU ALWAYS HAD A DISAGREEMENT, BUT THEY ALWAYS HAD A

12   CONVERSATION ON HOW THEY WERE GOING TO MOVE FORWARD TO THE NEXT

13   -- ON HOW TO RESOLVE ISSUES.

14   **Q.**   OKAY.  AND DURING ANY OF THOSE DISAGREEMENTS, DID YOU SEE

15   MR. TAYLOR ACT BELLIGERENTLY OR HOSTILELY OR ANYTHING LIKE

16   THAT?

17   **A.**   NOT THAT I CAN SAY.

18   **Q.**   OKAY.  AND WOULD YOU SAY THAT THERE WERE CHANGES AT UNION

19   PACIFIC RAILROAD HERE IN LOUISIANA IN LATE 2016 AND EARLY 2017?

20   **A.**   YES.

21   **Q.**   AND WHAT WERE THOSE CHANGES AND WHAT CAUSED THEM?

22   **A.**   I DON'T KNOW WHAT CAUSED IT.  BUT I DO KNOW WE CHANGED

23   CHIEF ENGINEERS.  WE CHANGED DIRECTORS AND WE CHANGED MTPS.

24   **Q.**   OKAY.  WHO WERE THE NEW SUPERVISORS THAT CAME IN?

25   **A.**   THAT WAS MR. WHEELAND, MR. STUART, AND MR. GILSDORF.

01:19  1   **Q.**   I SEE.

2          JACOB GILSDORF AND KENNETH STUART WERE TWO OF THEM?

3   **A.**   YES.

4   **Q.**   OKAY.  AND WAS THERE ANY DIFFERENCE IN THE ENFORCEMENT OF

5   THE FRA REQUIREMENTS BEFORE AND AFTER, SAY, NOVEMBER, DECEMBER

6   OF 2016?

7   **A.**   YES.  FROM WHAT I CAN TELL, YES.

8   **Q.**   AND EXPLAIN YOUR ANSWER, PLEASE, SIR.

9   **A.**   BEFORE WE DIDN'T GET -- WE DIDN'T GET MUCH FLACK BEHIND

10  TAKING TRACKS OUT OF SERVICE OR WE -- YOU KNOW, WE DIDN'T GET

11  INTIMIDATED, I WOULD SAY, BY REMOVING TRACKS OR, YOU KNOW,

12  SAYING WE PUTTING OUT SLOW ORDERS OR, YOU KNOW, JUST THINGS --

13  THINGS -- YOU CAN JUST TELL THE ENERGY WAS DIFFERENT.

14  **Q.**   OKAY.  DO YOU RECALL WHETHER THERE WAS A SAFETY AND

15  COMPLIANCE ORDER THAT WAS ISSUED DURING THAT BASIC TIME PERIOD?

16  **A.**   YES.

17  **Q.**   OKAY.

18  **A.**   IT WAS ISSUED IN, I BELIEVE, IN '16, I BELIEVE.

19  **Q.**   I'M TALKING ABOUT LATE 2016.

20  **A.**   RIGHT, THAT'S CORRECT.

21  **Q.**   OKAY.  AND DID YOU EVER READ THAT COMPLIANCE AGREEMENT?

22  **A.**   YES, SIR.

23  **Q.**   AND WERE YOU TOLD ABOUT THE COMPLIANCE AGREEMENT AS WELL?

24  **A.**   YES, SIR.

25  **Q.**   AND WHO TOLD YOU ABOUT THE COMPLIANCE AGREEMENT?

01:21  1   **A.**   THEY BROUGHT US INTO A MEETING INTO LIVONIA, AND THEY HAD

2   ALL OF US SITTING DOWN AND WENT OVER THIS COMPLIANCE AGREEMENT.

3   **Q.**   OKAY.  WHAT WAS YOUR UNDERSTANDING OF YOUR

4   RESPONSIBILITIES AS A TRACK INSPECTOR AND THE RESPONSIBILITIES

5   OF MR. TAYLOR UNDER THAT COMPLIANCE AGREEMENT?

6   **A.**   WELL, WE WERE TO MAKE SURE WE STRICTLY ENFORCED THE STRICT

7   REMOVE OR REPAIR GUIDELINES AND PREVENT ANY DERAILMENTS.

8   **Q.**   OKAY.  AND WHAT EFFECT DID THE FRA INCREASING ITS

9   ACTIVITIES, ENFORCEMENT ACTIVITIES, HAVE ON YOUR WORK AND MR.

10   TAYLOR'S WORK?

11   **A.**   WELL, IT INCREASED MY -- ON MY CRITICAL LEADS AND

12   INCREASED MY INSPECTIONS TO MAYBE -- CRITICAL LEADS, I GOT AT

13   LEAST TWICE A WEEK AND SOMETIMES MORE.  IT JUST DEPENDED ON

14   WHAT THE SITUATION WAS.  IT ALSO -- IT JUST INCREASED.  INSTEAD

15   OF MAYBE TWO INSPECTIONS, I HAD TO DO MAYBE FOUR INSPECTIONS.

16   AND IT MADE US GO INTO MORE DETAIL ABOUT WHAT OUR DEFECTS WERE,

17   THINGS OF THAT NATURE.

18   **Q.**   IS IT FAIR TO SAY THAT THERE WAS MORE PRESSURE BEING

19   APPLIED BY THE FRA DURING THAT PERIOD OF TIME?

20   **A.**   YES, SIR.  BECAUSE THEY WAS ALSO SAYING THAT WE COULDN'T

21   TURN IN -- THAT WE SHOULDN'T TURN IN AN EMPTY TRACK INSPECTOR

22   REPORT.

23   **Q.**   DID --

24   **A.**   THAT WE HAD TO FIND A DEFECT.

25   **Q.**   IN 2016 AND 2017, 2018, DID YOU HAVE TIMES WHERE YOU

01:23 1  INTERACTED WITH FRA OFFICIALS?

2  **A.**  YES, SIR.

3  **Q.**  AND WHO WERE THOSE FRA OFFICIALS?

4  **A.**  I HAD MR. NICK ROPPOLO.  I HAD -- LET ME THINK OF HIS

5  NAME.  HE WAS ROBERT FAABORG AND --

6  **Q.**  OKAY.

7  **A.**  -- J.D. PRICE.

8  **Q.**  OKAY.  THANK YOU, SIR.

9      NOW, WHEN YOU HAD INTERACTIONS WITH THOSE FRA

10  OFFICIALS DURING, SAY, 2017 AND 2018, HOW FREQUENTLY WAS THAT

11  INTERACTION?

12  **A.**  THAT WAS, I WOULD SAY, EVERY FOUR, SIX MONTHS.

13  **Q.**  OKAY.  EVERY SIX MONTHS?

14  **A.**  CORRECT.

15  **Q.**  DID YOU SPEAK WITH THEM MORE FREQUENTLY THAN THAT OVER THE

16  PHONE OR OVER ANY KIND OF OTHER COMMUNICATIONS?

17  **A.**  THEY WOULD SHOW UP AT VARIOUS LOCATIONS ON MY TERRITORY

18  AND QUESTION ME.  I MEAN, HE MIGHT JUST -- HE MIGHT BE GOING TO

19  ANOTHER RAILROAD AND JUST DECIDE TO POP UP AT A SWITCH.

20  **Q.**  OKAY.  DID YOU HAVE A CONCERN THAT IF YOU DID NOT DO YOUR

21  JOB CORRECTLY IN TERMS OF RAILROAD SAFETY, THAT THERE COULD BE

22  REPERCUSSIONS FROM THE FRA?

23  **A.**  YES, SIR.

24  **Q.**  AND WHAT WAS YOUR CONCERN?

25  **A.**  IT WAS SOME JAIL TIME, ALSO HEFTY FINES.

01:24 1    Q.    OKAY.  DO YOU KNOW WHETHER -- OR WERE YOU TOLD WHETHER YOU

2    COULD BE LIABLE FOR CRIMINAL AND CIVIL PENALTIES FOR NOT

3    ENFORCING THE FRA REQUIREMENTS?

4    A.    WELL, THEY WAS BASICALLY TELLING ME THAT, LOOK, IF

5    SOMETHING HAPPENS RIGHT HERE, YOU'RE GONNA BE THE FIRST ONE,

6    AND THEY'RE GONNA PULL YOUR TRACK INSPECTOR REPORTS, SO YOU'RE

7    GONNA BE THE ONE THAT THEY'RE GONNA INITIALLY COME AFTER FIRST.

8    Q.    OKAY.

9    A.    'CAUSE I WAS THE LAST PERSON TO LOOK AT IT.

10    Q.    OKAY.  AND WHAT WAS THE CONDITION OF UNION PACIFIC'S

11    TRACKS IN AVONDALE, IN GENERAL?

12    A.    WHEN I FIRST TOOK THE POSITION, IT WAS QUITE A BIT THAT

13    THEY FOUND, AND THEY HAD TO REALLY RUSH TO TRY TO GET ALL OF

14    THIS STUFF.  THEY HAD TO PULL A LOT OF RESOURCES IN ORDER TO

15    GET THESE DEFECTS CORRECTED IN A SHORT PERIOD OF TIME.

16    Q.    OKAY.  BUT GENERALLY WHEN YOU STARTED WORKING AT AVONDALE,

17    WHAT WAS THE CONDITION OF THE TRACKS?

18    A.    VERY DEPLORABLE.

19    Q.    AND WHY?  WHY DO YOU SAY THAT?

20    A.    THEY HAD A LOT OF WOOD TIE ISSUES AND MISSING COMPONENTS

21    THAT THEY HAD TO UPGRADE IN SOME VERY --

22    Q.    DO YOU KNOW WHEN THOSE TRACKS CAME INTO OPERATION AT THE

23    AVONDALE YARD?

24    A.    WHEN IT WAS BUILT.

25    Q.    WERE THE TRACKS OLD?

01:26  1  **A.**   YES, SIR.

2  **Q.**   AND HOW OLD WERE THEY?

3  **A.**   FROM WHAT I UNDERSTAND, IT WAS LIKE MAYBE 1985, '6,

4  SOMEWHERE AROUND THAT AREA.

5  **Q.**   AND WERE THE TRACKS IN OTHER PLACES CORRECTED BY UNION

6  PACIFIC?

7  **A.**   YES.

8  **Q.**   SUCH AS ADDIS?

9  **A.**   THAT'S CORRECT.

10  **Q.**   DID THEY EVER CORRECT THE AVONDALE TRACKS?

11  **A.**   I'M SORRY.  REPEAT THAT.

12  **Q.**   LET ME REPHRASE THAT QUESTION.

13         WAS THERE EVER ANY GENERAL IMPROVEMENT OF THE OVERALL

14  CONDITION OF THE AVONDALE TRACKS WHILE YOU WERE THERE?

15  **A.**   YES.

16  **Q.**   OKAY.  AND WHAT WAS THAT?

17  **A.**   THE TAIL TRACK AND I WANT TO SAY -- I CAN'T REMEMBER THE

18  NAME OF THAT SWITCH.  IT WAS ANOTHER SWITCH, BUT THEY ENDED UP

19  HAVING TO UPGRADE THEM.

20  **Q.**   OKAY.

21  **A.**   BECAUSE OF THE FREQUENCY THAT WAS RUNNING OVER THEM.

22  **Q.**   OKAY.  SWITCH 16 WAS TAKEN OUT OF SERVICE, WAS IT NOT?

23  **A.**   YES, SIR.

24  **Q.**   OKAY.  DID YOU HAVE ANY DIFFICULTY DURING YOUR WORK AT

25  AVONDALE?  DID YOU HAVE ANY DIFFICULTY FINDING COMPONENT PARTS

01:27 1    TO MAINTAIN THESE RAILROAD TRAINS?

2    **A.**    YES, WE DID.

3    **Q.**    AND TELL US ABOUT THAT, PLEASE, SIR.

4    **A.**    WELL, A LOT OF THE COMPONENTS FOR THOSE TRACKS WERE EITHER

5    THEY DIDN'T MANUFACTURE THEM ANYMORE, SO YOU HAD TO GO THROUGH

6    OTHER RESOURCES TO FIND CERTAIN COMPONENTS.

7    **Q.**    OKAY.  WHERE WOULD YOU FIND THEM?

8    **A.**    ANOTHER RAILROAD COMPANY MAY HAVE IT, AND AT THAT TIME I

9    BELIEVE JOHNNY HAD TO REACH OUT TO THEM AND DO A SWAP OR

10    SOMETHING, SOME KIND OF WAY INTERCHANGE RESOURCES IN ORDER TO

11    MAKE IT WORK.

12    **Q.**    OKAY.  DO YOU HAVE KNOWLEDGE OF THE AVONDALE TAIL TRACK

13    BEING TAKEN OUT OF SERVICE IN 2017?

14    **A.**    YES, SIR.

15    **Q.**    AND DO YOU RECALL THE DATE THAT WAS DONE?

16    **A.**    YES, SIR.

17    **Q.**    AND WHAT WAS THAT?

18    **A.**    WE COME TO REALIZE THAT THE POINTS WERE TOO CLOSE.

19    **Q.**    OKAY.  WHAT WAS THE DATE, THOUGH?  DO YOU RECALL?

20    **A.**    I CAN'T REALLY REMEMBER THE DATE.

21    **Q.**    DOES MARCH 28 SOUND RIGHT?

22    **A.**    SOMEWHAT, YES.

23    **Q.**    OKAY.  AND HOW DO YOU HAVE KNOWLEDGE OF THAT TRACK BEING

24    TAKEN OUT OF SERVICE AT THAT TIME?

25    **A.**    I WAS CALLED TO COME OUT TO THAT LOCATION, AND WE HAD TO

01:29 1  FIGURE OUT WHY WE DERAILED THERE.

2  **Q.**    OKAY.  AND WHO WAS CALLED TO FIGURE OUT WHY?

3  **A.**    I'M SORRY?

4  **Q.**    WHO WAS CALLED IN TO FIGURE OUT WHY?

5  **A.**    ME, MR. TAYLOR, AND I THINK THAT WAS IT THAT DAY.

6  **Q.**    OKAY.  AND DID YOU PARTICIPATE IN AN INVESTIGATION OF

7  DERAILMENTS AT THAT SITE?

8  **A.**    YES, SIR.

9  **Q.**    AND WHAT DID THAT INVOLVE?

10  **A.**    WE HAD TO TAKE MEASUREMENTS, AND WE HAD TO DO AN

11  INVESTIGATION AND PULL MEASUREMENTS JUST TO FIGURE OUT, OKAY,

12  WHY DID WE FAIL HERE.

13  **Q.**    AND DID YOU PARTICIPATE IN THE DECISION TO TAKE IT OUT OF

14  SERVICE?

15  **A.**    YES, SIR.

16  **Q.**    AND WHAT WAS THE REASON IT WAS TAKEN OUT OF SERVICE -- THE

17  REASONS?

18  **A.**    BECAUSE THE POINTS WERE TOO CLOSE TOGETHER, AND THE WAY

19  THE LOCOMOTIVES WERE SET UP, THEY WASN'T ABLE TO HANDLE THE

20  DEGREE OF CURVATIVE THAT THOSE TURNOUTS WERE DESIGNED FOR.

21  **Q.**    AND DID YOU EXPERIENCE ANY REACTION OR RESPONSE FROM UNION

22  PACIFIC IN RESPONSE TO THE TAKING OF THIS TRACK OUT OF SERVICE?

23  **A.**    THEY WASN'T PLEASED ABOUT IT.  THEY ASKED WHEN WAS IT

24  GONNA BE PUT BACK IN SERVICE.

25  **Q.**    OKAY.  DO YOU KNOW IF ANYBODY GOT MAD OVER THAT?

01:31 1 **A.** OH, YES.  I KNOW ONE GUY WAS REALLY MAD ABOUT IT.

2 **Q.** AND WHO WAS THAT?

3 **A.** MR. DANNY JAQUESS.

4 **Q.** DO YOU KNOW WHAT HE SAID IN RESPONSE TO THE TAKING THE

5 TRACK OUT OF SERVICE?

6 **A.** I KNOW HE WAS UPSET BEHIND IT.  I KNEW HE WASN'T HAPPY

7 ABOUT IT.

8 **Q.** OKAY.  AND DO YOU RECALL -- DO YOU RECALL SWITCH 16 BEING

9 TAKEN OUT OF SERVICE?

10 **A.** YES, SIR.

11 **Q.** AND HOW DO YOU HAVE KNOWLEDGE OF THAT?

12 **A.** WE ALSO HAD A DERAILMENT THERE, AND WE HAD TO TAKE SOME

13 MEASUREMENTS AGAIN, AND WE FOUND OUT THAT WE HAD SOME ISSUES

14 THERE AS WELL.

15 **Q.** OKAY.  DID YOU ACTUALLY PERSONALLY PARTICIPATE IN THE

16 INVESTIGATION OF THE DERAILMENTS AND THE DECISION TO TAKE THAT

17 SWITCH OUT OF SERVICE?

18 **A.** YES, SIR.

19 **Q.** AND WHAT DID YOU ACTUALLY PHYSICALLY DO IN CONNECTION WITH

20 THAT PARTICIPATION?

21 **A.** WE TOOK MEASUREMENTS, ACCORDING TO THE GUIDELINES, AND WE

22 DETERMINED AT -- WITH THOSE NUMBERS THAT WE HAD DID UNDER --

23 WITH THE GRAPH THAT WE -- THAT IT HAD AN ALIGNMENT ISSUE.

24 **Q.** OKAY.  AND, THEREFORE, SHOULD BE TAKEN OUT OF SERVICE?

25 **A.** YES, SIR.

01:32  1   **Q.**   AND WHY WOULD AN ALIGNMENT ISSUE REQUIRE A TRACK BEING

       2   TAKEN OUT OF SERVICE?

       3   **A.**   IF IT WAS A SEVERE ALIGNMENT UNDER THOSE FEDERAL

       4   GUIDELINES AND PER U.P., IT WARRANTED TAKING IT OUT OF SERVICE.

       5   **Q.**   AND WAS THIS A SEVERE ALIGNMENT PROBLEM?

       6   **A.**   YES, SIR.

       7   **Q.**   AND DID YOU PARTICIPATE IN MEASURING THE TRACK ON

       8   NOVEMBER 24, 2017?

       9   **A.**   YES, SIR.

      10   **Q.**   AND WHAT DO YOU RECALL AS TO THOSE MEASUREMENTS?  WHO DID

      11   THE MEASUREMENTS?

      12   **A.**   ME AND MR. TAYLOR.

      13   **Q.**   OKAY.  AND WERE YOU CAREFUL IN THOSE MEASUREMENTS?

      14   **A.**   YES, SIR.

      15   **Q.**   AND DID YOU TAKE YOUR TIME WITH THOSE MEASUREMENTS?

      16   **A.**   YES, SIR.

      17   **Q.**   DO YOU HAVE ANY REASON TO THINK THAT THOSE MEASUREMENTS

      18   WERE NOT PROPERLY TAKEN BY MR. TAYLOR?

      19   **A.**   NO, SIR.

      20   **Q.**   AND YOU WERE THERE TO ESSENTIALLY PERFORM A CHECK AND TO

      21   MAKE SURE THINGS WERE DONE CORRECTLY?

      22   **A.**   CORRECT.

      23   **Q.**   DID YOU HAVE ANY CONCERNS OR VOICE ANY CONCERNS ABOUT THE

      24   ACCURACY AND APPROPRIATENESS OF THOSE MEASUREMENTS?

      25   **A.**   WE TOOK SEVERAL MEASUREMENTS AT THOSE LOCATIONS.  IT'S NOT

01:33  1   LIKE WE JUST TOOK ONE, YOU KNOW, ONE SET OF MEASUREMENTS AND

2   JUST LIKE MEASURED ONE TIME.  WE ACTUALLY WALKED THROUGH THAT

3   PLACE TWO OR THREE TIMES BEFORE.  WE WAS PRETTY ACCURATE ON IT.

4   **Q.**   OKAY.  NOW, MR. ISAAC, CAN THE SIZE OF A SWITCH AFFECT THE

5   ALIGNMENT?

6   **A.**   YES, SIR.

7   **Q.**   AND EXPLAIN HOW SO.

8   **A.**   BECAUSE EVERY SWITCH THAT YOU HAVE HAS A STANDARD TO IT,

9   WHICH TELLS YOU PRETTY MUCH WHAT ANGLE OR WHAT DEGREE OF

10   CURVATIVE YOU'RE GOING TO HAVE FOR YOUR TURNOUTS FOR YOUR

11   TRAINS TO OPERATE THROUGH.

12   **Q.**   ARE THERE STANDARDS, FRA STANDARDS, THAT SHOW THE DEGREE

13   OF APPROPRIATE CURVATIVE ON EACH SWITCH?

14   **A.**   YES.  AND U.P.

15   **Q.**   WERE YOU PRESENT AT A MEETING ON JANUARY 9, 2018 WITH

16   JOHNNY TAYLOR, JACOB GILSDORF, AND KENNY STUART?

17   **A.**   YES.

18   **Q.**   OKAY.  AND WHERE DID THAT MEETING TAKE PLACE?

19   **A.**   IT WAS A TOWN HALL MEETING, I BELIEVE IT WAS.  I CAN'T

20   REALLY REMEMBER.

21   **Q.**   OKAY.

22   **A.**   MAYBE BATON -- NO.  MAYBE BATON ROUGE, MAYBE.

23   **Q.**   OKAY.  BUT WHO ELSE WAS PRESENT?  ANYBODY ELSE OTHER THAN

24   THE PEOPLE I'VE NAMED?

25   **A.**   YOU HAD ALSO A FRA INSPECTOR THERE AS WELL.

01:35  1    **Q.**   OKAY.  AND DO YOU RECALL AT THAT MEETING MR. TAYLOR ASKING

2    MR. GILSDORF AND MR. STUART TO COME LOOK AT THE TRACK?

3    **A.**   YES.

4    **Q.**   AND WHAT DID HE SAY?  DO YOU RECALL?

5    **A.**   THEY WEREN'T INTERESTED IN LOOKING AT THAT PARTICULAR

6    LOCATION.

7    **Q.**   OKAY.  AND DID THEY AGREE TO DO THAT?  DID THEY AGREE TO

8    COME INSPECT THE TRACKS WITH HIM?

9    **A.**   NO.

10   **Q.**   OKAY.  WHAT DID THEY SAY ABOUT THAT?  DO YOU RECALL?

11   **A.**   I JUST KNOW THEY DIDN'T WANT TO GO LOOK AT IT.

12   **Q.**   DID THEY EXPRESS A REASON?

13   **A.**   NO.

14   **Q.**   WAS IT COMMON PLACE IN THE OPERATION OF UNION PACIFIC

15   DURING THESE YEARS TO HAVE DIALOGUE ABOUT WHAT SHOULD BE DONE

16   ABOUT TRACK DEFECTS?

17   **A.**   THEY ALWAYS DISCUSSED WHAT THEY WERE GONNA DO.  BUT

18   SOMETIMES THEY DID OR THEY HAD A PLAN FOR IT.  ONCE YOU ADDRESS

19   IT, THEY'D COME WITH A PLAN.

20   **Q.**   OKAY.  DID KENNY STUART AND JACOB GILSDORF WANT TO AUDIT

21   YOU ON THAT OCCASION?

22   **A.**   YES, SIR.

23   **Q.**   AND WHAT WAS THAT ABOUT?  DO YOU KNOW WHAT THEY ASKED OF

24   YOU?

25   **A.**   ON THAT DATE THEY WERE LOOKING TO SEE IF I HAD ALL MY

01:37 1    PAPERWORK AND HAD MY TRUCK IN A CERTAIN -- IN A DIFFERENT -- A

2    CERTAIN KIND OF MANNER, THE UPKEEP, AND ALL THAT KIND OF STUFF.

3    **Q.**    OKAY.  AT THAT MEETING ON JANUARY 9, 2018, DID MR. TAYLOR

4    INFORM MR. STUART AND MR. GILSDORF THAT HE HAD ALREADY TAKEN

5    MEASUREMENTS THE DAY EARLIER ON JANUARY 4, 2018?

6    **A.**    THAT'S CORRECT.

7    **Q.**    AND YOU HEARD THAT.  IS THAT CORRECT?

8    **A.**    THAT'S CORRECT.

9    **Q.**    OKAY.  AND DO YOU KNOW MR. POWERS?

10    **A.**    NO.  I DON'T KNOW HIM PERSONALLY, NO.

11    **Q.**    OKAY.  DID YOU EVER PARTICIPATE IN ANY OTHER PHONE CALLS

12    WITH MR. TAYLOR AND MR. STUART?

13    **A.**    NO.

14    **Q.**    DURING THE INTERACTIONS WITH MR. STUART AND MR. GILSDORF,

15    DID YOU GET AN OPPORTUNITY TO OBSERVE MR. TAYLOR'S DEMEANOR ON

16    HOW HE WAS ACTING OUT, HOW HE WAS SPEAKING?

17    **A.**    JUST AT THAT -- JUST MAYBE AT A TOWN HALL MEETING WHEN I

18    THINK -- I THINK THE PRESSURE WAS COMING TO PUT THAT TRACK

19    NO. 16 BACK IN SERVICE.

20    **Q.**    OKAY.  WHO WAS PRESSURING?

21    **A.**    FROM WHAT I SEEN, MR. STUART.

22    **Q.**    OKAY.  MR. KENNETH STUART?

23    **A.**    THAT'S CORRECT.

24    **Q.**    OKAY.  AND DID YOU OBSERVE ANY OF MR. TAYLOR'S ACTIVITIES,

25    WORDS OR CONDUCT, WITH REGARD TO MR. STUART BEING INAPPROPRIATE

01:38 1  OR DISRESPECTFUL OR BELLIGERENT?

2  **A.**   NO.

3  **Q.**   AND HAD HE BEEN BELLIGERENT, DISRESPECTFUL, YOU BELIEVE

4  YOU WOULD'VE SEEN THAT?

5  **A.**   CORRECT.

6  **Q.**   IS THERE A COST TO THE UNION PACIFIC RAILROAD OF TAKING A

7  TRACK OUT OF SERVICE?

8  **A.**   YES, SIR.

9  **Q.**   AND CAN YOU KIND OF EXPLAIN THAT TO US?

10  **A.**   OKAY.  I USED TO TAKE TRACKS OUT OF SERVICE ALL THE TIME.

11  SO MOST OF THE TIME JOHNNY WOULD CALL THE GANG OVER, THEY'D

12  REPAIR IT, FIX IT THE SAME DAY OR, YOU KNOW, MAYBE THE NEXT DAY

13  OR SOMETHING.

14       BUT THOSE PARTICULAR TWO, MEANING THE TAIL TRACK AND

15  THE NO. 16 SWITCH, THOSE WEREN'T GONNA VERY -- THOSE WEREN'T

16  GONNA BE VERY EASY FIXES, NOT LIKE YOU CAN JUST GO FIX THOSE

17  OVERNIGHT AND PUT THEM RIGHT BACK IN SERVICE.

18  **Q.**   PUTTING TRACK 16 BACK IN SERVICE WOULD HAVE BEEN A

19  SIGNIFICANT PROJECT?

20  **A.**   YES, SIR, THAT WOULD BE CORRECT.

21  **Q.**   AND WHY IS THAT?

22  **A.**   YOU WOULD BASICALLY HAVE TO REDESIGN IT FROM THAT, AND IT

23  WAS GONNA COST YOU WAY MORE MONEY 'CAUSE IT WAS -- IT WASN'T

24  LIKE YOU JUST CHANGING OUT ONE OR TWO COMPONENTS.  YOU WAS

25  ACTUALLY GONNA HAVE TO REMOVE A TRACK AND INSTALL A DIFFERENT

01:40 1  TYPE OF TRACK TO THAT AREA.

2  **Q.**   AND IT WOULD BE A SIGNIFICANT COST TO UNION PACIFIC TO DO

3  THAT?

4  **A.**   YES, SIR.

5  **Q.**   OKAY.  SO WAS IT YOUR UNDERSTANDING MR. TAYLOR WAS

6  PROMOTING TAKING SWITCH 16 OUT OF SERVICE AND THAT MR. STUART

7  WAS OPPOSING THAT?

8  **A.**   CORRECT.

9  **Q.**   AND YOU ACTUALLY SAW THAT HAPPEN?

10  **A.**   YES.

11  **Q.**   OKAY.  DID ANYBODY ELSE FROM UNION PACIFIC, TO YOUR

12  KNOWLEDGE, OPPOSE MR. TAYLOR TAKING THAT TRACK OUT OF SERVICE?

13  **A.**   YES.

14  **Q.**   WHO WAS THAT?

15  **A.**   MR. JAQUESS.

16  **Q.**   MR. JAQUESS.

17      OKAY.  WHAT ABOUT MR. GILSDORF?  WAS HE INVOLVED IN

18  THAT AT ALL?

19  **A.**   IF HE WAS, I WASN'T PRESENT FOR THAT.

20  **Q.**   WERE YOU PRESENT FOR A CALL OR A MEETING AT ANYTIME WHEN

21  THERE WAS TENSION -- NERVOUS TENSION, ANXIETY -- BETWEEN MR.

22  STUART AND MR. TAYLOR?

23  **A.**   YES.

24  **Q.**   WILL YOU DESCRIBE THAT PLEASE, SIR.

25  **A.**   IT WAS A PARTICULAR TOWN HALL MEETING, AND WE WERE ALL

01:42 1    SITTING THERE WAITING ON EVERYONE TO GIVE WHATEVER THEIR

2    SEGMENT WAS ON THE MEETING.  AND AT THAT PARTICULAR MEETING, WE

3    HAD A FRA INSPECTOR AT THAT TOWN HALL, AND THEY PUT -- YOU CAN

4    DEFINITELY TELL THAT MR. STUART AND MR. TAYLOR WEREN'T GETTING

5    -- SEEING EYE TO EYE.

6    **Q.**    I SEE.

7          IN ANY OF THOSE TIMES THAT MR. TAYLOR AND MR. STUART

8    WERE NOT SEEING EYE TO EYE, DID YOU OBSERVE MR. TAYLOR ACT OR

9    SAY ANYTHING THAT YOU FELT WAS INAPPROPRIATE?

10    **A.**    NO.

11    **Q.**    OKAY.  WAS HE RESPECTFUL, TO YOUR KNOWLEDGE?

12    **A.**    YES, SIR.

13    **Q.**    AND HE WAS NOT BELLIGERENT?

14    **A.**    NO, SIR.

15    **Q.**    DO YOU RECALL A TOWN HALL MEETING IN LAFAYETTE IN JANUARY

16    OF 2018?

17    **A.**    YES, SIR.

18    **Q.**    AND WHO WAS PRESENT AT THAT MEETING?

19    **A.**    MR. STUART THAT I CAN -- I DON'T KNOW IF MR. GILSDORF WAS

20    THERE AT THAT TIME.

21    **Q.**    OKAY.

22    **A.**    BUT MR. STUART FOR SURE.

23    **Q.**    AND WHAT DO YOU RECALL ABOUT THAT MEETING, SIR?

24    **A.**    THAT WAS THE MEETING THAT ALL OF THIS STUFF KIND OF --

25    THAT'S WHEN I KNOW FOR SURE THAT WE WAS UNEASY AT, AT LEAST

01:43 1    HIM.

2    Q.    ALL RIGHT.  AND DO YOU REMEMBER MR. TAYLOR SAYING ANYTHING

3    AT THAT MEETING?

4    A.    WELL, HE WAS MAKING IT -- THAT'S WHEN HE VOICED ABOUT HOW

5    IT WAS UNFAIR THAT THEY WERE -- HE FELT LIKE HE WAS BEING

6    PRESSURED TO DO STUFF THAT WASN'T RIGHT.

7    Q.    OKAY.  THAT WASN'T RIGHT?

8    A.    THAT'S CORRECT.

9    Q.    WITH REGARD TO RAILROAD SAFETY?

10    A.    YES, SIR.  YES.

11    Q.    OKAY.  AND THAT DREW SOME TENSIONS?

12    A.    THAT'S CORRECT.

13    Q.    DID YOU EVER HEAR MR. TAYLOR BE INSUBORDINATE IN ANY WAY?

14    A.    NO, SIR.

15    Q.    DID YOU OBSERVE WHETHER OR NOT MR. TAYLOR WAS DISTURBED BY

16    THE OCCURRENCES AT THAT MEETING?

17    A.    YES.  'CAUSE IN THAT MEETING, I ALMOST THOUGHT HE BEGAN TO

18    CRY.  BUT I'M -- YEAH.

19    Q.    OKAY.  DID YOU EVER DISCUSS SWITCH 16 WITH MR. STUART OR

20    MR. GILSDORF AFTER MR. TAYLOR WAS FIRED?

21    A.    YES.

22    Q.    AND TELL US ABOUT THE DISCUSSIONS.  WHEN WERE THEY HAD AND

23    WHAT WAS SAID?

24    A.    I WAS CALLED INTO A MEETING ON JULY THAT FOLLOWING YEAR.

25    Q.    JULY OF '18 OR '19?

01:45  1    **A.**   YES, SIR, '18.

2    **Q.**   '18, OKAY.

3    **A.**   AND I WAS ASKED, WHEN WERE WE GONNA GET THIS TRACK BACK IN

4    SERVICE.

5    **Q.**   IN REFERENCE TO SWITCH 16?

6    **A.**   THAT'S CORRECT.

7    **Q.**   OKAY.  AND WHAT WAS THE RESPONSES, IF ANY?

8    **A.**   MY RESPONSE TO THEM WAS, UNLESS WE CAN REPAIR THIS DEFECT,

9    I CAN'T PUT IT BACK IN SERVICE.

10    **Q.**   AND YOU CONVEYED THAT TO MR. STUART?

11    **A.**   THAT'S CORRECT.

12    **Q.**   AND WHAT HAPPENED AFTER THAT?

13    **A.**   ON JULY 11 I WAS DEMOTED.

14    **Q.**   OKAY.  AND HAVE YOU ACTUALLY PHYSICALLY WORKED FOR UNION

15    PACIFIC SINCE THAT DAY?

16    **A.**   NO, SIR.

17    **Q.**   SO THIS IS HOW MANY DAYS -- YOU WERE DEMOTED HOW MANY DAYS

18    AFTER YOUR STATEMENT TO MR. STUART?

19    **A.**   I GUESS I'M GONNA SAY A WEEK OR TWO OR SOMETHING.

20    **Q.**   OKAY.  AT MOST?

21    **A.**   YES.

22        **MR. SMITH:**  YOUR HONOR, LET ME CONFER WITH COUNSEL

23    FOR A SECOND, IF I MAY?

24        **THE COURT:**  OKAY.

25        **MR. SMITH:**  THANK YOU, YOUR HONOR.  I TENDER THE

01:46  1  WITNESS.

2                    **THE COURT:**  CROSS.

3                           **CROSS-EXAMINATION**

4  **BY MR. FRASER:**

5  **Q.**   MR. ISAAC, HOW ARE YOU DOING TODAY?

6  **A.**   I'M DOING.

7  **Q.**   ALL RIGHT.  YOU'RE A FRIEND OF MR. TAYLOR'S?

8  **A.**   WE WORK TOGETHER.

9  **Q.**   YES, SIR.

10          HOW LONG HAVE YOU KNOWN HIM?

11  **A.**   SINCE I'VE REALLY BECAME A TRACK INSPECTOR.

12  **Q.**   ALL RIGHT.  BEFORE THAT, HAD YOU MET HIM?

13  **A.**   I MET HIM MAYBE ONCE WHEN HE WAS A MANAGER TRAINING OR

14  WHATEVER.

15  **Q.**   ALL RIGHT.  AS YOU TESTIFY BEFORE US TODAY, ARE YOU

16  CERTIFIED UNDER THE FEDERAL FRA REGULATION 213.7 TO INSPECT

17  TRACK?

18  **A.**   YES, SIR.

19  **Q.**   YOU ARE CERTIFIED?

20  **A.**   YES.

21  **Q.**   DID YOU GET THAT BACK?

22  **A.**   NO, SIR.

23  **Q.**   IS IT CORRECT THAT YOU LOST YOUR CERTIFICATION?

24  **A.**   WELL, NO, I DIDN'T LOSE THE CERTIFICATION.

25  **Q.**   OKAY.  EXPLAIN THAT FOR US, PLEASE, SIR.

01:47 1   **A.**   WELL, I HAD -- MEANING, WHEN I WENT THROUGH THE CLASS AND

2   THEY GAVE ME A CARD TO SAY, YES, I AM 213.7 QUALIFIED.  SO IF I

3   HAD -- IF I LOST IT, I'M NOT AWARE THAT I LOST IT.

4   **Q.**   YOU MENTIONED SOMETHING ABOUT YOU WERE A TRACK INSPECTOR

5   BUT SOMETHING ABOUT A LATE REPORT?

6   **A.**   YES, SIR.

7   **Q.**   ALL RIGHT.  YOU'RE TALKING ABOUT A LATE REPORT TO UNION

8   PACIFIC OR A LATE REPORT TO THE FRA?

9   **A.**   A LATE REPORT TO BOTH.  BECAUSE THE -- ONCE YOU UPLOAD IT,

10   SOMETIMES IT DOESN'T UPLOAD CORRECTLY 'CAUSE YOU MAY HAVE A

11   FAULT IN -- YOU MAY HAVE A FAULT IN YOUR WIFI OR YOU -- OR

12   SOMETIMES THE CLICK -- WHEN YOU CHECK OFF THE CHECK -- THESE

13   LITTLE SMALL CHECK-OFF BOXES, SOMETIMES THEY DON'T CLICK WHEN

14   YOU THINK THEY CLICK.

15   **Q.**   WELL, I UNDERSTAND THAT CAN HAPPEN.

16           BUT YOU'RE TALKING HERE ABOUT JUST A LATE REPORT THAT

17   YOU TURNED IN LATE?

18   **A.**   CORRECT.

19   **Q.**   AND WERE THERE ALSO OCCASIONS WHEN YOU INSPECTED TRACK AND

20   YOU DIDN'T FIND DEFECTS AND THE GEOMETRY CAR CAME ALONG DOING

21   ITS MAGIC LOOKING FOR DEFECTS AND IT FINDS ALL KIND OF DEFECTS

22   ON YOUR TERRITORY?

23   **A.**   SOME, BUT NOT MANY, NOT MUCH.

24   **Q.**   ENOUGH SO THAT UNION PACIFIC GOT CONCERNED ABOUT IT.

25   CORRECT?

01:49 1    **A.**    YEAH.  I GUESS YOU COULD SAY THAT.

2    **Q.**    AND IS THAT WHEN YOU STOPPED BEING A TRACK INSPECTOR?

3    **A.**    CORRECT.

4    **Q.**    WELL, YOU'VE MADE IT SOUND LIKE UNION PACIFIC WANTS TO

5    HIDE DEFECTS AND NOT FIND THEM IN YOUR EARLIER TESTIMONY.  BUT

6    WHAT YOU'VE JUST TOLD US MAKES IT SOUND LIKE UNION PACIFIC WAS

7    DEMOTING YOU BECAUSE YOU WERE NOT FINDING DEFECTS?

8    **A.**    NO, NOT BECAUSE I WASN'T FINDING DEFECTS.  THEY -- 'CAUSE

9    I TURNED IN A LATE REPORT.

10    **Q.**    WELL, IT WAS MORE THAN THAT ONE LATE REPORT, WASN'T IT?

11    **A.**    CORRECT.

12    **Q.**    IN FACT, IT WAS THAT THERE WERE A LOT OF DEFECTS THAT YOU

13    WERE NOT PICKING UP IN YOUR INSPECTIONS.  CORRECT?

14    **A.**    NO.  'CAUSE CERTAIN DEFECTS -- CERTAIN FREQUENCIES YOU GO

15    OVER THE TRACK AND YOU LOOK AT MAYBE A SWITCH ONCE A MONTH OR

16    IT'S SOMETHING TO THAT NATURE, BUT IT DOESN'T STOP TRAINS

17    'CAUSE THAT TRAIN COULD -- I COULD BE -- JUST INSPECT A SWITCH

18    AND A TRAIN COULD BE COMING RIGHT BEHIND ME LATER AND CREATE A

19    DEFECT.

20    **Q.**    WELL, THAT CAN HAPPEN.  RIGHT?

21    **A.**    CORRECT.

22    **Q.**    AND I'M SURE THAT DOES HAPPEN ON OCCASIONS.  BUT ISN'T IT

23    CORRECT THAT THERE WERE A LOT OF DEFECTS THAT SHOULD HAVE BEEN

24    PICKED UP BY YOU THAT WERE NOT BEING PICKED UP AND THAT LED TO

25    YOUR DEMOTION BY UNION PACIFIC?

01:51 1   **A.**   NO.  'CAUSE, AGAIN, LET'S JUST SAY IF I COVER -- LET'S SAY

2   I COVER FIVE SWITCHES AND OVER THAT COURSE OF THE TIME, IF I GO

3   TO SLEEP THAT NIGHT, YOU STILL RUNNING TRAINS.  SO GUESS WHAT?

4   THAT TRAIN COULD BE POSSIBLY STILL CREATING MORE DEFECTS.  SO

5   I'VE ALREADY INSPECTED THAT SWITCH FOR THE MONTH.

6           SO USUALLY YOU COME BACK, AND THE NEXT MONTH IF THAT

7   DEFECT IS THERE, I'M GONNA WRITE IT DOWN.  WE'RE GONNA GET IT

8   REPAIRED.

9   **Q.**   DID UNION PACIFIC TAKE YOU OFF TRACK INSPECTIONS?

10   **A.**   YES.

11   **Q.**   AND WHEN DID THEY DO THAT?

12   **A.**   JULY 10 OR 11.

13   **Q.**   OF WHAT YEAR, SIR?

14   **A.**   OF '18.

15   **Q.**   DID THAT MAKE YOU MAD?

16   **A.**   I WAS UPSET.  BECAUSE IT -- FOR THE WORK -- THE AMOUNT OF

17   WORK THAT WE PUT IN DOWN THERE -- AND I'VE KNOWN TRACK

18   INSPECTORS WHO HAVE DONE WAY WORSE THAN ME.  I HAVEN'T HAD A

19   CODE 1 VIOLATION, ANYTHING, DIDN'T EVEN GET A REPRIMAND.  AND

20   THEN ALL OF A SUDDEN ONE DAY YOU DECIDE, HEY, I DON'T THINK YOU

21   SHOULD DO THIS JOB ANYMORE.

22   **Q.**   WHAT REASONS DID THEY GIVE YOU?

23   **A.**   OH, BECAUSE I WAS LATE ON A TRACK INSPECTOR REPORT FOR SIX

24   MONTHS.

25   **Q.**   FOR ONE REPORT?

01:52 1    **A.**    I'M SORRY?

2    **Q.**    OR ONE REPORT?  OR DID THAT INCLUDE MISSING THOSE DEFECTS

3    WE TALKED ABOUT?

4    **A.**    THEY DIDN'T SAY ANYTHING ABOUT MISSING DEFECTS.  BUT THEY

5    DID SAY BECAUSE OF THE REPORTS.

6    **Q.**    WELL, LET ME ASK YOU THIS.  HOW OFTEN IS IT THAT YOU

7    DEVELOP A PROBLEM AREA ON THE RAILROAD?

8    **A.**    WITH THE SUBGRADES, SOMETIMES YOU GET A REOCCURRING ONE

9    HERE AND THERE.

10    **Q.**    NOT AT ALL UNUSUAL TO HAVE PROBLEM AREAS ON THE RAILROAD.

11    IS THAT RIGHT?

12    **A.**    CORRECT.

13    **Q.**    AND ESPECIALLY IN YARDS, WHERE THEY TAKE ALL KINDS OF USE

14    AND ABUSE WITH MEN SWITCHING CARS AND RUNNING TRAINS OVER THEM

15    ALL THE TIME.  CORRECT?

16    **A.**    THAT'S CORRECT.

17    **Q.**    AND THOSE SWITCHES GET THROWN I DON'T KNOW HOW MANY TIMES

18    A DAY, BUT A LOT OF TIMES A DAY MOVING CARS BACK AND FORTH.

19    CORRECT?

20    **A.**    THAT'S CORRECT.

21    **Q.**    ALL RIGHT.  AND THE AVONDALE YARD HAS BEEN THERE FOR A

22    GOOD WHILE, I THINK YOU SAID?

23    **A.**    THAT'S CORRECT.

24    **Q.**    HOW IN THE WORLD DID IT OPERATE BEFORE YOU WERE THE TRACK

25    INSPECTOR AND BEFORE MR. TAYLOR WAS THE MANAGER?

01:54 1    **A.**    THEY HAD A LOT OF -- BEFORE ME AND MR. TAYLOR, THEY -- IT

2    WAS KNOWN THAT WE HAD -- THEY HAD SEVERAL DERAILMENTS THERE.

3    **Q.**    OKAY.  BUT IT WAS BASICALLY YOUR JOB TO INSPECT CORE

4    PROBLEMS AND NOTE THEM BEFORE THEY CAUSED A DERAILMENT OR A

5    PROBLEM, WASN'T IT?

6    **A.**    CORRECT.

7    **Q.**    AND IT WAS MR. TAYLOR'S JOB TO MAINTAIN THE YARD SO THAT

8    YOU DIDN'T HAVE DERAILMENTS AND PROBLEMS?

9    **A.**    FOR THE MOST PART, YES.

10    **Q.**    YES, SIR.

11    AND IS IT COMMON FOR TWO QUALIFIED TRACK INSPECTORS

12    TO SIT THERE LOOKING AT SOMETHING LIKE A DERAILMENT OR A TRACK

13    ISSUE AND HAVE TWO DIFFERENT OPINIONS ABOUT IT?  ONE GUY SAYS,

14    NO, THIS IS THE PROBLEM WE GOT TO FIX AND WE GOT TO DO IT WITH

15    TIES, AND ANOTHER GUY SAYS, NO, THIS IS JUST A SPIKING ISSUE OR

16    SOMETHING ELSE.  HOW COMMON IS THAT?

17    **A.**    PRETTY OFTEN, I GUESS, IF YOU WANT TO SAY.

18    **Q.**    YES, SIR.

19    THE FACT THAT THERE'S AN ISSUE ABOUT WHAT'S CAUSED A

20    DERAILMENT IS SOMETHING THAT'S OFTEN DEBATED, AND THAT'S NOT A

21    REAL BIG DEAL ON THE RAILROAD.  CORRECT?

22    **A.**    NO, IT SHOULDN'T.  BUT THEY DEBATE THEM ALL THE TIME.

23    **Q.**    SURE.

24    AND WHAT THE MANAGER WANTS, THE PERSON HIGHER UP

25    WANTS, BEFORE HE STARTS SPENDING A LOT OF MONEY TO REPAIR

01:55 1  SOMETHING IS, HE WANTS REAL CAREFUL MEASUREMENTS.  WOULD YOU

2  AGREE?

3  **A.**    UH-HUH.

4  **Q.**    AND SOMETIMES THEY EVEN GET A SURVEYOR IN TO SEE EXACTLY

5  WHERE THAT TRACK SHOULD BE VERSUS WHERE IT IS TODAY.  IS THAT

6  WHAT THEY DO?

7  **A.**    I WOULD GUESS.

8  **Q.**    ALL RIGHT.  WHAT WE'RE TALKING ABOUT IS PRETTY MUCH

9  BUSINESS AS USUAL WITH A BAD SPOT ON THE RAILROAD IN THE

10  AVONDALE YARD.  CORRECT?

11  **A.**    OKAY.  YEAH.

12  **Q.**    ALL RIGHT.  THANK YOU, SIR.  THAT'S ALL I HAVE.

13          **THE COURT:**  ANY REDIRECT?

14          **MR. SMITH:**  THERE'S NO FURTHER QUESTIONS, YOUR HONOR.

15          **THE COURT:**  ALL RIGHT.  YOU CAN STEP DOWN.

16          **MR. SMITH:**  WE'D LIKE TO CALL MS. ERICA TAYLOR.

17          **THE COURT:**  IS HE RELEASED FROM THE SUBPOENA?

18          **MR. SMITH:**  YES, YOUR HONOR.

19          **THE COURT:**  OKAY.  IS THIS GENTLEMAN RELEASED FROM

20  THE SUBPOENA?

21          **MR. SMITH:**  YES, YOUR HONOR.

22          **THE COURT:**  YOU ARE FREE TO GO.  THANK YOU.

23              ERICA TAYLOR.

24          **THE COURT:**  COUNSEL AND MEMBERS OF THE JURY, WE'RE

25  GOING TO TAKE A BREAK AT 3:00.  THE COURT HAS A PRETRIAL

01:56 1    CONFERENCE IN ANOTHER MATTER THAT I HAVE TO TAKE BY

2    VIDEOCONFERENCE.  SO WE WILL PROBABLY TAKE ABOUT A 30-MINUTE

3    BREAK AT 3:00.

4                    NEXT WITNESS IS ERICA TAYLOR.

5              **MR. SMITH:**  YES, YOUR HONOR.

6                        **ERICA L. TAYLOR,**

7    **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

8              **THE COURT:**  GO AHEAD, MR. SMITH.

9                       **DIRECT EXAMINATION**

10   BY MR. SMITH:

11   **Q.**   PLEASE STATE YOUR RESIDENCE.  I'M SORRY.  PLEASE STATE

12   YOUR NAME FOR THE RECORD, MA'AM.

13   **A.**   MY NAME IS ERICA LATRICE TAYLOR.

14   **Q.**   OKAY.  AND YOU LIVE IN WHAT TOWN IN THE STATE?

15   **A.**   I LIVE IN GONZALES, LOUISIANA.

16   **Q.**   ARE YOU MARRIED?

17   **A.**   YES.

18   **Q.**   AND TO WHOM ARE YOU MARRIED?

19   **A.**   I'M MARRIED TO JOHNNY TAYLOR, SR.

20   **Q.**   AND HOW LONG HAVE Y'ALL BEEN MARRIED?

21   **A.**   WE'VE BEEN MARRIED FOR 32 YEARS.

22   **Q.**   DO YOU HAVE CHILDREN?

23   **A.**   YES.  WE HAVE THREE.

24   **Q.**   AND ARE THEY GROWN?

25   **A.**   YES.

01:59  1    **Q.**    AND WHAT IS YOUR OCCUPATION, MS. TAYLOR?

2    **A.**    MY OCCUPATION?  I'M ACTUALLY A SUPERVISOR AT THE JCPENNY'S

3    CO-OP, USED TO BE JCPENNEY'S CORPORATION.

4    **Q.**    OKAY.

5    **A.**    I SUPERVISE THREE DEPARTMENTS.

6    **Q.**    AND HOW LONG HAVE YOU HELD THAT POSITION?

7    **A.**    THAT PARTICULAR POSITION?  PROBABLY ABOUT THREE YEARS.

8    **Q.**    OKAY.  TELL ME IN THIS OVER 30 YEARS THAT Y'ALL HAVE BEEN

9    TOGETHER, I GATHER YOU'VE OBSERVED A LOT AND LEARNED A LOT

10    ABOUT YOUR HUSBAND'S DEMEANOR AND PERSONALITY, HAVE YOU NOT?

11    **A.**    YES, SIR.

12    **Q.**    HAVE YOU EVER SEEN HIM BE BELLIGERENT?

13    **A.**    NO, SIR.

14    **Q.**    EVER?

15    **A.**    NO.

16    **Q.**    EVER SEEN HIM BE QUARRELSOME?

17    **A.**    NO.

18    **Q.**    HAVE YOU EVER SEEN HIM BE DISRESPECTFUL?

19    **A.**    NO, SIR.

20    **Q.**    AND IF HE HAD BEEN THOSE WAYS, YOU THINK YOU WOULD HAVE

21    KNOWN ABOUT THAT?

22    **A.**    I THINK I WOULD HAVE.

23    **Q.**    OKAY.  NOW, MR. TAYLOR, YOUR HUSBAND, WORKED FOR UNION

24    PACIFIC UNTIL FEBRUARY OF 2018, DID HE NOT?

25    **A.**    YES, SIR.

02:00  1  **Q.**  AND PRIOR TO HIS TERMINATION, TELL US ABOUT WHAT HIS
       2  FEELINGS WERE ABOUT HIS JOB AND HIS WORK AND HIS GENERAL
       3  APPRECIATION OF THE JOB AND THE WORK THAT HE WAS DOING.
       4  **A.**  WELL, HE LOVED HIS JOB.  I DO KNOW THAT.  MY HUSBAND IS
       5  EDUCATED.  HE GOT EDUCATION.  HE HAS A DEGREE IN MATHEMATICS IN
       6  CIVIL ENGINEERING.
       7         SO WHEN HE GOT THE JOB WITH UNION PACIFIC RAILROAD,
       8  HE WAS EXCITED BECAUSE THAT GAVE HIM THE OPPORTUNITY TO USE HIS
       9  CIVIL ENGINEERING SKILLS, ALONG WITH HANDS-ON -- YOU KNOW, HE
      10  LOVED TO USE HIS BRAIN.  AND HE WAS VERY EXCITED WHEN THEY
      11  FIRST HIRED HIM, AND THROUGHOUT MOST OF HIS CAREER HE WAS VERY
      12  EXCITED.
      13  **Q.**  AND HAPPY?
      14  **A.**  BEG YOUR PARDON?
      15  **Q.**  AND HAPPY?
      16  **A.**  OH, YES, SIR.  FOR MOST OF IT HE WAS HAPPY.  AND I'LL SAY
      17  THIS, I MEAN, I DON'T KNOW -- EVEN TILL THE END, HE STILL
      18  LOVED HIS JOB.  IT WASN'T THE JOB ITSELF.  HE LOVED IT.
      19  **Q.**  I SEE.
      20  **A.**  IT'S JUST SOME THINGS THAT LED TO THE END OF EVERYTHING.
      21  **Q.**  FROM YOUR OBSERVATION, DID HE --
      22  **A.**  BEG YOUR PARDON?
      23  **Q.**  I'M SORRY.
      24  **A.**  I'M SORRY.  I'M SORRY.
      25  **Q.**  I INTERRUPTED YOU.  I'M SORRY.

02:01 1        FROM YOUR OBSERVATION, DID HE APPEAR TO HAVE PRIDE

2    IN HIS WORK?

3    **A.**   ABSOLUTELY.  ABSOLUTELY.

4    **Q.**   FROM YOUR OBSERVATION, DID IT APPEAR THAT HE HAD SELF-

5    RESPECT BECAUSE OF HIS WORK?

6    **A.**   YES, SIR.

7    **Q.**   AND DID YOU DISCUSS HIS JOB WITH HIM FROM TIME TO TIME?

8    **A.**   YES, SIR.

9    **Q.**   ABOUT HOW OFTEN?

10   **A.**   EVERY DAY.

11   **Q.**   EVERY DAY?

12   **A.**   I WOULD SAY THAT BECAUSE HE WAS -- WHEN YOU HAVE THAT TYPE

13   OF POSITION, YOU'RE ON -- IT'S LIKE 24 HOURS YOU HAVE YOUR

14   PHONE WITH YOU, SO ANYTHING COULD BREAK OUT AT ANY TIME.

15        SO WE DISCUSSED THINGS ALL THE TIME, AND IF HE HAD A

16   PROBLEM WITH SOMETHING, HE WAS ALWAYS TRYING TO FIGURE IT OUT,

17   LIKE HOW CAN I STOP THIS?  SOMETIMES WE'RE LAYING IN THE BED

18   AND HE'LL GET UP.  LIKE, "HONEY, WHERE ARE YOU GOING?"  HE

19   SAID, "I JUST THOUGHT OF SOMETHING.  I'M HAVING A PROBLEM WITH

20   THIS AND IF I DO THAT."  SO HE LOVED IT, AND HE ALWAYS HAD

21   RAILROAD ON THE MIND.

22   **Q.**   OKAY.  AND HOW MANY DAYS A WEEK DID HE NORMALLY WORK?

23   **A.**   SOMETIMES SEVEN WITH A COUPLE DAYS OFF, SOMETIMES FIVE.

24   IT JUST KIND OF ROTATED.  'CAUSE WHAT HE DID WAS, HE WOULD TRY

25   TO ROTATE WITH HIS TRACK INSPECTORS.  WHEN THEIR DAYS WERE OFF

02:03  1  --

2  **Q.**    UH-HUH.

3  **A.**    -- HE WOULD TRY TO FILL IN SO THEY COULD HAVE THEIR DAYS,

4  TOO.

5          SO HE WOULD HAVE SET DAYS OFF AND THEN HE WOULD

6  ROTATE.  SO I JUST CAN'T REMEMBER HOW THE ROTATION GOES.  BUT

7  FIVE DAYS, SEVEN DAYS, A COUPLE DAYS OFF.  SO I JUST CAN'T

8  REMEMBER THE ROTATION RIGHT NOW.

9  **Q.**    I UNDERSTAND.

10  **A.**    YES, SIR.

11  **Q.**    HE DID WHAT HE HAD TO DO?

12  **A.**    YES, SIR.

13  **Q.**    OKAY.  AND DID HE SHARE WITH YOU HIS UNDERSTANDING OF HIS

14  DUTIES AND RESPONSIBILITIES FOR UNION PACIFIC?

15  **A.**    YES, SIR.

16  **Q.**    AND WHAT DID HE TELL YOU ABOUT THAT?

17  **A.**    WELL, WHEN HE FIRST STARTED, HE WAS A MANAGER IN TRAINING.

18  AND WITH THAT BEING SAID, THEY TRAINED HIM HOW TO BE THE

19  MANAGER OF TRACK MAINTENANCE.  HE EVENTUALLY GOT THE MANAGER OF

20  TRACK MAINTENANCE JOB.  AND WHAT THAT MEANS, HE WAS SUPPOSED TO

21  MAINTAIN THE TRACKS OF A PARTICULAR TERRITORY, MAINTAIN THE

22  SAFETY.  BECAUSE ON THOSE TRACKS, THERE ARE PASSENGER CARGO,

23  ALL TYPES OF THINGS GOING.  IT COULD BE CHEMICALS.  IT COULD

24  JUST BE CORN FLAKES.  IT COULD BE -- YOU KNOW, IT'S JUST --

25  IT'S WHATEVER IS BEING TRANSPORTED.  AND IN THIS AREA A LOT OF

02:04   1   CHEMICALS GO ACROSS IT.

2   **Q.**   I SEE.

3          AND DID HE EXPRESS A FEELING OF PERSONAL

4   RESPONSIBILITY FOR SAFETY?

5   **A.**   ABSOLUTELY.

6   **Q.**   OKAY.

7   **A.**   IT'S NOT ON MY WATCH.  HE WAS LIKE I DON'T WANT THINGS TO

8   GO SIDEWAYS ON MY WATCH.

9   **Q.**   OKAY.

10   **A.**   HE FELT LIKE HE WAS THE -- THE TERM THAT THEY WOULD USE IN

11   THE RAILROAD -- AS FAR AS WHAT HE WOULD TELL ME, 'CAUSE HE

12   WOULD SPEAK RAILROAD TO ME, SO I LEARNED A FEW OF THE TERMS.

13   **Q.**   OKAY.

14   **A.**   AND HE WOULD SAY "THEY MADE ME THE OWNER OF THE TRACK.

15   I'M RESPONSIBLE."  HE SAID, "IF ANYTHING GOES WRONG, I'M

16   RESPONSIBLE."

17   **Q.**   OKAY.  AND DID HE EXPRESS TO YOU THAT AT SOME POINT IN

18   TIME HE BELIEVED THAT UNION PACIFIC STARTED RETALIATING AGAINST

19   HIM?

20   **A.**   YES, SIR.

21   **Q.**   AND ABOUT WHEN WAS THAT POINT IN TIME, GENERALLY SPEAKING?

22   **A.**   GENERALLY, IN THAT 2017, LATE -- KIND OF LATE '17ISH.

23   **Q.**   OKAY.  AND DID HE EVER DISCLOSE TO YOU THERE WAS A CHANGE

24   IN LEADERSHIP OR SUPERVISION AT UNION PACIFIC?

25   **A.**   YES.  YES.  YOU KNOW, THOSE ARE THINGS YOU ALWAYS TALK

02:05  1   ABOUT, SO WE'RE GETTING NEW LEADERS.  SO HE DID TELL ME.

2   **Q.**   AND WAS THAT ABOUT THE SAME TIME?

3   **A.**   YES, SIR.

4   **Q.**   OKAY.  AND WHAT DID HE RELAY TO YOU?

5   **A.**   THERE WAS A CHANGE IN HOW -- THE WAY THAT HE RELAYED IT

6   TO ME -- HE WOULD COME HOME WITH GRIEVANCES IN THE WAY IN WHICH

7   THESE PARTICULAR LEADERS WERE TREATING HIM DIFFERENTLY.  AS IN

8   THE SAME ISSUES THAT HE WOULD BRING TO THE PREVIOUS LEADERS

9   THAT HAD THE SAME POSITION, THEY WOULD TREAT HIM DIFFERENTLY.

10  LIKE, IF HE'D TELL THEM SOMETHING, THEY'D JUST TAKE HIS WORD

11  FOR IT OR THEY WOULD GET TOGETHER, FIGURE OUT A PLAN VERSUS:  I

12  TOLD YOU TO DO THIS, NOW GO DO THAT, YOU KNOW, WITHOUT THEM

13  MEETING.

14          MANY TIMES HE WOULD TELL ME "KEN SITO IS COMING,"

15  WHICH IS ONE OF THE OLDER ONES, OLDER MANAGEMENT TEAM.  OR, YOU

16  KNOW, JUST WHATEVER -- I CAN'T REMEMBER THEIR NAMES.  BUT PAST,

17  YOU KNOW, LEADERS WOULD COME AND HAVE MORE CONVERSATION WITH

18  HIM VERSUS -- FROM WHAT HE WAS TELLING ME AND FROM WHAT I WAS

19  SEEING, AND THAT THEY WAS MORE OF GO DO THIS AND GO DO THAT.

20  IT'S LIKE ALMOST -- THIS IS MY WORDS -- ALMOST, TO ME, LIKE A

21  BULLY-TYPE.  I'M NOT SAYING THEY WERE, BUT THAT'S HOW IT --

22  OUTSIDE LOOKING IN, LOOKING AT MY HUSBAND, IT SEEMED AS IF HE

23  WAS GETTING MORE, GO DO WHAT I TELL YOU VERSUS LET'S WORK

24  TOGETHER.

25  **Q.**   OKAY.

02:06 1   **A.**   AND IT WAS AFFECTING HIM.

2   **Q.**   SO PREVIOUSLY MR. TAYLOR AND HIS SUPERVISORS WOULD DISCUSS

3   ISSUES AND TRY TO JOINTLY ARRIVE AT SOLUTIONS?

4   **A.**   YEP.

5               **MS. SCHOONMAKER:**  OBJECTION.  FORM, LEADING.

6               **MR. SMITH:**  I'LL REPHRASE THE QUESTION.

7               **THE COURT:**  THANK YOU.

8   **BY MR. SMITH:**

9   **Q.**   WHAT, GENERALLY SPEAKING, WOULD THE -- MR. TAYLOR AND THE

10   PRIOR SUPERVISORS TRY TO ACCOMPLISH DURING THESE DISCUSSIONS?

11   **A.**   OKAY.  I'M JUST GONNA USE AN EXAMPLE.  IF SOMETHING IS

12   GOING ON WITH A SITUATION AT A TRACK AND HE'D SAY, OH, I GOT A

13   PROBLEM OVER HERE OR A PROBLEM OVER THERE THAT HE COULDN'T

14   HANDLE, HE WOULD GO TO HIS SUPERIORS AND SAY, HEY, THIS IS THE

15   PROBLEM.  AND THEY MAY SAY, WELL, I DON'T THINK THIS IS WHAT IT

16   IS.  AND HE'LL SAY, WELL, YEAH, IT IS.  AND THEN THEY MAY --

17   THEN THEY'D FIND OUT A WAY, AND THEY WOULD COME WITH HIM AND

18   COME AND SEE WHAT'S GOING ON SO THAT THEY COULD RECTIFY THE

19   PROBLEM, LIKE THEY WOULD GET TOGETHER, LOOK AT THE LOCATIONS OR

20   SEND INFORMATION BACK AND FORTH.

21   **Q.**   DID MR. TAYLOR SERVE IN THE UNITED STATES ARMY?

22   **A.**   YES, SIR.

23   **Q.**   AND TELL US HOW THAT MILITARY EXPERIENCE, IN YOUR VIEW,

24   AFFECTED HIS DEALING WITH AUTHORITY.

25   **A.**   WELL, ACTUALLY, WHEN I FIRST STARTED DATING MR. TAYLOR, HE

02:08 1   WAS ALREADY IN THE RESERVE.  HIS PARENTS SIGNED FOR HIM TO GO

2   IN EARLIER THAN 18.  SO THAT WAS INGRAINED IN HIM BEFORE WE --

3   WE KNEW EACH OTHER BUT WE WEREN'T DATING YET.  SO HE WAS

4   ALREADY IN THE MILITARY.

5        SO WE BELIEVE IN THE CHAIN OF COMMAND, GO TO YOUR

6   SUPERIORS, GET THE HELP THAT YOU NEED THROUGH THEM.  I MEAN,

7   WE'RE -- MY CHILDREN WERE BORN AT THE MILITARY BASE.  WE WERE A

8   MILITARY FAMILY.  SO CHAIN OF COMMAND, FOLLOWING RULES, THAT'S

9   IMPORTANT IN OUR FAMILY.

10  **Q.**   AND RESPECT FOR AUTHORITY?

11  **A.**   OH, ABSOLUTELY.

12  **Q.**   HAVE YOU EVER KNOWN MR. TAYLOR TO BE INSUBORDINATE?

13  **A.**   NO, NOT TO MY KNOWLEDGE.

14  **Q.**   WOULD MR. TAYLOR EVER GET ANGRY FOR LITTLE OR NO REASON?

15  **A.**   NO.

16  **Q.**   OKAY.  NOW, DO YOU RECALL A TIME WHEN MR. TAYLOR WAS PUT

17  ON ADMINISTRATIVE LEAVE?

18  **A.**   YES, SIR.

19  **Q.**   OKAY.  AND DO YOU RECALL ABOUT WHEN THAT WAS?

20  **A.**   YES, SIR.

21  **Q.**   OKAY.  AND WHEN WAS THAT ABOUT?

22  **A.**   JANUARY 29.

23  **Q.**   OKAY.  OF WHAT YEAR?

24  **A.**   OF 2018.

25  **Q.**   OKAY.  AND WHERE WERE YOU AT THE TIME THAT HE WAS PLACED

02:09 1   ON ADMINISTRATIVE LEAVE, IF YOU RECALL?

2   **A.**   I WAS WITH HIM.   THAT PARTICULAR WEEK HAD BEEN AN USUAL

3   WEEK.   I THINK HE HAD BEEN CORNERED OFF TO SEPARATE MEETINGS

4   AND SOME THINGS HAD HAPPENED.   HIS BLOOD PRESSURE WAS UP.   HE

5   WASN'T DOING WELL THAT DAY.   SO I WAS DRIVING HIM AROUND TO

6   WHERE WE NEEDED TO GO.   I CAN'T REMEMBER IF I -- TO THE

7   PHARMACY, THE DOCTOR -- I JUST CAN'T REMEMBER WHERE.   BUT

8   WHEREVER WE HAD TO GO, I DROVE HIM THAT DAY, 'CAUSE HE WASN'T

9   -- HEADACHE, BLOOD PRESSURE, ALL THAT.   SO I WAS WITH HIM.

10          AND AT THIS POINT I THINK WE MAY HAVE STOPPED TO --

11   WE STOPPED TO GET SOMETHING TO EAT, I BELIEVE.

12   **Q.**   OKAY.

13   **A.**   AND OUR TELEPHONE IS CONNECTED TO OUR DOOR.   AT HOME WE

14   HAVE A SECURITY SYSTEM, AND THE TELEPHONE RANG AND WE SAW THE

15   DOORBELL ON THE PHONE.   AND HE LOOKED DOWN AND HE SAID, "IT

16   LOOKS LIKE A UNION PACIFIC TRUCK."   AND HE SHOWED IT TO ME.   HE

17   SAID, "WHO ARE THESE PEOPLE?"   AND WE WERE TRYING TO FIGURE IT

18   OUT.   AND HE SAID, "I THINK THAT'S PHILLIP," WHO IS PHILLIP

19   HAWKINS.   HE SAID, "LET ME CALL.   LET'S SEE WHAT'S GOING ON."

20          I SAID, "WELL, MAYBE" -- THIS WAS ME THINKING.   I

21   SAID, "MAYBE THEY'RE COMING TO CHECK ON YOU BECAUSE YOU DIDN'T

22   GO THAT DAY."   HE CALLED AND HE TOLD THEM HIS SITUATION.   HE

23   WASN'T FEELING GOOD, ALL WHAT WAS GOING ON.   HE WAS -- BLOOD

24   PRESSURE UP, YOU KNOW, AND ALL OF THAT.   AND I THOUGHT, I

25   GUESS, STILL HOLDING ON TO HOPE, BEING NAIVE, THINKING THEY

02:11 1  COMING TO CHECK ON HIM.

2  **Q.**   OKAY.  WHAT HAPPENED?

3  **A.**   I BELIEVE MY HUSBAND CALLED HIM AND SAID, "HEY, I SAW YOU"

4  -- "WAS THAT YOU AT MY DOOR?"  I THINK IT WAS KENNY STUART HE

5  SPOKE WITH ON THE PHONE.  AND I THINK THEY SAID, "YEAH."  AND

6  HE WAS LIKE, "WHAT'S GOING ON?"  AND THEY WAS LIKE, "WELL, WE

7  JUST WANTED TO STOP BY AND TALK TO YOU."

8          SO WE PROCEEDED TO HEAD HOME.  AND WE WENT HOME AND

9  THEY CAME LATER ON.  AND WHEN THEY DID, I THINK I ANSWERED THE

10  DOOR.  I SAW MR. HAWKINS, WHICH I'VE KNOWN HIM, YOU KNOW, IN

11  PASSING THROUGH THE RAILROAD FOR YEARS 'CAUSE WE -- YOU KNOW,

12  I'VE BEEN WITH MY HUSBAND, WE BEEN THERE SINCE 2007.  WE'VE

13  BEEN IN DIFFERENT TERRITORIES, BUT I KNEW MR. HAWKINS.

14          MR. STUART, I DIDN'T KNOW.  I SAW HIM AND I WAS LIKE,

15  "COME IN.  HI, PHILLIP." AND THEY STEPPED IN.  AND I BELIEVE

16  MR. STUART SAID, "I NEED TO TALK TO JOHNNY," AND HE STEPPED IN.

17  AND I REMEMBER SAYING -- BECAUSE THAT'S JUST HOW I AM.  I

18  REMEMBER SAYING -- STICKING MY HAND OUT SAYING, "HOW YOU

19  DOING?"  THAT'S WHAT YOU SAY FIRST.  HE SAID -- KIND OF SNAPPED

20  OUT, "OH, HOW YOU DOING?" AND SHOOK MY HAND.

21          I WAS LIKE, OKAY, AND WE KIND OF CHUCKLED.  AND HE

22  JUST KIND OF HAD A LOOK.  AND I'M STANDING THERE NOT REALLY

23  KNOWING WHAT TO DO, 'CAUSE I DIDN'T THINK IT WAS THAT.  I

24  THOUGHT THEY WAS LIKE, "HEY, HOW YOU DOING?  WHAT'S GOING ON?"

25          AND A FEW MOMENTS LATER, THEY SAID, "WELL, WE'RE

02:13 1     GONNA PUT YOU ON ADMINISTRATIVE LEAVE."

2     **Q.**    DID THEY SAY WHY?

3     **A.**    NO.

4     **Q.**    DID THEY EVER SAY WHY?

5     **A.**    NO.

6     **Q.**    OKAY.  AND THEN WHAT HAPPENED?

7     **A.**    I BELIEVE I -- WELL, I KNOW I GOT REALLY UPSET AND --

8     BECAUSE I'M THINKING NOBODY SAID CAN YOU -- CAN I TALK TO HIM

9     ALONE?  CAN I STEP -- COULD YOU STEP OUT THE ROOM?  COULD YOU

10    -- SO I'M IN THE MIDDLE OF THE WORK THING, ALREADY KNOWING

11    ABOUT THE STRESS AND THE DIFFERENT THINGS THAT'S GOING ON, AND

12    I'M IN THE MIDDLE OF THE WORK THING.  SO I SAT DOWN.

13        AND I DON'T KNOW IF MY HUSBAND ASKED WHY OR I ASKED

14    WHY, BUT THEY STARTED SAYING "WE'RE GONNA HAVE TO GET THE

15    TRUCK."  AND I DIDN'T THINK SO MUCH ABOUT THAT.  "BRING US THE

16    KEYS.  WE NEED THE KEYS TO THE TRUCK."  AND I'M LIKE, "OKAY,"

17    AND I'M SITTING THERE LOOKING.  AND I'M LIKE, OKAY, THE KEYS TO

18    THE TRUCK.  AND I'M SITTING THERE.  AND NOBODY SAID, WELL, MS.

19    TAYLOR, YOU NEED TO -- YOU KNOW, I'M JUST SITTING.

20        THEN IT'S LIKE, CAN YOU BRING THE CELL PHONE, THE

21    COMPANY CELL PHONE, COMPANY LAPTOP, I THINK THE P-CARD.

22    EVERYTHING THAT WOULD ALLOW HIM TO DO HIS JOB, AND IT WAS LIKE

23    THEY WOULD JUST -- LIKE WANTED TO STRIP EVERYTHING RIGHT THERE

24    IN FRONT OF ME, LIKE.  AND I THINK WHEN -- NO.  WHEN THEY SAID,

25    GIVE ME YOUR -- GIVE ME THE LAPTOP, GIVE ME THE PHONE, THAT

02:15 1  STRUCK ME MORE THAN THE P-CARD AND THE TRUCK, 'CAUSE THE TRUCK

2  THEY COULD USE IT WHILE HE'S ON ADMINISTRATIVE LEAVE.  THE

3  P-CARD, SOMEONE COULD USE IT WHILE HE'S ON ADMINISTRATIVE

4  LEAVE.

5  **Q.**    OKAY.

6  **A.**    BUT HE WASN'T FIRED, AND YOU STRIPPED HIM DOWN LIKE IN

7  FRONT OF ME.  LIKE YOU STRIPPED HIS -- TO ME, THAT DAY WAS LIKE

8  A FIRING BECAUSE YOU STRIPPED HIM DOWN IN -- JUST IN FRONT OF

9  ME OF LIKE I WAS OF NO CONSEQUENCE.

10  **Q.**    DID THEY TAKE MR. TAYLOR'S WORK TRUCK, LAPTOP, AND CELL

11  PHONE?

12  **A.**    YES, SIR.

13  **Q.**    OKAY.  AND DID YOU ASK EITHER ONE OF THE GENTLEMEN WHAT

14  THEY WERE DOING AND WHY?

15  **A.**    I DID.

16  **Q.**    AND WHO RESPONDED?

17  **A.**    IT WAS MR. HAWKINS, BECAUSE THAT'S WHO I ADDRESSED BECAUSE

18  I KNEW HIM.  I ACTUALLY SAID TO HIM, "PHILLIP, WHY ARE YOU

19  LETTING THEM DO THIS?  NOW, YOU KNOW MY HUSBAND EAT, BREATHE,

20  SLEEP RAILROAD.  WHAT ARE YOU DOING AND WHY ARE YOU DOING IT?"

21  AND I WAS GETTING -- I WAS CRYING.  I LOST IT.  I WAS GETTING

22  HYSTERICAL.  EVEN MY HUSBAND, HE WALKED OVER TO ME AND PATTED

23  ME ON THE CHEST AND SAID "CALM DOWN.  IT'S OKAY.  IT'S GONNA BE

24  ALL RIGHT.  CALM DOWN," BECAUSE HE DIDN'T WANT ME THAT UPSET

25  AND I WAS.

02:16 1                  AND ONE OF THE REASONS COULD BE BECAUSE I HAD SOME

2       HEALTH ISSUES.  I'VE HAD A STROKE BACK IN 2015 WHILE HE WAS

3       WORKING WITH THE RAILROAD, AND HE SOMETIMES GET CONCERNED ABOUT

4       CERTAIN LEVELS OF UPSETNESS [SIC], AND HE WAS LIKE "JUST CALM

5       DOWN."  AND I WASN'T EVEN WORKING AT THAT PARTICULAR TIME.

6       **Q.**   AND SO DID THEY LEAVE THEN AFTER THAT?

7       **A.**   AT THAT POINT MY HUSBAND WENT TO GET HIS THINGS, TO GET

8       THE THINGS THEY WANTED.  WHEN HE DID STEP TO THE BACK -- I'M

9       STILL UPSET.  I THINK HE TOLD THEM "JUST GET OUT OF THE HOUSE,"

10      'CAUSE I THINK I UPSETTED [SIC] HIM LIKE EVEN MORE BECAUSE I

11      WAS UPSET BECAUSE THE SITUATION WAS SO -- SO I STEPPED OUTSIDE.

12      AND I WENT TO THE TRUCK WHERE PHILLIP WAS, AND I KEPT ASKING

13      HIM, "WHAT IS GOING ON?  WHY IS HE ON ADMINISTRATIVE LEAVE?"

14      AND HE WAS ONLY -- THE ANSWERS HE WAS GIVING ME WAS "ALL I KNOW

15      IS THEY TOLD ME TO COME GET THE TRUCK," AND I'M LIKE "BUT I

16      DON'T UNDERSTAND."  I SAID, "WHAT'S THE REASON?  YOU DIDN'T

17      GIVE HIM A REASON.  WHY DID THEY TELL YOU TO DO THIS?  WHY AT

18      MY HOUSE?"  LIKE WHY DID YOU --  AND AFTER THAT, MY HUSBAND

19      CAME OUT AND TOLD ME, LIKE, NO, DON'T -- HE GRABBED ME, LIKE,

20      NO, GO IN THE HOUSE.  YOU'RE UPSET, GO.  HE JUST THREW THE

21      STUFF TO THEM AND SAID, "GO IN THE HOUSE."  HE SAID, "YOU

22      UPSET, GO."  HE DIDN'T WANT ME TO CONTINUE TO TALK TO THEM AND

23      BE UPSET.  BUT I DID ASK PHILLIP MORE THAN ONCE BECAUSE I HAVE

24      KNOWN HIM.

25                  MR. STUART HAD ALREADY WALKED TO HIS TRUCK, WHICH WAS

02:18 1  PARKED OUT BY THE SIDE OF THE STREET.

2  **Q.**   OKAY.

3  **A.**   THE TRUCK MY HUSBAND HAD WAS PARKED IN THE DRIVEWAY.  SO

4  THAT'S THE ONE MR. PHILLIP HAWKINS WAS GONNA DRIVE.

5  **Q.**   THIS VISIT TO YOUR HOME UPSET YOUR HUSBAND?

6  **A.**   YES.

7  **Q.**   DESCRIBE HOW.

8  **A.**   THAT WAS VERY -- YOU KNOW, IT MADE YOU -- IT WAS

9  EMBARRASSING.  IT WAS DISRESPECTFUL.  I PERSONALLY FELT

10  VIOLATED BECAUSE THIS PARTICULAR EVENT SHOULD NEVER HAVE GONE

11  DOWN IN MY HOME.  IT WAS NASTY.

12       THE REASON I SAY IT'S NASTY, I -- MY HUSBAND DOESN'T

13  COME TO MY JOB AND, YOU KNOW, THEY REPRIMAND ME.  MY JOB

14  DOESN'T -- EXCUSE ME.  MY JOB DOESN'T COME TO MY HOME AND SAY,

15  HEY, WE'RE GOING TO REPRIMAND YOU FOR WHAT YOU'VE DONE.  YOU

16  BROUGHT THIS INTO MY HOUSE.  LIKE, YOU COULD -- THEY COULD HAVE

17  CALLED AND SAID, HEY, MEET ME HERE OR -- IT WAS A VIOLATION TO

18  OUR HOME.

19       SO HE WAS HIGHLY UPSET.  I WAS HIGHLY UPSET.  IT WAS

20  JUST A DISRUPTION, JUST A DISRUPTION.  IT'S SOMETHING THAT

21  EMASCULATES A PERSON.  HE'S THE BREADWINNER.  HE'S THE ONE

22  THAT'S CARRYING ALL THE BILLS AT THAT TIME.  OUR WHOLE LIFE WAS

23  BUILT AROUND UNION PACIFIC FROM 2007.

24       I DIDN'T HAVE A CAREER BECAUSE I FOLLOWED HIM AROUND

25  AND GOT JOBS AT RETAILERS BECAUSE THEY WERE THE ONES THAT WERE

02:19 1    PROVIDING.  THAT WAS MY FAMILY, UNION PACIFIC FAMILY.

2    **Q.**   DID IT CROSS YOUR MIND THAT IT WAS UNUSUAL FOR THEM TO

3    COME TO YOUR HOME?

4    **A.**   IT WAS VERY UNUSUAL TO ME.

5    **Q.**   AND WHY SO?

6    **A.**   BECAUSE THIS IS MY HOME.  YOU DON'T HANDLE WORK BUSINESS

7    AT MY HOME.  I HAVE BEEN AT TIMES A HR SUPERVISOR AT TWO

8    DIFFERENT PLACES.  IT WAS RETAIL PLACES.  BUT JUST LOOKING AT

9    CERTAIN THINGS, IT WOULD LOOK OFF TO ME.  THAT'S NOT SOMETHING

10   YOU DO AT A PERSON'S HOME.

11   **Q.**   OKAY.  DO YOU RECALL A MEETING IN LAFAYETTE THAT YOUR

12   HUSBAND ATTENDED?

13   **A.**   YES, SIR.  BECAUSE WE HAD A NEW GRANDBABY BORN AT THAT

14   TIME.

15   **Q.**   OKAY.

16   **A.**   WE WERE GONNA GO AND SEE.

17   **Q.**   AND WHAT WAS APPROXIMATELY THE DATE OF THAT?

18   **A.**   I BELIEVE THAT WAS THE 31ST OF JANUARY.

19   **Q.**   OKAY.  AND DID YOU GO TO THAT MEETING WITH HIM, OR DID YOU

20   TALK TO HIM AFTER HE CAME BACK?

21   **A.**   I BELIEVE I RODE IN THE VEHICLE AND WAITED ON HIM BECAUSE

22   WE WERE GONNA GO TO -- I BELIEVE THAT'S HOW IT WENT.  BUT I DO

23   KNOW WE WERE GONNA TRAVEL, SO I ABSOLUTELY WAS NOT IN THE

24   MEETING.

25   **Q.**   OKAY.  AND WHAT DO YOU RECALL AFTER THE MEETING OF YOUR

02:20 1   HUSBAND?

2   **A.**   I RECALL HIM TELLING ME THAT HE WAS -- THEY WERE WANTING

3   HIM TO SIGN SOME PARTICULAR LETTER, LIKE A PIP LETTER, YOU

4   KNOW, STATING CERTAIN THINGS IN THERE THAT HE DIDN'T AGREE WITH

5   THAT.  AND USUALLY JUST -- THIS IS JUST PASSING, JUST IN TIMES

6   IN PASSING, WHEN PEOPLE ARE PUT ON THOSE LETTERS, THEY'RE

7   USUALLY LOOKING FOR A WAY TO TERMINATE THEM.  THAT'S JUST MY

8   OPINION.

9   **Q.**   OKAY.  AND WHAT HAPPENED AFTER THE INCIDENT WITH LAFAYETTE

10  AND AFTER THE VISIT TO YOUR HOME, WITH RESPECT TO MR. TAYLOR'S

11  EMPLOYMENT AND THE RELATIONSHIP WITH HIS EMPLOYMENT?

12  **A.**   WELL, THEY PUT HIM ON THAT ADMINISTRATIVE LEAVE.  AND THE

13  THING ABOUT IT, WHEN THEY TOOK ALL HIS COMMUNICATIONS, IT MADE

14  EVERYTHING DIFFICULT TO FIND OUT WHAT NEEDS TO BE DONE.

15           SO THEY PUT HIM ON THE ADMINISTRATIVE LEAVE.  HE WAS

16  ON THAT.  AT FIRST THEY SAID IT WAS PAID; THEN THEY SAID IT

17  WASN'T PAID.  BUT IT ENDED UP BEING PAID.  BUT IT WAS A LOT OF

18  CONFUSION.  SO IT ENDED UP BEING PAID ADMINISTRATIVE LEAVE UP

19  UNTIL WE GOT TO THIS FINAL TERMINATION DATE.

20  **Q.**   OKAY.  HOW MUCH LONGER WAS IT, MS. TAYLOR, BEFORE YOUR

21  HUSBAND WAS TERMINATED?

22  **A.**   FEBRUARY 27.

23  **Q.**   OKAY.  HOW DID YOU FIND OUT ABOUT THE FACT THAT HE WAS

24  TERMINATED?

25  **A.**   HE RECEIVED A COMMUNICATION -- HAD TO BE A PHONE CALL.

02:22  1    **Q.**   OKAY.

2    **A.**   'CAUSE HE HAD NO OTHER COMMUNICATIONS WITH THE COMPANY AT

3    THAT TIME -- TO MEET THE DIRECTORS AT STARBUCKS, AT OUR

4    STARBUCKS IN GONZALES, LOUISIANA, NEAR TANGER MALL NOT FAR FROM

5    MY HOME.

6    **Q.**   ALL RIGHT.

7    **A.**   AND HE MET THEM.  I BELIEVE IT WAS MARK WHEELAND AND

8    KENNETH STUART, I BELIEVE.

9              **THE COURT:**  I CAN'T HEAR YOU.  YOUR VOICE ISN'T

10   CARRYING.

11   **A.**   I'M SORRY.  I'M SORRY.  HE WAS TOLD TO MEET TWO OF THE

12   DIRECTORS AT STARBUCKS IN GONZALES, LOUISIANA, NEAR THE TANGER

13   MALL.  AND WHEN HE DID GO TO THAT MEETING, I BELIEVE HE WAS

14   SERVED WITH A TERMINATION NOTICE.

15   **BY MR. SMITH:**

16   **Q.**   NOW, DID YOU SEE HIM AFTER HE RETURNED FROM THE MEETING?

17   **A.**   YEAH.  YEAH.

18   **Q.**   WHAT DID YOU OBSERVE WITH REGARD TO YOUR HUSBAND AT THAT

19   PARTICULAR TIME?

20   **A.**   HE WAS IN SHOCK, I THINK.  I KNOW I WAS IN SHOCK.  SO WE

21   WERE KIND OF DAZED, BUT HE HAD THIS LOOK LIKE IT'S -- LIKE WE

22   GONNA FIGHT IT.  IT'S GONNA BE OKAY.  WE GONNA FIGHT IT.

23   BECAUSE -- I GUESS WE JUST COULDN'T -- I COULDN'T BELIEVE IT

24   HAD GOTTEN THAT FAR.

25              AND WITH HIM, HE WAS JUST -- I DON'T KNOW, HE WAS

02:24 1   JUST LOOKING AT ME LIKE IT'S -- HE WAS IN A DAZE.  BUT AT THE

2   SAME TIME I FELT LIKE TRYING TO GIVE ME THAT HOPE LIKE IT'S

3   GONNA BE ALL RIGHT, YOU KNOW, BUT HE WAS, YOU KNOW, IN A DAZE.

4   AND I WAS, I DEFINITELY WAS IN A DAZE.  I COULD NOT BELIEVE IT.

5   I WAS SHOCKED.  I WAS SHOCKED.  OVER TEN YEARS, I WAS SHOCKED.

6   **Q.**   OKAY.  DID THE TERMINATION OF MR. TAYLOR AFFECT YOUR

7   FAMILY FINANCIALLY?

8   **A.**   YES, SIR.

9   **Q.**   IN WHAT WAYS?

10  **A.**   WELL, YOU GOT TO THINK I WASN'T WORKING AT THE TIME.  MY

11  HUSBAND MADE OVER $100,000 A YEAR, AND HE WAS LOOKING FOR JOBS.

12  HE WENT AS FAR AS TO TEXAS DOING INTERVIEWS.  HE WAS LOOKING

13  FOR JOBS.  HE WAS TRYING TO FIND THEM.  HE'D HAVE AN INTERVIEW

14  HERE, AN INTERVIEW THERE, NOTHING WOULD STICK.  YOU'RE PULLING

15  ALL YOUR LIFE'S SAVINGS OUT.  YOU'RE PULLING EVERYTHING OUT.

16        I WENT AND GOT A -- WENT BACK TO -- 'CAUSE I'D

17  PREVIOUSLY WORKED FOR THE JCPENNEY CORPORATION.  IT HAD CLOSED

18  DOWN ANOTHER LOCATION, SO I GOT BACK INTO THAT COMPANY BECAUSE

19  OF THAT AND I STARTED WORKING.  AND I HAVE A DAUGHTER THAT'S

20  TRYING TO HELP US.

21        MY HUSBAND ONLY PROBABLY MAKES, I DON'T KNOW,

22  40,000-SOMETHING THOUSAND A YEAR FROM $100,000.  I DON'T MAKE

23  THAT MUCH.  WE ARE TRYING TO NOT LOSE EVERYTHING.

24  **Q.**   OKAY.

25  **A.**   RIGHT NOW, RIGHT NOW.

02:25 1    **Q.**   YOUR HUSBAND ULTIMATELY FOUND A JOB AS A PUBLIC SCHOOL

2    TEACHER?

3    **A.**   HE DID.  HE DID.

4    **Q.**   OKAY.  BUT BEFORE HE FOUND A JOB, DID HE WORK HARD TO FIND

5    ANOTHER JOB?

6    **A.**   YES.  YES.  HUNDREDS AND HUNDREDS OF APPLICATIONS.  YOU'RE

7    CONSTANTLY ON THE COMPUTER, AND YOU'RE GETTING OFF AND THE GO

8    TO AN INTERVIEW, THINK YOU GOT IT AND -- OR THE NOT CALL BACK.

9    **Q.**   AT THE TIME THAT -- OF THE TERMINATION, WERE YOU EMPLOYED,

10   MS. TAYLOR?

11   **A.**   I WAS NOT.  I WAS NOT.  I ENDED UP GETTING A JOB THAT --

12   LIKE NEXT MONTH IN MARCH, AROUND THERE, I THINK, IN MARCH.

13   'CAUSE THE TERMINATION HAPPENED RIGHT AT THE END, SO I JUMPED

14   ON IN THERE AND SAID, I GOT TO GO BACK TO WORK.

15   **Q.**   YES.

16        THE NEXT SERIES OF QUESTIONS I WANT TO ASK YOU ABOUT

17   IS HOW, IF AT ALL, THE TERMINATION AFFECTED YOUR HUSBAND AND

18   YOUR HUSBAND' LIFE.  AND I'M JUST GOING TO ASK YOU TO ANSWER

19   THE QUESTIONS AND I'LL FOLLOW-UP WITH SOME DETAILS FOR THAT.

20   **A.**   YES, SIR.

21   **Q.**   IF YOU CAN.

22   **A.**   OKAY.

23   **Q.**   OKAY.  GO AHEAD.

24   **A.**   WELL, HIM BEING -- HE MARRIED ME OUT OF MY MOM AND DAD'S

25   HOUSE.  HE PROMISED MY DADDY HE WAS GONNA ALWAYS TAKE CARE OF

02:27 1   ME; THAT WAS A PROMISE HE MADE.  HE SAID, "I'M GONNA ALWAYS

2   TAKE CARE OF HER.  SHE AIN'T GONNA HAVE TO WORRY.  EVEN IF SHE

3   WORK, I'M GONNA TAKE CARE OF HER."

4         SO WHEN THEY SNATCHED -- WHEN THAT JOB WAS TAKEN AWAY

5   AND HE WASN'T GETTING ANYTHING QUICKLY AND MONEY IS DWINDLING

6   DOWN, HE STARTED TO REALLY CHANGE.  HE WAS DEPRESSED, EASILY

7   AGITATED, AGGRAVATED, LOW.

8         I MEAN, I'VE SEEN MY HUSBAND SAD BEFORE, BUT I'VE

9   NEVER SEEN MY HUSBAND DEPRESSED TO THE POINT WHERE HE WOULD

10  JUST -- IT WAS BAD.  HE WOULD SIT IN THE DARK AT TIMES.

11  **Q.**   OKAY.  HOW OFTEN DID HE DO THAT?

12  **A.**   IT BECAME FREQUENT.  IT BECAME MORE AND MORE FREQUENT AS

13  MORE AND MORE REJECTIONS -- JOB, YOU KNOW, OPPORTUNITIES.  HE

14  WOULD GO IN A ROOM, SIT IN THE CHAIR.  A PARTICULAR PAIR OF

15  JOGGING PANTS THAT I ENDED UP LIKE THROWING THEM AWAY BECAUSE

16  THEY WERE LIKE -- HE WOULD PUT THEM ON.  THEY WERE FADED.  AND

17  HE WOULD JUST SIT THERE AND JUST LOOK LIKE -- HE'D TRY TO DO

18  THINGS.

19        HE WAS TRYING TO DO THINGS, LIKE TRYING TO CLEAN UP,

20  TRYING TO COOK.  BUT HE WAS DOING IT WITH SUCH AN EFFORT, AND

21  HE WOULD SAY "YOU DON'T UNDERSTAND."  I CAN'T -- "YOU DON'T

22  UNDERSTAND."  HE WOULD TELL ME "YOU DON'T UNDERSTAND."

23  SOMETIMES HE'D SAY, "I JUST GOT TO GO."

24        THERE WERE TIMES MY HUSBAND LEFT THE HOUSE WITH

25  NOTHING BUT HIS WALLET.  I MEAN, LIKE LEFT FOR -- LIKE LEFT.

02:28 1    Q.   DID YOU HAVE --

2    A.   HE HAD A MENTAL BREAKDOWN, LIKE JUST --

3    Q.   DID YOU EVER HAVE A CONCERN ABOUT SUICIDE?

4    A.   I HAVE THOUGHT ABOUT IT.  I THOUGHT HE DID.  BUT BECAUSE

5    HE NEVER JUST OUT -- YOU KNOW, HE MADE A LITTLE INNUENDO, NEVER

6    OUT SAY:  OH, I'M GONNA KILL MYSELF.  BUT LIKE JUST LEAVE AND

7    YOU DON'T TAKE ANY CLOTHES.  YOU DON'T TAKE NOTHING BUT YOUR

8    WALLET AND HIS PHONE.  HE DID TAKE HIS PHONE.  HE'D SAY, "I

9    JUST HAD TO GO.  I'M OKAY."

10    Q.   OKAY.

11    A.   AND I WOULD CALL AND CALL AND CALL, NOTHING.  CALL AND

12    CALL AND CALL, NOTHING.  THEN HE WOULD FINALLY -- WHEN HE'D

13    COME BACK, I'M LIKE, "YOU OKAY?"  HE'D SAY, "I JUST HAD TO GO."

14    JUST STRANGE BEHAVIOR, JUST BEHAVIOR THAT -- I'VE BEEN KNOWING

15    HIM SINCE I WAS 16 -- HE'S NEVER EXHIBITED.

16    Q.   OKAY.  LET ME ASK YOU THIS.  YOU MENTIONED DEPRESSION.

17    CAN YOU BE MORE SPECIFIC, MS. TAYLOR, ABOUT HOW HIS DEPRESSION

18    MANIFESTED ITSELF AFTER HIS TERMINATION AND WHY IT IS THAT YOU

19    SAY HE WAS DEPRESSED?

20    A.   WELL, JUST THAT SITTING IN THE DARK, THAT BEING TO

21    HIMSELF, THAT -- IT'S KIND OF HARD TO EXPLAIN UNLESS YOU'RE

22    AROUND SOMEONE THAT EXHIBITS -- OR IF YOU'VE HAD IT YOURSELF,

23    EVEN IF YOU'RE IN THE SAME ROOM AND YOU HAVE ACTIVITIES THAT

24    YOU'RE GOING THROUGH, WHETHER IT'S LIKE YOU'RE WATCHING TV OR

25    YOU'RE LIKE, HE'S TRYING TO WATCH TV AND TRYING TO DO THIS, BUT

02:30 1  THEN IT'S LIKE YOU'RE THERE, BUT IT SEEMS HE'S FAR AWAY.

2  EVERYBODY ELSE IS HERE, BUT HE'S LIKE FAR AWAY.

3        JUST HIS DEMEANOR IS LIKE THEY TOOK THAT MILITARY

4  ARCH OUT YOUR BACK AND YOU'RE MORE -- YOU KNOW, HIS DEMEANOR

5  WAS LOW.  HIS SPIRIT WAS LOW.  HE SAID STUFF LIKE -- YOU KNOW,

6  HE WAS TALKING ON A LOWER LEVEL BECAUSE HE WAS FEELING REJECTED

7  BY EVERYONE AT THAT TIME BECAUSE, YOU KNOW, YOU'RE CUT OFF FROM

8  YOUR WORK FAMILY.  AND THEN YOU'RE TRYING TO GET OTHER JOBS AND

9  NOTHING'S HITTING.

10  **Q.**   OKAY.  AND DID MR. TAYLOR EVER EXPERIENCE ANY DEPRESSION

11  BEFORE THE TERMINATION?

12  **A.**   I WOULD THINK HE HAD MORE STRESS.  I WOULD SAY HE HAD SOME

13  STRESS.

14  **Q.**   OKAY.

15  **A.**   BUT NOT THIS DEPRESSION THING THAT HE WAS GOING THROUGH,

16  NO.

17  **Q.**   OKAY.  WHAT ABOUT THE ANXIETY, SAY, STRESS?  DID HE HAVE A

18  PROBLEM WITH ANXIETY BEFORE THE TERMINATION OR SOME PROBLEMS

19  WITH ANXIETY?

20  **A.**   I THINK BEFORE THE TERMINATION HE DID DEVELOP SOME ANXIETY

21  BECAUSE IN '17, HE STARTED TO -- SOME -- DIFFERENT TYPES OF

22  BEHAVIOR BECAUSE HE WAS ANXIOUS AND, YOU KNOW, WORRIED AND

23  TRYING TO DO IT, TRYING TO GET IT DONE, TRYING TO DO THE RIGHT

24  THING.  SO I THINK HE DEVELOPED SOME OF THAT TYPE OF ANXIETY,

25  BUT NOT THE DEPRESSION.

02:32 1    Q.    OKAY.  AND BEFORE HIS TERMINATION, DID YOU OBSERVE OR

2    BELIEVE THAT THE -- HIS ANXIETY WAS RELATED TO WORK ISSUES?

3    A.    WELL, I KNOW IT WAS BECAUSE WE SPOKE ON IT.  YOU KNOW, WE

4    SPOKE ON CERTAIN THINGS IF HE'S HAVING AN ISSUE.  I MEAN,

5    RAILROAD WAS OUR PILLOW TALK, THAT WAS OUR LIFE.  WE WOULD TALK

6    ABOUT THINGS.  HE'D TELL ME HOW HE'D FEEL OR HOW HE FELT, THE

7    PRESSURE COMING FROM DIFFERENT SIDES, WHETHER IT WAS FROM

8    PRESSURE FROM HIS COMPANY AND PRESSURE FROM THE FEDERAL

9    RAILROAD ADMINISTRATION.  HE WAS LIKE A MAN STUCK IN BETWEEN

10    THE TWO, SO HE WAS TRYING TO DO THE RIGHT THING.  AND ALL THAT

11    PRESSURE AND ANXIETY, HE -- I THOUGHT HE HANDLED IT WELL.  BUT

12    IT WAS GETTING TO HIM.

13    Q.    AND DID THE STRESS AND ANXIETY ON HIS PART INCREASE OR

14    DECREASE OR STAY THE SAME AFTER THE TERMINATION?

15    A.    IT DEFINITELY INCREASED.

16    Q.    OKAY.

17    A.    INCREASED.

18    Q.    AND CAN YOU EXPLAIN HOW IN TERMS OF FREQUENCY AND WHAT HE

19    DID OR SAID?

20    A.    WELL, AT THAT POINT AFTER THE TERMINATION, IT GOT TO THE

21    POINT HE HAD TO GO TO A PSYCHIATRIST.

22    Q.    OKAY.

23    A.    AND TO HELP WITH THE -- HIS -- IT GOT SO BAD HE HAD TO SEE

24    A DOCTOR BECAUSE IT WAS JUST -- AFTER THE TERMINATION IT WAS --

25    HE HAD TO GO SEE A DOCTOR.

02:33 1   **Q.**   OKAY.

2   **A.**   IT WAS TOO MUCH.

3   **Q.**   DID HE SEE THE DOCTOR?

4   **A.**   YES.  HE SEES THE DOCTOR NOW.  I THINK HE SAW HIM -- IT'S

5   BEEN A --

6   **Q.**   DID THE DOCTOR PRESCRIBE MEDICATION FOR DEPRESSION?

7   **A.**   OH, YES.  YES.

8   **Q.**   DO YOU KNOW WHAT KIND OF MEDICATION IT WAS?

9   **A.**   I THINK IT'S ONE CALLED CITALOPRAM OR SOMETHING.

10   **Q.**   OKAY.

11   **A.**   AND EFFEXOR.

12   **Q.**   OKAY.

13   **A.**   I THINK THOSE TWO.

14   **Q.**   DID MR. TAYLOR TAKE THE MEDICATION THAT THE DOCTOR

15   PRESCRIBED?

16   **A.**   YEAH, HE STARTED TAKING IT.

17   **Q.**   DID HE TAKE IT REGULARLY?

18   **A.**   YES.

19   **Q.**   IS HE BETTER NOW?

20   **A.**   YES, HE GOT BETTER.  BUT I THINK WHAT ULTIMATELY -- WHAT

21   MADE HIM BETTER WAS A COMBINATION OF THE MEDICATION, GETTING

22   THE EMPLOYMENT WITH THE SCHOOL SYSTEM AND GOD, HIS FAITH.  HE

23   GOT MORE INTO HIS FAITH.

24   **Q.**   OKAY.

25   **A.**   SO THOSE THREE, THAT THREE-PART COMBINATION, IS WHAT IS

02:34 1   PULLING HIM BACK TO A MORE NORMAL STATE.

2   **Q.**   IS HE THERE YET?

3   **A.**   HE'S PROCESSING.  HE'S GETTING THERE.  BUT THE THING ABOUT

4   IT, THE SITUATION WE'RE IN RIGHT NOW, HE CAN'T BE 100 BECAUSE

5   THERE'S NOT CLOSURE.  YOU CAN'T BE 100 BECAUSE WE'RE STILL IN A

6   STATE WHERE WE STILL COULD LOSE IT ALL.

7   **Q.**   OKAY.

8   **A.**   BECAUSE WE'RE NOT AT THAT FINANCIAL LEVEL WE WERE BEFORE

9   WHEN YOU BUILT YOUR HOME, YOUR BILLS AROUND THE TYPE OF JOB

10   THAT YOU HAVE.

11   **Q.**   OKAY.

12   **A.**   SO IT'S STILL -- AND ALSO, JUST WHAT HAS HAPPENED IS HE

13   STILL HAS -- I SAY A PTSD, OUTSIDE LOOKING IN.

14   **Q.**   YOU'RE NOT A DOCTOR, THOUGH?

15   **A.**   RIGHT.  THAT'S JUST MY THING FOR IT.

16   **Q.**   I UNDERSTAND.

17   **A.**   SO I'M NOT A PROFESSIONAL.  BUT AS HIS WIFE LOOKING AT

18   HIM, HE HAS THOSE -- LIKE, YOU KNOW, FLASHES OF, YOU KNOW,

19   TRYING TO SLEEP, AND THINGS LIKE THAT.  BUT HE'S WAY, WAY

20   BETTER.  HE'S CLOSER TO 100 PERCENT THAN I'VE SEEN IN A LONG

21   TIME.

22   **Q.**   LET'S TALK ABOUT HIS SLEEP.  I THINK YOU SAID IT WAS A

23   SLEEPING ISSUE ALSO?

24   **A.**   YES, SIR.

25   **Q.**   AFTER THE TERMINATION?

02:36 1   **A.**   YES, SIR.

2   **Q.**   CAN YOU DESCRIBE THAT FOR THE JURY, PLEASE?

3   **A.**   YEAH, ALWAYS WORRYING.  I MEAN, HE WOULD -- HE WASN'T ABLE

4   TO SLEEP WELL.  HE WAS GETTING UP, PACING, YOU KNOW, JUST

5   COULDN'T STAY STILL.  YOU KNOW, SLEEP AND JUST GET UP, COME

6   BACK TO BED, GET UP, JUST ALWAYS PACING AROUND, COULDN'T JUST

7   -- COULDN'T REALLY GET GOOD SLEEP.

8   **Q.**   HOW LONG DID THAT LAST AFTER THE TERMINATION?

9   **A.**   HE'S BETTER.  HE'S GETTING MORE SLEEP NOW.  HE'S SLEEPING

10   BETTER THAN HE HAS, BUT HE STILL HAVE SOMETIMES WHERE HE'S A

11   LITTLE RESTLESS.

12   **Q.**   OKAY.  WAS THERE A POINT IN WHICH OR AN APPROXIMATE POINT

13   AT WHICH IT DID GET BETTER?

14   **A.**   OH, YEAH.  SINCE THE -- LIKE SINCE THE MEDICATION AND ALL

15   THAT, THE SLEEPING AT NIGHT, IT'S BETTER.

16   **Q.**   OKAY.

17   **A.**   IT'S WAY BETTER.  BUT THERE ARE STILL SOMETIMES WHERE HE'S

18   A LITTLE ANXIOUS AND A LITTLE RESTLESS, AND THAT MAY BE MORE

19   NORMAL ANXIOUS AND RESTLESSNESS, YOU KNOW, AS SEEING WHAT

20   WE'RE GOING THROUGH RIGHT NOW.

21   **Q.**   AND AFTER THE TERMINATION, ABOUT HOW MANY NIGHTS DID HE

22   HAVE TROUBLE SLEEPING AT FIRST?

23   **A.**   ALL THE TIME.  I MEAN, IT WAS NIGHTLY.  I MEAN, IT'S A NAP

24   HERE, A NAP THERE.  BUT THAT'S NOT KNOWING AND NOT HAVING A JOB

25   THAT NOT -- YOU KNOW, HE'S --

02:37 1  Q.   OKAY.

2  A.   MANY NIGHTS, MOST NIGHTS THAN NOT.

3  Q.   AND THAT GOT BETTER AS WELL?

4  A.   THAT GOT BETTER.

5  Q.   OKAY.  DID MR. TAYLOR HAVE PROBLEMS WITH SLEEPLESSNESS

6  PRIOR TO THE TERMINATION?

7  A.   HE DID HAVE SOME PROBLEMS, MORE SO TOWARDS THE END, LIKE

8  MORE, YOU KNOW, WHEN ALL THE PROBLEMS WERE GOING ON.  HE --

9  BECAUSE HE WAS ALREADY -- HE HAD ALREADY STARTED TRYING --

10  TAKING SOMETHING FROM HIS GENERAL DOCTOR, TELLING HIM HE WAS

11  HAVING A PROBLEM SLEEPING WHEN HE STARTED HAVING MORE AND MORE

12  PROBLEMS ON THE RAILROAD.

13       BUT BEFORE THAT, IT WAS MORE OF THE LIFESTYLE OF

14  CAN'T SLEEP 'CAUSE YOUR PHONE IS RINGING.  HE HAD THE TYPE OF

15  JOB WHERE -- BEFORE ALL THE TROUBLE STARTED, IT WAS MORE OF IF

16  THE PHONE RING AND YOU GOT TO GO OUT, SOMETHING LIKE THAT.  SO

17  JUST NORMAL SLEEPLESSNESS.

18  Q.   WERE THERE THINGS THAT YOUR HUSBAND DID BEFORE THE

19  TERMINATION THAT HE'S NOT BEEN ABLE TO DO OR ENJOY SINCE THE

20  TERMINATION?

21  A.   WELL, IT'S GOTTEN BETTER.  BUT RIGHT AFTER THE -- MY

22  HUSBAND HAS THINGS HE LIKES TO DO.  HE LIKES TO FISH.  HE LIKES

23  TO GOLF.  HE LIKES TO, YOU KNOW, WATCH SPORTS, THINGS LIKE

24  THAT.  UP UNTIL LIKE HE GOT THE JOB, IT WAS -- HE WASN'T

25  PICKING UP -- HE PLAYS THE GUITAR.  WELL, HE DIDN'T PICK THAT

02:39 1    GUITAR UP FOR A VERY LONG TIME.

2    **Q.**    HOW LONG IS A VERY LONG TIME?  ABOUT?

3    **A.**    IT WAS MONTHS AND MONTHS BEFORE LIKE HE TRIED TO PICK IT

4    UP, AND THEN HE STARTED TO PICK IT UP.  HE MIGHT PLAY A COUPLE

5    OF MINUTES AND PUT IT DOWN.

6         YOU KNOW, HE WOULD TRY TO DO THINGS, TRY TO WATCH

7    SPORTS.  HE WASN'T WATCHING AS MANY SPORTS.  YOU KNOW, HE WAS

8    SITTING-IN-THE-CORNER-TYPE OF MODE, JUST THINGS LIKE THAT.

9    **Q.**    OKAY.

10    **A.**    OUR RELATIONSHIP WAS AFFECTED, YOU KNOW, JUST ALL OF THAT.

11    **Q.**    DID HE EXPLAIN TO YOU WHY HE DID NOT DO THOSE THINGS AFTER

12    THE TERMINATION?

13    **A.**    WELL, I KNOW HE WAS JUST DEPRESSED.  HE WAS LIKE I DON'T

14    FEEL LIKE IT.  I JUST DON'T FEEL LIKE IT.  ALL THAT I DON'T

15    FEEL LIKE IT, TRY.  I DON'T FEEL LIKE IT.  YOU KNOW, YOU'RE

16    TRYING BUT IT'S NOT WORKING.

17    **Q.**    OKAY.  ALL RIGHT.  AND HE WAS STILL FREQUENTLY EXPRESSING

18    COMPLAINTS ABOUT THE EFFECT OF THE TERMINATION?

19    **A.**    OH, ABSOLUTELY.  IT WAS SOMETHING WE'D TALK ABOUT ALL THE

20    TIME.  THIS IS OUR LIFE.

21    **Q.**    OKAY.  AND THANK YOU, MS. TAYLOR.

22         **MR. SMITH:**  I TENDER THE WITNESS, YOUR HONOR.

23         **THE COURT:**  CROSS.

24         **MS. SCHOONMAKER:**  YOUR HONOR, I HAVE NO QUESTIONS FOR

25    MS. TAYLOR.

02:40  1          **THE COURT:**  YOU MAY STEP DOWN.

2                  NEXT WITNESS.

3          **MR. SCHMIDT:**  THE PLAINTIFF RESTS, YOUR HONOR.

4          **MR. SMITH:**  ONE THING, SUBJECT TO THE STIPULATION.

5          **MR. SCHMIDT:**  THE STIPULATION REGARDING BACK PAY?

6          **MR. SMITH:**  YES.

7          **THE COURT:**  SUBJECT TO THE STIPULATION THAT YOU

8    ALREADY FILED?

9          **MR. SCHMIDT:**  YES, YOUR HONOR.

10          **THE COURT:**  OKAY.  THE PLAINTIFF RESTS.

11                  **(PLAINTIFF RESTS)**

12          **THE COURT:**  ARE YOU GOING TO HAVE A MOTION?

13          **MR. WADSWORTH:**  YOUR HONOR, THE DEFENDANT REQUESTS

14    THE OPPORTUNITY TO MAKE A MOTION.

15          **THE COURT:**  ALL RIGHT, LADIES AND GENTLEMEN.  WE'RE

16    GOING TO BREAK A LITTLE EARLIER THAN WE HAD PLANNED, SO WE WILL

17    BE IN RECESS UNTIL 3:30.

18          **(WHEREUPON, THE JURY EXITED THE COURTROOM.)**

19          **THE COURT:**  GO AHEAD.

20          **MR. WADSWORTH:**  YES, YOUR HONOR.  DEFENDANT, UNION

21    PACIFIC, MOVES FOR A JUDGMENT AS A MATTER LAW UNDER THREE

22    COMPONENTS.

23          **THE COURT:**  I CAN'T HEAR YOU.  USE THE MICROPHONE.

24          **MR. WADSWORTH:**  YES, YOUR HONOR.  IS THAT BETTER,

25    YOUR HONOR?

02:42 1    **THE COURT:**  YES.

2              WHY DON'T YOU COME TO THE PODIUM.

3    **MR. WADSWORTH:**  SURE.

4              IS THAT BETTER, YOUR HONOR?

5    **THE COURT:**  YES.

6    **MR. WADSWORTH:**  YOUR HONOR, DEFENDANT, UNION PACIFIC,

7    MOVES FOR A JUDGMENT AS A MATTER OF LAW UNDER THREE COMPONENTS.

8              THE FIRST BEING MR. TAYLOR'S CASE.  HE HAS FOUR

9    ELEMENTS.  ONE OF THOSE ELEMENTS IS THAT HE MUST PROVE THAT HIS

10   PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR IN THE ADVERSE

11   EMPLOYMENT ACTION OF THE TERMINATION HERE.  UNION PACIFIC

12   POSITS THAT MR. TAYLOR HAS NOT MET HIS OBLIGATIONS UNDER THAT

13   ELEMENT.

14             THE SECOND COMPONENT THAT UNION PACIFIC MOVES ON

15   IS ITS AFFIRMATIVE DEFENSE.  UNION PACIFIC BELIEVES THAT THE

16   EVIDENCE HAS SHOWN SO FAR THAT UNION PACIFIC WOULD HAVE

17   TERMINATED MR. TAYLOR FOR INSUBORDINATION REGARDLESS OF WHETHER

18   HE HAD ENGAGED IN PROTECTED ACTIVITY.

19             AND LASTLY, YOUR HONOR, UNION PACIFIC MOVES FOR

20   A JUDGMENT AS A MATTER OF LAW ON PUNITIVE DAMAGES.  UNION

21   PACIFIC MAINTAINS THAT THERE WAS INADEQUATE EVIDENCE TO SHOW

22   THAT UNION PACIFIC WAS WILLFUL OR NEGLIGENT IN TERMS OF

23   COMPLYING WITH THE FEDERAL RAIL SAFETY ACT, YOUR HONOR, AND I'M

24   HAPPY TO DISCUSS IT IN MORE DETAIL IF YOU PREFER.

25   **THE COURT:**  NO, I THINK I FOLLOW YOU.  THANK YOU.

02:43   1            **MR. WADSWORTH:**  THANK YOU, YOUR HONOR.

        2            **THE COURT:**  MR. SCHMIDT.

        3            **MR. SCHMIDT:**  YOUR HONOR, I'M GOING TO COME STEP UP

        4     HERE, IF THAT'S OKAY?

        5            **THE COURT:**  YES.

        6            **MR. SCHMIDT:**  YOUR HONOR, PLAINTIFF OPPOSES THE

        7     MOTION, OF COURSE.

        8                 WITH RESPECT TO THE CONTRIBUTING FACTOR ELEMENT,

        9     THE JURY COULD REASONABLY FIND THAT HIS PROTECTED ACTIVITY WAS

       10     A CONTRIBUTING FACTOR IN HIS TERMINATION.  WE HAVE TEMPORAL

       11     PROXIMITY OF A PERIOD OF APPROXIMATELY TWO MONTHS BETWEEN MR.

       12     TAYLOR REMOVING THE SWITCH 16 TRACK OUT OF SERVICE AND REMOVING

       13     A SLOW ORDER, REFUSING TO PUT THE TRACK BACK INTO SERVICE AND

       14     REFUSING TO TAKE THE SLOW ORDER OFF AND HIS TERMINATION IN

       15     FEBRUARY OF 2018.  APPROXIMATELY TWO MONTHS BEFORE THAT HE WAS

       16     A GREAT PERFORMER, ACCORDING TO UNION PACIFIC.

       17                 DUE TO THE TEMPORAL PROXIMITY, DUE TO

       18     INDICATIONS OF PRETEXT, THE CASE LAW SAYS THAT THE CONTRIBUTING

       19     FACTOR ELEMENT CAN BE SHOWN BY INDICATIONS OF PRETEXT.

       20                 HERE, WE HAVE MANAGERS DISAGREEING WITH EACH

       21     OTHER OVER EXACTLY WHAT HAPPENED.  MR. WHEELAND TESTIFIED THAT

       22     MR. GILSDORF AND MR. STUART DID TELL MR. TAYLOR TO PUT THE

       23     TRACK BACK INTO SERVICE.  BOTH OF THESE INDIVIDUALS DENIED IT

       24     DURING THEIR TESTIMONY.  THESE THINGS ARE INDICATIVE OF

       25     PRETEXT.

02:45  1          ALSO, MR. WHEELAND, WHO WAS THE DECISION-MAKER,

2   WHO MADE THE DECISION TO TERMINATE MR. TAYLOR, WAS GIVEN

3   INCORRECT AND INCOMPLETE INFORMATION BY MR. GILSDORF IN ORDER

4   TO GET MR. TAYLOR TERMINATED.

5          FOR INSTANCE, HE FAILED TO MENTION -- WHEN HE

6   SAID THAT MR. TAYLOR REFUSED TO PROVIDE THESE MEASUREMENTS TO

7   MR. STUART OR THAT HE REFUSED TO REDO THEM -- THAT HE HAD JUST

8   REDONE THE MEASUREMENTS FOUR DAYS PRIOR TO THAT.  ALSO FAILED

9   TO MENTION TO MR. WHEELAND THAT THE TIES THAT HE WAS

10  INSTRUCTING MR. TAYLOR TO COUNT WERE ENCASED WITHIN CONCRETE.

11  MR. WHEELAND ALSO ACKNOWLEDGED THAT IT WOULD NOT HAVE BEEN

12  POSSIBLE FOR MR. TAYLOR TO COUNT THOSE TIES WHILE THEY WERE

13  ENCASED IN CONCRETE.

14          AS FOR THE SECOND POINT, UNION PACIFIC ARGUES

15  THAT IT HAS SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT THEY

16  WOULD HAVE TERMINATED MR. TAYLOR ANYWAY DUE TO INSUBORDINATION.

17  CLEAR AND CONVINCING EVIDENCE IS THE STANDARD THAT UNION

18  PACIFIC HAS TO MEET IN ORDER TO MAKE THIS AFFIRMATIVE DEFENSE.

19  THE EVIDENCE HAS NOT SHOWN THAT MR. TAYLOR WAS -- HAD COMMITTED

20  INSUBORDINATION BY ANY STANDARD, AND CERTAINLY NOT CLEAR AND

21  CONVINCING EVIDENCE.  THE JURY COULD REASONABLY BELIEVE MR.

22  TAYLOR'S TESTIMONY WHICH, IF BELIEVED, SHOWS THAT HE WAS NOT

23  INSUBORDINATE.

24          MR. STUART REQUESTED SOME INFORMATION FROM HIM.

25  HE EXPLAINED WHAT THE SITUATION WAS, THAT HE HAD JUST RETAKEN

02:46 1   THE MEASUREMENTS, AND MR. STUART INSTRUCTED HIM TO PUT THE

2   TRACK BACK INTO SERVICE.  HE REFUSED.  MR. STUART SAYS, OH,

3   WELL, MR. TAYLOR JUST REFUSED TO REDO THE MEASUREMENTS.  IT'S

4   UP TO THE JURY TO DECIDE WHO TO BELIEVE ON THAT.

5          THE SAME THING WITH THE INCIDENT WITH MR.

6   GILSDORF.  MR. GILSDORF CLAIMS THAT MR. TAYLOR WAS

7   INSUBORDINATE BY SIMPLY REFUSING TO COUNT THE TIES UNDERNEATH

8   THAT TRACK.  MR. TAYLOR SAID, NO, I DID NOT REFUSE TO COUNT

9   THOSE TIES.  I COULDN'T COUNT THE TIES BECAUSE THEY WERE UNDER

10  CONCRETE, AND I TOLD THEM THAT.  IT IS UP TO THE JURY TO DECIDE

11  WHO TO BELIEVE ON THAT.

12          FURTHER, THE CASE LAW HAS ALSO NOTED THAT WHERE

13  THE PROTECTED ACTIVITY IS INEXTRICABLY INTERTWINED WITH THE

14  REASON FOR TERMINATION, THAT THAT SHOWS THE TERMINATION WAS

15  CAUSED BY THE PROTECTED ACTIVITY.

16          HERE, THE INSTANCES IN WHICH THEY'RE CLAIMING HE

17  WAS INSUBORDINATE INVOLVED -- DIRECTLY INVOLVED HIS PROTECTED

18  ACTIVITY:  ONE, WAS TAKING THE SWITCH 16 OUT OF SERVICE.  THEY

19  CLAIM HE WAS INSUBORDINATE IN CONNECTION WITH THAT.  THE SECOND

20  ONE WAS PLACING THE SLOW ORDER.  THEY CLAIM HE WAS

21  INSUBORDINATE IN CONNECTION WITH THAT.  IT CANNOT BE REMOVED

22  FROM THE PROTECTED ACTIVITY.

23          FINALLY, AS TO PUNITIVE DAMAGES, UNION PACIFIC

24  -- IT WOULD BE INAPPROPRIATE TO GRANT JUDGMENT AS A MATTER OF

25  LAW AS IT COMES TO PUNITIVE DAMAGES BECAUSE AS WE'VE DISCUSSED,

02:48 1   THERE ARE INDICATIONS OF PRETEXT.  WE HAVE MANAGERS FLATLY

2   CONTRADICTING EACH OTHERS' ACCOUNTS.  THESE ARE THINGS THAT A

3   JURY COULD FIND TO INDICATE THAT UNION PACIFIC WAS TRYING TO

4   COVER UP AN IMPROPER PURPOSE.  YOU KNOW, IF THAT'S THE CASE,

5   THEN THEY WERE AT LEAST NEGLIGENT IN BREAKING THE LAW, IF NOT

6   INTENTIONAL.

7            SO, YOUR HONOR, WE OPPOSE DEFENDANT'S MOTION AND

8   RESPECTFULLY SUBMIT THAT JUDGMENT AS A MATTER OF LAW WOULD NOT

9   BE APPROPRIATE IN THIS CASE.

10           **THE COURT:**  OKAY.  THE COURT HAS HEARD AND CONSIDERED

11   THE ARGUMENTS ON THE JUDGMENT AS A MATTER OF LAW.  THE COURT IS

12   GOING TO DENY THE RULE 50 MOTION FOR THE FOLLOWING REASONS:

13   THE ELEMENT THAT THE PROTECTED ACTIVITY BE A CONTRIBUTING

14   FACTOR, THE TEMPORAL PROXIMITY, AS POINTED OUT BY PLAINTIFF'S

15   COUNSEL -- ANOTHER WORD FOR THAT, THE TIMING OF THE JOB ACTION

16   -- IS ENOUGH TO WARRANT GOING FURTHER AND SUBMITTING THAT

17   MATTER TO THE JURY OR AT LEAST GOING THROUGH THE REST OF THE

18   DEFENSE'S CASE IN CHIEF.

19           AS TO THE AFFIRMATIVE DEFENSE, THE CLEAR AND

20   CONVINCING BURDEN OF PROOF ON THE AFFIRMATIVE DEFENSE IS A

21   BULWARK THAT UNION PACIFIC HAS NOT CROSSED.  THERE ARE

22   QUESTIONS OF FACT AS TO WHETHER OR NOT THE PRINCIPAL MOTIVATION

23   WAS INSUBORDINATION OR JOB PERFORMANCE AND WHETHER OR NOT

24   THOSE -- AND THERE ARE QUESTIONS OF FACT AS TO WHETHER OR NOT

25   THERE WAS CONSENSUS AMONG THE UNION PACIFIC PEOPLE AS TO WHAT

02:50 1   THE NATURE AND EXTENT OF THOSE JOB PERFORMANCE ISSUES WERE,

2   PARTICULARLY IN LIGHT OF THE FACT THAT JUST THREE MONTHS OR TWO

3   MONTHS BEFORE THE TERMINATION -- OR ACTUALLY A MONTH BEFORE THE

4   TERMINATION -- MR. TAYLOR HAD THE SAME JOB PERFORMANCE

5   EVALUATION, ESSENTIALLY THE SAME RATING, THAT HE HAD FOR FIVE

6   YEARS RUNNING OR AT LEAST FOUR YEARS RUNNING, AS THE COURT

7   RECALLS THE EVIDENCE.

8           SO THE COURT DOES NOT FIND THAT UNION PACIFIC

9   HAS CARRIED OR THAT -- I MEAN, IT'S KIND OF ODD BECAUSE YOU'VE

10  GOT THE BURDEN ON THE AFFIRMATIVE DEFENSE, SO UNION PACIFIC

11  REALLY NEEDS TO COME FORWARD WITH THAT IN ITS CASE IN CHIEF.

12          SO THE COURT DOES NOT FIND THAT THERE'S A REASON

13  TO GRANT JMOL ON THAT, AS WELL AS THE PUNITIVE DAMAGES.  THE

14  RECORD NEEDS TO BE DEVELOPED FURTHER WITH RESPECT TO THE

15  DEGREE, IF ANY, OF WILLFULNESS IN RESPECT TO THE FEDERAL SAFETY

16  ACT.  AND SO THE COURT WILL DENY THE MOTION FOR JUDGMENT AS A

17  MATTER OF LAW AND IT CAN BE REURGED AT THE CLOSE OF THE CASE.

18          OKAY.  NEXT, I'M GOING TO ASK THE LAW CLERK TO

19  GIVE YOU THE JURY INSTRUCTIONS.  AS I READ THROUGH THEM, BOTH

20  BEFORE COMING TO TRIAL AND THEN AS I READ THEM THROUGH BRIEFLY

21  AS WE'VE BEEN OF THE BENCH, IT DOESN'T LOOK LIKE THERE ARE A

22  LOT OF STARK ISSUES.  I MEAN, YOU'VE GOT MOSTLY FIFTH CIRCUIT

23  ON THIS SIDE AND SOME FIFTH CIRCUIT AND SOME EIGHTH CIRCUIT ON

24  THIS SIDE.  THE EIGHTH CIRCUIT IS NOT TERRIBLE.  BUT I CAN TELL

25  YOU THAT IF THE FIFTH CIRCUIT IS SILENT, I'M PROBABLY NOT GOING

02:51 1    TO GIVE AN EIGHTH CIRCUIT, JUST BECAUSE THEY DON'T GRADE MY

2    PAPERS.

3               BUT LET'S HAVE A CHARGE CONFERENCE IN THE

4    MORNING.  I THINK WHAT WE DO, SINCE WE'VE MADE PRETTY GOOD

5    PROGRESS -- IT LOOKS LIKE YOU'LL GET AT LEAST A WITNESS UNDER

6    YOUR BELT THIS AFTERNOON.  I WILL HAVE TO CLOSE COURT AT 5:30

7    BECAUSE I HAVE A 6:00 APPOINTMENT.  SO IF WE GET BACK ON THE

8    RECORD AT 3:30, YOU'VE GOT TWO HOURS.

9               LET'S LET THE JURY COME IN TOMORROW AT 10:00,

10    AND WE CAN HAVE A CHARGE CONFERENCE FIRST THING IN THE MORNING

11    IN CHAMBERS AT 9:00.  I THINK WE CAN PROBABLY MAKE SOME PRETTY

12    GOOD PROGRESS, GET ANOTHER DRAFT OUT TO YOU.  AND THEN IF WE

13    NEED TO DO IT AGAIN, WE CAN HAVE A FURTHER CHARGE CONFERENCE AT

14    NOON.  BUT AS I LOOK AT THEM, I THINK THAT -- I THINK WE'RE

15    GOING TO BE ABLE TO MAKE SOME -- I'M GOING TO BE SURPRISED IF

16    THERE ARE GOING TO BE ANY OBJECTIONS.  I THINK WE'RE GOING TO

17    BE ABLE TO WORK IT OUT.

18               AND I WANT TO SAY YOU ALL HAVE WORKED

19    MAGNIFICENTLY TOGETHER, AND I APPRECIATE IT VERY MUCH.  IT

20    MAKES MY JOB A LOT EASIER WHEN EVERYBODY HAS DONE THEIR

21    HOMEWORK AND KNOWS WHAT THE ISSUES ARE.

22               SO WE WILL BE IN RECESS UNTIL 3:30.

23            **(WHEREUPON, THE COURT WAS IN RECESS.)**

24         **THE COURT:**  ALL RIGHT.  WE CAN BRING IN THE JURY.

25               WHILE HE'S GETTING THE JURY, SHE'S GOING TO GIVE

03:37 1   THE COPIES OF THE JURY INSTRUCTIONS.  YOU WILL SEE -- I DON'T
      2   REMEMBER WHICH PAGE IT'S ON -- WHERE IT INDICATES TO SUPPLY
      3   SOME LANGUAGE ON THE BACK PAY QUESTION.  I WENT ROUND AND ROUND
      4   WITH THAT, AND I DECIDED, YOU KNOW WHAT?  RATHER THAN ME TRY TO
      5   DO IT, Y'ALL SUPPLY SOME LANGUAGE.  WE'LL TALK ABOUT THAT IN
      6   THE MORNING, BUT I THINK WE'LL HAVE IT IN PRETTY GOOD SHAPE.
      7   AND SHE'S GOING TO GIVE YOU THE VERDICT FORM, TOO.  THERE'S A
      8   QUESTION ON BACK PAY SO THAT MAY -- YOU MAY WANT TO LOOK AT
      9   THAT ONE AS WELL.
     10            **(WHEREUPON, THE JURY ENTERED THE COURTROOM.)**
     11            **THE COURT:**  OKAY.  BE SEATED.
     12                 OKAY.  SORRY FOR THE SHORT DELAY.  I'M GOING TO
     13   TELL YOU WHAT I THINK THE SITUATION IS.  THIS BUILDING WAS
     14   BUILT ON WHAT USED TO BE THE OLD STATE PENITENTIARY GROUNDS
     15   MANY, MANY, MANY YEARS AGO.  THERE'S SOME PRISON GRAVEYARDS
     16   THAT WERE EXCAVATED WHEN THE BUILDING WAS BUILT, SO WE HAVE
     17   POLTERGEISTS.  I'M NOT KIDDING.  THAT'S A BATTERY-OPERATED
     18   CLOCK, BECAUSE THERE'S A CLOCK THAT'S ON THE WALL THERE THAT
     19   HAS BEEN REPAIRED LIKE -- I DON'T KNOW -- 20 TIMES AND IT WOULD
     20   NEVER WORK BECAUSE THE CLOCK POLTERGEIST DOESN'T WANT IT TO
     21   WORK.  AND NOW WE APPARENTLY HAVE A COMPUTER OR A CABLE OR -- I
     22   MEAN, WE OVERCAME THE CLOCK POLTERGEIST, SO NOW WE HAVE ANOTHER
     23   ONE.  SO DON'T BE HERE AFTER DARK.
     24                 ALL RIGHT.  DEFENDANTS MAY CALL THEIR FIRST
     25   WITNESS.

03:39 1          **MR. FRASER:**  WE CALL MR. PHILLIP HAWKINS, JUDGE.

2          **THE COURT:**  OKAY, SIR.

3                    **PHILLIP P. HAWKINS, JR.,**

4  **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

5          **THE COURT:**  AND ONCE YOU GET SITUATED, SIR, YOU CAN

6  TAKE YOUR MASK OFF.  THANK YOU.

7                    GO AHEAD.

8                    **DIRECT EXAMINATION**

9  **BY MR. FRASER:**

10  **Q.**  ALL RIGHT.  WOULD YOU TELL US YOUR FULL NAME, PLEASE, SIR?

11  **A.**  PHILLIP PAUL HAWKINS, JR.

12  **Q.**  AND HOW OLD ARE YOU, MR. HAWKINS?

13  **A.**  FIFTY-FOUR.

14  **Q.**  AND WHO DO YOU WORK FOR?

15  **A.**  UNION PACIFIC RAILROAD.

16  **Q.**  ALL RIGHT.  LET ME ASK YOU JUST A FEW BACKGROUND

17  QUESTIONS.

18                    WHAT KIND OF EDUCATION DO YOU HAVE?

19  **A.**  HIGH SCHOOL, COMPUTER SCHOOL, A COUPLE YEARS OF COLLEGE.

20  **Q.**  ALL RIGHT.

21  **A.**  AND MILITARY.

22  **Q.**  ALL RIGHT.  HOW MANY YEARS WITH UNION PACIFIC?

23  **A.**  TWENTY-FOUR, RIGHT AT 25.  IT WILL BE 25 JANUARY 13.

24  **Q.**  ALL RIGHT.  I'D LIKE TO RUN THROUGH THE JOBS THAT YOU HAVE

25  HELD, BUT IN ADDITION -- AND THEY'VE ALL BEEN IN THE TRACK

03:40  1    DEPARTMENT.  IS THAT CORRECT?

2    **A.**    THAT'S CORRECT.

3    **Q.**    ALL RIGHT.  IN ADDITION TO JUST NAMING THEM, I'D LIKE YOU

4    TO TELL ME THE NAME OF THE JOB, AND THEN LET'S TALK ABOUT IT

5    JUST A MINUTE SO THESE FOLKS UNDERSTAND WHAT THESE JOBS ARE,

6    ALL RIGHT.

7              WHERE DID YOU START?

8    **A.**    I STARTED AS A TRACK LABORER.

9    **Q.**    ALL RIGHT.  WERE YOU WORKING BY YOURSELF OR ARE YOU IN A

10   GROUP?

11   **A.**    I WORKED WITH A GANG.

12   **Q.**    ALL RIGHT.  AND JUST GENERALLY, JUST REAL QUICK, WHAT DID

13   Y'ALL DO?

14   **A.**    TRACK REPAIRS.

15   **Q.**    ALL RIGHT.  BY HAND?

16   **A.**    YES.

17   **Q.**    PICKS AND SHOVELS?

18   **A.**    PICKS AND SHOVELS, MAULS, JACKS.

19   **Q.**    ALL RIGHT.

20   **A.**    ALL HAND TOOLS.

21   **Q.**    AND AFTER WORKING WITH THAT TRACK GANG, WHAT WAS YOUR NEXT

22   POSITION?

23   **A.**    MY NEXT POSITION WAS A TRUCK DRIVER.

24   **Q.**    ALL RIGHT.

25   **A.**    A TRUCK OPERATOR, WHICH CONSISTED OF OPERATING A CRANE

03:41 1  THAT WAS ALSO ON THE TRUCK ALSO.

2  **Q.**   ALL RIGHT.  WHAT WOULD YOU DO WITH THAT TRUCK?  WOULD IT

3  RUN ON THE RAILS OR ON THE ROAD?

4  **A.**   ON THE HIGHWAY AND ON THE RAIL.

5  **Q.**   ALL RIGHT.  WHEN IT RAN ON THE RAIL, WHAT WAS ITS PURPOSE?

6  **A.**   OUR PURPOSE WAS TO GO OUT AND DO TRACK REPAIRS.

7  **Q.**   ALL RIGHT.

8  **A.**   STILL DOING TRACK REPAIRS.

9  **Q.**   ALL RIGHT.  AND AFTER BEING A TRUCK OPERATOR, WHAT WAS

10  YOUR NEXT JOB?

11  **A.**   ASSISTANT FOREMAN.

12  **Q.**   OF THE TRACK GANG?

13  **A.**   OF THE TRACK GANG.

14  **Q.**   ALL RIGHT.  AND AS ASSISTANT FOREMAN, DID YOU HAVE DUTIES

15  WHEN IT CAME TO ASSIGNING WORK TO OTHER PEOPLE?

16  **A.**   I BASICALLY ASSISTED THE FOREMAN IN GIVING OUT

17  INSTRUCTIONS AND FOLLOWING THROUGH ON THE INSTRUCTIONS THAT

18  WERE GIVEN.

19  **Q.**   ALL RIGHT.  AFTER ASSISTANT FOREMAN?

20  **A.**   FOREMAN.

21  **Q.**   ALL RIGHT.  HOW MANY MEN WERE YOU MANAGING AS FOREMAN OF

22  THE TRACK GANG?

23  **A.**   AS A FOREMAN?  JUST FOUR AND MYSELF.

24  **Q.**   DID Y'ALL HAVE ANY EQUIPMENT, LIKE TRUCKS WITH YOU?

25  **A.**   THE SAME GANG THAT I WAS THE TRUCK DRIVER ON, I BECAME THE

03:42 1   FOREMAN ON.

2   **Q.**   ALL RIGHT.

3   **A.**   SO IT WAS STILL THE SAME GANG.

4   **Q.**   LET ME ASK YOU THIS.  IN DOING THAT WORK, WERE THERE

5   SAFETY RULES THAT THE RAILROAD HAD IN PLACE?

6   **A.**   YES.

7   **Q.**   ALL RIGHT.  TELL ME ABOUT THE RULES THAT THE RAILROAD HAS.

8   **A.**   BASIC SAFETY RULES.  BUT THERE ARE ALSO POLICIES AND

9   PROCEDURES ON HOW TO DO THE TYPE OF WORK AND THE GUIDELINES

10   THAT WE ACTUALLY USE TO DO THE TRACK REPAIRS.

11   **Q.**   DO YOU HAVE TO LEARN ABOUT THOSE RULES SO THAT WHEN YOU

12   REPAIR THE TRACK OR CONSTRUCT THE TRACK IT MEETS FRA

13   SPECIFICATIONS?

14   **A.**   YES.  MY NEXT JOB WAS A TRACK INSPECTOR JOB WHICH

15   CONSISTED OF ME GOING TO SCHOOL TO LEARN THE FRA GUIDELINES AND

16   THE REPAIR INSTRUCTIONS.  ALL OUT, EVERYTHING THAT I'VE JUST

17   TALKED ABOUT WAS WITHIN MY FIRST YEAR.

18   **Q.**   OKAY.

19   **A.**   SO I WAS ACTUALLY A CERTIFIED TRACK INSPECTOR AFTER EIGHT

20   MONTHS.

21   **Q.**   ALL RIGHT.  TELL US ABOUT GETTING CERTIFIED AS A TRACK

22   INSPECTOR.  WHAT DOES THAT MEAN?

23   **A.**   WELL, ONCE I WENT TO CLASS AND I TOOK THE ACTUAL FRA

24   INSTRUCTIONS -- WELL, WE UTILIZED THE FRA GUIDELINES, THE FRA

25   BOOK, THAT'S THE ACTUAL BOOK THAT WE USED TO INSTRUCT A CLASS.

03:44  1    ONCE I LEARNED ABOUT THE GUIDELINES AND HOW TO REPAIR WHAT'S

2    SUPPOSED TO BE DONE, THEN I WAS CERTIFIED AS AN FRA 213.7

3    QUALIFIED INSPECTOR AND SOMEONE TO BE ABLE TO DO THE REPAIRS.

4    **Q.**    DO YOU ACTUALLY GET A CARD SAYING YOU GOT A CERTIFICATION?

5    **A.**    WE DO.

6    **Q.**    ALL RIGHT.  HAVE YOU EVER LOST YOUR CERTIFICATION?

7    **A.**    NO.

8    **Q.**    ALL RIGHT.  DO YOU KNOW OF PEOPLE WHO HAVE?

9    **A.**    I KNOW OF SEVERAL, ONE OF WHICH JUST RECENTLY LOST IT.

10    **Q.**    ALL RIGHT.  MR. ISAAC TESTIFIED UP HERE FOR US A LITTLE

11    BIT AGO.  WAS HE ONE OF THOSE THAT LOST IT?

12    **A.**    YES.

13    **Q.**    ALL RIGHT.

14              **THE COURT:**  MR. FRASER, YOU'RE MIGHTY SOFT-SPOKEN.  I

15    THINK WE'RE GOING TO HAVE TROUBLE HEARING YOU, SO MAYBE ADJUST

16    THE MIC.

17              **MR. FRASER:**  YES, YOUR HONOR.

18              **THE COURT:**  THANKS.

19    **BY MR. FRASER:**

20    **Q.**    DO YOU KNOW THE CIRCUMSTANCE OF MR. ISAAC LOSING HIS

21    QUALIFICATION?

22    **A.**    BASICALLY FOR NOT PERFORMING THE DUTIES OF A TRACK

23    INSPECTOR FULLY, MISSING INSPECTIONS, TRACKS GOING OVERDUE FOR

24    INSPECTION, BASIC TRACK INSPECTOR DUTIES.

25    **Q.**    ALL RIGHT.  WHEN YOU WERE A TRACK INSPECTOR, DID YOU HAVE

03:45 1    A MANAGER OVER YOU?

2    **A.**    I DID.

3    **Q.**    AND WHAT DO YOU CALL THAT POSITION?

4    **A.**    A MANAGER OF TRACK MAINTENANCE.

5    **Q.**    ALL RIGHT.  IN MR. ISAAC'S CASE, WHO WAS HIS MANAGER OF

6    TRACK MAINTENANCE?

7    **A.**    MR. TAYLOR, MR. JOHNNY TAYLOR.

8    **Q.**    AND HOW LONG WERE YOU A TRACK INSPECTOR?

9    **A.**    FOR FIVE YEARS.

10    **Q.**    ALL RIGHT.  AND JUST SO THESE FOLKS GET AN IDEA OF WHAT A

11    TRACK INSPECTOR DOES, TELL US ABOUT A ROUTINE DAY WHEN YOU'RE

12    INSPECTING MAIN LINE TRACKS, SAY, OUT SOMEWHERE BETWEEN HERE

13    AND LIVONIA.

14    **A.**    YOUR DAY CONSISTED OF ACTUALLY GETTING TRACKING TIMES,

15    SECURING TRACKING TIME.

16    **Q.**    NOW, WHAT DOES THAT MEAN?

17    **A.**    CONTACTING THE DISPATCHER AND ACTUALLY BLOCKING A SECTION

18    OF TRACK TO BLOCK IT SO THE TRAINS WOULDN'T BE IN THE SAME

19    SECTION AS YOU ARE.

20    **Q.**    ALL RIGHT.

21    **A.**    SO IT WOULD BE SAFE FOR YOU TO GO OUT AND DO YOUR --

22    PERFORM YOUR DUTIES.

23    **Q.**    ALL RIGHT.  AND THEN TAKE US FROM THERE.

24    **A.**    ONCE YOU SECURE TRACKING TIME, YOU BASICALLY GO OUT AND

25    LOOK FOR DEFECTS BY FRA SPECIFICATIONS.  IF YOU FIND A DEFECT,

03:46 1    YOU TAKE A MEASUREMENT AND DETERMINE WHAT CLASS OF TRACK IT'S

2    ACTUALLY GOOD FOR.  IF IT'S GOOD FOR CLASS 4, WHICH IS 60 MILES

3    PER HOUR, THEN YOU DON'T HAVE TO DO ANYTHING TO IT.  YOU DO

4    MAKE A NOTE OF IT.  IF IT'S NOT GOOD FOR CLASS 4 TRACK OR 60

5    MPH, THEN YOU SLOW ORDER IT TO THE NEXT CLASS OF TRACK.

6    **Q.**    OKAY.  YOU SAY "TAKE MEASUREMENTS."  WHAT ARE MEASUREMENTS

7    AND WHY ARE THEY IMPORTANT?

8    **A.**    FOR INSTANCE, 60 MPH TRACK, CROSS-LEVEL MEASUREMENTS, IT'S

9    AN INCH AND A QUARTER.  YOU'RE GOING TO BE ALLOWED UP TO AN

10   INCH AND A QUARTER BEFORE YOU HAVE TO REDUCE IT DOWN TO THE

11   NEXT CLASS OF TRACK, THAT IS BY FRA SPECIFICATIONS.

12            SO IF YOU GO OUT AND YOU MEASURE TRACK -- AND YOU DO

13   TAKE UNDER LOAD MEASUREMENTS ALSO.  "UNDER LOAD" MEANS THAT YOU

14   ADD WHATEVER MOVEMENT YOU HAVE TO THE MEASUREMENT TO DETERMINE

15   WHAT CLASS OF TRACK YOU'RE GOOD FOR.

16   **Q.**    ALL RIGHT.  AND IF YOU FIND A DEFECT OF SOME KIND, ARE YOU

17   REQUIRED TO WRITE THAT UP?

18   **A.**    WE ARE.  THERE'S AN FRA INSPECTION THAT YOU PERFORM, AN

19   FRA REPORT THAT YOU DOCUMENT IN.

20   **Q.**    AND ALL IN YOUR -- IN YOUR FIVE YEARS AS A TRACK

21   INSPECTOR, DID ANYBODY AT UNION PACIFIC SUGGEST TO YOU THAT YOU

22   SHOULDN'T WRITE UP DEFECTS?

23   **A.**    NO.

24   **Q.**    WHY IS IT IMPORTANT TO THE RAILROAD TO FIND ANY DEFECTS

25   THAT EXISTS ON THE RAIL?

03:48  1   **A.**   FRA GUIDELINES AND UNION PACIFIC GUIDELINES PROTECT NOT

2   ONLY US, BUT IT PROTECTS THE PUBLIC ALSO.  IT'S IMPORTANT TO

3   FIND OUT OR TO FIND DEFECTS SO YOU DON'T DERAIL A TRAIN.

4   **Q.**   ALL RIGHT.

5   **A.**   THAT'S THE ULTIMATE PROTECTION THAT YOU HAVE.

6   **Q.**   WELL, LET ME ASK YOU THIS.  ARE YOU PRETTY WELL ASSIGNED A

7   TERRITORY AS A TRACK INSPECTOR?

8   **A.**   YOU ARE.

9   **Q.**   ALL RIGHT.  AND DO YOU LEARN YOUR TERRITORY?

10   **A.**   YES.

11   **Q.**   AND IF YOU START SEEING PROBLEMS IN A PARTICULAR AREA, DO

12   YOU PAY SPECIAL ATTENTION TO THAT AREA FROM THEN ON?

13   **A.**   YES.

14   **Q.**   OKAY.  WHAT DO YOU DO WHEN SOMETHING NEEDS FIXING?

15   **A.**   REMEDIATE, REMOVE OR REPAIR.  YOU EITHER SLOW ORDER IT TO

16   THE NEXT LEVEL OF TRACK OR YOU REPAIR IT OR YOU REMOVE IT FROM

17   SERVICE, ONE OF THE THREE.

18   **Q.**   ALL RIGHT.  IS IT POSSIBLE YOU FIND SOMETHING THAT YOU CAN

19   GET OUT AND FIX ON YOUR WAY THROUGH?

20   **A.**   YEAH.  TRACK INSPECTORS ARE REQUIRED TO DO MINOR WORK.

21   **Q.**   OKAY.

22   **A.**   MINOR WORK SUCH AS IF YOU FIND A JOINT BAR THAT HAS ONE

23   BOLT IN IT AND YOU CAN SAFELY PUT THE OTHER BOLT IN IT, THEN

24   YOU MAKE THAT REPAIR.

25   **Q.**   OKAY.  WE'RE GOING TO TALK ABOUT JOINT BARS IN JUST A

03:49  1    MINUTE, SO LET'S EXPLAIN WHAT IT IS.

2              CAN YOU TELL THE JURY WHERE THAT -- WHAT "JOINT BARS"

3    ARE?

4    **A.**   A JOINT BAR IS TWO BARS THAT YOU PUT TOGETHER TO CONNECT A

5    RAIL SECTION.  FOR INSTANCE, IF A RAIL IS EITHER BROKEN OR IT'S

6    CUT WHEN WE CUT OUR DEFECTS OR WE PUT IN A PIECE OF RAIL TO

7    PLACE A BAD PIECE, JOINT BARS ARE APPLIED IN ORDER TO SECURE

8    THE RAILS TOGETHER.

9    **Q.**   YOU MENTIONED BOLTS.  I'M ASSUMING YOU PUT ONE ON EACH

10   SIDE OF THE RAIL AND THEY'RE BOLTS THAT GET PUT ON THE RAIL?

11   **A.**   WELL, IN CWR, IT'S TWO BOLTS PER RAIL END.

12   **Q.**   ALL RIGHT.  AND "CWR" MEANS WHAT?

13   **A.**   CONTINUOUS WELDED RAIL.

14   **Q.**   ALL RIGHT.  SO THERE'S TWO DIFFERENT KINDS OF TRACK,

15   CONTINUOUS WELDED RAIL, AND WHAT'S THE OTHER ONE CALLED?

16   **A.**   JOINTED TRACK.

17   **Q.**   ALL RIGHT.  WHAT'S THE MORE MODERN, SAFER ONE, IN YOUR

18   ESTIMATION?

19   **A.**   CWR.

20   **Q.**   ALL RIGHT.  CONTINUOUS WELDED RAIL?

21   **A.**   CONTINUOUS WELDED RAIL.

22   **Q.**   AND DOES THAT DO AWAY WITH JOINT BARS?

23   **A.**   IT DOES.

24   **Q.**   ALL RIGHT.  AFTER YOU WERE A TRACK INSPECTOR FOR FIVE

25   YEARS, WHERE DID YOU GO FROM THERE?

03:51 1    **A.**    MANAGER OF TRACK MAINTENANCE.

2    **Q.**    OKAY.  AND HOW LONG DID YOU HOLD THAT POSITION?

3    **A.**    TEN YEARS.

4    **Q.**    ALL RIGHT.  LET'S TALK ABOUT BEING A MANAGER OF TRACK

5    MAINTENANCE FOR A MINUTE.  WHO DO YOU HAVE THAT REPORTS TO YOU?

6    WHO DO YOU SUPERVISE OR WHO REPORTS TO YOU?

7    **A.**    THE PEOPLE THAT REPORT TO ME ARE THE GANG MEMBERS:

8    WELDERS, SECTION GANGS, TRACK INSPECTORS.

9    **Q.**    ALL RIGHT.  ARE WELDERS SEPARATE FROM SECTION GANGS?

10    **A.**    YES.

11    **Q.**    ALL RIGHT.  WHAT'S A "SECTION GANG"?

12    **A.**    A SECTION GANG IS A GANG THAT HAS A SPECIFIC SECTION OF

13    TRACK THAT THEY DO REPAIRS ON.  THEY GO OUT AND REPAIR.  THEY

14    INSTALL TIES.  THEY MAY JACK UP A LOW SPOT TO CROSS LEVEL THE

15    SPOT.  THEY MAY ASSIST IN REPAIRING BROKEN RAILS, PRETTY MUCH

16    ALL RAIL REPAIRS.

17    **Q.**    ALL RIGHT.  AND WHAT DO WELDERS DO ON THE RAILROAD?

18    **A.**    WELDERS MAINLY ELIMINATE JOINTS.  THEY WELD FROGS.  THEY

19    WELD SWITCH POINTS.  THEY HELP TO INSTALL SWITCH POINTS, STOCK

20    RAILS, FROGS, BASIC WELDING ACTIVITIES.

21    **Q.**    YOU MENTIONED WELDS JOINTS.  WHAT ARE YOU TALKING ABOUT

22    THAT?

23    **A.**    THE SAME JOINTS, LIKE IF YOU HAD A BROKEN RAIL AND YOU CUT

24    IN A PIECE OF RAIL, YOU ADDED TWO JOINTS TO THE RAILROAD.

25    WELDERS GO OUT AND THEY PERFORM A THERMITE WELD AND ELIMINATE

03:52 1    THAT JOINT, MAKE IT CWR AGAIN.

2    **Q.**    ALL RIGHT.

3    **A.**    IN OTHER WORDS, REMOVE THE JOINT -- A JOINT ELIMINATION.

4    **Q.**    DOES UNION PACIFIC, LIKE A LOT OF RAILROADS, STILL HAVE

5    SOME JOINTED RAIL OUT THERE?

6    **A.**    THERE'S STILL JOINTED RAIL, NOT ON OUR MAIN LINES, MAYBE

7    IN THE YARDS.

8    **Q.**    ALL RIGHT.

9    **A.**    OR INDUSTRIES.

10    **Q.**    AND YOU MENTIONED OTHER PEOPLE THAT YOU MANAGED.  YOU HAD

11    TRACK INSPECTORS THAT WORKED UNDER YOU?

12    **A.**    I DID.

13    **Q.**    HOW MUCH TERRITORY DID YOU MANAGE AS A MANAGER OF TRACK

14    MAINTENANCE?

15    **A.**    WHEN I WAS MANAGER OF TRACK MAINTENANCE, I HAD FIVE

16    DIFFERENT SUBDIVISIONS.  A LITTLE BIT OVER 200 MILES OF TRACK

17    AND A MAJOR HUMP YARD.

18    **Q.**    ALL RIGHT.  SO HOW MANY TRACK INSPECTORS DID YOU HAVE

19    LOOKING AFTER ALL THAT?

20    **A.**    I HAD THREE.  I HAD THREE.

21    **Q.**    ALL RIGHT.  TELL US JUST SO WE'LL UNDERSTAND, HOW OFTEN

22    DOES A TRACK INSPECTOR GO OVER A 60-MILE PER HOUR TRACK ON THE

23    MAIN LINE PER WEEK?

24    **A.**    TWICE A WEEK WITH AT LEAST A ONE-DAY INTERVAL BETWEEN THE

25    INSPECTIONS.

03:53  1   **Q.**   ALL RIGHT.  AND THEN THE TRACK GANGS ARE USED AS

2   NECESSARY, I ASSUME?

3   **A.**   YES.

4   **Q.**   AND WELDERS ALSO?

5   **A.**   CORRECT.

6   **Q.**   ALL RIGHT.

7   **A.**   THE MANAGER SCHEDULES THE WORK.  THE SECTION GANG PERFORMS

8   SECTION-TYPE WORK, AND THE WELDERS PERFORM WELDING ACTIVITIES.

9   **Q.**   ALL RIGHT.  AFTER YOU HAD BEEN A MANAGER OF TRACK

10  MAINTENANCE -- WELL, LET ME ASK YOU HOW MANY YEARS?

11  **A.**   MANAGER OF TRACK MAINTENANCE WAS TEN.

12  **Q.**   AFTER THOSE TEN YEARS, WHAT WAS YOUR NEXT POSITION?

13  **A.**   MANAGER OF TRACK PROJECTS.

14  **Q.**   ALL RIGHT.  WHAT'S THE DIFFERENCE BETWEEN THE TWO JOBS?

15  **A.**   THE MANAGER OF THE TRACK BROUGHT -- THE MANAGER OF TRACK

16  PROJECTS IS THE ASSISTANT DIRECTOR WHEN A DIRECTOR IS OFF.  BUT

17  YOUR BASIC JOB IS TO BUILD PROJECTS.  YOU GO TO EACH MANAGER OF

18  TRACK MAINTENANCE'S TERRITORY AND COMMUNICATE WITH THEM, AND

19  ALSO LOOK AT AREAS THAT WE WANT TO IMPROVE OR UPGRADE.  AND

20  THEN WE BUILD A PROJECT IN ORDER TO DO IT.

21  **Q.**   SO YOU WOULD WORK WITH THE MANAGERS TO FIND OUT WHAT

22  TROUBLE AREAS THEY HAD AND Y'ALL WOULD SCHEDULE SOME WORK?

23  **A.**   YEAH.  AND WE WOULD LOOK AT BUILDING A PROJECT FOR THEM.

24  **Q.**   WHAT RESOURCES DID YOU HAVE THAT YOU COULD THROW INTO A

25  PROJECT LIKE THAT?

03:55 1    **A.**   WELL, WE HAD CAPITAL MONEY.  BUT WE ALSO HAD REGIONAL

2    MONEY IN ORDER TO ASSIST IN.

3    **Q.**   ALL RIGHT.  HOW MANY PEOPLE REPORTED TO YOU WHEN YOU WERE

4    MANAGER OF TRACK PROJECTS?

5    **A.**   MANAGER OF TRACK PROJECTS?  I HAD ABOUT 29 BECAUSE I HAD

6    WELDERS THAT DID PROJECTS, AND I HAD PROJECT GANGS THAT

7    PERFORMED THE PROJECTS ALSO.

8    **Q.**   ALL RIGHT.  AND HOW LONG WERE YOU ON THAT JOB?

9    **A.**   UP UNTIL LAST YEAR.  SO FROM 2016 TO 2020.

10   **Q.**   ALL RIGHT.  AND WHAT ARE YOU DOING THESE DAYS?

11   **A.**   DIRECTOR OF TRACK MAINTENANCE.

12   **Q.**   ALL RIGHT.  JUST SO WE GO BACK AND LOOK AT IT.  YOUR

13   START-UP JOB, YOUR STARTING JOB IS A LABORER?

14   **A.**   CORRECT.

15   **Q.**   A TRACK LABORER, WHO'S A MEMBER OF A GANG?

16   **A.**   CORRECT.

17   **Q.**   THEN YOU CAN BECOME FOREMAN OF THAT GANG?

18   **A.**   ASSISTANT FOREMAN -- WELL, A TRUCK DRIVER, THEN ASSISTANT

19   FOREMAN.

20   **Q.**   ALL RIGHT.

21   **A.**   AND THEN FOREMAN.

22   **Q.**   AND THEN YOU CAN GO INTO TRACK INSPECTING?

23   **A.**   CORRECT.

24   **Q.**   AND AFTER THAT YOU CAN BE A MANAGER OF TRACK MAINTENANCE?

25   **A.**   YES.

03:56 1  **Q.**   AND AFTER THAT IS DIRECTOR.  IS THAT CORRECT?

2  **A.**   MANAGER OF TRACK PROJECTS.

3  **Q.**   MANAGER OF TRACK PROJECTS NEXT.  AND THEN A DIRECTOR OF

4  TRACK MAINTENANCE?

5  **A.**   CORRECT.

6  **Q.**   DO THE MANAGERS OF TRACK MAINTENANCE REPORT TO THE

7  DIRECTOR OF TRACK MAINTENANCE?

8  **A.**   YES.

9  **Q.**   ALL RIGHT.  AND THEN ABOVE DIRECTORS OF TRACK MAINTENANCE,

10  WHO DO YOU REPORT TO NOW?

11  **A.**   MY GENERAL DIRECTOR.

12  **Q.**   ALL RIGHT.  AND WHAT'S HIS JOB TITLE?

13  **A.**   GENERAL DIRECTOR OF MAINTENANCE OF WAY.

14  **Q.**   OKAY.  AND THEN, I GUESS, IT GOES UP FROM THERE?

15  **A.**   YES.

16  **Q.**   CURRENTLY AS DIRECTOR OF TRACK MAINTENANCE, HOW MANY

17  PEOPLE DO YOU HAVE THAT REPORT TO YOU?

18  **A.**   ABOUT 84.

19  **Q.**   OKAY.  IS IT IMPORTANT TO YOU AS A DIRECTOR THAT YOUR

20  MANAGERS GET ALONG WITH YOU?

21  **A.**   YES.  YOU HAVE TO HAVE COMMUNICATION.  IN ORDER TO BUILD A

22  TEAM, YOU HAVE TO COMMUNICATION THROUGHOUT THE TEAM.

23  **Q.**   ALL RIGHT.  AND I GUESS THAT GOES ALL THE WAY DOWN TO THE

24  TRACK WORKERS, ET CETERA?

25  **A.**   CORRECT.

03:57 1    Q.    ALL RIGHT.  CURRENTLY WHO DO YOU REPORT TO?

2    A.    JAKE GILSDORF, JACOB GILSDORF.

3    Q.    ALL RIGHT.  SO HE'S BEEN THROUGH ALL THOSE PROGRESSIONS OR

4    HE MAY HAVE HOPPED SOME.  BUT HE IS NOW IN A POSITION ABOVE

5    YOURS?

6    A.    CORRECT.

7    Q.    DO YOU RECALL WHEN HE ASSUMED THAT POSITION THAT HE'S IN?

8    A.    NO, I DON'T.

9    Q.    ALL RIGHT.  DO YOU REMEMBER THERE BEING SOMETHING THAT HAS

10   BEEN DESCRIBED HERE AS A CHANGE OF LEADERSHIP?

11   A.    WE'VE HAD SEVERAL CHANGES IN LEADERSHIP THROUGHOUT THE

12   YEARS.

13   Q.    WHAT ABOUT BACK TWO OR THREE YEARS AGO?  DO YOU REMEMBER

14   THERE BEING A CHANGE?

15   A.    YEAH, WE RESTRUCTURED THE TERRITORY.

16   Q.    ALL RIGHT.  WHAT DOES THAT MEAN?

17   A.    THAT MEANS THE COMPANY BASICALLY RESTRUCTURED ENGINEERING,

18   AND SOME PEOPLE GOT PROMOTED, SOME PEOPLE GOT MOVED AROUND TO

19   DIFFERENT POSITIONS.

20   Q.    ALL RIGHT.  DID THEY CHANGE THE SUBDIVISIONS, THE

21   GEOGRAPHIC DISTRIBUTION?

22   A.    NO.  THE SUBDIVISIONS STAYED THE SAME.

23   Q.    ALL RIGHT.  WE'VE GOT IN THIS CASE EXHIBIT 12, WHICH IS A

24   PERFORMANCE IMPROVEMENT PLAN.  HAVE YOU EVER HEARD OF A

25   PERFORMANCE IMPROVEMENT PLAN?

03:59 1    **A.**    I HAVE.

2    **Q.**    ALL RIGHT.  I ASK YOU TO TAKE A LOOK AT THIS PERFORMANCE

3    IMPROVEMENT PLAN.  IT'S J-12 AND IT'S ON YOUR -- IT SHOULD BE

4    ON YOUR SCREEN.  CAN YOU IDENTIFY THAT AS WHAT I ASKED YOU TO

5    TAKE A LOOK AT?

6    **A.**    THAT IS THE DOCUMENT.

7    **Q.**    ALL RIGHT.  HERE'S MY SIMPLE QUESTION.  IS THERE ANYTHING

8    ABOUT THAT PERFORMANCE IMPROVEMENT PLAN THAT YOU SEE THAT WOULD

9    CREATE A SAFETY PROBLEM ON THE RAILROAD?

10    **A.**    NO.  THESE ARE BASIC DUTIES OF A MANAGER.

11    **Q.**    SO IN YOUR ESTIMATION AND BASED ON YOUR CAREER, ARE THESE

12    THINGS THAT A MANAGER SHOULD BE DOING ANYWAY?

13    **A.**    THAT'S CORRECT.  THESE ARE BASIC MANAGER DUTIES.

14    **Q.**    LET'S JUST QUICKLY GO DOWN THE TITLES OF THESE HERE.  THE

15    FIRST IS ABOUT COACHES.  TELL US WHAT "COACHING" IS.

16    **A.**    YOU GO OUT AND YOU DO TESTING, AND IF AN EMPLOYEE IS NOT

17    PERFORMING UP TO WHERE HE NEEDS TO BE, YOU COACH HIM TO GET HIM

18    WHERE HE NEEDS TO BE.

19          IN OTHER WORDS, IF HE'S NOT PERFORMING HIS DUTIES UP

20    TO THE EXPECTATIONS, THAT'S THE WAY IN WHICH YOU BRING HIM UP

21    TO THE LEVEL YOU NEED HIM AT.

22    **Q.**    ALL RIGHT.  YOU STARTED OUT BY SAYING WHEN YOU GO OUT AND

23    DO TESTING, WHAT DO YOU MEAN BY "TESTING"?

24    **A.**    WE ACTUALLY GO OUT AND WE MONITOR THE JOB ACTIVITIES OF

25    OUR EMPLOYEES TO MAKE SURE THAT THEY'RE DOING THEM SAFE, THAT

04:01 1  THEY'RE DOING THEM UP TO OUR STANDARDS AND UP TO THE FRA

2  STANDARDS.

3  **Q.**  AND IF EMPLOYEES ARE NOT WORKING SAFE OR WORKING UP TO

4  THOSE STANDARDS, IS THAT SOMETHING THAT CAN BE HELD AGAINST A

5  MANAGER?

6  **A.**  YOU BRING IT TO THEIR ATTENTION.  YOU BRING IT TO THE

7  EMPLOYEE'S ATTENTION.  THE MANAGER IS THE ONE THAT COACHES THE

8  EMPLOYEE.

9  **Q.**  OKAY.  AND TO FIND OUT WHO NEEDS COACHING, HE NEEDS TO GET

10  OUT THERE AND TAKE A LOOK AT THEM.  IS THAT CORRECT?

11  **A.**  YEAH.  HE'S GOT TO GET OUT AND DO AUDITS ON THEM OR

12  PERFORM TEAM TESTING.

13        **MR. SCHMIDT:**  OBJECTION.  IT CALLS FOR SPECULATION.

14  HE'S ASKING HIM SPECIFIC QUESTIONS ABOUT MR. TAYLOR.

15        **THE COURT:**  WELL, IT WAS ALREADY ANSWERED.

16          DO YOU WANT TO RESPOND TO THE OBJECTION, MR.

17  FRASER?

18        **MR. FRASER:**  I'M AFRAID I DON'T QUITE UNDERSTAND IT,

19  YOUR HONOR.

20        **THE COURT:**  ALL RIGHT.  OVERRULED.

21  **BY MR. FRASER:**

22  **Q.**  BELOW COACHING ON THE LIST IS "PLANS, ORGANIZES AND

23  PRIORITIZES."  DO YOU SEE THAT?

24  **A.**  YES.

25  **Q.**  AND UNDER THERE IT TALKS ABOUT STRUCTURES WORK WITH

04:02 1   EFFECTIVE PLANS AND SO ON.  IS THAT SOMETHING THAT YOU ALSO

2   BELIEVE TO BE A REGULAR MANAGER DUTY?

3   **A.**   YES.  IT'S THE MANAGER'S JOB TO PLAN THE WORK FOR THE

4   EMPLOYEES.

5   **Q.**   ALL RIGHT.  THE NEXT CATEGORY IS CALLED "BUILDS TRUST."

6   CAN YOU EXPLAIN WHAT BUILDING TRUST MEANS TO YOU IN A

7   MANAGEMENT CONTEXT?

8   **A.**   BUILDING RELATIONSHIPS WITH THE EMPLOYEES SO THAT WHEN YOU

9   NEED THEM TO PERFORM WORK, THAT THEY'RE DOING IT UP TO YOUR

10   EXPECTATIONS, BUT ALSO JUST HAVING A TRUSTING RELATIONSHIP WITH

11   THEM.

12   **Q.**   ALL RIGHT.  BELOW THAT IS "TEAMWORK."

13   **A.**   THAT'S CORRECT.

14   **Q.**   YOU MENTIONED SOMETHING ABOUT TEAMWORK.  TELL US A LITTLE

15   BIT MORE ABOUT THAT.

16   **A.**   IN ORDER TO HAVE A TRUE TEAM, YOU HAVE TO KNOW THE

17   STRENGTHS AND THE WEAKNESSES OF THE TEAM, AND YOU HAVE TO KNOW

18   EACH EMPLOYEE OR THE TEAM THAT YOU'RE BUILDING, THE PEOPLE THAT

19   ARE ON THE TEAM.  YOU HAVE SPECIFIC DUTIES THAT YOU WANT THE

20   TEAM TO PERFORM.

21          WELL, OF COURSE, SAFETY IS THE ULTIMATE ASPECT THAT

22   YOU WANT.  SO YOU WANT EVERYBODY LOOKING OUT FOR EACH OTHER.

23   SO IF EVERYBODY IS DOING THAT, THE CHANCES OF SOMEBODY GETTING

24   HURT OR SOMEBODY PERFORMING SOMETHING THAT'S NOT UP TO

25   STANDARDS, THE OTHER PERSON WILL CATCH IT.  AND THAT'S WHAT --

04:04 1   WHEN BUILDING A TEAM, THAT'S WHAT THE TEAMWORK IS ALL ABOUT.

2   **Q.**   ALL RIGHT.  DOES UNION PACIFIC HAVE SAFETY MEETINGS?

3   **A.**   YES.

4   **Q.**   TELL US ABOUT THAT.

5   **A.**   WE HAVE MONTHLY SAFETY MEETINGS, AND WHAT WE NORMALLY DO,

6   WE BRING THE GANG TOGETHER.  WE'LL SET UP SPECIFIC ACTIVITIES

7   THAT WE'LL DO DURING A SAFETY MEETING.  IF THERE IS TESTING --

8   TESTS THAT NEEDS TO BE DONE, THEN WE'LL NORMALLY GO THROUGH IT

9   DURING THE SAFETY MEETING.

10   **Q.**   ALL RIGHT.  WHAT DID YOU MEAN BY TESTS THAT NEED TO BE

11   DONE?

12   **A.**   YOU HAVE COMPUTER-BASED TRAINING THAT WE HAVE TO DO

13   YEARLY, AND SOMETIMES THERE'S TESTS THAT COME OUT OR TRAINING

14   THAT COMES OUT DURING THE YEAR.  AND WE SOMETIMES DO IT WITHIN

15   THOSE CONFINES OF THE SAFETY MEETING.

16   **Q.**   ALL RIGHT.  ARE THERE ALSO JOB BRIEFINGS BEFORE WORK?

17   **A.**   JOB BRIEFINGS ARE MANDATORY BEFORE WORK, EVEN AT SAFETY

18   MEETINGS WE HAVE JOB BRIEFINGS.

19   **Q.**   ALL RIGHT.  WHEN YOU WERE A MANAGER OF TRACK MAINTENANCE,

20   HOW OFTEN WOULD YOUR DIRECTOR CALL A MEETING MAYBE BY

21   TELEPHONE, JUST SO THAT Y'ALL WOULD MEET?

22   **A.**   MAINLY THE DIRECTOR PROBABLY ONCE TO TWICE A WEEK.

23   DAY-IN, DAY-OUT ACTIVITIES ARE BASICALLY LEFT TO THE MANAGER TO

24   SET UP, HIS JOB BRIEFINGS, HIS MORNING MEETINGS OR HIS EVENING

25   MEETINGS THAT HE'D DO.

04:06 1  **Q.**  SO THE MANAGERS ARE DOING EVENING MEETINGS WITH THEIR
2  EMPLOYEES?
3  **A.**  YES.  IT'S NOT UNCOMMON FOR A MANAGER TO DO A MORNING
4  MEETING OR, YOU KNOW, IF THERE'S A NEED, THEN DO AN AFTERNOON
5  MEETING.
6  **Q.**  ALL RIGHT.  FROM YOUR REVIEW OF THE PIP, DO YOU SEE
7  ANYTHING IN IT THAT MIGHT CREATE A HAZARD OR A DANGER BECAUSE
8  IT REQUIRES NEGLECTED WORK IN OTHER AREAS?
9  **A.**  NO.  THESE ARE BASIC DUTIES THAT SHOULD BE PERFORMED
10  ANYWAY.
11  **Q.**  THAT'S ALL THE QUESTIONS I HAVE.  THANK YOU, SIR.
12  　　　　　**THE COURT:**  CROSS.
13  　　　　　**MR. FRASER:**  YOUR HONOR, I APOLOGIZE.  I MISSED ONE
14  NOTE AND IF I COULD, ASK ANOTHER QUESTION.
15  　　　　　**THE COURT:**  ANY OBJECTION?
16  　　　　　**MR. SCHMIDT:**  NO OBJECTION.
17  　　　　　**THE COURT:**  GO AHEAD, SIR.
18  　　　　　**MR. FRASER:**  THANK YOU.
19  **BY MR. FRASER:**
20  **Q.**  MY APOLOGIES.
21  　　　　　MR. HAWKINS, WERE YOU AWARE -- WERE YOU MADE AWARE
22  THAT MR. TAYLOR WAS GOING TO BE PUT ON ADMINISTRATIVE LEAVE?
23  **A.**  I WAS.
24  **Q.**  ALL RIGHT.  AND DID YOU GO ALONG ON THAT VISIT TO HIM?
25  **A.**  I DID.  MY INSTRUCTIONS WAS TO DRIVE THE TRUCK BACK.

04:08 1  Q.   ALL RIGHT.  WHO WERE YOU WITH?

2  A.   MR. STUART, KENNY STUART.

3  Q.   ALL RIGHT.  I'M JUST GOING TO ASK YOU TO TELL US ABOUT

4  THAT MEETING.  TELL US WHEN YOU GOT TO THE HOUSE WHAT HAPPENED.

5  A.   OKAY.  INITIALLY WHEN WE DROVE TO HIS HOUSE, THEY WEREN'T

6  THERE.  SO WE WENT AND ATE LUNCH AND IN EATING LUNCH, WE

7  RECEIVED A CALL -- WELL, KENNY RECEIVED A CALL FROM MR. TAYLOR,

8  JOHNNY TAYLOR, AND KENNY TOLD HIM WE -- YOU KNOW, WE NEEDED TO

9  TALK TO HIM.  HE SAID, "SURE, COME ON BY."  SO WE WRAPPED UP

10  OUR LUNCH, AND THEN WE WENT TO HIS HOUSE.

11        WHEN WE GOT THERE, HIS WIFE ANSWERED THE DOOR, AND

12  SHE REFERRED BACK TO HIM AND SAID, "JOHNNY, DO YOU WANT TO GO

13  OUT AND TALK WITH THEM, OR DO YOU WANT THEM TO COME IN?"

14        HE SAID, "WELL, INVITE THEM IN."

15        SO WE CAME ON IN.  KENNY CAME IN, THEN I CAME IN.

16        THEN KENNY TOLD HIM, HE SAID, "WELL, WE'RE HERE TO

17  PUT YOU ON ADMINISTRATIVE LEAVE, AND WE NEED ALL THE U.P.

18  STUFF:  YOUR COMPUTER, YOUR CELL PHONE, YOUR KEYS, AND WE CAME

19  HERE TO PICK UP THE TRUCK ALSO."

20        WELL, WHEN JOHNNY STARTED TO GO AND GET THE

21  EQUIPMENT, HIS WIFE ASKED ME, "IS HE GONNA BE PUT ON

22  ADMINISTRATIVE LEAVE?  IS HE GONNA BE PAID?"

23        WELL, FIRST SHE ASKED ME WHO I WAS.  SHE SAID, "ARE

24  YOU PHILLIP HAWKINS?"  I SAID, "YES."  THEN SHE ASKED ME,

25  "WELL, HE'S GOING ON ADMINISTRATIVE LEAVE.  WE'VE BEEN ON

04:09 1  ADMINISTRATIVE LEAVE BEFORE AND WE DIDN'T GET PAID.  WILL HE

2  GET PAID THIS TIME?"

3           AND I TOLD HER, I SAID, "I HAVE NO IDEA."  I SAID,

4  "ALL I KNOW IS THAT HE'S GOING ON ADMINISTRATIVE LEAVE.  I'M

5  HERE TO PICK UP THE TRUCK."

6           SO IN HER DOING THAT, JOHNNY WAS GETTING THE COMPUTER

7  AND STUFF.  HE BASICALLY SHOUTED ACROSS TO HER:  DON'T ASK

8  THEM.  DON'T ASK THEM NOTHING.  DON'T ASK THEM NOTHING.

9           SO THEN JOHNNY HANDED KENNY THE COMPUTER AND THE CELL

10  PHONE AND KEYS, AND I TOOK THE KEYS TO THE TRUCK.  WELL, KENNY

11  STARTED TO GO OUT, SO I'M FOLLOWING BEHIND, AND ALL OF A SUDDEN

12  I FELT JOHNNY WALK UP BEHIND ME SO I KIND OF TENSED UP TO MAKE

13  SURE -- YOU KNOW, IF SOMETHING WAS GONNA OCCUR, I WAS READY FOR

14  IT.  SO NOTHING OCCURRED.

15           HE WALKED ON OUT, AND I WALKED OVER TO THE TRUCK.

16  WELL, HIS WIFE WALKED OVER TO THE TRUCK AGAIN, AND WHILE HE'S

17  OUT THERE, JOHNNY IS SHOUTING TO BOTH OF US, "GET OUT OF MY

18  YARD.  GET OUT OF MY YARD."

19           AND HIS WIFE IS ASKING AGAIN:  "IS HE GONNA BE PAID

20  WHILE HE'S ON ADMINISTRATIVE LEAVE?"  AND I TOLD HER AGAIN, "I

21  HAVE NO IDEA."

22           WELL, JOHNNY THEN TELLS HER, "DON'T ASK THEM NOTHING.

23  DON'T ASK THEM NOTHING.  WE HAVE MONEY.  WE HAVE MONEY.  WE'RE

24  GONNA GET AN ATTORNEY."  SO THEN I CRANKED UP THE TRUCK AND

25  LEFT.  SO THAT WAS THE END OF IT.

04:11  1   **Q.**   DURING THE COURSE OF THAT MEETING, DID YOU NOTICE HIM

       2   CHANGING MOODS?

       3   **A.**   OH, WHEN WE FIRST GOT HERE AND HE INVITED US IN, HE WAS

       4   CALM, JUST LIKE A NORMAL PERSON.  BUT THEN WHEN HIS WIFE ASKED

       5   ME THE QUESTION AND HE'S OVER GETTING THE COMPUTER AND STUFF,

       6   IT WAS LIKE HE JUST FLIPPED A SWITCH AND JUST A TOTALLY

       7   OPPOSITE PERSON, STARTED SHOUTING.  SO HE WENT FROM BEING

       8   TOTALLY CALM TO STARTING TO SHOUT.

       9   **Q.**   HAD YOU SEEN THAT --

      10   **A.**   SO YEAH.

      11   **Q.**   HAD YOU SEEN THAT IN HIM BEFORE?

      12   **A.**   YEAH.  THERE WAS ONE INSTANCE.  WE WERE ON A CONFERENCE

      13   CALL, AND IN THE COURSE OF THE CONFERENCE CALL -- JOHNNY HAD

      14   WENT ON VACATION.  WELL, IN COMING BACK FROM VACATION, I HAD

      15   SENT ANOTHER GUY DOWN TO TAKE CARE OF HIS JOB FOR THAT WEEK.

      16   WELL, THERE WAS SOME CHANGES THAT WAS MADE BY THE OTHER

      17   EMPLOYEE THAT JOHNNY DIDN'T LIKE.

      18         WE'RE ON A CONFERENCE CALL.  THEY START SHOUTING AT

      19   EACH OTHER.  I STOPPED THE CONFERENCE CALL AND SAID, "HEY,

      20   WE'RE NOT GONNA DO THIS ON THIS CONFERENCE CALL.  WE'RE THE

      21   LEADERS OF THIS COMPANY AND LOOK AT HOW WE'RE ACTING ON THIS

      22   CALL."  AND THEY MUCH CALMED DOWN.  HE HUNG UP, AND WE PRETTY

      23   MUCH WENT ON WITH THE CONFERENCE CALL.

      24   **Q.**   ALL RIGHT.  WHEN DID THAT BEHAVIOR START?

      25   **A.**   I THINK -- AND THIS IS MY PERSONAL OPINION.  WHEN HE WAS

04:12 1   MOVED TO LUFKIN -- HE WANTED THE LUFKIN JOB.  HE EVEN EXPRESSED

2   THAT TO ME.  AND THEN WHEN THE JOB WASN'T GIVEN TO HIM, HE WAS

3   SENT TO ODESSA.  WELL, I DIDN'T -- I DIDN'T TALK TO JOHNNY FOR

4   A LONG TIME AFTER THAT.  AND THEN WHEN HE CAME BACK, IT WAS A

5   TOTALLY DIFFERENT PERSON.

6           I DON'T KNOW IF, YOU KNOW, SOMETHING OCCURRED WHEN HE

7   WAS THERE THAT CAUSED HIM TO ACT DIFFERENTLY, BUT THE JOHNNY I

8   KNEW -- 'CAUSE WHEN JOHNNY CAME TO THE RAILROAD IT WAS 2008.

9   SO I'VE BEEN KNOWING JOHNNY FOR ABOUT TEN YEARS AT THAT TIME,

10  AND HE WAS ALWAYS THIS RESPECTFUL PERSON.  HE WAS ALWAYS A CALM

11  PERSON.  HE WAS NEVER ARGUMENTATIVE, THAT I HAD SAW.  NOW, I

12  CAN'T SPEAK FOR WHEN HE'S AROUND PEOPLE.  BUT IN MY PRESENCE,

13  THERE WAS NEVER NONE OF THAT.

14          AND WHEN HE CAME BACK FROM ODESSA AND HE'S BACK ON

15  THE AVONDALE JOB, IT WAS A TOTALLY DIFFERENT PERSON.  HE'S NOW

16  MORE ARGUMENTATIVE THAN HE WAS, 'CAUSE I HAD NEVER SAW THAT

17  SIDE OF HIM.

18  **Q.**   ALL RIGHT.  DID HE HANG UP ON PEOPLE WHEN YOU WERE ON THE

19  CALL?

20  **A.**   WELL, NOT SPECIFICALLY ON ME.  BUT I'VE KNOWN HIM OF

21  HANGING UP ON PEOPLE.  I'VE BEEN IN THE ROOM WITH OTHER PEOPLE

22  AND HE HUNG UP.

23          **MR. FRASER:**  ALL RIGHT.  THAT'S ALL I HAVE.  THANK

24  YOU, YOUR HONOR.  APPRECIATE THE COURTESY.

25          **THE COURT:**  OKAY.  CROSS.

1                        CROSS-EXAMINATION

2  BY MR. SCHMIDT:

3  **Q.**   MR. HAWKINS, YOU TESTIFIED THAT MR. TAYLOR WAS ALWAYS

4  RESPECTFUL BEFORE THE AVONDALE JOB BEGAN.  CORRECT?

5  **A.**   TO MY KNOWLEDGE, YES.  I HAD NEVER SAW THAT SIDE OF HIM.

6  **Q.**   OKAY.  AND WHAT TIME PERIOD WAS THIS, THIS CHANGE?

7  **A.**   WELL, HE CAME IN '08.  I'M NOT SURE WHEN HE CAME BACK TO

8  AVONDALE.  I THINK IT WAS AROUND MAYBE '14.  SO QUITE A FEW

9  YEARS LATER.

10 **Q.**   OKAY.  SO IN 2014, HE BEGAN TO BE DISRESPECTFUL AND

11 ARGUMENTATIVE?

12 **A.**   TO MY KNOWLEDGE, YES.

13 **Q.**   OKAY.  SO FOUR YEARS BEFORE HIS TERMINATION?

14 **A.**   CORRECT.

15 **Q.**   OKAY.  AND YOU SAID THAT YOU WERE PRESENT ON ONE

16 CONFERENCE CALL IN WHICH MR. TAYLOR AND MR. STUART WERE

17 SHOUTING AT EACH OTHER?

18 **A.**   YES.

19 **Q.**   OKAY.  SO THEY WAS BOTH SHOUTING?

20 **A.**   WELL, I DON'T KNOW IF THEY BOTH WERE SHOUTING.  THEY WERE

21 BOTH GOING BACK AND FORTH.  I'LL PUT IT THAT WAY.

22 **Q.**   BUT YOU DID TESTIFY A MINUTE AGO THAT THEY WERE SHOUTING

23 AT EACH OTHER.  CORRECT?

24 **A.**   WELL, I SAID I WAS IN THE ROOM OF HIM HANGING UP ON

25 SOMEBODY.

04:15 1          THE SHOUTING, I WAS ACTUALLY THE ONE CONDUCTING THE

2    CONFERENCE CALL THAT PARTICULAR TIME.

3    **Q.**   UH-HUH.

4    **A.**   AND KENNY WASN'T EVEN THERE THAT DAY.

5    **Q.**   SO WHEN YOU SHOWED UP AT MR. TAYLOR'S HOUSE TO TELL HIM

6    THAT HE WAS ON ADMINISTRATIVE LEAVE, YOU STATED THAT HE INVITED

7    YOU IN.  CORRECT?  HE DIDN'T KNOW WHY YOU WERE THERE WHEN HE

8    INVITED YOU IN, DID HE?

9    **A.**   TO MY KNOWLEDGE, NO.

10   **Q.**   OKAY.

11   **A.**   AGAIN, I WAS JUST THERE TO DRIVE THE TRUCK.

12   **Q.**   RIGHT.

13          AND YOU SAID AFTER MR. TAYLOR WAS INFORMED THAT HE

14   WAS BEING PLACED ON ADMINISTRATIVE LEAVE AND YOU WENT OUTSIDE,

15   YOU HEARD MR. TAYLOR WALK BEHIND YOU AND YOU SAID YOU WERE

16   READY FOR SOMETHING TO OCCUR.  WHAT DID YOU MEAN BY THAT?

17   **A.**   WELL, YOU KNOW HOW YOU CAN FEEL SOMEBODY INVADE YOUR

18   SPACE?  I FELT HIM WALK UP BEHIND ME SUDDENLY, SO I KIND OF

19   TENSED UP JUST IN CASE, BECAUSE I DIDN'T KNOW WHAT WAS GOING TO

20   OCCUR.

21   **Q.**   JUST IN CASE WHAT?

22   **A.**   YOU KNOW, HE WENT FROM BEING CALM TO BEING TOTALLY

23   OPPOSITE, SO I DIDN'T KNOW WHAT WAS GOING TO HAPPEN.

24   **Q.**   SO JUST IN CASE WHAT?

25   **A.**   IN CASE HE HAD PUSHED ME OR HIT ME OR DONE ANYTHING.

04:16  1   **Q.**   OKAY.  ARE YOU FREQUENTLY READY FOR SOMEBODY TO PUSH YOU
       2   AND HIT YOU?
       3   **A.**   IF SOMEBODY INVADES YOUR SPACE, YOU DON'T KNOW HOW --
       4   ESPECIALLY IN A SITUATION LIKE WE WERE IN.  WE WERE THERE -- HE
       5   WAS GOING ON ADMINISTRATIVE LEAVE, SO I HAD NO IDEA OF KNOWING
       6   WHAT WAY THINGS WERE GOING TO GO.  SO I DIDN'T KNOW BECAUSE,
       7   AGAIN, I HAD ONLY KNOWN JOHNNY AS BEING CALM.  THIS PERSON THAT
       8   WAS REALLY CALM FOR A LONG TIME UNTIL HE CAME BACK AND THEN I
       9   SAW ANOTHER SIDE OF HIM.
      10   **Q.**   OKAY.
      11   **A.**   SO I DIDN'T KNOW HOW TO REACT.
      12   **Q.**   AND WHAT HAD MR. TAYLOR DONE AT THAT MEETING PRIOR TO THAT
      13   POINT THAT MADE YOU FEAR THAT HE WAS GOING TO GET PHYSICAL WITH
      14   YOU?
      15   **A.**   AGAIN, THE TIME WE WERE ON THE PHONE CALL --
      16   **Q.**   I'M TALKING ABOUT THIS MEETING, SIR.
      17   **A.**   WELL, WHAT MADE ME FEEL LIKE HE WAS GOING TO GET PHYSICAL
      18   WITH ME?  JUST HIM RUSHING UP BEHIND ME.
      19   **Q.**   OKAY.  SO HE HADN'T SAID OR DONE ANYTHING PRIOR TO THAT AT
      20   THAT MEETING?
      21   **A.**   WELL, HE HAD STARTED SHOUTING.
      22   **Q.**   STARTED SHOUTING, OKAY.
      23          DID HE USE ANY CURSE WORDS?
      24   **A.**   NOT TO MY KNOWLEDGE.
      25   **Q.**   OKAY.  DO YOU REMEMBER ANYTHING HE SAID?

04:17 1  **A.**   NOT REALLY.  JUST GET OUT OF MY YARD, GET OUT OF MY HOUSE.

2  **Q.**   BUT I WAS TALKING ABOUT RIGHT AFTER YOU WALKED OUTSIDE AND

3  HE WALKED OUT BEHIND YOU, SO I'M TALKING ABOUT PRIOR TO THIS.

4  **A.**   WHEN I WAS WALKING OUT THE DOOR IS WHEN HE WALKED UP

5  BEHIND ME.  I WASN'T OUTSIDE.  I WAS STILL PHYSICALLY IN HIS

6  HOUSE AT THE TIME.

7  **Q.**   OKAY.  SO HE WASN'T YELLING "GET OUT OF MY YARD" WHEN YOU

8  WERE STILL IN HIS HOUSE?

9  **A.**   HE WAS YELLING "GET OUT OF MY HOUSE."

10  **Q.**   OKAY.  AND DID YOU GET OUT OF HIS HOUSE PROMPTLY WHEN HE

11  TOLD YOU TO?

12  **A.**   ONCE I GOT THE KEYS, KENNY GOT WHAT WE WENT THERE TO GET,

13  WE BOTH WERE LEAVING.

14  **Q.**   HOW LONG AFTER HE TOLD YOU TO LEAVE HIS HOUSE WAS THAT,

15  THAT YOU LEFT HIS HOUSE?

16  **A.**   A FEW MINUTES.

17  **Q.**   A FEW MINUTES?

18  **A.**   ALL IT TOOK FOR ME TO WALK OUT THE HOUSE, WALK OVER TO THE

19  TRUCK, UNLOCK THE TRUCK, ANSWER THE QUESTION THAT HIS WIFE

20  ASKED ME, AND THEN I CRANKED THE TRUCK UP AND I LEFT.

21  **Q.**   SO DID HE HAVE TO TELL YOU MORE THAN ONCE TO LEAVE HIS

22  HOUSE?

23  **A.**   NO.  BUT EVEN WHEN I WAS DRIVING OUT, I COULD STILL HEAR

24  HIM SHOUTING "GET OUT OF MY YARD, GET OUT OF MY YARD. "

25  **Q.**   OKAY.  SO HE TOLD YOU GET OUT MY HOUSE ONCE, AND THEN

04:19 1  SEVERAL MINUTES LATER, YOU LEFT HIS HOUSE AND HE DIDN'T TELL

2  YOU ANY MORE TIMES DURING THAT TIME TO GET OUT OF MY HOUSE?

3  **A.**   NO.  BECAUSE WE WERE OUTSIDE, HE WAS SAYING "GET OUT OF MY

4  YARD."

5  **Q.**   I'M TALKING ABOUT WHEN YOU WERE INSIDE?

6  **A.**   NO.  NO.  HE ONLY SAID ONCE TO MY KNOWLEDGE.

7  **Q.**   OKAY.

8  **A.**   BECAUSE, AGAIN, ONCE WE GOT THE KEYS TO THE TRUCK, THE

9  COMPUTER, THE CELL PHONE, AND HIS KEYS, HIS RAILROAD KEYS, THEN

10  WE LEFT.

11  **Q.**   SO DID YOU EVER SUPERVISE NICHOLAS ISAAC?

12  **A.**   INDIRECTLY.

13  **Q.**   INDIRECTLY.

14      DID YOU EVER PLAY ANY ROLE IN DISCIPLINING NICHOLAS

15  ISAAC?

16  **A.**   NO.

17  **Q.**   OKAY.  HOW WOULD YOU HAVE KNOWLEDGE OF MR. ISAAC LOSING

18  HIS CERTIFICATION?

19  **A.**   I MONITOR, I TRACK MAINTENANCE PLAN OR I TMP THE COMPUTER

20  PROGRAM.  IT DETERMINES -- WELL, IT DOESN'T DETERMINE.  IT LETS

21  YOU KNOW WHEN YOU'RE OVERDUE ON TRACK INSPECTIONS.  IT LETS YOU

22  KNOW IF YOU'VE GOT 30-DAY REPAIRS THAT ARE OVERDUE.  ANY DEFECT

23  THAT'S WITHIN THE RAILROAD STANDARDS THAT GOES OVERDUE, IT

24  MONITORS IT.

25      SO I MONITOR THAT SYSTEM.  AND THEN THAT'S HOW I KNEW

04:20 1    WHEN HE WOULD GO OVERDUE ON STUFF OR ANYBODY, BECAUSE IT'S NOT
      2    ONLY HIM, WE LOOK AT EVERY TRACK INSPECTOR.
      3    **Q.**    MY QUESTION WAS HOW YOU BECAME AWARE THAT HE LOST HIS
      4    TRACK INSPECTOR CERTIFICATION?
      5    **A.**    THE WAY IN WHICH I FOUND THAT OUT WAS JUST BY BEING IN THE
      6    POSITION THAT I WAS IN.  KENNY WAS THE DIRECTOR AND WHEN HE WAS
      7    DISQUALIFIED, THAT'S WHEN I FOUND OUT.
      8    **Q.**    OKAY.  AND DID SOMEBODY TELL YOU?
      9    **A.**    YES, HE DID.
     10    **Q.**    WHO?
     11    **A.**    KENNY DID.
     12    **Q.**    KENNY STUART?
     13    **A.**    YES.
     14    **Q.**    OKAY.  SO THE ONLY WAY YOU HAVE KNOWLEDGE OF MR. ISAAC
     15    LOSING HIS CERTIFICATION IS FROM SOMETHING SOMEBODY ELSE TOLD
     16    YOU?
     17    **A.**    RIGHT.
     18         **MR. SCHMIDT:**  OKAY.  CAN WE PULL UP THE PIP.  I
     19    BELIEVE IT'S JOINT EXHIBIT 12.  AND CAN WE GO UP TO THE FIRST
     20    PAGE.
     21         OH, I'M SORRY.  CAN WE CHANGE IT OVER TO HER
     22    COMPUTER.
     23         **THE DEPUTY CLERK:**  I'M SORRY.
     24         **MR. SCHMIDT:**  THANK YOU.
     25    **BY MR. SCHMIDT:**

04:21 1    Q.   ALL RIGHT, MR. HAWKINS.  DID YOU PLAY ANY ROLE IN DRAFTING

2    THIS DOCUMENT?

3    A.   I DID NOT.

4    Q.   DID YOU PLAY ANY ROLE IN EVALUATING MR. TAYLOR'S

5    PERFORMANCE?

6    A.   I DID NOT.

7        **MR. SCHMIDT:**  ALL RIGHT.  CAN WE SCROLL DOWN TO THE

8    NEXT PAGE.

9    **BY MR. SCHMIDT:**

10   Q.   ALL RIGHT.  THESE INSTANCES THAT ARE DESCRIBED HERE ON

11   JANUARY 22, JANUARY 10, JANUARY 25 OF 2018, WERE YOU PRESENT

12   FOR ANY OF THESE INSTANCES?

13   A.   I THINK I WAS.

14   Q.   OKAY.  WHICH ONES?

15   A.   THE ONE ABOUT THE HIGH VTI.  WELL, I WASN'T PRESENT, BUT I

16   WAS GIVEN A CALL, INQUIRING ABOUT IT.

17   Q.   OKAY.  SO YOU TALKED TO SOMEBODY ABOUT IT LATER?

18   A.   RIGHT.

19   Q.   BUT YOU WEREN'T THERE.  RIGHT?

20   A.   RIGHT.

21   Q.   OKAY.  DO YOU HAVE PERSONAL KNOWLEDGE OF ANY OF THE

22   ALLEGATIONS AGAINST MR. TAYLOR IN THIS PERFORMANCE IMPROVEMENT

23   PLAN?

24   A.   UNTIL I WAS PREPPED, I HAD NEVER EVEN SAW THIS.

25   Q.   OKAY.  NO FURTHER QUESTIONS.

04:22 1           **THE COURT:**  THANK YOU.

2                ANY REDIRECT?

3          **MR. FRASER:**  NO, YOUR HONOR.

4           **THE COURT:**  OKAY.  IS HE RELEASED FROM HIS SUBPOENA,

5  RELEASING HIM FROM HIS SUBPOENA?

6          **MR. FRASER:**  YES.  YES, YOUR HONOR.

7           **THE COURT:**  YOU ARE FREE TO GO, SIR.

8                PUT YOUR MASK ON BEFORE YOU LEAVE THE STAND.

9  THERE SHOULD BE A RECEPTACLE RIGHT THERE IF YOU WANT TO DISPOSE

10  OF YOUR SHIELD, YOU CAN.

11                OKAY.  NEXT WITNESS.

12         **MR. WADSWORTH:**  YOUR HONOR, UNION PACIFIC CALLS MR.

13  KENNETH STUART TO THE STAND.

14           **THE COURT:**  MR. STUART, YOU'RE STILL UNDER OATH.

15          **THE WITNESS:**  YES, MA'AM.

16                   **KENNETH W. STUART, II,**

17  **HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS:**

18           **THE COURT:**  YOU CAN REMOVE YOUR MASK.  THANK YOU.

19               GO AHEAD.

20                 **DIRECT EXAMINATION**

21  BY MR. WADSWORTH:

22  **Q.**  GOOD AFTERNOON, MR. STUART.

23  **A.**  GOOD AFTERNOON.

24  **Q.**  MR. STUART, I KNOW YOU'VE ALREADY INTRODUCED YOURSELF TO

25  THE JURY, BUT COULD YOU GIVE THE JURY A BRIEF BACKGROUND OF

04:24  1   YOUR EDUCATIONAL ATTAINMENTS?

2   **A.**   I WENT TO SCHOOL FOR TWO YEARS AT UNIVERSITY OF LINCOLN.

3             **THE COURT:**  YOU'LL NEED TO MOVE UP OR ADJUST THE MIC.

4   I'M HAVING TROUBLE HEARING YOU.

5   **A.**   I WENT TO SCHOOL FOR TWO YEARS AT UNIVERSITY OF NEBRASKA

6   AT LINCOLN.  I WENT TO THE MARINE CORPS, AND WHEN I GOT OUT, I

7   DID TWO MORE YEARS AT THE UNIVERSITY OF NEBRASKA-OMAHA, AND I

8   FINISHED AT THE UNIVERSITY OF BELLEVUE.

9   **BY MR. WADSWORTH:**

10  **Q.**   FOR HOW LONG WERE YOU IN THE MARINE CORPS?

11  **A.**   SIX YEARS.

12  **Q.**   AND WHEN DID YOU BEGAN WORKING FOR UNION PACIFIC?

13  **A.**   JUNE 20, 2006.

14  **Q.**   AND CAN YOU GIVE US JUST A BRIEF OVERVIEW OF THE DIFFERENT

15  TYPES OF POSITIONS YOU'VE HELD WHILE YOU'VE WORKED FOR UNION

16  PACIFIC?

17  **A.**   I HIRED IN AS A LABORER IN 2006, WORKED VARIOUS AGREEMENT

18  POSITIONS:  MACHINE OPERATOR, FOREMAN.  I WENT INTO THE

19  ENGINEERING ASSOCIATE PROGRAM, WHICH IS THE MANAGEMENT

20  OPERATIONS TRAINING PROGRAM.  I BECAME AN MTM, MANAGER OF TRACK

21  MAINTENANCE, IN PALMDALE, CALIFORNIA.  FROM THERE I WENT TO

22  MANAGER OF TRACK MAINTENANCE IN LOS SANTOS, WHICH IS EAST L.A.,

23  EAST LOS ANGELES.  I DID MANAGER OF TRACK PROGRAMS FOR RAIL

24  SOUTH IN GRAND PRAIRIE, TEXAS.  FROM THERE I WENT TO MANAGER OF

25  TRACK PROJECTS IN CHICAGO, ILLINOIS, FOR THE COMMUTER SIDE OF

04:26 1    OPERATIONS.  FROM THERE I WENT TO MANAGER OF TRACK PROJECTS IN

2    HOUSTON.  AFTER THAT I MOVED TO DIRECTOR OF TRACK MAINTENANCE.

3    THEN A TITLE CHANGE, SENIOR MANAGER OF TRACK MAINTENANCE IN

4    LIVONIA.  AND AFTER THAT I MOVED TO DIRECTOR OF TRACK

5    MAINTENANCE IN FORT WORTH.

6    **Q.**   AND ARE YOU CURRENTLY IN FORT WORTH RIGHT NOW?

7    **A.**   YES, SIR, I AM.

8          **MR. WADSWORTH:**  CAN WE GO AHEAD AND BRING UP EXHIBIT

9    J-14, PLEASE, THAT'S ALREADY BEEN PREADMITTED.  CAN WE SCROLL

10   TO THE VERY TOP, PLEASE.

11   **BY MR. WADSWORTH:**

12   **Q.**   AND, MR. STUART, DO YOU UNDERSTAND THIS TO BE THE OSHA

13   WHISTLEBLOWER POLICY AND DIRECTIVE FROM UNION PACIFIC?

14   **A.**   YES, SIR, I DO.

15   **Q.**   AND IF YOU SCROLL DOWN, PLEASE, YOU'LL GET TO A SECOND

16   PAGE WHERE IT SHOWS ANOTHER POLICY.

17         **MR. WADSWORTH:**  IF YOU'LL KEEP GOING.  I'M SORRY.

18   YES, KEEP GOING, MS. ABSHIRE.  MY APOLOGIES.  NEXT PAGE.

19   **BY MR. WADSWORTH:**

20   **Q.**   AND DO YOU UNDERSTAND THIS TO BE UNION PACIFIC'S FIRST

21   WHISTLEBLOWER POLICY?

22   **A.**   YES, SIR, I DO.

23   **Q.**   AND WHAT IS YOUR UNDERSTANDING OF THESE POLICIES?

24   **A.**   I CANNOT PENALIZE ANYONE FOR BRINGING A SAFETY CONCERN TO

25   MY ATTENTION, AND THERE IS TO BE NO RETALIATION FOR ANYTHING

04:27 1 | THAT IS BROUGHT TO MY ATTENTION.

2 | **Q.**   GREAT.

3 |         WHEN YOU WERE THE DIRECTOR OF MTM/SRMTM, CAN YOU GIVE

4 | US A BRIEF OVERVIEW OF THE DUTIES OF THAT POSITION?

5 | **A.**   SO I HAD -- BETWEEN DIRECTOR OF TRACK MAINTENANCE.

6 | CORRECT?

7 | **Q.**   YES, PLEASE.

8 | **A.**   SO I HAD 5 MTMS IN LIVONIA, TOTALING 600 MILES OF TRACK OR

9 | SO.  I WAS TO MAKE SURE THAT THE TRACK WAS SAFE AND EFFICIENT,

10 | GET OVER THE RAILROAD, MENTOR YOUNGER MANAGERS TO MAKE SURE

11 | THAT THEY WERE FOLLOWING AND COMPLYING WITH ALL SAFETY RULES,

12 | REGULATIONS; PRETTY MUCH MAKE SURE THAT WE WERE FOLLOWING ALL

13 | REQUIRED LAWS, RULES AND REGULATIONS TO KEEP TRAINS RUNNING

14 | SAFELY AND EFFICIENTLY.

15 | **Q.**   AND HOW MANY DIRECT REPORTS, HOW MANY MANAGERS DID YOU

16 | HAVE REPORTING TO YOU WHEN YOU WERE IN LIVONIA?

17 | **A.**   FIVE MANAGERS, SIR.

18 | **Q.**   OKAY.  AND WHO WERE YOUR SUPERVISORS WHILE YOU WERE IN

19 | LIVONIA?

20 | **A.**   I TAKE THAT BACK.  I HAD SIX MANAGERS.  I HAD A MANAGER OF

21 | TRACK PROJECTS, TOO.  SUPERVISOR WAS -- RUDY GARCIA WAS MY

22 | SUPERVISOR.

23 | **Q.**   AND AT ONE POINT DID MR. GILSDORF BECOME YOUR SUPERVISOR?

24 | **A.**   OH, MY IMMEDIATE SUPERVISOR?  YES, SIR.  MR. JAKE GILSDORF

25 | WAS MY SUPERVISOR, MY SUPERIOR.

04:29  1    **Q.**    OKAY.  AND I'M SORRY.  YOUR SUPERIOR.

2              AND WHAT POSITION DID MR. WHEELAND HOLD IN COMPARISON

3    TO YOUR POSITION WHILE YOU WERE IN LIVONIA?

4    **A.**    HE WAS TWO LEVELS UP.  HE WAS ESSENTIALLY THE TOP PERSON

5    FOR THE ENGINEERING DEPARTMENT ON THE SOUTHERN REGION.

6    **Q.**    OKAY.  AND WHEN DID YOU BEGIN SUPERVISING MR. TAYLOR?

7    **A.**    NOVEMBER OF 2017.

8    **Q.**    AND FOR APPROXIMATELY HOW LONG DID YOU SUPERVISE MR.

9    TAYLOR?

10   **A.**    ROUGHLY FOUR MONTHS.

11   **Q.**    AND AS HIS SUPERVISOR, DID YOU HAVE THE AUTHORITY TO

12   TERMINATE HIS EMPLOYMENT?

13   **A.**    NO, SIR.

14   **Q.**    DID YOU HAVE THE AUTHORITY TO DISCIPLINE HIM?

15   **A.**    YES, SIR.  VERBAL DISCIPLINE OR ALSO I COULD ENTER LETTERS

16   OF REPRIMAND OR LETTERS OF INSTRUCTION INTO HIS RECORD.

17   **Q.**    AND WERE THOSE VERBAL REPRIMANDS MUCH LIKE COACHING

18   SESSIONS?

19   **A.**    YES, SIR.

20   **Q.**    AND WHAT WERE MR. TAYLOR'S DUTIES WHILE HE WAS AN MTM IN

21   REPORTING TO YOU IN LIVONIA?

22   **A.**    SO MR. TAYLOR HAD ROUGHLY 120, 130 MILES OF RAILROAD.  HIS

23   JOB WAS TO MAKE SURE THAT THE RAILROAD WAS SAFE AND PROTECTED

24   SO THAT TRAINS CAN MOVE SAFE AND EFFICIENTLY OVER IT, TO MAKE

25   SURE HIS EMPLOYEES WERE COMPLYING WITH UNION PACIFIC RULES AND

04:30  1  REGULATIONS, FEDERAL LAWS ON THE REPAIRS THAT THEY MADE.  BUT

2  ESSENTIALLY MAKING SURE THAT THE RAILROAD WAS SAFE TO OPERATE

3  ON.

4  **Q.**    AND WHAT WERE YOUR EXPECTATIONS AS HIS SUPERVISOR

5  REGARDING THE TRACK OVER WHICH HE HAD RESPONSIBILITY?

6  **A.**    MY EXPECTATION WAS THAT HE TOOK OWNERSHIP OF HIS POSITION

7  AND HE PROTECTED THE STRUCTURE OF THE RAILROAD THAT TRAINS

8  COULD OPERATE SAFELY OVER IT.

9  **Q.**    AND DID PART OF THAT INCLUDE MAINTAINING THE TRACK?

10  **A.**    YES, SIR, WE ARE MAINTENANCE.  THAT'S OUR JOB:

11  MAINTENANCE OF THE RAILROAD.

12  **Q.**    AND WHAT TOOLS OR OTHER CAPABILITIES DID MR. TAYLOR HAVE

13  AT HIS DISCRETION IN ORDER TO MEET THE MAINTENANCE

14  RESPONSIBILITIES THAT HE HAD?

15  **A.**    HE HAD WORK GANGS.  HE HAD TWO SECTION GANGS.  HE HAD A

16  WELDING GANG, A SURFACING GANG, TWO TRACK INSPECTORS TO MAKE

17  SURE THAT EVERYTHING WAS -- THE TRACK INSPECTORS ESSENTIALLY

18  INSPECTED THE TRACK, NOTED ANY DEFICIENCIES OR TRACK DEFECTS IN

19  THE STRUCTURE.

20        THE GANGS, THE SECTIONS GANGS WERE BASICALLY OUR WORK

21  FORCES TO REPAIR ANYTHING AND MAKE SURE THAT IT IS SAFE TO

22  OPERATE OVER.

23        AND THEN THE TRACK INSPECTORS AND THE MANAGER GO OVER

24  THE TERRITORY TO MAKE SURE THAT REPAIRS ARE DONE CORRECTLY,

25  SAFELY, AND THAT IT'S STILL SAFE TO OPERATE ON.

04:32 1   **Q.**   SO FAIR TO SAY, INSPECTORS GO OUT AND LOOK AT THE TRACK

2   AND THEN PEOPLE WHO CAN REPAIR IT WHEN THOSE INSPECTORS FIND

3   DEFECTS?

4   **A.**   YES, SIR.

5   **Q.**   OKAY.  DID MR. TAYLOR'S DUTIES CAUSE HIM TO INTERACT WITH

6   THE FRA?

7   **A.**   YES, SIR.

8   **Q.**   AND I KNOW WE'VE BEEN TALKING A LOT ABOUT THE FRA, YOU

9   KNOW, THE LAST TWO DAYS.  CAN YOU JUST TELL US WHAT EXACTLY THE

10   FRA IS, JUST SO WE ALL REMEMBER?

11   **A.**   SO THE FRA IS THE FEDERAL RAILROAD ADMINISTRATION.  THEY

12   ARE BASICALLY THE GOVERNMENT ORGANIZATION THAT OVERSEES SAFE

13   AND EFFICIENT OPERATIONS OF THE RAILROAD.

14   **Q.**   AND IN WHAT WAYS WOULD MR. TAYLOR INTERACT WITH THE FRA IN

15   HIS POSITION?

16   **A.**   THE FRA WOULD CALL MR. TAYLOR, TELL HIM THAT HE WANTS TO

17   INSPECT HIS TERRITORY.  MR. TAYLOR WOULD ACCOMPANY HIM ON A

18   TRIP ACROSS HIS TERRITORY, AND THE FRA INSPECTOR WOULD NOTICE

19   ANY DEFECTS, GIVE THOSE DEFECTS TO MR. TAYLOR, AND MR. TAYLOR

20   WOULD BE RESPONSIBLE FOR REPAIRING THEM.

21   **Q.**   DURING YOUR EMPLOYMENT WITH UNION PACIFIC, DID YOU EVER

22   INSTRUCT AN EMPLOYEE TO LIE TO THE FRA?

23   **A.**   NO, SIR.

24   **Q.**   DID YOU EVER INSTRUCT AN EMPLOYEE TO DECEIVE THE FRA?

25   **A.**   NO, SIR.

04:33 1   **Q.**  WHAT WERE YOUR EXPECTATIONS WITH RESPECT TO A U.P.

2   EMPLOYEE WHO REPORTED TO YOU WHEN DEALING WITH THE FRA?

3   **A.**  TO BE HONEST AND REPAIR WHATEVER WAS FOUND TO AN

4   ACCEPTABLE LEVEL SO THAT IT DIDN'T BECOME A REPEAT ISSUE.

5   **Q.**  AND COULD AN EMPLOYEE BE DISCIPLINED FOR MISREPRESENTING

6   INFORMATION REQUIRED BY THE FRA?

7   **A.**  YES, I IMAGINE SO.

8   **Q.**  DO YOU KNOW OF ANY EMPLOYEES WHO WERE DISCIPLINED FOR

9   MISREPORTING INFORMATION REQUIRED BY THE FRA?

10   **A.**  I KNOW OF EMPLOYEES WHO WERE TERMINATED FOR NOT ACCURATELY

11   REPORTING THINGS THAT WERE SUPPOSED TO BE REPORTED TO THE FRA.

12        **MR. WADSWORTH:**  CAN WE GO AHEAD AND PULL UP EXHIBIT

13   J-3, PLEASE.

14   **BY MR. WADSWORTH:**

15   **Q.**  AND IS THIS MR. TAYLOR'S 2017 PERFORMANCE REVIEW, MR.

16   STUART?

17   **A.**  YES, SIR, IT IS.

18        **MR. WADSWORTH:**  AND CAN WE GO TO PAGE 3, PLEASE.  GO

19   DOWN JUST A LITTLE BIT MORE, PLEASE.

20   **BY MR. WADSWORTH:**

21   **Q.**  AND YOU SEE WHERE IT STARTS HERE "COMMENTS BY MARK THOMAS

22   OLDHAM."  DO YOU SEE THAT?

23   **A.**  YES, SIR.

24   **Q.**  AND WHAT IS YOUR UNDERSTANDING OF WHERE THIS INFORMATION

25   CAME FROM?

04:35 1  **A.**   HIS PREVIOUS MANAGER.

2  **Q.**   AND WAS THAT MR. OLDHAM?

3  **A.**   YES, SIR.

4  **Q.**   AND COULD YOU GO DOWN SOME MORE, PLEASE?

5  **A.**   AND WOULD YOU READ THE PARAGRAPH OUT LOUD THAT BEGINS

6  WITH "SOMETHING THAT IS"?

7  **A.**   "SOMETHING THAT IS TROUBLING TO ME IS YOUR ATTITUDE

8  TOWARDS THE MANAGEMENT GROUP OF UNION PACIFIC RAILROAD WHICH

9  YOU ARE A MEMBER OF.  WE SHOULD COME TO WORK EVERY DAY WITH A

10  POSITIVE ATTITUDE FOR OUR EMPLOYEES THAT WE WORK WITH AND THE

11  COMPANY THAT WE WORK FOR.  HOW WE INTERACT WITH OUR CO-WORKERS

12  AND OUR PEERS SHOULD HAVE A POSITIVE RESULT.  IF NOT, IT

13  AFFECTS THE ATTITUDES OF EVERY EMPLOYEE AROUND US.  I NEED YOUR

14  POSITIVE ENGAGEMENT ON OUR DAILY BUSINESS ACTIVITIES.  YOU HAVE

15  AN OPEN INVITATION TO WORK THROUGH THIS WITH ME.  BUT BEING

16  MORE POSITIVE IN YOUR DUTIES AS A MANAGER IS SOMETHING THAT HAS

17  TO BE DONE FOR THE WHOLE TEAM."

18  **Q.**   AND HOW DO YOU INTERPRET THAT?

19  **A.**   I INTERPRET THAT AS MR. OLDHAM ESSENTIALLY HAD ISSUES

20  WHERE MR. TAYLOR'S ATTITUDE TOWARDS MANAGEMENT AND THE COMPANY

21  WAS NOT TO HIS LIKING.

22  **Q.**   AND THERE WAS SOME QUESTIONS THAT YOU RECEIVED REGARDING

23  INFORMATION THAT YOU HAD NOT PLACED IN THIS REVIEW.  WHY DID

24  YOU NOT INCLUDE ANY NEGATIVE COMMENTS IN THIS REVIEW THAT YOU

25  FILLED OUT?

04:36   1    **A.**   I HAD ONLY BEEN ON THE JOB FOR ABOUT THREE MONTHS WHEN I

        2    FILLED THIS OUT.  I DID NOT THINK IT WOULD BE FAIR TO AN

        3    EMPLOYEE WHO HAD KNOWN ME FOR THREE MONTHS TO GO OFF OF

        4    SOMEBODY ELSE'S -- BASICALLY WHAT I HAD HEARD OR SAID.  I CAME

        5    INTO A SITUATION TRYING TO GIVE EVERY EMPLOYEE A CHANCE.  BASED

        6    ON, YOU KNOW, MY THREE WEEKS, I TRIED TO GIVE STRONG, ACCURATE

        7    FEEDBACK.

        8    **Q.**   AND I'M SORRY.  I THINK YOU HAD USED THREE MONTHS AND

        9    THREE WEEKS.  COULD YOU CLARIFY HOW LONG YOU HAD BEEN

       10    SUPERVISING MR. TAYLOR AT THAT TIME THAT YOU FILLED THIS OUT?

       11    **A.**   YES, SIR.  IT WAS ABOUT THREE WEEKS, A LITTLE LESS, I

       12    BELIEVE.

       13    **Q.**   AND HOW LONG DURING THAT THREE-WEEK PERIOD HAD YOU SPENT

       14    ACTUALLY INTERACTING WITH MR. TAYLOR?

       15    **A.**   WE HAD CONFERENCE CALLS IN THE MORNING AND THE AFTERNOON,

       16    SO MAYBE HALF AN HOUR, 45 MINUTES A DAY WHEN IT WAS SOMETHING

       17    THAT I WAS ACTUALLY INVOLVED IN THE COMMUNICATION PROCESS, AND

       18    THEN WE COMMUNICATED THROUGHOUT THE DAY, IF SOMETHING WAS

       19    NEEDED.

       20            WHEN I FIRST GOT THERE, I WAS PREPARING FOR A

       21    "SPECIAL," WHICH IS THE VICE-PRESIDENT RIDES A TRAIN DOWN THE

       22    TRACKS.  AND SO A LOT OF MY FOCUS WAS BASICALLY FOCUSED ON

       23    GETTING OVER THE RAILROAD SO THAT IT -- I DIDN'T SEE IT THE

       24    FIRST TIME WITH THE VICE-PRESIDENT, AND I HAD AN IDEA OF WHAT I

       25    WAS LOOKING AT.

04:38 1    Q.    WAS THAT A SIGNIFICANT EVENT FOR YOU TO HAVE THE SPECIAL?

2    A.    YES, SIR.  I WAS A BRAND-NEW DIRECTOR.  THE FIRST TIME

3    EVER BEING A DIRECTOR, AND IT WAS PRETTY -- IT MADE ME VERY

4    NERVOUS TO RIDE THE SPECIAL FOR THE FIRST TIME AS A DIRECTOR.

5    Q.    AFTER THIS REVIEW, DID UNION PACIFIC PAY MR. TAYLOR A

6    BONUS?

7    A.    YES, SIR.

8    Q.    IN YOUR EXPERIENCE, DID EVERY MANAGER GET A BONUS

9    REGARDLESS OF PERFORMANCE?

10    A.    IN MY EXPERIENCE, EVERY MANAGER HAS GOTTEN A BONUS.

11    Q.    AND YOU'RE FAMILIAR WITH THE TRACK, THE AVONDALE SWITCH 16

12    TRACK.  RIGHT?

13    A.    YES, SIR.

14    Q.    AND CAN YOU GO AHEAD AND REMIND US WHAT THE DIFFERENCE IS

15    BETWEEN A YARD TRACK AND A MAIN LINE TRACK?

16    A.    SO A MAIN LINE TRACK, I WOULD THINK OF AS LIKE AN

17    INTERSTATE.  YOU GO FAST.  YOU AVOID ALL OF THE STOP SIGNS AND

18    STOP LIGHTS.

19         A YARD TRACK WOULD BE MORE OF A SIDE STREET WHERE,

20    YOU KNOW, YOU STOP AND PICK UP SOMETHING, GO ON AGAIN.

21    Q.    AND WAS THE AVONDALE SWITCH 16 TRACK A YARD TRACK OR A

22    MAIN LINE TRACK?

23    A.    IT WAS A YARD TRACK.

24         MR. WADSWORTH:  CAN WE GO AHEAD AND LOOK AT EXHIBIT

25    J-7, WHICH HAS BEEN PREADMITTED, PLEASE.  THANK YOU.  AND THEN

04:39  1    IF WE COULD SCROLL TO U.P. TAYLOR 206, WHICH I THINK IS TOWARDS

       2    THE BOTTOM.  OKAY.  IF WE COULD STOP RIGHT THERE.  THANK YOU.

       3    **BY MR. WADSWORTH:**

       4    **Q.**   WHO IS THIS MR. AARRON BROWN?

       5    **A.**   I GUESS, IT SAYS:  HE WAS THE ASSISTANT MANAGER OF

       6    GEOMETRY.  BUT HE IS THE MANAGER OF GEOMETRY FOR OUR GROUP.  SO

       7    HE RUNS -- HE IS RESPONSIBLE FOR THE GEOMETRY CARS, WHICH IS A

       8    VEHICLE THAT GOES OVER OUR RAILROAD, TAKES MEASUREMENTS ON A

       9    MOVING LOADED BASIS OF DIPS AND CURVES.  AND THEN HE ALSO HAS

      10    THE SURVEYORS THAT WORK FOR HIM.

      11    **Q.**   AND IN THIS EMAIL MR. BROWN SAYS:  "KENNY STUART IS

      12    WANTING TO LOOK FOR RISKS IN THE ALIGNMENT FOR DERAILMENT

      13    PREVENTION PURPOSES."

      14          DO YOU RECALL MAKING A REQUEST SUCH AS THAT?

      15    **A.**   YES, SIR.  I HAD TALKED TO JOHNNY.  JOHNNY HAD TALKED TO

      16    ME ABOUT HIS CONCERN OF THE ALIGNMENT, SO I ASKED -- THE

      17    SURVEYORS WORK FOR MR. BROWN.  SO I HAD ASKED AARRON IF HE

      18    COULD SEND A SURVEYOR DOWN SO THAT WE COULD SEE EXACTLY WHAT

      19    WAS WRONG, GET A LARGE SAMPLE OF DATA POINTS.

      20    **Q.**   LET'S GO AHEAD AND SCROLL UP TO U.P. TAYLOR 205 TO AN

      21    EMAIL THAT YOU SENT ON DECEMBER 14, 2017, RIGHT HERE.

      22          CAN YOU GO AHEAD AND READ THAT RESPONSE FOR US?

      23    **A.**   "THERE HAVE BEEN TWO AT THE 16 SWITCH IN THE LAST TWO

      24    MONTHS.  I CANNOT OPEN THE ATTACHMENT, BUT MY MTM JOHNNY TAYLOR

      25    WAS WITH THEM AND HAS MORE HISTORY ON THE LOCATION.  I HAVE

04:41 1  INCLUDED HIM, AS HE WOULD BE A BETTER REFERENCE TO THE HISTORY

2  OF THAT SIDE OF THE YARD."

3  **Q.**  AND CAN YOU GO AHEAD AND EXPLAIN WHAT YOU'RE TALKING ABOUT

4  HERE?

5  **A.**  SO WE ASKED THE SURVEYORS TO COME DOWN, AND THEY SENT A

6  DOCUMENT LIKE A LINK, LIKE A PDF, BUT IT WASN'T A PDF, AND I

7  COULDN'T OPEN IT.  I DIDN'T HAVE THE CAD SOFTWARE ON MY

8  COMPUTER OR I DON'T KNOW WHAT KIND OF SOFTWARE IT IS, WHATEVER

9  KIND OF SOFTWARE IT WAS TO OPEN, SO I JUST TOLD HIM, YOU KNOW,

10  I COULDN'T SEE THE ATTACHMENT.

11       I CAN'T REMEMBER -- OH, HE'D ASKED IF THERE WAS A

12  PROBLEM SPOT, AND I WASN'T -- I WAS NEW TO THE TERRITORY.  I

13  WASN'T PARTICULARLY AWARE OF A WHOLE BUNCH OF PROBLEM SPOTS.

14  SO I DIRECTED HIM TO THE MANAGER OF TRACK MAINTENANCE, MR.

15  TAYLOR, SO THAT JOHNNY COULD TELL HIM WHERE HE WANTED SURVEYED.

16  **Q.**  AND WHAT IS THE "THERE HAVE BEEN TWO"?  WHAT IS THAT IN

17  REFERENCE TO?

18  **A.**  DERAILMENTS.

19  **Q.**  GOTCHA.

20       AND WHAT DID YOU HOPE TO ACCOMPLISH BY MAKING THIS

21  REQUEST?

22  **A.**  I MEAN, TO PERMANENTLY SOLVE ANY ISSUE, MR. TAYLOR HAD

23  TOLD ME THAT HE HAD CONCERNS WITH IT.  MY PLAN WAS TO SURVEY

24  IT, YOU KNOW, ROOT CAUSE, WHAT THE ISSUE WAS AND CORRECT IT.

25       **MR. WADSWORTH:**  AND CAN WE SCROLL UP JUST A LITTLE

04:43 1  BIT, PLEASE, UNTIL THIS GRAPHIC IS IN THE PICTURE.

2  **BY MR. WADSWORTH:**

3  **Q.**   AND WHAT IS THIS GRAPHIC HERE?

4  **A.**   SO THAT IS THE SURVEY PLOT POINTS THAT THEY SENT TO US.

5  **Q.**   AND CAN YOU READ THIS?

6  **A.**   NO, SIR, I CAN'T.

7  **Q.**   OKAY.

8  **A.**   IT'S JUST A BASIC DRAWING TO ME.

9          **MR. WADSWORTH:**   AND CAN YOU SCROLL DOWN JUST A LITTLE

10  BIT, PLEASE.

11  **BY MR. WADSWORTH:**

12  **Q.**   AND THIS WAS SENT BY A MR. C. ALAN POWERS.  IS THAT

13  CORRECT?

14  **A.**   YES, SIR.

15  **Q.**   AND WAS HE AN ENGINEER OR A SURVEYOR WHEN HE WAS WORKING

16  ON THIS PROJECT?

17  **A.**   MR. POWERS IS A SURVEYOR FOR OUR COMPANY.

18  **Q.**   AND WHAT'S THE DIFFERENCE BETWEEN AN ENGINEER AND A

19  SURVEYOR?

20  **A.**   A SURVEYOR BASICALLY COLLECTS THE DATA, AND AN ENGINEER

21  WOULD TAKE THOSE DATA POINTS AND DETERMINE WHAT NEEDS TO BE

22  DONE.

23  **Q.**   SO AS A SURVEYOR, WAS IT MR. POWERS' DUTY TO RECOMMEND

24  CHANGES TO TRACK OR SWITCHES?

25  **A.**   I DO NOT BELIEVE SO, NO.

04:44  1        **MR. WADSWORTH:**  LET'S GO TO EXHIBIT J-6, PLEASE,

2    WHICH HAS BEEN PREADMITTED, AND YOU CAN GO AHEAD AND SCROLL

3    DOWN TO THE VERY BOTTOM.  AND THIS IS AN EMAIL THAT WE'VE

4    TALKED ABOUT BEFORE.  CAN YOU SCROLL UP -- I'M SORRY -- TO THE

5    PAGE ABOVE.  THANK YOU.

6    **BY MR. WADSWORTH:**

7    **Q.**  AND YOU SEE THIS IS AN EMAIL SENT TO YOU ON JANUARY 10,

8    2018, FORWARDING INFORMATION FROM NOVEMBER 24, 2017.  REMIND

9    US, WHAT, IF ANYTHING, HAPPENED ON JANUARY 10, 2018?

10   **A.**  I BELIEVE THAT'S THE DAY THAT MR. TAYLOR TOOK THE TRACK

11   OUT OF SERVICE.

12        **MR. WADSWORTH:**  OKAY.  AND CAN YOU SCROLL UP JUST A

13   LITTLE BIT MORE.

14   **BY MR. WADSWORTH:**

15   **Q.**  IN YOUR EMAIL HERE, YOUR EMAIL SAYS:  "THESE MEASUREMENTS

16   ARE OVER SIX WEEKS OLD.  DID WE MEASURE IT TODAY?"

17        ARE SIX-WEEK-OLD MEASUREMENTS ACCEPTABLE FOR REMOVING

18   A TRACK FROM SERVICE?

19   **A.**  NO, SIR.  MY EXPECTATION IS THAT IF YOU TOOK THE TRACK OUT

20   OF SERVICE ON THAT DAY THAT WE TOOK MEASUREMENTS TO JUSTIFY

21   TAKING THE TRACK OUT OF SERVICE ON THAT DAY.

22   **Q.**  WOULD EVEN FOUR-DAY OLD MEASUREMENTS BE ACCEPTABLE?

23   **A.**  NO, SIR.  IF WE TOOK MEASUREMENTS FOUR DAYS AGO AND WE HAD

24   CONCERNS, WE SHOULD HAVE TAKEN THE TRACK OUT OF SERVICE FOUR

25   DAYS AGO.

04:45 1   **Q.**   AND DID ANYTHING HAPPEN TO THESE TRACKS IN THE SIX-WEEK

2   INTERVENING PERIOD THAT MAY HAVE AFFECTED THOSE MEASUREMENTS?

3   **A.**   I MEAN, WE RAN TRAINS ON THEM.   TRACKS ARE IN A CONSTANT

4   STATE OF DEGRADATION.   THEY DON'T GET ANY BETTER IF WE DON'T DO

5   ANYTHING TO THEM.

6   **Q.**   AND WOULD YOU STILL EXPECT AN MTM TO MEASURE OR MAKE THESE

7   MEASUREMENTS, EVEN IF MR. POWERS' PRIOR SURVEY THAT WE LOOKED

8   AT DEMONSTRATED THAT THE SWITCHES WERE OUT OF ALIGNMENT?

9   **A.**   YES, SIR, I WOULD.

10   **Q.**   WERE CURRENT MEASUREMENTS AN EXPECTATION YOU HAD OF ALL

11   YOUR MTMS?

12   **A.**   YES, SIR.

13   **Q.**   DID YOUR OTHER MTMS COMPLY WITH THAT EXPECTATION?

14   **A.**   YES, SIR.

15   **Q.**   HAVE YOU EVER HAD TO THIS DAY AN EMPLOYEE, OTHER THAN MR.

16   TAYLOR, REFUSE TO SEND MEASUREMENTS WHEN YOU REQUESTED THEM?

17   **A.**   NO, SIR.

18   **Q.**   DID YOU ASK FOR THESE MEASUREMENTS JUST TO HARASS MR.

19   TAYLOR?

20   **A.**   NO, SIR.

21   **Q.**   DID YOU ASK FOR THESE MEASUREMENTS SO YOU COULD FIND A

22   REASON TO RECOMMEND MR. TAYLOR'S TERMINATION?

23   **A.**   NO, SIR.

24        **MR. WADSWORTH:**   IF WE COULD SCROLL UP TO U.P. TAYLOR

25   224.   STOP RIGHT THERE.

04:46 1 | **BY MR. WADSWORTH:**

2 | **Q.**   MR. TAYLOR SAYS:  "DID YOU FORWARD THE INFORMATION TO THE

3 | CHIEF ENGINEER," BEING MARK WHEELAND, "LIKE YOU SAID

4 | INITIALLY?"

5 |             DID YOU EVER TELL MR. TAYLOR THAT YOU WOULD FORWARD

6 | THIS INFORMATION TO MR. WHEELAND?

7 | **A.**   NO, SIR.

8 | **Q.**   WOULD YOU REGULARLY -- EXCUSE ME.  WOULD YOU REGULARLY

9 | SEND THIS TYPE OF INFORMATION TO MR. WHEELAND?

10 | **A.**   NO, SIR.

11 | **Q.**   AND WHY NOT?

12 | **A.**   SO THIS IS A YARD TRACK WITH LOW-LEVEL, LOW-IMPACT

13 | DERAILMENT.  YOU CAN THINK OF DERAILMENTS AS LIKE CAR

14 | ACCIDENTS.  YOU HAVE BIG ONES AND LITTLE ONES, RIGHT.

15 | SO THIS WAS A RELATIVELY MINOR DERAILMENT, AND THIS IS

16 | SOMETHING THAT SHOULD HAVE BEEN HANDLED AT OUR LEVEL WITH

17 | MEASUREMENTS GETTING IN THE OTHER THINGS.  MR. WHEELAND HAS

18 | MORE IMPORTANT -- BIGGER THINGS TO DO THAN OUR JOBS.

19 | **Q.**   SO YOUR UNDERSTANDING WAS, MR. WHEELAND HAD AN EXPECTATION

20 | THAT THESE TYPES OF ISSUES WOULD BE HANDLED AT YOUR LEVEL OR

21 | LOWER?

22 | **A.**   YES, SIR.

23 | **Q.**   YOU RESPONDED:  "GET YOUR TAMPER HEADING SOUTH TO THE YARD

24 | AND WE MAY NEED TO DO SOME SPIKE LINING."

25 |             WHAT DOES THAT MEAN?

04:48  1   **A.**   BRING YOUR TAMPER DOWN THERE SO THAT –– SO BASICALLY A

2   "TAMPER" IS A MACHINE THAT PICKS UP THE RAIL AND IT CAN MOVE

3   THE TRACK IN EITHER DIRECTION:  OUT OR IN, LEFT OR RIGHT.  SO

4   THAT IF YOU HAVE AN ALIGNMENT DEVIATION, YOU CAN CORRECT IT.

5         SPIKE LINING WOULD BE UNSPIKING THE RAIL AND MOVING

6   IT TO WHERE IT NEEDS TO BE.

7   **Q.**   AND THESE ARE PROCEDURES THAT COULD POTENTIALLY REMEDY

8   ALIGNMENT ISSUES?

9   **A.**   YES, SIR.

10         **MR. WADSWORTH:**  OKAY.  COULD WE SCROLL UP A LITTLE

11   BIT JUST TO LOOK AT THE RESPONSE WE GET?

12   **BY MR. WADSWORTH:**

13   **Q.**   AND THIS IS THE RESPONSE THAT YOU RECEIVE FROM MR. TAYLOR.

14   CORRECT?

15   **A.**   YES, SIR.

16   **Q.**   AND HOW DID YOU INTERPRET THIS MESSAGE?

17   **A.**   I INTERPRETED IT AS HE WAS NOT GOING TO DO AS I TOLD HIM

18   TO DO.  HE DIDN'T RESPOND AT ALL TO WHAT I TOLD HIM TO DO.  HE

19   JUST KIND OF CHANGED THE SUBJECT.

20   **Q.**   IF WE COULD SCROLL UP A LITTLE BIT FURTHER, THERE'S AN

21   EMAIL WHERE MR. GILSDORF GETS INVOLVED RIGHT HERE.  MR.

22   GILSDORF SENDS SOME QUESTIONS ALONG AS WELL.  ARE THESE THE

23   SAME –– IS THIS ASKING FOR THE SAME MEASUREMENTS THAT YOU DID

24   LOWER IN THE EMAIL CHAIN –– EARLIER IN THE EMAIL CHAIN?

25   **A.**   YES, SIR.  HE'S ASKING FOR A LITTLE MORE DETAIL.  HE'S

04:49 1    ASKING FOR THE SIZE OF THE SWITCH AND THE SIZE OF THE FROG AND

2    SOME ZTS MAPS, WHICH ARE BASICALLY A MAP OVERVIEW OF THE YARD.

3    BUT HE'S ASKING FOR A LITTLE MORE INFORMATION THAN I ASKED FOR,

4    BUT IT'S THE SAME BASIC INFORMATION.

5    **Q.**   SO THESE ARE ACTUALLY THE SAME -- THESE ARE THE SAME TYPE

6    OF MEASUREMENTS OR ARE THEY DIFFERENT MEASUREMENTS?

7    **A.**   SAME MEASUREMENTS.

8         **MR. WADSWORTH:**   LET'S GO AHEAD AND SCROLL UP A LITTLE

9    BIT FURTHER.  KEEP GOING.  IF WE COULD STOP RIGHT HERE.

10   **BY MR. WADSWORTH:**

11   **Q.**   YOU ALSO ON A COUPLE OF DAYS LATER, ON JANUARY 12, 2018,

12   IN THE SAME EMAIL CHAIN YOU REACH OUT TO MR. GILSDORF.  WHAT

13   DID YOU MEAN BY THIS EMAIL THAT YOU'VE SENT?

14   **A.**   SO I DON'T REMEMBER WHICH DAY IT WAS, BUT WE WENT OVER

15   WIG, WHICH IS OUR WILDLY IMPORTANT GOAL.  OUR GOAL IS TO

16   PREVENT DERAILMENTS.  EVERY MANAGER DID ONE TO TWO TASKS EXTRA

17   A MONTH THAT WAS NOT SCHEDULED FOR REPAIR OR FRA FOUND.

18   BASICALLY I WOULD ASK THEM, YOU KNOW, WHERE'S YOUR NEXT

19   DERAILMENT GONNA HAPPEN?  AND THEN I WOULD ASK THEM WHAT ARE

20   YOU DOING ABOUT IT?  SO WITH THE EXPECTATION THAT WE'RE BEING

21   PROACTIVE, REPAIRING TRACKS BEFORE WE TAKE THEM OUT OF SERVICE

22   SO WE CAN STILL OPERATE ON THEM.

23        JOHNNY GOT ON THE CALL, AND HE SAID HE TOOK TRACK 16

24   OUT OF SERVICE FOR HIS WIG.  THAT WAS HIS ACTIVITY.  I TOLD HIM

25   THAT TAKING TRACKS OUT OF SERVICE WAS NOT AN ACCEPTABLE WIG

04:51  1   ACTIVITY.  HE BECAME ARGUMENTATIVE, TOLD ME THAT'S WHAT HE DID.
       2   HE SAID, "JOHNNY OUT," AND HE HUNG UP ON THE CALL.
       3   **Q.**   AND WHY WOULD TAKING TRACKS OUT OF SERVICE NOT BE A PROPER
       4   WIG?
       5   **A.**   WE'RE IN THE BUSINESS OF RUNNING TRAINS.  SO WE'RE TRYING
       6   TO PREVENT DERAILMENTS WHILE STILL MOVING THOSE TRAINS.
       7   **Q.**   AND SO A WIG WOULD BE AN ACTIVITY MEANT TO MAINTAIN THE
       8   TRAIN OR MAINTAIN THE TRACK.  IS THAT CORRECT?
       9   **A.**   YES, SIR.
      10   **Q.**   OKAY.  HOW MANY TIMES DID YOU ASK MR. TAYLOR FOR THE
      11   UPDATED JANUARY 10, 2018 OR LATER MEASUREMENTS FOR THE SWITCH
      12   16 TRACK?
      13   **A.**   SEVERAL.
      14   **Q.**   AND DID HE EVER SEND THOSE TO YOU?
      15   **A.**   I NEVER RECEIVED THEM, NO, SIR.
      16   **Q.**   DID YOU EVER REQUEST THAT ANYONE ELSE PROVIDE THOSE
      17   MEASUREMENTS?
      18   **A.**   I DID.
      19   **Q.**   AND WHO WAS THAT?
      20   **A.**   I CALLED THE TRACK INSPECTOR, NICK ISAAC, AND ASKED HIM
      21   FOR THE MEASUREMENTS.
      22   **Q.**   WHAT HAPPENED?
      23   **A.**   HE TOLD ME THAT JOHNNY INSTRUCTED HIM NOT TO TAKE THEM,
      24   AND HE NEVER GOT THEM TO ME.
      25           **MR. WADSWORTH:**  LET'S GO TO EXHIBIT D-10, WHICH HAS

04:52 1   BEEN PREADMITTED -- NO.  EXCUSE ME.  I'M SORRY.  LET'S GO TO

2   EXHIBIT D-11, WHICH HAS BEEN PREADMITTED, AND LET'S TURN TO

3   U.P. TAYLOR 228.  GO DOWN JUST A LITTLE BIT, OKAY, RIGHT THERE.

4   **BY MR. WADSWORTH:**

5   **Q.**   THIS IS AN EMAIL THAT WAS SENT TO YOU BY MR. TAYLOR.  WHAT

6   IS YOUR UNDERSTANDING OF THIS EMAIL?

7   **A.**   MY UNDERSTANDING IS JOHNNY WAS GIVING ME HIS JUSTIFICATION

8   FOR NOT DOING ANYTHING TO TRACK 16.

9   **Q.**   AND DID IT MAKE SENSE TO YOU?

10   **A.**   NO, IT DID NOT.

11   **Q.**   AND WHY WAS THAT?

12   **A.**   BECAUSE I HADN'T RECEIVED ANYTHING BACK FROM THE SURVEY AT

13   THAT POINT, OTHER THAN THE PLOT.  I MIGHT HAVE NOT EVEN HAD THE

14   PLOT BACK AT THAT POINT.  BUT THERE WAS NO RECOMMENDATIONS

15   MADE.  THERE WAS NOTHING OTHER THAN A SURVEY TAKEN.

16   **Q.**   AND HAD YOU EVER SEEN ANYTHING ABOUT A PROJECT THAT WOULD

17   COST OVER $100,000?

18   **A.**   NO, SIR.  THERE WAS NO PROJECT BECAUSE THERE WAS NO

19   JUSTIFICATION FOR A PROJECT AT THAT POINT.

20          **MR. WADSWORTH:**  CAN WE SCROLL UP TO U.P. 227, AND

21   YOUR EMAIL RIGHT HERE, YOUR RESPONSE RIGHT HERE.

22   **BY MR. WADSWORTH:**

23   **Q.**   CAN YOU GO AHEAD AND LET US -- GIVE US YOUR UNDERSTANDING

24   OR GIVE US YOUR EXPLANATION OF THAT RESPONSE.

25   **A.**   SO WE WERE BOTH COPIED ON THE SAME EMAIL.  IN THE PREVIOUS

04:54 1    EMAIL JOHNNY SAID THAT IT WAS GOING TO COST A HUNDRED THOUSAND

2    DOLLARS, AND I HADN'T GOT ANYTHING BACK.  SO I ASKED HIM WHERE

3    IN THE EMAIL DOES HE MAKE RECOMMENDATIONS OR MENTION COSTS, AND

4    THEN I EXPLAINED TO HIM THAT THERE WAS NO FUNDS BECAUSE, TO MY

5    KNOWLEDGE, THERE HAS NOT BEEN ANY RECOMMENDATIONS MADE.  THE

6    SURVEY WAS WHAT'S DESIGNED, TO MY KNOWLEDGE, AT THAT TIME.  SO

7    SURVEYORS DON'T MAKE DECISIONS, OUR DESIGN TEAM DOES.  THEY

8    MAKE RECOMMENDATIONS.  AND THEN I TOLD HIM, YOU KNOW, WITHOUT

9    RECOMMENDATIONS THERE WILL NOT BE A PROJECT, AND THEN I ASKED

10    HIM, DID HE GET SOMETHING BACK THAT I WAS NOT COPIED ON.

11              **MR. WADSWORTH:**  AND CAN WE GO AHEAD AND SCROLL UP,

12    PLEASE, TO THE TOP.

13    **BY MR. WADSWORTH:**

14    **Q.**   AND HOW DID YOU INTERPRET MR. TAYLOR'S RESPONSE THERE AT

15    THE VERY TOP?

16    **A.**   I JUST TOOK IT, AGAIN, AS HE -- HIS WAY OF TELLING ME HE

17    WASN'T GOING TO DO WHAT I ASKED.

18    **Q.**   DID YOU TAKE THAT AS INSUBORDINATE?

19    **A.**   I DO TAKE THAT AS INSUBORDINATE, YES, SIR.

20    **Q.**   LET'S GO AHEAD AND TURN TO EXHIBIT J-5, WHICH HAS BEEN

21    PREADMITTED.

22              SO WHAT IS YOUR UNDERSTANDING, ONCE AGAIN, OF THIS

23    EMAIL AT THE TOP FROM MR. TAYLOR?

24    **A.**   MY INTERPRETATION WAS THAT HE JUST WAS NOT GOING TO MAKE

25    AN EFFORT TO PUT THE TRACK BACK INTO SERVICE.

04:56 1    **Q.**    AND WAS IT AN ENGINEER IN OMAHA WHO WALKED THE YARD?

2    **A.**    NO, SIR.  IT WAS A SURVEYOR.

3    **Q.**    MR. STUART, WHAT'S "EXCEPTED TRACK"?

4    **A.**    EXCEPTED TRACK IS TRACK THAT IS NO -- IT'S GOOD FOR -- ANY

5    MEASUREMENTS ARE GOOD ON IT EXCEPT FOR GAUGE.  SO YOU CAN HAVE

6    ANY SURFACE DEVIATIONS, ANY KIND OF CONDITIONS, OTHER THAN THE

7    57-AND-A-QUARTER-INCH OR 58-AND-A-QUARTER-INCH GAUGE.

8    **Q.**    AND HOW DOES TRACK BECOME EXCEPTED TRACK?

9    **A.**    YOU HAVE TO FILE A PETITION WITH THE FRA.  YOU HAVE TO

10    MAKE SURE THAT IT'S 30 FEET AWAY FROM YOUR MAIN LINE.  IT CAN'T

11    BE NEAR A ROAD CROSSING.  I DON'T REMEMBER THE DISTANCE OF THE

12    ROAD CROSSING, AND YOU CANNOT MOVE PASSENGERS OR MORE THAN FIVE

13    CHEMICAL CARS OVER IT.

14    **Q.**    AND MAKING TRACK EXCEPTED TRACK, DOES THAT MAKE IT SAFER?

15    **A.**    NO.  NO.  MAKING TRACK EXCEPTED TRACK IS THE LEAST

16    MAINTAINED TRACK THAT WE HAVE.  IT HAS THE LEAST EXPECTATION

17    FOR ANY DEVIATIONS IN IT.

18    **Q.**    SO IF I UNDERSTAND THIS CORRECTLY, WHEN TRACK IS MADE

19    EXCEPTED TRACK, LESS MAINTENANCE HAS TO BE PERFORMED ON IT?

20    **A.**    YES, SIR.  THE ONLY THING THAT HAS TO BE DONE ON EXCEPTED

21    TRACK IS THE GAUGE, AND IT'S EVEN WIDER THAN CLASS 1 TRACK.

22    **MR. WADSWORTH:**  I'M GOING TO ASK THAT YOU PULL UP AN

23    EXHIBIT THAT HAS NOT YET BEEN ADMITTED.  IT'S EXHIBIT D-12.  IT

24    HAS NOT BEEN PREADMITTED.

25    **BY MR. WADSWORTH:**

04:58 1    **Q.**   MR. STUART, ARE YOU FAMILIAR WITH THIS EMAIL?

2    **A.**   YES SIR.

3    **Q.**   AND DID YOU WRITE IT?

4    **A.**   YES, SIR.

5             **MR. WADSWORTH:**  YOUR HONOR, AT THIS TIME I MOVE TO

6    ADMIT EXHIBIT D-12.

7             **MR. SCHMIDT:**  NO OBJECTION.

8             **THE COURT:**  I'M SORRY.  SAY THAT AGAIN.

9             **MR. WADSWORTH:**  I'M SORRY, YOUR HONOR.  YOUR HONOR,

10   I, AT THIS TIME, REQUEST ADMISSION OF EXHIBIT D-12.

11            **THE COURT:**  WITHOUT OBJECTION, IT'S ADMITTED.

12            **MR. WADSWORTH:**  CAN WE SCROLL DOWN JUST A LITTLE BIT,

13   PLEASE.

14   **BY MR. WADSWORTH:**

15   **Q.**   AND PICKING UP WITH THIS EMAIL FROM JOHNNY TAYLOR ON

16   JANUARY 22, 2018 -- EXCUSE ME -- THAT'S FROM YOU, WHAT ARE YOU

17   ASKING FOR THERE?

18   **A.**   I ASKED JOHNNY TO PLEASE BE PREPARED TO STAY BEHIND AFTER

19   THURSDAY'S TOWN HALL TO DISCUSS THE SWITCH.

20   **Q.**   AND JUST SO WE ALL UNDERSTAND, WHAT'S A TOWN HALL?

21   **A.**   A TOWN HALL IS WHERE I BROUGHT IN TWO MTM TERRITORIES.  WE

22   TALKED ABOUT HOW WE DID LAST YEAR, WHAT OUR GOALS AND

23   EXPECTATIONS WERE FOR THIS YEAR.

24            **MR. WADSWORTH:**  CAN WE SCROLL UP A LITTLE BIT,

25   PLEASE.

04:59  1    BY MR. WADSWORTH:

2    Q.    AND HOW DID YOU INTERPRET MR. TAYLOR'S RESPONSE THERE, THE

3    JANUARY 22, 2018, 2:06 P.M. EMAIL?

4    A.    JUST DEFIANT.  YOU KNOW, HE JUST SAYS I'M NOT GONNA PUT

5    THE TRACK BACK IN SERVICE.

6    Q.    AND THEN LET'S GO AHEAD AND GO TO THE VERY TOP WHERE YOUR

7    EMAIL IS.

8              IN THIS EMAIL ARE YOU ASKING MR. TAYLOR TO PUT THE

9    AVONDALE SWITCH 16 TRACK BACK INTO SERVICE?

10   A.    NO, SIR.

11   Q.    DID YOU EVER ASK MR. TAYLOR TO PUT THAT TRACK BACK INTO

12   SERVICE?

13   A.    I NEVER DID, NO, SIR.

14   Q.    DID YOU HAVE THE AUTHORITY TO PUT THE TRACK BACK INTO

15   SERVICE YOURSELF?

16   A.    I DID, SIR.

17   Q.    AND DID YOU DO SO?

18   A.    NO, SIR.

19   Q.    WHY NOT?

20   A.    I TYPICALLY LEAVE THAT TO THE MANAGERS WHO WORK FOR ME.

21   THOSE TRACKS BELONG TO THOSE MANAGERS.  IT'S NOT A TYPICAL

22   DIRECTOR ROLE TO GO TAKE MEASUREMENTS TO SEE IF IT'S GOOD FOR A

23   CLASS OF TRACK; THAT'S TYPICALLY A MANAGER AND A TRACK

24   INSPECTOR DOING THAT.

25   Q.    AND WITHOUT THOSE MEASUREMENTS, THOSE UPDATED

05:00 1  MEASUREMENTS, DID YOU KNOW WHETHER THE TRACK SHOULD BE IN

2  SERVICE OR NOT?

3  **A.**  NO, SIR.

4  **Q.**  TO YOUR KNOWLEDGE, WAS THE TRACK AT SWITCH 16 EVER PUT

5  BACK INTO SERVICE?

6  **A.**  NO, SIR, TO MY KNOWLEDGE, IT WAS NOT.

7  **Q.**  AND HAS U.P. BEEN ABLE TO OPERATE WITH THAT TRACK OUT OF

8  SERVICE SINCE THEN?

9  **A.**  WE'VE STAYED OPERATING FOR THE LAST FEW YEARS, YES, SIR.

10  **Q.**  AND THE TOWN HALL MEETING THAT YOU REFERRED TO IN THIS

11  EMAIL, DID YOU SPEAK -- END UP SPEAKING WITH MR. TAYLOR AFTER

12  THAT TOWN HALL MEETING?

13  **A.**  YES, SIR, I DID.

14  **Q.**  JUST TO CLARIFY, WAS THAT AFTER THE MAIN TOWN HALL MEETING

15  OCCURRED?

16  **A.**  YES, SIR.  IT WAS AT THE END.  EVERYBODY HAD LEFT WITH THE

17  EXCEPTION OF ME, JOHNNY TAYLOR, PHILLIP HAWKINS AND JAKE

18  GILSDORF.

19  **Q.**  SO WAS MR. ISAAC PRESENT DURING THAT MEETING?

20  **A.**  NO, SIR.

21  **Q.**  AND WHAT WAS THE POINT OF THAT MEETING?

22  **A.**  WE WERE TALKING TO JOHNNY ABOUT HIS INSUBORDINATION, HIS

23  UNWILLINGNESS TO DO WHAT HE WAS ASKED TO DO, AND THAT WAS THE

24  POINT OF THE -- THAT WASN'T -- I DON'T THINK THAT -- IT TURNED

25  INTO VERY ARGUMENTATIVE.

05:02   1   **Q.**   SO COULD YOU DESCRIBE FOR US MR. TAYLOR'S BEHAVIOR OR

2   DEMEANOR DURING THAT MEETING?

3   **A.**   SO HE STARTED OFF SAYING THAT HE WANTED TO RECORD THE

4   MEETING.  HE TOLD US SEVERAL TIMES THAT BEFORE WE EVEN REALLY

5   GET STARTED, THAT HE HAD A LAWYER.  HE WANTED US TO FIRE HIM,

6   "FIRE ME.  I WANT YOU TO FIRE ME."

7       HE TOLD US WHEN WE TOLD HIM THIS IS NOT ABOUT TRACK

8   16, WE'RE GETTING OFF TOPIC.  LET'S COME BACK TO WHAT THE ISSUE

9   IS:  YOU WERE ASKED FOR MEASUREMENTS.  YOU DIDN'T BRING THEM.

10   HE CONTINUED TO -- HIS RESPONSE WAS:  FIRE ME.  HE WAS VERY

11   COMBATIVE AND DEFIANT.

12   **Q.**   AND WAS HE EVER RECEPTIVE TO THE COACHING THAT WAS MADE

13   DURING THAT MEETING?

14   **A.**   NO, SIR.

15   **Q.**   MR. STUART, WHAT IS "ADMINISTRATIVE LEAVE"?

16   **A.**   ADMINISTRATIVE LEAVE IS BASICALLY YOU'RE PAID NOT TO COME

17   TO WORK UNTIL WE DECIDE WHAT'S GOING TO BECOME OR WHAT'S GOING

18   TO HAPPEN.

19   **Q.**   WAS IT PAID?

20   **A.**   YES, SIR.

21   **Q.**   AND DID YOU MAKE THE DECISION TO PUT MR. TAYLOR ON

22   ADMINISTRATIVE LEAVE?

23   **A.**   NO, SIR.

24   **Q.**   WERE YOU INVOLVED IN MR. TAYLOR'S PLACEMENT ON

25   ADMINISTRATIVE LEAVE?

05:03 1    **A.**   I BELIEVE I WAS, YES, SIR.

2    **Q.**   WELL, DID YOU TRAVEL TO -- DID YOU GO TO HIS HOUSE TO

3    OBTAIN THE ITEMS THAT HE HAD FROM WORK?

4    **A.**   YES, SIR.  SO AFTER ADMINISTRATIVE LEAVE WAS DECIDED, I

5    DID DRIVE TO HIS HOUSE TO PICK UP HIS COMPANY MATERIAL.

6    **Q.**   AND WHY WAS IT IMPORTANT TO PICK UP THE COMPANY MATERIAL?

7    **A.**   WE HAVE INFORMATION, COMPUTER SYSTEMS THAT WE DON'T WANT

8    COMPETITORS GETTING.  YOU KNOW, WE HAVE -- HE HAD COMPANY

9    TRUCKS AND COMPANY CREDIT CARDS.  WE DON'T WANT A DISGRUNTLED

10   EMPLOYEE GOING AND SPENDING MONEY ON THEIR STUFF.  IT'S JUST

11   BETTER THAT WE HAVE ALL OF OUR OWN MATERIAL AND PROPERTY WITH

12   US.

13   **Q.**   AND WHY DID YOU HAVE TO GO TO MR. TAYLOR'S HOUSE?

14   **A.**   MR. TAYLOR CALLED IN SICK.

15   **Q.**   SO, YOU KNOW, WHY DIDN'T YOU OBTAIN IT FROM HIM -- SO DOES

16   THAT MEAN YOU COULDN'T DO IT AT WORK?

17   **A.**   YES.  MR. TAYLOR CALLED ME THE NEXT MORNING, SAID THAT DUE

18   TO THE STRESS THAT I HAD PUT HIM UNDER FROM THREATENING TO FIRE

19   HIM, THAT HE COULD NOT COME TO WORK.

20   **Q.**   WAS YOUR INTENT IN GOING TO MR. TAYLOR'S HOUSE TO

21   EMBARRASS HIM?

22   **A.**   NO, SIR.

23   **Q.**   WAS IT YOUR INTENT TO EMASCULATE HIM?

24   **A.**   NO, SIR.

25   **Q.**   WAS IT YOUR INTENT TO UPSET HIM?

05:05 1   A.   NO, SIR.

2   Q.   AND HOW WOULD YOU DESCRIBE MR. TAYLOR'S DEMEANOR DURING

3   THIS, YOU KNOW, TIME YOU'RE AT HIS HOUSE?

4   A.   WE KNOCKED ON THE DOOR.  HE OPENED THE DOOR.  I ASKED HIM

5   IF WE COULD TALK.  HE TOLD US TO COME INSIDE.  I TOLD HIM IT'D

6   BE BETTER IF WE COULD JUST TALK OUT HERE.  HE TOLD US SOMETHING

7   TO THE EXTENT OF ANYTHING YOU SAY TO ME, YOU CAN SAY IN FRONT

8   OF MY WIFE.

9        SO WE WALKED IN.  I JUST BASICALLY TOLD HIM THAT HE

10   WAS BEING PLACED ON ADMINISTRATIVE LEAVE.  HIS WIFE STARTED

11   CRYING.  HE BECAME VERY ERRATIC, QUICK JERKY MOTIONS AROUND THE

12   HOUSE.  I TOLD HIM THAT I HAD TO GET HIS KEYS AND HIS COMPUTER

13   AND HIS CREDIT CARDS, AND IT WAS VERY ERRATIC AND KIND OF

14   INTIMIDATING.

15   Q.   DURING YOUR DISCUSSIONS WITH MR. TAYLOR, DID YOU EVER

16   THREATEN TO FIRE HIM?

17   A.   NO, SIR.

18   Q.   WAS YOUR INTENTION IN COACHING MR. TAYLOR -- WHAT WAS YOUR

19   INTENTION IN COACHING MR. TAYLOR DURING THE TIME YOU SUPERVISED

20   HIM?

21   A.   JUST TO GET THE INFORMATION THAT I NEEDED.  IF THERE WAS

22   -- JUST TO GET THE INFORMATION THAT I NEEDED TO DO MY JOB.

23   Q.   DID YOU WANT MR. TAYLOR TO FAIL?

24   A.   NO, SIR.

25   Q.   DID YOU WANT TO RECOMMEND HIS TERMINATION?

05:06 1   A.   NO, SIR.

2   Q.   AND WHY NOT?

3   A.   HE'D BEEN THERE.  YOU KNOW, HE WAS A PRETTY GOOD TRACK

4   GUY.  I MEAN, HE DID PRETTY GOOD WORK.  THERE WAS NO REASON

5   THAT WE COULDN'T WORK THROUGH WHAT NEEDED TO BE WORKED THROUGH.

6        **MR. WADSWORTH:**  CAN WE TURN TO EXHIBIT J-12, WHAT'S

7   BEEN PREADMITTED, PLEASE, AND SCROLL TO THE TOP.

8   **BY MR. WADSWORTH:**

9   Q.   AND WAS THIS THE PIP PLAN THAT WAS PRESENTED TO MR.

10  TAYLOR?

11  A.   YES, SIR.

12  Q.   AND AS I UNDERSTAND IT, MR. STUART, YOU DRAFTED THAT?

13  A.   YES, SIR.

14  Q.   WOULD YOU SAY THIS WAS A DIFFICULT PIP FOR MR. TAYLOR TO

15  FOLLOW?

16  A.   NO, SIR.

17  Q.   DID ANYTHING IN THIS PIP REQUIRE MR. TAYLOR TO VIOLATE FRA

18  REGULATIONS?

19  A.   NO, SIR.

20  Q.   DID ANYTHING IN THIS PIP PREVENT MR. TAYLOR FROM ISSUING A

21  SLOW ORDER?

22  A.   NO, SIR.

23  Q.   DID ANYTHING IN THIS PIP PREVENT MR. TAYLOR FROM TAKING A

24  TRACK OUT OF SERVICE?

25  A.   NO, SIR.

05:08 1   **Q.**  WERE YOU INVOLVED IN A MEETING IN WHICH THIS PIP WAS

2   COMMUNICATED TO MR. TAYLOR?

3   **A.**  NO, SIR.

4   **Q.**  WERE YOU RESPONSIBLE ULTIMATELY FOR THE DECISION TO

5   TERMINATE MR. TAYLOR'S EMPLOYMENT?

6   **A.**  NO, SIR.

7   **Q.**  DID YOU RECOMMEND THAT UNION PACIFIC DO SO?

8   **A.**  I BELIEVE I DID, YES, SIR.

9   **Q.**  AND WHY WAS THAT?

10   **A.**  HE WAS JUST VERY INSUBORDINATE.  IT WAS -- I HAD A VERY

11   YOUNG MANAGEMENT TEAM.  HE WAS -- I HAD TWO OR THREE MTMS WHO

12   HAD A COUPLE YEARS ON THE RAILROAD.  HE WAS THE SECOND OLDEST,

13   AND I JUST -- IT WAS NOT GOOD LEADERSHIP TO ALLOW SOMEBODY TO

14   GET AWAY WITH SOMEONE BEING INSUBORDINATE REPEATEDLY OVER AND

15   OVER WITHOUT CONSEQUENCES.

16   **Q.**  SO WHAT DO YOU PERCEIVE HAPPENED AFTER ALL THOSE YEARS TO

17   MR. TAYLOR?

18   **A.**  I THINK THAT HE PROBABLY -- JUST MY OPINION IS, HE

19   PROBABLY GOT AWAY WITH A LITTLE BIT AND THEN IT JUST

20   PROGRESSIVELY GOT WORSE OVER THE YEARS.

21   **Q.**  AND WHEN YOU SAY "GOT AWAY WITH A LITTLE BIT," WHAT DO YOU

22   MEAN?

23         **MR. SCHMIDT:**  OBJECTION.  CALLS FOR SPECULATION.

24         **MR. WADSWORTH:**  AND I'M ASKING, YOUR HONOR, FROM HIS

25   PERCEPTION.

05:09   1              **MR. SCHMIDT:**  HIS PERCEPTION FROM BEFORE HE WAS MR.
        2    TAYLOR'S MANAGER.
        3              **THE COURT:**  FROM BEFORE HE WAS A SUPERVISOR,
        4    SUSTAINED.
        5              **MR. WADSWORTH:**  I'LL WITHDRAW THE QUESTION, YOUR
        6    HONOR.  MY APOLOGIES.
        7              **THE COURT:**  SUSTAINED.
        8    **BY MR. WADSWORTH:**
        9    **Q.**   DO YOU THINK IF MR. TAYLOR HAD COMPLIED WITH THE
       10    PERFORMANCE IMPROVEMENT PLAN THAT HE WOULD STILL BE EMPLOYED BY
       11    UNION PACIFIC?
       12    **A.**   YES, SIR.
       13    **Q.**   DID YOU TAKE ANY ACTION AGAINST MR. TAYLOR BECAUSE HE TOOK
       14    ANY TRACKS OUT OF SERVICE?
       15    **A.**   NO, SIR.
       16    **Q.**   WAS MR. TAYLOR THE ONLY MTM WHO REPORTED TO YOU WHO TOOK
       17    TRACKS OUT OF SERVICE?
       18    **A.**   NO, SIR.
       19    **Q.**   WELL, DID YOU RECOMMEND THE TERMINATION OF ANY OTHER MTMS
       20    WHO REPORTED TO YOU AND TOOK TRACKS OUT OF SERVICE?
       21    **A.**   NO, SIR.
       22    **Q.**   DID YOU TAKE ANY ACTION AGAINST MR. TAYLOR BECAUSE HE
       23    ISSUED A SLOW ORDER?
       24    **A.**   NO, SIR.
       25    **Q.**   WELL, WAS MR. TAYLOR THE ONLY MTM WHO REPORTED TO YOU WHO

05:10 1    ISSUED A SLOW ORDER?

2    **A.**    NO, SIR.

3    **Q.**    DID YOU RECOMMEND THE TERMINATION OF ANY OTHER MTM WHO

4    REPORTED TO YOU WHO ISSUED A SLOW ORDER?

5    **A.**    NO, SIR.

6    **Q.**    DID YOU TAKE ANY ACTION AGAINST MR. TAYLOR BECAUSE HE MADE

7    COMPLAINT TO THE FRA?

8    **A.**    NO, SIR.

9    **Q.**    DID YOU KNOW THAT MR. TAYLOR MADE A COMPLAINT TO THE FRA

10    BEFORE UNION PACIFIC TERMINATED HIS EMPLOYMENT?

11    **A.**    NO, SIR, I DID NOT.

12    **Q.**    DID YOU TAKE ANY ACTION AGAINST MR. TAYLOR BECAUSE HE MADE

13    A VALUES LINE COMPLAINT?

14    **A.**    NO, SIR.

15    **Q.**    DID YOU TAKE ANY ACTION AGAINST MR. TAYLOR BECAUSE HE

16    RAISED A SAFETY ISSUE?

17    **A.**    NO, SIR.

18    **Q.**    DID THE FACT THAT MR. TAYLOR TOOK TRACKS OUT OF SERVICE,

19    ISSUED A SLOW ORDER, MADE A COMPLAINT TO THE FRA, MADE A VALUES

20    LINE COMPLAINT, OR RAISE A SAFETY ISSUE PLAY ANY ROLE IN YOUR

21    RECOMMENDATION THAT MR. TAYLOR BE TERMINATED?

22    **A.**    NO, SIR.

23        **MR. WADSWORTH:**  YOUR HONOR, I TENDER THE WITNESS.

24        THANK YOU, MR. STUART.

25        **THE COURT:**  OKAY.  THANK YOU.

05:11   1              THIS IS A GOOD TIME TO TAKE A BREAK FOR THE

       2    EVENING.

       3              SO, LADIES AND GENTLEMEN, I HAVE GOOD NEWS.  I

       4    THINK IT'S GOOD NEWS FOR YOU.  WE'RE GOING TO RECONVENE AT

       5    10:00.  THE LAWYERS AND I ARE GOING TO MEET AT 9:00 TO GET SOME

       6    DOCUMENTS AND THINGS READY SO THAT HOPEFULLY IF THEY ARE ABLE

       7    TO REST TOMORROW, YOU MAY GET THE CASE TOMORROW TO DELIBERATE.

       8    SO IN ORDER TO GET THE CASE READY FOR YOU ALL, WE WILL MEET AT

       9    9:00, SO YOU REPORT AT 10:00, OKAY.

      10              YOU ARE FREE TO GO.  DON'T DISCUSS THE CASE OR

      11    DO ANY RESEARCH.

      12              **(WHEREUPON, THE JURY EXITED THE COURTROOM.)**

      13              **THE COURT:**  OKAY.  BE SEATED FOR A MOMENT.

      14              I THINK WITH GIVEN THE SIZE -- THE NUMBER OF

      15    PEOPLE, I KNOW THAT Y'ALL ARE GOING TO BRING MULTIPLE LAWYERS

      16    -- IT'S PROBABLY BEST THAT WE JUST CONVENE IN THE COURTROOM

      17    TOMORROW MORNING.  SO LET'S CONVENE IN THE COURTROOM.

      18              YOU'VE BEEN GIVEN THE JURY INSTRUCTIONS, TAKE A LOOK

      19    AT THEM AND WE WILL BE READY TO TALK ABOUT THEM TOMORROW, OKAY.

      20              ANYTHING FURTHER?

      21              **MR. SMITH:**  NO, YOUR HONOR.

      22              **MS. SCHOONMAKER:**  NO, YOUR HONOR.

      23              **THE COURT:**  ALL RIGHT.  GOOD.  SEE YOU IN THE

      24    MORNING.

      25              **MR. SMITH:**  THANK YOU VERY MUCH.

05:12  1          THE COURT:  WE ARE IN RECESS.

       2          THE LAW CLERK:  COURT IS NOW IN RECESS.

       3      (WHEREUPON, THE PROCEEDINGS ARE ADJOURNED UNTIL 11/03/21.)

       4                          * * *

       5                        **CERTIFICATE**

       6      I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

       7  UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

       8  CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

       9  THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

      10  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

      11

      12                    _Shannon Thompson_

      13                    SHANNON THOMPSON, CCR

      14                    OFFICIAL COURT REPORTER

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25